UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHAEL F. ELDRIDGE, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>ETHAN ALLEN, INC. )<br>)<br>Defendant. )<br>) | CIVIL ACTION<br>NO. 04-12506-MEL |

### DEFENDANT'S LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS

Pursuant to Local Rule 56.1, Defendant, Ethan Allen, Inc. (now known as "Ethan Allen Retail, Inc.") ("Ethan Allen") or ("the Company"),[1] submits the following statement of material facts as to which it contends there is no genuine issue of material fact for purposes of its Motion for Summary Judgment only. These undisputed material facts establish that Ethan Allen is entitled to summary judgment as to all claims raised by Plaintiff, Michael F. Eldridge.

1. Ethan Allen is an international home furnishings company. In addition to its two sawmills and eleven manufacturing facilities, Ethan Allen has a network of over 300 retail stores around the world.

2. Ethan Allen maintains an Equal Employment Opportunity policy that is applicable to all of its employees. (See Exhibit A at 7.)[2]

3. Ethan Allen also maintains a policy pursuant to the Family and Medical Leave Act ("FMLA") for eligible employees. (See Exhibit A at 34-37.)

---

[1] As of July 1, 2005, Ethan Allen, Inc.'s name changed to Ethan Allen Retail, Inc.

*Plaintiff's Employment with Ethan Allen*

4.  Plaintiff began working for Ethan Allen at its Service Center in Franklin, Massachusetts ("the Franklin Service Center") on or about August 5, 1999. (Exhibit B at 35-36; Exhibit C.)

5.  For the first several years of his employment, Plaintiff reported directly to Dave Pellicciotti, who was then the Warehouse Manager. (Exhibit B at 36-37.) Plaintiff liked Pellicciotti as a manager and respected his opinion. (Id. at 55.)

6.  Most recently, Plaintiff held the position of Warehouse Manager with Ethan Allen. (See Exhibit B at 59-60.) As Warehouse Manager, Plaintiff was generally responsible for overseeing functions related to the proper storage and safe delivery of furniture to Ethan Allen's customers. (See Exhibit D.) In connection with his duties as Warehouse Manager, Complainant was responsible for supervising approximately six to eight Warehouse employees. (Exhibit B at 37-38, 58.) One of Plaintiff's responsibilities as a supervisor was to enforce the rules in Ethan Allen's Employee Handbook. (Id. at 65.)

7.  In December 2002, around the time that he became Warehouse Manager, Plaintiff began reporting directly to Denna Hamilton, the Boston District Manager, and he continued to report to her for the duration of his employment with Ethan Allen. (See Exhibit B at 58-60, 62.) In connection with her responsibilities as Boston District Manager, Hamilton visited the Franklin Service Center from one and one-half days to three days per week in 2003. (Exhibit E at 46-47.)

8.  Plaintiff initially got along well with Hamilton, going so far as to write an e-mail on February 21, 2003 to Hamilton's boss, Sandra Lamenza, that praised Hamilton as follows:

---

[2] Exhibits A - T, cited herein, are attached to the Affidavit of Heather C. Krauss, Esq., which is filed herewith.

"…it is a complete JOY to have Denna Hamilton as our [District Manager]….Thanks for picking out a winner!" (Exhibit B at 62-64; Exhibit F.)

### *Plaintiff's Poor Performance*

9.  In or around July 2001, Pellicciotti contemplated terminating Plaintiff's employment due to his lack of respect and professionalism in questioning an employee about his absence from work. (Exhibit B at 40-45; Exhibit G.) The employee actually resigned because of Plaintiff's conduct towards him. (Exhibit G; Exhibit H.) Pellicciotti also spoke with Plaintiff on other occasions about the need to speak to difficult, unruly employees in a calmer manner. (Exhibit B at 46-47.)

10. On a performance appraisal discussed with Plaintiff on September 17, 2001, Pellicciotti gave Plaintiff a rating of "below expectations" in the categories of effective communication and leadership. (Exhibit B at 49-50; Exhibit H.) Based on this performance appraisal, Pellicciotti placed Plaintiff on an Action Plan that identified ways in which Plaintiff was expected to improve his performance within the next ninety days. (Exhibit B at 52-54; Exhibit H.)

