UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHAEL F. ELDRIDGE,<br><br>　　　　*Plaintiff,*<br><br>v.<br><br>ETHAN ALLEN, INC.<br><br>　　　　*Defendant.* | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )　　CIVIL ACTION <br> )　　NO. 04-12506-MEL <br> ) <br> ) |

## DEFENDANT'S MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant, Ethan Allen, Inc. (now known as "Ethan Allen Retail, Inc.") ("Ethan Allen") or ("the Company"),[1] hereby submits the following Memorandum of Law in Support of its Motion for Summary Judgment in the above-captioned matter. As discussed more fully herein, the undisputed facts[2] – for purposes of this Motion only – establish that Ethan Allen is entitled to summary judgment as to all claims asserted by Plaintiff Michael F. Eldridge.

### PRELIMINARY STATEMENT

Plaintiff's original Complaint, filed in November 2004, consisted of five claims against Ethan Allen: (1) violation of the Family and Medical Leave Act ("FMLA"); (2) violation of the Massachusetts Anti-Discrimination Law, Mass. Gen. Laws ch. 151B ("Chapter 151B") on the basis of an alleged handicap; (3) violation of the Massachusetts Worker's Compensation Act, Mass. Gen. Laws ch. 152, §§ 75A and 75B ("WCA"); (4) violation of the Massachusetts Health Benefits Continuation law, Mass. Gen. Laws ch. 175, § 110D; and, (5) violation of the Massachusetts law requiring payment of overtime, Mass. Gen. Laws ch. 151, § 1B.

---

[1] As of July 1, 2005, Ethan Allen, Inc.'s name changed to Ethan Allen Retail, Inc.

Ethan Allen moved to dismiss two claims from the original Complaint. The Court allowed Ethan Allen's motion on April 21, 2005.[3] As a result, there are currently three claims remaining in the case: (1) violation of Chapter 151B; (2) violation of the WCA; and, (3) violation of the FMLA.

Ethan Allen contends that the undisputed facts reveal that there are no genuine issues of material fact and that it is entitled to judgment in its favor as a matter of law on the following grounds: (1) Plaintiff cannot prove a *prima facie* case of handicap discrimination because his knee injury did not constitute a "handicap" within the meaning of Chapter 151B, and he was not qualified to perform the essential functions of his job, with or without a reasonable accommodation; (2) Plaintiff cannot produce sufficient evidence to establish that Ethan Allen's decision to terminate his employment was motivated by a discriminatory animus on the basis of his alleged handicap; (3) Plaintiff cannot establish a claim for retaliatory termination in violation of the WCA because the termination decision was made before he allegedly reported his work-related back sprain; (4) Plaintiff fails to state a claim under § 75B of the WCA; (5) Plaintiff cannot produce sufficient evidence to establish that Ethan Allen's decision to terminate his employment was motivated by a retaliatory animus on the basis of his request for FMLA leave; and (6) Plaintiff cannot establish that Ethan Allen interfered with his FMLA rights. For these reasons, explained more fully herein, Ethan Allen urges this Court to grant its Motion, enter judgment in its favor, and dismiss Plaintiff's Complaint in its entirety.

---

[2] Citations herein are to the Defendant's Statement of Material Undisputed Facts ("SUF"), which is filed herewith.
[3] On May 18, 2005, Plaintiff filed a motion to amend the Complaint by adding four more common law claims including one against a new proposed defendant, Denna Hamilton. Ethan Allen opposed Plaintiff's motion to amend the Complaint on the grounds that none of the proposed new claims would survive a motion to dismiss. Specifically, Ethan Allen argued that all of these claims would be dismissed because they all related to an ERISA

## FACTUAL BACKGROUND

Plaintiff began working for Ethan Allen at its Service Center in Franklin, Massachusetts ("the Franklin Service Center") on or about August 5, 1999. Most recently, Plaintiff held the position of Warehouse Manager with Ethan Allen. As Warehouse Manager, Plaintiff was generally responsible for overseeing functions related to the proper storage and safe delivery of furniture to Ethan Allen's customers. In connection with his duties as Warehouse Manager, Complainant was responsible for supervising approximately six to eight Warehouse employees. One of Plaintiff's responsibilities as a supervisor was to enforce the rules in Ethan Allen's Employee Handbook. (SUF at ¶¶ 4, 6.)

In December 2002, around the time that he became Warehouse Manager, Plaintiff began reporting directly to Denna Hamilton, the Boston District Manager, and he continued to report to her for the duration of his employment with Ethan Allen. (SUF at ¶ 7.)

### *Plaintiff's Poor Performance*

Plaintiff had a history of performance problems at Ethan Allen,[4] which were identified by managers he liked and respected.[5] During 2003, after Hamilton became his supervisor, Plaintiff exhibited other performance problems as well. Hamilton learned from her conversations with

---

plan and were pre-empted by ERISA. Consequently, amending the Complaint to add these claims would be "futile." Following a hearing on this matter, the Court denied Plaintiff's motion on August 23, 2005.

[4] For the first several years of his employment, Plaintiff reported directly to Dave Pellicciotti, who was then the Warehouse Manager. In or around July 2001, Pellicciotti contemplated terminating Plaintiff's employment due to his lack of respect and professionalism in questioning an employee about his absence from work. The employee actually resigned because of Plaintiff's conduct towards him. Pellicciotti also spoke with Plaintiff on other occasions about the need to speak to difficult, unruly employees in a calmer manner. On a performance appraisal discussed with Plaintiff on September 17, 2001, Pellicciotti gave Plaintiff a rating of "below expectations" in the categories of effective communication and leadership. Based on this performance appraisal, Pellicciotti placed Plaintiff on an Action Plan that identified ways in which Plaintiff was expected to improve his performance within the next ninety days. (SUF at ¶¶ 5, 9-10.)

[5] Plaintiff liked Pellicciotti as a manager and respected his opinion. Plaintiff initially got along well with Hamilton, as well, going so far as to write an e-mail on February 21, 2003 to Hamilton's boss, Sandra Lamenza, that praised Hamilton as follows: "...it is a complete JOY to have Denna Hamilton as our [District Manager]....Thanks for picking out a winner!" (SUF at ¶¶ 5, 8.)

several Warehouse employees that he had leadership problems and "some people issues with the team that he was supervising." Plaintiff also had problems with chronic tardiness. This led to a frustration expressed by Warehouse employees that Plaintiff was not around in the mornings to distribute work and to give good leadership to the staff. Moreover, as one Warehouse employee pointed out, Plaintiff disciplined other employees when he himself was breaking the rules by being late. Hamilton had multiple coaching conversations with Plaintiff beginning in February or March 2003 regarding his tardiness and the importance of arriving at work on time. (SUF at ¶¶ 11-12, 17.)

In or around July 2003, Hamilton completed a performance appraisal for Plaintiff. The appraisal included Hamilton's observations regarding Plaintiff's performance from the time period of December 2002 through the end of June 2003. Plaintiff received a total of forty-six points on his performance evaluation, which is equivalent to the second-lowest rating of "Needs Improvement." In the evaluation, Hamilton gave Plaintiff the benefit of the doubt by giving him a rating of "meets requirements" in the "Dependability" category. However, in this same category, she wrote that Plaintiff needed "to be on time for work to set the example for your team." After completing the appraisal, Hamilton submitted it to Ethan Allen's Human Resources Department for review and approval and then signed the appraisal in early September. (SUF at ¶ 18.)

Meanwhile, after having had conversations with Plaintiff about his tardiness without any improvement, Hamilton issued a written warning to him in late July 2003. In the written warning, Hamilton noted that Plaintiff had been one hour and fifteen minutes late on July 21, 2003, that he had been late for work on several previous occasions in June, and that his behavior

4

set a poor example for the employees who reported to him. Plaintiff concedes that it is possible that he was late on the dates listed in the warning. (SUF at ¶ 19.)

At the meeting where Hamilton gave Plaintiff this written warning, she stressed that he needed to be a leader and set the example for his team of Warehouse staff. She explained that he could not be disciplining people when he himself was not abiding by rules. She also reminded him that the Warehouse staff was depending on him for direction and for letting people into the Warehouse in the morning.    In addition, his absence in the morning contributed to disorganization and chaos in the Warehouse. (SUF at ¶ 20.)

On October 8, 2003, having received approval from the corporate Human Resources Department on Plaintiff's performance appraisal, Hamilton met with Plaintiff to review it. When discussing the performance appraisal with Plaintiff, Hamilton explained that although she had given him a rating of "meets requirements" in the "Dependability" category, she had completed the appraisal back in July. She informed him that his performance had become considerably worse since then. (SUF at ¶ 21.)

During that same October 8, 2003 meeting, Hamilton gave Plaintiff final written warnings based on two separate, ongoing problems. The first final written warning given to Plaintiff was for his continued tardiness problems. As noted in this final written warning, his tardiness had actually become *more* frequent after receiving the written warning in late July 2003. He had been ninety minutes late to work on August 29, 2003, one hour late to work on September 2, 2003, one hour late in meeting a co-worker on September 19, 2003, two hours late on October 1, 2003, and forty-five minutes late on October 2, 2003. Hamilton also placed Plaintiff on an Action Plan as a means of motivating him to improve his performance to a satisfactory level. Hamilton warned Eldridge that this was a serious matter because it was a final

5

written warning, and that he could be terminated if the tardiness problems continued. Indeed, Plaintiff knew that a final warning was serious.[6] The second final written warning given to Plaintiff concerned his repeated failures to check the accuracy of paperwork used in the Warehouse to track transfers of inventory. (SUF at ¶¶ 22-23, 25.)

Despite receiving a final written warning for his repeated tardiness on October 8, 2003 and knowing that his job was in jeopardy, Plaintiff was tardy two more times within the next ten days. On Saturday, October 11, 2003, Plaintiff arrived at the new Natick store one hour and twenty minutes after he was expected to report there.[7] On Saturday, October 18, 2003, Plaintiff planned to meet Hamilton and another employee at the new Natick store in the morning to personally deliver needed products that were supposed to have been shipped the day before from the Franklin Service Center, but he did not arrive until at least one hour after the time he was expected to arrive. Moreover, when he finally arrived, Plaintiff had his six year-old son in the Company vehicle with him, which is against Ethan Allen's policies. (SUF at ¶¶ 26-28.)

Because Plaintiff had failed to improve his tardiness problems after October 8, 2003, and was late to work twice within ten days after receiving a final warning and being placed on an Action Plan, Hamilton was understandably disappointed. On the morning of Monday, October, 20, 2003, Hamilton spoke with Charles Farfaglia, Ethan Allen's Vice President of Human Resources, and then with Khusro Elley, who was then the Vice President and Regional Manager, Retail Division, regarding what course of action should be taken. They concluded that morning

---

[6] Plaintiff tried to excuse his tardiness at the October 8, 2003 meeting by claiming that he was taking medication that made him feel groggy and oversleep. Hamilton responded by telling Plaintiff that if he had medical issues, he should get a note from his doctor and bring it in to her so that she could work with him. However, Plaintiff never brought in a note from his doctor regarding his medication, nor did he tell his doctor that the medication was making him late for work. (SUF at ¶ 24.)

[7] At his deposition, Plaintiff did not deny that he was late, he simply disagrees as to how late he was. Plaintiff claimed that he arrived at the new Natick store ten minutes late. (SUF at ¶ 27.)

6

that termination was appropriate because Plaintiff's tardiness had been repeatedly documented and was not improving. (SUF at ¶¶ 29-30.)

Later that day, Hamilton asked Plaintiff to meet with her in her office at approximately 4:30 p.m., at the end of his shift. Louann Starr, the Controller for the Boston District, was also present. Hamilton began the discussion by reminding Plaintiff of their previous conversations regarding his tardiness and performance issues. She reminded him that he had been late for work again on October 11, 2003 and October 18, 2003, and then told him that his employment was terminated. (SUF at ¶ 32.)

Before Hamilton could even finish their discussion, Plaintiff said that he "did not recognize this meeting" and walked out of Hamilton's office. Plaintiff was extremely angry and exclaimed, "the bitch just fired me!" as he left her office. A few seconds later, Hamilton and Starr heard a loud noise, walked out of the office, and saw that a partition to a cubicle had been knocked down, which they believed had been the result of Plaintiff kicking or hitting it. Plaintiff returned to the office a few minutes later and said that he had just slipped and banged his knee.[8] Because Plaintiff then yelled something that caused Starr to feel threatened, and she thought that he had kicked down a partition, Starr called the police to escort him out of the building. (SUF at ¶¶ 33-34.)

### Plaintiff's Knee Injury

Plaintiff claims that he hurt both of his knees in June or July 2003 while playing basketball outside of work, but he did not see a doctor about his knees until two to four weeks later. At that time, Plaintiff visited his general practitioner, Dr. Ravzi, who told Plaintiff to rest

---

[8] Plaintiff testified at his deposition that he simply walked into the partition because tears had welled up in his eyes, and he denies that the partition fell over, which contradicts a November 7, 2003 e-mail that he authored. (SUF at ¶ 34.)

7

his knees and prescribed Naprosyn, an anti-inflammatory medicine.   Dr. Ravzi did not recommend that Plaintiff stay home from work or reduce his work schedule, however. (SUF at ¶¶ 38-39.)

The first time that Plaintiff told Hamilton about his knees hurting was in June or July 2003. He did not ask for any accommodations for his knees at that time. Plaintiff alleges that the next time he spoke to Hamilton about his knees was after he returned from a previously-scheduled vacation to Block Island in mid-August 2003. At that time, he purportedly asked Hamilton if he could take another week of vacation. Plaintiff did not provide any medical information in support of this request -- he alleges that he simply told Hamilton that his knees were hurting and asked if he could use his remaining vacation time. (SUF at ¶¶ 40-41.)

According to Plaintiff, Hamilton allegedly denied his request because there was then a freeze in effect for all employees on using any more vacation days until after the old Natick store closed in late September, and because Plaintiff was too valuable to the Company and the transition to the new Natick store to take time off then. Plaintiff concedes that he responded to Hamilton by telling her that he could understand her position. When asked at his deposition to elaborate why he could understand, Plaintiff testified that the Warehouse was then shipping out between $300,000 and $500,000 of products, and "No one knew it better than [him] in the building." Plaintiff also knew that other Warehouse employees had requested time off around that time and been denied because of the vacation freeze, so he did not think that he was being singled out in any way by being denied the opportunity to use his remaining vacation time then. (SUF at ¶ 42.)

After he returned from Block Island in August, Plaintiff went to Dr. Ravzi for the second time about his knees. At that time, Dr. Ravzi recommended that Plaintiff have an MRI of his

knees. The MRIs revealed that Plaintiff had a torn meniscus in each knee, and that he needed arthroscopic surgery to correct it. (SUF at ¶¶ 43-45.)

According to Plaintiff, he informed Hamilton in early September that he had had MRIs done for his knees, that he had torn meniscuses, and that he needed to have corrective surgery. He claims that he then asked Hamilton when he could take time off to have the surgery. When Hamilton allegedly asked him how much time he needed off, he responded that he did not know. Plaintiff claims that Hamilton asked him if he could schedule his surgery after the old Natick store closed at the end of September. (SUF at ¶ 47.)

Plaintiff claims that he next approached Hamilton regarding his knees at the end of September, when he told her that he wanted to schedule the surgery as soon as possible. According to Plaintiff, Hamilton asked him if he could wait until after the new Natick store opened on October 18, 2003. Plaintiff agreed, and he scheduled the surgery for October 23, 2003. (SUF at ¶ 48.)

According to Plaintiff, he subsequently told Hamilton that he had scheduled his surgery for October 23, 2003 and that he was willing to continue working for three more weeks. At that time, he also claims that he provided Hamilton with a note indicating a surgery date of October 23, 2003 and a post-operative appointment scheduled for October 28, 2003. Hamilton responded that this date was fine. Similarly, Plaintiff alleges that the Human Resources personnel with whom Plaintiff spoke about his upcoming surgery assured him that everything regarding his short-term disability coverage and FMLA application was in order and set.[9] (SUF at ¶ 49.)

---

[9] Plaintiff had out-patient surgery on his left knee on October 23, 2003 and on his right knee on December 8, 2003. His left knee "felt good" after surgery and did not have any complications or require any treatment following a routine post-operative appointment with Dr. Burns. Due to some complications, Plaintiff's right knee was more painful than his left knee after the surgery, and he was unable to walk without pain for approximately six weeks or to climb upstairs without pain for a few months. Plaintiff did not undergo physical therapy for either of his knees

The only activities that Plaintiff claims were difficult or impossible for him to perform while he was feeling the effects of his knee injury were standing and walking for great lengths of time. Plaintiff also alleges that it was difficult or impossible for him to lift, yet, by his own admission, he was able to help deliver a very heavy dresser on his last day of work at Ethan Allen without any injury to his knees. (SUF at ¶ 53.)

### *Plaintiff's Back Sprain*

Mike Duppelle, the Customer Service Manager at the Franklin Service Center, asked Plaintiff to deliver a two-piece dresser to a customer in Medfield on the morning of Monday, October 20, 2003. Plaintiff agreed, and he brought with him a Warehouse employee, Danny Forte, to assist with the delivery. The dresser weighed approximately 200 pounds. While delivering the top piece of the dresser up a set of stairs to the customer's master bedroom, Plaintiff felt a muscle in his lower back pull. (SUF at ¶ 57.)

Plaintiff did not tell Forte that he had pulled his back. Nor did Plaintiff tell Duppelle about it when Plaintiff returned to the Franklin Service Center around noon. Plaintiff did not complete or submit any kind of worker's compensation claim regarding his back injury, either. (SUF at ¶ 58.)

According to Plaintiff, he walked to his office after speaking with Duppelle. As he did so, Plaintiff claims that he passed by Hamilton in an office hallway. Plaintiff alleges that he told

---

before or after his surgeries. His only ongoing treatment following these surgeries was to take pain medication, Vicodin, and his last prescription ran out in late December 2003. Plaintiff's knees have not been a problem at all since early 2004, although he no longer plays basketball. As of his March 27, 2006 deposition, his knees felt good. (SUF at ¶¶ 50-52, 55.)

Hamilton that he had completed the delivery and that he had hurt his back carrying the dresser upstairs with Forte, but that Hamilton said nothing in response.[10]  (SUF at ¶ 59.)

After leaving work on October 20, 2003, Plaintiff visited Dr. Ravzi regarding his back pain.  Dr. Ravzi informed Plaintiff that he had sprained his back and advised him to rest for one week.  Plaintiff never returned to Dr. Ravzi or any other doctors again regarding the back sprain.  He has not had any other back problems since leaving Ethan Allen.  (SUF at ¶ 61.)

## LEGAL ARGUMENT

A.    Summary Judgment Standard.

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Once the moving party has pointed to the absence of evidence supporting the opponent's case, the onus is on the non-moving party to respond by presenting facts that show that there is a genuine issue for trial.  Serrano-Cruz v. DFI Puerto Rico, Inc., 109 F.3d 23, 25 (1st Cir. 1998) (internal quotation omitted) "'Even in employment discrimination cases where elusive concepts such as motive or intent are at issue,' summary judgment is appropriate if the non-moving party rests 'merely upon conclusory allegations, improbable inferences, and unsupported speculation.'"  Benoit v. Technical Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003) (internal citation omitted); Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 33 (1st Cir. 2001) (internal citations omitted).

---

[10] Hamilton recalls that she saw Plaintiff for the first time that day around 11:00 a.m. or 11:30 a.m. when they passed each other in the hallway, but she denies that Plaintiff ever told her that he had injured himself while making a delivery. (SUF at ¶ 60.)

Based on the deposition testimony in this case, it is clear that some the facts relating to Plaintiff's requests for time off and the issue of whether or not he notified Hamilton of a work-related back injury on October 20, 2003 are in dispute. For purposes of this Motion, however, the Court need not resolve these disputes. Even accepting as true Plaintiff's assertions that (1) he requested and was denied an additional week of vacation time in August 2003; (2) Hamilton asked him to postpone his surgery until after the opening of the new Natick store on October 18, 2003; and, (3) he told Hamilton that he had hurt himself during a delivery on October 20, 2003, Ethan Allen is nonetheless entitled to summary judgment on all of Plaintiff's claims.

B.    Ethan Allen Did Not Discriminate Against Plaintiff On the Basis of His Alleged Handicap.

In order to establish a *prima facie* case of discrimination on the basis of handicap in violation of Chapter 151B, Plaintiff must demonstrate that (1) he is handicapped within the meaning of the statute; (2) he is qualified to perform the essential functions of the job with or without a reasonable accommodation; (3) he was terminated or otherwise subjected to an adverse employment action; and, (4) the position he had occupied remained open and the employer sought to fill it. Dartt v. Browning-Ferris Indus., Inc., 427 Mass. 1, 2 (1998). If Plaintiff is unable to establish these elements of a *prima facie* case, then his case must fail. If, however, he is able to establish a *prima facie* case, Ethan Allen may rebut any inference of discrimination by articulating a legitimate, nondiscriminatory reason for its employment decision and producing some credible evidence in support of that reason. See Abramian v. President & Fellows of Harvard College, 432 Mass. 107, 116-17 (2000); Blare v. Husky Injection Molding Sys. Boston, Inc., 419 Mass. 437, 442 (1995). Once Ethan Allen does so, the burden shifts back to Plaintiff to demonstrate, by a preponderance of the evidence, that discriminatory animus was the determinative cause for the adverse employment action. See Lipchitz v. Raytheon Co., 434

12

Mass. 493, 501, 504-05 (2001); Abramian, 432 Mass. at 118 (burden of persuasion remains at all times on the plaintiff to prove unlawful discrimination).

1.      *Plaintiff Cannot Prove A Prima Facie Case of Handicap Discrimination.*

Plaintiff cannot sustain even a *prima facie* case of discrimination on the basis of a handicap because he cannot prove that his knee injury constituted a handicap.    Not all impairments rise to the level of a "handicap" under Chapter 151B. Rather, Chapter 151B defines a "handicapped person" as any person who "(a) [has] a physical or mental impairment which substantially limits one or more major life activities...(b) [has] a record of such impairment; or (c) [is] regarded as having such impairment." Id. at §§ 1(16), (17). Plaintiff's knee injury, a torn meniscus, did not substantially limit him in any major life activities. He worked throughout the duration of his injury without any restrictions, even helping to lift a 200-pound dresser on his last day of work with Ethan Allen without any injury to his knees. (SUF at ¶ 53, 57.)

Moreover, Plaintiff's knee injury was sustained in June or July 2003 and was healed completely after his last surgery in December 2003 – a duration of only approximately six months. It is well-established that a temporary, isolated injury such as the knee injury alleged to have been suffered by Plaintiff is not a "handicap" within the meaning of Chapter 151B. See, e.g., Cormier v. Littlefield, 112 F.Supp.2d 196, 198-99 (D.Mass. 2000) (knee injury, which lasted for approximately seven months, was not a "disability" within the meaning of Chapter 151B or the Americans with Disabilities Act); Hallgren v. Integrated Financial Corp., 42 Mass. App. Ct. 686, 688 (1997) (holding that plaintiff's knee injury was not a handicap within meaning of Chapter 151B).    Indeed, numerous courts have held that an injury requiring arthroscopic surgery, which is *precisely* what Plaintiff had, does not qualify as a disability within the meaning of the federal Americans with Disabilities Act ("ADA") due to its temporary, non-chronic

13

nature.[11]  In short, Plaintiff was not handicapped because of his knee injury, nor did Ethan Allen perceive him to be handicapped.

Furthermore, as detailed herein, Plaintiff was not qualified to perform the essential functions of his job as a Warehouse Manager, with or without a reasonable accommodation, because he was chronically tardy.  Plaintiff never requested any reasonable accommodation for his knee injury that would have allowed him to perform the essential functions of his job.  After all, Ethan Allen is not required to waive or eliminate essential job functions such as regular, predictable, attendance as a reasonable accommodation.  To the extent that Plaintiff's requested accommodation was time off for surgery, Ethan Allen told Plaintiff that he could be excused from work for that purpose.  (SUF at ¶ 49.)  For these reasons, Plaintiff's claim that he was terminated on the basis of a purported handicap should be dismissed.

    2.    *Ethan Allen Has Articulated A Legitimate, Non-Discriminatory Reason for his Termination.*

Assuming for the sake of argument that Plaintiff could establish a *prima facie* case of discrimination on the basis of handicap, Ethan Allen had legitimate, nondiscriminatory reasons for terminating his employment.  The Company's Employee Handbook states that repeated incidents of absence or lateness will subject an employee to disciplinary action, up to and including discharge.  (SUF at ¶ 13.)  Plaintiff not only signed a form acknowledging that he had

---

[11] See, e.g., Hartwell v. Lifetime Doors, Inc., No. Civ. A. 05-2115, 2006 WL 381685 (E.D.Pa., Feb. 16, 2006) (shoulder injury requiring arthroscopic surgery and physical therapy held not to be a disability because it was not permanent or of long-term duration); Hawrych v. Custom Plastics, Inc., No. 98 C 4848, 2000 WL 33121063 (N.D.Ill., June 5, 2000) (employee who suffered a knee injury, underwent arthroscopic surgery, was medically restricted from performing certain types of work at his job for several months, but who was cleared to work without restrictions fourteen months after initial injury had only a temporary injury rather than a disability); Murray v. Sysco Corp., NO. CIVA96CV1073RSP/DHN, 1998 WL 160826 (N.D.N.Y., Apr. 2, 1998) (torn meniscus, requiring outpatient arthroscopic surgery, had only a transitory effect and was not a disability within meaning of ADA); Kelleher v. Solopak Pharm., Inc., No. 96 C 7743, 1997 WL 610779 (N.D.Ill., Sept. 26, 1997) (knee injury resulting in arthroscopic surgery not a disability); Blanton v. Winston Printing Co., 868 F.Supp. 804 (M.D.N.C., Mar. 22, 1994) (knee injury, a torn medial meniscus, held to be a temporary impairment rather than a disability).

received and read the Employee Handbook on his first day of employment, August 5, 1999, but also, one of his responsibilities as a supervisor was to enforce the Handbook. (Id. at ¶ 6, 13.) In fact, Plaintiff has personally disciplined employees for arriving at work late, both at Ethan Allen and with other companies. (Id. at ¶ 14.) Plaintiff agrees and understands that it is important for employees to come to work on time, and that it is reasonable for management to expect their employees to arrive at work on time. (Id. at ¶ 15.) Plaintiff also acknowledges that someone can lack credibility as a leader if he is not following the same rules that they are enforcing. (Id.)

Plaintiff's tardiness had been a concern to Ethan Allen as far back as February or March 2003 – months *before* he injured his knees. (SUF at ¶ 17.) At that time, Hamilton began to counsel Plaintiff about the need to arrive at work on time. Hamilton explained to Plaintiff that arriving at work at his scheduled time was necessary, in part, to set an example for the employees reporting to him and to be credible when enforcing the Company's policies. Unfortunately, informal coaching, a written warning, a final written warning, and an Action Plan proved ineffective. Plaintiff was tardy twice within ten days of receiving a final written warning and being placed on an Action Plan for his repeated tardiness – October 11 and October 18, 2003. Under the circumstances, Ethan Allen's decision to terminate Plaintiff's employment on October 20, 2003 was justified and based on legitimate, non-discriminatory reasons.

3.    *Plaintiff Cannot Establish a Pretext for Discrimination.*

Plaintiff cannot demonstrate that Ethan Allen's articulated reason for terminating his employment is a pretext for unlawful discrimination on the basis of his alleged handicap. One means of establishing that a complainant's discharge was a pretext for discrimination is to demonstrate that similarly situated employees not of the protected class were treated differently. See Matthews v. Ocean Spray Cranberries, Inc., 426 Mass. 122, 129 (1997). Plaintiff has not

15

identified any other employees that suffered from the same performance issues as he did, nor can he. None of the other managers reporting to Hamilton had the same problems with consistent tardiness as Plaintiff did. (SUF at ¶ 36.) Plaintiff's personal belief and unsupported speculation that he was treated differently because of his purported handicap is, in and of itself, insufficient to establish a claim of discrimination. In short, there is an utter lack of objective evidence to support that Plaintiff's alleged handicap was ever a concern for Ethan Allen. There simply was no unlawful discrimination.[12]

C.   Ethan Allen Did Not Violate the Massachusetts Workers' Compensation Act.

1.   *Ethan Allen Did Not Retaliate Against Plaintiff In Violation of WCA.*

In order to assert a claim of retaliation under § 75B of the WCA, Plaintiff must first demonstrate that: (1) he engaged in an activity protected by the WCA; (2) Ethan Allen was aware of the protected activity; (3) Ethan Allen thereafter engaged in an adverse employment action; and, (4) but for his engagement in the protected activity, Ethan Allen would not have taken the adverse employment action. See Benoit, 331 F.3d at 177 n.5. As an initial matter, it is not clear that merely reporting a work-related injury to one's supervisor, without even completing a notice of injury form or offering any independent evidence of an unlawful motive, is sufficient to constitute protected activity under the WCA. See, e.g., Piderit v. Siegal & Sons Investments, Ltd., 55 Mass. App. Ct. 1 (2002), review denied 437 Mass. 1107.