11. During 2003, after Hamilton became his supervisor, Plaintiff exhibited other performance problems as well. Hamilton learned from her conversations with several Warehouse employees that he had leadership problems and "some people issues with the team that he was supervising." (Exhibit E at 50.) For example, he was perceived to play favorites among the Warehouse employees and to distribute workloads unfairly, which led to animosity and arguments among them. (Id. at 50-52.) One Warehouse employee also complained that Plaintiff had a temper and yelled and swore. (Id. at 52.) Other Warehouse employees were frustrated that the Warehouse was disorganized, chaotic, and dirty. (Id. at 52-53, 54-55.)

12. Plaintiff also had problems with chronic tardiness. This led to a frustration expressed by Warehouse employees that Plaintiff was not around in the mornings to distribute work and to give good leadership to the staff. (Exhibit E at 51, 54, 64.) Moreover, as one Warehouse employee pointed out, Plaintiff disciplined other employees when he himself was breaking the rules by being late. (Id. at 54.)

13. Ethan Allen's Employee Handbook states that repeated incidents of absence or lateness will subject an employee to disciplinary action, up to and including discharge. (Exhibit A at 12-13.) Plaintiff signed a form acknowledging that he had received and read the Employee Handbook on his first day of employment, August 5, 1999. (Exhibit B at 68-69; Exhibit I.)

14. Plaintiff has personally disciplined employees for arriving at work late, both at Ethan Allen and with other companies. (Exhibit B at 23, 66.)

15. As a former business owner himself, Plaintiff agrees and understands that it is important for employees to come to work on time, and that it is reasonable for management to expect their employees to arrive at work on time. (Exhibit B at 17-18.) Plaintiff also acknowledges that someone can lack credibility as a leader if he is not following the same rules that they are enforcing. (Id. at 99-100.)

16. Hamilton was also aware of Plaintiff's tardiness because of her personal observations of his late arrivals while she was at the Franklin Service Center, her calls to Eldridge when he was not there because he was late to work, and his failure to meet her at agreed upon times in other locations. (See Exhibit E at 66-67, 71-72.) Hamilton kept track of Plaintiff's tardiness incidents by making notes in her Franklin planner of dates when he was late and then regularly transferring those notes onto printed-out copies of Plaintiff's weekly work schedules. (See id. at 90-92, 94-95; Exhibit J.) The only times that Hamilton documented Plaintiff's

4

y

tardiness incidents were when she personally observed him arriving late, or when he admitted to being late during conversations with her. (See Exhibit E at 163-64.)

17.  Hamilton had multiple coaching conversations with Plaintiff beginning in February or March 2003 regarding his tardiness and the importance of arriving at work on time. (Exhibit E at 59-60, 64-65, 69-70, 90-91.) Plaintiff responded that he knew he had an issue and would work on it. (Id. at 69-70.)

18.  In or around July 2003, Hamilton completed a performance appraisal for Plaintiff. (Exhibit E at 152-53; Exhibit K.) The appraisal included Hamilton's observations regarding Plaintiff's performance from the time period of December 2002 through the end of June 2003. (Exhibit E at 153-54.) Plaintiff received a total of forty-six points on his performance evaluation, which is equivalent to the second-lowest rating of "Needs Improvement." (Exhibit K.) In the evaluation, Hamilton gave Plaintiff the benefit of the doubt by giving him a rating of "meets requirements" in the "Dependability" category. (Exhibit E at 153; Exhibit K.) However, in this same category, she wrote that Plaintiff needed "to be on time for work to set the example for your team." (Exhibit K.) After completing the appraisal, Hamilton submitted it to Ethan Allen's Human Resources Department for review and approval and then signed the appraisal in early September. (Exhibit E at 152-53; Exhibit K.)

19.  Meanwhile, after having had conversations with Plaintiff about his tardiness without any improvement, Hamilton issued a written warning to him in late July 2003. (Exhibit B at 93-95; Exhibit E at 65, 185-91; Exhibit L.) In the written warning, Hamilton noted that Plaintiff had been one hour and fifteen minutes late on July 21, 2003, that he had been late for work on several previous occasions, and that his behavior set a poor example for the employees

5

who reported to him. (Exhibit L.) Plaintiff concedes that it is possible that he was late on the dates listed in the warning. (Exhibit B at 95.)

20. At the meeting where Hamilton gave Plaintiff this written warning, she stressed that he needed to be a leader and set the example for his team of Warehouse staff. (Exhibit E at 65.) She explained that he could not be disciplining people when he himself was not abiding by rules. (Id.) She also reminded him that the Warehouse staff was depending on him for direction and for letting people into the Warehouse in the morning. (Id.) In addition, his absence in the morning contributed to disorganization and chaos in the Warehouse. (Id.)