Assuming for the sake of argument that merely reporting a work-related injury to one's supervisor *does* constitute protected activity within the meaning of the WCA, and that Hamilton

---

[12] To the extent that Plaintiff claims that the back sprain that he allegedly sustained on October 20, 2003 while making a furniture delivery rendered him "handicapped" pursuant to Mass. Gen. Laws ch. 152, § 75B(1), his discrimination claim on this basis also merits dismissal. His chronic tardiness made him incapable of performing the essential functions of his job. Furthermore, as discussed more fully in Section II.C1., *infra*, Hamilton was not aware of his back sprain at the time that she made the decision to terminate Plaintiff's employment. Thus, this "handicap" could not have motivated the termination decision.

heard Plaintiff's statement to that effect on October 20, 2003, Plaintiff still cannot prove that he would have been terminated but for his protected activity. A conclusion that Ethan Allen terminated Plaintiff to avoid a worker's compensation claim would be based solely on the fact that he was discharged shortly after sustaining a work-related injury; however, timing alone is insufficient evidence to support a claim of retaliation. See Piderit, 55 Mass. App. Ct. at 5-6.

More importantly, the evidence clearly establishes that Hamilton made the decision to terminate Plaintiff the morning of Monday, October 20, 2003 – *before* she saw Plaintiff and he allegedly reported the back injury. (See SUF at ¶¶ 30-31, 59-60.) Indeed, she avoided conversations with him that day because she knew she would be terminating him at the end of his work day. (SUF at ¶ 31.) Plaintiff noticed Hamilton's silence and thought it was unusual that she walked right past him that day without making small talk. (Id. at ¶¶ 31, 59.) Moreover, Plaintiff stated in a subsequent e-mail that he believed that Hamilton did not say anything because "...she had already made up her mind to terminate [him]." (SUF at ¶ 37.) Thus, Plaintiff's purported back sprain from lifting the armoire could not have played (and did not play) any role in her decision to terminate his employment. See, e.g., Benoit, 331 F.3d at 172, 177 (no retaliation where supervisor made decision to terminate employee without any knowledge of employee's recent work-related injury).

Finally, it should be noted that following Plaintiff's termination, Starr reported to the Company's worker's compensation carrier that it thought Plaintiff had incurred a knee injury as he left his termination meeting. (SUF at ¶ 35.) The fact that Ethan Allen made this worker's compensation claim should militate against an inference of an unlawful retaliatory animus. After all, if Ethan Allen was motivated by a desire to avoid a worker's compensation claim, it would make no sense for it to have made a claim regarding this perceived knee injury.

17

2.    *Ethan Allen Did Not Violate the Provision of the WCA that Imposes a Preference in Hiring.*

The WCA provides that "[a]ny person who has lost a job as a result of an injury compensable under this chapter shall be given preference in hiring by the employer for whom he worked at the time of compensable injury over any persons not at the time of application for reemployment employed by such employer...." Mass. Gen. Laws ch. 152, § 75A. This provision is not a right to be rehired, nor does it require an employer to keep the employee's job open while he is receiving worker's compensation or to maintain his employment benefits. See Nason, Koziol, and Wall, eds., 29 Mass. Practice Series § 16:9 (2002).

Plaintiff has alleged that Ethan Allen violated § 75A of the WCA, but there is no evidence to support that this provision applies to Plaintiff. He did not lose his job because of his sprained back; rather, he was terminated because of his ongoing tardiness. Indeed, the decision to terminate his employment was made before Plaintiff allegedly told Hamilton that he had hurt himself during a furniture delivery. Furthermore, Plaintiff there is not a shred of evidence to suggest that he ever applied for re-employment with Ethan Allen. Thus, Plaintiff fails to state a claim for a violation of Mass. Gen. Laws ch. 152, § 75A, and this claim should be dismissed.

D.    Ethan Allen Did Not Violate Plaintiff's Rights Under the FMLA.

1.    *Plaintiff Cannot Prove A Case of Retaliation Under the FMLA.*

Plaintiff alleges that he was retaliated against because he attempted to exercise his rights under the FMLA, which is also known as an alleged violation of a proscriptive right. Under this type of claim, the standard of proof traditionally used in Title VII discrimination cases is applied. See Colburn v. Parker Hannifin/Nichols Portland Div., 429 F.3d 325, 335 (1st Cir. 2005); Hodgens v. General Dynamics Corp., 144 F.3d 151, 159-60 (1st Cir. 1998). To make out a *prima facie* case, Plaintiff must show that (1) he availed himself of a protected right under the FMLA;

18

(2) he was adversely affected by an employment decision; and, (3) there is a causal connection between the protected activity and the adverse action. See Colburn, 429 F.3d at 336 n.10; Hodgens, 144 F.3d at 160-61.

For purposes of this motion for summary judgment only, Ethan Allen will presume that Plaintiff's knee injury constituted a "serious health condition" and that he can establish a *prima facie* case. However, as stated more fully above, Ethan Allen had legitimate, non-retaliatory reasons for terminating his employment on October 20, 2003. His chronic tardiness had not improved even after informal coaching, a written warning, a final written warning, and an Action Plan. He was late twice within ten days of receiving the final written warning and Action Plan.

Plaintiff cannot prove that Ethan Allen's articulated reason for terminating his employment was a pretext for a retaliatory motive prohibited by the FMLA. While statutes preventing discrimination in the workplace bar retaliation for exercising rights guaranteed by law, they do "not clothe the complainant with immunity for past and present inadequacies, unsatisfactory performance, and uncivil conduct...." Mesnick v. General Elec. Co., 950 F.2d 816, 828-29 (1st Cir. 1991) (ADEA retaliation claim dismissed), cert. denied, 504 U.S. 985 (1992) (internal citation omitted). Here, Hamilton had counseled Plaintiff and given him a written warning regarding his ongoing tardiness well before he notified her of his need for surgery. Plaintiff's request for time off simply was not a shield against any future adverse employment actions or criticisms. Furthermore, Hamilton had approved numerous FMLA leaves for employees in the past, which makes it unlikely that she would deny FMLA leave to Plaintiff. (See SUF at ¶ 56.) There was no retaliation.

2. *Plaintiff Cannot Prove that Ethan Allen Interfered With or Denied his Substantive FMLA Rights.*

19

Plaintiff's Complaint can also be construed to allege that Ethan Allen violated the FMLA by denying him a prescriptive right or entitlement. Plaintiff can establish this type of violation by demonstrating that he was entitled to the benefits of the FMLA and that all of the FMLA's requirements are satisfied. See Colburn, 429 F.3d at 331; Hodgens, 144 F.3d at 159.

Even if Plaintiff could show that he was entitled to take FMLA leave and that he satisfied the FMLA's requirements, he cannot show that he was denied his FMLA rights. *There is no dispute that Hamilton agreed that he could take time off for surgery.* (SUF at ¶ 49.) Hamilton's alleged request that Plaintiff schedule his surgery after the closing of the old Natick store and the grand opening of the new Natick store on October 18, 2003 was not unlawful, either. After all, where, as here, an employee needs FMLA leave for planned medical treatment, the employee must make a reasonable effort, in consultation with the employer, to schedule the treatment so as not to unduly disrupt the employer's operations. See 29 U.S.C. § 2612(e)(2); 29 C.F.R. § 825.302(e). Therefore, even crediting Plaintiff's version of events that Hamilton asked him to schedule his surgery after the opening of the new Natick store, this is precisely the type of situation permitted by the regulations. See, e.g., Krueger v. Speedway Superamerica, LLC, No. Civ. 03-6568 (DSD/JSM), 2005 WL 1475368 (D.Minn., June 22, 2005) (no unlawful interference under the FMLA where plaintiff delayed her surgery by three months because her manager told her at the time of the initial request that it was a bad time for her to take leave and that the store needed a manager). Plaintiff appropriately discussed the timing of his non-emergency surgery and anticipated leave with Hamilton, and she approved his request for time off for this reason just a few weeks later.[13]

---

[13] For similar reasons, Hamilton's alleged denial of Plaintiff's request to take an extra week of vacation in August 2003 cannot be deemed as a violation of the FMLA. This was simply another instance in which Plaintiff was lawfully expected to give notice of a need for medical leave so as not to unduly disrupt Ethan Allen's operations.

## CONCLUSION

For the reasons above, Ethan Allen's Motion for Summary Judgment should be granted and this Court should enter judgment in favor of Ethan Allen on Eldridge's Complaint.

<div style="margin-left: 40%;">

Respectfully submitted,

ETHAN ALLEN INC.

/s/: Barry A. Guryan
Barry A. Guryan, BBO # 214920
bguryan@foley.com
Heather C. Krauss, BBO # 644457
hkrauss@foley.com
FOLEY & LARDNER LLP
111 Huntington Avenue
26th Floor
Boston, MA 02199
Tel: (617) 342-4000
Fax: (617) 342-4001

</div>

Dated: August 17, 2006

## CERTIFICATE OF SERVICE

I, Barry A. Guryan, hereby certify that on August 17, 2006, a true copy of the foregoing document was served electronically upon counsel for Plaintiff:

Denise A. Chicoine, Esq.
Englander & Chicoine, P.C.
Two Newton Place
Suite 200
Newton, MA 02458-1634

<div style="margin-left: 40%;">

/s/: Barry A. Guryan
Barry A. Guryan

</div>

---

See 29 C.F.R. § 825.302. Indeed, Plaintiff testified at his deposition that he understood Hamilton's position because the Warehouse was then shipping out between $300,000 and $500,000 of products, and "No one knew it better than [him] in the building." Plaintiff also knew that other Warehouse employees were requesting time off around that time and were denied because of the vacation freeze, so he did not think that he was being singled out. Furthermore, although Plaintiff purportedly wanted to use this extra time because his knees hurt, he admits that he did not provide any medical documentation in support of this request. There was no indication that this request had been ordered by his doctor or was an emergency. (SUF at ¶¶ 41-42.)

# EXHIBIT A

Westlaw.

Slip Copy
Slip Copy, 2006 WL 381685 (E.D.Pa.)
(Cite as: Slip Copy)

C

Briefs and Other Related Documents

Only the Westlaw citation is currently available.

United States District Court,E.D. Pennsylvania.

Timmy HARTWELL, Plaintiff,

v.

LIFETIME DOORS, INC., Defendant.

**No. Civ.A. 05-2115.**

Feb. 16, 2006.

Kevin Orloski, The Orloski Law Firm, Richard J. Orloski, Orloski, Hinga, Pandaleon & Orloski, Allentown, PA, for Plaintiff.

James K. Mitchell, Farmington Hills, MI, R. Michael Carr, Bethlehem, PA, for Defendant.

Memorandum and Order

YOHN, J.

*1 Plaintiff Timmy Hartwell brings this employment discrimination, hostile work environment, and retaliation case under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII") and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq. Hartwell, an African-American man who suffered an injury to his shoulder, claims that his former employer, defendant Lifetime Doors, Inc., discriminated against him and subjected him to a hostile work environment because of his race and disability and fired him in retaliation for his filing a charge with the Equal Employment Opportunity Commission ("EEOC"). Presently before the court is Lifetime's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). For the reasons set forth below, I will grant Lifetime's motion.

FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff, Timmy Hartwell, is an African-American male. (Pl.'s Statement of Material Facts ¶ 1.) He applied for a job with Lifetime Doors at its Easton plant on May 13, 2003, was hired, and started work as a laborer on May 19, 2003. (Id. at ¶ 2.) Within about a month, he was promoted to Assistant Supervisor. (Id. at ¶ 3.)

Hartwell injured his left shoulder on Friday, August 1, 2003 while lifting and stacking doors. (Id. at ¶ 4.) He returned to work on Monday, August 4, 2003 with a physician's note stating that he could not work on Tuesday or Wednesday of that week because he was scheduled for medical tests. (Id. at ¶ 5.) Lifetime Doors then prepared a workers' compensation accident report on August 15, 2003 (Id. at ¶ 6), and Hartwell was limited to light duty (Hartwell Dep. 84:21-22). Also on August 15, Hartwell was examined at Redi-Care Medical Center and was instructed not to return to work pending further evaluation. (Pl.'s Statement of Material Facts at ¶ 7.)

Hartwell was reevaluated at Redi-Care on August 18, 2003, and the doctor determined that he could return to work on limited duty. (Pl.'s Statement of Material Facts ¶ 8.) Hartwell then returned to work on August 20, 2003, but his supervisor initially would not honor his work restriction. (Id. at ¶ 9.) Accordingly, Hartwell complained to Peter Sarnac, the plant manager; Ernie Keller, the assistant plant manager; and Randy Oswald, the safety supervisor. (Id.) This apparently rectified the problem, because Hartwell has testified that from August 15, 2003 (and for the remainder of his employment at Lifetime) he worked only on light duty. (Hartwell Dep. 51:19-52:3, 70:7.) Nonetheless, on August 21, 2003, Hartwell called Don Hyatt at Lifetime's corporate headquarters and reported that he was suffering from unfair and discriminatory treatment at work. (Pl.'s Statement of Material Facts ¶ 10.)

On August 25, 2003, plaintiff was again examined at Redi-Care, and was referred to Coordinated Health Systems ("CHS"). (Id. at ¶ 11.) On September 2, 2003, CHS completed a Physical Therapy Initial Evaluation, which explained that Hartwell's "signs and symptoms are consistent with that of left shoulder impingement" and noted that the long-term goal was to "return [Hartwell] to prior level of function pain free." (Def.'s Ex. 4 at 15.) During this initial visit the CHS physician extended light-duty restrictions and prescribed physical therapy. (Pl.'s Statement of Material Facts ¶ 12.) Those light-duty restrictions were again extended during subsequent visits on September 10, 2003; September 17, 2003; October 1, 2003; October 23, 2003; and November 20, 2003. (Id.) During this time period two doctors suggested surgery, but Hartwell opted for nonoperative care. (Def.'s Ex. 4 at 16; Hartwell Dep. 158:1-15.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 381685 (E.D.Pa.)
**(Cite as: Slip Copy)**

*2 Eventually, Hartwell did have surgery. On January 28, 2004, Dr. Mark Lazarus conducted a left shoulder arthroscopic repair of Hartwell's superior labrum and biceps tenodesis as well as distal clavicle excision. (Def.'s Ex. 4 at 20.) At a follow-up examination on February 15, 2004, Dr. Lazarus determined that Hartwell should remain out of work for three weeks. (Pl.'s Statement of Material Facts ¶ 14.) On March 1, 2004, Dr. Lazarus released Hartwell to return to work with restrictions. (*Id.* at ¶ 15.) On March 12, 2004, Lifetime Doors offered Hartwell a position with light duties, which Hartwell accepted five days later. (*Id.*)

Plaintiff returned to work on March 17, 2004. (*Id.* at ¶ 16.) On his first day back, he heard his co-worker Randy Oswald say "black people like [Hartwell] make black people look bad." [FN1] (*Id.*; Hartwell Dep. 35:4-7.) On the following day, Hartwell heard Oswald make the same comment, more clearly and loudly. (Pl.'s Statement of Material Facts ¶ 17.) He also heard Oswald use the word "nigger." [FN2] Also on March 17, Peter Sarnac called Hartwell into his office. (*Id.* at ¶ 18.) Sarnac criticized Hartwell for electing to communicate with Sarnac through a lawyer, rather than personally, while he was out from work recovering from surgery. (*Id.*)

> FN1. Hartwell's statement of material facts alleges, without equivocation, that he heard Randy Oswald say "black people like me make black people look bad." (Pl.'s Statement of Material Facts ¶ 16.) However, in Hartwell's deposition testimony, he displayed some uncertainty as to what exactly Oswald said, testifying that Oswald "mumbled" the comment, so that Hartwell "could hear like bits and pieces of the conversation." (Hartwell Dep. 35:4-7.)

> FN2. Hartwell did not allege that Oswald used this epithet while describing this incident in his affidavit or in his statement of material facts. (Hartwell Aff. ¶ 16; Pl.'s Statement of Material Facts ¶ 16.) However, he did make the allegation in his deposition testimony. (Hartwell Dep. 34:15-16.)

Hartwell also reported that upon his return to work he heard a co-worker say that due to his shoulder injury he was no longer big and tough, and that he could be taken out by hitting the shoulder. (*Id.* at ¶ 19.) The situation in which Hartwell heard this statement is unclear, however. In his affidavit and in prior testimony he stated that he overheard Oswald say this to Dennis Furry (Pl.'s Ex. 9 at 14:17-20; Pl.'s Statement of Material Facts ¶ 19); however, in his deposition testimony, Hartwell stated that Furry made this threat to him after the two had an argument (Hartwell Dep. 98:19-22). Nonetheless, it is undisputed that Furry and Hartwell did have a heated argument on either March 23 or 24, which was prompted by Furry's mistaken belief that Hartwell had criticized his work performance to a supervisor. (Hartwell Dep. 96:5-9.) Later that day, Furry apologized to Hartwell (although Hartwell did not accept the apology). (Hartwell Dep. 107:12.) After the argument, Hartwell decided that he felt unsafe at work and told his supervisor, assistant plant manager Ernie Keller, that he was going to leave early. (Hartwell Dep. 101:21-22.)

On Thursday, March 25, 2004, plant manager Sarnac saw Hartwell drive out of the parking lot before quitting time. (Def.'s Statement of Material Facts ¶ 10.) Hartwell does not dispute this.

Also on March 25, Hartwell filed a charge of discrimination with the EEOC, alleging racial and disability discrimination. (Pl's Statement of Material Facts ¶ 20.) Hartwell was not sure when Lifetime Doors would have received notice of the complaint (Hartwell Dep. 138:18-19); Sarnac has testified that he received notice on Monday, March 29, 2004 (Sarnac Aff. ¶ 12).

*3 March 26, 2004 was Hartwell's last day of employment at Lifetime Doors. The circumstances around his separation from employment are in dispute. In Hartwell's version, he arrived to work at about 7:06 a.m., "a couple minutes late." (Pl.'s Statement of Material Facts ¶ 21; Hartwell Dep. 118:1-4). At this time, he was supervising two employees, Ryan Christman and Julio Delgado. (Pl.'s Statement of Material Facts ¶ 22.) He told the two men to work on flipping some doors, which they did until around 8:30. (*Id.* at ¶ 23.) When they finished that project, they took a break. (*Id.*) During the break, Hartwell called his workers' compensation lawyer, but the lawyer did not answer his phone. (*Id.* at ¶ 24.) Then Hartwell called his probation officer, Marie Marth, but she also failed to answer her phone. (*Id.* at ¶ 25.) Then Sarnac came out on the dock and he and Hartwell began to argue. (*Id.* at ¶ 26; Hartwell Dep. 122:8-15.) Sarnac told Hartwell that he was "tired of [Hartwell's] bullshit." (Pl.'s Statement of Material Facts ¶ 26.) Sarnac initially warned Hartwell to go back to work or he would be fired, but then said "no,

as a matter of fact, you're fired." (Hartwell Dep. 123:4-10.) Upon being fired, Hartwell called his probation officer to inform her of this development. (Pl.'s Statement of Material Facts ¶ 28.) Again, he was unable to reach her. (*Id.*) Hartwell then called his lawyer again. (*Id.* at ¶ 29.) At 9:10 a.m., Marth called Hartwell at Lifetime and left a message with a secretary, and Hartwell was notified that he should come to an office to get this message. (*Id.* at ¶ 30.) Hartwell called Marth from Lifetime and told her that he had been fired, and she advised him to leave the premises so that he would not be arrested for trespassing. (*Id.* at ¶ 30-31.) After this conversation, Sarnac handed Hartwell his paycheck for the preceding week and said "you know what I told you." (*Id.* at ¶ 32.) Hartwell then left the building and again called Marth. (*Id.* at 33.) Hartwell's timecard showed that he punched out at 9:27, which, according to Hartwell, was after he had exited the building. (*Id.* at ¶ 37.)

While I must accept Hartwell's version of disputed facts in ruling upon Lifetime's motion for summary judgment, I will briefly recount Sarnac's version of the March 26, 2004 events to highlight the fact that there is a dispute between the parties. Sarnac has testified that his confrontation with Hartwell occurred shortly after 7:00 a.m. (rather than 8:30 a.m.). (Sarnac Aff. ¶ 8.) Sarnac testified that he saw Hartwell on the dock shortly after starting time, and approached him with the intent of confronting him about leaving work early the previous day without permission. (Sarnac Aff. ¶ 8.) As he approached Hartwell, Sarnac heard Hartwell shouting into his phone. (Sarnac Aff. ¶ 8.) Sarnac explained that his conversation with Hartwell was heated and both men raised their voices. (Sarnac Aff. ¶ 9.) Sarnac stated that Hartwell asked multiple times "why don't you fire me?" (Sarnac Aff. ¶ 9.) After Hartwell asked this for the third time, Sarnac said "either go back to work or leave." (Sarnac Aff. ¶ 9.) Then Hartwell went back inside. (Sarnac Aff. ¶ 9.) About two hours later, Hartwell came to Sarnac's office and said "I'm done." (Sarnac Aff. ¶ 10.) Sarnac asked Hartwell if he was quitting, and Hartwell said "no, you fired me." (*Id.*) Sarnac responded "no, I didn't." (*Id.*) Hartwell then asked for and received his paycheck, handed Sarnac his timecard, and left. (*Id.*; Pl.'s Ex. 1 at 47.)

*4 On March 28, 2004, Hartwell filed for unemployment benefits. A Referee conducted a hearing in which Hartwell, Sarnac, Keller, and three others testified. The Referee determined that Hartwell had been fired. (*See* Hartwell Exs. 1-2.)

On April 19, 2004, Hartwell filed a petition to reinstate workers' compensation benefits, claiming that he had been fired from his position. Lifetime Doors opposed Hartwell's petition, arguing that Hartwell had not been fired but had quit. The Workers' Compensation Judge heard the testimony of Hartwell, Sarnac, and eleven other witnesses. Ultimately, the WCJ determined that Hartwell had voluntarily quit his employment. (*See* Def.'s Ex. 1.) Hartwell then appealed, but ended up withdrawing his appeal after he and Lifetime reached a compromise agreement.[FN3]

> FN3. Lifetime argues that the WCJ's decision should bind this court under the doctrine of collateral estoppel. Three requirements must be met before the doctrine of collateral estoppel will apply: "(1) the issue decided in the prior adjudication must be identical to the one presented in the later action, (2) there must be a final judgment on the merits and (3) the party against whom the doctrine is asserted must have been a party or in privity with a party to the prior adjudication and have had a full and fair opportunity to litigate the issue in question in the prior action." *Seborowski v. Pittsburgh Press Co.,* 188 F.3d 163, 169 (3d Cir.1999). Here, as I determined previously in an order dated October 3, 2005, collateral estoppel is not applicable because the WCJ's findings had been appealed and the parties thereafter entered into a compromise agreement involving the payment of a substantial sum of money to the plaintiff in this action while the appeal was still pending. *See Arizona v. California,* 530 U.S. 392, 414, 120 S.Ct. 2304, 147 L.Ed.2d 374 (2000) (" [S]ettlements ordinarily occasion no issue preclusion (sometimes called collateral estoppel), unless it is clear, as it is not here, that the parties intend their agreement to have such an effect.").

On May 25, 2004, Hartwell filed a second charge of discrimination with the EEOC, alleging that he was terminated because of racial and disability discrimination. (Pl.'s Ex. 6.)

On May 4, 2005 Hartwell filed a complaint with this court, alleging that he was fired because of his race and/or disability, that he was harassed due to his race and/or disability, and that he was fired in retaliation

for filing a charge of discrimination with the EEOC. Lifetime then filed a motion for summary judgment, seeking judgment on all counts. As will be explained below, I will grant Lifetime's motion for summary judgment and enter judgment in its favor on all counts.

## LEGAL STANDARD

A court may only grant a motion for summary judgement, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(c). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." Ideal Dairy Farms, Inc. v. John Labatt, Ltd., 90 F.3d 737, 743 (3d Cir.1996) (citation omitted).

When a court evaluates a motion for summary judgment, "[t]he evidence of the non-movant is to be believed." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In addition, "[a]ll justifiable inferences are to be drawn in [the non-movant's] favor." Id. "Summary judgment may not be granted ... if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed." Ideal Dairy, 90 F.3d at 744 (citation omitted). However, "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment." Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n. 12 (3d Cir.1990). The non-movant must show more than "[t]he mere existence of a scintilla of evidence" for elements on which she bears the burden of production. Anderson, 477 U.S. at 252. Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " [FN4] Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted).

> FN4. Federal Rules of Civil Procedure Rule 56(c) provides that summary judgment shall be granted if "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

The Third Circuit has explained that "[i]n order to demonstrate the existence of a genuine issue of material fact, the nonmovant must supply sufficient evidence (not mere allegations) for a reasonable jury to find for the nonmovant." Olson v. General Elec. Astrospace, 101 F.3d 947, 951 (3d Cir.1996) (citing Coolspring Stone Supply, Inc. v. American States Life Ins. Co., 10 F.3d 144, 148 (3d Cir.1993)). Because the "reasonable jury" test is slightly easier to conceptualize than the "genuine issue of material fact" test, the court will use the former throughout the opinion, although the former test is merely another way of articulating the latter and does not change the inquiry in any way. This test applies in considering both whether plaintiff is able to make a prima facie case and whether he is able to carry his ultimate burden. See Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir.1997) (en banc) (in affirming grant of summary judgment for the defendant, stating "the plaintiff must produce evidence that is sufficient to convince a reasonable factfinder to find all of the elements of a prima facie case"); Stanziale v. Jargowsky, 200 F.3d 101, 105 (3d Cir.2000) ("A plaintiff must first produce evidence sufficient to convince a reasonable factfinder as to all of the elements of a prima facie case of discrimination.").

## DISCUSSION

### I. Claims Regarding Race

### A. Racial Discrimination

*5 Hartwell has presented a claim under Title VII [FN5] alleging discriminatory discharge. However, because Hartwell has produced sparse evidence of discrimination and fails to link that evidence, directly or circumstantially, to his discharge, a reasonable jury could not find in his favor on this claim.

> FN5. Title VII provides that "it shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 381685 (E.D.Pa.)
(Cite as: Slip Copy)

Page 5

respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

Courts analyze Title VII claims under either a mixed-motive analysis or a pretext analysis. *See Watson v. Se. Pa. Transp. Auth.*, 207 F.3d 207, 214 (3d Cir.2000). The "mixed-motive" analysis was first described in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). Under this analysis, the plaintiff has the initial burden and must show that the protected trait was a "substantial factor" in the defendant's employment decision. *Fakete v. Aetna, Inc.*, 308 F.3d 335, 338 (3d Cir.2002) (citing *Price Waterhouse*, 490 U.S. at 265-66). After the plaintiff makes this showing, "the burden of persuasion on the issue of causation shifts, and the employer must prove that it would have fired the plaintiff even if it had not considered" the protected trait. *Id.* Initially, based on Justice O'Connor's concurring opinion in *Price Waterhouse*, courts required the plaintiff to produce direct evidence to proceed under the mixed-motive theory. *See id.* However, in *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101-02, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003), the Supreme Court held that in a Title VII discrimination case, the plaintiff need not present direct evidence,[FN6] but "need only present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that 'race, color, religion, sex, or national origin was a motivating factor for any employment practice.' " *Id.* at 101.

FN6. The court notes that the mixed-motive test, originally described by Justice O'Connor in *Price Waterhouse* (whose concurrence the Third Circuit has determined "represents the holding of the fragmented Court in *Price Waterhouse*," *Fakete v. Aetna, Inc.*, 308 F.3d 335, 338 n. 2 (3d Cir.2002)) was designed "as a supplement to the careful framework established by [the Supreme Court's] unanimous decision[ ] in *McDonnell Douglas Corp. v. Green.*"*Price Waterhouse*, 490 U.S. 228, 261, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). In explaining her reasoning for supplementing the *McDonnell Douglas* test, Justice O'Connor emphasized that she did not believe "that the employer is entitled to the same presumption of good faith [as described in *McDonnell Douglas*]

where there is direct evidence that it has placed substantial reliance on factors whose consideration is forbidden by Title VII." *Id.* at 271. Essentially, the mixed-motive test was created to rectify problems of causation; the plaintiff in *Price Waterhouse* "proved that Price Waterhouse 'permitt [ed] stereotypical attitudes towards women to play a significant, *though unquantifiable,* role in its decision not to invite her to become a partner.' " *Id.* at 272 (emphasis added) (quoting *Hopkins v. Price Waterhouse*, 825 F.2d 458, 461 (D.C.Cir.1987)).