21. On October 8, 2003, having received approval from the corporate Human Resources Department on Plaintiff's performance appraisal, Hamilton met with Plaintiff to review it. (Exhibit B at 108-09.) When discussing the performance appraisal with Plaintiff, Hamilton explained that although she had given him a rating of "meets requirements" in the "Dependability" category, she had completed the appraisal back in July. (Exhibit E at 179.) She informed him that his performance had become considerably worse since then. (Id.)

22. During that same October 8, 2003 meeting, Hamilton gave Plaintiff final written warnings based on two separate, ongoing problems. (Exhibit B at 108-09.)

23. The first final written warning given to Plaintiff on October 8, 2003 was for his continued tardiness problems. (See Exhibit E at 157-59, 174-79; Exhibit M.) As noted in this final written warning, his tardiness had actually become more frequent after receiving the written warning in late July 2003. (Exhibit M.) He had been ninety minutes late to work on August 29, 2003, one hour late to work on September 2, 2003, one hour late in meeting a co-worker on September 19, 2003, two hours late on October 1, 2003, and forty-five minutes late on October 2, 2003. (Id.) Hamilton also placed Plaintiff on an Action Plan as a means of motivating him to

6

improve his performance to a satisfactory level. (Exhibit E at 176-78; Exhibit M.) Hamilton warned Eldridge that this was a serious matter because it was a final written warning, and that he could be terminated if the tardiness problems continued. (Exhibit E at 176-78.) Indeed, Plaintiff knew that a final warning was serious. (Exhibit B at 95-96.)

24. Plaintiff tried to excuse his tardiness at the October 8, 2003 meeting by claiming that he was taking medication that made him feel groggy and oversleep. (See Exhibit B at 77-80, 100-01; Exhibit E at 83-84, 158-59; Exhibit M.) Hamilton responded by telling Plaintiff that if he had medical issues, he should get a note from his doctor and bring it in to her so that she could work with him. (Exhibit B at 81-82; Exhibit E at 83, 158.) However, Plaintiff never brought in a note from his doctor regarding his medication, nor did he tell his doctor that the medication was making him late for work. (Exhibit B at 82, 101.)

25. The second final written warning given to Plaintiff on October 8, 2003 concerned his repeated failures to check the accuracy of paperwork used in the Warehouse to track transfers of inventory. (Exhibit B at 101-104; Exhibit E at 180-83; Exhibit N.)

26. Despite receiving a final written warning for his repeated tardiness on October 8, 2003 and knowing that his job was in jeopardy, Plaintiff was tardy two more times within the next ten days. (Exhibit B at 82-83, 88; Exhibit E at 92-93.)

27. On Saturday, October 11, 2003, Plaintiff was expected to report to the new Natick store by 8:00 a.m. to meet with Hamilton and some independent contractor drivers. (Exhibit E at 126-29.) Plaintiff did not arrive at the Natick store until 9:20 a.m. – one hour and twenty minutes after his scheduled starting time. (Id. at 127.) (At his deposition, Plaintiff claimed that he arrived at the new Natick store ten minutes late. (Exhibit B at 82-83.))

28.     On Saturday, October 18, 2003, Plaintiff planned to meet Hamilton and another employee at the new Natick store in the morning to personally deliver needed products that were supposed to have been shipped the day before from the Franklin Service Center. (Exhibit E at 119-126.) Plaintiff did not arrive until at least one hour after the time he was expected to arrive. (Compare Exhibit B at 88 (admitting that he was one hour late) with Exhibit E at 122-23 (indicating that he was more than one hour late).) Moreover, when he finally arrived, Plaintiff had his six year-old son in the Company vehicle with him, which is against Ethan Allen's policies. (Exhibit B at 88, 92-93; Exhibit E at 123-24.)

29.     Because Plaintiff had failed to improve his tardiness problems after October 8, 2003, and was late to work twice within ten days after receiving a final warning and being placed on an Action Plan, Hamilton was understandably disappointed. (Exhibit E at 129.)