Two years after *Price Waterhouse*, Congress adopted the Civil Rights Act of 1991, which "respond[ed] to *Price Waterhouse* by setting forth standards applicable in mixed motive cases in two new statutory provisions." *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 94, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003). The key new provision was 42 U.S.C. § 2000e-2(m), which states "[e]xcept as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." In *Desert Palace*, the Supreme Court held that "direct evidence of discrimination is not required in mixed-motive cases" so that "[i]n order to obtain an instruction under § 2000e-2(m), a plaintiff need only present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that race, color, religion, sex, or national origin was a motivating factor for any employment practice." *Id.* at 101.

Thus, the Civil Rights Act of 1991 and *Desert Palace*, in removing *Price Waterhouse'* s direct evidence requirement, appear to also remove the rationale for the different evidentiary rules in pretext and mixed-motive cases. The court also notes that the language in *Desert Palace* describing the plaintiff's burden in mixed-motive cases (the improper consideration "was a motivating factor for any employment practice") is similar to the language used by the Third Circuit's opinion in *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir.1994), describing the second manner in which a plaintiff can show pretext

Slip Copy
Slip Copy, 2006 WL 381685 (E.D.Pa.)
**(Cite as: Slip Copy)**

(discrimination "was more likely than not a motivating or determinative cause of the employer's action"). Indeed, in *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1113-14 (3d Cir.1997) (en banc), the Third Circuit explained that because a plaintiff failed to show pretext under the second *Fuentes* method, the plaintiff also failed to establish a mixed-motive claim, because both methods required a finding that the protected characteristic was a "determinative factor" in the employment decision. Thus, the court will use similar reasoning in evaluating Hartwell's claims under both mixed-motive and pretext frameworks.

A plaintiff can also show racial discrimination under the pretext theory. The Supreme Court set forth the analytical framework for this theory in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under *McDonnell Douglas*, the plaintiff must first establish a prima facie case of discrimination. *Stanziale v. Jargowsky*, 200 F.3d 101, 105 (3d Cir.2000). If the plaintiff successfully establishes a prima facie case, the burden of production shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the employment decision. *McDonnell Douglas*, 411 U.S. at 802. Once the employer comes forward with a legitimate, nondiscriminatory reason, to survive summary judgment, the plaintiff must demonstrate by a preponderance of the evidence "that the employer's articulated reason was not the actual reason, but rather a pretext for discrimination." *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 644 n. 5 (3d Cir.1998).

It should also be noted that despite the shifting of intermediate evidentiary burdens, the ultimate burden of persuading the trier of fact that the employer acted with discriminatory intent remains on the plaintiff. *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 698 (3d Cir.1995).

*\*6* The court will analyze Hartwell's racial discrimination claims first under the pretext theory and then under the mixed-motive theory.

1. Pretext Theory

a. Step One Prima Facie Case

As described above, in order to survive a defendant's

summary judgment motion under the pretext theory, a "plaintiff must first produce evidence sufficient to convince a reasonable factfinder as to all of the elements of a prima facie case of discrimination." *Stanziale v. Jargowsky*, 200 F.3d 101, 105 (3d Cir.2000). To establish a prima facie case for discriminatory discharge, a plaintiff must show that: (1) he is a member of a protected class, (2) he was qualified for an employment position, (3) he was discharged from that position, (4) " 'under circumstances that give rise to an inference of unlawful discrimination.' " *Waldron v. SL Indus., Inc.*, 56 F.3d 491, 494 (3d Cir.1995) (quoting *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). The "central focus of the prima facie case is always whether the employer is treating 'some people less favorably than others because of their race, color, religion, sex, or national origin.' " *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 798 (3d Cir.2003) (quoting *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 352 (3d Cir.1999)).

The fourth prong is flexible, and thus courts do not employ the same test for every factual situation. "[O]ne prima facie standard cannot apply 'in every respect to differing factual situations.' " *Matczak v. Frankford Candy & Chocolate Co.*, 136 F.3d 933, 940 (3d Cir.1997) (quoting *McDonnell Douglas*, 411 U.S. at 802 n. 13). "[T]he nature of the required showing to establish a prima facie case of disparate treatment by indirect evidence depends on the circumstances of the case." *Marzano v. Computer Science Corp., Inc.*, 91 F.3d 497, 503 (3d Cir.1996) (internal quotations omitted).

Here, there is no dispute that Hartwell, as an African-American, is a member of a protected class. The parties also agree that Hartwell was qualified for his position. Also, although the parties disagree about whether Hartwell was terminated or quit, for purposes of this summary judgment analysis I must accept Hartwell's claim that he was fired. Thus, the only issue is whether Hartwell is able to present sufficient evidence, which, if believed, could convince a reasonable factfinder that he was terminated "under circumstances that give rise to an inference of unlawful discrimination." *Waldron*, 56 F.3d at 494.

First of all, Hartwell does not present any evidence showing that "the position was ultimately filled by a person not of the protected class," which is a common way for plaintiffs to create an inference of discrimination. *Sheridan v. E.I. DuPont de Nemours*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 381685 (E.D.Pa.)
(Cite as: Slip Copy)

& Co., 100 F.3d 1061, 1066 n. 5 (3d Cir.1996) (citing
*Waldron,* 56 F.3d at 494). Indeed, Lifetime Doors has
stated that the position remains open. (Sarnac Aff. ¶
11.) Also, Hartwell has neither argued that he was
treated differently than some similarly-situated white
employee nor offered statistical evidence showing
discriminatory patterns.

*7 Hartwell argues that he can show that his
termination occurred "under circumstances that give
rise to an inference of unlawful discrimination,"
*Waldron,* 56 F.3d at 494, based on the comments of
Oswald and alleged discrepancies in Sarnac's
description of the confrontation that preceded
Hartwell's termination.

Oswald's statements, specifically those saying that
Hartwell made black people look bad and calling
Hartwell a "nigger," although entirely inappropriate
and reprehensible, provide limited support for
Hartwell's claim of discriminatory discharge because
they were mere "stray remarks" made by a non-
decisionmaker. The Third Circuit has explained that
"comments by those individuals outside of the
decisionmaking chain are stray remarks." *Walden v.
Georgia-Pacific Corp.,* 126 F.3d 506, 521 (3d
Cir.1997). Here, the "decisionmaking chain" only
included a single person, Sarnac, the plant manager,
who terminated Hartwell after having an argument
with him. Hartwell has presented no evidence that
Oswald was somehow involved in the decision to
terminate him or that the decision was not made
entirely by Sarnac. Indeed, Hartwell did not report to
Oswald. (Hartwell Dep. 21:23-24.) Oswald was the
safety supervisor at Lifetime, who only instructed
Hartwell on safety issues. (Hartwell Dep. 21:17-24.)
Accordingly, Oswald's statements were stray
remarks, which, although available "to build a
circumstantial case of discrimination," *Abrams v.
Lightolier, Inc.,* 50 F.3d 1204, 1214 (3d Cir.1995),
"standing alone, are inadequate to support an
inference of discrimination." *Walden,* 126 F.3d at
521. Accordingly, Oswald's statements provide
limited support for Hartwell's discriminatory
discharge claim.

Hartwell also attempts to draw inferences from what
he considers to be inconsistencies in Sarnac's
testimony about the March 26, 2004 confrontation.
Hartwell makes much of the fact that Sarnac testified
that he did not have "any real cause to fire"
Hartwell.[FN7] (Pl.'s Ex. 12 at 18:3-4.) However, this
statement is not extraordinary: Sarnac was merely
discussing his state of mind while arguing that he did
*not* fire Hartwell. Hartwell also argues that Sarnac is

lying about Hartwell quitting and that he can
demonstrate this by impeaching Sarnac's testimony
about the time of the confrontation and Sarnac's
testimony that Hartwell handed him his timecard
when he left. Both sides produce evidence tending to
support their accounts of these events.[FN8] Since both
sides have presented evidence, this is a genuine
dispute of material fact, properly evaluated by a
factfinder and not by the court in considering a
motion for summary judgment. Thus, for purposes of
this motion, I must assume (because a reasonable
juror could so find) that Sarnac fired Hartwell and
tried to pretend that Hartwell quit.

> FN7. Under Pennsylvania law, Hartwell was
> an at-will employee so that Sarnac did not
> have to have cause to fire Hartwell; he just
> could not do so based on a discriminatory
> reason. *See Pipkin v. Pa. State Police,* 548
> Pa. 1, 693 A.2d 190, 191 (Pa.1997) (stating
> "as a general rule, Pennsylvania law holds
> that employees are at-will, absent a contract,
> and may be terminated at any time, for any
> reason or for no reason") (internal quotation
> omitted).

> FN8. Hartwell presented the testimony of
> Ryan Christman and phone records.
> Christman, an employee of Lifetime who
> used to report to Hartwell, testified that he
> heard Sarnac fire Hartwell during their
> confrontation. (Pl.'s Ex. 11 at 59:1.) The
> phone records are for a phone registered to
> Tara Miller that Hartwell testified he was
> using on March 26, 2004. (Pl.'s Ex. 14-B.)
> The records show that a call was made to
> Hartwell's probation officer Marth at 9:13
> a.m., during which call, Marth has testified,
> Hartwell said he was outside Lifetime. Thus,
> Hartwell argues, he could not have punched
> out at 9:27 a.m. Hartwell argues that this
> impeaches Sarnac's testimony that Hartwell
> handed Sarnac his timecard when he left.
> The records also show that the first phone
> call made from that phone on March 26
> occurred at 8:35 a.m., which Hartwell
> argues shows that he could not have been
> talking on the phone before 7:30 as Sarnac
> claimed. Lifetime has presented testimony
> from Oswald and alternative phone records.
> Oswald's testimony essentially corroborates
> Sarnac's version of the confrontation. (Pl.'s
> Ex. at 118:22-119:12.) Lifetime's phone
> records are for a phone with the number

610-653-3555, which Hartwell has explained was Lisa Williams's second line and which he sometimes borrowed. (Pl.'s Ex. 12 at 64:4-23; Def.'s Ex. 4 at 26, 27.) The records show that calls were made on March 26 at 7:22 a.m., 7:30 a.m., and 7:36 a.m. to the number 610-570-3477, another phone registered to Lisa Williams, which could have been the phone calls Sarnac observed Hartwell make.

Even assuming that Sarnac has been untruthful in claiming that he did not fire Hartwell, Hartwell fails to establish a prima facie case of discriminatory discharge because he fails to link Sarnac's alleged coverup to discriminatory animus and otherwise only presents stray remarks by another employee to support his claim. This case is similar to *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 798 (3d Cir.2003), where the court found that an individual of Native American heritage, whose co-workers sometimes "called him derogatory nicknames referencing his Native American heritage," failed to establish a prima facie case of discrimination because he did not "establish some causal nexus between his membership in a protected class" and the adverse employment decision. Here, even if Sarnac did cover up the true facts of Hartwell's termination, Hartwell must link that suspicious behavior to racial discrimination. The mere fact that Sarnac was untruthful about firing Hartwell does not show that Sarnac was motivated by racial hostility. For example, Sarnac could have been claiming that Hartwell quit in order to avoid workers' compensation and unemployment compensation issues. (*See* Pl.'s Ex. 12 at 18:1-3, where Sarnac discusses his concern about firing someone who is on workers' compensation.)

*8 In summary, Hartwell presents evidence showing only that Oswald, a non-decisionmaker, made two racist comments, and that Sarnac fired Hartwell and pretended that Hartwell quit. Because Hartwell provides no link, direct or circumstantial, between these acts and his discharge, a reasonable jury could not find that he has presented a prima facie case of disparate treatment.

### b. Step Two—Employer's Legitimate Reason

Even if I were to determine that Hartwell has established a prima facie case, he would still fail to sustain his ultimate burden to prevent summary judgment. As noted above, the second step of the

*McDonnell Douglas* analysis is for the employer to "articulate some legitimate, nondiscriminatory reason" for the employment decision. *McDonnell Douglas*, 411 U.S. at 802. "[T]he employer need only produce admissible evidence which allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 257, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). This is a "relatively light burden." *Fuentes*, 32 F.3d at 763. The current case is unique because rather than offering an alternative explanation for Hartwell's discharge, as normally occurs in the second part of the *McDonnell Douglas* framework, Lifetime has steadfastly maintained that it did not fire Hartwell. Hartwell argues that because Lifetime has claimed that it did not fire him, it cannot articulate a nondiscriminatory reason, which would mean that he would prevail. (Pl.'s Resp. 16-17.) However, the court agrees with the Seventh Circuit's treatment of this factual situation, which concluded that "such a result is obviously not the purpose of the statute nor of the burden-shifting process established in *McDonnell Douglas/Burdine." E.E.O.C. v. Our Lady of Resurrection Med. Ctr.*, 77 F.3d 145, 150 (7th Cir.1996) (citations omitted). Thus, the court stated that the employer had "a right to offer a legitimate, nondiscriminatory reason for its actions regardless of whether [the plaintiff] quit or was fired." *Id.* at 150. Here, Sarnac has explained that he confronted Hartwell about his leaving early the prior day, and that the two got into a heated argument. (Sarnac Aff. ¶¶ 8, 9.) Thus, whether Hartwell quit or was fired, Lifetime would explain that it was a result of an angry confrontation about Hartwell's leaving early the prior day. As the Seventh Circuit articulated the issue, "[e]ven if a factfinder were to determine that [the plaintiff] was fired, [the defendant's] proffered reason for termination would remain unchanged ." *Our Lady of Resurrection Med. Ctr.*, 77 F.3d at 150. Thus, I find that Lifetime's explanation, for purposes of this stage of the proceeding, is a legitimate, nondiscriminatory reason. Accordingly, Lifetime satisfies its burden at the second step.

### c. Step Three—Plaintiff's Demonstration of Pretext

After the employer comes forward with a legitimate, nondiscriminatory reason, in order to survive summary judgment the plaintiff must present evidence "that the employer's articulated reason was not the actual reason, but rather a pretext for discrimination." *Simpson*, 142 F.3d at 644 n. 5. The plaintiff may show pretext and defeat summary

judgment "by submitting evidence from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Stanziale,* 200 F.3d at 105 (citing *Keller v. Orix Credit Alliance, Inc.,* 130 F.3d 1101, 1108 (3d Cir.1997) and *Fuentes v. Perskie,* 32 F.3d 759, 763 (3d Cir.1994)). Here, Hartwell fails to present sufficient evidence for a reasonable jury to find pretext under either of the two methods.

**\*9** Under the first option, a plaintiff can cast sufficient doubt on a defendant's legitimate non-discriminatory reason by showing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence." ' *Fuentes,* 32 F.3d at 765 (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen,* 983 F.2d 509, 531 (3d Cir.1992)). A plaintiff who seeks to prove pretext under *Fuentes'* s first option must also show "not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason." *Keller,* 130 F.3d at 1109. Here, Hartwell presents no evidence, beyond mere speculation, that Sarnac fired him for any reason other than the one that Sarnac has offered. He admits that he and Sarnac had an argument and that their tempers flared. (Hartwell Aff. ¶ 15 .) Further, Hartwell's challenges to Sarnac's account deal with details (such as the time of the confrontation) rather than the essence: Hartwell presents no evidence showing that Sarnac did not come to the dock to confront him about leaving early the previous day or that the argument did not escalate and lead to his termination. As the Third Circuit has explained, "an employer would be entitled to judgment as a matter of law ... if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant ... evidence that no discrimination had occurred." *Goodman v. Pa. Turnpike Comm'n,* 293 F.3d 655, 673 (3d Cir.2002).

In order to successfully challenge an employer's legitimate reason, the plaintiff must somehow explain why its explanation is implausible. For example, in *Brewer v. Quaker State Oil Ref. Corp.,* 72 F.3d 326 (3d Cir.1995), the plaintiff, a salesman, was fired for several reasons related to job performance. However, the employer admitted that sales volume "represents the best simple measure of a salesperson's

performance," and the plaintiff produced evidence showing that he had produced consistently good sales performances for twenty-three years, had received a bonus three months before he was fired, and was the only sales representative in his region who received such a bonus. *Id.* at 332-34. Based on this evidence the court held that a "factfinder could find it implausible that [the employer] would have fired [the plaintiff] for such deficiencies when he was successful in the sole area identified by Quaker State's own performance incentive program-sales." *Id.* at 332. Here, Hartwell has presented no evidence challenging Lifetime's articulated reason, and accordingly no reasonable jury could find pretext under this method.

A plaintiff can also survive summary judgment by establishing evidence that would allow the fact finder to reasonably "believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes,* 32 F.3d at 764. "For example, the plaintiff may show that the employer has previously discriminated against [the plaintiff], that the employer has previously discriminated against other persons within the plaintiff's protected class ..., or that the employer has treated more favorably similarly situated persons not within the protected class." *Simpson,* 142 F.3d at 645 (citing *Fuentes, 32 F.3d at 765).* Again, Hartwell fails to make out the necessary showing under this method. The only evidence of discrimination he points to comes from Oswald, who was not a decision maker. As noted above, "standing alone, [stray remarks] are inadequate to support an inference of discrimination." *Walden,* 126 F.3d at 521. Stray remarks are all that Hartwell has presented. Further, Hartwell has presented no evidence that Lifetime had previously discriminated against other African-Americans or that it has treated non African-Americans more favorably. Consequently, Hartwell cannot survive summary judgment under part two of the *Fuentes* test. Since the court has already concluded that he failed under part one as well, it follows that he cannot defeat summary judgment under the scheme of proof set out in *McDonnell Douglas.*

### 2. Mixed-Motive Theory

**\*10** As noted above, in order to proceed under the mixed-motive theory, Hartwell must "present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that race ... was a motivating factor" in Lifetime's decision to

Slip Copy
Slip Copy, 2006 WL 381685 (E.D.Pa.)
**(Cite as: Slip Copy)**

terminate his employment. *Desert Palace,* 539 U.S. at 101. While Hartwell has presented evidence that an employee of Lifetime made inappropriate racial comments directed toward Hartwell, he has failed to show that his race was a motivating factor in Lifetime's decision.[FN9]

> FN9. As noted in footnote four, this inquiry is similar to that of the second part of the pretext test under *Fuentes.* Just as Hartwell has failed to show that an "invidious discriminatory reason was ... a motivating or determinative cause of the employer's action," *Fuentes,* 32 F.3d at 764, he has failed to show "that race ... was a motivating factor" in Lifetime's decision to terminate his employment, *Desert Palace,* 539 U.S. at 101.

Hartwell has alleged that Oswald made a number of inappropriate statements, including twice saying that he made black people look bad and once referring to him as a "nigger." Additionally, he has alleged that Sarnac fired him but claimed that he quit. However, as noted above, Oswald's comments are merely stray remarks by a non-decisionmaker, and as such "are inadequate to support an inference of discrimination." *Walden,* 126 F.3d at 521. Also, Hartwell has failed to link Sarnac's purported mischaracterization of his exit with racial animus. See *Sarullo v. U.S. Postal Serv.,* 352 F.3d 789, 798 (3d Cir.2003). Hartwell has presented no evidence from which a reasonable jury could conclude that his termination was motivated by racial discrimination, so I find that he cannot defeat summary judgment under the mixed-motive theory.

## B. Hostile Work Environment

In Hartwell's complaint, he alleged that "Beginning about March 17, 2004, Defendant's agents, servants and employees subjected Plaintiff to a patter[n] of invidious discrimination due to his race, color or national origin." (Compl. ¶ 27.) This statement seems to charge that he was subjected to a racially hostile work environment; while it lacks the word "harassment" that is included in his disability-based hostile work environment claim, an allegation of a "pattern of discrimination" properly charges the first two elements of the claim. Also, Hartwell alleged that he was harassed due to his race in his initial EEOC charge. However, Lifetime alleged in its motion for summary judgment that Hartwell did not present a claim of race-based hostile work

environment, and Hartwell did not challenge that assertion in his response. He has thus waived the issue. Nonetheless, to complete the record, I will construe this section as a claim of race-based hostile work environment that purportedly began on March 17, 2004. However, I will conclude that Lifetime's alternative argument that Hartwell has failed to proffer sufficient evidence for a reasonable jury to find that he suffered from severe or pervasive discrimination is correct, and will therefore grant Lifetime's motion for summary judgment on the issue.

To prevail on a Title VII claim sounding in the creation of a racially hostile working environment, a litigant must establish that " '(1) he suffered intentional discrimination because of his [race]; (2) the discrimination was pervasive and regular; [FN10] (3) it detrimentally affected him; (4) it would have detrimentally affected a reasonable person of the same protected class in his position; and (5) there is a basis for vicarious liability." ' *Caver v. City of Trenton,* 420 F.3d 243, 262 (3d Cir.2005) (quoting *Cardenas v. Massey,* 269 F.3d 251, 260 (3d Cir.2001)).

> FN10. While the Third Circuit has at times stated that in order to make out a hostile work environment claim the plaintiff must show that the discriminatory harassment was "pervasive and regular," the court in *Jensen v. Potter,* No. 04-4078, 2006 WL 224002, at *3 n. 3 (3d Cir. Jan.31, 2006), emphasized that the correct standard is "severe *or* pervasive." Accordingly, and despite the quotation above, in ruling on Hartwell's claims the court will use the "severe or pervasive" standard.

**\*11** The Supreme Court has explained that "offhand comments, and isolated incidents (unless extremely serious)" are not sufficient to sustain a hostile work environment claim. *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Rather, the plaintiff must demonstrate that he suffered from extreme conduct that effectively changed "the terms and conditions of employment." *Id.*

In determining whether the conduct at issue is sufficiently extreme, it is necessary to consider the "totality of the circumstances." *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1482 (3d Cir.1990). As such, a hostile work environment analysis "must

Slip Copy
Slip Copy, 2006 WL 381685 (E.D.Pa.)
(Cite as: Slip Copy)

concentrate not on individual incidents, but on the overall scenario." *Id.* at 1484. Factors which may demonstrate a hostile work environment include: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

Here, Hartwell's hostile work environment claim fails because he has presented very limited evidence describing racial harassment. Hartwell has alleged that the pattern of discrimination commenced on March 17, 2004; however, he has only described two incidents of explicit racial harassment that occurred between March 17, 2004 and his last day of work, March 26, 2004. Both incidents involved Randy Oswald, during which Oswald allegedly said "black people like [Hartwell] make black people look bad," and used the word "nigger." (Hartwell Aff. ¶¶ 16-17.) Besides the incidents directly involving race, Hartwell has complained of Oswald's [FN11] remark that he could easily "take [Hartwell] out" by hitting his shoulder. (Hartwell Aff. ¶ 19.) The first two incidents (one of which Hartwell may not have heard clearly, *see supra* note 1) certainly constitute racial harassment. At least on its face, Oswald's statement that he could easily harm Hartwell was unrelated to race. *See Walton v. Mental Health Ass'n of Se. Pa.*, 168 F.3d 661, 667 (3d Cir.1999) (noting "[t]he fact that [defendant's] behavior toward [plaintiff] may have been offensive does not indicate that it was based on [plaintiff's] race)." Nonetheless, the Third Circuit has recognized that "the advent of more sophisticated and subtle forms of discrimination requires that we analyze the aggregate effect of all evidence and reasonable inferences therefrom, including those concerning incidents of facially neutral mistreatment, in evaluating a hostile work environment claim." *Cardenas v. Massey*, 269 F.3d 251, 262 (3d Cir.2001). Thus, since Hartwell has alleged that Oswald made two other racist comments, I will accept that this third inappropriate statement was also racially motivated.

FN11. This is assuming that Oswald, rather than Furry, made this comment. Hartwell has presented differing accounts.

Even accepting these three incidents, Hartwell has failed to show a sufficient frequency or severity of discriminatory actions from which a reasonable jury could find a hostile work environment. This situation is similar to that of *Page v. City of Pittsburgh*, 114 Fed. Appx. 52, at *2 (3d Cir.2004), where the Third Circuit found that plaintiff had failed to establish the existence of a hostile work environment where her "allegations of discrimination [were] limited to a series of isolated incidents, all occurring in the month of October 1995, interspersed with a melange of complaints having little or nothing to do with race." *See also Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) ("[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment' ") (internal citation omitted); *Kidd v. MBNA America Bank*, 93 Fed. Appx. 399, at *3 (3d Cir.2004) (noting that "comments by a single coworker do not establish that discrimination was pervasive and regular"); *Drinkwater v. Union Carbide Corp.*, 904 F.2d 853, 863 (3d Cir.1990) ("Hostile environment harassment claims must demonstrate a continuous period of harassment, and two comments do not create an atmosphere."). Additionally, while the word "nigger" is morally repulsive, when it is used a single time it is not sufficiently severe to show the existence of a hostile work environment. *See King v. City of Philadelphia*, 66 Fed. Appx. 300 (3d Cir.2003) (determining that one racial epithet, one physical push, and one threat to sabotage plaintiff's work record did not demonstrate a pervasive atmosphere of harassment); *Maldonado v. Invensys Bldg. Systems, Inc.*, No. 05-1295, 2005 WL 3179500, at *2 (7th Cir.2005) (stating "a single utterance of an epithet, while offensive, is not sufficient to establish a hostile work environment") (citing *Smith v. Ne. Ill. Univ.*, 388 F.3d 559, 566-67 (7th Cir.2004)); *Singletary v. Mo. Dept. of Corrs.*, 423 F.3d 886, 893 (8th Cir.2005) (explaining that "a plaintiff [must] show more than a few [uses of racial epithets] over a course of years" to make out a claim).

*12 The Third Circuit has found that a plaintiff has successfully shown the existence of a hostile work environment in cases where the plaintiff demonstrated a lengthy pattern of harassment. For example, in *Cardenas v. Massey*, 269 F.3d 251, 262 (3d Cir.2001), the Third Circuit found that a Mexican-American made out a hostile work environment claim by presenting evidence that his employer subjected him to ethnic slurs and comments; asked him in cases of professional disagreements whether he intended to pull out a switchblade; spread word that he was an affirmative-action hire; placed derogatory anonymous messages on the marker board in his cubicle; rounded down his

scores in performance evaluations, while those of non-Hispanics were regularly rounded up; and disproportionately assigned minorities and trainees to his unit. Similarly, in *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1082 (3d Cir.1996), the Third Circuit found that a hostile work environment existed where African-American plaintiffs showed that from 1986 through 1992 co-workers made inherently racist remarks, including referring to them as "another one," "one of them," "that one in there," and "all of you"; other black employees were harassed on a daily basis by other employees, who warned them "don't touch anything," and "don't steal"; plaintiffs were subjected to apparently false accusations of favoritism, incompetence, and were made to do menial jobs; and several employees refused to deal with one plaintiff even in matters where she was directly responsible, and these employees were never reprimanded even though their actions were in direct violation of company policy. Hartwell has alleged far fewer incidents of harassment than the plaintiffs in *Cardenas* and *Aman;* indeed, he has alleged that three incidents occurred in less than two weeks. Thus, I find that as a matter of law Hartwell has presented insufficient evidence from which a reasonable jury could find a hostile work environment.

## II. Disability Claims

### A. Disability Discrimination

Hartwell also alleges that he was discharged from his position due to his alleged disability. However, because plaintiff fails to present sufficient evidence for a reasonable jury to find that he is disabled under the ADA, I will grant defendant's motion for summary judgment on this issue.

Hartwell presents no direct evidence of discrimination based on his alleged disability, and accordingly, the burden-shifting framework of *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), is applicable to his disability discrimination claim.[FN12] *See Shaner v. Synthes (USA)*, 204 F.3d 494, 500 (3d Cir.2000); *Walton v. Mental Health Ass'n of Se. Pa.*, 168 F.3d 661, 667-68 (3d Cir.1999). This framework contains the same three steps described above.

> FN12. The Supreme Court's opinion in *Desert Palace* was based on an interpretation of provisions of the Civil

Rights Act of 1991, and as such only expressly concerns discrimination actions brought under Title VII. The Third Circuit has held that in non-Title VII discrimination cases, a plaintiff still must produce direct evidence to proceed under the mixed-motive theory. *See Glanzman v. Metropolitan Management Corp.*, 391 F.3d 506, 512 n. 3 (3d Cir.2004) (requiring direct evidence in ADEA cases because the Civil Rights Act of 1991 only applies to Title VII cases). Accordingly, a different standard is applicable to Hartwell's disability discrimination than his racial discrimination claims. *See Helfrich v. Lehigh Valley Hosp.*, No. 03-05793, 2005 WL 1715689 (E.D.Pa. July 21, 2005) (providing detailed discussion of issue).