30.     On the morning of Monday, October, 20, 2003, Hamilton spoke with Charles Farfaglia, Ethan Allen's Vice President of Human Resources, and then with Khusro Elley, who was then the Vice President and Regional Manager, Retail Division, regarding what course of action should be taken. (Exhibit E at 129-31, 60, 140.) They concluded that morning that termination was appropriate because Plaintiff's tardiness had been repeatedly documented and was not improving. (Id. at 130, 60, 140.)

31.     Hamilton wanted to avoid having any conversations with Plaintiff until the end of the day because she knew from her conversations with Farfaglia and Elley that she would be terminating him at that time. (Exhibit E at 140.) Plaintiff noticed Hamilton's silence and thought it was unusual that she walked right past him that day in a hallway without making small talk. (Exhibit B at 122-23.)

8

32. Later that day, Hamilton asked Plaintiff to meet with her in her office at approximately 4:30 p.m., at the end of his shift. (See Exhibit E at 140.) Louann Starr, who was then the Controller for the Boston District, was also present. (See id.; Exhibit B at 123.) Hamilton began the discussion by reminding Plaintiff of their previous conversations regarding his tardiness and performance issues. (Exhibit B at 124.) She reminded him that he had been late for work again on October 11, 2003 and October 18, 2003, and then told him that his employment was terminated. (Id.)

33. Before Hamilton could even finish their discussion, Plaintiff said that he "did not recognize this meeting" and walked out of Hamilton's office. (Exhibit B at 124.) Plaintiff was extremely angry and exclaimed, "the bitch just fired me!" as he left her office. (Id. at 129, 132.)

34. A few seconds later, Hamilton and Starr heard a loud noise, walked out of the office, and saw that a partition to a cubicle had been knocked down, which they believed had been the result of Plaintiff kicking or hitting it. (Exhibit E at 141-43.) Plaintiff returned to the office a few minutes later and said that he had just slipped and banged his knee. (Exhibit O.) (However, Plaintiff testified at his deposition that he simply walked into the partition because tears had welled up in his eyes, and he denies that the partition fell over. (Exhibit B at 129-31.)) Because Plaintiff then yelled something that caused Starr to feel threatened, and she thought that he had kicked down a partition, Starr called the police to escort him out of the building. (Exhibit E at 143-44.)

35. Following Plaintiff's termination, Starr reported to the Company's worker's compensation carrier that it thought Plaintiff had incurred a knee injury as he left his termination meeting. (Exhibit P. See also Exhibit B at 255-56.) Plaintiff talked about this claim with a representative from the carrier after his termination. (Exhibit B at 208.)

36. None of the other managers reporting to Hamilton had the same problems with consistent tardiness as Plaintiff did. (Exhibit E at 96, 101.)

37. On November 7, 2003, Plaintiff wrote an e-mail to Farooq Kathwari, Ethan Allen's Chief Executive Officer and Chairman of the Board, regarding his termination. (Exhibit E at 28; Exhibit O.) Farfaglia and Hamilton also received copies of this e-mail. (Exhibit O.)

## *Plaintiff's Knee Injury*

38. Plaintiff claims that he hurt both of his knees in June or July 2003 while playing basketball outside of work. (Exhibit B at 140.)

39. Plaintiff did not see a doctor about his knees until two to four weeks later. (Exhibit B at 141.) At that time, Plaintiff visited his general practitioner, Dr. Ravzi, who told Plaintiff to rest his knees and prescribed Naprosyn, an anti-inflammatory medicine. (Id. at 142.) Dr. Ravzi did not recommend that Plaintiff stay home from work or reduce his work schedule, however. (Id. at 143.)

40. The first time that Plaintiff told Hamilton about his knees hurting was in June or July 2003. (Exhibit B at 155-56.) He did not ask for any accommodations for his knees at that time. (Id. at 156.)

41. Plaintiff alleges that the next time he spoke to Hamilton about his knees was after he returned from a previously-scheduled vacation to Block Island in mid-August 2003. (Exhibit B at 156-57.) At that time, he purportedly asked Hamilton if he could take another week of vacation. (Id. at 156-59.) Plaintiff did not provide any medical information in support of this request – he alleges that he simply told Hamilton that his knees were hurting and asked if he could use his remaining vacation time. (Id. at 159-60.)