Pursuant to the *McDonnell-Douglas* framework, the court must first determine whether the plaintiff has successfully established a prima facie case of disability discrimination under the ADA. The Third Circuit has held that "[i]n order to establish a prima facie case of disparate treatment under the ADA, a plaintiff must show '(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination." ' *Shaner*, 204 F.3d at 500 (citing *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580 (3d Cir.1998) and *Deane v. Pocono Med. Ctr.*, 142 F.3d 138, 142 (3d Cir.1998)).

**\*13** The ADA defines a qualified individual as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). A person is disabled "within the meaning of the ADA" if he has "[1) ]a physical or mental impairment that substantially limits one or more of the major life activities of such an individual; [2) ]a record of such an impairment; or [3) has been] regarded as having such an impairment." 42 U.S.C. § 12102(2).

The EEOC defines [FN13] "substantially limits" as being "unable to perform a major life activity that the average person in the general population can perform, or significantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity

as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C . F.R. § 1630.2(j)(1)(i-ii). It further defines "major life activities" as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Id.* at § 1630.2(i).

> FN13. Since the statute does not define "substantially limits one or more of the major life activities," the court seeks instruction from the EEOC guidelines, which are entitled to substantial deference. *See Deane v. Pocono Med. Ctr.*, 142 F.3d 138, 143 n. 4 (3d Cir.1998) (en banc) (relying on EEOC guidelines for similar purposes and according them identical deference pursuant to the *Chevron* doctrine).

Thus, in order to establish a prima facie case, Hartwell must first show that he was disabled under the ADA or regarded as disabled by his employer.

### 1. Hartwell's Argument that He Was Disabled

While Hartwell's complaint alleges that he was disabled under the ADA (Pl.'s Compl. ¶ 15), he has failed to allege or provide any evidence that his shoulder injury substantially limits any major life activity, which is required by the ADA. *See* 42 U.S.C. § 12111(8).

Even if Hartwell had argued that his shoulder injury substantially limited his major life activity of working, the claim would still fail. The Supreme Court has held that "[w]hen the major life activity under consideration is that of working, the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 491, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999).

First of all, Hartwell's claim would fail because he only lists the restrictions that a physician has placed on his work and does not identify the class of jobs from which he claims he is disqualified as a result of his impairment. In a case with similar facts, the Third Circuit has explained:
[The plaintiff] argues that the restrictions placed upon his work by Dr. Cohen-that he was only capable of a "medium range of exertion"-limits his ability to

perform "all super heavy and heavy jobs and all medium, light and sedentary positions requiring bilateral grip or repetitive use of the left extremity." This assertion, however, only lists the restrictions that a physician has placed on [the plaintiff's] work; it does not indicate, as stated above, the class of jobs (e.g., meatpacker, pilot, chef) from which he is disqualified as a result of his impairment (and resulting restrictions).... [The plaintiff cannot] avoid judgment as a matter of law simply by pointing to the restrictions that Dr. Cohen placed upon his work.

**\*14** *Marinelli v. City of Erie, Pa.*, 216 F.3d 354, 364 (3d Cir.2000) (internal citation, footnote omitted). Similarly, Hartwell has failed to point out a class of jobs from which he is disqualified, and thus is not disabled under the ADA.

Hartwell's claim must also fail because while his doctor limited him to light work upon his return, "[a]s a matter of law, a 'transient, nonpermanent condition,' *McDonald v. Commonwealth*, 62 F.3d 92, 94-97 (3d Cir.1995), or 'a temporary, non-chronic impairment of short duration,' *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 380 (3d Cir.2002), ... fall short of substantially limiting an individual in a major life activity." *Williams v. Philadelphia Hous. Auth. Police Dept.*, 380 F.3d 751, 765 (3d Cir.2004). Indeed, the EEOC has suggested that "temporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities," and provided the examples of broken limbs and strained joints. EEOC Interpretive Guidance, 29 C.F.R. Pt. 1630, App. § 1630.2(j). While plaintiff's shoulder injury may have been more severe than a broken limb, there is no evidence that it is permanent or of long-term duration. He required surgery on his shoulder, and then underwent physical therapy. By the time of his deposition testimony in September 2005, Hartwell stated that he was able to walk, stand, stoop, climb, sleep, eat, breathe, and care for himself in a normal fashion. (Hartwell Dep. 88:6-19.) He stated that while he still had some aches and pains in his shoulder, he had regained 80% of its function. (Hartwell Dep. 88:4-5.) Thus, while it took some time for him to recover from his surgery, Hartwell has presented insufficient evidence for a reasonable jury to find that he was disabled under the ADA.

### 2. Hartwell's Argument that He Was Regarded as Disabled

The EEOC guidelines define "regarded as having

Slip Copy
Slip Copy, 2006 WL 381685 (E.D.Pa.)
(Cite as: Slip Copy)

Page 14

such an impairment" as having either 1) "a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation" or 2) "a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such an impairment." 29 CFR § 1630.2(1)(1-2). Based on this definition, our Court of Appeals explicitly recognizes two circumstances in which an employer regards an employee as being disabled. The first occurs when an employer makes "an innocent misperception based on nothing more than a simple mistake of fact as to the severity, or even the very existence, of an individual's impairment." _Deane v. Pocono Med. Ctr.,_ 142 F.3d at 144; _see also Taylor v. Pathmark Stores, Inc.,_ 177 F.3d 180 (3d Cir.1999) (holding that an employer's perception of plaintiff's disability could be based on legitimate yet inaccurate medical information and nonetheless subject the employer to liability). The second circumstance occurs when an employer's action is predicated largely on "society's myths, fears, stereotypes, and prejudices with respect to the disabled." _Deane,_ 142 F.3d at 144; _see also School Bd. of Nassau Cty. v. Arline,_ 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987) (holding that simply because an individual suffers from a contagious disease does not automatically justify denying her employment).

*15 Hartwell presents five reasons why he believes that his employer regarded him as suffering from a disability. However, all of these arguments are without merit.

First, Hartwell argues that he was regarded as disabled because the defendant refused to honor his medical restrictions shortly after his work-related injury. (Pl.'s Resp. 20.) Hartwell made this allegation in his affidavit (Hartwell Aff. ¶ 19), but testified during his deposition that he was always assigned to light-duty work after he injured his shoulder in August of 2003 (Hartwell Dep. 84:13-85:3). However, even accepting his affidavit's explanation, this does not show that Lifetime somehow considered his impairment more serious than it actually was. The opposite actually appears to be the case: if Lifetime did not honor Hartwell's restrictions, it must have perceived him as less disabled than he truly was, not more.

Second, Hartwell argues that his supervisors knew that he had complained of discrimination. (Pl.'s Resp. 20.) However, the part of the record that Hartwell cites in support of this claim describes purported racial discrimination, rather than disability

discrimination, and accordingly provides no support for this claim.

Third, Hartwell alleges that his co-workers blamed his injury for his failure to obtain a raise. (Pl.'s Resp. 20.) However, this argument also fails to demonstrate that Hartwell was regarded as disabled. Even if Hartwell's co-workers did believe that they received less money due to his injury, it does not mean that they believed that Hartwell was disabled. These are two entirely different points.

Fourth, Hartwell claims that a supervisor, Lester, complained when he returned to work after surgery. (Pl.'s Resp. 20.) This is second-hand information, testified to by Julio Delgado, one of the men who worked under Hartwell, and as hearsay is not legally admissible to combat a summary judgment motion. _See_ Fed.R.Civ.P. 56(e). Moreover, even if the evidence can be considered, it is altogether too vague to properly make out a regarded as claim. The statement does not explain why Lester complained: it could have been due to any number of problems that he had with Hartwell, and could have been prompted by something as commonplace as a personality conflict. _See Walton,_ 168 F.3d at 667 (noting that "[a] personality conflict doesn't ripen into an ADA claim simply because one of the parties has a disability") (quoting _Uhl v. Zalk Josephs Fabricators, Inc.,_ 121 F.3d 1133, 1137 (7th Cir.1997)). Additionally, like Hartwell's other arguments, this fails to link the purported criticism of Hartwell to the employer's perception of the severity of Hartwell's condition. To reiterate, a regarded as disabled claim is operative when an employee is not actually disabled but the employer believes that he is, and treats him as such.

Finally, Hartwell alleges that his employer regarded him as being disabled because Peter Sarnac expected him to return to work three days after his shoulder surgery. (Pl.'s Resp. 20.) While this does appear to be an inappropriate expectation, it actually tends to show that Sarnac mistakenly regarded Hartwell as less disabled than he truly was, not more.

*16 Thus, Hartwell fails to provide sufficient evidence for a reasonable jury to find that his employer regarded him as disabled. Contrary to cases where plaintiffs successfully showed that their employers regarded them as disabled, Hartwell provides no evidence that Lifetime overestimated his limitations. _See, e.g., Williams v. Philadelphia Hous. Auth. Police Dep't,_ 380 F.3d 751, 767 (3d Cir.2002) (plaintiff regarded as disabled where his employer thought that he was unable to be in the presence of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

firearms, when he actually was just unable to carry a firearm); *Taylor v. Pathmark Stores, Inc.,* 177 F.3d 180, 188 (3d Cir.1999) (plaintiff regarded as disabled when employer erroneously concluded that plaintiff's ankle injury prevented him from performing jobs involving standing, walking, and lifting).

Accordingly, because Hartwell fails to provide sufficient evidence for a reasonable jury to find that he was disabled or that his employer regarded him as disabled, he does not make out a prima facie case of disability discrimination under the ADA. Thus, I will grant Lifetime's motion for summary judgment on this point.

### B. Hostile Work Environment

In his complaint, Hartwell alleges "[i]immediately upon Plaintiff's return from surgery, Defendant's servant, agents and employees began a pattern of invidious discrimination against and harassment directed to Plaintiff solely due to his disability or perceived disability." (Pl.'s Compl. ¶ 13.) However, because plaintiff has failed to provide sufficient evidence for a reasonable jury to conclude that he was disabled and that he was subject to severe or pervasive harassment, I will grant defendant's motion for summary judgment on this claim.

In order to demonstrate a disability-based hostile work environment, Hartwell must show that: (1) Hartwell is a qualified individual with a disability under the ADA; (2) Hartwell was subject to unwelcome harassment; (3) the harassment was based on Hartwell's disability or a request for an accommodation; (4) the harassment was sufficiently severe or pervasive to alter the conditions of Hartwell's employment and to create an abusive working environment; and (5) Lifetime Doors knew or should have known of the harassment and failed to take prompt, effective remedial action. *Walton v. Mental Health Ass'n. of Se. Pa.,* 168 F.3d 661, 666-67 (3d Cir.1999) (assuming, without deciding, that such a cause of action exists).

Here, Hartwell's hostile work environment claim is without merit. First of all, as discussed above, Hartwell has not provided evidence that he was disabled under the ADA, because he has failed to show that his ailment was permanent and because he has failed to allege a class of jobs from which he was disqualified due to his injury. Also, Hartwell has not provided evidence that he was regarded as disabled by his employer. Thus, Hartwell has failed to show

that he is an "individual with a disability under the ADA."

Additionally, Hartwell fails to argue the other elements of hostile work environment in his response. Indeed, he has failed to present evidence that he was harassed so severely or pervasively so as to alter the conditions of his employment. The few incidents that he has described that concern his disability at all appear to be incidental to, rather than based on, his disability. For example, he has stated that some of his co-workers questioned whether he was really injured elsewhere rather than at work. (Hartwell Dep. 55:14-56:11.) While this questioning was "based on" his disability insofar as the disability was a necessary predicate to the questioning, the attack seems more directed at Hartwell's integrity than his injury. Also, Hartwell has stated that Oswald said that he would be easier to harm due to his shoulder injury. This appear to be a general taunt more than harassment based on Hartwell's injury. Nonetheless, even if I determined that Oswald's statement were harassment based on Hartwell's disability, a single incident is insufficient to show a severe or pervasive pattern of discrimination. *See supra* I.B. Thus, even if Hartwell were to be disabled under the ADA, I find that he has failed to produce sufficient evidence for a reasonable jury to find a hostile work environment. Accordingly, I will grant Lifetime's motion for summary judgment on this claim.

### III. Retaliation

*17 Hartwell also alleges that Lifetime terminated his employment in retaliation for his filing a charge of discrimination with the EEOC alleging racial and disability discrimination. (Compl.¶ 41.) Lifetime argues that Hartwell failed to exhaust his administrative remedies and that therefore this charge should be dismissed.

Retaliation claims are subject to the same *McDonnell Douglas* burden-shifting framework as discrimination claims. *Woodson v. Scott Paper Co.,* 109 F.3d 913, 920 (3d Cir.1997). Accordingly, the plaintiff must first establish a prima facie case of retaliation. To establish a prima facie case of retaliation, "a plaintiff must show that: (1) the employee engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with the employee's protected activity; and (3) a causal link exists between the employee's protected activity and the employer's adverse action." *Farrell v.*

*Planters Lifesavers Co., 206 F.3d 271, 279 (3d Cir.2000)*. If a plaintiff establishes the prima facie case, the burden of production shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for its adverse employment action. *Woodson, 109 F.3d at 920*. If the defendant satisfies its burden, then the plaintiff must prove that the proffered reason was merely a pretext and that in actuality, " 'retaliatory animus played a role in the employer's decisionmaking process and that it had a determinative effect on the outcome of that process." ' *Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 188 (3d Cir.2003)* (quoting *Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500 (3d Cir.1997)*).

Here, Hartwell alleges that he engaged in the protected activity of making an EEOC complaint, and that he was fired as a result of that activity. It is undisputed that Hartwell's filing of an EEOC complaint was a protected activity. *See Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d Cir.1997)*.

However, before filing a suit claiming violations of Title VII, a plaintiff must exhaust his administrative remedies by filing a timely discrimination charge with the EEOC. *See Waiters v. Parsons, 729 F.2d 233, 237 (3d Cir.1984)*. The ensuing suit is limited to claims that are within the scope of the original administrative charge. *Antol v. Perry, 82 F.3d 1291, 1295 (3d Cir.1996)*. The Third Circuit has explained that "the parameters of the civil action in the district court are defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination, including new acts which occurred during the pendency of proceedings before the Commission." *Ostapowicz v. Johnson Bronze Co., 541 F.2d 394, 398-99 (3d Cir.1976)* (internal citations omitted). While the Third Circuit has stated that "the scope of [an EEOC] charge should be liberally construed" because "charges are most often drafted by one who is not well versed in the art of legal description," *Hicks v. ABT Assocs. Inc., 572 F.2d 960, 965 (3d Cir.1978)*, there are limits. The Third Circuit has "expressly declined to adopt the per se rule" that "held that all claims of 'retaliation' against a discrimination victim based on the filing of an EEOC complaint are 'ancillary' to the original complaint, and that therefore no further EEOC complaint need be filed." *Robinson v. Dalton, 107 F.3d 1018, 1024 (3d Cir.1997)* (citing *Waiters, 729 F.2d at 237 n. 10*). Here, Hartwell did not explicitly include a retaliation charge in either of his two EEOC complaints. Accordingly, I must determine whether Hartwell's retaliation claims are "reasonably within the scope of the complainant's original charges and if a reasonable investigation by the EEOC would have encompassed the new claims." *Howze v. Jones & Laughlin Steel Corp., 750 F.2d 1208 (3d Cir.1984)*.

*18 Hartwell's second charge of discrimination, which he filed with the EEOC on May 25, 2004, stated "I immediately encountered racial and disability discrimination on my return. I was fired on March 26, 2004, after filing a discrimination charge with the EEOC dated March 25, 2004. My termination was because of my race and my disability." (Pl.'s Ex. 6.) In the section of the form where Hartwell was instructed to check the boxes representing the specific types of unfair treatment that he suffered, he checked the boxes representing race and disability discrimination but not the one labeled "retaliation." (*Id.*) Hartwell certainly could have been more artful in the presentation of his claim: indeed, the EEOC conducted no investigation with respect to any claim of retaliation. (Mitchell Aff. ¶ 10.) Nonetheless, I find that his description of the claim caused retaliation to be reasonably within the scope of the original charges and that a reasonable investigation by the EEOC should have encompassed a retaliation charge. Hartwell's explanation of his claim stated that he was fired a single day after filing a discrimination charge with the EEOC. While he emphasized race and disability discrimination in the next sentence, his sentence tentatively linking the date of his termination to the date of his first EEOC filing should have been sufficient to alert the EEOC to a potential retaliation claim. Further, the court is mindful of the Third Circuit's directive that I liberally construe EEOC charges. *Hicks v. ABT Assocs. Inc., 572 F.2d at 965*. Accordingly, I conclude that Hartwell sufficiently exhausted his administrative remedies regarding this retaliation claim.

However, I conclude that Hartwell has failed to exhaust his administrative remedies with respect to a claim that he was fired in retaliation for his prior complaints to management and corporate headquarters.[FN14] While his second EEOC charge contained sufficient information to alert the EEOC that he may have been discharged in retaliation for filing an EEOC charge, it did not even hint that he had ever complained to his supervisors or corporate headquarters, let alone claim that he may have been retaliated against for doing so. These allegations would have required an investigation of an entirely different nature than the one contemplated by his EEOC filings, and were neither investigated by the EEOC nor "reasonably within the scope of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

complainant's original charges." *Howze v. Jones & Laughlin Steel Corp.,* 750 F.2d 1208 (3d Cir.1984); *see Porchia v. Cohen,* No. 98-3643, 1999 WL 357352 (E.D.Pa. June 04, 1999) (dismissing plaintiff's retaliation claim where plaintiff's EEOC complaint alleged sexual assault and harassment but not retaliation); *Fient v. Pocopson Home,* No. No. 96-5343, 1997 WL 220280 (E.D.Pa. April 29, 1997) (dismissing plaintiff's retaliation claim where plaintiff's EEOC complaint alleged disability discrimination but not retaliation). This case presents different facts than *Waiters,* where the Third Circuit found that the plaintiff's claim of retaliatory discharge was within the scope of her EEOC charge because while the EEOC charge did not allege retaliatory discharge, it did allege different forms of retaliation that occurred before she was fired. 729 F.2d at 238. Here, Hartwell did not allege retaliation in any form. Additionally, Hartwell filed his second EEOC charge *after* he was fired, yet still did not specifically allege retaliation. Thus, he is not now alleging a violation that occurred after his EEOC filing, but one that he simply neglected to include in his filing. Accordingly, because Hartwell's EEOC claims could not have put the organization on notice that he may have been retaliated against for complaining to his supervisors, I conclude that Hartwell failed to exhaust his administrative remedies for such a claim.

> FN14. In his complaint, Hartwell only alleged retaliation based on his filing of an EEOC charge. (Compl.¶ 41.) However, his response to the motion for summary judgment alleges that Lifetime "knew Plaintiff made complaints of racial discrimination prior to the first formal charge of discrimination" and also refers to "Plaintiff's discrimination complaints to corporate headquarters in South Carolina." (Pl.'s Resp. 22-23.)

**\*19** Although Hartwell did properly exhaust his administrative remedies for his claim alleging that he was retaliated against for filing an EEOC complaint, I conclude that this claim is meritless as a matter of law. Hartwell has failed to provide any evidence of the requisite causal link between his protected activity and his discharge. He signed his first EEOC charge on March 25, 2004, just before his employment was terminated on the morning of March 26, 2004. However, the key date here is not the date that Hartwell filed or signed his EEOC charge, but the date that Sarnac or Lifetime received notice of the charge. *See Jalil v. Avdel Corp.,* 873

F.2d 701, 708 (3d Cir.1989) (stating that plaintiff "demonstrated the causal link between the two by the circumstance that the discharge followed rapidly, only two days later, upon [the employer's] receipt of notice of Jalil's EEOC claim."). Sarnac has testified that he first saw the EEOC charge on March 29, 2004, when a copy arrived in the mail at Lifetime. (Sarnac Aff. ¶ 12.) Hartwell has presented no contrary evidence. Thus, Sarnac could not have retaliated against Hartwell for filing an EEOC charge when he did not know that Hartwell had done so. Accordingly, because there is no genuine factual dispute as to whether Lifetime had notice of the EEOC charge before firing Hartwell, Hartwell cannot make out a prima facie case of retaliation and summary judgment is appropriate against Hartwell's retaliation claim.

Thus, I will grant Lifetime's motion for summary judgment and enter judgment in its favor against Hartwell.

An appropriate order follows.

### Order

AND NOW, this _____ day of February, 2006, upon consideration of defendant Lifetime Doors' motion for summary judgment (Doc. No. 17), plaintiff Timmy Hartwell's response, and Lifetime Doors' reply, it is hereby ORDERED that Lifetime Doors' motion for summary judgment is GRANTED and judgment is ENTERED in favor of defendant Lifetime Doors, Inc. and against plaintiff Timmy Hartwell.

E.D.Pa.,2006.
Hartwell v. Lifetime Doors, Inc.
Slip Copy, 2006 WL 381685 (E.D.Pa.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 3723599 (Trial Motion, Memorandum and Affidavit) Plaintiff's Brief in Opposition to Defendant's Motion For Summary Judgment (Nov. 2005) Original Image of this Document (PDF)
• 2005 WL 3135205 (Trial Motion, Memorandum and Affidavit) Memorandum of Law of Defendant in Support of Its Motion for Summary Judgment (Oct. 31, 2005) Original Image of this Document (PDF)
• 2005 WL 1403599 (Trial Pleading) Answer and Affirmative Defenses of Defendant, Lifetime Doors, Inc. (May 27, 2005) Original Image of this Document (PDF)

Slip Copy                                                                                          Page 18
Slip Copy, 2006 WL 381685 (E.D.Pa.)
**(Cite as: Slip Copy)**

• 2:05cv02115 (Docket) (May. 04, 2005)
• 2005 WL 1403598 (Trial Pleading) Complaint
(2005) Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

Westlaw.

Not Reported in F.Supp.2d                                                     Page 1
Not Reported in F.Supp.2d, 2000 WL 33121063 (N.D.Ill.), 18 NDLR P 138
(Cite as: Not Reported in F.Supp.2d)

C

United States District Court, N.D. Illinois, Eastern
Division.
Mykola HAWRYCH, Plaintiff,
v.
CUSTOM PLASTICS, INC., Defendant.
No. 98 C 4848.

June 5, 2000.

Mykola Hawrych, Schaumburg, IL, plaintiff, pro se.
Carmen V. Speranza, Stephen Vincent Speranza,
Peter Anthony Speranza, Speranza and Associates,
Lake Forest, IL, for Custom Plastics Inc, defendant.

*MEMORANDUM OPINION AND ORDER*

GOTTSCHALL, J.
**\*1** Plaintiff Mykola Hawrych has brought suit under
the Americans with Disabilities Act ("ADA"), 42
U.S.C. § 12101, *et seq.*, alleging that his former
employer, Custom Plastics, Inc., discriminated
against him because of a knee injury he suffered on
the job. Because the court finds that Hawrych has
failed to establish that he was disabled for purposes
of the ADA, defendant's motion for summary
judgment is granted.

*Background*

Hawrych worked as a maintenance mechanic for
defendant, helping maintain equipment used to
manufacture plastic parts. On September 26, 1994,
Hawrych injured his knee by bumping it on the metal
frame of a doorway at work. After being referred to a
physician by defendant, Hawrych continued to
perform his work duties for several months. The
orthopedic surgeon consulted by Hawrych, Dr.
Robert Walsh, prescribed physical therapy from
November 1994 through February 1995, then
performed arthroscopic surgery on Hawrych on
February 8, 1995. On May 8, 1995, Hawrych was
allowed by Dr. Walsh to return to work under certain
medical restrictions.

A few months after his surgery, in addition to his
eight-hour work shift, Hawrych engaged in a "work
hardening" program [FN1] at a rehabilitation center for

three hours each day, five days per week. Defendant
paid for this rehabilitation, but still required Hawrych
to work full-time while attending his physical therapy
sessions. Dr. Walsh believed that this schedule was
too much for Hawrych's knee. After several weeks,
defendant's          workers        compensation     adjuster,
Gallagher Bassett Services, decided that it would not
pay for work hardening. Apparently in response, Dr.
Walsh restricted Hawrych from working at all,
asserting that without a work hardening program,
Hawrych would become permanently disabled.[FN2] On
July 18, 1995, Hawrych stopped reporting to work.

> FN1. Under a traditional "work hardening"
> program, the employee goes back to work
> part-time and gradually works up to being
> able to do his original job.

> FN2. The court is unable to discern from the
> parties' submissions whether the workers
> compensation adjuster's refusal to pay
> stemmed from Dr. Walsh's objection to
> Hawrych's full-time work schedule, or
> whether it was made independently. In any
> event, the sequence-or causal relation, if
> any-of these events is irrelevant to the
> disposition of defendant's motion.

Defendant has a work rule providing that
unauthorized absenteeism of three days or more will
be considered a voluntary resignation from the
company. On September 5, 1995, Gallagher Bassett
Services sent a letter to Hawrych and his attorney
instructing Hawrych to return to work immediately.
After discussing the letter with his attorney, Hawrych
decided to stay home.

In October 1995, Gallagher Bassett Services
videotaped Hawrych walking without a limp,
repeatedly getting in and out of a car easily, and
generally    functioning    with    no    apparent
impairment.[FN3] On November 21, 1995, Dr. Walsh
decided-after discussing the matter with Hawrych-
that Hawrych could return to work with no
restrictions. When Hawrych reported for work, he
was informed that he had been terminated for failing
to return to work in September.

> FN3. As discussed below, Hawrych was also

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 33121063 (N.D.Ill.), 18 NDLR P 138
(Cite as: Not Reported in F.Supp.2d)

videotaped two years later-on September 27, 1997-working without impairment for a heating and air-conditioning contractor.

Hawrych filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on July 23, 1996. On November 29, 1996, the EEOC dismissed the charge and issued a right-to-sue letter. After receiving additional information from Hawrych, the EEOC reopened his charge on February 27, 1997. The EEOC dismissed Hawrych's charge again on July 31, 1998. Hawrych filed this lawsuit on August 5, 1998, alleging that he was discharged because of his disability, in violation of the ADA. Specifically, Hawrych alleges that defendant "terminated" his "employment and insurance due to injury sustained on the job which disabled plaintiff." (Compl.¶ 12)

## Analysis

*2 Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of material fact exists, courts must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in that party's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

The ADA prohibits employers from discriminating against a qualified individual with a disability because of that disability. See 42 U.S.C. § 12112(a). To survive a summary judgment motion, Hawrych must first establish that he is a qualified individual with a disability under the statute. Harrington v. Rice Lake Weighing Systems, Inc., 122 F.3d 456, 459 (7th Cir.1997). The ADA defines "disability" in three ways:

(1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(2) a record of such an impairment; or

(3) being regarded as having such an impairment.

42 U.S.C. § 12102(2).

While Hawrych has not expressly identified the definition governing his claim, the court believes that the first definition is the only one potentially applicable.[FN4] Accordingly, the court's analysis will be limited to determining whether Hawrych's knee injury is a physical impairment that substantially limits one of his major life activities.

> FN4. The record contains no indication that Hawrych's knee injury was regarded by defendant as a disability. On the contrary, the evidence suggests that defendant was skeptical that Hawrych's injury warranted the amount of rehabilitation recommended by Dr. Walsh, and demanded that Hawrych work a normal eight-hour shift.

An impairment is any physiological disorder, condition, cosmetic disfigurement, or anatomical loss affecting one of the body's systems, or any mental or psychological disorder. See 29 C.F.R. § 1630.2(h). Major life activities are basic functions such as breathing, hearing, seeing, speaking, walking, working, performing manual tasks and learning. See id. § 1630.2(i). The impairment "substantially limits" a major life activity if the person is "[u]nable to perform a major life activity that the average person in the general population can perform," or is "[s]ignificantly restricted as to the condition, manner or duration under which [the] individual can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." Id . § 1630.2(j)(1). In determining if an impairment is substantially limiting, the court should consider:

(1) The nature and severity of the impairment;

(2) The duration or expected duration of the impairment; and

(3) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

Id. § 1630.2(j)(2).