42.     According to Plaintiff, Hamilton allegedly denied this request because there was then a freeze in effect for all employees on using any more vacation days until after the old Natick store closed in late September, and because Plaintiff was too valuable to the Company and the transition to the new Natick store to take time off then. (Exhibit B at 158-59.) Plaintiff claims that he responded to Hamilton by telling her that he could understand her position. (Id. at 159.) When asked at his deposition to elaborate why he could understand, Plaintiff testified that the Warehouse was then shipping out between $300,000 and $500,000 of products, and "No one knew it better than [him] in the building." (Id. at 159-60.) Plaintiff also knew that other Warehouse employees had requested time off around that time and been denied because of the vacation freeze, so he did not think that he was being singled out in any way by being denied the opportunity to use his remaining vacation time then. (Id. at 158-59.)

43.     After he returned from Block Island in August, Plaintiff went to Dr. Ravzi for the second time about his knees. (Exhibit B at 143-44.) At that time, Dr. Ravzi recommended that Plaintiff have an MRI of his knees. (Id. at 144.)

44.     On September 4, 2003, Plaintiff had an MRI on his left knee at South County Hospital in Rhode Island. (Exhibit B at 144-45; Exhibit Q.) The MRI revealed that Plaintiff had a meniscus tear in his left knee, and that he needed arthroscopic surgery to correct it. (Exhibit B at 145-46.)

45.     On September 20, 2003, Plaintiff had an MRI on his right knee. (Exhibit B at 146-47; Exhibit R.) This MRI indicated that Plaintiff also had a torn meniscus on his right knee, which similarly needed arthroscopic surgery to correct it. (Exhibit B at 146-47.) Dr. Ravzi recommended that Plaintiff go to a specialist to perform the surgery, and Plaintiff suggested Dr.

Burns, an orthopedic surgeon who had previously performed surgery on Plaintiff's son. (Exhibit B at 147-48, 198.)

46. In early September 2003, Plaintiff went to see Dr. Burns for the first time about his knees. (Exhibit B at 149.) Dr. Burns reviewed the MRI and confirmed that Plaintiff had a meniscus tear and that he should get it corrected because Plaintiff was in pain. (Id. at 149-50.) Dr. Burns also prescribed Vicodin for Plaintiff's pain. (Id. at 151-52.) Plaintiff claims that he had no idea how much time he was going to need off for this surgery. (Id. at 154-55.)

47. According to Plaintiff, he informed Hamilton in early September that he had had MRIs done for his knees, that he had torn meniscuses, and that he needed to have corrective surgery. (Exhibit B at 160-61.) He claims that he then asked Hamilton when he could take time off to have the surgery. (Id. at 160-61.) When Hamilton allegedly asked him how much time he needed off, he responded that he did not know. (Id. at 162.) Plaintiff claims that Hamilton asked him if he could schedule his surgery after the old Natick store closed at the end of September. (Id. at 160-61.)

48. Plaintiff claims that he next approached Hamilton regarding his knees at the end of September, when he told her that he wanted to schedule the surgery as soon as possible. (Exhibit B at 163.) According to Plaintiff, Hamilton asked him if he could wait until after the new Natick store opened on October 18, 2003. (Id. at 163, 168.) Plaintiff agreed, and he scheduled the surgery for October 23, 2003. (Id. at 163-64.)

49. According to Plaintiff, he subsequently told Hamilton that he had scheduled his surgery for October 23, 2003 and that he was willing to continue working for three more weeks. (Exhibit B at 165.) At that time, he also claims that he provided Hamilton with a note indicating a surgery date of October 23, 2003 and a post-operative appointment scheduled for October 28,

12

2003. (Id. at 164-65, 168-69; Exhibit S.) Hamilton responded that this date was fine. (Exhibit B at 164-65.) Similarly, Plaintiff alleges that the Human Resources personnel with whom Plaintiff spoke about his upcoming surgery assured him that everything regarding his short-term disability coverage and FMLA application was in order and set. (Id. at 153-55, 166-67, 170, 173-74.)

50. Plaintiff had out-patient surgery on his left knee on October 23, 2003. (Exhibit B at 192.) His left knee "felt good" after surgery and did not have any complications or require any treatment following a routine post-operative appointment with Dr. Burns. (Id. at 194; Exhibit S.)

51. Plaintiff had out-patient surgery on his right knee on December 8, 2003. (Exhibit B at 194-95; Exhibit T.) Due to some complications, Plaintiff's right knee was more painful than his left knee after the surgery, and he was unable to walk without pain for approximately six weeks or to climb upstairs without pain for a few months. (Exhibit B at 196, 197.)