As the Seventh Circuit has recognized, "The ADA protects an important, but finite, universe of people." Waggoner v. Olin Corp ., 169 F.3d 481, 484 (7th Cir.1999). The ADA does not protect employees "from being fired because of illness," nor does it protect employees "who are unable to perform only a narrow range of jobs." Id. Further, for purposes of the ADA, "[d]isability does not include temporary medical conditions." Id.; see also Talanda v. KFC Nat'l Mgmt. Co., No. 94 C 1668, 1997 WL 160695, at *2 (N.D.Ill. Apr. 2, 1997) (observing that "temporary injuries ... generally are not considered

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 33121063 (N.D.Ill.), 18 NDLR P 138
(Cite as: Not Reported in F.Supp.2d)

Page 3

disabilities under the ADA, particularly when those injuries ... are readily correctable"), *aff'd*, 140 F.3d 1090 (7th Cir.), *cert. denied*, 525 U.S. 869 (1998); *Blue v. R.R. Donnelley & Sons, Inc.*, No. 95 C 5489, 1996 WL 613161, at *2 (N.D.Ill. Oct. 22, 1996) (concluding that "the undisputed facts show that plaintiff's back injury constituted a temporary and transitory physical impairment which is not covered by the ADA"), *rev'd on other grounds*, 114 F.3d 1191 (7th Cir.1997); *Harris v. United Air Lines, Inc.*, 956 F.Supp. 768, 773 (N.D.Ill.1996) ("The injury to Harris' knee may be considered a temporary impairment that is not a disability under the ADA.").

*3 Hawrych has offered no evidence to suggest that his knee injury was permanent.[FN5] Indeed, even his arguments fail to suggest any sort of permanent disability, as he contends that "Custom Plastics violated plaintiff's rights as an employee who was hurt on the job and needed medical treatment." (Pl.'s Resp. at 11) Further, nothing in the medical records submitted by either party-including the progress notes of Hawrych's physician, Dr. Walsh-suggests a permanent disability.[FN6] At his first examination of Hawrych, Dr. Walsh's diagnosis was "contusion right knee," and he recommended physical therapy. (Exh. 2 to Pl.'s Resp. at 1) At their next meeting, Dr. Walsh noted Hawrych's improvement, but in light of the continuing pain, stated that "we need to get an MRI to rule out the possibility of an occult fracture." (*Id.*) When the MRI showed no fracture, and Hawrych reached a "plateau" in physical therapy, Dr. Walsh performed surgery. (*Id.* at 2) Hawrych made "slow steady progress" in post-operative therapy, but Dr. Walsh noted that he still needed "to work intensively on muscle rehabilitation." (*Id.* at 3)

FN5. The court notes that defendant provided Hawrych-who is proceeding *pro se* in this case-with a copy of Rule 56 with its summary judgment motion and informed him "that any fact asserted in the affidavits submitted in support of the Motion for Summary Judgment must be taken as true by the Court unless you contradict them with counter-affidavits or other documentary evidence." (Exh. 1 to Def.'s Opp. to Pl.'s Mtn. to Amend) This was sufficient notice to Hawrych of his Rule 56 obligations. *See Timms v. Frank*, 953 F .2d 281, 285 (7th Cir.1992) (holding that "all pro se litigants ... are entitled to notice of the consequences of failing to respond to a summary judgment motion"). Hawrych did submit evidence

with his summary judgment response; indeed, the court's analysis is based, to a large extent, on that evidence.

FN6. The court's analysis focuses on Dr. Walsh's progress notes because they are more favorable to Hawrych. Dr. Kornblatt-the orthopedic surgeon whom defendant arranged for Hawrych to see-found after the surgery that Hawrych exaggerated his symptoms, and that there was significant psychological overlay delaying his rehabilitation. Dr. Kornblatt disagreed with the need for a work hardening program.

On April 4, 1995, nearly two months after surgery, Dr. Walsh noted that Hawrych was not improving and "seems to have reached a plateau as far as his knee is concerned." (*Id.* at 4) Dr. Walsh referred him to another physician, Dr. David Hora, and stated that they would "need to make a determination as to whether or not further cortisone injection is indicated or whether he may or may not have permanent disability." (*Id.*) Dr. Hora recommended that Hawrych "work on his quads and hamstrings." (*Id.*)

On May 2, 1995, Dr. Walsh authorized Hawrych to return to work on May 8 "at sedentary type work only with no lifting or carrying over 10 lbs.," and "[n]o squatting, standing, climbing or extensive walking and must wear a brace on his right knee." (*Id.* at 5) Further, Dr. Walsh recommended that Hawrych continue physical therapy three times per week. On May 16, Dr. Walsh noted that Hawrych was experiencing some pain at work, but stated that "this will eventually work itself out." (*Id.*) On June 6, Dr. Walsh maintained the same restrictions, except that he cut down the physical therapy requirements to twice per week.

On June 27, 1995, Dr. Walsh found that Hawrych "is getting some improvement with the therapy," but that "he would benefit more from a work hardening program." (*Id.* at 6) The previous restrictions were continued for Hawrych at work. Several weeks later, on July 18, Dr. Walsh noted that Hawrych had been attending work hardening, but that the program "is getting a little in the way of cooperation either from the patient's employer or from the insurance company," and that Hawrych "is being made to work 8 hours a day in addition to getting 2 hours of work hardening." (*Id.*) Because "this is way too much for his knee to be able to endure," Dr. Walsh recommended that Hawrych "not return to work until he gets work hardening and if he cannot get the work

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 33121063 (N.D.Ill.), 18 NDLR P 138
(Cite as: Not Reported in F.Supp.2d)

hardening then he will be permanently disabled and we will have to establish a permanent disability percentage for which he will have to be adequately compensated." (*Id.*)

*4 As it turns out, Hawrych did not participate in the recommended work hardening program because the workers compensation adjuster would not pay for it. Dr. Walsh continued to observe that Hawrych was experiencing pain, but noted that he had "no idea what is causing his continued pain." (*Id.* at 9) Hawrych eventually consulted another physician, Dr. Gordon Nuber, who could not identify any problems with the knee aside from the pain felt by Hawrych. Dr. Nuber offered the option of another arthroscopic surgery to see if there was previously undetected damage. On November 21, 1995, Hawrych told Dr. Walsh that "maybe he would try going back to work next week." (*Id.* at 10) Dr. Walsh gave Hawrych a note stating that he could return to his normal duties with no restrictions.

Despite Dr. Walsh's fear that Hawrych's injured knee would become a permanent disability without his participation in a work hardening program, such did not turn out to be the case. There is no indication that his knee worsened, or that the nature of the injury changed without work hardening. More importantly, four months after Dr. Walsh expressed his fear, he cleared Hawrych to work without restriction even though Hawrych never participated in the recommended work hardening.

The mere fact that Hawrych's physician feared that the injury could, absent a work hardening program, become permanent does not transform the injury into a disability for purposes of the ADA. In *Kelly v. Woodridge Park Dist.*, No. 97 C 5763, 1999 WL 203020, at *3 (N.D.Ill. Mar. 31, 1999), the court rejected the plaintiff's argument that his knee injury amounted to a disability because it could only be corrected by successful surgery. The court reasoned that "[t]he fact that only 'successful' surgery would correct plaintiff's knee problem does not make the injury any more permanent or chronic" because "[i]n all cases, the temporary nature of an injury may depend on successful treatment." *Id.* at *4. In this regard, even though "a broken leg that is set improperly may result in less than full recovery," a broken leg is not a disability for purposes of the ADA. *Id.*

Viewing the evidence in the light most favorable to Hawrych, as the court must, Hawrych suffered a knee injury, underwent surgery, and was medically restricted from performing certain types of work at his job for several months. Within fourteen months of the initial injury, however, Hawrych was cleared to work without restrictions. This chronology suggests that Hawrych suffered from a temporary injury, not a disability.

Further, Hawrych has not shown that the injury substantially limited his ability to work. He must do more than simply allege that he worked under medical restrictions, for "the mere fact that an impairment affects the ability to work is not necessarily sufficient to show disability." *Duffin v. Federal Express Corp.*, No. 95 C 3723, 1997 WL 208428, at *3 (N.D.Ill. Apr. 22, 1997) (finding that plaintiff's lifting restriction did not amount to a disability). There is no evidence that defendant found his job performance unsatisfactory while he was performing under the restrictions recommended by Dr. Walsh, and Hawrych has not alleged that the restrictions prevented him from performing the essential duties of his job. "An inability to do minor aspects of the job while performing one's duties in general does not amount to a substantial limitation on the activity of working." *Harrington, 122 F.3d at 460.* Defendant's decision to terminate his employment was based on his failure to show up for work for several months, not from his inability to perform his job. The fact that Hawrych's decision not to work was related to the injury does not mean that the injury substantially limited his ability to work.

*5 This conclusion is also supported by Hawrych's ability to procure other employment, as evidenced by a September 1997 videotape of him working for a heating and air-conditioning contractor. Hawrych argues that the tape "is not appropriate or material to this case" because it was made after he underwent a second knee operation, and because he was wearing a knee brace and taking medication at the time. (Pl.'s Resp. at 11) However, "the mere use of a mitigating measure does not automatically prove the presence of a disability; some individuals may use medication, prosthetic devices, or auxiliary aids to alleviate impairments that are not substantially limiting." *Roth v. Lutheran General Hosp., 57 F.3d 1446, 1454 (7th Cir.1995).*

Judging by his success in procuring employment with the heating and air-conditioning contractor, Hawrych was not precluded from other work. In any event, Hawrych has made no showing that he was unable to find other, similar work. Under these circumstances, the court cannot find that his ability to work was substantially limited by his knee injury. *See Byrne v.*

*Board of Educ., 979 F.2d 560, 565 (7th Cir.1992)* ("It is well established that an inability to perform a particular job for a particular employer is not sufficient to establish a handicap; the impairment must substantially limit employment generally.").

Because Hawrych has not alleged that his knee injury substantially limited him in a major life activity other than work, his failure to establish that he was so limited in his ability to work is dispositive of his claim. Coupled with the temporary nature of his knee injury, Hawrych's apparent ability to perform his job-albeit under certain medical restrictions-precludes a finding that he was disabled for purposes of the ADA because he was not substantially limited in any major life activity. *See Blue, 1996 WL 613161,* at *3 (concluding that plaintiff was not "substantially limited" in his ability to work where injury "had a limited duration of approximately two years, it did not prevent him from engaging in other types of work, and appears to have had no permanent effect on plaintiff").

Essentially, Hawrych's claim is that his employer's workers compensation adjuster wrongfully refused to pay for his physician-recommended work hardening program. He has not established a claim for disability-based discrimination. However wrongful the refusal to pay for work hardening may have been, it does not give rise to a cause of action under the ADA against defendant.

### Conclusion

For the reasons set forth above, defendant's motion for summary judgment is granted. Because the above analysis is dispositive of Hawrych's claim, the court does not address the other arguments raised in defendant's motion. Because Hawrych's motion to amend his summary judgment response brief does not raise any new matters that would alter the above analysis-and because there is no basis under the Federal Rules of Civil Procedure for granting the motion to amend-the court denies it.[FN7]

> FN7. In the motion to amend, the strongest argument raised by Hawrych is that the Illinois Industrial Commission's finding that he was disabled for purposes of the Illinois Workers' Compensation Act is evidence that he was disabled for purposes of the ADA. However, the "findings of the Illinois Industrial Commission regarding [the

plaintiff's] injury are irrelevant because the ADA's definition of disability is unique." *Baker v. Chicago Park Dist., No. 98 C 4613, 1999 WL 519064,* at *4 n. 3 (N.D.Ill. Jul. 15, 1999).

N.D.Ill.,2000.
Hawrych v. Custom Plastics, Inc.
Not Reported in F.Supp.2d, 2000 WL 33121063 (N.D.Ill.), 18 NDLR P 138

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C

Westlaw.

Not Reported in F.Supp.                                                                 Page 1
Not Reported in F.Supp., 1998 WL 160826 (N.D.N.Y.), 12 NDLR P 208
**(Cite as: Not Reported in F.Supp.)**

**C**
Briefs and Other Related Documents

United States District Court, N.D. New York.
Richard F. MURRAY, Plaintiff,
v.
SYSCO CORPORATION, Defendant.
**No. CIVA96CV1073RSP/DNH.**

April 2, 1998.

Berger & Ducharme, LLP, Attorneys for Plaintiff,
Clifton Park, John B. DuCharme, Esq.
Bond, Schoeneck & King, LLP, Attorneys for
Defendant, Albany, Nicholas J. D'Ambrosio, Jr.,
Esq., John M. Bagyi, Esq., of Counsel.

MEMORANDUM DECISION AND ORDER

POOLER, D.J.
*1 Plaintiff Richard F. Murray commenced this
lawsuit against his former employer, Sysco
Corporation ("Sysco"), pursuant to Title I of the
Americans with Disabilities Act of 1990, 42 U.S.C. §
§ 12101, *et seq.* ("ADA"), and New York law.
Murray alleged that Sysco unlawfully terminated his
employment because of his disability and then
unlawfully caused a subsequent employer as well.
Following
discovery, Sysco made a motion for summary
judgment, which Murray opposed. Because Murray
has failed to raise a genuine issue of material fact,
and because I decline to exercise supplemental
jurisdiction over the state law claims, I dismiss this
action in its entirety.

BACKGROUND

Sysco Corporation is a Delaware corporation
engaged in the wholesaling, marketing, and
distribution of food and food related products to
hotels, restaurants, hospitals, and other food
preparation facilities. Ragusa Aff., Dkt. No. 12, ¶ 2.
Sysco Food Services-Albany ("Sysco Albany") is
one of the approximately sixty operating divisions of
Sysco Corporation. *Id.* ¶¶ 1-2. Sysco Albany's
sales territory is broken into several sales districts,
each of which is led by a district sales manager. *Id.*
¶ 2. In April 1993, Sysco Albany acquired the

Upstate New York operations of Monarch/New
England, a subsidiary of JP Foodservice, Inc.
("Monarch"). *Id.* ¶ 4. As part of the acquisition,
Sysco assumed Monarch's contractual obligations to
Murray and several other Monarch employees. *Id.*
Sysco Albany hired Murray, pursuant to his contract
with Monarch, as a district sales manager through
April 1994. *Id.; see also* Murray Aff., Dkt. No. 19,
Ex. B. On April 23, 1993, Murray executed a Sales
Representative's Agreement (the "Agreement") with
Sysco Albany. App. of Exs., Dkt. No. 16, Ex. J. The
Agreement provided that that the Company could
terminate Murray's employment with or without
cause, *id.* ¶ 8, and contained a one year
noncompetition provision, *id.* ¶ 5.

As District Sales Manager of the newly acquired
territory, Murray was expected to increase market
penetration and profitable sales volume in that area.
[FN1] Wiedower Aff., Dkt. No. 13, ¶ 5; Murray Aff.,
Ex. C. Generally, Murray's work week consisted of
riding with the marketing representatives he
supervised on Monday through Thursday and doing
paperwork in the office on Friday. Murray Dep.,
Dkt. No. 17, at 26. Murray also maintained
telephone contact with the representatives throughout
the week, visited customers by driving himself on
occasion, and attended meetings. *Id.* at 26-27.
Murray's direct supervisor from shortly after he was
hired until March 1994 was Sam Spear. In March
1994, Michael Wiedower replaced Spear as director
of territory sales and became Murray's direct
supervisor. Wiedower Aff. ¶ 2. Murray Dep. at 338.

> FN1. Plaintiff denies this allegation and
> many others in his L.R. 7.1(f) statement.
> However, he furnishes no competent proof
> to support many of his denials. In the
> absence of competent proof, I have
> disregarded plaintiff's 7.1(f) denials.

In December 1994, Murray began to experience
severe pain in his right knee while on a trip to Florida
with his wife. Murray Aff. ¶ 32. Upon his return
to New York, Murray visited Dr. Lawrence Fein, an
orthopaedic physician located in Saratoga Springs,
New York, on January 30, 1995. *Id.* ¶ 33. Murray
returned to work but experienced pain when he
walked, climbed stairs, carried his briefcase, or
occasionally carried product to a customer. *Id.* ¶ 34.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 2
Not Reported in F.Supp., 1998 WL 160826 (N.D.N.Y.), 12 NDLR P 208
(Cite as: Not Reported in F.Supp.)

Murray claims that many people at work commented about his limp and the fact that he appeared in pain. *Id.* Dr. Fein initially attempted to treat Murray's knee with medication and physical therapy, but these treatments failed to provide relief. *Id.* ¶ 35. On March 29, 1995, a magnetic resonance imaging test ("MRI") performed on Murray's knee revealed a tear of the meniscus, osteoarthritis, and chondromalacia patella. *Id.* ¶ 40; App. Ex. B. Dr. Fein advised Murray that these results indicated the need for surgery, which was scheduled for April 7, 1995, and advised Murray that the recovery period ranged from two to three days to several weeks. Murray Aff. ¶ ¶ 40-41; Murray Dep. at 146-47.

*2 Murray immediately informed Wiedower that he required time off on the day of the surgery and thereafter to recuperate. Murray Aff. ¶ 41. Murray told Wiedower that he would work from home while recuperating from his surgery and asked Wiedower to call him at home if anything arose. *Id.;* Murray Dep. at 402. On Friday, April 7, 1995, Dr. Fein performed outpatient arthroscopy and partial medial meniscectomy on Murray's right knee. App. Ex. C. On the following Monday, Wiedower began telephoning Murray at home. Murray Aff. ¶ 43. Murray claims that Wiedower called on numerous occasions during the days following the surgery. Murray Dep. at 405. According to Murray, Wiedower repeatedly told him that his group was suffering, asked him when he was returning to work, and asked him how long it would take him to get better. *Id.* at 405-06. Wiedower also indicated his concern that sales were suffering in Murray's district in his absence. *Id.* Murray told Wiedower that his recovery would have to take its course and that he would return when he could. Murray Dep. at 406; Murray Aff. ¶ 43. Murray never filed for disability benefits. Murray Dep. at 398.

Some time in the second week after the surgery, Murray was able to move around the house without a great deal of difficulty using crutches. Murray Dep. at 149. That same week Murray was able to resume driving himself using his right leg. *Id.* at 152. Between April 18 and 21, Murray worked two days at a food show with the aid of crutches. Murray Aff. ¶ 46. Murray walked around, talked with customers and "[his] people," and, at the end of the afternoon, sat down at one of the registration tables. Murray Dep. at 151. Murray testified that he was able to function effectively at the food show. *Id.* Murray worked his first full week in the days immediately following the food show, when he was asked to go in to the office to answer telephones for two days while

office staff members were away on a trip. Murray Dep. at 403-04. During the third or fourth week after the surgery, Murray began using only one crutch or a cane. *Id.* at 150. Murray also resumed riding with his marketing associates during this time. *Id.* at 426-27. By six or seven weeks after surgery, Murray testified that the knee "really didn't remind [him] that there was anything wrong with it." *Id.* at 154. However, Murray still had bad days that necessitated the use of a cane from time to time until March of 1996. *Id.* at 155-56.

During the week of April 24, 1995, Wiedower's secretary, Beverly Johnston, informed Murray that Wiedower had reclassified some of the days Murray worked from home as sick days instead of work days. On April 24, 1995, Wiedower met with Murray as he did every quarter to discuss his district's performance in the third quarter of the 1994-95 fiscal year, the quarter immediately preceding Murray's surgery. Wiedower Aff. ¶ 15. Wiedower claims that he expressed disappointment with Murray's performance at that meeting and that Murray twice offered to resign. Wiedower Aff. ¶ 15. Murray acknowledges that a meeting took place but contends that the meeting focused on his concerns with the shortcomings of his own marketing associates. Murray Dep., Dkt. No. 18, at 414. Murray denies that he ever offered to resign. *Id.* at 415.

*3 After the meeting, Wiedower decided that Murray's employment "should be terminated due to his continuing failure to improve his district's margin figures and his unwillingness to make any effort to do so." Wiedower Aff., ¶ 16. On May 1, 1995, Wiedower advised Murray that he had decided to accept Murray's offer to resign. Murray Dep., Dkt. No. 18, at 415; Murray Aff. ¶ 52. Murray denied that he had offered to resign, and Wiedower informed Murray that his employment at Sysco Albany was being terminated. Murray Dep. at 415. Murray's termination was effective May 1, 1995, but he received payment for salary through May 16, 1995. Murray Aff. Ex. B.

On September 5, 1995, Murray began to work for Rykoff-Sexton, Inc. ("Rykoff"). Murray Aff. ¶ 62. On October 4, 1995, Sysco sent letters to Murray and to Rykoff setting forth the terms of the non-compete and confidentiality clauses of Murray's former contract with Sysco. App. Exs. K, L. Sysco stated that it had information that Murray was violating the terms of the contract and indicated that it would commence a lawsuit if necessary to protect its interests. *Id.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 160826 (N.D.N.Y.), 12 NDLR P 208
**(Cite as: Not Reported in F.Supp.)**

On October 16, 1995, Ron Vautour, General Manager of Rykoff, wrote to Sysco indicating that Rykoff intended to comply with the terms of Murray's agreement immediately. App. Ex. H. Vautour told Murray that Rykoff could not afford to be involved in a lawsuit with Sysco and instructed Murray to have his lawyers resolve the situation and to get a definite position by Sysco in writing as to where they stood. Murray Dep. at 89-90. Murray contacted his attorney, Joseph C. Berger, who wrote to Sysco on October 23, 1995. App. Ex. I. Berger advised Sysco that he considered the non-compete agreement to be unenforceable and Sysco's letters to be an unwarranted attempt to interfere with Murray's ability to earn a livelihood. *Id.* Murray made no attempt, either personally or through his attorney, to get Sysco to put its position in writing, as requested by Rykoff. Murray Dep. at 90-91. After questioning Murray on several occasions about the status of his request that Murray get something in writing, Vautour decided on December 1, 1995, to cease operations in Murray's area and terminate Murray's employment there because of poor performance of the branch overall and the threat of a lawsuit. Murray Dep. at 92. Vautour told Murray that he would consider talking with Murray again after May 1, 1996, the one year anniversary of Murray's termination from Sysco. *Id.* at 93. Vautour offered to transfer Murray to Rykoff's Norwood branch, but Murray declined the offer because he did not want to relocate his residence to Norwood. *Id.* at 94.

Murray commenced this lawsuit on July 1, 1996. Murray's complaint alleged that Sysco (1) terminated his employment because of his arthritis-induced disability in violation of the ADA and the New York Executive Law and (2) wrongfully interfered with his contract of employment with Rykoff by causing Rykoff to terminate his employment. Compl. ¶¶ 22, 30, 37, 43, 44. Following discovery, on September 30, 1997, Sysco filed a motion for summary judgment, which Murray opposed. I heard oral argument at my November 3, 1997, motion term.[FN2]

> FN2. On March 2, 1998, defendant filed a submission calling to the court's attention the Second Circuit's recent decision in *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867 (2d Cir.1998), and arguing that the case compels dismissal of Murray's claim. Dkt. No. 28. My decision in the present case is in accord

with the principles set forth in *Ryan*, which reaffirmed existing ADA jurisprudence. However, I note that I have not considered defendant's March 2, 1998, submission in reaching my decision because defendant's submission included unpermitted additional argument.

## DISCUSSION

### A. Standard for Summary Judgment

*4 Summary judgment shall enter if, when viewing the evidence in the light most favorable to the nonmovant, the court determines that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Eastman Kodak Co. v. Image Technical Servs. Inc.*, 504 U.S. 451, 456, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). A party seeking summary judgment must demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the movant satisfies this initial burden, then the burden shifts to the nonmovant to proffer evidence demonstrating that a trial is required because a disputed issue of fact exists. *Weg v. Macchiarola*, 995 F.2d 15, 18 (2d Cir.1993). The nonmovant must do more than present evidence that is merely colorable, conclusory, or speculative and must present "concrete evidence from which a reasonable juror could return a verdict in his favor...." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### B. The Americans With Disabilities Act

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to ... discharge of employees ... and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The plaintiff in a disability discrimination action bears the initial burden of establishing a prima facie case. *Wernick v. Federal Reserve Bank of New York*, 91 F.3d 379, 383 (2d Cir.1996). In order to satisfy this burden, the plaintiff must show that (1) he is an individual with a disability within the meaning of the ADA; (2) he is qualified for the position; and (3) he was discharged because of his disability. *Id.* Sysco argues that it is entitled to summary judgment because Murray fails to show either that he is an individual with a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 160826 (N.D.N.Y.), 12 NDLR P 208
(Cite as: Not Reported in F.Supp.)

Page 4

disability for purposes of the ADA or that he was discharged because of a disability. I address only the disability issue because it is dispositive.

Sysco claims that Murray is not an individual with a disability for purposes of the ADA and thus is not entitled to the protection of the Act. To demonstrate that he is an individual with a disability, the plaintiff must show that he (1) has "a physical or mental impairment that substantially limits one or more of [his] major life activities;" (2) has "a record of such an impairment;" or (3) is "regarded as having such an impairment." 42 U.S.C. § 12102(2). Sysco does not dispute Murray's claim that he had a physical impairment but argues that the impairment did not substantially limit any of Murray's major life activities. Sysco also contends that there is no evidence to indicate that Murray has a record of such an impairment or was regarded as having such an impairment.

In his complaint, Murray alleged that Sysco terminated his employment "because he was rendered disabled due to his arthritic condition." Compl. ¶ 22. Similarly, in his deposition, Murray stated that he believed Sysco terminated his employment because he had knee surgery. Murray Dep. at 425. Murray testified that he based his belief on the fact that Wiedower telephoned Murray at home following his surgery and harassed him about coming back to work while he was still recuperating from his knee surgery. Murray Dep. at 425. Murray stated that "the conversations were that the group is suffering, when are you coming back to work, how long is it going to take you to get better, conversations of that nature." Id. at 405. Murray also testified that "[t]he basis of the conversation was when are you coming back to work, your group needs you. That was the ongoing basis." Id. at 406.

*5 Murray has not demonstrated that he had a physical impairment which substantially limited a major life activity. It is undisputed that Murray suffered from a condition which required surgery to his knee and that the knee condition affected his ability to walk and to work, both of which are considered major life activities under the ADA. 29 C.F.R. § 1630.2(i). However, a major life activity is "substantially limited" only when the individual is (1) "unable to perform a major life activity that the average person in the general population can perform" or (2) "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration

under which the average person in the general population can perform the same major life activity." 29 C.F.R. § 1630.2(i)(1).

In determining whether an impairment is "substantially limiting," I consider (1) the "nature and severity of the impairment;" (2) the "duration or expected duration of the impairment;" and (3) the "permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." Id. § 1630.2(i)(2). With respect to the major life activity of working, "[t]he term 'substantially limits' means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." Id. § 1630.2(i)(3).

Murray's knee condition and its effect on his ability to walk and work was transitory. See 29 C.F.R. Pt. 1630, App.-Interpretive Guidance, § 1630.2(j) ("temporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities"). Approximately four months after Sysco discharged Murray, he began working as a district sales manager for a different wholesale food company. Murray acknowledges that his knee has improved to the point that he no longer requires crutches or a cane to walk and is hardly ever reminded of a problem. Thus, his condition cannot be considered substantially limiting under the ADA.

Murray now apparently concedes that his impairment was not substantially limiting and argues instead that Sysco terminated his employment because it perceived him to be disabled. In his affidavit, Murray states, "Defendant terminated my employment as one of its District Sales Manager's [sic] because my direct supervisor, Michael Wiedower, perceived me (albeit erroneously) as an individual who was disabled and unable to continue performing my job functions on behalf of the Defendant after I underwent knee surgery to correct a condition which impaired my ability to walk." Murray Aff. ¶ 3. Similarly, plaintiff's memorandum of law states, "It is the Plaintiff's contention that Michael Wiedower, [sic] regarded the Plaintiff (albeit erroneously) as an individual whose knee condition had rendered it impossible for the Plaintiff to walk without assistance and perform his job duties as a District Sales Manager." Pl.'s Mem., Dkt. No. 21, at

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 160826 (N.D.N.Y.), 12 NDLR P 208
**(Cite as: Not Reported in F.Supp.)**

7.

*6 The Equal Employment Opportunity Commission interprets the "regarded as" provision of the ADA as applying to "an individual who is regarded as having an impairment that substantially limits a major life activity is an individual with a disability." 29 C.F.R. Pt. 1630, App. § 1630.2(l). This statutory provision was enacted to guard against decisions based on "myth, fear or stereotype." 29 C.F.R. Pt. 1630, App. To prevail in a case based on a "perceived disability" theory, the plaintiff must show that the defendant (1) knew about plaintiff's impairment and (2) viewed the condition as substantially limiting a major life activity. Cf. Heilweil v. Mount Sinai Hosp., 32 F.3d 718, 722 (2d Cir.1994) (Rehabilitation Act case); Scott v. Flaghouse, 980 F.Supp. 731, 735 (S.D.N.Y.1997). Moreover, the employer also must have treated plaintiff as having an impairment that substantially limited one of plaintiff's major life activities. Greenberg v. New York State, 919 F.Supp. 637, 641 (E.D.N.Y.1996).