52. Plaintiff did not undergo physical therapy for either of his knees before or after his surgeries. (Exhibit B at 193, 197.) His only ongoing treatment following these surgeries was to take pain medication, Vicodin, and his last prescription ran out in late December 2003. (Id. at 197.)

53. Plaintiff never missed any work because of his knee injury. (Exhibit B at 141; Exhibit O.) The only activities that Plaintiff claims were difficult or impossible for him to perform while he was feeling the effects of his knee injury were standing and walking for great lengths of time, which he defines to be half an hour to an hour. (Exhibit B at 191.) Plaintiff also alleges that it was difficult or impossible for him to lift, yet he was able to help deliver a very heavy dresser on his last day of work at Ethan Allen without any injury to his knees. (Id. at 191-92.)

54. The only accommodation requested by Plaintiff from Ethan Allen in connection with his knee injury was for time off of work. (Exhibit B at 174-75.)

55. Plaintiff's knees have not been a problem at all since early 2004, although he no longer plays basketball. (Exhibit B at 198.) As of his March 27, 2006 deposition, his knees felt good. (Id. at 191.)

56. Hamilton has approved numerous FMLA leaves for Ethan Allen employees in the past. (Exhibit E at 32-34.)

*Plaintiff's Back Sprain*

57. Mike Duppelle, the Customer Service Manager at the Franklin Service Center, asked Plaintiff to deliver a two-piece dresser to a customer in Medfield on the morning of Monday, October 20, 2003. (Exhibit B at 113-14.) Plaintiff agreed, and he brought with him a Warehouse employee, Danny Forte, to assist with the delivery. (Id. at 114.) The dresser weighed approximately 200 pounds. (Id. at 192.) While delivering the top piece of the dresser up a set of stairs to the customer's master bedroom, Plaintiff felt a muscle in his lower back pull. (Id. at 115-16.)

58. Plaintiff did not tell Forte that he had pulled his back. (Exhibit B at 118.) Nor did Plaintiff tell Duppelle about it when Plaintiff returned to the Franklin Service Center around noon. (Id. at 118.) Plaintiff did not complete or submit any kind of worker's compensation claim regarding his back injury before he left work on October 20, 2003, either. (Id. at 135.)

59. According to Plaintiff, he walked to his office after speaking with Duppelle. (Exhibit B at 118-19.) As he did so, Plaintiff claims that he passed by Hamilton in an office hallway. (Id. at 119.) Plaintiff alleges that he told Hamilton that he had completed the delivery and that he had hurt his back carrying the dresser upstairs with Forte. (Id. at 119-20.) Plaintiff

alleges that Hamilton did not say anything in response; rather, she walked right past him. (Id. at 120-21.) Plaintiff thought it was unusual that Hamilton walked right past him without making small talk. (Id. at 122-23; Exhibit O.)

60. Hamilton recalls that she saw Plaintiff for the first time that day around 11:00 a.m. or 11:30 a.m. when they passed each other in the hallway, but she denies that Plaintiff ever told her that he had injured himself while making a delivery. (Exhibit E at 138-40.)

61. After leaving work on October 20, 2003, Plaintiff visited Dr. Ravzi regarding his back pain. (Exhibit B at 134-35, 199.) Dr. Ravzi informed Plaintiff that he had sprained his back and advised him to rest for one week. (Id. at 199.) Plaintiff never returned to Dr. Ravzi or any other doctors again regarding the back sprain. (Id. at 199-200.) He has not had any other back problems since leaving Ethan Allen. (Id. at 200.)

Respectfully submitted,

ETHAN ALLEN INC.

/s/: Barry A. Guryan
Barry A. Guryan, BBO # 214920
bguryan@foley.com
Heather C. Krauss, BBO # 644457
hkrauss@foley.com
FOLEY & LARDNER LLP
111 Huntington Avenue
26th Floor
Boston, MA 02199
Tel: (617) 342-4000
Fax: (617) 342-4001

Dated: August 17, 2006

## CERTIFICATE OF SERVICE

I, Barry A. Guryan, hereby certify that on August 17, 2006, a true copy of the foregoing document was served electronically upon counsel for Plaintiff:

Denise A. Chicoine, Esq.
Englander & Chicoine, P.C.
Two Newton Place
Suite 200
Newton, MA 02458-1634

/s/: Barry A. Guryan
Barry A. Guryan