The evidence indicates that Wiedower certainly knew about Murray's knee condition. Thus, the issue is whether there is evidence in the record that suggests that Wiedower or Sysco Albany viewed Murray's condition as substantially limiting a major life activity and treated him accordingly.

Murray contends that because his knee surgery impaired his ability to walk without assistance during his recovery, Wiedower believed that Murray could not perform his job duties as a district sales manager. With respect to the major life activity of walking, there is no evidence in the record to suggest that Wiedower expected Murray's inability to walk without crutches or a cane to be anything other than temporary. In fact, Murray fails to allege that Wiedower or anyone else at Sysco Albany believed that Murray's knee impairment would result in a long-term inability to walk without assistance. Wiedower testified at his deposition that Murray initially said "[h]e would be able to get back out and work in his area in no more than two or three days" after the April 7, 1995, surgery and then at the end of the first week called to tell Wiedower "that he needed another week off of his leg." Wiedower Dep., Dkt. No. 18, at 48. Wiedower classified some of these days as sick days and others as work at home days. Id. The parties agree that Wiedower never suggested that Murray go on disability, which customarily was used after one week out of work, and Murray never applied for disability. It is undisputed that Murray's knee showed steady improvement. He was able to

drive using his right leg the second week following surgery. At the end of the second week, Murray in fact returned to work on crutches and worked two days at the Sysco Albany food show on approximately April 20, 1995. Murray testified that he was able to function effectively at the food show and returned to work full-time that week, answering phones in the office and riding with his marketing associates. I find no facts from which a reasonable jury could infer that Wiedower believed Murray would have a significant limitation on his ability to walk. As noted above, an impairment that is transitory or temporary does not constitute a "substantially limiting" condition under the ADA. 29 C.F.R. Pt. 1630, App. § 1630.2(j). Consequently, Sysco Albany did not regard Murray as having a physical impairment that substantially limited the major life activity of walking.

*7 Next, Murray contends that Wiedower perceived Murray as substantially limited because Wiedower thought Murray's inability to walk without assistance rendered him unable to carry out the job duties of a district manager. Murray claims that those job duties, as set forth in his job description, required that he be "able to lift and carry food product which could weigh up to fifty (50) pounds once a week, able to lift and carry a briefcase weighing twenty (20) to thirty (30) pounds one (1) to three (3) time per week, [s]it: 50% of the day, [w]alk: 25% of the day, stand 25% of the day." Murray Aff. ¶ 44.

This argument fails for several reasons. First, I find no evidence from which a jury could infer that Wiedower held such a belief. Murray contends that Wiedower telephoned him at home following his surgery and asked Murray whether he was "going to be able to perform [his] job duties in light of his knee surgery." Murray Aff. ¶ 44. Murray also claims that during the food show, he was unable to carry his brief case, product information, or product samples, and had to sit down for a portion of the show. Murray claims that again during the food show Wiedower "expressed his ongoing concern that [Murray] would not be able to perform [his] job duties as a District Sales Manager given [his] knee condition." Id. ¶ 46. Murray contends that at the April 24, 1995, sales meeting Murray told him that "in light of [Murray's] condition, [Wiedower] was concerned that [Murray] would not be able to continue [good sales] performance." Id. ¶ 48.

Yet, in his deposition, Murray testified that when Wiedower telephoned following the surgery, the conversations were always "that the group is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 160826 (N.D.N.Y.), 12 NDLR P 208
(Cite as: Not Reported in F.Supp.)

suffering, when are you coming back to work, how long is it going to take you to get better." Murray Dep. at 405-06. Murray also testified that at the food show people asked generally how he was doing, or how the knee was doing, but made no other comments about his knee condition or his surgery. Murray Dep. at 422. Finally, Murray testified that during the time he had returned to work prior to his termination, neither Wiedower nor anyone else at Sysco Albany indicated that they were not satisfied with the level of his work effort or made any comment or statement that forms the basis for Murray's belief that his termination was based on the knee surgery.

These facts alleged in Murray's affidavit contradict Murray's own prior deposition testimony. On a motion for summary judgment, if a party's affidavit contradicts his own prior deposition testimony, then I should disregard the affidavit. *Buttry v. General Signal Corp.*, 68 F.3d 1488, 1493 (2d Cir.1995); *see also Hayes v. New York City Dep't of Corrections*, 84 F.3d 614, 619 (2d Cir.1996). Thus, there is no dispute that Wiedower made no comments about Murray's ability to perform his job duties, and Murray's self-serving affidavit fails to raise an issue of fact.

Second, Murray's allegation that Wiedower regarded Murray as unable to perform the job duties of a district sales manager is insufficient as a matter of law to show that Wiedower perceived Murray as substantially limited in the major life activity of working. It is well established that a person found unsuitable for a particular position has not thereby demonstrated an impairment substantially limiting his major life activity of working. *Heilweil v. Mount Sinai Hospital*, 32, F.3d 718, 723-24 (2d Cir.1994) (collecting cases); *Daley v. Koch*, 892 F.2d 212, 215 (2d Cir.1989). The Second Circuit has noted that the purpose of disability discrimination statutes would be debased "if the statutory protections available to those truly handicapped could be claimed by anyone whose disability was minor and whose relative severity of impairment was widely shared. Indeed, the very concept of an impairment implies a characteristic that is not commonplace and that poses for the particular individual a more general disadvantage in his or her search for satisfactory employment." *Daley*, 892 F.2d at 215 (quoting *Forrisi v. Bowen*, 794 F.2d 931, 934 (4th Cir.1986)). The regulations provide that "the inability to perform a single, particular job does not constitute a substantial limitation on the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(i).

Consequently, Murray's allegation that Wiedower perceived him as unable to perform the duties of a district sales manager fails to lead to the inference that Wiedower perceived Murray as substantially limited in his ability to perform a broad range or entire class of jobs.

*8 Third, even if Wiedower believed that Murray was physically unable to perform the duties of a district manager at the time he terminated Murray's employment, there is no evidence that Wiedower thought Murray's condition would persist. As noted above, a transitory impairment is not considered substantially limiting. Murray points to no evidence in the record to suggest that Sysco Albany treated him as having an impairment that substantially limited a major life activity. The undisputed facts indicate that Wiedower believed that Murray could and would return to work. Murray testified that Wiedower repeatedly urged Murray to return to work because his group needed him, classified none of Murray's time off as sick time until Murray requested a second week off, and even then did not suggest that Murray go on disability but classified some of Murray's days off as sick days.

In light of the above, I find that Murray fails to make the threshold showing that he is entitled to protection under the terms of the ADA. Because Murray fails to establish a prima facie case, I need not consider Sysco's argument that it discharged Murray for a nondiscriminatory reason.

### CONCLUSION

For the reasons stated, I grant Sysco's motion for summary judgment and dismiss Murray's ADA claim. I also decline to continue to exercise supplemental jurisdiction over the state law claims. Consequently, Murray's complaint is dismissed in its entirety.

N.D.N.Y.,1998.
Murray v. Sysco Corp.
Not Reported in F.Supp., 1998 WL 160826 (N.D.N.Y.), 12 NDLR P 208

Briefs and Other Related Documents (Back to top)

· 5:96cv01073 (Docket) (Jul. 01, 1996)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT D

Westlaw.

Not Reported in F.Supp.                                                    Page 1
Not Reported in F.Supp., 1997 WL 610779 (N.D.Ill.), 11 NDLR P 46
**(Cite as: Not Reported in F.Supp.)**

**H**
Briefs and Other Related Documents

United States District Court, N.D. Illinois.
Patrick KELLEHER, Plaintiff,
v.
SOLOPAK PHARMACEUTICALS, INC., and
Solopak Laboratories, Inc. a Delaware corporation,
Defendants.
**No. 96 C 7743.**

Sept. 26, 1997.

*MEMORANDUM OPINION AND ORDER*

CONLON, District J.
**\*1** Patrick Kelleher ("Kelleher") sues Solopak
Pharmaceuticals, Inc. and Solopak Laboratories, Inc.
("Solopak") for discrimination and retaliation in
violation of the Americans with Disabilities Act, 42
U.S.C. § 12101, et seq. (Count I) and for state law
retaliatory discharge (Count II). The parties have
filed cross-motions for summary judgment. The
parties have also filed cross-motions to strike
affidavits.

*MOTIONS TO STRIKE*

Solopak moves to dismiss Kelleher's second affidavit,
attached as exhibit A to his 12(N) response.
Kelleher Affidavit II ("Kelleher Aff. II at ¶   ").
Solopak's motion to strike is granted as to paragraphs
3, 4 and 5, but not for the reasons Solopak asserts.
The court strikes these paragraphs because Kelleher
has not sought to predicate a retaliation claim on
these facts in his motion for summary judgment or
his memorandum in response to Solopak's motion for
summary judgment. Statements in Solopak's 12(M)
that relate to these incidents are similarly stricken as
irrelevant and immaterial.[FN1]   Solopak argues
paragraph 2 of Kelleher's second affidavit should be
stricken because it contradicts his earlier sworn
deposition testimony. The court agrees. *See, e.g.,*
*Unterrainer v. Volkswagen of America,* 8 F.3d 1206,
1210 (7th Cir.1993); *Gray v. Ameritech Corp.,* 937
F.Supp. 762, 769 (N.D.Ill.1996). Contrary to
Solopak's assertions, paragraph 6 of Kelleher's
affidavit does not contradict exhibit 11 to Kelleher's
12(M) statement of facts. The letter is not written to

either Michelle Pierce or Donna Swenson and states
nothing about not wanting to accept worker's
compensation payments because the accident was his
fault. Thus, the court declines to strike paragraph 6
of Kelleher's second affidavit. Solopak's motion to
strike the additional paragraphs of Kelleher's second
affidavit is denied.

> FN1. The following paragraphs of Solopak's
> 12(M) statement relate to the incidents in
> paragraphs 3, 4 and 5 of Kelleher's second
> affidavit and are therefore stricken: ¶¶ 10,
> 18, 19, and 20.

Kelleher moves to strike the affidavit of David J.
Dvorak. Solopak's 12(M) stmt., Ex. B. Specifically,
Kelleher takes issue with paragraphs 3-5 of the
affidavit. Dvorak's position as Solopak's vice-
president of human resources lays an adequate
foundation for his testimony about Solopak's
debarment policy and the FDA regulations applicable
to Solopak. Thus, Kelleher's motion to strike
paragraph 3 of the Dvorak affidavit for lack of
foundation is rejected. Kelleher argues that
paragraph 4 of Dvorak's affidavit contradicts his clear
deposition testimony by stating that Kelleher was
terminated for not returning to work despite a
doctor's release. As Kelleher notes, in Dvorak's
deposition he ascribed Kelleher's termination to
insubordination. Dvorak Dep. at 24. However,
Dvorak also went on to explain the particular form of
the insubordination. Dvorak testified the
insubordination was for failure to communicate his
medical status to supervisors, to advise them of when
he would return to work and to return to work upon
his medical release. Dvorak Dep. at 24-26. Thus,
Dvorak's deposition and his affidavit are entirely
consistent.

**\*2** Kelleher asserts paragraphs 5 and 6 of Dvorak's
affidavit are irrelevant and lack foundation. In
paragraph 5 Dvorak states he learned for the first
time in Kelleher's deposition that Kelleher had been
convicted of felony forgery, had falsely certified
Solopak's debarment policy indicating that he was not
subject to debarment, had falsified his job application
to Solopak by stating he had been involuntarily
terminated from each of his prior employers and had
provided an improper home address on his
employment application. In paragraph 6 Dvorak

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 610779 (N.D.Ill.), 11 NDLR P 46
(Cite as: Not Reported in F.Supp.)

attests the information that surfaced in Kelleher's deposition would have led to his termination. Further, Dvorak asserts if Kelleher had not falsified his certification of the debarment policy, he never would have been hired. A proper foundation for this testimony is provided by the fact Dvorak has the authority to hire and fire employees in his position and was in attendance at Kelleher's deposition. Dvorak Aff. ¶¶ 4-5. Moreover, this after-acquired evidence of reasons supporting Kelleher's termination is admissible because it is relevant to the issue of damages. *See, e.g., Buckner v. Sam's Club, Inc.,* 75 F.3d 290, 292 (7th Cir.1996); *Deimer v. Cincinnati Sub-zero Products, Inc.,* 990 F.2d 342, 346 (7th Cir.1993).[FN2] Accordingly, the court denies Kelleher's motion to strike the Dvorak affidavit.

> FN2. Although the after-acquired evidence of Kelleher's falsification of his employment application is relevant and admissible on the issue of damages, the court's decision on the merits makes it unnecessary to evaluate this evidence. Thus, the court does not discuss this evidence further.

## BACKGROUND

The following facts are undisputed except where otherwise noted. Solopak produces injectable pharmaceutical supplies and distributes various plastic components. Solopak's 12(M) stmt. ¶ 1 ("Def.12(M) ¶ "). Solopak hired Kelleher to work as a maintenance technician. Def. 12(M) ¶ 5. He began work on September 19, 1994 at Solopak's Tonne Avenue, Elk Grove Facility. *Id.;* Kelleher's 12(M) stmt. ¶ 1 ("Pl.12(M) ¶ ").

Kelleher was required to perform various maintenance and machine repairs. *Id.* The work required lifting and work over the shoulders. *Id.* Shortly after he was hired, Kelleher had an automobile accident. Def. 12(M) ¶ 9. Although Kelleher was not entitled to any approved medical leave, Solopak gave Kelleher a medical leave of absence from approximately October 15, 1994 until early-mid December, 1994. *Id.* Kelleher admits that except for some limitations in his ability to run, bike and swim and "probably permanent" difficulties climbing, he fully recovered from this incident. *Id.;* Pl. 12(N) ¶ 9; Kelleher Dep. 117-118.

*3 On August 7, 1995, Kelleher had another non-work related car accident. Def. 12(M) ¶ 11; Pl. 12(M) ¶ 3. Due to the injury, Kelleher was again unable to perform his job functions for a brief period of time. Def. 12(M) ¶ 11. Solopak accommodated Kelleher's initial medical restrictions by giving him light duty work from August 7 to August 24, 1995. He was treated by Dr. Dobozi, who released him to return to work with restrictions on August 28. Pl. 12(M) ¶ 4. Dr. Dobozi's, release letter stated:

Patrick Kelleher just had arthroscopic knee surgery and a manipulation of his right knee. He can return to work, but only in a light duty capacity for the next three weeks. He cannot do any standing for more than 5 or 10 minutes, without adequate rest periods, and he cannot do any lifting greater than 5 lbs. He can sit, but he has to get up to move his leg around if it becomes uncomfortable. He cannot do any walking greater than one to two blocks before he needs to rest. These restrictions will be enforced until I see him again to re-evaluate his condition, which is about three weeks. Thank you very much.

Pl.Ex. A. Because of the severity of these medical restrictions, Solopak did not have a full day's work available he could perform. *Id.* Solopak acknowledged this in several handwritten memoranda signed by Gayle Nicholas ("Nicholas"), senior manager of human resources, dated August 29 and August 30. Pl.Ex. 2, 4. Although Kelleher was not covered by the Family and Medical Leave Act, Solopak allowed him to remain on medical leave because of his inability to work. Def. 12(M) ¶ 12; Def. 12(N) ¶ 6; Deposition of Gayle Nicholas ("Nicholas Dep. at ") at 151, 199-200.

In order that Kelleher continue to be paid during the time Solopak was unable to provide light duty work he could perform, Donna Swenson ("Swenson"), human resources assistant, contacted Kelleher to arrange short term disability leave. Def. 12(M) ¶ 12. On September 5, 1995, according to her handwritten memorandum of the same date, Kelleher told Swenson he did not want to file a short term disability claim because there were already multiple carriers involved. *Id.* Short term disability was the only way Kelleher could continue to be paid and be on an approved leave of absence. *Id.* Solopak interpreted Kelleher's failure to cooperate with their request he fill out short term disability paperwork as an indication he was no longer interested in returning to work. Def. 12(M) ¶ 13; Nicholas Dep. at 170. Thus, Solopak considered him absent without leave (AWOL). *Id.*

On September 11, 1995, David Dvorak sent a memorandum to Kelleher explaining that Solopak was terminating his employment because of his high

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 610779 (N.D.Ill.), 11 NDLR P 46
(Cite as: Not Reported in F.Supp.)

absenteeism. Def. 12(M) ¶ 14. The letter explained he had been absent 72 days in less than a year of employment. *Id.*<sup>FN3</sup> Solopak never officially terminated Kelleher because it never removed him from its payroll. *Id.* Kelleher disputes this point vigorously, but cites to no evidence refuting the essential point he was never officially terminated. True, he received a letter stating in no uncertain terms, "your poor attendance leaves no other alternative but to terminate your employment effective September 11, 1995." Def. Ex. N.<sup>FN4</sup> Nevertheless, Solopak points to extensive deposition testimony stating the termination was never finalized. *See* Deposition of David J. Dvorak ("Dvorak Dep. at ") at 177-179; Nicholas Dep. at 148, 151, 169-170.

> FN3. Kelleher disputes he was absent for 72 days citing to a statement of earnings attached as exhibit C to his 12(N) response. Pl. 12(N) ¶ 14. The statement of earnings only totals Kelleher's earnings for a weekly pay period ending 1/12/96. The statement fails to contradict the validity of the assertion in Solopak's letter of termination he was absent 72 days.

> FN4. Solopak mislabels this exhibit and others throughout its summary judgment pleadings and in its index of 12(M) exhibits. Solopak burdened the court with sifting through its exhibits to find the correct document. This problem was so chronic that even Solopak's last minute motion to substitute exhibits sought leave to substitute exhibits in the wrong place in the record. Despite Solopak's sloppy compilation of the index to its exhibits, the court cites the correct location in the record.

**\*4** Nicholas sent a letter, dated September 13, 1995, inquiring whether Solopak misinterpreted Kelleher's refusal to participate in its disability insurance program and inviting him to contact Solopak to rectify the termination situation. Def. Ex. N. Kelleher contacted Solopak the same day and clarified the misunderstanding. Def. 12(M) at ¶ 14; Kelleher Dep. at 87. Also on September 13, Kelleher filed his first charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). Def. 12(M) ¶ 15; Pl. 12(M) ¶ 9. The parties dispute whether Solopak knew of the EEOC charge prior to Kelleher's termination. *Id.;* Pl. 12(M) ¶¶ 8, 11; Pl. 12(N) ¶¶ 15, 39. On September 25, 1995, Kelleher received a "full duty, full time"

medical release to return to work with one restriction- no ladder climbing. Def. 12(M) ¶ 16; Pl. 12(N) ¶ 16; Def. Ex. O.

On December 27, 1995, Kelleher injured himself at work. Def. 12(M) ¶ 23; Pl. 12(M) ¶ 13. Schettl instructed a Solopak employee to take Kelleher to Alexian Brothers Clinic ("Alexian"). *Id.;* Pl. 12(M) ¶ 14. Dr. Hill from Alexian instructed Kelleher to remain off work for that day only and to return to work with light duty restrictions. Def. 12(M) ¶ 24. Kelleher followed up his initial treatment with Dr. Long at Alexian. Pl. 12(M) ¶ 16. Solopak accommodated Kelleher in a number of ways after his injury. Def. 12(M) ¶ 25. On January 3, 1996, Solopak allowed Kelleher to work 6 a.m. to noon instead of his regular shift of 7:00 a.m. to 3:30 p.m. *Id.* Solopak permitted him to take the entire day off on January 4, 1996, for a doctor's appointment. *Id.* On January 9-11, 1996, Solopak allowed his absence from work even though he did not have a release from Dr. William Long, his treating physician at Alexian. *Id.* He did, however, have a release for those dates from Dr. Cirrincione, a specialist from Barrington Orthopedic Specialists Ltd. Pl. 12(M) ¶ 17; Def. 12(M) ¶ 29.

Solopak provided these accommodations and wanted its workers' compensation insurance provider to pay Kelleher's medical bills. Solopak uses Chubb Group Insurance Companies ("Chubb") for handling and processing all its workers' compensation claims. Def. 12(M) ¶ 27. Michelle Pierce ("Pierce"), Solopak's manager of health and safety, wrote a memorandum on December 29, 1995, summarizing a meeting she and Swenson had with Kelleher on the same date. According to this account, they explained to him that Solopak's workers' compensation carrier would cover his medical expenses related to the visit to the clinic. Def. 12(M) ¶ 25, Ex. V. Further, Kelleher "explained that he felt the accident was entirely his fault and in order to 'do right' he wanted to pay all of the bills associated with his visit to the clinic." Ex. V. Kelleher denies this contemporaneous record by citing to the blunt denial in paragraph six of his second affidavit. While not exactly contradictory, his letter to Dvorak undermines his affidavit. Pl.Ex. 11. The letter describes his dissatisfaction at the "comparatively minor work related injury that the company *insisted* be a work/comp. claim." *Id.* (emphasis added).

**\*5** On January, 10, 1996, Pierce called Kelleher to inform him that Chubb had directed him to continue to see Dr. Long. Def. 12(M) ¶ 28; Pl. 12(M) ¶ 10.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 610779 (N.D.Ill.), 11 NDLR P 46
(Cite as: Not Reported in F.Supp.)

Page 4

She explained he needed to either appear at his appointment, scheduled for January 10, or reschedule. *Id.* The same day, Alexian called Pierce to inquire whether, based on Kelleher's statements, he was returning to the clinic. *Id.* Pierce contacted both Alexian and Long to let them know he would make the appointment. *Id.*

In the meantime, Kelleher visited Dr. Cirrincione. Def. 12(M) ¶ 29. Initially, Dr. Cirrincione released him for two weeks. *Id.* At Pierce's direction, Nicholas contacted Dr. Cirrincione with questions about the two week release. *Id.* Dr. Cirrincione learned that Solopak had light duty available and thus scaled back the release from two to one week. *Id.* According to Dr. Cirrincione's handwritten office notes, Kelleher was to visit him at the end of the week so he could determine whether he was ready for light duty. Ex. Z. Following Dr. Cirrincione's instructions, he did not report to work on January 9-12. Pl. 12(M) ¶¶ 22-23.

On January 11, 1996, Long released Kelleher to return to work with some restrictions. Def. 12(M) ¶ 30. Pierce called Michael Ray ("Ray") at Chubb to inform him about the divergent work restrictions from Kelleher's doctors. Def. 12(M) ¶ 31. Ray instructed Pierce she could follow Long's instructions if the Company was able to accommodate the restriction. *Id.* Later the same day, Pierce attempted to contact Kelleher. Def. 12(M) ¶ 32. She was unable to reach him in person because the phone number and address he had given on his employment application were for an office, instead of his actual residence. *Id.* Hence, Pierce sent him a telegram notifying him to return to work because Solopak was able to meet his restrictions. *Id.;* Pl. 12(M) ¶ 20. He did not receive the telegram until the next day. Pl. 12(M) ¶ 21.

Well after his shift started on January 12, 1996, at approximately 8:50 a.m., Kelleher contacted Swenson and asked why Solopak was forcing him to return to work. Def. 12(M) ¶ 33; Pl. 12(N) Ex. D. Swenson told him he had to contact either Pierce or Nicholas. *Id.* At 9:45 a.m., Kelleher called Pierce and she explained Chubb had instructed her to bring him back to work if Solopak was able to accommodate his restrictions. *Id.* He never requested a sick day, told Pierce he was ill, or that he was going to the hospital. *Id.* He told her he would pay Cirrincione's bills and she would receive minimal information and should not expect him to return to work. *Id.* Kelleher disputes Pierce's notes documenting the call. Pl. 12(N) Ex. D. He claims he

informed Pierce of the reason he was not coming into work on January 12, namely that he was following the advice of Dr. Cirrincione. Kelleher Aff. II ¶ 8; Pl. 12(N) Ex. D. The citations establish he informed Solopak he was abiding by Dr. Cirrincione's release; however, he points to no record evidence that he informed Solopak he was in the emergency room at the direction of Dr. Long for suspected bronchitis and pneumonia.

**\*6** Pierce told Dvorak that Dr. Long released Kelleher to return to work. Def. 12(M) ¶ 34. Because Kelleher neither appeared for work nor informed the company of his absence prior to the start of the shift, Dvorak terminated his employment pursuant to Solopak's rules of conduct. *Id.* Specifically, Dvorak found Kelleher in violation of Rule 15 which requires immediate discharge for "overstaying a leave of absence without authorization of the Company." *Id.*

On January 14, 1996, a Sunday, Kelleher left Pierce a voice mail message at work explaining he had been hospitalized on the afternoon of January 12 and was to be released that day. Def. 12(M) ¶ 35; Pl. 12(N) Ex. D. At that time, Kelleher provided Solopak with no medical certification to support his hospitalization. *Id.* On January 24, 1996, Long sent Solopak a letter releasing Kelleher from work from January 9, 1996 to January 23, 1996. Def. 12(M) ¶ 36. The letter stated Kelleher had developed infectious bronchitis as a complication of his injury and was instructed to go to the nearest hospital to evaluate possible pneumonia and admission. Ex. EE. However, because he failed to timely inform Solopak of his illness and did not communicate to Solopak he was ill or sick on January 12, 1996, the termination was not rescinded. Def. 12(M) ¶ 36. He denies he failed to timely inform Solopak of his illness. Pl. 12(N) ¶ 36. Yet, the only portions of the record he cites in support of this denial are the notes of Swenson and Pierce. Pl. 12(N) Ex. D. These notes do not establish he timely informed Solopak he was in the hospital based on Dr. Long's indication he might have bronchitis. As stated above, the notes only establish Kelleher informed Solopak he would not follow Dr. Long's work release and Solopak's request he return to work. After these medical complications, he was fully released to work on March 20, 1996. *Id.;* Pl. 12(N) ¶ 36.

On March 25, 1996, he filed a workers' compensation claim. Def. 12(M) ¶ 38. [FN5] No one at Solopak knew he intended to file this claim before the date of termination. *Id.* Kelleher denies this statement. Pl.

Not Reported in F.Supp.                                                                                          Page 5
Not Reported in F.Supp., 1997 WL 610779 (N.D.Ill.), 11 NDLR P 46
(Cite as: Not Reported in F.Supp.)

12(M) ¶ 38. But the exhibits Kelleher cites do not demonstrate knowledge of his intention to file a workers' compensation claim. Def. 12(M) Exs. [L]-7, Y, Z and GG.[FN6] These exhibits only establish Solopak and its insurer were aware of Kelleher's injury, and the company's insurance claim was being handled by Chubb.[FN7] In the past two years, Solopak has terminated numerous employees for failing to return to work after a scheduled leave without notifying their supervisor. Def. 12(M) ¶ 41. Further, 56 Solopak employees suffered workers' compensation injuries from January 1, 1994 to December 31, 1996. Def. 12(M) ¶ 42. Of these, all received workers' compensation benefits. *Id.* None of these employees was terminated for their claim or receipt of benefits. *Id.* Only Kelleher was involuntarily terminated. *Id.*

FN5. Defendant cites the incorrect date for filing of the workers' compensation claim. The claim is dated March 25, not March 21.

FN6. The court corrects Kelleher's mislabeled citation to exhibit J-7 because the mistake is due to Solopak's erroneous labeling of its exhibits. Kelleher obviously refers to page 7 of the Ray notes found in Solopak's 12(M) exhibit L.

FN7. Exhibit GG is the workers' compensation claim itself, which is dated March 25, 1996.

*7 Kelleher became re-employed with Wessley-Jesson Corporation as a maintenance mechanic in 1996. Def. 12(M) ¶ 44. He is currently employed there. *Id.* He filed a second charge of discrimination with the EEOC on May 15, 1996. Compl. ¶ 5. On August 30, 1996, he received a no reasonable cause finding and a right to sue letter. *Id,* Ex. B. This case was timely filed on November 25, 1996.

## DISCUSSION

### I. SUMMARY JUDGMENT STANDARD

A movant is entitled to summary judgment under Rule 56 when the moving papers and affidavits show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265

(1986); *Unterreiner v. Volkswagen of America, Inc.*, 8 F.3d 1206, 1209 (7th Cir.1993). Once a moving party has met its burden, the non-moving party must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. Fed.R.Civ .P. 56(e); *Becker v. Tenenbaum-Hill Assoc., Inc.*, 914 F.2d 107, 110 (7th Cir.1990). The court considers the record as a whole and draws all reasonable inferences in the light most favorable to the party opposing the motion. *Fisher v. Transco Services-Milwaukee, Inc.*, 979 F.2d 1239, 1242 (7th Cir.1992).

A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Stewart v. McGinnis*, 5 F.3d 1031, 1033 (7th Cir.1993), *cert. denied*, 510 U.S. 1121, 114 S.Ct. 1075, 127 L.Ed.2d 393 (1994). This standard is applied with added rigor in employment discrimination cases, where issues of intent and credibility often dominate. *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1038 (7th Cir.1993) (citations omitted). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus., Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson*, 477 U.S. at 252.

### II. DISCRIMINATION UNDER THE ADA

The ADA prohibits an employer from discriminating against a qualified individual with a disability because of that disability. 42 U.S.C. § 12112. Kelleher argues in his motion for summary judgment he is entitled to judgment of as a matter of law because he has established the elements of a prima facie case of discrimination under the McDonnell-Douglas burden-shifting analysis applied by the Seventh Circuit in *DeLuca v. Winer Indus*, 53 F.3d 793, 797 (7th Cir.1995). Pl. Mem. at 4. The Seventh Circuit, however, clarified when the McDonnell-Douglas burden-shifting analysis was appropriate in an ADA context in *Bultemeyer v. Fort Wayne Community Schools*, 100 F.3d 1281 (7th Cir.1996). The court explained that while McDonnell-Douglas burden-shifting was appropriate in disparate treatment cases such as *DeLuca*, it is unnecessary and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 610779 (N.D.Ill.), 11 NDLR P 46
(Cite as: Not Reported in F.Supp.)

Page 6

inappropriate in a case involving a reasonable accommodation claim. *Id.* at 1283-84.

\*8 Kelleher clearly bases his summary judgment motion as to the discrimination claim on the following contentions: (1) he was disabled as defined by the ADA because he was suffering from a serious knee injury; (2) he was a qualified individual with a disability because he was able to work with restrictions on August 28, 1995, but Solopak refused to accommodate those restrictions; and (3) he was terminated on September 11, 1995 for being absent from work. Pl. Mem. at 4. Kelleher does not attempt to bring any evidence to the court's attention showing he was a victim of disparate treatment: employees not suffering from disabilities were more favorably treated than he. Hence, the court need not analyze Kelleher's discrimination claim under the McDonnell-Douglas framework. Rather, to establish a prima facie case of discrimination under the ADA, Kelleher need only show: "(1) that [he] is a disabled person within the meaning of the ADA; (2) that [he] is qualified, that is, with or without reasonable accommodation (which [he] must describe), [[[he] is able to perform the essential functions of the job; and (3) that [he] suffered an adverse employment action because of [his] disability." *Garza v. Abbott Laboratories*, 940 F.Supp. 1227, 1235 (N.D.Ill.1996).

Solopak's motion fits this framework. Solopak argues it is entitled to summary judgment because Kelleher cannot prove he is disabled under the ADA or that Solopak failed to reasonably accommodate him. Motion at 1. These threshold elements of Kelleher's alleged prima facie case are discussed below.

### A. Disability

The ADA defines a disability as "a physical or mental impairment that substantially limits one or more of the major life activities of an individual ...." 42 U.S.C. § 12102(2). "Major life activities" include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working ." 29 C.F.R. § 1630.2(i). For an impairment to "substantially limit" one or more of these major life activities, the individual must be unable to perform, or be significantly limited in the ability to perform, an activity compared to an "average person in the general population." 29 C.F.R. § 1630.2(i). When determining whether an impairment is substantially limiting, courts should consider the nature and severity of the impairment, its duration or expected duration, and its permanence or long term impact. *Hamm v. Runyon*, 51 F.3d 721, 725 (7th Cir.1995).

Kelleher fails to set forth any evidence his injuries resulted in permanent or long term impact. "Intermittent, episodic impairments are not disabilities." *Van Zande v. State of Wisconsin Dept. of Admin.*, 44 F.3d 538 (7th Cir.1995). Although Kelleher suffered three injuries during the time he was an employee of Solopak, he limits his claim of disability under the ADA to the knee injury he sustained on August, 7, 1995. Several courts have held a knee injury resulting in no permanent impairment does not constitute a disability as defined by the ADA. See, e.g., *Harris v. United Airlines, Inc.*, 956 F.Supp. 768, 773 (N.D.Ill.1996) (knee injury considered a temporary impairment for purposes of the ADA); *Blanton v. Winston Printing Co.*, 868 F.Supp. 804, 807 (M.D.N.C.1994) (same). Kelleher submits no evidence demonstrating his knee injury had any permanent effects on his ability to perform the essential functions of his job. The only testimony describing the essential physical functions of Kelleher's job as maintenance technician states he was required to perform work requiring lifting and work over the shoulders. Shettl Aff. ¶ 4. Moreover, the only evidence suggesting the inference of a significant limitation on any life activity is one statement in his deposition that the knee injury gave him "probably permanent" difficulty climbing. Kelleher Dep. at 117-118. These statements pertain to the injury Kelleher suffered on September 14, 1994-an injury he fails to even mention in his motion for summary judgment or his 12(M) statement. Further, certain types of climbing are not considered a major life activity. *Kriskovic v. Wal-Mart Stores, Inc.*, 948 F.Supp. 1355, 1364 (E.D.Wisc.1996). There is no evidence the "no climbing" restriction in his medical release from Dr. Dobozi resulted in Kelleher's inability to perform the functions of his job. See *Thompson v. American Hosp. Ass'n*, 1996 WL 563455, \*4 (N.D.Ill. September 30, 1996) (granting summary judgment because plaintiff did not show limitations on stair climbing substantially impaired his ability to his own job, let alone class or range of jobs). This evidence alone is not enough from which a reasonable jury could conclude, Kelleher suffered from a disability as defined by the ADA.

\*9 Further, to prove he is substantially limited in the major life activity of working Kelleher must provide evidence he is "significantly restricted in ability to perform either a class of jobs or a broad range of jobs

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                     Page 7
Not Reported in F.Supp., 1997 WL 610779 (N.D.Ill.), 11 NDLR P 46
(Cite as: Not Reported in F.Supp.)

in various classes as compared to the average person with comparable training, skills, and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C .F.R. § 1630.2(j)(3)(i). In other words, Kelleher has the burden to produce evidence showing a significant restriction in ability to perform either a class of jobs or a broad range of jobs in various classes. *Bolton v. Scrivner, Inc.*, 36 F.3d 939, 943 (10th Cir.1994). In the language of the Seventh Circuit, "the impairment must substantially limit employment generally." *Byrne v. Board of Educ. .*, 979 F.2d 560, 565 (7th Cir.1992). It is not enough for Kelleher to argue the inability to perform a particular job. *Roth v. Lutheran General Hosp.*, 57 F.3d 1446, 1454 (7th Cir.1995). Nor is it sufficient to submit evidence of one's disqualification from a narrow class of jobs. *Mckay v. Toyota Motor Mfrg.*, 110 F.3d 369, 372 (6th Cir.1997) (citing *Wooten v. Farmland Foods*, 58 F.3d 382, 386 (8th Cir.1995) (quoting *Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 723 (2d Cir.1994))).

Construing the evidence of medical impairment favorably to Kelleher, as this court is required to do, the evidence still fails to establish a substantial impairment of his ability to perform a broad class of jobs, such as maintenance technician jobs, or a broad range of jobs. As Solopak correctly points out, all Kelleher's injuries resulted in only temporary leaves of absence from his job. After each of these injuries he received a full medical release to return to work. In fact, sometime after Solopak finally terminated his employment on January 12, 1996, he obtained alternate employment as a maintenance technician at another company. Def. 12(M) ¶ 44. The lack of evidence as to the permanence and long term impact of any of Kelleher's injuries and of his inability to perform either a broad class of jobs or a broad range of jobs in various classes disposes of Kelleher's claim he suffers a disability as defined by the ADA.

### B. Qualification and Accommodation

Even assuming, Kelleher could show his knee injury or any of his other short term injuries substantially limit his ability to work, he has failed to produce evidence sufficient to satisfy the remaining element of a prima facie case of discrimination. The ADA defines a "qualified individual" as an individual "who satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires, and who, with or without reasonable accommodation, can

perform the essential functions of such position." 29 C.F.R. § 1630 .2(m). The ADA requires an employer to provide reasonable accommodations for the known physical or mental limitations of an otherwise qualified individual with a disability, unless the accommodation would impose an undue hardship on the employer. 42 U.S .C. § 12112(b)(5)(a). The ADA "does not relieve a disabled employee or applicant from the obligation to perform the essential functions of [a] job. To the contrary, the ADA is intended to enable disabled persons to compete in the workplace based on the same performance standards and requirements that employers expect of persons who are not disabled." 29 C.F.R. § 1630, Appendix.

**\*10** The Seventh Circuit has held that an "employer has at least some responsibility in determining the necessary accommodation." *Feliberty v. Kemper Corp.*, 98 F.3d 274, 280 (7th Cir.1996) (citing *Beck v. University of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir.1996)). Both the employer and the employee must make reasonable, good faith efforts to find a reasonable accommodation. *Id.* The employer's responsibility to participate in this process does not arise, however, until the employee requests an accommodation. *Bultemeyer v. Ft. Wayne Community Schools*, 100 F.3d 1281, 1286 (7th Cir.1996). Further, the employee has the burden of demonstrating the requested accommodation is reasonable. *Van Zande*, 44 F.3d 538, 543 (7th Cir.1996).

Kelleher seeks to hold Solopak liable for its alleged refusals to accommodate his need for light duty work following his knee injury. The evidence demonstrates Solopak's inability to accommodate his need for light duty work. The evidence does not otherwise show Solopak failed to make attempts to reasonably accommodate Kelleher. Rather the evidence shows Solopak attempted to make short term disability payments available during the brief period it could not accommodate his restrictions, and Kelleher refused. Def. 12(M) ¶ 12. Further, it is clearly established as a matter of law that the unavailability of light duty work does not subject an employer to liability for failure to reasonably accommodate. *See, e.g., Adams v. Joilet Public Schools*, 1997 WL 222883 (N.D.Ill. April 24, 1997); *Cochrum v. Old Ben Coal Co.*, 102 F.3d 908, 912-13 (7th Cir.1996). Kelleher has produced no evidence to refute or raise an inference Solopak misrepresented the availability of light duty work meeting his restrictions. Accordingly, summary judgment is appropriate in favor of Solopak on the ADA

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 610779 (N.D.Ill.), 11 NDLR P 46
**(Cite as: Not Reported in F.Supp.)**

discrimination claim.

## II. RETALIATION UNDER THE ADA

The ADA prohibits retaliation by an employer against an employee for opposing any unlawful act or practice under the statute. 42 U.S.C. § 12203(a). Section 12203(a) of the ADA explicitly provides: No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

42 U.S.C. § 12203(a). Kelleher need only have had a "sincere and reasonable belief" that Solopak's conduct violated the ADA; an actual violation is not a prerequisite. *Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1314 (7th Cir.1989). Unlike Kelleher's claim of ADA discrimination based on Solopak's alleged failure to provide reasonable accommodation, he can seek to apply the McDonnell-Douglas burden-shifting analysis in the retaliation context. *Hunt-Golliday v. Metro. Water Reclamation Dist. of Greater Chicago*, 104 F.3d 1004, 1013 (7th Cir.1997). In order to establish a prima facie case of retaliation in violation of the ADA, Kelleher must show (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) there is a causal link between the protected expression and the adverse action by UIC. *Roth*, 57 F.3d at 1459. Kelleher argues, in conclusory fashion, the following sequence of events establishes a prima facie case of retaliation under the ADA: (1) on September 7, 1995 he informed Solopak he had contacted the EEOC; (2) on September 11, 1995 he was terminated by Solopak; (3) on September 13, 1995 he filed a complaint against Solopak with the EEOC. Pl. Mem. at 6. Solopak contends Kelleher fails to establish two essential elements of a prima facie case of retaliation.

*11 First, Solopak argues Kelleher cannot prove an adverse employment action on September 11, 1995. The court agrees. The Seventh Circuit defines an adverse employment action as follows:
[A] material adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits,

significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

*Crady v. Liberty National Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir.1993) (interpreting similar language in the Age Discrimination in Employment Act). Unless Kelleher can point to a material adverse change in the terms and conditions of his employment stemming from the September 11, 1995 termination letter, he fails to establish a prima facie case of retaliation. *Rabinowitz v. Pena*, 89 F.3d 482, 488 (7th Cir.1996).

The undisputed facts establish Kelleher suffered no material adverse change because of the September 11, 1995 termination letter. In fact, all evidence leads to the conclusion the issuance of the letter was the result of an unfortunate misunderstanding amongst the parties as to the reason for Kelleher's refusal to fill out short term disability paperwork. This conclusion is bolstered by the fact that as soon as the nature of the misunderstanding was clarified, Kelleher was allowed to return to work without any material loss of wage, title, benefits or responsibilities. Def. 12(M) ¶ 16. Kelleher provides no evidence to the contrary. Thus, he fails to make out an essential element of a prima facie case of retaliation.

The facts also fail to clearly establish the requisite causal connection. "In order to demonstrate the requisite causal link, [Kelleher] must demonstrate that [Solopak] would not have taken the adverse action 'but for' the protected expression." *Gleason v. Mesirow Financial, Inc.*, 118 F.3d 1134, 1147 (7th Cir.1997). Kelleher's attempt to show the September 11, 1995 termination letter would not have been issued but for his filing of an EEOC charge two days later, falters for two reasons. First, he submits inconsistent and contradictory testimony about Solopak's awareness of his intention to file an EEOC complaint. Solopak claims it did not learn of this charge until Kelleher spoke with Nicholas after receiving correspondence on September 13. Def. 12(M) ¶ 15. Kelleher claims he made Solopak aware of the EEOC charge prior to September 11. Pl. 12(M) ¶ 11. However, at various points in the record Kelleher makes divergent claims as to the date on which Solopak first became aware of the EEOC complaint. In his 12(M) statement he informed Solopak on September 7, 1995 he had contacted the EEOC to report an ADA violation. Pl. 12(M) ¶ 8; Kelleher Aff. I. He does not identify whom he spoke with nor does he describe the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 610779 (N.D.Ill.), 11 NDLR P 46
(Cite as: Not Reported in F.Supp.)

conversation. In contrast, in his 12(N) response he states he informed Solopak by telephone on September 4, 1995 of his intention of filing an EEOC charge. Pl. 12(N) ¶ 15. He cites to his deposition in support of this statement. Yet, several pages later in his deposition, on a page not cited by Kelleher, he states "but I'm beginning to wonder whether or not the September 4 [conversation] wasn't September 7." Kelleher Dep. at 105. Other portions of his deposition similarly undermine Kelleher's attribution of knowledge. Def. 12(N) ¶ 8.

*12 The deposition testimony on behalf of Solopak consistently denies knowledge of the EEOC charge prior to September 13, 1995. Dvorak testifies he did not know of the EEOC charge until "they [the EEOC] supplied us with the charge," in other words sometime after its filing on the 13th. Dvorak Dep. at 184. Shettl and Nicholas testify to the same effect. Deposition of Randal Shettl ("Shettl Dep. at ") at 105; Nicholas Dep. at 174-179.

Second, even assuming Kelleher informed Solopak on September 7, 1995 he had contacted the EEOC in spite of his uncorroborated testimony, he fails to proffer any explanation why Solopak would send a letter of termination on September 11 and then abruptly stop the termination process, had it known of the impending EEOC charges. In other words, he points to no grounds from which a reasonable jury could conclude Solopak sent the termination letter in retaliation for protected activity. The fact Kelleher was never removed from the payroll only lends legitimacy to Solopak's assertion that the letter was sent because its management understood Kelleher's refusal of short term disability benefits-the only way he could continue to be absent on approved medical leave-as an indication of his desire to end his employment. Def. 12(M) ¶ 13; Nicholas Dep. at 170. The requisite causal connection is further undermined by the fact the filing of the EEOC complaint took place two days after, not two days before, the alleged adverse action. *See McClendon v. Indiana Sugars, Inc.*, 108 F.3d 789, 796 (7th Cir.1997). Accordingly, Kelleher fails to establish a prima facie case of retaliation under the ADA.

## III. STATE LAW RETALIATORY DISCHARGE

The federal claims are no longer part of this case. Under the general rule, "when all federal claims are dismissed before trial, the pendent claims should be left to the state courts." *Wright v. Associated Ins. Co.s Inc.*, 29 F.3d 1244, 1252 (7th Cir.1994).

Retention of jurisdiction is proper under at least two of the three recognized exceptions to the general rule. *Id.* at 1251-1253. First, substantial judicial resources have been consumed in seeing the case to this late stage. Discovery has been completed and was hotly contested. The court was required to make discovery rulings on motions to show cause, motions to compel, motions to quash subpoenas and motions to vacate, all of which were heavily briefed. Second, the state law retaliatory discharge claim does not require the court to address areas of unsettled state law. Rather the claim is ripe for summary judgment due to Kelleher's failure to establish an essential element of a prima facie case of retaliatory discharge for exercising his workers' compensation rights.

Illinois has crafted a retaliatory discharge exception to the general rule that "at-will" employment is terminable at any time for any or no cause. *Hartlein v. Illinois Power Co.*, 151 Ill.2d 142, 176 Ill.Dec. 22, 601 N.E.2d 720, 728 (Ill.1992) (citing *Kelsay v. Motorola, Inc.*, 74 Ill.2d 172, 23 Ill.Dec. 559, 384 N.E.2d 353 (Ill.1978)). To establish a prima facie workers' compensation retaliatory discharge claim, Kelleher must show: (i) he was employed by the employer before incurring a work-related injury; (ii) he exercised a right granted by the Workers' Compensation Act; and (iii) his discharge was causally related to filing a workers' compensation claim. *Jackson v. Bunge Corp.*, 40 F.3d 239, 242 (7th Cir.1994) (citing *Slover v. Brown*, 140 Ill.App.3d 618, 94 Ill.Dec. 856, 488 N.E.2d 1103, 1105 (Ill.App.Ct.1986)). "The element of causation is not met if the employer has a valid basis, which is not pretextual, for discharging the employee." *Hartlein*, 176 Ill.Dec. 22, 601 N.E.2d at 728. Thus, once the employer produces a valid reason for discharge, the employee must show the purportedly valid reason was pretextual. *Meister v. Georgia-Pacific Corp.*, 43 F.3d 1154, 1160 (7th Cir.1995); *Jackson*, 40 F.3d at 244; *McEwen v. Delta Air Lines, Inc.*, 919 F.2d 58, 59-60 (7th Cir.1990). An employee establishes pretext by showing that the employer's reason is unworthy of credence or that the decision to terminate was more likely than not motivated by discriminatory reasons. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Horton v. Miller Chemical Co., Inc.*, 776 F.2d 1351, 1359 n. 11 (7th Cir.1985) (applying *Burdine* to Illinois retaliatory discharge cases), cert. denied, 475 U.S. 1122, 106 S.Ct. 1641, 90 L.Ed.2d 186 (1986).

*13 Kelleher fails to establish his March 21, 1996 filing of a workers' compensation claim was causally

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                        Page 10
Not Reported in F.Supp., 1997 WL 610779 (N.D.Ill.), 11 NDLR P 46
(Cite as: Not Reported in F.Supp.)

related to his termination on January 12, 1996, for failure to return to work despite the existence of a full medical release from Dr. Long. It is undisputed Solopak had no information at the time of the termination that he had been ordered by Dr. Long to admit himself to the nearest hospital emergency room for evaluation of bronchitis and possible pneumonia. The only information Kelleher did provide was that he chose to abide by the work restrictions of his specialist Dr. Cirrincione. Pl. 12(N) Ex. D. In light of the conflicting releases, Michelle Pierce contacted Mr. Ray at its workers' compensation carrier, Chubb Insurance, for advice on how she should proceed. Ray indicated Solopak could follow Dr. Long's restrictions if it could meet them. Because Solopak could meet the restrictions, it attempted to contact Kelleher to return to work. For various reasons recited in the statement of facts, Kelleher did not receive word of Solopak's desire he return to work until January 12, 1996. Even then, however, Kelleher appears to have acted in a standoffish manner and to fail to clearly communicate his needs. Pl. 12(N) Ex. D; Def. 12(M) Ex. Y. Instead, Kelleher insisted he follow Dr. Cirrincione's work release, instead of Dr. Long's. Pl. 12(N) Ex. D. None of the foregoing facts establish the requisite knowledge about Kelleher's intent to file a workers' compensation claim with the Illinois Industrial Commission. *Sweat v. Peabody Coal Co.*, 94 F.3d 301, 305 (7th Cir.1996); *Washburn v. IBP, Inc.*, 910 F.2d 372, 374 (7th Cir.1990).

Further, Kelleher fails to establish the element of causality because Solopak proffered a valid reason for discharge; Kelleher fails to demonstrate the reason was merely a pretext. *Bunge*, 40 F.3d at 242. Solopak cites to company rule of conduct 15 in support of the propriety of its discharge. The rule requires immediate discharge for failure to return from a medical leave. Def. 12(M) ¶ 34. In addition, Solopak stressed the discharge was also predicated on the undisputed fact Kelleher failed to communicate his current medical status to the company. Dvorak Dep. at 24-26. Kelleher never contended Solopak knew he was in the hospital pursuant to Dr. Long's orders. Moreover, "Illinois law does not require an employer to retain an at-will employee who is medically unable to return to his assigned position." *Hartlein*, 176 Ill.Dec. 22, 601 N.E.2d at 728. Finally, Kelleher points to no evidence from which a reasonable jury could conclude this stated reason was mere pretext. In fact, Solopak bolsters its claim by citing uncontroverted evidence that it uniformly discharges employees who fail to return from medical leave and

has not involuntarily terminated other employees who have received workers' compensation benefits. Def. 12(M) ¶ ¶ 41-42. Kelleher submits no evidence to call this evidence into question. Accordingly, the evidence also fails to establish a disputed issue of material fact that would preclude summary judgment in favor of Solopak on the state law retaliatory discharge claim.

### CONCLUSION

*14 Defendant's motion to strike is granted in part and denied in part. Plaintiff's motion to strike is denied. Defendant's motion for summary judgment is granted, and plaintiff's motion for summary judgment is denied. Judgment is entered in favor of defendant Solopak Pharmaceuticals, Inc. and Solopak Laboratories, Inc. and against plaintiff Patrick Kelleher.

N.D.Ill.,1997.
Kelleher v. Lolopak Pharmaceuticals
Not Reported in F.Supp., 1997 WL 610779 (N.D.Ill.), 11 NDLR P 46

Briefs and Other Related Documents (Back to top)

• 1:96cv07743 (Docket) (Nov. 25, 1996)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT E

Westlaw.

868 F.Supp. 804
868 F.Supp. 804, 5 NDLR P 403, 6 A.D.D. 775, 4 A.D. Cases 17
(Cite as: 868 F.Supp. 804)

Page 1

**C**
Briefs and Other Related Documents

United States District Court,M.D. North Carolina
,Greensboro Division..
James Howard BLANTON, Plaintiff,
v.
WINSTON PRINTING COMPANY, Defendant.
No. 2:93CV00392.

March 22, 1994.

Former employee brought action against employer alleging violation of Americans with Disabilities Act (ADA). Employer moved for summary judgment, to strike employee's summary judgment response, and for sanctions. Employee moved to compel discovery and to amend summary judgment response. The District Court, Sharp, United States Magistrate Judge, held that: (1) employee's knee injury was not "disability" within meaning of ADA, and (2) court would not impose sanctions on employee for his failure to appear for his own scheduled deposition.

Ordered accordingly.

West Headnotes

**[1] Civil Rights 78 ☞1218(3)**

78 Civil Rights
    78II Employment Practices
        78k1215 Discrimination by Reason of Handicap, Disability, or Illness
            78k1218 Who Is Disabled; What Is Disability
                78k1218(3) k. Particular Conditions, Limitations, and Impairments. Most Cited Cases
(Formerly 78k173.1)
Former employee's knee injury was not "disability" within meaning of ADA, even assuming that knee injury impaired major life activities; injury was of relatively short duration, preventing employee from working for a few days in each of three months, employee's postinjury physical condition was nearly as good as it was prior to injury, and employee's inability to run briskly and climb stairs easily were not sufficient residual effects to constitute "disability." Americans with Disabilities Act of 1990, § 3(2), 42 U.S.C.A. § 12102(2); 29 C.F.R. Part 1630 App., § 1630.2(j).

**[2] Civil Rights 78 ☞1019(2)**

78 Civil Rights
    78I Rights Protected and Discrimination Prohibited in General
        78k1016 Handicap, Disability, or Illness
            78k1019 Who Is Disabled; What Is Disability
                78k1019(2) k. Impairments in General; Major Life Activities. Most Cited Cases
(Formerly 78k107(1))
Temporary injury with minimal residual effects cannot be basis for viable claim under ADA. Americans with Disabilities Act of 1990, § 3(2), 42 U.S.C.A. § 12102(2); 29 C.F.R. Part 1630 App., § 1630.2(j).

**[3] Federal Civil Procedure 170A ☞1451**

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(C) Depositions of Parties and Others Pending Action
            170AX(C)6 Failure to Appear or Testify; Sanctions
                170Ak1451 k. In General. Most Cited Cases
Defendant was not entitled to sanctions for plaintiff's failure to appear for his own scheduled deposition; plaintiff was proceeding pro se, and subsequently cooperated fully in discovery.

**\*804** James Howard Blanton, pro se.
James M. Powell and Brian Marc Freedman, Haynsworth, Baldwin, Johnson, and Greaves, P.A., Greensboro, NC, for Winston Printing Co.

**MEMORANDUM OPINION AND ORDER**
SHARP, United States Magistrate Judge.
This case is before the court on the following motions: (1) Defendant's motion for summary judgment; (2) Plaintiff's motion to compel discovery; (3) Plaintiff's motion to amend his summary judgment response to include an affidavit; (4) Defendant's motion to strike Plaintiff's summary judgment response; and (5) Defendant's motion for sanctions, on which the court earlier deferred ruling.

For reasons set forth below, Defendant's motion for

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

868 F.Supp. 804
868 F.Supp. 804, 5 NDLR P 403, 6 A.D.D. 775, 4 A.D. Cases 17
(Cite as: 868 F.Supp. 804)

Page 2

summary judgment is granted. Because the information sought in Plaintiff's motion to compel does not bear on the reasons for the grant of summary judgment, the court need not reach that motion. Plaintiff's motion to include his affidavit is **GRANTED.** Defendant's motion to strike is **DENIED**, as is Defendant's motion for sanctions.

## BACKGROUND

Plaintiff filed this action on July 1, 1993, alleging that the Defendant discharged him in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq. (1993 Supp.) ("ADA"). Blanton claims that his employment was terminated because of a knee injury that prevented him from working.

## *805 FACTS

In June 1990, Plaintiff was hired by Winston Printing to be a multimedia sales representative. (Blanton Deposition [hereinafter "Dep."] 22.) His supervisor was Thomas B. Carey. (Dep. 24.)

On January 4, 1991, Blanton received a memorandum, addressed to all sales associates, instructing him to report to Carey whenever he would be out of the office due to illness or for personal reasons. (Dep. 29-30.)

Between January and April of 1991, Blanton suffered from various illnesses and personal problems that caused him to miss several days of work. (Dep. 36-37.)

On April 16, 1991, Blanton was advised in a written memorandum, followed by a personal meeting with Carey, that Carey did not believe Blanton to be adhering to the policy outlined in the January 4, 1991 memorandum. In the April 16 memorandum, Carey warned Blanton that when Blanton would be absent he would be required speak with Carey personally or leave a number where Blanton could be reached. (Dep. 31-34 and Exh. 2). That memorandum also noted that Carey believed he and Blanton had discussed the attendance policy "numerous times in the past few months." (Exh. 2.)

On August 15, 1991, Carey put Blanton on probation for 60 days "[d]ue to continued unapproved absences." (Dep. 40-41 & Exh. 3.) The probationary conditions were (1) that Blanton be in the company's offices during regular working hours

unless making personal, approved, sales calls, and (2) that Blanton would not miss work without a doctor's excuse more than two times in the next 60 days. The letter warned that if condition (2) was not met, Blanton's employment would be terminated. (Exh. 3.) Blanton received the letter at a meeting with Carey which took place after Blanton was absent for several days due to recurring illness. (Dep. 40-42.)

On September 16, 1991, Blanton met with Carey and James Gordon to discuss Blanton's attendance. (Dep. 50.) Blanton had been absent each of the five days preceding that meeting, again due to illness. At the meeting, Blanton was asked to choose between various employment options, including resignation from Winston Printing. (Dep. 51.) Blanton chose to remain with the company, promising to improve his communication with Carey when Blanton would be out of the office. (Dep. 54-55 and Exh. 4).

Blanton was again absent October 14-18, 1991. (Dep. 66.) Later in October, at the suggestion of a superior, Blanton contacted a counselor retained by Winston Printing, as well as other counselling services in the Greensboro area, including the Greensboro Veteran's Center. (Dep. 66-68.) On November 1, 1991, Blanton was admitted to the Veteran's Administration hospital in Durham, North Carolina for the evaluation and treatment of post-traumatic stress disorder. (Dep. 68.) Blanton stayed in the hospital for approximately 11 or 12 days, during which time Winston Printing paid him disability income. (Dep. 68.)

In January 1992, Blanton missed nine days of work due to illness and the death of his daughter. (Dep. 69.) He missed one day in February due to illness. (Dep. 69.) In March, he was absent due to an intestinal virus. (Dep. 73.) In June, Blanton missed three additional days of work, although he worked from his home part of that time. (Dep. 74-75.) According to company records, Blanton missed 12 days of work between January 1, 1992 and June 8, 1992. (Exh. 5.) On June 8, 1992, Carey again met with Blanton to discuss Blanton's absences. Carey warned Blanton that beginning July 1, 1992, continued absences would not be tolerated and Blanton would be subject to dismissal. (Dep. 75-78 and Exh. 5.)

On July 7, 1992, Blanton contacted a supplier without permission from the appropriate supervisors at Winston Printing, in violation of company policy. (Dep. 83.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

868 F.Supp. 804
868 F.Supp. 804, 5 NDLR P 403, 6 A.D.D. 775, 4 A.D. Cases 17
(Cite as: 868 F.Supp. 804)

Page 3

The injury underlying this case occurred on July 4, 1992, when Blanton noticed that his knee was swelling without any apparent trauma to the knee. (Dep. 93.) That day, he was examined and treated by Dr. Guest, who did not diagnose the cause of the condition at that time. (Dep. 94.) He was told to stay off the knee, stay home from work, and return for treatment on July 7, 1992. (Dep. *806 95.) Blanton returned to the doctor on July 7, when he was told to return again on July 10 and to continue to stay off the knee. (Dep. 97.) Within approximately one week of treatment, Blanton could drive and walk satisfactorily. (Dep. 109.)

On July 10, 1992, Blanton, Chuck Whitman, James Gordon, and Tom Carey held a telephone conference during which Blanton was placed on an unpaid leave of absence due to excessive absences and unprofessional actions. (Dep. 102-05.) Blanton was told to return to work on August 10, 1992.

When Blanton returned to work August 10, the only difficulty presented by the knee condition was in negotiating stairs. (Dep. 110.) Because Winston Printing had an elevator, his work was not affected by the knee condition. (Dep. 110-11.)

On Sunday, September 13, 1992, Blanton's knee again began to swell. (Dep. 122.) Blanton missed work on September 14 and 15. (Dep. 122-29.) On September 15, Blanton was again treated by a doctor. (Dep. 129.) Blanton had called Carey on September 13, and had spoken with someone else at the office on September 14 and possibly September 15, but did not call the office at all on September 16, 17 or 18. (Dep. 122-34, 142.) Blanton asked the physician's assistant to call Carey on September 15. (Dep. 131.)

Beginning September 13, Blanton's knee remained swollen for approximately eight to ten days; by October 10, he was able to function relatively normally. (Dep. 146, 153.) The knee was eventually treated by an orthopedist on November 16, 1992, when a tear of the medial meniscus was diagnosed as the problem underlying both episodes of swelling. (Dep. 146 and Exh. 14.)

On September 29, Blanton sent Carey a mailgram advising Carey of the knee condition and that the treating physician would be forwarding to Carey copies of Blanton's medical records. (Dep. 148.) At some point in late September, someone employed by Blanton's dentist contacted Winston Printing and was told that Blanton was no longer employed there. The dental assistant informed Blanton of this fact in late

September or early October. (Dep. 154.)

Blanton's next contact with Winston Printing occurred on November 5, 1992, when he called to discuss his termination. (Dep. 151.) Blanton had never received the company's letter of termination, dated September 18, 1992, which stated that Blanton was being fired due to his failure to contact the company on September 16, 17, and 18, 1992. (Exh. 9.)

On December 1, 1992, Blanton was released by his orthopedist to return to full employment. (Exh. 15.) He was unable to afford the recommended arthroscopic surgery to ameliorate the knee condition. He retains slight limitation of his knee function; he can not run well nor climb stairs easily. (Dep. 167.)

Blanton filed a charge with the Equal Employment Opportunity Commission, which found no violation of the ADA and issued a right to sue letter. (Exh. 16.)

## DISCUSSION

### A. The ADA Claim

The Americans With Disabilities Act, 42 U.S.C. 12101 et seq. (1990) ( "ADA"), is a remedial statute designed to ensure that employers will not deny qualified persons with disabilities employment opportunities on the basis of a real or perceived handicap. *Interpretive Guidance on Title I of the Americans With Disabilities Act,* 29 C.F.R. Pt. 1630, App. (1993). Section 12112(a) of the ADA sets out the "general rule" of the Act as follows:

No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). "Covered entity" includes all employers, and therefore prohibits Defendant Winston Printing from discriminating against otherwise qualified individuals with disabilities. 42 U.S.C. § 12111(2).

[1] The threshold question in this case is whether Plaintiff can be considered a "qualified individual with a disability" within the *807 meaning of the

868 F.Supp. 804
868 F.Supp. 804, 5 NDLR P 403, 6 A.D.D. 775, 4 A.D. Cases 17
(Cite as: 868 F.Supp. 804)

Page 4

ADA. Plaintiff's claim is bottomed on the fact that his employment was terminated during a period when his knee had been injured and prevented him from caring for himself, walking, and attending work. A central issue of the case, then, is whether Blanton's knee injury constitutes a "disability" under the ADA. Because the court concludes that it does not, Plaintiff's claim must fail.

The ADA defines "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). In turn, the Act defines "disability" as "(A) [a] physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2).

To further clarify the physical conditions intended to be within the purview of the ADA, it is helpful to consult the Act's interpretive guidelines. They state that "temporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities. Such impairments may include, but are not limited to, broken limbs, sprained joints, concussions, appendicitis, and influenza." 29 C.F.R. pt. 1630 App.

The interpretive guidelines also provide the following guidance:
Part 1630 notes several factors that should be considered in making the determination of whether an impairment is substantially limiting. These factors are (1) the nature and severity of the impairment, (2) the duration or expected duration of the impairment, and (3) the permanent or long term impact, or the expected permanent or long term impact of, or resulting from, the impairment.... Thus, for example, a broken leg that takes eight weeks to heal is an impairment of fairly brief duration. However, if the broken leg heals improperly, the "impact" of the impairment would be the resulting permanent limp.

29 C.F.R. pt. 1630 App.

Blanton's knee injury, as debilitating as it may have been at times, was of a relatively short duration. The knee injury prevented Plaintiff from working for a matter of days in July, September, and October 1992. Given this fact, the interpretive guidelines

unquestionably preclude a finding of "disability" under the ADA, even assuming that "major life activities" were temporarily impaired when the knee was at its worst.

Further, the medical record shows in uncontradicted fashion that Blanton's post-injury physical condition is nearly as good as it was prior to the tear. As of the date of his deposition (October 7, 1993), Blanton's only remaining difficulties were running and ascending and descending stairs. The interpretive guidelines directly address this situation:
An individual is not substantially limited in a major life activity if the limitation ... does not amount to a significant restriction when compared with the abilities of the average person. For example, an individual who had once been able to walk at an extraordinary speed would not be substantially limited in the major life activity of walking if, as a result of a physical impairment, he or she were only able to walk at an average speed, or even at moderately below average speed.

29 C.F.R. pt. 1630 App. Plaintiff's inability to run briskly or climb stairs as easily as he could before the injury are not sufficient residual effects to constitute a "disability."

Surveying the cases decided under the Americans with Disabilities Act and the Rehabilitation Act of 1973 (Rehabilitation Act),[FN1] the same result is achieved. For example, in *Evans v. City of Dallas,* 861 F.2d 846 (5th Cir.1988), a former city employee sued the city, asserting various federal and state *808 claims in connection with the termination of his employment. After the trial court granted summary judgment for the city, Evans appealed. One of Evans' arguments on appeal was that the district court erred in dismissing his claim brought under the Rehabilitation Act. *Id.* at 852-53. Evans argued that he had a viable claim under the Act because one of the alleged reasons for his discharge was excessive absenteeism resulting from a knee injury which required surgery. *Id.* at 852.

FN1. The Rehabilitation Act prohibits discrimination on the basis of a "handicap," which was replaced by the term "disability" in the ADA. The definitions of the two terms are identical and the two statutes are interpreted identically on this topic. *Interpretive Guidance on Title I of the Americans with Disabilities Act,* 29 C.F.R. pt. 1630 App. (1993).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

868 F.Supp. 804                                                    Page 5
868 F.Supp. 804, 5 NDLR P 403, 6 A.D.D. 775, 4 A.D. Cases 17
(Cite as: 868 F.Supp. 804)

The Fifth Circuit concluded that Evans was not an "individual with a handicap" within the meaning of the Rehabilitation Act: "Although the injury may have limited plaintiff's life activities during his recuperation, Plaintiff does not allege that it continues to do so; nor does he contend that others regard him as having an impairment that continues to do so." *Id.* (quoting district court opinion). The court noted also that the definition of "handicap," which mirrors the definition of "disability" in the ADA, is written in the present tense, implying that diminished physical capacity or the perception thereof continues to exist. *Id.* The court agrees with this interpretation.

In another case factually similar to the instant litigation, a chronically absent employee brought a discrimination claim under the ADA on the basis of a temporary injury. In that case, the court also rejected the ADA claim:

Under the theory proposed by plaintiff to define his condition as a "handicap," the Court would have to find all chronic illnesses, whether transitory or permanent, that prevent an employee from meeting a regular work schedule, as a handicap under the Act. This is clearly inconsistent with congressional intent under the Act.

*Santiago v. Temple Univ.*, 739 F.Supp. 974, 979 (E.D.Pa.1990), *aff'd,* 928 F.2d 396 (3d Cir.1991).

[2] Thus, the plain wording of the statute, the interpretive guidelines, and prior court decisions all indicate that a temporary injury with minimal residual effects, such as Plaintiff's, cannot be the basis for a viable claim under the Americans with Disabilities Act. Because of this finding, the court does not address Defendant's argument that, as an employee incapable of conforming to the company attendance policy, Blanton was not "otherwise qualified" within the meaning of the ADA.

Accordingly, summary judgment will be granted for Defendant.

**B. The Remaining Pending Motions**

1. Plaintiff's Motion to Compel Discovery

Because judgment will be entered for Defendant, and the information Plaintiff seeks in his motion to compel has no bearing on the determinative issue of the case, Plaintiff's motion is now moot, and accordingly the court will not rule on it.

2. Defendant's Motion for Sanctions

[3] At an earlier stage in the case, Defendant requested that the court impose sanctions on Blanton for his failure to appear for his own scheduled deposition. The court reserved ruling on the matter, and at this time will deny the motion. Blanton is proceeding *pro se,* and after the time of his earlier appearance before this court seems to have cooperated fully in discovery. Therefore, the court will not impose sanctions on him and Defendant's motion is **DENIED.**

3. Plaintiff's Motion to Amend

Plaintiff's motion to amend is **GRANTED.**

4. Defendant's Motion to Strike

Because Defendant's motion for summary judgment will be granted notwithstanding the excessive length of Plaintiff's response to it, the court will **DENY** Defendant's motion to strike.

**CONCLUSION**

**IT IS ORDERED** that Defendant's motion for summary judgment is **GRANTED.** A Judgment will be entered dismissing this action will be entered contemporaneously with this Memorandum Opinion and Order. Defendant's motion for sanctions is **DENIED.** Plaintiff's motion to compel discovery is dismissed as moot. Plaintiff's motion to amend **\*809** his summary judgment response is **GRANTED.** Defendant's motion to strike is **DENIED.**

M.D.N.C.,1994.
Blanton v. Winston Printing Co.
868 F.Supp. 804, 5 NDLR P 403, 6 A.D.D. 775, 4 A.D. Cases 17

Briefs and Other Related Documents (Back to top)

• 2:93CV00392 (Docket) (Jul. 01, 1993)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT F

Westlaw.

Slip Copy

Slip Copy, 2005 WL 1475368 (D.Minn.)
(Cite as: Slip Copy)

C
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Minnesota.
Kerry B. KRUEGER, Plaintiff,
v.
SPEEDWAY SUPERAMERICA, LLC, a Delaware
limited liability company (incorrectly named as
Speedway SuperAmerica, L.L.C., a Delaware
limited liability corporation, Defendant.
**No. Civ.03-6568(DSD/JSM).**

June 22, 2005.

Daniel B. Honsey, and Kraft, Walser, Hettig &
Honsey, Hutchinson, MN, for plaintiff.
Marko J. Mrkonich, Stephanie D. Sarantopoulos,
and Litter Mendelson, P.C., Minneapolis, MN, for
defendant.

ORDER

DOTY, J.

*1 This matter is before the court upon defendant's
motion for summary judgment. Based upon a
review of the file, record and proceedings herein,
and for the reasons stated, the court grants
defendant's motion.

BACKGROUND

This is an action under the Family and Medical
Leave Act ("FMLA"), 29 U.S.C. § 2601, et seq.
Defendant Speedway SuperAmerica LLC ("
Speedway") operates service stations and
convenience stores. Plaintiff Kerry Krueger was
employed by Speedway in August of 1995. She
voluntarily resigned approximately seven months
later and was then re-employed by Speedway
beginning February 10, 1997. In 1999, she was
promoted to the position of store manager at the
Hutchinson, Minnesota, Speedway store. She

worked in that position until her termination on
September 9, 2002.

In November of 2001, a Speedway store in
Burnsville, Minnesota, received a citation for
selling tobacco to minors and lost its license to sell
tobacco products for one year. In response,
defendant began conducting internal compliance
checks, or "stings," of its stores to ensure that
tobacco sales complied with state law. Defendant
sent a memo dated March 14, 2002, to all
employees that included the following warning:
Employees who fail these compliance checks are
subject to discipline and likely will be terminated.
Managers' [sic] whose store sustain [sic] multiple
failures of internal compliance checks risk
termination. This is a serious issue. All employees
will follow the policy, and will not break the law.

(Krueger Dep. Ex. 19.) Plaintiff signed and returned
a copy of the memo on April 3, 2002. She also
filled out a short quiz on tobacco sales and signed
an agreement to inform all store clerks about
tobacco laws. (See Krueger Dep. Ex. 20.)

By the end of April, plaintiff's store had failed five
out of five compliance checks. She received a
written warning that failing a check in May "will
result in removal from her position as manager ." (
Id. Ex. 21.) Plaintiff signed and returned the
warning on April 29, 2002. She later received a
memo dated May 6, 2002, that addressed tobacco
sales policies and stated that "[i]t is the managers
[sic] responsibility first to make certain all
associates understand the policy and are trained
accordingly." (Id. Ex. 23 .) On June 26, 2002,
Plaintiff received a "less than satisfactory" overall
performance rating from her district manager,
Leland Firkus.

In early July of 2002, plaintiff submitted a request
for FMLA leave from July 24 to September 4,
2002, to undergo surgery. Defendant approved the
leave on July 15, 2002. By the time plaintiff began

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2005 WL 1475368 (D.Minn.)
**(Cite as: Slip Copy)**

her FMLA leave, her store was the only location in the Minnesota division that had failed ten out of ten compliance checks. In August, Minnesota division vice president David Kaspar informed region manager Ron Meyer and others of compliance check results. Kaspar noted that the Hutchinson store "has NEVER passed-(mgr needs replaced)." (Krueger Dep. Ex. 29 (emphasis in original).) On August 14, 2002, Meyer forwarded the message to Firkus and others with the instruction that "[i]f you have an item or issue on the list that applies, or needs attention or correction-get going on it." (*Id.*)

**\*2** Defendant alleges that Firkus correctly understood that he was to terminate plaintiff's employment. However, defendant contends that he did not immediately do so because he mistakenly believed he had to wait until she returned from leave. On Thursday, September 5, 2002, plaintiff returned from leave and informed Firkus that she could not work more than four hours at a time and required at least two days off per week, as instructed by her doctor. Firkus responded that he wanted her to work mornings from six to ten starting Friday, September 6, and that she should take her days off during the week. Plaintiff apparently asked for Friday off, which Firkus granted.[FN1] Firkus also learned on September 5 that he could terminate plaintiff's employment at any time, if based on a legitimate reason. On September 9, 2002, Firkus terminated plaintiff based upon her store's failure to pass a compliance check as of August 2002.

> FN1. Plaintiff cites "Firkus Dep. Exhibit 10" following the alleged transcript of Firkus's voice mail messages left for Plaintiff on September 5, 2002. The court is unable to locate such an exhibit in the record. However, defendant does not dispute the content of those messages. Therefore, the court will refer to plaintiff's rendition of the messages. (*See* Pl.'s Mem. Opp'n Def.'s Mot. Summ. J. at 6.)

Plaintiff filed this action on December 31, 2003. She claims that defendant violated FMLA by retaliating against her for taking FMLA leave,

failing to reinstate her to a same or similar position and denying her additional leave. Defendant denies plaintiff's allegations and now moves for summary judgment on all claims.

## DISCUSSION

### I. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In order for the moving party to prevail, it must demonstrate to the court that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986) (quoting Fed.R.Civ.P. 56(c)). A fact is material only when its resolution affects the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. *See id.* at 252.

On a motion for summary judgment, all evidence and inferences are to be viewed in a light most favorable to the nonmoving party. *See id.* at 255. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial. *See Celotex,* 477 U.S. at 324. Moreover, if a plaintiff cannot support each essential element of its claim, summary judgment must be granted because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. *See id.* at 322-23.

## II. FMLA

### A. Retaliation Claim

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2005 WL 1475368 (D.Minn.)
(Cite as: Slip Copy)

Page 3

Plaintiff alleges defendant retaliated against her for exercising her rights under FMLA. FMLA prohibits employers from discriminating or retaliating against an employee because the employee exercised or attempted to exercise rights established by the Act. *See* 29 U.S.C. § 2615(a)(2); *Throneberry v. McGehee Desha County Hosp.*, 403 F.3d 972, 977 (8th Cir.2005). For a FMLA retaliation claim to survive a motion for summary judgment, a plaintiff must make a prima facie showing of wrongful retaliation. *See McBurney v. Stew Hansen's Dodge City, Inc.*, 398 F.3d 998, 1002 (8th Cir.2005). To establish a prima facie claim, plaintiff must show (1) that she engaged in conduct protected under the Act, (2) that she suffered an adverse employment consequence, and (3) that there is a causal connection between the two. *See id.*

*3 Once a plaintiff has made a prima facie showing of FMLA retaliation, the court applies a variant of the familiar "shifting burdens" analysis set forth in *McDonnell Douglas. See Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 832 (8th Cir.2002) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). The defendant must offer a legitimate, non-retaliatory reason for the adverse action. *See id.* at 833. Next, the plaintiff must rebut the defendant's justification by presenting evidence that the proffered reason is pretext. *See id.* at 833. If the plaintiff presents such evidence and creates a reasonable inference of retaliation, summary judgment is inappropriate. *See id.* at 833.

Plaintiff sets forth two different theories of retaliation. First, plaintiff alleges that defendant unlawfully terminated her employment in retaliation for taking FMLA leave from July 24 to September 4, 2002. As to this allegation, plaintiff has shown the first and second elements of a prima facie claim. She engaged in protected conduct when she received qualifying leave under the Act, and she experienced an adverse employment action when defendant later terminated her employment.[FN2] *See Kerns v. Capital Graphics*, 178 F.3d 1011, 1016 (8th Cir.1999).

> FN2. Plaintiff claims that the June 26, 2002, negative performance review was

also an adverse action in response to her request for leave. (Pl.'s Mem. Opp'n Def.'s Mot. Summ. J. at 10.) However, a negative employment review "is actionable only if the employer subsequently uses the evaluation as a basis to alter in a detrimental way the terms or conditions of the recipient's employment." *Henthorn v. Capitol Communications, Inc.*, 359 F.3d 1021, 1028 (8th Cir.2004). Here, plaintiff has neither alleged nor shown that her negative performance review was used as a basis to terminate her employment.

To show causation, plaintiff asserts that the passage of a few days time between her return from leave and her termination supports an inference of reprisal. However, temporal proximity is generally measured between the request for, or beginning of, FMLA leave and the adverse employment action. *See Strate v. Midwest Bankcentre, Inc.*, 398 F.3d 1011, 1020 (8th Cir.2005); *Smith*, 302 F.3d at 832-33. *But see McBurney*, 398 F.3d at 1003 (lapse of six months between *return* from FMLA leave and adverse action does not suffice to show causation). More than mere temporal proximity is generally required to create a fact question on a claim of retaliation. *See Buettner v. Arch Coal Sales Co.*, 216 F.3d 707, 716 (8th Cir.2000) (citing *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir.1999)). The *Smith* court noted certain exceptions to the general rule, but stated that where temporal proximity is the only evidence of a causal connection, such proximity "must be very close." *Smith*, 302 F.3d at 832-33 (8th Cir.2002). The court found that a two-week interval between the beginning of FMLA leave and the adverse employment action "barely" met the minimal requirements of establishing a prima facie claim. *Id.* Here, the interval was three times as long and the court finds that plaintiff cannot establish a causal connection on that basis alone. Therefore, plaintiff's first theory of retaliation is rejected.

As to her second theory, plaintiff alleges that defendant retaliated against her for attempting to exercise her FMLA rights after returning to work by requiring her to work every Saturday and Sunday and terminating her employment. Defendant

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2005 WL 1475368 (D.Minn.)
**(Cite as: Slip Copy)**

responds that plaintiff never engaged in conduct protected by FMLA after she returned from her leave. In order to benefit from the protections of FMLA, an employee must provide notice to her employer that she plans to take FMLA leave. *See* 29 U.S.C. § 2612(e)(2). The employee need not name the statute, but must provide information to suggest that her health condition is serious. *Woods v. DaimlerChrysler Corp.,*-F.3d-, 2005 WL 1330704, at *6 (8th Cir. June 7, 2005). An employee may take intermittent FMLA leave if medically necessary. 29 U.S.C. § 2612(b)(1).

*4 Here, when plaintiff returned to work after having her surgery, she informed Firkus that she could only work four hours a day with a minimum two days off per week. She also alleges that she provided a note and letter from her doctor regarding the necessary work restrictions. Based on these undisputed facts, plaintiff has made a prima facie showing that she provided adequate notice of a need for intermittent FMLA leave. Further, because only a few days lapsed between the notice of intermittent leave and her discharge, plaintiff has also satisfied the causation element. Therefore, plaintiff has met her prima facie burden on her second theory of retaliation.

Because she met her prima facie burden, defendant must offer a legitimate, nondiscriminatory reason for its actions. *See Smith,* 302 F.3d at 833. Defendant alleges that it discharged plaintiff because her store continually failed tobacco sales compliance checks. In other words, plaintiff did not meet the requirements of her position as store manager because she failed to adequately train the store clerks. Poor work performance is a legitimate, non-retaliatory justification for termination. *See Pope v. ESA Servs., Inc.,* 406 F.3d 1001, 1008 (8th Cir.2005).

When the defendant has come forward with a valid reason for its actions, the burden returns to plaintiff to present evidence that (1) creates a question of fact as to whether the proffered reason is pretextual and (2) creates a reasonable inference of retaliation. *Smith,* 302 F.3d at 833. To make such a showing, plaintiff points to the fact that Firkus did not immediately terminate her when he received

Kaspar's email on August 14, 2002, but rather waited a few weeks until she returned from leave. However, such a delay does not suffice to show pretext because Firkus did not make the original determination to remove plaintiff from her position as store manager .[FN3] Furthermore, defendant had been concerned for many months about the failed compliance checks at plaintiff's store. The consistency of that concern is not undermined by waiting until plaintiff returned from leave to terminate her employment. *See Smith,* 302 F.3d at 834 (evidence that employer was concerned about performance before employee engaged in protected conduct undercuts showing of pretext).

> FN3. Plaintiff asserts that "[t]here is no evidence Mr. Kaspar directed the termination of Plaintiff." (Pl.'s Mem. Opp'n Def.'s Mot. Summ. J. at 12.) The court finds the assertion has no merit, however, because it is undisputed that Kaspar instructed that plaintiff "needs [to be] replaced." (Krueger Dep. Ex. 29.) Also undisputed is the fact that Kaspar's instruction was in response to the failed compliance checks.

Finally, plaintiff contends that defendant's proffered reason is pretextual because Firkus promoted store clerks who personally failed the compliance checks. For such evidence of pretext, it is plaintiff's burden " to prove that the compared employees were similarly situated in all relevant respects." *Smith,* 302 F.3d at 835. As store manager, it is undisputed that plaintiff had the duty to train the store clerks concerning the tobacco sales policy. Defendant also warned plaintiff as early as March, 2002 that she had such a duty and would be held responsible for any failed compliance checks at her store. The store clerks did not have a similar duty to train or similar responsibility for the store's compliance with company policy and state law. Plaintiff has made no showing to contradict these facts or otherwise prove that the compared employees were similarly situated. For all of the above reasons, plaintiff has failed to show that defendant's justification for her termination is pretext or to show a reasonable inference of a retaliatory motive. Therefore,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2005 WL 1475368 (D.Minn.)
(Cite as: Slip Copy)

Page 5

summary judgment in favor of defendant is appropriate.

## B. Interference Claim

*5 Although not set forth in her complaint, plaintiff alleges that defendant unlawfully interfered with her FMLA rights. She points to the fact that she delayed her surgery when Firkus told her in late March or early April of 2002 that it was a bad time for her to take leave and that the store needed a manager. FMLA prohibits employers from interfering with, restraining or denying the exercise of an employee's rights provided under the Act. *See* 29 U.S.C. 2615(a)(1). Similarly, an employer may not discourage an employee from using FMLA leave. *See* 29 C.F.R. § 825.220(b). On the other hand, "the employee must consult with the employer and make a reasonable effort to schedule the leave so as not to disrupt unduly the employer's operations." *Id.* § 825.302(e). Plaintiff has made no showing that Firkus discouraged her from taking any FMLA leave. Rather, plaintiff appropriately discussed the timing of her elective surgery and anticipated leave with Firkus. Less than three months later, she requested and was approved for such leave. The court finds that plaintiff has failed to show unlawful interference. Summary judgment is appropriate.

## C. Reinstatement Claim

Plaintiff alleges that defendant failed to reinstate her to her employment when she returned from FMLA leave. Any employee who takes FMLA leave is entitled to return to the position she held when the leave commenced, or to an equivalent position. *See* 29 U.S.C. § 2614(a)(1). However, "if an employer were authorized to discharge an employee if the employee were not on FMLA leave, the FMLA does not shield an employee on FMLA leave from the same, lawful discharge ." *Throneberry,* 403 F.3d at 978. It is undisputed that plaintiff returned to her position as store manager of the Hutchinson, Minnesota Speedway store when she returned from her FMLA leave. Her subsequent discharge has already been analyzed and found lawful pursuant to FMLA. For these reasons, the court finds that

defendant reinstated plaintiff to the position she held when her leave commenced and that FMLA did not shield her from the lawful discharge that occurred after she returned from leave. Therefore, summary judgment is warranted.

## D. Denial of Additional Leave Claim

Plaintiff alleges that defendant unlawfully denied her FMLA leave on September 9, 2005. In particular, plaintiff asserts that she attempted to discuss her inability to return to work full-time. Although plaintiff was entitled to take intermittent FMLA leave if medically necessary, 29 U.S.C. § 2612(b)(1), she has failed to show that she was denied any such leave. Rather, the record demonstrates that Firkus accommodated her work restrictions when she returned on September 5, 2002. Therefore, summary judgment is appropriate.

## CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that defendant's motion for summary judgment [Doc. No. 8] is granted.

LET JUDGMENT BE ENTERED ACCORDINGLY.

D.Minn.,2005.
Krueger v. Speedway SuperAmerica, LLC
Slip Copy, 2005 WL 1475368 (D.Minn.)

Briefs and Other Related Documents (Back to top)

• 2004 WL 3370685 (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment (Dec. 29, 2004) Original Image of this Document (PDF)
• 2004 WL 3370684 (Trial Motion, Memorandum and Affidavit) Defendant's Memorandum of Law in Support of Its Motion for Summary Judgment (Nov. 1, 2004) Original Image of this Document (PDF)
• 2004 WL 3370686 (Trial Motion, Memorandum and Affidavit) Defendant's Reply Memorandum of Law in Support of Its Motion for Summary

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Page 6

Slip Copy, 2005 WL 1475368 (D.Minn.)
**(Cite as: Slip Copy)**

Judgment (Jan. 14, 2004) Original Image of this
Document (PDF)
• 0:03cv06568 (Docket) (Dec. 31, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.