UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

MICHAEL F. ELDRIDGE,

        *Plaintiff,*

v.

ETHAN ALLEN, INC.

        *Defendant.*

      CIVIL ACTION
      NO. 04-12506-MEL

## AFFIDAVIT OF HEATHER C. KRAUSS

I, Heather C. Krauss, being first duly sworn, state as follows:

1.    I am an associate in the law firm of Foley & Lardner LLP, counsel to Defendant, Ethan Allen, Inc. (now known as "Ethan Allen Retail, Inc.") ("Ethan Allen")[1] in the above-captioned matter.

2.    I am submitting this Affidavit to authenticate documents identified as Exhibits A-T, hereto, which are cited in Defendant's Statement of Undisputed Facts submitted herewith in support of Defendant's Motion for Summary Judgment.

3.    Attached as Exhibit A is a true and correct copy of Ethan Allen's Employee Handbook bearing Bates-stamp numbers EA 00283 – 00327 and identified as Exhibit 6 to the deposition of Michael F. Eldridge.

4.    Attached as Exhibit B is a true and correct copy of excerpts from the deposition of Michael F. Eldridge, which was taken on March 27, 2006.

---

[1] As of July 1, 2005, Ethan Allen, Inc.'s name changed to Ethan Allen Retail, Inc.

5.      Attached as Exhibit C is a true and correct copy of a Personnel Action Notice bearing Bates-stamp number EA 00018, which was produced by Ethan Allen as part of its Initial Disclosures in the above-captioned matter.

6.      Attached as Exhibit D is a true and correct copy of an Ethan Allen Retail Division Job Description – Warehouse Manager bearing Bates-stamp numbers EA 00074 – 00075, which was produced by Ethan Allen as part of its Initial Disclosures in the above-captioned matter.

7.      Attached as Exhibit E is a true and correct copy of excerpts from the deposition of Denna A. Hamilton, which was taken on April 27, 2006.

8.      Attached as Exhibit F is a true and correct copy of a February 21, 2003 e-mail from Michael F. Eldridge to Sandra Lamenza bearing Bates-stamp number EA 00328 and identified as Exhibit 5 to the deposition of Michael F. Eldridge.

9.      Attached as Exhibit G is a true and correct copy of a July 10, 2001 memo from David Pellicciotti to Michael F. Eldridge bearing Bates-stamp number EA 00076 and identified as Exhibit 2 to the deposition of Michael F. Eldridge.

10.     Attached as Exhibit H is a true and correct copy of a September 2001 performance appraisal of Michael F. Eldridge bearing Bates-stamp numbers EA 00097 – 00100 and identified as Exhibit 4 to the deposition of Michael F. Eldridge.

11.     Attached as Exhibit I is a true and correct copy of a August 5, 1999 Employee Handbook acknowledgment form signed by Michael F. Eldridge bearing Bates-stamp number EA 00049 and identified as Exhibit 7 to the deposition of Michael F. Eldridge.

12.     Attached as Exhibit J is a true and correct copy of a collection of schedules with handwritten notes by Denna A. Hamilton bearing Bates-stamp numbers EA 00126 – 00156 and identified as Exhibit 3 to the deposition of Denna A. Hamilton.

2

13.    Attached as Exhibit K is a true and correct copy of a performance appraisal of Michael F. Eldridge bearing Bates-stamp numbers EA 00190 – 00194 and identified as Exhibit 11 to the deposition of Denna A. Hamilton.

14.    Attached as Exhibit L is a true and correct copy of a July 21, 2003 written warning issued to Michael F. Eldridge bearing Bates-stamp number EA 00201 and identified as Exhibit 14 to the deposition of Denna A. Hamilton.

15.    Attached as Exhibit M is a true and correct copy of an October 2, 2003 final written warning issued to Michael F. Eldridge bearing Bates-stamp numbers EA 00195 – 00197 and identified as Exhibit 12 to the deposition of Denna A. Hamilton.

16.    Attached as Exhibit N is a true and correct copy of a September 23, 2003 final written warning issued to Michael F. Eldridge bearing Bates-stamp number EA 00198 and identified as Exhibit 13 to the deposition of Denna A. Hamilton.

17.    Attached as Exhibit O is a true and correct copy of a November 7, 2003 e-mail from Michael F. Eldridge to Farooq Kathwari bearing Bates-stamp numbers EA 00275 – 00277 and identified as Exhibit 30 to the deposition of Michael F. Eldridge.

18.    Attached as Exhibit P is a true and correct copy of an Ethan Allen Accident Report bearing Bates-stamp number EA 00248, which was produced by Ethan Allen as part of its Initial Disclosures in the above-captioned matter.

19.    Attached as Exhibit Q is a true and correct copy of a September 4, 2003 MRI bearing Bates-stamp numbers EA 00242 and 00245 and identified as Exhibit 17 to the deposition of Michael F. Eldridge.

3

20.    Attached as Exhibit R is a true and correct copy of a September 20, 2003 MRI bearing Bates-stamp number 0054 and identified as Exhibit 18 to the deposition of Michael F. Eldridge.

21.    Attached as Exhibit S is a true and correct copy of a note bearing Bates-stamp number 0020 and identified as Exhibit 19 to the deposition of Michael F. Eldridge.

22.    Attached as Exhibit T is a true and correct copy of a note bearing Bates-stamp number 0058 and identified as Exhibit 38 to the deposition of Michael F. Eldridge.


Signed under the penalties of perjury this 17th day of August, 2006.


                              /s/: Heather C. Krauss
                              Heather C. Krauss


## CERTIFICATE OF SERVICE

I, Heather C. Krauss, hereby certify that on August 17, 2006, a true copy of the foregoing document was served electronically upon counsel for Plaintiff:

        Denise A. Chicoine, Esq.
        Englander & Chicoine, P.C.
        Two Newton Place
        Suite 200
        Newton, MA  02458-1634


                              /s/: Heather C. Krauss
                              Heather C. Krauss


4

# EXHIBIT A





3/27/06
EXHIBIT NO. 6
Margie Simmons

# ETHAN ALLEN®

## HOME INTERIORS

### EMPLOYEE HANDBOOK

EA 00283



# ETHAN ALLEN
## HOME INTERIORS



# RETAIL HANDBOOK

Retail Handbook
January 1, 1997

EA 00284

## ETHAN ALLEN

**Please sign the statement below and return it to your supervisor**

I have received and read my copy of the Ethan Allen Employee Handbook. I understand this Handbook supersedes all previous editions and polices and that the employer retains sole discretion to, add, modify or delete any provision. My receipt of this Handbook does not create a contract of employment and both Ethan Allen and I retain the right to terminate the employment relationship at any time and for any reason.

Date: _____

Print Name: _____

Signed: _____

Retail Handbook
October 1, 1997

## WELCOME

Whether you are a new or long-service employee, we want your relationship with Ethan Allen to be pleasant and productive. Because of the many hours that you spend at work, it is important that you get the most - and give the most - to the work that you do. We will strive to make your job as interesting and challenging as possible and your work conditions pleasant, clean and safe. Your energy and enthusiasm can help strengthen our reputation as a provider of unparalleled products and services to our many loyal customers.

As an employee in a highly competitive, fast-changing industry, it is natural to have questions about the Company, your job, your responsibilities and career opportunities. This Handbook should give you answers to some of those questions. You can obtain more information from and freely discuss all job-related issues with your supervisor.

EA 00286

## READ CAREFULLY

No part of this Handbook confers any rights or privileges on any particular employee or group of employees. Nor does it entitle anyone to remain employed by Ethan Allen, establir' conditions of employment or create a contract of emplo, ment.

Ethan Allen (by action of the Board or through its authorized committees or officers) retains the right to change, modify, suspend, interpret or cancel any part of an unpublished or published policy, without advance notice.

Employment at Ethan Allen is terminable at will, which means that employment is not guaranteed for any particular period of time, and both employer and the employee are free to end the employment relationship at any time, for any reason, and without notice.

If there is a conflict between the description of any benefits plan or program in this Handbook and the official plan document(s), the latter always prevails. This Handbook provides a general outline of current Company policy and is not the policy itself.

The policies, procedures and guidelines described in this Handbook replace all others previously published.

## TABLE OF CONTENTS

**I.    Employment**
Equal Employment Opportunity . . . . . . . . . . . . . . .7
Employee Qualifications . . . . . . . . . . . . . . . . . . . .7
Employee Classifications . . . . . . . . . . . . . . . . . . . .7
Referrals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8
Employee Applicant Referral Incentive Program . . .8
Employment of Relatives . . . . . . . . . . . . . . . . . . . .9
Training Period . . . . . . . . . . . . . . . . . . . . . . . . . .9
Seniority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10
Personal Status Changes . . . . . . . . . . . . . . . . . . .10
Re-employment . . . . . . . . . . . . . . . . . . . . . . . . . .10

**II.   On the Job**
Work Week . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12
Inclement Weather . . . . . . . . . . . . . . . . . . . . . . . .12
Attendance and Punctuality . . . . . . . . . . . . . . . . .12
Smoking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13
Personal Telephone Calls and Mail . . . . . . . . . . .13
Communications Systems . . . . . . . . . . . . . . . . . .14
Personal Property . . . . . . . . . . . . . . . . . . . . . . . .14
Parking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14
Travel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14
In-Home Selling . . . . . . . . . . . . . . . . . . . . . . . . .15
In-Store Events . . . . . . . . . . . . . . . . . . . . . . . . .16

**III.  Guidelines**
Conflicts of Interest . . . . . . . . . . . . . . . . . . . . . .17
Sexual Harassment . . . . . . . . . . . . . . . . . . . . . . . .19
Drug Testing/Screening . . . . . . . . . . . . . . . . . . . .21
Employee Advisory Resource Program . . . . . . . .22
Solicitations . . . . . . . . . . . . . . . . . . . . . . . . . . . .23
Solving Problems . . . . . . . . . . . . . . . . . . . . . . . . .23
Safety . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

EA 00288

**III.**  **Guidelines (Cont.)**
Fire . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24
Personal Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . .24
Housekeeping . . . . . . . . . . . . . . . . . . . . . . . . . . . .25
Personal Appearance . . . . . . . . . . . . . . . . . . . . . . .25
Terminations . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

**IV.**  **Your Pay**
Salary Administration . . . . . . . . . . . . . . . . . . . . . .28
Overtime . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28
Your Paycheck . . . . . . . . . . . . . . . . . . . . . . . . . . . .29
Payroll Deductions . . . . . . . . . . . . . . . . . . . . . . . . .29

**V.**  **Time Off**
Holidays . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30
Vacations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30
Vacation Entitlement . . . . . . . . . . . . . . . . . . . . . . .31
Vacation Pay . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32
Sick Days . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32
Salary Continuation . . . . . . . . . . . . . . . . . . . . . . . .33
Family and Medical Leave . . . . . . . . . . . . . . . . . . .34
Personal Leave of Absence . . . . . . . . . . . . . . . . . .37
Jury Duty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .38
Military Leave . . . . . . . . . . . . . . . . . . . . . . . . . . . .38
Bereavement Leave . . . . . . . . . . . . . . . . . . . . . . . .39

**VI.**  **Benefits and Services**
Medical, Dental, Disability, Life Insurance and
     Retirement Program Benefits . . . . . . . . . . . . . .40
Educational Assistance . . . . . . . . . . . . . . . . . . . . . .40
Credit Union . . . . . . . . . . . . . . . . . . . . . . . . . . . . .41
Bulletin Board . . . . . . . . . . . . . . . . . . . . . . . . . . . .41
Employee Purchase Plan . . . . . . . . . . . . . . . . . . . .42

Index . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .43

EA 00289

# I. EMPLOYMENT

## EQUAL EMPLOYMENT OPPORTUNITY

It is the policy of Ethan Allen not to discriminate on the basis of race, color, gender, religion, age, marital status, sexual orientation, national origin, citizenship status, disability, veteran's status or any basis protected by applicable laws. Ethan Allen is an Equal Opportunity Employer.

## EMPLOYEE QUALIFICATIONS

You must be 18 years or older and have a high school education or equivalent to qualify for a job at Ethan Allen. All applicants must also take a company paid physical and pass a drug screening test - see page 21. If your position requires special skills, your supervisor will arrange for relevant testing.

## EMPLOYEE CLASSIFICATIONS

- *Training* - an employee with less than three months of service who has not completed their introductory training period.

- *Regular* - an employee with at least three months of service who has satisfactorily completed the training period and has a definite position assignment within Ethan Allen.

- *Full-time* - an employee who is normally scheduled to work the full schedule of hours each week (see Work Week - page 12) and who maintains continuous, regular employment.

- *Part-time* - an employee who works a designated number of hours but fewer than a full-time schedule.

EA 00290

# I. EMPLOYMENT

- *Exempt* - an employee who is not eligible for overtime p͏ under the Fair Labor Standards Act.

- *Non-exempt* - an employee who is eligible for overtime pay under the Fair Labor Standards Act.

All employees must fill out time cards showing the number of hours worked each day or any approved, paid time off. Your supervisor is responsible for approving your weekly time card.

## REFERRALS

Ethan Allen encourages you to recommend potential qualified candidates for employment. Both you and the Company can gain from these efforts - Ethan Allen by obtaining the services of a capable employee; you, from a possible Employee Applic͏ Referral Incentive Program cash award.

## EMPLOYEE APPLICANT REFERRAL INCENTIVE PROGRAM

Employees with three or more months of service are eligible to participate in this program. To qualify for an award, you must recommend a candidate for a posted position displaying an incentive amount. Your suggested candidate must not be an employee or an outside agent of the Company or a temporary employee presently on assignment with Ethan Allen. Your supervisor will have additional details.

If Ethan Allen hires your candidate, you receive the cash award of up to $500.

EA 00291

# I. EMPLOYMENT

## EMPLOYMENT OF RELATIVES

Ethan Allen permits the employment of relatives within certain guidelines designed to avoid favoritism and discrimination in the work environment.

Ethan Allen will not hire or promote a relative of another employee if the action will create a reporting relationship between the two.

## TRAINING PERIOD

Each new employee completes an initial 90-day training period. This period gives you a chance to adapt to your position. It also gives your supervisor an opportunity to provide training and to evaluate your skills and work habits.

However, your supervisor may extend the period if he or she believes you need more time to adjust to the Company and to the job.

Both Ethan Allen and you retain the right to terminate the employment relationship at will at any time, for any reason, during or after the training period.

Once you complete the training period, you become a regular employee, eligible for health care coverage, holiday pay and sick days.

If you work full-time, you are eligible for health care coverage, holiday pay and sick days. Part-time regular employees who work a minimum of 20 hours a week are eligible for holiday pay and sick days based on standard scheduled hours.

EA 00292

# I. EMPLOYMENT

## SENIORITY
Seniority is determined by the length of your uninterrupted service with the Company. Seniority defines your vacation entitlement.

Service for purposes of retirement income benefits may be calculated differently from seniority based on plan provisions and federal rules and regulations. Please refer to the appropriate retirement income Summary Plan Descriptions to learn how each plan credits and uses service to determine eligibility and benefit amounts.

## PERSONAL STATUS CHANGES
Please notify your supervisor promptly if there is a change in your name, home or mailing address, home phone number, marital status, insured dependents, insurance beneficiary or the person to call in an emergency. It is important that this information be current to ensure that you maintain access to Company-provided benefits and communications channels.

## RE-EMPLOYMENT
If you leave Ethan Allen and are interested in reemployment, the Company may consider rehiring you provided you:
* submit a written application
* meet the requirements of the open position
* were in good standing at the time of your termination.

If the Company rehires you within the 30 calendar days of your termination date, all benefits and seniority-based privileges, including previously earned but unused sick time, will be restored. The Company will treat your time off the payroll as a leave of absence without pay.

EA 00293

# I. EMPLOYMENT

If the Company rehires you more than 30 calendar days after you terminate, you will be considered as a new employee.

Length of service for the purposes of benefits is governed by the terms and conditions of each benefit plan. In certain circumstances, employees who retire may be eligible for rehire.

EA 00294

## II. ON THE JOB

### WORK WEEK

The basic work week consists of 40 hours. Your schedule w.. include Saturday, Sunday, Holidays, and some evenings.

The lunch period is 30 minutes and is not considered part of the 40 hour work week. Your supervisor schedules the lunch period.

### INCLEMENT WEATHER

Extreme weather may require a delayed opening or an early closing of your work location. Otherwise, you are to report on time and complete your work day making whatever travel adjustments the weather requires.

You can use a vacation day or a personal day if you can't make it to work in bad weather when the facility is open. You cannot u a sick day. They are solely for absences due to the employee's sickness or injury.

You should listen to media reports whenever severe weather conditions pose the possibility of a delayed opening or, if possible, contact your supervisor. These reports can help you assess the situation. If your work location is open, you should report to work.

### ATTENDANCE AND PUNCTUALITY

Every employee at Ethan Allen has important job responsibilities. If you are late or absent from work, it may require that another employee cover for you.

EA 00295

## II. ON THE JOB

So, unless you have your supervisor's approval, you must stay on the premises during working hours except for lunch or dinner periods.

If, for some unexpected and compelling reason, you cannot get to work on time - or at all - you must notify your supervisor. You should call within one-half hour of your scheduled starting time. Your supervisor will need to know why you will be late or absent - and, in case of absence, when you expect to return.

If you are regularly absent or late, your supervisor will discuss the problem with you. If your behavior continues, you will be subject to disciplinary action up to and including discharge.

### SMOKING

For the comfort and safety of our employees, all Ethan Allen locations are smoke free except for specifically designated smoking lounges. This means that smoking is not permitted in offices, conference rooms, hallways, rest rooms, elevators or company-owned vehicles - only in areas set aside for this purpose. Feel free to report any violations of this policy to your supervisor so he or she can take appropriate action.

### PERSONAL TELEPHONE CALLS AND MAIL

The Company's telephone lines are vital to the conduct of our business. Please ask your family and friends not to call you at work unless there is a real emergency.

Employees should not use Company communications services and equipment for personal purposes except in emergencies or when extenuating circumstances warrant it.

Personal mail should *not* come to your work location.

Retail Handbook
January 1, 1997

13

EA 00296

## II. ON THE JOB

### COMMUNICATION SYSTEMS

All company communications services and equipment, includii
the messages transmitted or stored by them, are the sole property
of the company. The Company may access and monitor employ-
ee communications and files as it considers appropriate.
Communications equipment and services include mail, electron-
ic mail, courier services, facsimilies, telephone systems, comput-
er networks, on-line services, computer files, telex systems, video
equipment and tapes, tape recorders and recordings, pagers, cel-
lular phones, and bulletin boards.

### PERSONAL PROPERTY

Although Ethan Allen attempts to protect you and your property,
it is not responsible for theft or damage to your car or possessions
while at work. You should therefore:

* carefully secure your purse, briefcase, wallet and other
  valuables while at work
* park and drive carefully in any Company-provided parking
  lot.

### PARKING

Except for reserved parking areas, you can park in any open,
available space. Please drive carefully and secure your car prop-
erly. While on Company premises, the safety and security of your
car is your responsibility.

### TRAVEL

Ethan Allen reimburses the necessary and reasonable job-related
expenses you incur for which you have prior written authoriza-
tion.

EA 00297

## II. ON THE JOB

The Company has a designated travel agency. They make all arrangements for travel involving expenses which the Company will reimburse - except the use of your own car. If you use your own car for Company travel, you will receive a standard rate for each mile you drive plus the costs of tolls and parking.

While traveling on Company business, you should use your own credit cards. If you fly and your flight is canceled, you must return the unused ticket to the Company. If you rent a car, you should decline purchasing additional collision and personal accident insurance since it would duplicate coverage the Company already provides. You must also promptly report to the police, the car rental company and Human Resources any accident involving the vehicle.

Also, be careful and thorough in preparing your expense reports. You must submit receipts for expenses in excess of $10 plus all relevant information related to the expense - i.e., date, place, business purpose, names, miles driven each day in your own car, etc. If your report is accurate and complete, payment will be prompt. If not, payment will be delayed.

### IN-HOME SELLING

It will be necessary in the course of conducting our business for the designer to visit customers in their homes.

If a call is scheduled during your assigned store working hours, check with your supervisor to ensure that the floor is covered. A store diary is maintained to record whom you are visiting, the address, telephone number and how long you expect to be away from the store.

EA 00298

## II. ON THE JOB

This time is reserved on a first come-first go basis. We must be sure that we have sales coverage on the floor. Generally speak-ing, in-home selling should be scheduled for weekday mornings or afternoons.

If a company van is available for house calls, it should not be used without authorization, and under no circumstances for personal business. Strict disciplinary action, up to and including termina-tion of your employment will be imposed if any company vehicle is used for personal business.

### IN-STORE EVENTS

In addition to assigned work responsibilities, all employees must be available from time to time to attend meetings at the request of the store manager. The meetings may be held before or after store hours. Also from time to time, your supervisor will require help in conducting a physical inventory and all employees must be available to assist. Your supervisor will schedule the day and hours for this project.

EA 00299

## III. GUIDELINES

### CONFLICTS OF INTEREST

It is the policy of Ethan Allen to prohibit its employees from engaging in any activity, practice, or conduct which conflicts with, or appears to conflict with, the interests of Ethan Allen, its customers, or its suppliers. This includes, but is not limited to, activities which could confuse customers about the source or range of products available through Ethan Allen. Since it is impossible to describe all of the situations which may cause or give the appearance of a conflict of interest, the prohibitions included in this policy are not intended to be exhaustive and only include some of the more clear-cut samples.

- Employees are expected to represent Ethan Allen in a positive and ethical manner and have an obligation both to avoid conflicts of interest and to refer questions and concerns about potential conflicts to their supervisor. Top management and employees who have contact with customers and supplier may be required to sign a special statement acknowledging their understanding of and adherence to this policy.

- Employees are not to engage in, directly or indirectly either on or off the job, any conduct which is disloyal, disruptive, competitive, or damaging to Ethan Allen. Such prohibited activity also includes any illegal acts in restraint of trade. Such prohibited conduct includes, but is not limited to:
  - accepting compensation personally for any activity related to or associated with an employee's position with Ethan Allen
    or
  - accepting orders for non-Ethan Allen supplied product from Ethan Allen retail customers.

EA 00300

## III. GUIDELINES

- Employees are not to accept any employment relationship with any organization which does business with Ethan Allen or is a competitor of Ethan Allen. This prohibition on employment includes serving as an advisor, consultant or director to any such organization, unless that activity is conducted as a representative of Ethan Allen.

- Employees must disclose any financial interest they or their immediate family have in any firm which does business with Ethan Allen or which competes with Ethan Allen. Ethan Allen may require divestiture of such interest as a condition of retaining employment if it deems the financial interest to be in conflict with its best interests.

- Employees and their immediate family are not to accept gift except those of nominal value, or any special discounts or loans from any person or firm doing, or seeking to do, business with Ethan Allen. The meaning of gifts for purposes of this policy includes the acceptance of lavish entertainment and free long-distance travel and lodging.

- Employees are not to give, offer, or promise, directly or indirectly, anything of value to any representative of a customer, of a potential customer, or of a financial institution in connection with any transaction or business that Ethan Allen may have with that customer, potential customer, or financial institution.

Retail Handbook
January 1, 1997                    18

EA 00301

## III. GUIDELINES

- Employees may learn or become aware of information about Ethan Allen which, if known to the public, might affect the decision of a reasonable investor to buy, sell, or hold securities issued by Ethan Allen. Employees are prohibited from misusing such material inside information, prior to public disclosure, by purchasing or selling Ethan Allen's securities for their own benefit or for the benefit of members of their immediate family. In addition, employees are not to disclose inside information to anyone, either inside or outside the organization, who does not have a legitimate business need to know it.

- Any conflict or potential conflict of interest must be disclosed to Ethan Allen. Failure to do so will result in discipline, up to and including termination and/or other available legal remedies.

## SEXUAL HARASSMENT

All employees of Ethan Allen have the right to work in an environment free of illegal discrimination, including freedom from sexual harassment. Officers and other supervisory personnel are responsible for assuring that no staff member encounters such conduct in any form from any employees or vendor of the Company.

All employees - including those in non-supervisory positions - are prohibited from engaging in any form of harassment and in particular, sexual harassment. The Company will take disciplinary action - up to and including discharge - against any employee who engages in such behavior.

Retail Handbook
January 1, 1997                    19

## III. GUIDELINES

Specifically, this policy protects you from threats or suggestion
that your refusal to submit to sexual advances will affect your jo...
This includes continued employment, performance evaluation,
pay, promotions, assigned duties or any other condition of
employment or career development.

No form of harassment will be tolerated including harassment for
the following reasons: race, color, national origin, religion, dis-
ability, pregnancy, age, military status, gender, marital status, sex-
ual orientation, citizenship status or veteran's status.

The policy also prohibits offensive sexual flirtations, advances
and propositions, repeated verbal abuse, graphic verbal commen-
taries, jokes and other similar, sexually degrading expressions.
Also prohibited is physical contact of a sexual nature even
intended as a jest.

Ethan Allen will use the following criteria to determine if a vio-
lation of this policy has occurred.

- Whether submission to such conduct is made a term or
  condition of an individual's employment, either explicitly or
  implicitly.

- Whether submission to or rejection of such conduct is used as
  the basis for decisions affecting the individual's
  compensation, promotion, assignment or opportunities

- Whether such conduct has the purpose or effect of interferin.
  with an individual's work performance, or of creating an
  intimidating, hostile, or offensive work environment.

Retail Handbook
January 1, 1997                    20

EA 00303

## III. GUIDELINES

If you feel you are a victim of sexual harassment, you should immediately notify your supervisor or the Human Resources Department. The Company expressly forbids any retaliatory action to be taken against you by anyone for reporting a perceived violation of this policy. Every complaint will be given prompt and serious attention, and a timely, objective, investigation will be conducted. The investigation will be kept as confidential as practicable. Should the investigation confirm any inappropriate conduct or harassment, Ethan Allen will take prompt remedial action.

### DRUG TESTING/SCREENING

Ethan Allen aims to maintain a safe, healthy and productive work place free of illegal drugs and alcohol. The Company prohibits the possession, purchase, use, sale, or transfer of illegal drugs or alcohol on Ethan Allen property. It also prohibits employees from having either in their system while at work or while conducting Company business.

If the use of legally prescribed medication impairs the employee's judgment or diminishes an employee's ability to perform essential functions of the job, then the Company will review reasonable accommodation options that may be available.

The Company also reserves the right to screen employees, in accordance with applicable laws, post accident or for reasonable suspicion as business needs dictate.

Ethan Allen requires each person applying for employment to undergo drug screening. Those who refuse the screening - or fail it - are *not* hired.

Retail Handbook
January 1, 1997                    21

EA 00304

## III. GUIDELINES

Because of the serious harm that alcohol and drug abuse can cause, Ethan Allen also requires that you report any observed work place violation of this policy to your supervisor. Failure to do so may be grounds for termination.

### EMPLOYEE ADVISORY RESOURCE PROGRAM

This program offers you and your family members immediate and confidential intervention phone counseling from professional counselors, as well as referrals to external services for more in-depth ongoing assistance. Counseling is available for a wide range of problems including personal and work related stress, dealing with catastrophic illness, alcohol, drug abuse, family and marital conflicts, emotional difficulties, loss of a loved one, child and elder care plus financial and legal issues. You can call as often as you need, 24 hours a day, 365 days a year. The EAR's services can help you bring balance back into your life and minimize any adverse effects on your job performance. If you need additional help beyond the EAR's over-the-phone counseling services, the EAR also provides short-term, face-to-face counseling. If you are enrolled in Ethan Allen's Medical Program, the first six outpatient counseling sessions provided by the EAR are free. If you need additional outpatient counseling, your health care program may cover part of the costs of the care you receive.

Your supervisor may also refer you to the EAR following a "corrective interview" if your problems are affecting your ability to perform your job. If you fail to call the EAR while your performance continues to decline, your supervisor will again suggest, after a second "corrective interview," that you seek counseling or face disciplinary action up to and including discharge. The decision to call the EAR is always yours. The goal of the EAR whether initiated by you or your supervisor - is to give you an opportunity to overcome your difficulties.

EA 00305

## III. GUIDELINES

### SOLICITATIONS

During work hours you cannot solicit anyone for any purpose (funds, charities, signatures, opinions, membership drives, sales, etc.). Work hours, for purposes of this policy, do *not* include meal time, breaks or other periods when you are not actually working. You are also not allowed to distribute written materials in work areas at any time.

### SOLVING PROBLEMS

Ethan Allen hopes to foster friendly cooperative relations among staff and realistic standards of performance and conduct. Occasionally, misunderstandings may occur. If so, a prompt solution to the problem should be sought.

Go to your supervisor first. Next go to your district or regional manager. If the problem remains unresolved, you and your supervisor or regional manager should meet with the Vice President of the Retail Division.

### SAFETY

Ethan Allen wants your work area to be safe. Safety is a critically important management responsibility. It is also an important responsibility of every employee.

You should learn and follow all safety guidelines which apply to the work you do and to your work area (see Safety Guidelines section). You should also familiarize yourself with the location of the nearest fire station alarm box and how to use it. In an emergency requiring the clearing of your work area, it is essential to follow instructions and to act in a calm and orderly manner.

EA 00306

## III. GUIDELINES

### FIRE
In case of fire (or a fire drill), you are to leave your area immediately and go to the nearest exit. You are not to leave the grounds unless told to do so.

### PERSONAL CONDUCT
Your behavior on the job should exhibit good judgment, regard for other employees and respect for the Company.

Improper behavior will result in disciplinary action up to and including discharge. The following are some examples of misconduct that the Company will not condone. The list is not all inclusive. The Company reserves the right to determine what is unacceptable conduct, as well as the appropriate level of disciplinary action.

Here is the list.
- Possessing firearms or other weapons on Company property.

- Deliberately destroying, defacing or removing Company property or that of another employee, customer or vendor without authorization.

- Providing false or misleading information on your employment application or on Company records.

- Falsifying or altering a time card or that of another employee.

- Causing bodily harm to an employee or any other person or displaying belligerent, defiant, abusive or threatening conduct on Company premises.

- Smoking in any location area except a lounge or other area designated for that purpose.

Retail Handbook
Rev. October 1, 1997          24

EA 00307

## III. GUIDELINES

- Criminal, immoral or indecent behavior at work.

- Unsatisfactory record of punctuality and attendance.

- Unexcused absence for three consecutive days.

- Possessing, selling or using alcohol or illegal drugs on Company property or reporting to work under their influence.

- Unauthorized use of Company vehicles or property.

*Again, the list is not all inclusive.* If you have any questions about your conduct while at work, check with your supervisor.

### HOUSEKEEPING

Ethan Allen strives to make your work conditions pleasant, clean and safe. The Company expects you to share in this responsibility.

At the end of each day, leave your work area in a neat and orderly manner. Also be sure to turn off any machines you may have used during the day, e.g., computer, printer, etc.

### PERSONAL APPEARANCE

The Company's success is due, in part, to our ability to maintain a proper business atmosphere.

All employees are expected to present a professional, business-like image to all visitors, especially our customers. Therefore, it is important to dress appropriately on normal business days, including those designated as business casual.

EA 00308

## III. GUIDELINES

You are asked to refrain from wearing blue jeans, shorts, sandals, sneakers, T-shirts, tube or halter tops, or sweat suits. In addition to these items, other types of clothing may be considered unsuitable. Your supervisor's best judgment should be observed. Uniforms should be worn in the departments for which they are provided.

### TERMINATIONS

Employment with Ethan Allen is "at will" and may be terminated by you or the Company at any time and for any reason. It is the Company's goal to make the separation process as amicable as possible through fair and impartial treatment regardless of who initiates the termination and why.

*Resignation* - If you decide to resign, you should notify your supervisor. The customary minimum period for notice is two weeks. Depending on why you are leaving, management may shorten or eliminate the two-week notice period and decide whether you will receive pay in lieu of notice or not.

Your Supervisor will conduct an exit interview and collect any Company property that you have - i.e., identification cards, credit cards, keys, etc. On your last day of work, your supervisor will inform you, if you are eligible, of your right to continue your health care benefits under COBRA. A COBRA letter describing this continued coverage will be mailed to your home.

If you resign, you will receive wages due you in accordance with applicable wage laws. Unused vacation will typically be paid to employees in good standing and in accordance with wage payment laws at the time of resignation. In some cases, existing agreements will govern vacation pay. You will not receive pay for any accumulated sick or personal days.

EA 00309

## III. GUIDELINES

*Discharge* - Before a termination takes place, your supervisor will notify the Corporate Human Resources Department and will most likely have had discussions with you. If the Company terminates you, you will receive pay for time worked. You will not receive pay for any accumulated sick or personal days or for any unused vacation, except as required by law or by written agreement. You will receive your check in the next regularly scheduled pay period or in accordance with state law if sooner. Before you leave, your supervisor will conduct an exit interview, collect all Ethan Allen property in your possession and, if you are eligible, inform you of your right to continue your health care coverage. A COBRA letter describing this coverage will be sent to your home.

*Layoff* - A layoff is a termination caused by lack of work, the elimination of your job or a reorganization.

If you are laid off, the Company will give you your final pay check on your last day of work or shortly thereafter, in accordance with applicable laws. That check will include unused vacation plus additional payments based on your employee classification and length of service. You will not receive pay for any accumulated sick or personal days. Your Supervisor can provide you with more details.

EA 00310

## IV. YOUR PAY

### SALARY ADMINISTRATION
Ethan Allen's salary administration program uses job descriptio.. and job evaluations, performance appraisals and periodic reviews of our pay scales to ensure competitiveness. The responsibilities of your position and the skills you need to perform it determine how much you receive.

*Job descriptions* identify the precise objectives and responsibilities which a job entails. They describe the position, not the person in it.

*Job evaluation* ranks the various positions into salary grades on the basis of their relative importance to the Company. All jobs are important, but some have a greater impact on the Company's operating results. Those that have a higher impact get a high salary grade.

*Performance appraisals* evaluate how well you are handling the responsibilities of your job. You generally will receive one from your supervisor each year. Ethan Allen determines salary increases, transfers and promotions based on performance. The better you perform, the more job opportunities you can help create for yourself.

### OVERTIME
To meet special or unusual business needs, your supervisor may ask you to work overtime. Some positions require occasional overtime. However, your supervisor will take into account your personal commitments and will try to provide advance notice.

Overtime pay is for non-exempt employees who work 40 hours a week. Overtime work must be authorized in advance by your supervisor.

EA 00311

# IV. YOUR PAY

You will receive 1 1/2 times your regular rate of pay for hours worked in excess of 40 hours a week. Holiday pay counts toward the 40 hour requirement. Vacation, sick or personal time do not.

## YOUR PAYCHECK
You will receive your paycheck on the next scheduled work day if you are a part-time employee and your work schedule does not include Thursdays.

Ethan Allen provides a direct deposit paycheck service. If you elect to participate, your paycheck will be sent directly to the bank you designate. State law may impose certain restrictions and limitations on direct deposit methods.

## PAYROLL DEDUCTIONS
As required by law - or based on your benefit program elections - the Company makes the following payroll deductions:
* federal income taxes and Social Security; state and local taxes too, if applicable
* your part of the cost of contributory benefit plans in which you participate
* the cost of U.S. Savings Bonds or Credit Union deposits, if you have made arrangements with payroll to process these transactions for you.

EA 00312

## V. TIME OFF

### HOLIDAYS

A list of paid holidays is published annually. To qualify for holiday pay, you must be at work - *if scheduled and not excused* - on the day before and after the holiday.

For *full-time regular employees*, the list includes:

* Easter
* Thanksgiving Day
* Christmas Day.

*Part-time employees who work at least 20 hours a week* receive pay for holidays that fall on a regularly scheduled work day. Pay for the holiday is your normal pay for the day. Part-time employees scheduled to work less than 20 hours per week are not eligible for holiday pay.

If a holiday falls during vacation, you will receive an additional day off as arranged by your supervisor. There is no pay for a holiday that falls during a leave of absence.

### VACATIONS

You should submit your request for vacation time to your supervisor as early in the year as possible. You will normally get your choice of dates provided there is no conflict with staffing needs or the request of another employee. If you and another employee ask for the same vacation time and only one of you can be spared, *seniority* will generally control.

The vacation year runs from January 1 to December 3.. Whatever vacation time is yours, you must take it *all* during this period.

Retail Handbook
January 1, 1997                30

EA 00313

## V. TIME OFF

You *cannot carry over* unused vacation time into future years. However, if you resign from or are laid off by the Company during the year, you will be paid for whatever vacation time you earned but did not use (see page 26) unless governed by written agreement.* Check with your supervisor for specific details.

## VACATION ENTITLEMENT

Your vacation entitlement depends on your continuous service. You are entitled to one week paid vacation after you complete six months of service. Employees hired on or before March 31 are entitled to one week paid vacation in the current vacation year, after six months of continuous service is completed. Employees hired April 1 through December 31 are entitled to two weeks paid vacation in the following vacation year, after six months of continuous service is completed.*

The following table shows the vacation entitlements for *full-time* employees with one or more years of service*

| Full-Time Employees Vacation Entitlement ||
|---|---|
| Years of Service | Vacation Time |
| 1 but less than 5 | 2 weeks |
| 5 but less than 11 | 3 weeks |
| 11 but less than 12 | 3 weeks *plus* 1 day |
| 12 but less than 13 | 3 weeks *plus* 2 days |
| 13 but less than 14 | 3 weeks *plus* 3 days |
| 14 but less than 15 | 3 weeks *plus* 4 days |
| 15 or more | 4 weeks |

\* Employees who leave employment prior to July 1 of any applicable year will receive pro-rated vacation pay in accordance with policy guidelines.

Retail Handbook
January 1, 1997                    31

EA 00314

# V. TIME OFF

*Part-time employees* who work at least 20 hours a week receive vacation time based on your scheduled weekly hours.

If a holiday falls while you are on vacation, you will be entitled to an extra day off some time later that year. You and your super-visor will arrange when you can take the day.

## VACATION PAY

Vacation pay is the same as your regularly scheduled salary rate. If your supervisor notifies the Payroll Department at least three weeks in advance, your vacation check should be ready for you before you leave.

## SICK DAYS

When you complete one year of service, you become eligible for 6 paid sick days during each year. You can use two of those days for personal business with your supervisor's prior approval.

Employees with less than three months of service are not entitled to sick pay. Employees with more than three months' service, but less than a year, receive one sick day for each additional month completed up to a maximum of 6 days. For example, if you have seven months of service and become ill, you can receive sick pay for three days that first year.

Part-time employees who work at least 20 hours a week receive sick pay based on the scheduled hours. If you cannot make it to work because of an illness or accident, you must notify your supervisor within one-half hour of your scheduled starting time. You must provide similar notice each day you are absent. Otherwise, your time away will be unexcused. Your supervisor may ask for a note from your doctor. You can carry over unused sick days. You should, therefore, use these days only as intend-ed. If you don't, you can squander valuable coverage against an extended illness or serious injury.

Retail Handbook
Rev. October 1, 1997                          32

EA 00315

## V. TIME OFF

**SALARY CONTINUATION**
The Salary Continuation Plan ensures that you receive a portion or all of your income if you are physically unable to work for a short period of time. Remember, **if you work in a state that has a mandatory disability insurance program (California, New Jersey, or New York), your benefits are coordinated with payments you receive from this plan.** If you work in one of these states, contact your local Ethan Allen benefits administrator for more information about your state's disability program.

Plan benefits are paid for illnesses or injuries that are not job-related. (Disability income for job-related illnesses or injuries is provided through Workers' Compensation Program.)

If you are a regular full-time employee and have three or more years of service, the plan continues 100% of your basic weekly earnings. If you have less than three years of service, the benefit is 60%. "Basic weekly earnings" means your current weekly salary on the day before you became disabled. "Basic weekly earnings" do not include bonuses, commissions or overtime.

If you are on disability leave when you reach your three-year anniversary, your Salary Continuation benefit will not increase from 60%-100%. Once you return to active duty, you will be eligible for 100% of your basic weekly earnings for any future disability leaves.

You may not receive any salary increases while you are receiving Salary Continuation benefits.

Retail Handbook
Rev. October 1, 1997                    33

EA 00316

# V. TIME OFF

## FAMILY AND MEDICAL LEAVE

Ethan Allen's Family and Medical Leave provides up to 12 wee.
of unpaid absence from work within any 12-month period. The
12-month period starts on the day your leave begins. Some states
permit different leave periods. Consult your supervisor for
specifics in your location.

While on leave, your health care coverage, life insurance and dis-
ability benefits will continue if you continue your contributions.
You can make these contributions in person or by mail by the 15th
of the month. If your payment is more than 30 days overdue,
these coverages may stop for the duration of your leave.

Your time on leave does *not count* toward paid vacation or sick
days entitlements.

When you return, you will be restored to the same or equivalent
position with no loss of pay or benefits. Failure to return without
proper notice will be considered a voluntary termination.

Ethan Allen grants Family and Medical Leave for the following
reasons:

- the birth of your child or placement of a child with you for
  adoption or foster care
- to care for your spouse, child or parent who has a serious
  health condition; children must be under 18 years of age,
  unless the child is incapable of self care because of a mental
  or physical disability
- your own serious health condition
  *or*
- any other reason required by applicable laws.

Retail Handbook
January 1, 1997                            34

EA 00317

## V. TIME OFF

*Ethan Allen requires that a doctor certify a serious health condition.* Human Resources must receive the certification within 15 days after it requests it. Failure to respond may result in the termination of your leave.

A serious health condition is an illness, injury, impairment, or physical or mental condition that involves:

- any period of illness or treatment requiring inpatient care in a hospital, hospice or live-in medical care facility
  *or*
- any period of illness requiring an absence from work of three or more days to receive continued treatment from a health care provider - i.e., doctor, dentist, chiropractor, nurse, practitioner, clinical psychologist, etc.

Family and Medical Leave also may be taken as:

- *intermittent or non-consecutive leave* - i.e., separate blocks of time of at least one hour
- *reduced schedule leave* - which regularly reduces the number of hours you normally work.

Before you start an intermittent or reduced schedule leave, you and your supervisor must agree on your schedule. To accommodate your modified schedule, you may be transferred to an alternate position of equal pay and benefits.

You can be on an intermittent or reduced schedule leave for the birth or adoption of your child or for foster care placement for no more than a year.

EA 00318

## V. TIME OFF

### APPLYING FOR LEAVE

To apply for a Family and Medical Leave you must:

- have completed at least 12 months of service and have worked a minimum of 1,250 hours in the previous 12-month period, unless state law provides otherwise

- work at a facility where there are 50 or more employees within 75 miles of your worksite unless state law stipulates fewer employees

- provide at least 30 days advance written notice, if the leave is foreseeable; if not, as soon as practical

- complete and submit the appropriate documentation from the health care provider of the person with the serious conditi

While on leave, you may need to provide additional medical certification - i.e., a second opinion or re-certification of the condition plus periodic reports of your status.

### USING OTHER TIME OFF

If you take a leave to care for your own or a family member's serious health condition or for the birth of your child, you must use all paid vacation plus personal and sick leave first as part of the 12-week leave period before the unpaid portion of your leave begins. For the adoption or foster care of a child, you must take all your personal days and unused vacation before the unpaid portion of your leave begins.

EA 00319

## V. TIME OFF

As noted, some states such as California, Connecticut and New Jersey have family leave laws that work somewhat differently than the federal law described here - e.g., they may provide a longer period of unpaid leave or have different eligibility requirements. If you anticipate or need Family and Medical Leave, contact your supervisor.

### PERSONAL LEAVE OF ABSENCE
### (OTHER THAN FAMILY AND MEDICAL LEAVE)

After you complete one year of service, you may request a personal, unpaid leave of absence for compelling personal reasons. Your request should note when you would like the leave to start, its length and the reason for it. A personal leave of absence may be granted for a maximum of two weeks.

In response to your request, your supervisor will consider the following:

- the departments staffing needs
- your service time, performance and attendance
- the reason and length of the leave you are requesting
- whether your position can remain vacant until you return.

If your leave is granted, you must first use all your unused vacation. Vacation time counts as part of your total time away. When your vacation ends, the unpaid portion of your leave begins.

While on leave, you must continue to pay in person or by mail all required contributions for your Benefit Program coverages. If you fail to do so, these coverages will end.

Unexcused absences for personal reasons can result in dismissal as will providing false information to secure a leave. Failure to return is the same as voluntary resignation effective three days after the day you were due back.

Retail Handbook
January 1, 1997                    37

## V. TIME OFF

### JURY DUTY

Jury duty is an important civic obligation which Ethan Allen recognizes. If you receive a jury summons, you should notify your supervisor immediately.

If you are a full-time regular employee, you will receive your full pay less any jury fees you earn. Part-time employees receive pay for their regularly scheduled hours of work.

All employees are required to report to work on days they are not needed in the jury room or are excused early enough to work part of the day.

### MILITARY LEAVE

If you are a regular employee, you will receive up to 10 days each year for military leave to attend reserve training or National Guard Duty. Ethan Allen will pay you the difference between your military pay and your regular salary for the time you are away.

When ordered by the Armed Forces, you may take additional time off to attend more than one two-week training period each year. Ethan Allen, however, will not continue your regular salary during these extra training periods unless required by state law.

If you enter the Armed Forces of the United States through the draft, enlistment or recall, you should notify your manager. If you can, you should also provide an estimate of your anticipated service. While on active duty you retain certain reemployment rights which are protected by law.

EA 00321

## V. TIME OFF

After you satisfactorily complete your military service, you are assured of being reinstated to your former position - or one of similar status - including pay and benefits provided you reapply within specified time frames and meet required criteria. All you need to do is to notify Ethan Allen that you want to return. If you are a veteran disabled during military service, you will be given special consideration if you are able to perform duties in other positions.

### BEREAVEMENT LEAVE

You are entitled to a paid leave of three days for the death of your spouse, sister or brother, child, parent, parent-in-law, grandparent, or grandchild.

EA 00322

## VI. BENEFITS AND SERVICES

## MEDICAL, DENTAL, DISABILITY, LIFE INSURANCE AND RETIREMENT PROGRAM BENEFITS

Eligibility for medical, dental, disability and life insurance benefits begins after 3 months of continuous Company service.

You become eligible for the Retirement Program benefits when you complete one year of continuous Company service in which you work a minimum of 1,000 hours.

The Ethan Allen Benefit Program contains a well-balanced combination of plans. They have been carefully designed and are thoughtfully administered to deliver important values to you and your family all during your career.

You can obtain more information about each of your benefit plan by reading the Summary Plan Description (SPD). You can obtain up-to-date SPD copies and other benefit information materials from the Corporate Benefits Department.

## EDUCATIONAL ASSISTANCE

Ethan Allen can help you enhance your career opportunities by paying part of the costs for approved courses that you take outside of normal working hours. You must be a full-time employee with at least six months of service and be performing satisfactorily to participate.

The Plan reimburses 80% of the cost of tuition, books, laboratory or registration fees up to $1,500 each school year for under graduate study; up to $2,000 for graduate programs. The pla school year starts on September 1 and ends August 31.

EA 00323

## VI. BENEFITS AND SERVICES

To qualify for reimbursement, an accredited educational institution approved by the Company must provide your course of study. In addition, the course you take must relate to your current job or to the reasonable possibility of a promotion to a better one.

You must apply to your supervisor for educational assistance no later than one month following the start of the course. To apply, you complete the *"Application for Education Assistance"* form which you can obtain from Human Resources. Your supervisor and other levels of management will review the form, approve or reject your application and inform you of the outcome.

If approved, you must complete your studies with a grade of "C" or better. You must also be an active full-time employee when you finish the course and request a plan payment. To process your request, Human Resources needs a copy of your initial application, a record of your grade and copies of receipts - i.e., tuition, books, etc.

### CREDIT UNION

Ethan Allen provides you with the opportunity to participate in the Danbury Health Systems Credit Union. You can obtain more information about the Credit Union by contacting your supervisor.

### BULLETIN BOARD

The bulletin board is your "Information Center" for Company news. You should check the board regularly for official notices and announcements of interest. All bulletin boards are for Company use only and items may be posted only by Ethan Allen management, or approved by the Corporate Human Resources Department.

EA 00324

## VI. BENEFITS AND SERVICES

**EMPLOYEE PURCHASE PLAN**
Once you complete a year of service, you become eligible to participate in Ethan Allen's Employee Purchase Plan. You can buy merchandise from your store. All purchases must be prepaid based on landed costs plus sales tax and must be approved by your supervisor. Purchases may also be made through an Ethan Allen qualified credit plan.

It is also essential that any purchase you make through this plan is *only for your personal use.*

Your store is your purchase pickup point. You can take your purchase home from there. Once you receive the merchandise, you are responsible for any damages.

Part-time employees who work less than 20 hours per week are not eligible to participate in this program.

EA 00325

## INDEX

Applying for Leave . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .36
Attendance and Punctuality . . . . . . . . . . . . . . . . . . . . . . . .12
Bereavement Leave . . . . . . . . . . . . . . . . . . . . . . . . . . . . .39
Bulletin Board . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .41
Conflicts of Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17
Credit Union . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .41
Drug Testing/Screening . . . . . . . . . . . . . . . . . . . . . . . . . .21
Educational Assistance . . . . . . . . . . . . . . . . . . . . . . . . . .40
Employee Advisory Resource Program . . . . . . . . . . . . . .22
Employee Applicant Referral Incentive Program . . . . . . . .8
Employee Classifications . . . . . . . . . . . . . . . . . . . . . . . . . .7
Employee Purchase Plan . . . . . . . . . . . . . . . . . . . . . . . . .42
Employee Qualifications . . . . . . . . . . . . . . . . . . . . . . . . . .7
Employment of Relatives . . . . . . . . . . . . . . . . . . . . . . . . . .9
Equal Employment Opportunity . . . . . . . . . . . . . . . . . . . .7
Family and Medical Leave . . . . . . . . . . . . . . . . . . . . . . . .34
Fire . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24
Holidays . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30
Housekeeping . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25
Inclement Weather . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12
In-Home Selling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15
In-Store Events . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16
Jury Duty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .38
Medical, Dental, Disability, Life Insurance and Retirement
Program Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .40
Military Leave . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .38
Overtime . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28
Parking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14
Payroll Deductions . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29
Personal Appearance . . . . . . . . . . . . . . . . . . . . . . . . . . .25
Personal Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24
Personal Leave of Absence . . . . . . . . . . . . . . . . . . . . . . .37

EA 00326

## INDEX

Personal Property ............................14
Personal Status Change .......................10
Personal Telephone Calls and Mail .............13
Re-employment ..............................10
Referrals ....................................8
Safety .....................................23
Salary Administration .........................28
Salary Continuation ..........................33
Seniority ...................................10
Sexual Harassment ..........................19
Sick Days ..................................32
Smoking ...................................13
Solicitations ................................23
Solving Problems ...........................23
Terminations ...............................26
Training Period .............................9
Vacation Entitlement .........................31
Vacation Pay ...............................32
Vacations ..................................30
Work Week .................................12
Your Paycheck ..............................29

EA 00327

# EXHIBIT B

1          UNITED STATES DISTRICT COURT

2          DISTRICT OF MASSACHUSETTS

3                         CIVIL ACION

4                    NO. 04-12506-MEL.

5

6     * * * * * * * * * * * * * * * * * * * * * * * * *

7     MICHAEL F. ELDRIDGE,          *

8        PLAINTIFF                  *

9     VS.                           *

10    ETHAN ALLEN INC.,             *

11       DEFENDANT                  *

12    * * * * * * * * * * * * * * * * * * * * * * * * *

13

14              **DEPOSITION of MICHAEL F.**
      **ELDRIDGE**, a witness called on behalf of
15    the Defendant, pursuant to the applicable
      provisions of Massachusetts Rules of
16    Civil Procedure, before Marjorie L.
      Simmons, a Shorthand Reporter and Notary
17    Public in and for the Commonwealth of
      Massachusetts on Monday, March 27, 2006,
18    commencing at 11:15 a.m., at the offices
      of FOLEY & LARDNER, LLP, 111 Huntington
19    Avenue, Boston, Massachusetts.

20

21

22

23              **DUNN AND GOUDREAU**
      **COURT REPORTING SERVICE INC.**
                **ONE STATE STREET**
24        **BOSTON, MASSACHUSETTS 02109**
                 **{617} 742-6900**

1  A.   It is my resume.

2  Q.   And I note under work experience it says

3       "Eldridge Trucking, Inc"?

4  A.   Yes.

5  Q.   Is that the name of the business you

6       operated under?

7  A.   As independent, correct.

8  Q.   And I note under here you directed a

9       staff of  12 and six moving trucks?

10  A.   Hmm-mm.

11  Q.   Were these people that worked directly

12       for you as employees?

13  A.   Yes.

14  Q.   And did you ever have to fire anyone

15       while you owned this business?

16  A.   One.

17  Q.   One person?

18  A.   One person.

19  Q.   And what were the circumstances, why did

20       you fire them?

21  A.   Stole medication out of a customer's

22       home.

23  Q.   Would you agree with me as a businessman,

24       an owner, it is important for employees

1    to come to work on time?

2 A.   Yes.

3 Q.   Why is that important?

4 A.   You have to know they are showing up.

5 Q.   Just moving down to certification, kind

6    of the bottom "certified moving

7    consultants"?

8 A.   Yes.

9 Q.   What does that mean?

10 A.   That is, you can go into peoples' homes

11    and give estimates to move from point A

12    to point B.

13 Q.   How do you get certified?

14 A.   It was a moving company that was running

15    a course.

16 Q.   Do you still have that certification?

17 A.   No.

18 Q.   I'm sorry I didn't mean to cut you off.

19 A.   No.

20 Q.   Under professional membership it says

21    "Massachusetts Movers Association"?

22 A.   Yes.

23 Q.   What is that?

24 A.   It is association within the State of

1    A.    One maybe two.

2    Q.    And what were their job titles?

3    A.    It was assistant manager and supervisor.

4    Q.    While you were at GTS did you ever

5          discipline or terminate anyone?

6    A.    Yes.

7    Q.    Why don't you tell me what you remember

8          the circumstances were?

9    A.    I would discipline a driver for showing

10         up late or returning with a noncompleted

11         day.

12   Q.    How many times do you remember

13         disciplining people while you were there?

14   A.    I don't remember.

15   Q.    More than ten or was it just a handful of

16         times?

17   A.    I would say less than ten.

18   Q.    Did the drivers report to you or did they

19         report to someone else?

20   A.    They reported to me.

21   Q.    How many drivers were there?

22   A.    We had 17 driving teams.

23   Q.    How many people were on a team?

24   A.    Two men per team.

35

1          performance review, anything about it?

2    A.    It was outstanding.

3    Q.    I am going to ask you about Ethan Allen/,

4          how did you come to be employed by Ethan

5          Allen?

6    A.    ADS lost the account.  They were the

7          delivery service for Ethan Allen.  They

8          knew me from working for ADS.

9    Q.    Was there a position actually posted that

10         you applied for?

11   A.    No.  They asked me to work for them.

12   Q.    And who asked you to work for Ethan

13         Allen?

14   A.    Dave Pellicciotti.

15   Q.    What was his job title at the time?

16   A.    Warehouse manager.

17   Q.    And did you interview with Dave about the

18         job?

19   A.    Yes, I did.

20   Q.    Did you interview with anyone else?

21   A.    No.

22   Q.    And when did you start working at Ethan

23         Allen?

24   A.    Sometime around July 8, 1999.

1   Q.   Okay.

2   A.   Or August 8.  Somewhere around there.

3   Q.   And what title or position did you hold

4        when you began working at Ethan Allen?

5   A.   Shuttle truck driver.

6   Q.   And to whom were you reporting?

7   A.   Dave Pellicciotti.

8   Q.   And could you just briefly tell me what

9        you did as a shuttle truck driver?

10  A.   I drove the truck from Franklin to one of

11       the four stores.

12  Q.   And so you worked out of Franklin at that

13       time?

14  A.   Yes, I did.

15  Q.   And have you held any other positions at

16       Ethan Allen?

17  A.   Yes.

18  Q.   What was the next position you held after

19       shuttle truck driver?

20  A.   Warehouse supervisor.

21  Q.   And how did you get that position?

22  A.   Dave promoted me.

23  Q.   When did you begin to work in that role?

24  A.   One week later.

37

1    Q.    Did you know there was a chance you would

2          be promoted that soon?

3    A.    No.

4    Q.    What were your responsibilities as

5          warehouse supervisor?

6    A.    To make sure the product came into the

7          building and was put away properly and to

8          make sure that the product was pulled,

9          stacked, and prepared for the delivery

10         service to load the truck.

11   Q.    Were you still making deliveries?

12   A.    Yes.

13   Q.    How often?

14   A.    On a per call emergency basis.

15   Q.    And who did you report to in that

16         position?

17   A.    Dave Pellicciotti.

18   Q.    Were there any other warehouse

19         supervisors?

20   A.    No.

21   Q.    Did you have employees that were

22         reporting directly to you?

23   A.    Yes, I did.

24   Q.    About how many?

1   A.   Let's see, approximately six to eight.

2   Q.   Did that number change during the time

3        you were the warehouse supervisor?

4   A.   Yes.  If someone left I would hire

5        someone.

6   Q.   Was there ever any big jump from six to

7        12 or anything like that; did it stay

8        about the same size?

9   A.   No, approximately the same.

10  Q.   What were the titles of the employees who

11       were reporting to you in your warehouse

12       supervisor's position?

13  A.   All of their titles?

14  Q.   Yes.

15  A.   General laborer and a prepper.

16  Q.   During the time you were warehouse

17       supervisor, do you recall ever discussing

18       performance issues with your managers at

19       Ethan Allen?

20  A.   Yes.

21  Q.   How often?

22  A.   Whenever they brought it up.

23  Q.   And about how many times do you remember

24       it coming up?

40

1            MS. KRAUSS: Can we mark this as

2      the next exhibit.

3

4            (Exhibit 2, Letter dated 7/10/01,
              Marked for identification.)

5

6   Q.   Do you recognize this document?

7   A.   Yes.

8   Q.   Can you tell me what it is, please?

9   A.   Can I tell you what this letter is?

10  Q.   Please tell me, how do you recognize it?

11  A.   From the phone call I placed to his house

12       on that day.

13  Q.   Do you remember ever seeing this

14       particular document before?

15  A.   Yes.

16  Q.   When do you remember seeing this for the

17       first time?

18  A.   I am going to say right around the summer

19       of 2001.

20  Q.   Who showed this to you?

21  A.   Dave Pellicciotti.

22  Q.   Did you talk about this memo?

23  A.   I am assuming we did, yes.

24  Q.   And do you have a memory of actually

```
 1           talking to Dave about this?
 2    A.    I remember him asking me about a phone
 3           call.
 4    Q.    And why don't you describe for me what
 5           did happen during this phone call?
 6    A.    I had an employee who was not showing up
 7           for work.  Dave asked me to call his
 8           house to find out if he was coming in.  I
 9           told the kid we needed him to come in.
10    Q.    And how did that come to Dave's
11           attention, if you know?
12    A.    About the phone call?
13    Q.    Yes.
14    A.    He asked me to make it.
15    Q.    Then what happened after that, did the
16           employee come in?
17    A.    I don't remember.
18    Q.    It says here in the memo in the second
19           paragraph, "On June 28, 2001 an employee
20           has formally complained and in his
21           resignation letter clearly stated his
22           reason for leaving is from your "lack of
23           respect and professionalism" during the
24           phone call you placed to his house that
```

1     day."

2           Do you remember this employee

3     resigning?

4  A.   I remember him quitting, yes.

5  Q.   And did you see his resignation letter?

6  A.   I don't remember.

7  Q.   What was the employee's name, if you

8     remember?

9  A.   Adam.

10  Q.   Do you know what Adam meant by the "lack

11     of respect and professionalism"?

12  A.   I do not.

13  Q.   Did Dave talk to you about that in

14     particular?

15  A.   He asked me if I -- he asked me if I was

16     using foul language over the phone.

17  Q.   And did you?

18  A.   No.

19  Q.   What did you tell Dave?

20  A.   I don't remember.

21  Q.   What else do you remember Dave saying

22     during this meeting?

23  A.   I don't remember.

24  Q.   Do you remember anything that you said

| | | |
|---|---|---|
| 1 | | during the meeting? |
| 2 | A. | No, I don't. |
| 3 | Q. | The first paragraph -- it starts out in |
| 4 | | this memo by saying, "In the past there |
| 5 | | have been conversations about the |
| 6 | | unprofessional nature in which you talk |
| 7 | | to your employees at certain times." |
| 8 | | Do you remember talking to Dave |
| 9 | | about that issue in the past? |
| 10 | A. | Yes. |
| 11 | Q. | What was -- what did Dave say at those |
| 12 | | times? |
| 13 | A. | I don't remember. |
| 14 | Q. | What do you remember about the |
| 15 | | conversation? |
| 16 | A. | I don't remember. |
| 17 | Q. | I am just trying to clarify, when I asked |
| 18 | | if you remember conversations you said |
| 19 | | you did.  I am just trying to find out |
| 20 | | what you -- |
| 21 | A. | I don't know which specifics though, I |
| 22 | | just don't remember. |
| 23 | Q. | I don't even need specifics.  If you |
| 24 | | remember generally what Dave said to you |

1          about that issue  ..

2     A.   I don't.

3     Q.   You don't?

4     A.   No.

5     Q.   And then do you remember talking on

6          March 21 about a written warning having

7          to do with your general supervisory

8          skills?

9     A.   I don't remember.

10    Q.   So the meeting that you had with Dave

11         about this particular memo in this phone

12         call to Adam, do you remember the outcome

13         of that meeting?

14    A.   Repeat that please.

15    Q.   Do you remember the outcome of the

16         meeting that you had with Dave to discuss

17         the issues in this memo, Exhibit No. 2?

18    A.   This memo right here?

19    Q.   Yes.

20    A.   I believe I denied saying what Adam said

21         I said.

22    Q.   Do you know if you were disciplined as a

23         result of that?

24    A.   I don't think so.

45

1    Q.    Did you know that Ethan Allen

2          contemplated terminating your employment

3          for that?

4    A.    Later I found out about it.

5    Q.    How did you find out about it later?

6    A.    Dave told me.

7    Q.    And what did Dave tell you exactly in

8          that conversation?

9    A.    That this had been typed up.  That is all

10         I remember.

11   Q.    Do you remember anything you said to him?

12   A.    No.

13   Q.    Do you remember the time frame of when

14         you -- when he told you this was typed

15         up?

16   A.    I don't remember.

17   Q.    Do you remember having any other

18         conversations with Dave about speaking

19         with employees in an unprofessional

20         nature?

21   A.    I don't remember.

22              MS. KRAUSS:  Can we mark this

23         questionnaire as the next exhibit please.

24

1                     (Exhibit 3, Questionnaire,

2                         Marked for identification.)

3

4    Q.   Mr. Eldridge, do you recognize this

5         document?

6    A.   Yes.

7    Q.   What is it?

8    A.   I believe it is a questionnaire that they

9         had us fill out for our reviews.

10   Q.   And if we turn to the second page, is

11        that your signature?

12   A.   Yes, it is.

13   Q.   The date looks like August 15, 2001?

14   A.   Yes.

15   Q.   If you look still on the same page, up at

16        the top under item No. 4, can you read

17        what you wrote in this space?

18   A.   Yes, I can.

19   Q.   Okay.  Please read it.

20   A.   "I must learn to control my emotions when

21        my tension rises. I need continued

22        support in my discipline of inappropriate

23        behavior."

24   Q.   When you said "you need to learn to

1    control your emotions" what were you

2    referring to?

3  A.  To speak to unruly employees in a calm

4    voice.

5  Q.  Had there been times when you had not

6    done that?

7  A.  Yes.

8  Q.  Is that something that Dave or any other

9    supervisor had talked to you about?

10  A.  Dave had spoken to me.

11  Q.  Do you remember what Dave said and what

12    you said during that conversation?

13  A.  I believe Dave told me to just be calmer.

14  Q.  Was there more than one conversation

15    about this with you?

16  A.  I don't remember.

17  Q.  Do you remember what you said in response

18    when he told you to be calmer?

19  A.  I believe I said, okay.

20  Q.  Can you think of any specific examples,

21    you know, that prompted you to write

22    this, "you needed to control your

23    emotions"?

24  A.  I can't remember.

1      of inappropriate behavior?

2    Q.   Yes.

3    A.   In other words, Dave backed me up.  When

4         I -- when an employee was being unruly.

5    Q.   Okay.

6              MS. KRAUSS:  Can you mark this as

7         Exhibit No. 4?

8

9              (Exhibit 4, Personnel appraisal,
               Marked for identification.)

10

11   Q.   Do you recognize this document?

12   A.   Yes, I do.

13   Q.   What is it?

14   A.   It is a review.

15   Q.   And if we turn to the third page of this,

16        is that your signature --

17   A.   Yes, it is.

18   Q.   -- where it says "employee"?

19   A.   Yes, it is.

20   Q.   It is dated September 17, 2001?

21   A.   Yes, it is.

22   Q.   And did you go over this with your

23        supervisor?

24

1   A.   Yes, I did.

2   Q.   And that was Dave Pellicciotti at the

3        time, is that correct?

4   A.   Yes, Dave Pellicciotti.

5   Q.   Was anyone else present when you went

6        over this?

7   A.   I don't remember.

8   Q.   Do you remember what he said, what you

9        said during that conversation?

10  A.   No, I don't remember.

11  Q.   You don't remember anything?

12  A.   I remember I was surprised by a "below

13       expectations" on page 2.

14  Q.   Looks like "below expectations for

15       effective communications," then another

16       one under the "leadership heading," am I

17       reading it correctly?  Delegation and

18       control  --

19  A.   Yes, effective communication and

20       leadership.

21  Q.   Okay.  You said you were surprised.  Why

22       were you surprised?

23  A.   Because if I read effective

24       communication, "Often disagreements with

1    says "Review again 1/01/02." That is

2    January 1, 2002. That was the regional

3    manager requested we review this again.

4    She thought it was a little harsh.

5    Q.  Who was the regional manager?

6    A.  Lisa Brown. Excuse me, the district

7        manager.

8    Q.  Lisa Brown?

9    A.  Yes.

10   Q.  When you went over this with Dave, do you

11       remember about how long that meeting

12       would have lasted?

13   A.  No, I don't.

14   Q.  If we turn to I think the last page, yes,

15       the last page --

16   A.  Yes.

17   Q.  -- where it says "Goals and Actions"?

18   A.  Yes.

19   Q.  Is that something Dave created?

20   A.  Yes.

21   Q.  Do you remember discussing this with him

22       at the time of the review?

23   A.  Yes.

24   Q.  And is it fair to say this is kind of an

1          action plan?

2    A.    Yes.

3    Q.    And what was your understanding of what

4          Dave wanted you to do with this action

5          plan?

6    A.    Well, number one says, "Increase

7          individual productivity with more

8          effective use of time."  That was the

9          goal.  The action was to "Submit to Dave

10         a 30/60/90-day plan by the first of each

11         month.  This should include both self and

12         warehouse areas."

13   Q.    Is that something that you did?

14   A.    Yes.  If you look at number two,

15         "leadership skills to improve, more of a

16         professional attitude, mood setting tone

17         in warehouse.  Your approach and

18         communication to your staff can

19         de-motivate and decrease productivity at

20         times."  The answer was to "Attend

21         another leadership class by the end of

22         October of 2001.  Use professional

23         language as though you're being filmed

24         for a training video and maintain a

```
 1              positive/supportive proactive approach to
 2              problem solving.  Keep your ego out of
 3              the workplace."
 4                   And the third was, "Enforce and
 5              control all procedures in the warehouse,
 6              safety, OSHA, UPS, MIA's -- stands for
 7              missing pieces of the furniture --
 8              quality cards, off-load paperwork,
 9              warehouse aisles." Then the action, "Have
10              a warehouse meeting every six weeks and
11              continue to join in the service and
12              driver meetings."
13    Q.        And did you attend the leadership class
14              by the end of October of 2001?
15    A.        I believe I did.
16    Q.        Did you hold warehouse meetings every six
17              weeks?
18    A.        Yes, we did.
19    Q.        Do you know what Dave meant "keep your
20              ego out of the workplace"?
21    A.        When I was a driver I was an excellent
22              driver and some of these workers I had
23              working under me were not excellent
24              workers.  So I think what he meant was I
```

1           can't expect everybody to be an excellent

2           worker.

3    Q.    You had anticipated my question.  Sounds

4           like you reviewed this in January of

5           2002?

6    A.    Correct.

7    Q.    Was that with Dave again or was it with

8           Dave and Lisa, if you remember?

9    A.    I know Dave was there, I don't remember

10          if Lisa was there.

11   Q.    Did you actually discuss this very same

12          review, or was there a different one?

13   A.    I thought there was a different one.

14   Q.    Do you recall ever being put on an action

15          plan before while you were a warehouse

16          supervisor?

17   A.    I don't remember.

18   Q.    How did you and Dave get along?

19   A.    We got along fine.

20   Q.    Did you like him as a manager?

21   A.    Yes.

22   Q.    Did you respect his opinion?

23   A.    Yes.

24   Q.    When did he leave Ethan Allen?

1    A.    Repeat that please.

2    Q.    Once you became interim warehouse

3          manager, did you have any new groups of

4          employees reporting to you?

5    A.    Customer service and what we call

6          schedulers?

7    Q.    How many more people were reporting to

8          you then?

9    A.    Approximately five to six.

10   Q.    So earlier you I believe you said there

11         were six to eight while you were

12         warehouse supervisor, then you had five

13         to six more people that were reporting to

14         you?

15   A.    Correct.

16   Q.    And when did you first meet Denna

17         Hamilton?

18   A.    I believe Denna -- I believe it was

19         December of 2002.

20   Q.    And describe the circumstances of that

21         meeting?

22   A.    We had been without a district manager

23         for almost six months.  We had been

24         without a warehouse manager for almost

1              three months, so I was relieved to

2              finally be getting some help.

3    Q.    So is it when Denna first started working

4              for Ethan Allen that you first met her?

5    A.    Yes.

6    Q.    And where was she working, was she

7              working out of the Franklin office?

8    A.    When she first got hired?

9    Q.    Yes.

10   A.    Yes.

11   Q.    I believe you said you started working

12             from Franklin.  Is that where you kept

13             working throughout your employment?

14   A.    Correct.

15   Q.    How often was she in the Franklin office?

16   A.    I don't know.

17   Q.    Was she there every day?

18   A.    I don't know her schedule.

19   Q.    Well, in general were the district

20             managers, did they travel around to

21             different locations, did they just stay

22             in the same office everyday?

23   A.    They traveled.

24   Q.    What position did you hold after you were

1           interim warehouse manager?

2    A.    I was promoted to warehouse manager.

3    Q.    When did that happen?

4    A.    December of 2002.

5    Q.    How did that come about?

6    A.    Khurso recommended to Denna that I be
7          promoted.

8    Q.    Did Denna actually -- do you know if
9          Denna posted the position?

10   A.    I don't know.

11   Q.    Did she interview you?

12   A.    I sat in a room with her and Khurso.

13   Q.    Was it to talk about the warehouse
14         manager's position?

15   A.    Yes, if I remember right.

16   Q.    And so who actually told you you were
17         being promoted to warehouse manager?

18   A.    Well, it was mutual Khurso and Denna.

19   Q.    Did it happen during that meeting?

20   A.    It was in that meeting.

21   Q.    I'm sorry for the misunderstanding, did
22         you have any meetings with them before
23         that meeting where they told you, where
24         you maybe talked about the position and

1    A.    I said "Thank you."

2    Q.    And did your pay increase at that time?

3    A.    I remember -- I am going to say yes.

4    Q.    How did you get along with Denna? Let me

5          back up.  While you were the warehouse

6          manager who did you report to?

7    A.    When?

8    Q.    Why don't you take me through it.  Who

9          did you report to first?

10   A.    At what timetable?

11   Q.    When you first became  -- when you were

12         promoted from interim to warehouse

13         manager, once you were the regular

14         warehouse manager who were you reporting

15         to at that time?

16   A.    When I became the warehouse manager?

17   Q.    Yes.

18   A.    Denna Hamilton.

19   Q.    What was Denna's title?

20   A.    District manager.

21   Q.    And how did you get along with Denna

22         while she was your supervisor?

23   A.    I thought I got along with her fine.

24   Q.    And did that change?

1   A.   In what way?

2   Q.   You said you thought you got along with

3        her fine.

4   A.   I was relieved to have a district

5        manager.

6              MS. KRAUSS:  Let's mark this as

7        Exhibit No. 5.

8              (Exhibit 5, E-mail 2/21/03,
                 Marked for
9                 identification.)

10   Q.   Do you recognize that document?

11   A.   Yes, I do.

12   Q.   What is it?

13   A.   It is AN e-mail I sent to Sandra Lamenza.

14        She was a vice president.

15   Q.   And why did you write this e-mail?

16   A.   Because there had been a difficult

17        September, October, November, and this is

18        without a district manager.  We were

19        without a district manager from June of

20        that year until mid-December.

21   Q.   So what did you mean when you wrote, "It

22        is a complete joy to have Denna Hamilton

23        as our DM"?

24   A.   We finally had someone that could

64

1   communicate with the four stores with us.

2   Q.   What did you mean "Thanks for picking out

3        a winner"?

4   A.   You never know who you are going to get.

5   Q.   You liked --

6   A.   I didn't want her to pick out a loser.

7   Q.   Understandable.  What was it, what

8        qualities did Denna have that made you

9        think she was "a winner"?

10  A.   With four stores, we used to deal with

11       four stores, each store is a separate

12       entity and communication is critical.

13       And as district manager, the four stores

14       fall under her responsibility along with

15       us.  And we had no -- we had no district

16       manager for almost five, six months.  And

17       now we had one.

18  Q.   So Denna did a good job with

19       communication among the four stores, is

20       that fair to say?

21  A.   Yes.

22  Q.   As far as working with her, did she seem

23       to be doing a good job as district

24       manager?

1    A.    Most often.

2    Q.    Most often?  Okay.

3                MS. KRAUSS:   Let's mark this

4          Ethan Allen handbook marked as Exhibit

5          No. 6.

6                     (Exhibit 6, Ethan Allen handbook,
                       Marked for identification.)
7

8    Q.    Do you recognize this?

9    A.    Yes.

10   Q.    What is it?

11   A.    Looks like a Xerox copy of the Ethan

12         Allen employee handbook.

13   Q.    You understood that part of your job as

14         supervisor was to enforce the rules in

15         the employee handbook, didn't you?

16   A.    Yes.

17   Q.    And I am going to turn to pages 12 and 13

18         of the handbook.  If you look down at

19         bottom it says EA 00295 and 002296.

20   A.    Okay.

21   Q.    One of the provisions in that handbook is

22         attendance and punctuality, isn't it?

23   A.    Yes.

24   Q.    This is one of your responsibilities to

|    |    |                                              |
|----|----|----------------------------------------------|
| 1  |    | make sure that people arrived at work on     |
| 2  |    | time?                                        |
| 3  | A. | Yes.                                         |
| 4  | Q. | And you would agree that reporting to        |
| 5  |    | work on time is a reasonable expectation     |
| 6  |    | for management to have?                      |
| 7  | A. | For who?                                     |
| 8  | Q. | For management to have, to expect their      |
| 9  |    | employees to arrive at work on time?         |
| 10 | A. | Yes.                                         |
| 11 | Q. | And while you were at Ethan Allen did you    |
| 12 |    | ever discipline any employees for            |
| 13 |    | tardiness?                                   |
| 14 | A. | Yes.                                         |
| 15 | Q. | Can you describe those situations for me?    |
| 16 | A. | If someone was late I would bring it to      |
| 17 |    | their attention.                             |
| 18 | Q. | Did you have any specific employees who      |
| 19 |    | you remember disciplining for this           |
| 20 |    | reason?                                      |
| 21 | A. | No, I don't remember.                        |
| 22 | Q. | When you say "You would bring it to their    |
| 23 |    | attention," did you ever write someone up    |
| 24 |    | and actually give them informal              |

1    A.    I don't remember.

2    Q.    Do you remember not just talking to an

3          employee, do you remember ever

4          terminating someone for being tardy?

5    A.    I don't remember.

6    Q.    Is it possible?

7    A.    Yes.

8    Q.    Is it possible that you also wrote up a

9          discipline at some point for someone

10         being tardy?

11   A.    It is possible.

12   Q.    Are there any employees who stand out in

13         your mind as, you know, ones who likely

14         would have been tardy a lot?

15   A.    I don't remember.

16   Q.    Okay.

17              MS. KRAUSS:   Let's mark this

18         statement as Exhibit No. 7.?

19              (Exhibit 7, Statement,
                 Marked for identification.)
20

21   Q.    Do you recognize this, Mr. Eldridge?

22   A.    Yes.

23   Q.    What is it?

24   A.    It is my signature.

1    Q.    And what's the date on that?

2    A.    August 5, 1999.

3    Q.    And this appears to be an acknowledgment

4          that you have read and acknowledged the

5          employee handbook?

6    A.    Yes.

7    Q.    Okay.

8                    MS. KRAUSS: Let's go off the

9          record.

10                   {Off the record.}

11                   MS. KRAUSS: Let's mark this as

12         the next exhibit please.

13

14                   (Exhibit 8, E-mail 7/16/03,
                        Marked for identification.)

15   Q.    Do you recognize this document?

16   A.    Yes.

17   Q.    And what is it?

18   A.    It is an e-mail.

19   Q.    And who is Amy Deane?

20   A.    She was a controller.

21   Q.    Controller at Ethan Allen?

22   A.    Yes.

23   Q.    And was she the controller at Ethan Allen

24         at the time you wrote this e-mail?

1    A.    Yes, there was a write-up.

2    Q.    And so it was to discuss that write-up

3          she was giving you?

4    A.    Correct.

5    Q.    Okay.

6    A.    Correct.

7    Q.    When was the next conversation that you

8          had with Denna about or concerning you

9          being late to work?

10   A.    I am going to say it was at either

11         September or October.  Okay.  I believe

12         it was October.

13   Q.    Who was at that meeting?

14   A.    All I remember is Denna and myself.

15   Q.    Where did that meeting take place?

16   A.    In Denna's office.

17   Q.    Denna's office.  How long did it last

18         approximately?

19   A.    Under half an hour.

20   Q.    Under half an hour.  Okay.  And can you

21         please tell me as best you can remember

22         what she said and what you said about

23         tardiness and everything?

24   A.    Well, she come up with some dates that I

1    was tardy and again, I couldn't remember

2    the specific dates of what time I

3    arrived, what time I was scheduled to

4    arrive and when.

5         What I believe I told her, if I

6    was late it was because I was on

7    medication from my doctor.

8    Q.   Okay.  Do you remember next about what

9         she said?

10   A.   I believe she said that if I was late it

11        was going to mean  -- well, it was going

12        to be more serious, something along those

13        lines.  I don't remember her exact words.

14   Q.   Were you taking any notes during this

15        conversation?

16   A.   I don't believe I was.

17   Q.   Was Denna?

18   A.   I don't remember if she was.

19   Q.   Were there any documents involved in that

20        conversation?

21   A.   Yes.

22   Q.   What were they?

23   A.   I believe it was a write-up for the

24        alleged tardiness for the days she was

```
 1          saying.
 2    Q.    And when you say earlier, you just said
 3          "alleged," do you have any reason to
 4          think she was making up the dates that
 5          you were tardy?
 6    A.    She couldn't tell me.  I asked her who
 7          the person was and she would never tell
 8          me.
 9    Q.    And have there been times when you have
10          disciplined an employee and she wanted to
11          know who reported something to you?
12    A.    Can you give me an example?
13    Q.    Sure.  If you have -- if there is a fight
14          in the warehouse, you're not there, but
15          you hear about it from someone else, the
16          two fighting employees said who told you,
17          has a situation like that ever arisen?
18    A.    No, we never had any fights in the
19          warehouse.  No, not that I am aware of.
20    Q.    Well, can you think of any reasons why
21          Denna might not want to tell you who
22          reported you being late to work?
23    A.    Well, I would -- I didn't know who would
24          be responsible to give the time to her.
```

```
 1              I didn't punch in, I didn't punch out.
 2              So if someone said I was there at 8:45,
 3              maybe that is when she saw me.  Maybe I
 4              was there at 7:15.
 5    Q.   What did you generally -- when you came
 6         in, in the morning,s did you do the same
 7         thing every morning?  Did you go straight
 8         to the warehouse or straight to your
 9         office?
10    A.   No.  Each day is different.
11    Q.   Do you remember anything else that was
12         said during this meeting?
13    A.   I remember telling Denna I felt
14         uncomfortable signing my name there --
15    Q.   Okay.
16    A.   -- if she  -- she told me I had to sign
17         it.
18    Q.   Okay.
19    A.   If I remember right I put in parens
20         "medical" because I was on Vicodin at the
21         time.
22    Q.   Did you and Denna have any further
23         conversations about the medical reasons?
24    A.   That day?
```

| 1 | Q. | Yes. |
|---|----|------|

1   Q.   Yes.

2   A.   What do you mean?

3   Q.   Well, if you said, you know, medical

4        reasons, did Denna ask you about that?

5        Did she ask you what medical reasons were

6        making you late, what medication you were

7        on?

8   A.   This was in October.  So she had known I

9        was on Vicodin quite awhile.

10  Q.   Okay.  But did you actually -- I am

11       trying to get a sense if you talked about

12       it at that meeting, whether it was making

13       you late or not?

14  A.   I talked about it.

15  Q.   What did you say?

16  A.   I told her I -- if I was -- if I was

17       late, possibly might have been that I was

18       on Vicodin.

19  Q.   And what was her response when you said

20       that?

21  A.   I don't recall.

22  Q.   Do you recall if she said anything about

23       offering to work with you if you could

24       bring in a doctor's note?

| | | |
|---|---|---|
| 1 | A. | I believe she did bring that up. |
| 2 | Q. | Did you bring in a note talking about |
| 3 | | your being on Vicodin? |
| 4 | A. | I don't remember. |
| 5 | Q. | Other than your last day at Ethan Allen, |
| 6 | | do you remember having any other |
| 7 | | conversation with Denna about being late |
| 8 | | to work? |
| 9 | A. | Yes. |
| 10 | Q. | When? |
| 11 | A. | I don't remember what Saturday it was. |
| 12 | | It was October 6th if that was on a |
| 13 | | Saturday. |
| 14 | Q. | Okay. |
| 15 | A. | Denna accused me of being late getting to |
| 16 | | the Natick store. |
| 17 | Q. | Was this -- just so I have the date in my |
| 18 | | mind, was this after you received the |
| 19 | | second write-up? |
| 20 | A. | Yes. |
| 21 | Q. | It is after the second write-up? |
| 22 | A. | Yes. |
| 23 | Q. | And she accused you of being late to the |
| 24 | | Natick store? |

| 1  | A. | Correct. |
| 2  | Q. | Was it that same day? |
| 3  | A. | I don't remember.  I don't think so |
| 4  |    | because that was a Saturday. |
| 5  | Q. | Had you been late to the Natick store? |
| 6  | A. | I got there at 8:10. |
| 7  | Q. | What time were you asked to be there? |
| 8  | A. | 8:00. |
| 9  | Q. | Were you scheduled to be at the Franklin |
| 10 |    | store before then? |
| 11 | A. | I had made plans to be  -- to meet an |
| 12 |    | employee there at 7:00, to drive over |
| 13 |    | together to save on the cost. |
| 14 | Q. | Okay.  What time did you actually arrive |
| 15 |    | at the Franklin store? |
| 16 | A. | 7:00 a.m. |
| 17 | Q. | Who was the other employee that you were |
| 18 |    | meeting? |
| 19 | A. | Danny. |
| 20 | Q. | What is his last name? |
| 21 | A. | I can't remember it right this second. |
| 22 | Q. | I will come back to it.  Was Danny at the |
| 23 |    | Franklin store at 7:00? |
| 24 | A. | No, not when I was there. |

| 1  |    | anything else?                            |
|----|----|-------------------------------------------|
| 2  | A. | No, not that I am aware of.               |
| 3  | Q. | So did she somehow indicate to you she    |
| 4  |    | had changed her mind about firing you?    |
| 5  | A. | Well, she -- I worked until noontime that |
| 6  |    | day.                                      |
| 7  | Q. | Okay.                                     |
| 8  | A. | She sent us home.                         |
| 9  | Q. | So again, other than your last day at     |
| 10 |    | Ethan Allen, did you and Denna have any   |
| 11 |    | other conversation about running late for |
| 12 |    | work?                                     |
| 13 | A. | The Saturday on I believe it was October  |
| 14 |    | 18th I was told by Denna to bring five    |
| 15 |    | cartons from Franklin to the Natick       |
| 16 |    | store.  She wanted me there at 9:00.      |
| 17 | Q. | What happened?                            |
| 18 | A. | I got there at 10:00.                     |
| 19 | Q. | Why were you late?                        |
| 20 | A. | I have a little boy who was six years old |
| 21 |    | and I normally didn't work Saturdays.  So |
| 22 |    | I had to take my son with me to work.  So |
| 23 |    | I called Denna at 7:30 in the morning and |
| 24 |    | I left a voice mail on her cell phone     |

```
 1              opening in a few minutes.
 2                    And then Denna came over to me
 3              after she was speaking to the designers.
 4              I am not sure if Virginia was within
 5              earshot at that time.
 6     Q.   So she said "you're late again," what did
 7              you say?
 8     A.   I told her that I had to find a fifth box
 9              that was already at the Natick store.
10              And that I had to go to Franklin and get
11              the van and I told her that I had left a
12              voice mail on her cell phone.  She said
13              she'd not gotten it.  She had not
14              listened to her phone that morning.  She
15              told me I can go home.
16     Q.   Were you scheduled to work a full day?
17     A.   No.  All she wanted was those boxes
18              brought over from Franklin to Natick.
19     Q.   Was your son in the truck with you when
20              you came from Franklin to Natick?
21     A.   Yes, he was.
22     Q.   Is that allowed under Ethan Allen's
23              policies?
24     A.   It was extraordinary circumstances and I
```

```
 1              had no place to put him.
 2     Q.      When did you find out you were going to
 3              need to come in that morning?
 4     A.      Denna had called me Friday afternoon  and
 5              asked me to bring the boxes over at that
 6              point in time.  When -- but I couldn't.
 7              I had to get home to pick my son up.
 8     Q.      And who usually takes care of your son?
 9     A.      Either my wife or my myself.
10     Q.      Were there any other conversations about
11              your being late with Denna?
12     A.      No.
13     Q.      Did anyone beside Denna talk to you about
14              concerns with your being late to work?
15     A.      Not that I can remember.
16     Q.      Okay.
17                      MS. KRAUSS:  Let's mark as
18              Exhibit No. 9 this corrective action
19              form.
20
21                      (Exhibit 9, Corrective action
                         form, Marked for
22                       identification.)
23     Q.      Do you recognize this document?
24     A.      Yes.
```

1   Q.   What is it?

2   A.   It is a corrective action form from Ethan

3        Allen.

4   Q.   And is that your signature at the bottom

5        where it says "associate's signature"?

6   A.   Yes, it is.

7   Q.   The date is July 27, 2003?

8   A.   That is what I signed, yes.

9   Q.   Does that help you pinpoint the time when

10       you met with Denna to talk about your

11       tardiness?

12  A.   Yes.

13  Q.   Does this look like the same document you

14       saw during the meeting with Denna where

15       she mentioned you had been late?

16  A.   Yes, it does.

17  Q.   It says in the middle, "On the month of

18       June Mike was late three days."

19            Do you remember discussing that

20       with Denna?

21  A.   I remember asking her what three days.

22  Q.   Was she able to tell you the specific

23       dates during this meeting?

24  A.   No.

1  Q.  Do you disagree you could have been late

2      to work three different days?

3  A.  I never punched in.

4  Q.  But did you ever -- did you have a set

5      time you generally arrived at work

6      everyday?

7  A.  It changed weekly.

8  Q.  Is it possible that you were late?

9  A.  Yes.

10         MS. KRAUSS:  Let's mark this as

11     Exhibit No. 10, corrective action form.

12            (Exhibit 10, Corrective action
                  form, Marked for
13                identification.)

14  Q.  Do you recognize this?

15  A.  Yes.

16  Q.  What is it?

17  A.  This is the top page.

18  Q.  The whole thing, do you recognize the

19     whole thing?

20  A.  Yes, I recognize this.

21  Q.  What is this?

22  A.  It is a corrective action form.

23  Q.  If you look at "level of action," if you

24     look back at Exhibit No. 9, what is the

```
1              action checked off on Exhibit No. 9?
2     A.   A warning.
3     Q.   What's the action checked off on Exhibit
4              No. 10?
5     A.   A final warning.
6     Q.   And as manager you knew a final warning
7              was pretty serious, is that correct,
8              didn't you?
9     A.   Yes.
10    Q.   Is this your signature at the bottom of
11             the page on 195?
12    A.   Yes.  Yes.
13    Q.   The date is October 8, 2003 that you
14             signed this?
15    A.   Correct.
16    Q.   Does that help you remember the date you
17             talked about this with Denna?
18    A.   Yes.
19    Q.   At this time in the brief description
20             Denna writes "Mike was on warning
21             7/21/03, the tardiness has been more
22             frequent.  8/29/03 oversleep, late 90
23             minutes 9/1/03, late 60 minutes,
24             oversleep, 9/19 going to meet a coworker
```

1    Q.   Just generally, what was the purpose of
2         these?
3    A.   To point out an employee's weaknesses,
4         and --
5    Q.   Go ahead.
6    A.   That is all.
7    Q.   Do you remember talking with Denna about
8         her comment, "Mike is a manager.  He
9         needs to be on time.  He has no
10        credibility as a leader because he
11        doesn't set the example."
12   A.   I told her I disagreed with that.
13   Q.   Why did you disagree?
14   A.   She told me that the guys in the
15        warehouse did not look at me as a
16        credible manager.  I disagreed saying
17        that it couldn't be further from the
18        truth, that I had a great working
19        relationship with the men in my
20        warehouse.
21   Q.   What did she say?
22   A.   I don't remember what her answer was.
23   Q.   Just, you know, in terms of your being a
24        manager at other places, do you think it'

```
 1          is true that someone can lack credibility
 2          as a leader if they are not following the
 3          same rules that they are enforcing?
 4    A.    I can agree with that.
 5    Q.    Then did Denna discuss these steps with
 6          you that are listed in this box, "plan
 7          your schedule, plan to be at work early,
 8          and leave 15 minutes early everyday"?
 9    A.    Yes, she did.
10    Q.    Did you follow this?
11    A.    Yes, I did.
12    Q.    Did you do these actions?
13    A.    Yes.
14    Q.    So you left 15 minutes early everyday for
15          work after talking with Denna?
16    A.    Well, I can't tell you I did everyday.
17    Q.    If you turn back to the first page, I
18          note you wrote "medical reason" next to
19          the date?
20    A.    Hmm-mm.
21    Q.    Was this the reference to the Vicodin
22          that you had mentioned?
23    A.    Yes.  What I had told Denna is that if I
24          was late on any of these days, there is a
```

1    good chance I was on -- I was on Vicodin.

2    And I was in severe pain.  I was taking

3    medication to quell that pain.

4    Q.    And was the medication -- what was it,

5          what was the side effect causing you to

6          be late to work?

7    A.    Vicodin was making me groggy.

8    Q.    Did you ever talk to your doctor about

9          that?

10   A.    That it was making me late for work?

11   Q.    Or just making you groggy, either one.

12   A.    He just told me to follow the medication.

13   Q.    Did you ever ask for a different

14         medication?

15   A.    No.

16   Q.    Did you actually tell your doctor it was

17         making you late for work?

18   A.    No.

19              MS. KRAUSS: This is a good place

20         to break for lunch.

21

22              {Luncheon recess}

23   BY MS. KRAUSS:

24   Q.    Mr. Eldridge, I wanted to go back to the

1    October 8 meeting where I believe you

2    mentioned you sat down and went over

3    Exhibit No. 10 with Denna?

4  A.  Yes.

5  Q.  Did you discuss any other performance

6    issues with Denna at that meeting?

7  A.  Performance issues?

8  Q.  Yes, not being late to work, anything

9    else, do you remember anything else?

10  A.  I don't remember.  I don't recall.

11    MS. KRAUSS:  Let's mark this

12    corrective action form as Exhibit No. 11.

13

14        (Exhibit 11, Corrective action
          form, Marked for
15          identification.)

16  Q.  Do you recognize this document?

17  A.  I do remember this.

18  Q.  Okay.  What is it?

19  A.  It is a corrective action form.

20  Q.  Is that your signature at the bottom of

21    the page?

22  A.  Yes.

23  Q.  The date is October 8, 2003?

24  A.  Correct.

1   Q.   What was this corrective action for?

2   A.   Denna alleged that the paperwork was not

3        in order going from Franklin to Natick.

4   Q.   What did Denna say the problem was with

5        that paperwork?

6   A.   What did she say the problem was?

7   Q.   Yes.

8   A.   Well, do you want me to read it?

9   Q.   No.  Why don't you tell me what you

10       remember.  Do you remember discussing

11       this document with Denna?

12  A.   Yes, I remember this.

13  Q.   What do you remember her telling you what

14       the problem was with the paperwork?

15  A.   The problem was we were sending goods,

16       used goods from Franklin to Natick.

17  Q.   What kind of paperwork were you supposed

18       to keep?

19  A.   Well, it says here "Trans trucks

20       paperwork on 9/23/03 was not done right.

21       Items were missing from paperwork.  Items

22       on the truck didn't have paperwork to

23       match."

24  Q.   Okay.

1    A.    I don't -- I told Denna I didn't know

2          what she was talking about.

3    Q.    What did she say when you said that to

4          her?

5    A.    "It is your warehouse, you should know

6          what I am talking about."

7    Q.    Right underneath the part you just read,

8          there is mention of a previous

9          conversation with you?

10   A.    "Have talk to Mike on 8/27, 9/3, 9/10

11         2003 about making sure when he signs off

12         on the trans truck paperwork is right."

13   Q.    Do you remember talking with Denna about

14         this issue before October 8th?

15   A.    Yes.

16   Q.    Fair to say it was an ongoing issue?

17   A.    No.   The paperwork was right when I sent

18         it over.

19   Q.    Was it right on the earlier dates

20         mentioned here, 8/27, 9/3 and 9/10?

21   A.    Yes, it was.

22   Q.    Where did you think the discrepancy was?

23   A.    The gentleman that was receiving this

24         paperwork, his name was Jackson Rivers.

1   Q.   Okay.

2                    MS. KRAUSS:   Can you mark that as

3        Exhibit No. 12.

4

5                    (Exhibit 12, Performance
                      appraisal, supervisory
                      personnel,
6                     Marked for identification.)

7   Q.   It sounds like the issue didn't come up

8        again?

9   A.   There was no need for it to come up

10       again.

11  Q.   Exhibit No. 12, do you recognize this

12       document?

13  A.   Yes, I do.

14  Q.   What is it?

15  A.   It is a performance appraisal for

16       supervisory personnel.

17  Q.   If you turn to the back page, is that

18       your signature on the second from the

19       bottom?

20  A.   Yes.

21  Q.   The date is October 8, 2003?

22  A.   Correct.

23  Q.   Do you remember discussing this with

24

1          Denna Hamilton?

2     A.   Yes.

3     Q.   Was this at the same meeting where you

4          received the two final warnings?

5     A.   Yes.

6     Q.   And I note that on the page 4 of 5 the

7          total number of the points are listed and

8          the total is 46 which falls under the

9          "needs improvement" category?

10    A.   Yes.

11    Q.   Do you remember going over these numbers

12         with Denna?

13    A.   Yes.

14    Q.   And did you agree with her assessment of

15         your performance?

16    A.   No.

17    Q.   Why not?

18    A.   Well, I thought the score was very low.

19         The highest score was a "3" and most of

20         them were "2." I disagreed with her on

21         that.

22    Q.   Did you tell her that you disagreed with

23         her during the meeting?

24    A.   Yes, I did.

# EXHIBIT B

1    said that after this October 8 meeting

2    you were late getting to the Natick store

3    on Saturday because you were meeting a

4    coworker.  And you were late on another

5    Saturday because you were bringing

6    cartons over and you were late?

7    A.   Yes.

8    Q.   Were you late at all between that

9         Saturday and the day you were let go?

10   A.   No.

11   Q.   So why don't we move ahead to your last

12        day.  Do you remember what day it was?

13   A.   My last day at Ethan Allen?

14   Q.   Yes.

15   A.   I believe it was October 20.

16   Q.   2003?

17   A.   Yes.

18   Q.   And why don't you tell me about your day

19        at work.  What happened when you went in

20        that day?

21   A.   I had been asked by Mike Duppelle, the

22        customer service manager, if I could go

23        out and deliver a two-piece bedroom

24        dresser on Monday morning to an extremely

1    difficult customer, who had either

2    refused delivery or had in-home damage to

3    the product.

4         We had been out to her home on

5    three different occasions with our third

6    party vendor.  And I told Mike I would do

7    it but I would do it only as a last

8    resort.  And when I came in Monday

9    morning Mike said that I had to make that

10   delivery.  So I grabbed a van, grabbed

11   the biggest boy in the warehouse who

12   happened to be Danny Forte, we loaded the

13   pieces in the van, we drove over to

14   Medfield and we completed the delivery.

15   Q.  Did anything unusual happen during the

16       delivery?

17   A.  When I knocked on the door -- I have been

18       in the delivery business for a long time.

19       This woman was extremely agitated at

20       Ethan Allen.  She was extremely skeptical

21       that two men in a white service van could

22       deliver the product.  I asked the woman

23       to please give us a shot.

24            We carried the first piece in.

1    We had put blankets on the railings, and

2    on the floors.  The stairway went up and

3    had a 90 degree angle to your left.  And

4    there was a low overhead which I could

5    see how the previous delivery teams had a

6    very difficult time making this delivery.

7          The bottom piece was the lighter

8    of the two.  We brought that upstairs

9    first.  And we put it in the master

10   bedroom.  The top half is the bigger of

11   the two pieces and it was much more

12   difficult to carry.  Danny has virtually

13   zero experience doing home deliveries.

14   And this woman was very close to me at

15   all times, within 12 inches of my face to

16   the point where I had to ask her to step

17   back and let me do my job.

18         Danny was on the top and I was on

19   the bottom.  And I had to correct for

20   Danny's inexperience.  As we were going

21   upstairs we were twisting the piece to go

22   around the corner and I pulled a muscle

23   in my back.  I sat the piece down.  The

24   problem was Danny didn't know how to

1    carry the top half of the furniture

2    around the corner.  So I put the piece

3    down, I asked Danny to come downstairs.

4    I went upstairs and I talked Danny

5    through carrying it.  We got it around

6    the corner, we put it on the pad, a

7    moving pad, and we pulled it in and set

8    it up in the customer's home.

9  Q.  So you were able to keep -- sounds like

10    you switched positions, you were able to

11    help him with the move?

12  A.  Correct.  There was no one else to bail

13    out.

14  Q.  What part of your back was it you pulled?

15  A.  My lower back.  The problem we had was

16    that this piece of furniture had no hand

17    grips on it.  I don't know if you are

18    familiar with furniture but --

19  Q.  I try to stay uninvolved with moving it.

20  A.  There is a bottom.  The top piece rested

21    on the piece.  There was no place to

22    grab.  I kept saying to myself I

23    shouldn't be here, I shouldn't be here

24    but I was there so we completed it.  We

1        pleased.  We turned around and we drove

2        back.  I parked the van, Danny went back

3        to work, I went to talk to Mike Duppelle.

4    Q.  And so am I correct you didn't tell Danny

5        that you pulled your back?

6    A.  No.

7    Q.  What did you talk to Mike Duppelle about

8        when you came back?

9    A.  I told Mike it was an extremely difficult

10       delivery, to never put me in that

11       position again.

12   Q.  Okay.

13   A.  I told him that we had the customer sign

14       off on the piece.  I gave him the

15       paperwork and I walked out.

16   Q.  Do you remember about what time it was

17       you came back to the Franklin store?

18   A.  I am going to say it was before noontime.

19   Q.  How long did you chat with Mr. Duppelle?

20   A.  Ten minutes.

21   Q.  And did you tell Mr. Duppelle you pulled

22       your back?

23   A.  No, I did not.

24   Q.  What did you do after you left Mr.

1    Duppelle's office?

2  A.  I walked over to my office.  And I was

3      catching up with paperwork.  I seen Denna

4      Hamilton walk by my window.  To get past

5      my window there was a kitchen.  She was

6      going to the kitchen.  Okay.  And we ran

7      into each other in front of my window, it

8      was just Denna and myself.  And I told

9      her that we had completed that delivery,

10     and that I had hurt myself carrying the

11     piece up the stairs with Danny Forte.

12 Q.  So you are in your office?

13 A.  My office had a -- I got out of my office

14     and -- can I give you an illustration?

15 Q.  Sure.

16 A.  This was my office right here, there is a

17     window here, and Denna had walked in and

18     she was in the kitchen.  I got out and by

19     the time I got out she was right there.

20     I was right there and we met. {Witness

21     indicates}.

22          MS. KRAUSS:  Can we mark this as

23     Exhibit No. 13?

24

120

1           (Exhibit 13, Illustration,
2               diagram,  Marked for
                identification.)

3   Q.   So that "X" you drew is your office?

4   A.   Yes.

5   Q.   Then that heavy line?

6   A.   Is the window.

7   Q.   And you --

8   A.   This is the kitchen  --

9   Q.   Kitchen.

10  A.   -- to the right of my window.

11  Q.   Can you write "kitchen."  Label that

12       "kitchen."

13           Could you tell me again what

14       exactly, in as much detail as you can,

15       what did you say to Denna about the

16       delivery?

17  A.   Denna was coming out.  I said, "Denna we

18       made that delivery in Medfield."  She

19       said, "How did it go"?  I says, "It went

20       good.  The customer took it.  I hurt my

21       back carrying it upstairs."

22  Q.   What did she say in response?

23  A.   Nothing.  She walked past me.

24  Q.   Did she actually -- did she actually stop

121

```
 1        to talk?

 2   A.   Yes.  Well, I stopped.  She looked at me

 3        and I told her.  She kept walking.  She

 4        didn't say another word.

 5   Q.   Is it possible she didn't hear you?

 6   A.   No.

 7   Q.   Why?

 8   A.   Because she asked, "How did it go."

 9   Q.   How big is that hallway outside of your

10        office?

11   A.   Well, from here to the wall.  {Witness

12        indicates}.

13   Q.   So about  --

14   A.   Four feet.

15   Q.    -- four feet?

16   A.   About four feet.

17   Q.   Was anyone else in the hallway at the

18        time?

19   A.   No.

20   Q.   It was just the two of you?

21   A.   Yes.

22   Q.   You were telling me about your back that

23        day.  Were you actually able to sit at

24        your desk and do work or at your computer
```

1       and do work?

2   A.   Yes.

3   Q.   And were you walking any differently

4        because of having pulled your back?

5   A.   I was sore.  I was sore.

6   Q.   But, you know, were you limping?  Were

7        there any sort of outward signs that you

8        had?

9   A.   I was limping because my knees were hurt.

10  Q.   Did you tell anyone else that you had

11       pulled your back or hurt your back?

12  A.   I didn't have an opportunity to.  Denna

13       walked past me and I went back into my

14       office because I had to catch up on a

15       bunch of work.  That was approximately

16       12:30.

17           Then I ran into Denna, the time

18       clock was right there and I remember

19       looking at it.  And at 12:30 everybody

20       was back to work in the warehouse.  No, I

21       was in my office for the rest of the

22       afternoon.

23  Q.   So you were in your office doing

24       paperwork.  What was the next thing that

```
 1        happened that stands out in your mind?
 2   A.   The fact that Denna walked right past me.
 3        Normally, she would have small talk or
 4        she would ask, how you were doing or
 5        something.  She just walked right past
 6        me.
 7   Q.   Was this -- when you say "she walked past
 8        you" was it the exchange you were talking
 9        about in the hallway?
10   A.   Yes.  This point, yes.
11   Q.   That is unusual because she normally
12        would make small talk with you?
13   A.   Yes.  I would -- yes.
14   Q.   And at some point that day did you meet
15        again with Denna?
16   A.   Yes, that was the day she brought me into
17        the office.
18   Q.   Why don't you tell me about that meeting?
19   A.   I was told to meet Denna, I don't recall
20        the exact time.  And when I walked in
21        Denna was there, and the controller was
22        there, Louann Starr.  And myself.
23   Q.   I'm sorry where was this meeting, in
24        Denna's office?
```

1    A.    It was in Denna's office.

2    Q.    How long did the meeting last?

3    A.    I would say under ten minutes.

4    Q.    And who started the meeting off?

5    A.    Denna.

6    Q.    Okay.  What did she say?

7    A.    She brought it to my attention that I was

8         late two previous Saturdays.  And then

9         she had given me a warning, that she was

10        in the process of terminating me.

11   Q.    Did Louann say anything?

12   A.    Not that I can remember.

13   Q.    Did you say anything?

14   A.    I stood up.  I told Denna I didn't

15        recognize this meeting.  I got up and I

16        walked out of the office.

17   Q.    What do you mean "you didn't recognize

18        this meeting"?

19   A.    I couldn't believe she was terminating

20        me.

21   Q.    So you walked out of the meeting.  Do you

22        remember anything else that either you or

23        Denna said during the meeting,

24        approximate words is fine.

```
 1          go.  You said you walked out of the
 2          meeting and what happened next?
 3     A.   I was upset.  I think I said "the bitch
 4          just fired me" although I am not 100
 5          percent sure.  And my eyes were welling
 6          up.  I was extremely upset and I walked
 7          into a partition.
 8     Q.   Could we draw on Exhibit No. 13 Denna's
 9          office?  Is it possible to get her office
10          drawn on there?
11     A.   It would be on another sheet.
12     Q.   Let me give you another piece of paper.
13               MS. KRAUSS:  Can we mark this
14          diagram as Exhibit No. 14.
15
16               (Exhibit 14, Diagram,
                  Marked for identification.)
17     Q.   Can you draw for me Denna's office and
18          where the partition was.
19     A.   Okay.  Denna's office was in the corner,
20          and there was a partition right here.
21          And right here is the doorway that I had
22          to walk out to get to my office. {Witness
23          indicates}.
24
```

1   Q.   So was your office in the same building?

2   A.   Well, if you will notice there is a

3        hallway right here.  Here's the front

4        doorway.  There is a door to Denna's

5        office right here.  So I was walking

6        through this one to get back to my

7        office.

8   Q.   Okay.

9   A.   So it looks like this.

10  Q.   All right.  I understand you actually had

11       to walk back out to the front door?

12  A.   Not the front door but the front lobby.

13  Q.   Front lobby?

14  A.   Yes.

15  Q.   The partition, was that a cubicle, was

16       there a person sitting there?

17  A.   It was a cubicle.  I believe there was a

18       person sitting there.

19  Q.   And you said you walked into it?

20  A.   Yes.

21  Q.   How did that happen?

22  A.   My eyes were welling up.  I -- I was

23       looking to see if this girl was looking

24       at me, I walked into the partition.

1  Q.  What happened to the partition?

2  A.  Nothing.

3  Q.  It didn't fall over?

4  A.  No.

5  Q.  Did you injure yourself at all when you

6      walked into that partition?

7  A.  No.

8  Q.  Did you fall down?

9  A.  No.

10 Q.  You just walked into it.  Okay.  Then

11     what happened after that?

12 A.  I -- Denna come out of the office, she

13     asked me if I was all right.  And I was

14     pretty upset.  I told her I really didn't

15     want to talk to her.  I asked her if I

16     could go in the warehouse and get a box

17     to put my personal belongings in.  She

18     said yes.  I walked out into the

19     warehouse, got a box and went into my

20     office.

21 Q.  Did you tell Denna and Louann you had

22     just banged your knee on the partition?

23 A.  I told them I had banged into the

24     partition.

```
1    Q.   Did you say anything about your knee?

2    A.   No.

3    Q.   Did you have any further conversations

4         with Denna that afternoon?

5    A.   Well, when the Franklin police came to

6         escort me out of the building, I asked

7         her to make sure my personal belongings

8         were taken care of.  She insisted they

9         would be sent to my home.

10   Q.   Did you have any further conversation

11        with Louann that afternoon?

12   A.   No.

13   Q.   Fair to say you were, I think you said,

14        "upset you were terminated"?

15   A.   I was upset.

16   Q.   Were you angry?

17   A.   Yes, I was angry.

18   Q.   And do you remember at some point someone

19        asking you for your keys?

20   A.   Outside in the parking lot.

21   Q.   Okay.  Who asked?

22   A.   Oh, Denna asked me for my keys.  They

23        were on my key chain which was in my

24        truck.
```

1    Q.    And what did the police say to you when

2          they came?

3    A.    They asked me for the keys to my -- the

4          keys to the office.  And I put -- I told

5          them they were in my truck.  And I asked

6          them if I could continue to put my

7          personal belongings in the box.  They

8          said, no.  So I got up, walked out, got

9          my keys and handed them over.

10   Q.    Were you using any foul language when

11         talking to the police?

12   A.    Not at all.

13   Q.    If you can estimate for me how much time

14         passed between the meeting where you were

15         let go and when the police came?

16   A.    I am going to say within 15 minutes.

17   Q.    Where did you go after you left Ethan

18         Allen?

19   A.    I went into the doctor that we use.

20         Ethan Allen's doctor for workman's comp.

21         And I went in and had my back checked

22         out.

23   Q.    Who was that doctor?

24   A.    Milford Medcare, R-a-v-z-i Dr. Ravzi.

```
 1            Milford Medcare.
 2     Q.     Why didn't you go to Mr. Ravzi earlier in
 3            the day?
 4     A.     I was doing my paperwork.  I was going to
 5            do it on the way home.
 6     Q.     And did you fill out any kind of worker's
 7            comp claim form on your back injury
 8            before you left on October 20th?
 9     A.     No.
10     Q.     Why not?
11     A.     I was working on my paperwork.  And then
12            when I went to the meeting with Denna, I
13            didn't have a chance to, I was escorted
14            out of the building.
15     Q.     But before that time why didn't you fill
16            one out?
17     A.     I was going to --
18     Q.     Okay.
19     A.     -- I didn't know I was getting terminated
20            that day.
21     Q.     Had you made any other worker's
22            compensation claims while at Ethan Allen?
23     A.     Not that I know of.
24     Q.     Had you filled out forms like that for
```

```
 1              have savings at the time you were let go?
 2    A.   I had a little.  I don't know what the
 3         amount was.
 4    Q.   You have mentioned a couple of times your
 5         knees were hurt.  I want to ask you about
 6         that.
 7              It is your claim in this lawsuit
 8         you injured your knees in the summer of
 9         2003, is that correct?
10    A.   Correct.
11    Q.   Was it one knee or both knees?
12    A.   It was both knees.
13    Q.   And how did you do that?
14    A.   Playing basketball, in particular a men's
15         league.
16    Q.   Were both of them injured at the same
17         time?
18    A.   Yes.
19    Q.   What happened, was it a particularly bad
20         fall or just --
21    A.   I don't remember to be honest with you.
22         I thought I was just getting old.
23    Q.   And if you can, can you pinpoint when in
24         the summer it took place?
```

| | | |
|---|---|---|
| 1 | A. | I'm going to say sometime in June. |
| 2 | Q. | How did you know you had injured your |
| 3 | | knees? |
| 4 | A. | They were really sore. |
| 5 | Q. | Immediately or -- |
| 6 | A. | Well, no.  I thought at first they were |
| 7 | | just because I had not played in awhile. |
| 8 | | I thought they were just old. |
| 9 | Q. | I am just trying to get an understanding. |
| 10 | | It is not as if you had an injury during |
| 11 | | the game and couldn't play any longer |
| 12 | | during the game, it was more of a -- |
| 13 | A. | You know, it wasn't until the next day |
| 14 | | when I got up I could hardly walk. |
| 15 | Q. | What did you do about your injuries? |
| 16 | A. | Nothing.  I went to work everyday. |
| 17 | Q. | You never saw a doctor? |
| 18 | A. | Not until -- I was convinced at first I |
| 19 | | thought it was just creaky knees. |
| 20 | Q. | So how much time passed before you went |
| 21 | | to see a doctor? |
| 22 | A. | I would say maybe two to four weeks. |
| 23 | Q. | So maybe the July time frame? |
| 24 | A. | It would be in July, correct. |

```
 1   Q.   Who was the doctor that you went to see?

 2   A.   Dr. Ravzi.

 3   Q.   And if you remember, when was your first

 4        appointment about your knees?

 5   A.   I don't remember when.

 6   Q.   And I'm sorry, what time of day, do you

 7        remember that?

 8   A.   I probably would have gone after work.

 9   Q.   And did Dr. Ravzi have a diagnosis?

10   A.   He just said, "give them rest."

11   Q.   Was any medicine prescribed after the

12        first visit?

13   A.   I think anti-inflammatory might have

14        been.

15   Q.   Do you remember what the name was?

16   A.   No, I don't.

17   Q.   Okay.  And --

18   A.   Naprosyn.

19   Q.   Did you rest your knees?

20   A.   Yes, I did.  I stopped playing

21        basketball.

22   Q.   Did you say you iced them?

23   A.   Yes, I did everything the doctor told me

24        to do.
```

```
 1    Q.   Was the doctor, at that time,
 2         recommending that you stay home from
 3         work?
 4    A.   No.
 5    Q.   How often were you taking Naprosyn?
 6    A.   Whatever the prescription was.  I don't
 7         recall what it was.
 8    Q.   I know nothing about this medicine. Is it
 9         something like you take once a day or a
10         few times a day or only when you have
11         pain?
12    A.   I don't remember.
13    Q.   And when was your next visit to the
14         doctor?
15    A.   I went on vacation.  I picked -- I wanted
16         to see if seawater did it.  They say
17         seawater helps a lot of things.  My
18         family went to Block Island and I went
19         down to Block Island for a week and when
20         I came back my knees were still sore.
21    Q.   And did you return to Dr. Ravzi, did you
22         to go a different doctor?
23    A.   I went back to Dr. Ravzi, and it was at
24         that point in time that he recommended
```

```
 1              that I have an MRI done on my knees.

 2    Q.   So you had gone to Dr. Ravzi once in

 3         maybe July of 2003, then the next visit

 4         was where he recommended an MRI, is that

 5         correct?

 6    A.   Correct.  It was in August of 2003.

 7    Q.   Do you remember what week you took your

 8         vacation?

 9    A.   In August.  I am going to say it was

10         either the second or the third week.

11    Q.   Was Dr. Ravzi able to do the MRI or did

12         you go somewhere else?

13    A.   No, we went to South County Hospital.  It

14         was closer to my home.

15    Q.   And do you remember what day the MRI was

16         done?

17    A.   Just remember it was at the last week of

18         August.  He did it for my left knee.

19    Q.   Was the left knee causing you more pain?

20    A.   Well, they both were, but doctor only

21         made the MRI for the left knee.  I had to

22         go back and have an MRI done on my right

23         knee.

24    Q.   Do you remember who at South County
```

```
 1            Hospital you met with to have the MRI?
 2    A.    MRI people.
 3    Q.    You don't remember a specific doctor's
 4            name or anything?
 5    A.    No.  I -- we had a Dr. Burns review the
 6            MRI.
 7    Q.    Did you when you say "we had Dr. Burns
 8            review it," was that Dr. Ravzi and you?
 9    A.    Correct.  Dr. Ravzi and I, correct.
10    Q.    So how did you find out the results of
11            the MRI?
12    A.    I called Dr. Ravzi and he said that I had
13            a meniscus tear in my left knee.  That I
14            would need surgery to correct it.
15    Q.    Did you talk to Dr. Burns at that time or
16            was it just Dr. Ravzi?
17    A.    I believe it was just Dr. Ravzi at first.
18    Q.    And did they explain to you what a
19            meniscus -- did Dr. Ravzi explain to you
20            what a meniscus tear is?
21    A.    Yes.
22    Q.    Can you explain in layman's terms?
23    A.    The cartilage in between your knee gets
24            squished, it tears.  There was a part
```

```
 1        that was exposed.  That is what was

 2        causing my irritation.

 3   Q.   Okay.  How does the surgery correct it?

 4        Did they explain to you what they do?

 5   A.   They do arthroscopic surgery. They put a

 6        hole in one knee, camera, and the other

 7        hole with the corrective tool.  They

 8        correct it.

 9   Q.   You said during this call Dr. Ravzi said

10        you were going to need surgery.  Did he

11        say when?

12   A.   Well, he said immediately.

13   Q.   Were those his words?

14   A.   No, I am saying it.  He asked me if I was

15        in pain.  And I told him, yes, I was.

16   Q.   Okay.  Then what happened?

17   A.   What transpired next?

18   Q.   Yes, thank you.

19   A.   I had a second MRI done on my right knee.

20        And that came back with a meniscus tear

21        in it also.

22   Q.   Do you remember when that second MRI was

23        done?

24   A.   I am going to say it was the first week
```

```
 1              of September.
 2    Q.    And so approximately a couple of weeks
 3          after the left knee MRI?
 4    A.    I don't know whether it was a couple.
 5          Maybe one week, maybe two weeks.  It
 6          depends when we can get the scheduling
 7          in.
 8    Q.    Was Dr. Ravzi the one who told you the
 9          results of the second MRI?
10    A.    Correct.
11    Q.    And just going back to Dr. Ravzi with
12          your left knee, did he say how long the
13          surgery -- what details did he give you
14          about the surgery?
15    A.    None.  He recommended that we go to a
16          specialist that could perform the
17          surgery.  And that is when I recommended
18          Dr. Burns because he was close to my
19          house.
20    Q.    You actually recommended Dr. Burns?
21    A.    Yes.  Dr. Burns had done surgery on my
22          son previously.  He did an exceptional
23          job.  He's surgeon for the University of
24          Rhode Island.
```

1  Q.  What did Dr. Ravzi think of that

2      recommendation?

3  A.  About getting surgery from Dr. Burns?

4  Q.  Yes.

5  A.  He was all for it.

6  Q.  And did Dr. Ravzi have any sort of

7      information about how long you would be

8      out if you had surgery?

9  A.  No.

10 Q.  Did he tell you anything about whether it

11     was the kind of knee surgery that had an

12     overnight stay?

13 A.  No, not Dr. Ravzi.

14 Q.  So when -- so did you continue to see

15     Dr. Ravzi about your knees?

16 A.  I -- yes, because I had asked Denna for

17     some time off to have corrective surgery

18     on my knee.  And she asked me if I would

19     postpone it until after the Natick store

20     opened.

21 Q.  I will ask you if you saw Dr. Ravzi

22     again?

23 A.  I had to keep seeing him because I was

24     putting off my -- he was prescribing the

1       Vicodin for me.

2    Q.  And when did he start prescribing Vicodin

3       for you?  Was it after the MRI?

4    A.  No, I am going to say it was before

5       because I told him the pain was not going

6       away.  I had a very difficult time

7       walking and climbing stairs.

8    Q.  And do you remember how frequently you

9       were taking Vicodin?

10   A.  Whatever the prescription was.

11   Q.  I'll ask you the same question, is it

12      sort of once a day or a couple of times a

13      day?

14   A.  Whatever was on the bottle.  I took

15      whatever the doctor was saying.

16   Q.  And when was the first time you saw

17      Dr. Burns?

18   A.  I believe it was in early September.

19   Q.  Tell me about that visit?

20   A.  Well, he read the MRI, he told me that --

21      he told me that I had a meniscus tear.

22      He showed me where it was.  He says,

23      "You're in a lot of pain," I said, "Yes I

24      am, doctor."  And he said, "You should

1          get that corrected as soon as possible."

2     Q.   At this point was he just looking at the

3          left knee MRI or both MRIs?

4     A.   I am not sure if the second one come in.

5          I think -- I really don't remember if the

6          second, one how close it was.

7     Q.   And so at this meeting with Dr. Burns

8          were you actually able to set a date for

9          surgery at that time?

10    A.   I had asked him -- I had asked Denna if I

11         could have surgery in the early part of

12         September.  And she had asked me to stay

13         on until the Natick store opened.  I was

14         under the impression the Natick store

15         closed, which was the part that I was

16         affiliated with, the old store.  When I

17         went to Denna I asked her if I could take

18         time off to have corrective surgery, she

19         asked me if I could again stay on now to

20         October 18th, which was the grand

21         opening.  We had set a date.  And with

22         great reluctance I said I would.

23    Q.   I am just trying to get a sense when you

24         and Dr. Burns set the surgery then?

1   A.   I set the surgery date I am going to say

2        with Dr. Burns around October first or

3        second.

4   Q.   Did you actually go to meet with Dr.

5        Burns to set a scheduled date or was it

6        something you scheduled over the

7        telephone?

8   A.   I think I talked to his secretary.  I

9        just said I need something after the 18th

10       of October.

11  Q.   And did you -- you mentioned you met with

12       Dr. Burns in early September.  Did you

13       meet with Dr. Burns again before you had

14       your surgery?

15  A.   I don't remember.

16  Q.   Did Dr. Burns give you any different

17       treatment from what Doctor Ravzi was

18       giving you in this September time frame?

19  A.   He just gave me  -- he was giving me the

20       prescription for Vicodin.

21  Q.   So both Doctor Ravzi and Dr. Burns were

22       giving you Vicodin?

23  A.   Well, I couldn't do a cross-doc so when I

24       got the Vicodin from Dr. Burns I didn't

```
 1          go up to see Doctor Ravzi anymore.
 2    Q.    So just with Dr. Burns then.  You saw him
 3          in September, then you don't remember if
 4          you ever saw him before you had the
 5          surgery again?
 6    A.    I don't know if I did or not.  I think
 7          after two prescriptions for Vicodin the
 8          doctor has to see you again.  So I might
 9          have went in to see him, have him take a
10          look at my knee so I can get another
11          prescription.
12    Q.    Were there any other doctors that you saw
13          about your knees?
14    A.    No.
15    Q.    When was the first time you told anyone
16          at Ethan Allen about your injuries?
17    A.    The next day I told Bill Holmes.
18    Q.    The next day after the basketball game
19          you told Holmes about your knees?
20    A.    Yes.
21    Q.    Bill Holmes was the office manager?
22    A.    Correct.
23    Q.    What did you tell Bill?
24    A.    I told him that I had hurt my knees
```

```
 1              playing basketball.  I used to have to
 2              work with Bill because he was in charge
 3              of inventory.  So if we had any questions
 4              on any misallocated or missing pieces, I
 5              had to sit next to his desk and go over
 6              it with him.  I remember having great
 7              difficulty sitting down.
 8      Q.      Was anyone else with you when you told
 9              Bill Holmes?
10      A.      There was another gentleman that is in
11              the office, I don't know if he overheard.
12      Q.      Were you requesting any accommodation
13              from Bill Holmes at that point for your
14              knees?
15      A.      No.
16      Q.      When was the next time you told anyone at
17              Ethan Allen about your knee injury?
18      A.      I talked to Becky DesRosiers who was our
19              human resource girl.  I -- when I knew I
20              was going to have surgery, I wanted to
21              make sure that all of my insurance and my
22              shots and short-term disability were
23              current and up-to-date.
24      Q.      So it sounds like maybe that conversation
```

```
 1        would have taken place in September, is
 2        that correct?
 3   A.   Becky left us in -- Becky left Ethan
 4        Allen in early September so I would have
 5        thought it would have been more August.
 6   Q.   I am not trying to be difficult I am --
 7        it sounds like you didn't know until you
 8        talked to Doctor Ravzi about the MRI?
 9   A.   I got the results for the left knee in
10        late August.
11   Q.   What did you tell Becky about the surgery
12        that you were planning?
13   A.   Well, I told her that I had torn
14        ligaments in my knee, I would be needing
15        some time off to have corrective surgery.
16   Q.   Where did this conversation take place?
17   A.   At her desk.
18   Q.   And was anyone else present?
19   A.   I don't remember if anybody else was
20        present.
21   Q.   Did you tell Becky DesRosiers how much
22        time you were going to need off for
23        surgery?
24   A.   No.  I had no idea.
```

```
 1   Q.   So you had no idea at the time either how
 2        much time you were going to need?
 3   A.   No.
 4   Q.   What was Becky's response when you told
 5        her about that?
 6   A.   She just made a note of it.  And I -- I
 7        had told Denna about my knees and that I
 8        had hurt them and that I would be needing
 9        corrective surgery.
10   Q.   Did Becky ever get back to you to let you
11        know if everything was in order?  I think
12        you mentioned you wanted to know about
13        the insurance?
14   A.   Yes.  She -- I went to her, and when I
15        found out she was leaving us, I asked her
16        if everything was in order.  She said
17        yes, it was.
18   Q.   Now, you mentioned that you told Denna.
19        When did you tell Denna about your knee
20        injuries?
21   A.   I don't remember the exact time I first
22        told her.  It might have been June or
23        July.
24   Q.   How did it come up?
```

1    A.    I was hobbling.

2    Q.    Did she ask you or --

3    A.    No, I told her.

4    Q.    Okay.

5    A.    When I came back from vacation my knees
6          were -- I was convinced at that point in
7          time my -- something was wrong with my
8          knees.  And I had another week's vacation
9          owed me.  And I had asked Denna if I
10         could take another week off.  She said,
11         no.

12   Q.    I am trying to get done with the first
13         conversation.  So you remember telling
14         Denna, if I understand your testimony, in
15         June or July about your knees because you
16         were hobbling?

17   A.    Yes.

18   Q.    And at that point were you asking for any
19         kind of accommodations because of your
20         knees?

21   A.    No.

22   Q.    And so then the next time you talked to
23         Denna about your knees was after you took
24         this vacation to Block Island?

```
 1   A.   I had taken a week off for vacation.  My
 2        knees were still hurting me.  And it was
 3        hurting everyday to get up and come to
 4        work.
 5   Q.   So is the vacation from -- were you out a
 6        full week, Monday through Friday?
 7   A.   Yes, seven days.
 8   Q.   When did you ask Denna for this extra
 9        time off, how soon after you returned?
10   A.   I am going to say it was between the day
11        I returned from vacation until
12        September 1.
13   Q.   Where did this conversation take place?
14   A.   Somewhere in Franklin.  I wouldn't
15        remember where.
16   Q.   So you don't have a memory.  Was it your
17        office, her office, or over the phone?
18   A.   No, it wouldn't have been over the phone.
19   Q.   And do you remember anyone else being
20        around during the conversation?
21   A.   For the initial time?
22   Q.   What do you mean by "initial"?
23   A.   When I first told her.
24   Q.   Sure, yes.  Was anyone else around at
```

| | | |
|---|---|---|
| 1 | | that time? |
| 2 | A. | I don't remember. |
| 3 | Q. | How about in August? |
| 4 | A. | I am going to say Becky DesRosiers was |
| 5 | | around. |
| 6 | Q. | Why do you say that? |
| 7 | A. | Because she was human resources. She was |
| 8 | | in charge of insurance, personal days and |
| 9 | | time off. She was our liaison between |
| 10 | | Franklin and corporate. |
| 11 | Q. | And how long did this conversation last? |
| 12 | A. | I don't remember. |
| 13 | Q. | And tell me in as much as you can |
| 14 | | remember, in approximate words, what you |
| 15 | | said and what Denna said and what Becky |
| 16 | | said during this conversation? |
| 17 | A. | I remember saying that -- I requested |
| 18 | | another week off from work. It was |
| 19 | | denied. And the reason given to me was |
| 20 | | that we were too close to the Natick |
| 21 | | store and that all vacations for all |
| 22 | | employees was put off until after the end |
| 23 | | of September. So I just didn't think it |
| 24 | | was just me it was -- because I had other |

```
 1        employees in the warehouse that were
 2        requesting time off.  That was denied
 3        also.
 4   Q.   There's the closing of the old Natick
 5        store that was scheduled for the end of
 6        September?
 7   A.   Correct.
 8   Q.   How did you go about requesting this?
 9        Did you say "Can I have another week of
10        vacation?"  What exactly do you remember
11        saying?
12   A.   I think I asked for another week's
13        vacation and was just told no.
14   Q.   Did you mention anything about your knees
15        during the conversation?
16   A.   Yes.
17   Q.   What did you say about your knees?
18   A.   Well, I told them my knees were hurting
19        and she said I was too valuable to the
20        company and too valuable in these
21        transactions to take time off.
22   Q.   What was your response?
23   A.   I could understand.
24   Q.   What do you mean by that, why could you
```

```
 1         understand?

 2   A.    Well, we were shipping out between

 3         $300,000 and $500,000 worth of products.

 4         No one knew it better than me in the

 5         building.

 6   Q.    So during this conversation did you have

 7         any doctor's note or anything like that

 8         with you?

 9   A.    Not at this time.

10   Q.    Was this something that your doctors were

11         telling you you should ask for?

12   A.    The time off?

13   Q.    Yes.

14   A.    I had a doctor tell me, Dr. Burns had

15         told me that -- he asked me if I was in

16         pain, I said, yes, I am.  He asked me why

17         I wasn't having corrective surgery.  I

18         told him about the store.  That was the

19         gist of it.

20   Q.    But that was -- it sounds like you met

21         with Dr. Burns after you had talked to

22         Denna and Becky, is that fair to say?

23   A.    Well, I had asked Denna when I could take

24         time off to have my knee surgeries.  She
```

```
 1            said after September.  This was early
 2            September.
 3    Q.      So I am just trying to plot all of these
 4            out on a timeline.  So you got back from
 5            vacation, you met with Denna and Becky,
 6            and asked for another week of vacation,
 7            is that correct?
 8    A.      Correct.
 9    Q.      And during that conversation were you
10            also asking for time off for surgery?
11    A.      No.  No.  I was just --
12    Q.      That was later?
13    A.      It was later, correct.
14    Q.      So I am just talking about the extra week
15            of vacation then.
16    A.      Yes.
17    Q.      So they said, no.  You understood.  When
18            was the next time you talked to Denna
19            about your knees?
20    A.      After I had my MRI readings.
21    Q.      How did that conversation come up?
22    A.      I had told her that I had an MRI done,
23            that I had a torn meniscus and I needed
24            corrective surgery.
```

1  Q.  And where did that conversation take

2      place?

3  A.  I don't know the exact location.

4  Q.  And was anyone else present?

5  A.  I don't remember that.

6  Q.  Do you remember how long your

7      conversation with Denna lasted?

8  A.  Not that particular conversation.  I used

9      to talk to her quite a bit.

10 Q.  Did you actually have the MRI with you at

11     the time?

12 A.  I really don't remember but I don't

13     believe I did.

14 Q.  And do you remember if you told Denna how

15     long you were going to need to be out?

16 A.  I remember she asked me.  I told her I

17     didn't know because I knew nothing about

18     knee surgery.

19 Q.  Were you asking her about a specific date

20     you could take time off for the surgery?

21 A.  I was asking her for permission to set

22     the date.

23 Q.  Then what was her response to that?

24 A.  After September.

1   Q.   Did you have anything from your doctor
2        during that conversation, not the MRI,
3        but anything else that backed up what you
4        were saying about the need for surgery?
5   A.   I don't remember.
6   Q.   When was the next time you remember
7        talking to Denna about your knee surgery?
8   A.   I remember it was the end of September
9        and I told her I wanted to set up surgery
10       and I wanted it ASAP.
11            She asked if I could wait until
12       after the new store opened.  And the date
13       for that was October 18th.  So anything
14       after October 18th would have been okay.
15  Q.   Do you remember where that conversation
16       took place?
17  A.   Either Natick or Franklin, I don't
18       remember the exact location.
19  Q.   Do you remember if anyone else was
20       present?
21  A.   I don't remember that.
22  Q.   Do you remember if you had any kind of
23       medical documentation at that point to
24       show Denna?

```
 1   A.   On which date now?

 2   Q.   I am talking about the conversation where

 3        you --

 4   A.   In late September?

 5   Q.   -- you were asking her about scheduling

 6        it.  She said after the new store date

 7        opening?

 8   A.   Well, I called and made an appointment.

 9        I got a date of October 23.  And I

10        believe I got the document on

11        October 2.

12   Q.   So it sounds like it must have been a

13        separate conversation with Denna.  Do you

14        remember when that would have happened,

15        when you would have given her the

16        document with the October 23 date?

17   A.   I believe I went -- I made the

18        appointment on Friday, and I came into

19        work on Saturday.  And we were told to

20        put all documents in a document folder

21        she had on her door.  And I Xeroxed a

22        copy and put one in her door folder.

23   Q.   Do you remember actually talking about it

24        with her?
```

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | Going over it? |
| 3 | A. | Yes. |
| 4 | Q. | And why don't you tell me about that |
| 5 | | conversation? |
| 6 | A. | Well, I told her that I had made the |
| 7 | | surgery for October 23 and that I would |
| 8 | | be willing to stay on for three more |
| 9 | | weeks, with great reluctance.  I was |
| 10 | | relieved that I could finally have a date |
| 11 | | to get the surgery. |
| 12 | Q. | What did she say? |
| 13 | A. | Fine.  The store opened on the 18th.  I |
| 14 | | think it was the following Thursday was |
| 15 | | the 23 or 24th.  And she was fine with |
| 16 | | that. |
| 17 | Q. | Do you remember how that conversation |
| 18 | | came up?  I know you said you put it in |
| 19 | | an envelope outside of her door? |
| 20 | A. | Yes. |
| 21 | Q. | Do you remember how you came -- |
| 22 | A. | I don't know whether I told her that |
| 23 | | Saturday or I went over it with her on |
| 24 | | Monday when I saw her Monday. |

```
 1   Q.   Do you remember if anyone else was around
 2        when you were going over it?
 3   A.   When I put it in there?
 4   Q.   On the note with the October 23 date, do
 5        you remember anyone else being there?
 6   A.   I am going to say either Erin Richer --
 7        she has a married name now, I don't know
 8        what it is, she was new or  Louann, the
 9        resource girl.  I showed her the form for
10        the surgery.  And I -- that is when I
11        Xeroxed a copy and put it in Denna's
12        folder.
13   Q.   Do you remember if Erin was around when
14        you actually talked about the form with
15        Denna?
16   A.   With Denna present?
17   Q.   Yes.
18   A.   I don't remember.  I did talk to her with
19        Becky DesRosiers around.
20   Q.   So please describe for me the
21        conversation you had with Becky and with
22        Denna about this form with the October 23
23        date?
24   A.   Becky wasn't there at that time.
```

```
 1   Q.   Okay.

 2   A.   It would have been with Erin.

 3   Q.   Okay.

 4   A.   Sorry, I misheard.

 5   Q.   Could you please tell me about that

 6        conversation with Erin and Denna?

 7   A.   It was with Erin.  I asked Erin if

 8        everything was in order.  She assured me

 9        it was.  And that is when I Xeroxed a

10        copy, gave Erin a copy of the scheduled

11        surgery and put it in Denna's file.

12   Q.   So then the conversation with Denna where

13        she said it is okay as long as you stay,

14        that happened after you talked to Erin

15        about it?

16   A.   No, it was before because I had to get

17        Denna's permission to book it.

18   Q.   So how did you -- let me make sure I am

19        not missing a conversation in here.  So

20        when was the conversation when you

21        actually asked her for permission to book

22        it?

23   A.   With Denna?

24   Q.   Yes.
```

| | | |
|---|---|---|
| 1 | A. | I don't know.  It would have been the |
| 2 | | last day.  I was under the impression my |
| 3 | | commitment was done to the new store as |
| 4 | | of the end of September.  It was at that |
| 5 | | point in time I said to Denna, can I set |
| 6 | | my appointment now for the surgery.  That |
| 7 | | is when she told me, no, I need you for |
| 8 | | another three weeks.  I am going to say |
| 9 | | it was sometime I think  -- we worked a |
| 10 | | Sunday that day, the last -- whatever the |
| 11 | | last day of September of that year was. |
| 12 | | For some reason I thought it was a |
| 13 | | Sunday. |
| 14 | Q. | There was never a conversation where you |
| 15 | | said to Denna the October 23 is open, do |
| 16 | | I have your permission to book it October |
| 17 | | 23?  It wasn't that specific? |
| 18 | A. | No.  It was the other way around.  I had |
| 19 | | asked her, do you need me anymore.  I |
| 20 | | wanted to get it done ASAP. |
| 21 | Q. | She said any time after the 18th? |
| 22 | A. | Correct. |
| 23 | Q. | And that is when you got the note of the |
| 24 | | 23rd date? |

| | | |
|---|---|---|
| 1 | A. | Next day I went to the doctor, on October |
| 2 | | 2. So whatever -- I don't know what |
| 3 | | September 31 was. |
| 4 | Q. | All right. So then after you got the |
| 5 | | note from the doctor that is when you had |
| 6 | | the conversation with Erin and left the |
| 7 | | note in Denna's envelope or box? |
| 8 | A. | Correct. |
| 9 | Q. | Thanks for taking the time to go through |
| 10 | | that with me. |
| 11 | | Did you have any other |
| 12 | | conversations with Denna about the time |
| 13 | | off that you needed for surgery? |
| 14 | A. | Not that I -- I don't remember. |
| 15 | Q. | When you were talking to Denna in late |
| 16 | | September I don't -- did you know how |
| 17 | | much time you were going to need to be |
| 18 | | out of work? |
| 19 | A. | No. It was a major concern of mine. I |
| 20 | | had no idea. |
| 21 | Q. | Did the doctor have any idea? |
| 22 | A. | No. I mean every knee is different. |
| 23 | Q. | Do you remember when you were actually |
| 24 | | asking for time off were you requesting a |

```
 1           day or two and then see how it went after
 2           the surgery happened?
 3    A.     No, because I had no idea how much time.
 4           I made sure my short-term disability was
 5           current, it was.  And I didn't know
 6           whether it would take two days or 60
 7           days.
 8    Q.     Did you tell that to Denna, do you
 9           remember?
10    A.     She asked me how long the surgery was
11           going to be.  I told her I had no idea.
12    Q.     Other than the note that set your surgery
13           date for the 23rd, do you remember giving
14           any other medical document to Denna or
15           anyone else at Ethan Allen before you
16           left?
17    A.     I don't remember that.
18    Q.     You mentioned that you had the
19           conversation with Becky to make sure
20           everything was in order in terms of
21           insurance.  Did you have any other
22           conversation with Becky about your knee
23           injuries?
24    A.     Well, I used to keep her abreast.  She
```

173

```
 1        in your department asking for FMLA leave
 2        time before?
 3   A.   No.
 4   Q.   Do you remember, did anyone in your
 5        department ever go on FMLA leave?
 6   A.   Not to my knowledge.
 7   Q.   So did the issue of the FMLA application
 8        come up again with Erin, Denna or Becky?
 9   A.   I had just asked Erin if she was
10        up-to-date on my request for FMLA.  And
11        she said she was because I wanted to make
12        sure that if there was a problem with my
13        surgery, there would be no cash flow
14        problems.
15   Q.   What was -- was this the conversation
16        with Erin where you also Xeroxed the copy
17        of your note with the surgery date?
18   A.   I don't remember if it was the same time.
19   Q.   And what forms, if any, did Erin give you
20        to fill out about FMLA?
21   A.   I don't remember.
22   Q.   Do you remember if she gave you anything?
23   A.   I don't remember.
24   Q.   And do you remember asking for any
```

```
1          applications or forms having to do with
2          FMLA?
3    A.    I remember asking Becky if there was
4          anything I needed to do. She said she
5          would take care of everything.  Then I
6          remember asking Erin, "Was everything all
7          set"? She said, yes.  I never gave it
8          another thought.
9    Q.    So any other conversations you can
10         remember having with people from human
11         resources or Denna or any other
12         management before you left Ethan Allen
13         about your knee injuries?
14   A.    No, not that I can think of right now.
15   Q.    Were you requesting any other
16         accommodations for your knees other than
17         time off?
18   A.    No.  I just thought if I had corrective
19         surgery that would resolve the issue.
20              MS. KRAUSS:  Let's mark this as
21         Exhibit No. 17.
22
                (Exhibit 17, Medical letter,
23               Marked for identification.)
24
```

```
 1
 2    Q.   Do you recognize this document?
 3    A.   Yes.
 4    Q.   What is this?
 5    A.   It is the results of my MRI.
 6    Q.   Up toward the top, examine date 9/4/03?
 7    A.   Yes.
 8    Q.   Is that -- does that sounds like the date
 9         when you had the MRI taken, September 4,
10         2003?
11    A.   I know it was late August, early
12         September, yes.
13    Q.   And do you remember giving this to anyone
14         at Ethan Allen?
15    A.   I don't remember that.
16    Q.   I would also just note, I believe the
17         only difference between the first page
18         and the second page of this is the fax
19         line down at the very bottom of the first
20         page.  But you don't have any memory --
21         do you have any memory of discussing this
22         with anyone at Ethan Allen?
23    A.   This actual sheet?
24    Q.   Yes.
```

1  A.   I don't remember.

2  Q.   Do you have any memory of showing this to

3       the Department of Labor?  By that I mean

4       Exhibit No. 23?

5  A.   I don't remember if I showed them that

6       one.

7  Q.   What's the current status of your knee

8       injuries?

9  A.   As of today?

10 Q.   Yes.

11 A.   They feel good.

12 Q.   At the time that you were having pain,

13      the summer, fall of 2003, what types of

14      physical activities were typical to

15      impossible for you to perform?

16 A.   Standing on my feet for great lengths of

17      time, walking for great lengths of time.

18      Lifting.

19 Q.   When you say long periods of time, can

20      you estimate for me how long you could

21      stand or walk?

22 A.   Half an hour to an hour.

23 Q.   How about lifting, is there any sort

24      of -- did you have a weight in mind

```
 1        beyond which it became painful?
 2    A.  No.
 3    Q.  How heavy do you think the dresser was
 4        you had to move on October 20th?
 5    A.  I would say that weighed over 200 pounds.
 6    Q.  That was the heavy top piece?
 7    A.  Yes.  It was two pieces.  The top piece
 8        was the heavier of the two.
 9    Q.  You had -- you still you went ahead with
10        your surgery on October 23, correct?
11    A.  Correct.
12    Q.  How long after that surgery were you
13        incapable of working?
14    A.  How long was I -- was I incapable of
15        working?
16    Q.  Yes.
17    A.  I would say two weeks, two weeks.
18    Q.  What did you do during those two weeks?
19    A.  Stayed off my knees.
20    Q.  Were you -- did you stay overnight at the
21        hospital?
22    A.  I don't believe so.
23    Q.  So you were home later that day on the
24        23rd?
```

```
 1    A.   Correct.
 2    Q.   Were you given crutches or anything like
 3         that?
 4    A.   Yes.
 5    Q.   How long were you on those?
 6    A.   I would say a week.
 7    Q.   Did you go through any kind of physical
 8         therapy after the surgery on your left
 9         knee?
10    A.   I don't remember.
11    Q.   Were you taking any medication after the
12         surgery?
13    A.   Vicodin.
14    Q.   How long did you take Vicodin after the
15         surgery?
16    A.   I took it until I had the second surgery.
17    Q.   Which I believe was December 8, 2003?
18    A.   12/8, yes.
19    Q.   Off crutches after about a week.  Was
20         there any sort of limits to what you
21         could do physically with your left knee?
22         I am keeping in mind that surgery?
23    A.   The doctor just said stay off, stay off
24         it.  I live down by the ocean and he said
```

194

```
 1            to walk, walk on the sand.
 2   Q.   About how long after the surgery did it
 3         take for your left knee to be feeling
 4         back to normal?
 5   A.   It was tough to take because my right
 6         knee was still hurting.
 7   Q.   I imagine it would be tough.  Was it
 8         feeling better by the time of the right
 9         knee surgery?
10   A.   I was on Vicodin the whole time.  I
11         couldn't pinpoint it.
12   Q.   Were there any other complications with
13         your left knee?
14   A.   No, my left knee felt good.
15   Q.   And did you go back to Dr. Burns after
16         your surgery on your left knee about your
17         left knee?
18   A.   Just for the checkup to the --
19         postcheckup.
20   Q.   You haven't needed any treatment on your
21         left knee since then?
22   A.   No.
23   Q.   And how about your right knee, when did
24         the surgery on your right knee get
```

1    scheduled?

2    A.    I don't remember when it got scheduled.

3          But I remember it was December 8.

4    Q.    Was the right knee surgery scheduled

5          after you had the left knee surgery?

6    A.    Yes.  Yes, I remember the doctor saying

7          he wanted up to six weeks in between.

8    Q.    And how was the recovery for your right

9          knee?

10   A.    That was much more difficult.

11   Q.    In what way?

12   A.    The -- my leg swelled up, and I would say

13         within a week after I had the surgery.

14         They thought I had a possible blood clot.

15         So they had -- I had to go to the

16         hospital and have some machine that reads

17         if you have a blood clot.

18   Q.    Did you have to stay overnight at the

19         hospital when you came back for either

20         the right knee surgery or for that visit

21         to check out the blood clot?

22   A.    No.  I went there and the woman did her

23         thing and that was it.

24   Q.    Was there actually a blood clot?

1    A.   I think they gave me a blood thinner.

2         No, they couldn't find anything.

3    Q.   You testified a few minutes ago you

4         thought you were capable of working again

5         after your left knee surgery, two weeks

6         after the surgery.  About how long after

7         your right knee surgery do you think you

8         were able to go back to work?

9    A.   My right knee was much more painful.  I

10        think I asked the doctor why.  It is

11        because the meniscus tear on my left knee

12        was very obvious.  If you look at the

13        report it -- they didn't find a meniscus

14        tear. He did see one in there.  It --

15        when they moved the knee, they moved it

16        to all of these different positions, and

17        he felt that he had to move my knee in

18        such a rough position to get at the

19        meniscus tear that it was sore.

20   Q.   So about how many weeks later, a couple

21        of weeks later?

22   A.   No.  On my right knee it was, I would

23        say, at least six weeks before I could

24        walk pain free.

```
1    Q.    Do you remember if you went to any
2          physical therapy for your right knee?
3    A.    The doctor -- I used to just walk the
4          Narragansett Bay.
5    Q.    So no formal therapy?
6    A.    No formal therapy.
7    Q.    No formal anything for that?
8    A.    No.
9    Q.    Did you take any medication after you had
10         the right knee surgery?
11   A.    I don't remember.  I am going to -- I
12         don't remember.
13   Q.    Were you still taking Vicodin?
14   A.    Not after the surgery, after a week or
15         two.  When that prescription ran out,
16         that was it.
17   Q.    And so by early 2004 you were off Vicodin
18         all together?
19   A.    Correct.  Correct.
20   Q.    Has your right knee been a problem since
21         then?
22   A.    No.  But it took a few more months after
23         that for me to climb upstairs pain free.
24   Q.    And other than Dr. Burns and Doctor Ravzi
```

```
 1              did you see any other physicians about
 2              your knee injuries?
 3    A.    No.
 4    Q.    How many visits did you have with
 5              Dr. Burns after your right knee surgery?
 6    A.    After my right knee?
 7    Q.    Yes.  Sounds like it would have been more
 8              than just the postoperative?
 9    A.    I had the postoperative then I called him
10              about the left knee.  And so I am going
11              to say I might have seen him for the
12              swelling of the knee, then postswelling
13              of the knee.
14    Q.    Have you seen Dr. Burns since then?
15    A.    No.
16    Q.    Have your knees been a problem at all
17              between that early 2004 time frame and
18              when you last saw Dr. Burns and today?
19    A.    I don't play basketball anymore.
20    Q.    You mentioned Dr. Burns is at the
21              University of Rhode Island?
22    A.    He's an orthopedic surgeon for the
23              University of Rhode Island.
24    Q.    If I could, I want to ask you about the
```

```
 1          back injury that you had on your last day
 2          at Ethan Allen.
 3    A.    Yes.
 4    Q.    And you mentioned that you went to Doctor
 5          Ravzi on your way home that night?
 6    A.    Hmm-mm.
 7    Q.    What did Doctor Ravzi do to treat that?
 8    A.    He told me to rest for a week.
 9    Q.    Do you remember if he prescribed any
10          medication?
11    A.    I think he just prescribed rest.
12    Q.    And was he able to tell you what the
13          diagnosis was, what you had done to your
14          back?
15    A.    Sprained it carrying a heavy piece of
16          furniture with an inexperienced rookie up
17          a flight of stairs.
18    Q.    It was a sprain?
19    A.    Yes.
20    Q.    After a week how was your back again?
21    A.    It was still sore but I was still
22          resting.
23    Q.    Did you go back to Dr. Ravzi or any other
24          doctors again about the back sprain?
```

```
 1   A.   No.
 2   Q.   Have you had any back problems since your
 3        last date at Ethan Allen?
 4   A.   No.
 5   Q.   Did you ever consider postponing your
 6        left knee surgery after you learned you
 7        had been terminated?
 8   A.   No.  The pain was too great.
 9   Q.   I will ask you about some conversations
10        you had with folks at Ethan Allen after
11        you were let go.
12             Do you remember having any other
13        conversation with Erin Richer?
14   A.   Yes.
15   Q.   Can you tell me about each of the
16        conversations you remember?
17   A.   I don't remember what I said.
18   Q.   Do you remember when you had these
19        conversations?
20   A.   It was after I was terminated.  I don't
21        remember the exact time.
22   Q.   You don't remember what it was about at
23        all?
24   A.   I don't remember.
```

```
 1   Q.   Okay.

 2              MS. KRAUSS:  Let's mark as

 3         Exhibit No. 27 this letter.

 4

 5

 6              (Exhibit 27, Letter 11/11/03,
                Marked for identification.)

 7

 8   Q.   Do you recognize what has been marked as

 9        Exhibit No. 27?

10   A.   Yes, I do.

11   Q.   What is this?

12   A.   This is a letter I received from Regina

13        Leuci.

14   Q.   And do you remember having any

15        conversation with Regina Leuci about this

16        letter?

17   A.   No, I don't.

18   Q.   Do you remember having any conversation

19        with anyone from Ethan Allen workman's

20        comp carrier after you were let go?

21   A.   Yes, I remember speaking to someone.

22   Q.   And do you remember when that

23        conversation took place?

24   A.   After I was terminated.
```

1          right now.

2    Q.    And you're claiming Ethan Allen

3          interfered with your right to take leave

4          under the FMLA?

5    A.    What do you mean by that?

6    Q.    I believe you have mentioned that Ms.

7          Hamilton didn't let you take your leave

8          when you wanted to.  Is there anything

9          else that you believe she or anyone else

10         did to interfere with your FMLA leave?

11   A.    I was under the impression from speaking

12         to the human resources person, Becky

13         DesRosiers and Erin that my family

14         medical leave application had been filled

15         out and everything was -- everything was

16         filled out to their satisfaction.

17   Q.    And are you claiming in this lawsuit that

18         Ethan Allen retaliated against you for

19         reporting a worker's compensation injury?

20   A.    I believe that Denna Hamilton did not

21         want me to file a workman's comp claim.

22   Q.    Why do you say that?

23   A.    Because it would have come out of her

24         bonus money.

1  Q.  But do you agree that they did file a

2      claim about you banging your knee against

3      the partition?

4  A.  But I never banged my knee against the

5      partition.

6  Q.  But you don't -- but do you dispute -- I

7      don't think there is dispute though, at

8      least that they filed a form about your

9      knee, would you agree with that?  I know

10     you don't agree with it, but do you agree

11     we saw something marked as a document or

12     one of the exhibits marked earlier that

13     was an employer's report of an injury?

14 A.  Right, but that said that I had hurt my

15     knee in the Franklin office.  And that

16     didn't happen there.

17 Q.  Okay.

18 A.  I think Louann Starr deliberately put

19     that in there.

20 Q.  Any other reasons why you think that

21     Denna Hamilton or anyone else at Ethan

22     Allen retaliated against you for

23     reporting a worker's comp injury?

24 A.  Yes, Louann Starr didn't like me.  She

1        ERRATA SHEET

2        Deposition of Michael Eldridge

3

4      Page        Line              Corrections

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

# EXHIBIT C

EA 00018

## ETHAN ALLEN INC.
ETHAN ALLEN DRIVE • P.O. BOX 1966 • DANBURY, CT 06813-1966
PLEASE USE BALLPOINT PEN

### PERSONNEL ACTION NOTICE

☐ Corporate Headquarters        ☐ Distribution Center        ☐ Exempt    ☒ Full Time
☒ Retail Division               ☐ Manufacturing Division     ☒ Non-Exempt ☐ Part Time
☒ Service Center

Location __Franklin Service Center__

Name __Inge Elahar__   Position __Point__

Social Security Number _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_  Date of Birth* _6/21/56_  Effective Date _8/5/91_

Department __OSE__   Department Number _503_  Average Hours/Week _42_

(Check One)
☒ Hire
☐ Reinstate (30 days or less)
☐ Rehire (30 days or more)
☐ Recall from layoff

☐ Change of Status              ☐ Salary                    ☐ Terminate
  (Check All That Apply):        (Check All That Apply):      (Check One)
  ___ Leave of Absence (L)        ___ Merit                    ___ Voluntary
  ___ Return from L.O.A.          ___ Promotion                ___ Discharge
  ___ Department Transfer         ___ Adjustment               ___ Workforce Reduction
  ___ Payroll Transfer            ___ Other Pay                ___ Other _____
  ___ Job Change                                              Last Day Worked _____

| | Present Status (From) | | | Proposed Status (To) |
|---|---|---|---|---|
| Position | | | | |
| Job Code | | | | |
| % Thru Range | | | | |
| Pay Class | ☐ Hourly  ☐ Weekly  ☐ Bi-Weekly | | | |
| Pay Amount | 15/hr (plus bonus 2x yearly) | | | |
| Type Increase | | | | |
| Grade | | New Grade | | |
| Date of Last Increase | | | | |

Special Action or Instructions: _____

| _Williams_ | _Marc Berard 8/9_ | | |
|---|---|---|---|
| Signature of Originator | Signature of Site Manager, Department Head or Vice President | Signature of Human Resources Department | Signature of Chairman (if applicable) |

*New Hires Only     Blue=Payroll     Pink=Personnel     Yellow=Insurance     Green=Supervisor
Form 37 - R Rev. 3/87

# EXHIBIT D



## ETHAN ALLEN INC.

# WAREHOUSE MANAGER

## SPECIFICATIONS

*Location:*       Retail Division Service Center
*Job Code:*       #34
*FLSA Status:*    Exempt
*Revised:*        July 2003
*Approved:*

_____          _____
V.P. General Manager – Retail        V.P. Human Resources

## ORGANIZATION

*Reports to:*              District Manager

*Primary Supervision:*     Assist Warehouse Manager, Warehouse Workers, Furniture Prep
                           Supervisor, Furniture Prep Specialist, Delivery Specialist and
                           Delivery Assistant

*Functional Guidance:*     Outside delivery service (if applicable)

## QUALIFICATIONS

*Education:* High school graduate preferably with an Associates degree or equivalent.

*Experience:* At least five years prior experience in furniture warehouse or distribution management.

*Other Requirements:* Excellent management and communication skills. Ability to work independently. Understanding of how to access data through a computer terminal. Requires a valid driver's license with a good driving record. Some travel to stores may be required. Weekend work required.

Ethan Allen Retail Division Job Description – Warehouse Manager

EA 00074

## GENERAL OBJECTIVES

Oversee the functions related to the proper storage and safe delivery of our furniture to our customers.

## SPECIFIC RESPONSIBILITIES

- ➢ Manage the receiving, storing and loading of furniture and accessories by warehouse workers in accordance with company procedures.

- ➢ Monitor all receiving practices to ensure that procedures are followed and that all freight can be accounted for.

- ➢ Provide for inspection of incoming and outgoing merchandise against order and delivery paperwork and specifications.

- ➢ Coordinate transfer of inventory and supplies to the store.

- ➢ Inspect returned items for condition and determine disposition. Follow through with training when appropriate with furniture prep specialist or design consultant as it relates to point-of-sale issues.

- ➢ Ensure that all warehouse employees comply with all company security and safety regulations. Ensure workers are applying proper handling procedures during the unloading and storage of all freight received.

- ➢ Work with the delivery contractor, or oversee the delivery function to ensure our furniture is properly delivered to customer's home.

- ➢ Maintain a safe, secure and clean work environment for employees.

- ➢ Conduct cycle counts in conjunction with the operations controller, operations manager and inventory control specialist according to corporate procedures. Report all variances as required.

- ➢ Participate in all physical inventories and their reconciliation.

- ➢ Establish procedures to keep the stores informed of any delivery issues.

- ➢ Provide training and guidance to all staff on critical job functions and safety practices.

- ➢ Maintain work schedules and resource allocation making necessary changes to ensure that priorities are met.

- ➢ Evaluate performance of all warehouse personnel, issue verbal and written warnings when appropriate, execute discharge of warehouse employees when necessary. Complete performance appraisals in accordance with company policy.

- ➢ Perform any other duties as required.

# EXHIBIT E

1

VOLUME:  I
PAGES:  1 through 213
EXHIBITS:  See Index


UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

MICHAEL F. ELDRIDGE,                )
            Plaintiff,              )
                                    )  Civil Action
      VS.                           )  No. 04-12506-MEL
                                    )
ETHAN ALLEN, INC.,                  )
            Defendant.              )
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*




            **DEPOSITION OF DENNA A. HAMILTON,**
a witness called on behalf of the Plaintiff, taken
pursuant to the provisions of the Federal Rules
of Civil Procedure, before Kathleen M. McHugh, a
Registered Professional/Certified Shorthand
Reporter (#120093) and Notary Public in and for
the Commonwealth of Massachusetts, at the offices
of Englander & Chicoine, P.C., Two Newton Place,
Newton, Massachusetts, on Thursday, April 27,
2006, commencing at 10:06 a.m.




            COPLEY COURT REPORTING
                101 Tremont Street
        Boston, Massachusetts 02108
                (617) 423-5841

28

1    the week-long trainings?

2         A.    Which week?

3         Q.    The week in Florida?

4         A.    The week in Florida was just an

5    overview of how the stores were set up, staffing,

6    P&L, conference calls.  We had a Farooq call.

7    It's called a Farooq.  He is the CEO of the

8    company.  So he'd have conference calls once a

9    month, so preparing for that call; overseeing the

10   warehouse.

11             I toured the warehouse and got a

12   picture of what that needed to look like and how

13   that needed to work, customer service, delivery,

14   training, SR credit training.  That's customer

15   service related.

16             We looked at store setup; met

17   designers; looked at commission statements from

18   designers, how that worked.  So I got the full

19   overview of what the expectations were from a

20   district manager.

21        Q.    And did the -- I'm sorry.  Were you

22   finished?

23        A.    Mm-hmm.

24        Q.    Did this training occur just at the

32

1          A.    Yes.

2          Q.    Since 2002 when you started with Ethan

3     Allen, how many employees under your supervision

4     have applied for Family Medical Leave Act leave?

5          A.    Managers or employees?

6          Q.    Total, both managers and employees?

7          A.    I believe -- it's a rough estimate.

8     I believe around six because we had a lot of

9     maternity leaves as well and some ended up having

10    the Family Medical Leave Act as well involved.

11         Q.    So, of those six employees, you're

12    saying there were some that were maternity leaves

13    that then became extended leave?

14         A.    Yes.

15         Q.    Can you recall the names of any of the

16    six employees who sought leave under FMLA?

17         A.    Jack, I can't remember his last name;

18    Erin, Erin Milan. We had about 18 maternity

19    leaves and I know a few of them fell into that

20    category, so I can't remember exactly who took

21    Family Medical Leave Act from that, but I know

22    those two for sure.

23         Q.    And what role did you play in regard to

24    the FMLA leave for these employees under your

33

1    direct supervision?

2        A.    Erin was a direct report into me and

3    she talked to me about it and I told her that she

4    needed to contact human resources.  I gave her the

5    contact name and get the paperwork filled out and

6    she did all that and I followed up with her on

7    it.

8        Q.    And was that similar to what you did

9    for the employees?

10       A.    Jack worked through one of the -- I

11   have, like, HR, like, an HR rep in my office and

12   so he worked through her and she kept me in the

13   loop what was going on with Jack.

14       Q.    Who's the HR rep in your office today?

15       A.    Today?

16       Q.    Yes.

17       A.    Today is Sue Estrella.

18       Q.    Who was it in 2003?

19       A.    Becky DesRosiers.

20       Q.    Is Jack still employed by Ethan Allen?

21       A.    Yes.

22       Q.    Is Erin Milan still employed by Ethan

23   Allen?

24       A.    No.

34

1          Q.    Do you know when she separated from

2     employment?

3          A.    Twelve months ago, 12, 13 months ago.

4          Q.    So sometime in 2005?

5          A.    Yes.

6          Q.    Do you recall the reason Erin requested

7     maternity leave --

8                MS. KRAUSS:  Objection.

9          Q.    -- FMLA leave?  It wasn't maternity

10    leave that she requested.

11         A.    No.  She had some issues with her

12    mother.  Her mother was very sick, so she needed

13    to take care of her mother.

14         Q.    And do you recall what the reason Jack

15    was seeking FMLA leave?

16         A.    He had some medical conditions.

17         Q.    Do you know if Donna Curry-Wilson ever

18    talked to you about needing FMLA leave?

19         A.    No.

20         Q.    Were you involved with an employee

21    named Jonathan Estromera who sought FMLA leave?

22         A.    That would have been Mike Eldridge's

23    employ, so I can't recall that.

24         Q.    Was Mr. Estromera someone who was under

46

1    a salary change?

2            A.    Title change and salary change.

3            Q.    And what was Sandra's title at that

4    time?

5            A.    Vice president of Retail Division.

6            Q.    Did she recommend other individuals for

7    promotion as well in late 2002 and early 2003?

8            A.    As a manager or --

9            Q.    Or just in general?

10           A.    Yes.  She made some recommendations.

11           Q.    In the first half of 2003 how

12   frequently did you interact with Mr. Eldridge?

13           A.    I'm sorry.  Can you repeat the

14   question?

15           Q.    In the first six months of 2003 how

16   frequently did you interact with Mr. Eldridge?

17           A.    I would say on a daily basis, whether

18   it be by phone, whether by e-mail or actually me

19   being in the warehouse, pretty consistently.

20           Q.    Where was the warehouse that Mr.

21   Eldridge oversaw?

22           A.    Franklin, Massachusetts.

23           Q.    And so how often during any given week

24   would you physically go to the warehouse in

47

1    Franklin?

2        A.    Minimum, a day and a half; sometimes

3    three days.  It depended on the week.  It depended

4    on what was needed in the district.

5        Q.    You said two and a half to three days?

6        A.    One and a half minimum.

7        Q.    Okay.

8        A.    And then up to three days I would be

9    there.

10       Q.    And when you were at the warehouse

11   in Franklin each week, what tasks were you

12   performing?

13       A.    A lot of office work, but when I

14   first would go there, I'd walk the floor in the

15   warehouse; had conversations with Michael's team

16   or Michael.  I'd walk into customer service.

17   Basically I'd talk to all the people when I first

18   walk into the building because I know once I get

19   into my e-mail, it's done for a few hours, a lot

20   of e-mail, a lot of phone-calling, talking to my

21   stores about business.  They send me Monday

22   reports.  I'd walk through them with my managers

23   as well on Mondays.

24            The other half day that I'd go there,

50

1       A.      Yes.

2       Q.      What impression did you have by June of

3    2003 of the work Mr. Eldridge was performing in

4    the warehouse?

5       A.      He had some people issues with the team

6    that he was supervising.  I had -- when he was not

7    in the warehouse, they would come and visit me in

8    my office and tell me, you know, what I needed to

9    know, what was going on in the warehouse, and

10   they'd fill me in on what was -- in their version

11   of what was going on in the warehouse.

12              When I'd go out and visit, my morning

13   visits, or when I was there during the week

14   because I'd check the merchandise out, too, and it

15   all got in line, I'd be out there for half an

16   hour, checking out what was going out, and you can

17   see and can hear and you can also feel from the

18   employees that something was not right.

19              They also complained that workload was

20   not correct either; that some people were doing

21   more than other people and Mike was letting people

22   slack off, the ones that he favored, so there was

23   some animosity building up as well in the

24   warehouse.

51

```
1          Q.    What individuals were speaking with you
2     from the warehouse?
3          A.    Philip, Jack, Bill Lopez.
4          Q.    Any others that you recall?
5          A.    Ray would have conversations with me
6     from time to time, Ray Carbonneau.
7          Q.    Any others?
8          A.    Those are really the four that would
9     talk to me the most.
10         Q.    Do you recall Philip's last name?
11         A.    I can't think of it off -- right now.
12         Q.    Was it Philip Cole?
13         A.    Yes.
14         Q.    And what types of problems did Philip
15    Cole report to you about the warehouse?
16         A.    He would report that the workload was
17    distributed unfairly.  He would report that Mike
18    was -- he would tell me that Mike didn't show up
19    on time and they had to wait outside.  He'd be
20    frustrated because they had a lot of work to
21    do and Mike was not around in the mornings to
22    distribute out the work and he was supposed to be
23    in at a certain time.  So Mike was not there to do
24    that so he had to pick up the slack.  He felt that
```

52

1    he worked harder than Mike.

2              Basically he was really upset just

3    because the team was -- was not -- not a team.

4    They were arguing a lot with each other.

5         Q.    What types of problems did Jack report

6    to you about the warehouse under Mr. Eldridge?

7         A.    He said that Mike had a temper.  Mike

8    would yell and swear at him.  He thought that was

9    wrong.  He said again the workload -- complained

10   about the workload between the employees not being

11   distributed out.  He said it was pure chaos in the

12   warehouse.  He also talked to me about the

13   Richie's Delivery guys did not respect Michael

14   Eldridge as well.

15        Q.    The what people?

16        A.    They're called Richie's.  They're the

17   outside contractor who delivered our furniture.

18        Q.    Anything else that Jack talked to you

19   about?

20        A.    Not that I can remember.

21        Q.    What types of things did Bill Lopez

22   report to you about the warehouse under Mr.

23   Eldridge?

24        A.    Bill has been with Ethan Allen for over

54

1   why is he writing me up for this when he does this

2   himself. So it was one of those situations.

3        Q.    What types of things would Jerry report

4   in to you that Mr. Eldridge did that should have

5   been written up?

6        A.    His lateness. Michael damaged some

7   product and that's -- we wrote him up for damaging

8   product. He dropped something off the picker.

9   And he said that Michael damaged a desk. So he

10  couldn't understand, you know, he was asking, did

11  he get written up for that. Why did I get written

12  up for damaging something that was an accident?

13       Q.    And what types of things did Ray

14  Carbonneau report to you about the warehouse under

15  Mr. Eldridge?

16       A.    Missing items, things were put away in

17  a certain location and Ray couldn't find them

18  again. He would go to him and ask for certain --

19  Ray was a service tech so he needed parts to be

20  able to fix the furniture, and so when he asked

21  Michael for things, they never got done.

22            He talked about him not being in the

23  warehouse to give good leadership to the staff.

24  He talked about the chaos again that was in the

55

1    warehouse.  He talked about how dirty it was and

2    unorganized it was and was very frustrated because

3    you have to keep it very clean for a service tech

4    to do some of the things that they need to do with

5    their spraying and fixing the furniture.

6         Q.    In regard to the comments about missing

7    merchandise, were there reports filed that

8    documented this problem; do you know?

9         A.    I was aware of it, so, you know, I did

10   talk to my supervisor at that time to let him know

11   some of the concerns that we did have.  But

12   there's -- it's hard because you have to see it,

13   you know.  I mean, if they put it in a location

14   and if nobody saw anybody move it, you know, we

15   didn't have cameras out there or any vehicles of

16   that nature.  So it's really hard to determine if

17   it's really missing or not unless you do an

18   inventory.

19        Q.    Were inventories done of the warehouse?

20        A.    Yes.

21        Q.    How frequently?

22        A.    At that time in 2003?

23        Q.    In 2003?

24        A.    I believe there was a physical

59

1     warehouse at the same time.

2          Q.    And what time of day did the Franklin

3     warehouse open in 2003?

4          A.    Between six and 6:30.

5          Q.    Two people had to be there?  That was

6     company policy in 2003?

7          A.    Yes.

8          Q.    And what would happen if there weren't

9     two people present between six and 6:30?

10         A.    They'd have to wait until somebody

11    showed up.

12         Q.    Now, in all your communications with

13    Mr. Eldridge in 2003 on a daily basis, were you

14    reporting these issues to him that you heard from

15    his staff?

16         A.    Yes.  We'd have conversations about

17    it.  We'd sit down and think of, you know,

18    solutions on how we can get -- because I was very

19    hugely supporting in developing people and that's

20    one of my big skill sets that I really tried to

21    develop everybody and give them the right tools.

22              So we had multiple conversations.  We

23    thought of some good strategies together about

24    meetings and team building and we thought of

60

1    Fish.  There's a book out that's called Fish and

2    it's having fun at work and I really wanted to

3    implement that into his warehouse and he was all

4    for it.  So I gave a few meetings with his staff.

5    I conducted the meetings myself and had all his

6    team in place and I felt that they went very

7    well.

8         Q.    When did these team meetings occur with

9    Mr. Eldridge's staff?

10        A.    Probably my estimate is about spring of

11   2003.  We probably had one in May and I believe we

12   probably had one around the March time -- so March

13   and then May.  We had two,

14        Q.    And did this situation in the warehouse

15   improve after the team meetings in regard to the

16   workload not being properly distributed?

17        A.    We had -- the second meeting we had we

18   talked about workload.  They came up with some

19   great ideas about having, like, a chalkboard of

20   where their stations would be and what they'd be

21   doing on a daily basis.

22             Mike agreed with that.  He said he

23   would have our supply person order a chalkboard

24   and Philip liked that as well and they would keep

64

1          Q.     So you noted for yourself that Mr.
2     Eldridge was becoming aggressive towards you in
3     late spring of 2003?
4          A.     He wasn't taking direction.  He was
5     being argumentative.  I wouldn't say -- aggressive
6     is a pretty strong word for me to use.
7          Q.     Did that interaction continue during
8     the summer of 2003 between you and Mr. Eldridge
9     where you felt that he wasn't taking your
10    direction and being argumentative?
11         A.     In the summer I was not at the
12    warehouse as much so I was probably only there a
13    day and a half.  So in the summer months it slows
14    down.  People go on vacation.  A lot of vacations
15    happen.
16             So not to my recollection I don't
17    remember anything that really sticks out in my
18    mind.  The tardy and absence was still a problem
19    and we had multiple conversations about tardy and
20    absence over the summer because the staff was
21    complaining.
22         Q.     When did you first begin having
23    conversations with Mr. Eldridge about his
24    tardiness?

65

1      A.    I don't remember the exact month.  I'd
2    have to look.

3      Q.    When did you view it as becoming a
4    problem?

5      A.    After I had multiple conversations with
6    him and then I did a warning.  I remember I did a
7    warning.  I can't remember when.  And I wrote it
8    all down for him and I had talked to him about,
9    you know, about being a leader.  You have to set
10   the example.  You can't write people up if you're
11   late yourself.  And I let him know that it really
12   inconveniences everybody.  People are depending on
13   him for direction.  People are depending on him
14   letting people in the building when he's
15   responsible for being there, you know.

16           He's got to check the merchandise out
17   before Richie's leaves and he's got to sign the
18   final, like, it's good to go.  He's got to sign
19   off on trucks that come in, and when he's not
20   around it caused chaos.  So I had a lot of
21   conversations with him about that.  They were
22   daily.  They were weekly.  And how I would know is
23   I would call and ask for him and he would not be
24   there yet.  Nobody ever saw him yet at the

66

1    warehouse.

2          Q.    So what time of day would you call for

3    him at the warehouse?

4          A.    I started work between eight and nine,

5    depending on if I was traveling far.  I would call

6    probably from my car when I was traveling to a

7    store.  So 7:30, 8:00, I would call, sometimes

8    nine, 9:30, depending on where I was.

9          Q.    And this is now -- well, let me

10   understand.  You said there were a lot of

11   conversations about the tardiness problem before

12   you first wrote up a warning?

13         A.    Yes.

14         Q.    And you don't recall when these

15   conversations began?

16         A.    They had to have began February/March

17   time frame.  I mean, to my recollection that's my

18   thing, that I started talking to him.  After the

19   policy came out he had some tardy and absence

20   problems, and so I probably had causal

21   conversations at that time with him, the

22   February/March time frame.

23         Q.    And so you observed the tardiness by

24   calling?

67

1          A.     Or being there.

2          Q.     Or being there?

3          A.     Yes.

4          Q.     How frequently when you would call

5     would Mr. Eldridge not be available?

6          A.     How frequently?

7          Q.     How many times in a given week or

8     month?

9          A.     It just depended on the week or the

10    month.

11         Q.     And who would you speak with when you

12    would call the warehouse?

13         A.     Whoever answered the phone.  Multiple

14    people answer the phone.

15         Q.     And it was clear to you that he had not

16    shown up for work that day?

17         A.     Yeah, because they would check out in

18    the parking lot.  He drove a pickup truck.  He

19    would check in with the office when he got there

20    and then they would go ask Philip or Bill or

21    whoever was out in the warehouse.

22                We had an overhead paging system.

23    You can hear it clearly from every angle in the

24    building.  So they'd overhead page him.  They'd go

69

1        A.    Yes.

2        Q.    -- from the schedule.  How late?  Would

3    it matter to you or --

4        A.    I said a verbal ten minutes.  Because

5    of where we live, there's always a ten-minute

6    leeway that still exists to this day in my

7    district.

8        Q.    And so what were the procedures for

9    employees starting a work shift, like, you said

10   that Mr. Eldridge had to check in with the office?

11       A.    I'm sorry.  Can you rephrase that

12   question?

13       Q.    What's the general procedure for an

14   employee in the Boston district to start the

15   workday?  Do they punch a time clock?

16       A.    Yes, they do.  I'm sorry.  In Franklin

17   they punch a time clock.

18       Q.    In Franklin do the managers also punch

19   a time clock?

20       A.    No.  They write down on their time

21   card.  Some did.  Some wrote down.  It depended on

22   what they wanted to do.  Some punched.

23       Q.    And so some managers punched a time

24   clock?

70

1      A.    Yes.

2      Q.    And some managers would write on a time

3  card their start and end times of their shift?

4      A.    Mm-hmm.

5      Q.    And then would you oversee that

6  documentation?  I mean, did you check that

7  documentation on a regular basis?

8      A.    Yes.  We had to sign off on it once a

9  week, so I'd go through and look at it.

10     Q.    In your conversations with Mr. Eldridge

11  about the tardiness problem before the first

12  written warning, what was Mr. Eldridge's response

13  to you?

14     A.    He said he knew he had an issue.  He

15  said he would be working on it.  We talked about

16  maybe changing his time in.  I wanted to work with

17  him on it because it was really important for me

18  that one of the leaders in the district be on

19  time, especially the warehouse manager, because a

20  lot is riding on when he gets in.

21          You know, setting an example, you have

22  to coach by, you know, doing it right yourself,

23  and he understood and he told me that he would

24  work on it.  That was the end of the really

71

1   conversation.  He got it.  He understood.

2        Q.   So you discussed changing his time, his

3   start time, to later.  Was that actually done?

4        A.   Yeah, he did.  He was in control of his

5   own schedule, so he changed it when he needed to

6   be later because he had some 8:30's, some nine's,

7   on there.  He had -- he worked all different

8   times, so he would do that.  I think he talked to

9   his wife and looked at day-care and talked to

10  Philip when he could be there as well.

11       Q.   So Mike would set up his schedule each

12  week for the coming week?

13       A.   Yes.  He'd give it to Becky.

14       Q.   And then you viewed the schedules of

15  all your managers each week?

16       A.   Yeah, Becky would send it to me and

17  everybody else was on that list.

18       Q.   And you stated that in the summer of

19  2003 Mike's tardiness was still a problem?

20       A.   Yes.

21       Q.   And how did that information come to

22  you?

23       A.   I'm sorry.  Can you rephrase?

24       Q.   How did you become aware of that in the

72

1    summer of 2003?

2        A.    The same way I became aware, either I

3    witnessed it myself or I called him and he was not

4    there or I was meeting him at another location and

5    he agreed upon the time that we would arrive there

6    and he didn't show up.

7        Q.    What other locations did you meet Mr.

8    Eldridge at?

9        A.    The only -- the project that we were

10   working on over the summer was the Natick

11   relocation.  So Natick -- there was a few times

12   that we were supposed to meet at Natick at a

13   certain time.  He was scheduled off on those days

14   and he agreed upon the time.

15            I had other people would be there

16   because they were scheduled off as well.  So we

17   had to have a conversation of what time we were

18   meeting and I left it up to him because he was

19   coming from Rhode Island.  So he needed to tell us

20   the time that he'd be there.

21       Q.    And you said he never showed up?

22       A.    I'm sorry?

23       Q.    I thought you had testified to that

24   just moments ago, that there were times that he

83

1    basketball and he hurt his knee playing basketball

2    and he said something to the fact that he's done

3    it before.

4         Q.    Do you recall when he told you that?

5         A.    No, sometime over the summer though.

6         Q.    Do you recall where the conversation

7    occurred?

8         A.    Yeah, in his office.

9         Q.    Did Mike tell you at some point during

10   the summer of 2003 that he was taking pain

11   medication for his knee injury?

12        A.    He told me after the second document

13   that I sent down the reason that he was being

14   late is because he was taking medication.  I mean,

15   I really didn't ask too much what type of

16   medication, but I did tell him if he was taking

17   medication and it was causing him to be late, that

18   he needed to have a medical doctor type of note.

19        Q.    You just stated this discussion

20   occurred after the second document when you sat

21   down?

22        A.    It was the -- one of the warnings that

23   I gave him.  I believe it was the second -- over

24   the summer, the July, like, the July time period.

84

1    It was the second document that I -- yeah, second,

2    I believe it's the second.

3        Q.    So you believe there were two warnings

4    given to Mr. Eldridge in the summer of 2003?

5        A.    I'm sorry.  I'm not understanding.

6        Q.    You've now called it the second

7    document.

8        A.    I am assuming it's the second one.  One

9    of the documents, I know medication did come up on

10   it.  I can't recall if it was the -- I believe it

11   was the second.

12       Q.    So at the time that the medication

13   issue came up was when you were giving a second

14   warning to Mr. Eldridge?

15       A.    Yes, correct.

16       Q.    Had there been any discussion about

17   pain medication between you and Mr. Eldridge prior

18   to this second warning that you're referring to?

19       A.    No.

20       Q.    Was there any indication to you that

21   Mr. Eldridge's knees were affecting his

22   performance in the summer of 2003?

23       A.    No, just that one time he shared about

24   he was playing basketball over the weekend.

90

1       A.      In all different locations it was up to

2    the managers to post it.  Some locations had it

3    posted.  Some did not have it posted.  Usually the

4    receptionist would have a copy at the front desk

5    and sometimes it was posted in employee lounges.

6       Q.      Then you said changes to the schedule

7    had to be sent to you in advance and approved by

8    you in advance?

9       A.      Yes.

10      Q.      Now, many of the pages of Exhibit 3

11   have handwritten notes.  Do you know whose

12   handwriting is on Exhibit 3?

13      A.      On Exhibit 3, yes, mine.

14      Q.      And what was the process that you went

15   through to make the notes that appear on Exhibit

16   3?

17      A.      The process why I made it on the

18   schedule is because I was coaching Michael

19   Eldridge and this was the easiest tool that I had

20   to be able to keep track of it.

21      Q.      And so did you begin coaching Michael

22   Eldridge, you said, in the spring of 2003?

23      A.      I'm sorry?

24      Q.      When did you begin coaching Michael

91

1   Eldridge?

2       A.      Regarding absence?

3       Q.      Yes.

4       A.      I said about February/March time

5   period.

6       Q.      In February or March.  And so would you

7   in those sessions present the notes of the weekly

8   schedule that you have kept?

9       A.      That was more casual conversation at

10  that time.

11      Q.      And so would you make notes on a weekly

12  basis on the weekly schedule?

13      A.      No.  I'd make them in my planner.

14      Q.      The planner that was thrown away in

15  2004?

16      A.      Correct.

17      Q.      At what point did you transfer the

18  notes from your planner onto the weekly schedules?

19      A.      I don't remember the date.  I don't

20  remember the time frame.

21      Q.      Was it while Mr. Eldridge was still

22  employed?

23      A.      Yes, because I had to give this to

24  human resources.  I had to give some type of

92

1    documentation so they could see how I was tracking
2    it.
3        Q.    Who in human resources requested the
4    documentation from you?
5        A.    Charlie Farfaglia.
6        Q.    At what point did Mr. Farfaglia request
7    the documentation from you about Mr. Eldridge's
8    tardiness?
9        A.    The date when he was on the final
10   written warning I talked to him about it and then
11   on the 20th of October I had to review it in the
12   a.m., in the morning, with him on what documents I
13   had.
14       Q.    So you had notified Mr. Farfaglia in
15   advance of October 20th of your intention to
16   terminate Mr. Eldridge?
17       A.    I want to correct that.  I notified
18   human resources on the final written warning.  I
19   don't know if I talked to Chris or Charlie.
20       Q.    On the date of the final written
21   warning you notified human resources that you were
22   giving the final written warning?
23       A.    No.  On the date, on the 20th, I had to
24   call because he was late on that Saturday prior,

93

1    the Saturday before that, and so that was two

2    times after his final written warning, and I

3    called human resources that Monday morning to

4    notify them he was late two additional times after

5    the final written warning and I also called my

6    boss as well that morning when I got into the

7    office.

8         Q.    And so when you were calling to notify

9    HR that he had been late on the preceding

10   Saturday, was part of that notification a

11   statement that you intended to terminate his

12   employment that day?

13        A.    I was discussing those options with

14   human resources at that time, what our options

15   were at that point.

16        Q.    Were you requesting permission to

17   terminate his employment?

18        A.    Can you rephrase?  "Permission,"

19   it's --

20        Q.    Well, did you need authorization from

21   HR to terminate an employee's employment?

22        A.    Yes, I did.

23        Q.    And that's what this discussion was

24   about on October 20th?

94

1          A.      Correct.

2          Q.      And as a result of that discussion in

3     the morning, Mr. Farfaglia asked you to document

4     the tardiness of Mr. Eldridge?

5          A.      No.  He asked what documentation I had,

6     not to document.  I already had it documented.

7          Q.      You had it documented in your planner?

8          A.      No.  I had it in this for the -- I

9     started it -- I don't remember the exact date,

10    somewhere between the warnings I started this

11    process because it was easier for me to do because

12    I had it right in front of me.  So somewhere

13    mid-process I changed my notes and I looked back

14    on my notes, got probably half of it, and then I

15    intend on printing them out and putting them on

16    this type of form.

17         Q.      And so did you do that on a weekly

18    basis?

19         A.      I don't know how often I did it.  Maybe

20    I could have done it on a monthly, weekly basis,

21    but I was keeping track on a weekly basis, yes.

22         Q.      So, if you were driving somewhere in

23    the morning and called in to speak to Mr. Eldridge

24    and he wasn't at the warehouse, you would note

95

1    that in your Franklin planner?

2         A.    Correct.

3         Q.    And then at some point you would

4    transfer that note from your Franklin planner onto

5    the weekly schedule?

6         A.    Yes.

7         Q.    Did you ever give these weekly

8    schedules with your notes to Mr. Eldridge?

9         A.    No, because I had the dates on the

10   documentation.  So he had the dates.  He knew when

11   he was late.  And I have the reasons why.  So I

12   discussed each one of the dates that I had put

13   on the warnings to him and he agreed with them

14   because he signed them.  I mean, he knew he was

15   late.  I had daily discussions.  So he knew he was

16   late.  And then when I documented it and gave it

17   to him, he had the dates on the documentations.

18        Q.    And you're talking about the warning

19   documentation that you gave him?

20        A.    The warnings, yes.

21        Q.    Did you keep notes about any other of

22   your direct reports?

23        A.    Yes.

24        Q.    And which of your direct reports did

96

1    you keep notes on?

2         A.    Donna Curry-Wilson.  I kept notes on

3    Louann Starr.  I kept notes on Sue Linker, some

4    performance issues that I was coaching on.

5         Q.    Did you know the start times or

6    tardiness of Louann Starr, Donna Wilson-Curry or

7    Susan Linker?

8         A.    They didn't have tardy or absence

9    problems.

10        Q.    Did any of your other direct reports

11   other than Mr. Eldridge have any tardiness or

12   absentee problems in 2003?

13        A.    Not to my knowledge.

14        Q.    Were you checking about the start times

15   of all your direct reports the way you checked on

16   Mr. Eldridge in 2003?

17        A.    Yes.  I called the store, the same type

18   of thing.  I'd be at the store.  They were never

19   late when I was there.  So, I mean, if they were

20   late, you know, they were not -- if they were

21   late, I would have done the same thing that I did

22   with Mr. Eldridge, just have conversations, but

23   not to my knowledge nobody was late.

24        Q.    So the other -- there were 11 direct

COPLEY COURT REPORTING

101

1    on the store, so I would check those logs on a
2    monthly audit basis in the stores.  They would
3    sign in when they'd come in.

4         Q.    But how did you know the sign-in times
5    were accurate if you were looking at the end of a
6    month?

7         A.    The people would have to be in to
8    verify.  So, if I had questions with regard to the
9    scheduling, I would ask the other individual who
10   came in with them.

11        Q.    And it's your recollection that of the
12   13 direct reports you had, none of the others,
13   other than Michael Eldridge, had issues with
14   tardiness in this time frame, April to October,
15   2003?

16        A.    No, not consistent tardiness, no.

17        Q.    Now, if you look at Exhibit 3, at the
18   page stamped 129, for the week ending 10/18 --

19        A.    Mm-hmm.

20        Q.    -- and you compare that to the next
21   page which is stamped 130 for the week ending
22   11/1, is it fair to say that the week of October
23   19th is missing?

24             MS. KRAUSS:  Objection.

119

1    reported directly in to me.

2         Q.    How important was Mike's work to the

3    opening of the new Natick store compared to your

4    other direct reports' work on the new Natick

5    store?

6         A.    It was a team effort.  So, I mean, his

7    responsibility is making sure that the trucks were

8    running; the inventory is being accounted for.  He

9    did help with, you know, transfer trucks at times

10   with the old store.  Some of the stuff would come

11   back to the old store and then it's disposition

12   back out to the new store, and those were

13   basically supplies and samples, like the design

14   center, the design center stuff, but all the

15   product came from the factories to the store.

16        Q.    In the weeks prior to the grand opening

17   of the new Natick store in October of 2003, did

18   you ask Mr. Eldridge to work on his days off in

19   the new Natick store?

20              MS. KRAUSS:  Objection.

21        A.    I'm sorry.  Can you --

22        Q.    In October, 2003 did you ask Mr.

23   Eldridge to work in the new Natick store location

24   on days he had been scheduled to be off?

120

1          A.    What I recollect is that a Friday he

2     was supposed to send a transfer truck to the new

3     Natick store that had stuff for the design center

4     on it. When it arrived, it was not there. He

5     forgot to put it on the truck.

6                So I had called him and I said I really

7     need this stuff. What is the solution? How can

8     you get it to me? He offered that he would come

9     in and take it to me because he felt bad because

10    he forgot to put it on the truck and he had done

11    this a few other times so that it stressed my team

12    out a little bit.

13               So when I said to him what time because

14    I have to have other people come in on their days

15    off as well to receive this stuff in because we

16    had to take inventory of it and make sure that we

17    had it for grand opening, so he said -- he gave me

18    the time and I told him I would meet him there

19    along with Virginia and we would help him unload

20    the truck for the Natick store. It was like a

21    service van.

22         Q.    You volunteered to come in on that

23    Saturday in October?

24         A.    Yes.

COPLEY COURT REPORTING

121

1        Q.    Do you know what Saturday this is,
2    you're referencing?
3        A.    It was -- let me think here, the 18th.
4    It was two days before the Monday.  It was October
5    18th, I believe.
6        Q.    And what time did Mr. Eldridge
7    volunteer to appear at the new Natick location on
8    Saturday, the 18th?
9            MS. KRAUSS:  Objection.
10       A.    I believe to my knowledge it was 8:00.
11   I'd have to look that up --
12       Q.    What would you need to look at?
13       A.    -- to make sure.
14       Q.    Exhibit 3 you're going to look at?  I
15   believe it's page 129.
16       A.    Page 129.
17       Q.    The Bates stamp page.
18       A.    Okay, yes, 8:00.
19       Q.    And you said you were working with
20   another employee named Virginia at this point?
21       A.    Yes.
22       Q.    Do you know her last name?
23       A.    Klinefelter.
24       Q.    Do you know if she's still employed by

122

1    Ethan Allen?

2         A.    Yes.

3         Q.    And you and Virginia planned to meet

4    Mr. Eldridge in the new Natick store at 8:00 a.m.

5    on Saturday, the 18th?

6         A.    Yes.

7         Q.    And he was bringing product to you that

8    was supposed to have been shipped the day before?

9         A.    Correct.

10        Q.    And was it cartons of product?

11        A.    Cartons, it was boxes of fabric samples

12   and some other supplies that we were needing as

13   well that were supposed to be on that transfer

14   truck.

15             The visual puts it down on what they

16   want and puts it through the system and I think

17   that was a phone call that he -- it was on his

18   paperwork that was supposed to come over.  I don't

19   know how it got on his paperwork.

20        Q.    And so how many boxes was he supposed

21   to bring to Natick on the 18th?

22        A.    I don't know the exact quantity of

23   boxes.  It would have been on the paperwork.

24        Q.    And then what happened that Saturday

123

1    morning, the 18th?

2         A.    Well, I arrived a little before eight.

3    Virginia was there and Michael was not there.  We

4    waited.  We did some other things.  And at 9:20 he

5    showed up with his son in the company vehicle.

6         Q.    Had he called you in advance that

7    morning or the night before?

8         A.    Nope.

9         Q.    No phone call?

10        A.    No phone calls.

11        Q.    Did he have the product with him that

12   he was supposed to have?

13        A.    He had some of it, but some of it was

14   wrong.

15        Q.    Did he have any explanation for the

16   situation?

17        A.    I pulled him aside and I had a

18   conversation with him and he said that he had some

19   day-care issues.  I said, you know, I've talked to

20   you about this before.  If you'd had day-care

21   issues, why didn't you call me the night before.

22   I could have called Virginia.  I could have

23   changed things around.

24               I said I'm very disappointed because

124

1   we've had these conversations repeatedly and

2   there's no excuse for being late, and I also

3   talked to him about taking his son in the company

4   van and that was against policy as well.

5        Q.    Did he state whether or not he had been

6   to the Franklin warehouse that morning?

7        A.    No.

8        Q.    What was his response to you that you

9   recall?

10       A.    He said that his boy was sleeping and

11  he couldn't wake him up or he didn't want to wake

12  him up -- I can't remember the exact verbiage --

13  and that his wife needed to do something in the

14  morning and he was waiting for her to come back

15  and he decided at that point rather than get in

16  trouble with me, he'd bring his boy along with him

17  and get me the stuff that I needed because he had

18  made a promise that he would bring that stuff to

19  Franklin -- I mean to Natick.

20       Q.    And was there any discussion about the

21  product that was still wrong?

22       A.    At that point I really didn't know

23  until after he had left that it was the wrong

24  product because he did have his son with him.  The

125

1   store was not open yet. So, you know, I was kind
2   of nervous about that, so I did not know the
3   product was wrong until after he had left. I was
4   not aware of that.

5        Q.    And so there was no discussion with
6   Mr. Eldridge that Saturday morning about any tasks
7   he had been doing in Franklin related to finding
8   this merchandise?

9        A.    To my knowledge he had loaded it up the
10  night before because that's what he told me he was
11  doing.

12       Q.    And when did he tell you that?
13       A.    Friday.
14       Q.    Friday night. When did you speak
15  with --
16       A.    Friday afternoon.
17       Q.    When on Friday did you speak with
18  Mr. Eldridge?
19       A.    In the afternoon because Virginia
20  needed to talk to him to tell him what she needed
21  because he was still looking for some things and
22  he had a hard time finding them. So I had put her
23  in touch.
24             We had that discussion and we had had

COPLEY COURT REPORTING

126

1    that discussion because he was loading it up and

2    he had a hard time finding it and I said for him

3    to call Virginia because she knew what the boxes

4    were labeled because she had cleaned the design

5    center up from the old store.

6        Q.    And so it's your memory that after

7    Mr. Eldridge left on Saturday, the 18th, Virginia

8    still didn't have all the product that she was

9    looking for?

10       A.    Yes.  She had talked to me that day.

11       Q.    Was there another Saturday in October,

12   2003 that you requested or was there another

13   Saturday in October, 2003 that Mr. Eldridge worked

14   on his day off?

15       A.    Yes, I believe there was.

16       Q.    And did you request him to work his day

17   off on that other Saturday in October, 2003?

18       A.    I believe we discussed it as a team,

19   what we needed to do to get the job done the

20   Saturday before, and again to my recollection he

21   probably volunteered because I'd never make

22   somebody work on their day off.

23       Q.    So this is, you say, the Saturday

24   before, Saturday, October 11th?

127

1          A.    It was the Saturday before the 18th,

2     correct.

3          Q.    So this is -- I'm referring to Exhibit

4     3, the page Bates-stamped 128, and you stated that

5     you would not have asked Mr. Eldridge to work that

6     Saturday?

7          A.    I could have asked.  I'm not sure if he

8     volunteered or I asked him on that Saturday.

9          Q.    And who would have set the start time

10    for Saturday, October 11th, 2003?

11         A.    I think we were with a team with

12    Richie's that day.  My recollection is we were

13    meeting drivers from Richie's.  So we would have

14    talked amongst the group what time our start time

15    would have been.

16         Q.    And what happened that morning in

17    regard to Mr. Eldridge?

18         A.    He had two reasons, I remember.  He was

19    going to pick somebody up at Franklin.  That

20    person never showed up.  And then there was an

21    accident, he said, on the freeway that day.

22         Q.    So what time did Mr. Eldridge arrive on

23    October 11th, 2003?

24         A.    It looks like 9:20.

128

1    Q.    And when did you make that note, do you

2    think, on our Exhibit 3?

3    A.    I probably made it on Monday, on the

4    following Monday, because I would have done that

5    on that Monday.

6    Q.    So, when Mr. Eldridge showed up, he

7    explained to you that he was supposed to meet

8    another employee of Ethan Allen?

9    A.    He said he was going to pick somebody

10   up that morning, the morning of.  He said he had

11   stopped at Franklin to try and pick somebody up

12   because somebody didn't have transportation.  I

13   can't remember the actual person.  Then he said he

14   left from there and then there was an accident on

15   495.

16   Q.    Did that other employee work in Natick

17   that day; do you remember?

18   A.    I can't remember.  I don't remember who

19   it was.

20   Q.    Was it Daniel Forte?

21   A.    It could have been.

22   Q.    And do you know if Daniel Forte worked

23   in the new Natick location that Saturday?

24   A.    I don't remember.  We had so many

129

1   people there that day.

2         Q.    Do you know if Mr. Eldridge performed

3   any work-related tasks at Franklin on October

4   11th?

5         A.    Not by my direction.

6         Q.    Okay.

7         A.    The work that day that was supposed to

8   be done was supposed to be done at the new Natick

9   store.  We were all meeting at 8:00 to get the

10  work done.

11        Q.    And on October 18th when Mr.

12  Eldridge -- you testified he was over an hour

13  late that day?

14        A.    Mm-hmm.

15        Q.    Did you decide on Saturday, October

16  18th, that you were going to terminate his

17  employment?

18        A.    Not to my recollection.  I knew that

19  I needed to talk to human resources.  I was

20  disappointed in him, yes.  I was very disappointed

21  because I always thought the behavior would

22  change.

23        Q.    And you testified earlier that you

24  spoke with Charles Farfaglia on Monday, October

# EXHIBIT E

130

1    20th?

2        A.    Correct.

3        Q.    Did you speak with Khusro Elley, also?

4        A.    Yes.

5        Q.    And did you speak with him on October

6    20th?

7        A.    Yes.

8        Q.    What do you recall of your conversation

9    with Khusro Elley?

10        A.    I told him the situation, that Michael

11    was late the last two Saturdays.  I told him that

12    I talked to Charlie and I asked him what he

13    thought and he gave me his opinion, and I know

14    that Charlie and Khusro had talked and the final

15    decision was arrived at in the a.m. that he would

16    be terminated by all parties.

17        Q.    What was the opinion that Mr. Elley

18    expressed to you on October 20th?

19        A.    Due to the documentation and the

20    problems that we were having with his tardy and

21    absence, that it would be in our best interest to

22    terminate because the behavior was not getting

23    better.

24        Q.    And so the chronology of events that

131

1    day was that first you spoke with Charles

2    Farfaglia?

3        A.    Yes.

4        Q.    And then later that morning you spoke

5    with Mr. Elley?

6        A.    Right after.

7        Q.    But it appeared to you in your

8    conversation with Mr. Elley that Mr. Elley and Mr.

9    Farfaglia had independently spoken?

10       A.    I think after I spoke to Khusro, he had

11   talked to Charlie.  He went down to his office in

12   the a.m.

13               MS. CHICOINE:  I think this would be

14   a good point to take a break.

15                      (Recessed at 12:51 p.m.)

16                      (Resumed at 1:46 p.m.)

17               MS. CHICOINE:  Back on the record.

18       Q.    You testified this morning that you

19   were in e-mail contact with Mike Eldridge in 2003;

20   is that true?

21       A.    I would e-mail him, yes.

22       Q.    And you e-mailed him regularly about

23   daily work issues.

24       A.    It would be different things on

138

1    e-mail, also?

2         A.    Yes.   That's my e-mail system.

3         Q.    Do you know where Ken Lynch is located

4    at Ethan Allen?

5         A.    Danbury, Connecticut.

6         Q.    And so he physically came up to where

7    your computer was in Franklin, Mass. to work on

8    it?

9         A.    No.   They can go on -- they take it

10   over from where they're at.  We sign into websites

11   and they can take it over and see what's going

12   on.

13        Q.    Now, on Monday, October 20th, 2003 do

14   you recall when you first saw Mike Eldridge?

15        A.    Around -- estimated time was around 11,

16   11:30 in the afternoon.  I was going to go get

17   some tea that morning in the employee break room.

18        Q.    So where did you see Mr. Eldridge?

19        A.    In the hallway.

20        Q.    Did you and Mr. Eldridge have any

21   conversation?

22        A.    I think I had just said hello to him.

23        Q.    And did Mr. Eldridge say anything to

24   you?

139

1      A.    I don't really remember if he said

2  hello back.  If he said hello back, that would be

3  it.

4      Q.    Was Mr. Eldridge on a delivery earlier

5  that morning; do you know?

6      A.    Yes.

7      Q.    And what do you recall about the

8  delivery that was being done that morning of the

9  20th?

10     A.    I don't remember.  I just know he had

11 a -- he was out helping with a delivery.

12     Q.    Was that discussed at all between you

13 and Mr. Eldridge at any point that day, the

14 delivery that he had done that morning?

15     A.    That morning, no.

16     Q.    Was it discussed at some point after

17 October 20th, the delivery that Mr. Eldridge had

18 done that morning?

19     A.    When we terminated him, from the -- he

20 had discussed that he had hurt himself with other

21 employees.  I didn't hear that, per se, myself,

22 but he had discussed that with other people after

23 he was terminated and walked out of my office that

24 day.

140

1       Q.    So Mike never said to you directly that

2   he had suffered any type of injury on the delivery

3   on the morning of October 20th?

4       A.    No.   I kind of wanted to avoid him

5   because I had conversations in the morning that we

6   knew I'd be terminating him, so I didn't want to

7   have any conversations until that conversation

8   that I would be having with him later on that

9   day.

10      Q.    What time did you meet with him later

11  on the 20th?

12      A.    At the end of his shift.   I don't

13  remember the exact time.

14      Q.    Where did you meet with him?

15      A.    In my office.

16      Q.    Who else was present?

17      A.    Louann Starr.

18      Q.    And what do you recall of the

19  conversation with Mr. Eldridge?

20      A.    I just -- it was really short and

21  simple.  I told him that I was terminating him at

22  this time because his tardy and absence behavior

23  has not changed.  He was put on a final written

24  warning.  I gave him the dates.  I told him the

141

1    two dates from that final written document he was

2    late and that was the reason why I would be

3    terminating his position with our company.

4         Q.    Did Louann Starr say anything in this

5    meeting?

6         A.    No.

7         Q.    What did Mr. Eldridge say in this

8    meeting?

9         A.    I can't really remember word for word.

10   He was upset.  He said some swear words.  I can't

11   remember which ones.  He walked out of my office

12   and kicked, like, another office wall down and it

13   kind of went all over the place, and then he

14   threatened -- I heard him scream back something in

15   my office and my controller got nervous and called

16   the police.

17         I asked him for the keys on his way --

18   on his way out of my office and I needed to walk

19   him out and I told him please bring me his set of

20   keys.

21         Q.    So you don't recall anything specific

22   that Mr. Eldridge said in the meeting?

23         A.    No.  But I think I was a little nervous

24   at that point because of how he was reacting.

142

1        Q.    Well, you were used to terminating
2    employees; isn't that true?
3        A.    Not used to it, I mean.
4        Q.    You had terminated a number of
5    employees at Ethan Allen?
6             MS. KRAUSS:  Objection.
7        A.    I had terminated a few employees, not a
8    number of them.
9        Q.    You said that Mr. Eldridge kicked a
10   wall on the way out of your office?
11       A.    Yes.
12       Q.    Did you observe that directly?
13       A.    I heard it.
14       Q.    Was Louann Starr in a position to be
15   able to see what caused the noise out in the
16   hallway; do you know?
17       A.    I can't answer that.  I don't
18   remember.
19       Q.    Then you stated that Mr. Eldridge
20   yelled something back in that you felt was
21   threatening?
22       A.    Louann Starr felt that it was
23   threatening.
24       Q.    Do you know what it was that was said?

143

1          A.    No, I can't remember.

2          Q.    And did you say that as a result -- or

3    at what point in this chronology were the police

4    called?

5          A.    Louann Starr called them.  That was

6    after he kicked -- became, you know, after he

7    kicked the divider down and said something back

8    into the office that they felt -- she felt that it

9    was threatening to myself and the team.

10         Q.    But you didn't hear what it was?

11         A.    No.

12         Q.    Did you feel threatened?

13         A.    Yes.

14         Q.    And why did you feel threatened?

15         A.    Because he's a big guy, he is -- he

16   turned beat red and his fists were clenched, and

17   when I heard the noise out in my office, I knew he

18   was mad.

19         Q.    And then did you walk with him, you

20   said, because you had to get the keys?

21         A.    When he was leaving my office, I asked

22   him to bring -- get the keys and I needed to walk

23   him out of the building.

24         Q.    And so at what point did you walk with

144

1    him?

2        A.    I didn't walk with him.  I stayed in my

3    office.

4        Q.    Did you end up after this loop of

5    events walking him out of the building?

6        A.    No.  The police did.

7        Q.    And did you have any further discussion

8    with Mr. Eldridge either before the police came or

9    after the police came?

10        A.    No.  I stayed in my office.

11        Q.    You didn't see him out in the warehouse

12    later that day?

13        A.    No.

14            MS. CHICOINE:  Can I have this marked

15    as an exhibit.

16                    (Note was marked Exhibit No. 8

17    for identification.)

18        Q.    Who typed up Exhibit 8?

19        A.    I don't know.

20        Q.    Do you know who -- have you ever seen

21    this before today?

22        A.    It had to -- yeah, I think I seen

23    it somewhere on some -- one of the witness

24    statements, I think, I believe, that I saw.  I saw

152

1        A.    This is what I did give to him as a
2    review, yes.
3        Q.    Do you know where the original of this
4    document is?
5        A.    Yes. I brought it.
6              MS. CHICOINE: Can we go off the
7    record?
8                   (Discussion off the record.)
9                   (Original Performance
10   Appraisal, Supervisory Personnel, dated 9/5/03,
11   consisting of five pages, was marked Exhibit No.
12   11A for identification.)
13       Q.    So now you have 11 and 11A. 11A is the
14   original performance appraisal that you gave Mr.
15   Eldridge?
16       A.    Yes.
17       Q.    And that consists of five pages?
18       A.    Correct.
19       Q.    And is that your signature on the fifth
20   page in?
21              MS. KRAUSS: Of Exhibit 11A?
22       Q.    Of Exhibit 11A?
23       A.    Yes.
24       Q.    And is that the date that you signed

COPLEY COURT REPORTING

153

1    Exhibit 11A?

2        A.    Yes.

3        Q.    Do you know why this was presented to

4    Mr. Eldridge more than a month later?

5        A.    Yes, because the process went as I did

6    them in July, around July time period, and then

7    when I got back from corporate that they'd been

8    approved, then I went and signed all of my

9    managers' reviews.

10       Q.    So the substance of Exhibit 11A was

11   completed by you in July of 2003?

12       A.    Yes.

13       Q.    If you turn to page two of your

14   exhibit, in regard to Category E for

15   dependability, you rated Mr. Eldridge a three; is

16   that true?

17       A.    Mm-hmm.

18       Q.    And what time period did this relate

19   to, this rating?

20       A.    It probably to my best abilities when I

21   got there at Ethan Allen, you know, when I got

22   into the district around the December time period

23   until July 1st.

24       Q.    So this covered all your observations

154

1    from December through the end of June, 2003?

2        A.    Yes, estimated time, yes.

3        Q.    And Category F there on page two of

4    Exhibit 11, you rated Mr. Eldridge again as

5    meeting the requirements, a three?

6        A.    Yes.  I gave him the benefit of the

7    doubt.  I really felt that he had a good attitude,

8    that he was going to work through the issues, and

9    I did give him the benefit of the doubt that the

10   behavior was going to change, you know.  I saw

11   improvements and then -- for a few weeks and then

12   he'd go back to it after the June/July time

13   period.

14       Q.    But as of July 1st you hadn't provided

15   any written warnings to Mr. Eldridge for anything;

16   is that true?

17       A.    I can't remember exact dates.  I'd have

18   to look at actual document dates.

19       Q.    Any written warning you would have

20   provided to Mr. Eldridge would have been in his

21   personnel file?

22       A.    Yes.

23       Q.    And none of those issues would have

24   been raised on your e-mail as you stated?

157

1              MS. CHICOINE:  If I could have this

2       marked as 12 and then the original as 12A.

3                      (Corrective Action Form, dated

4       10/2/03, consisting of three pages, was marked

5       Exhibit No. 12 for identification.)

6                      (Original Corrective Action

7       Form, dated 10/2/03, consisting of three pages,

8       was marked Exhibit No. 12A for identification.)

9           Q.    Okay.  Exhibit 12, we've marked it as a

10      three-page document.

11              MS. KRAUSS:  Can I take my pink notes

12      off it?

13              MS. CHICOINE:  Yes.

14          Q.    So you have three pages in front of

15      you, Ms. Hamilton?

16          A.    Mm-hmm.

17          Q.    And 12A is the original of the same

18      three pages?

19          A.    Yes.

20          Q.    And do you recognize this as relating

21      to the document that's listed in Exhibit 10?

22              MS. KRAUSS:  Objection.

23          A.    I didn't -- I didn't put this down, so

24      I wouldn't have that recollection.

158

1       Q.    So you don't know what this was that
2   Becky DesRosiers was attaching, these various
3   documents?
4       A.    I can assume, but Becky did the work so
5   I don't know if that's what she was relating to.
6       Q.    Page one is a corrective action form
7   addressed to Mr. Eldridge.  Is that your signature
8   at the bottom?
9       A.    Yes.
10      Q.    And who wrote "medical reason" next to
11  the date 10/8/03?
12      A.    Michael did.
13      Q.    And what discussion did you have with
14  him?
15      A.    He said he was taking medication,
16  causing him to oversleep.
17      Q.    Did he explain what type of medication?
18      A.    No.
19      Q.    Did you ask anything more about it?
20      A.    No, because I know that's not my place
21  to ask those questions.  But I did tell him that
22  if he had medical issues, he should get a doctor's
23  note and bring it in to me.
24      Q.    This was given to Mr. Eldridge on the

159

1    day that he signed it?

2          A.    Yes.  I believe that is true.

3          Q.    Did you give it to him at the same time

4    as you gave him the performance appraisal which is

5    Exhibit 11?

6          A.    Yes.  It looks like I did.

7          Q.    Now, this document states at the bottom

8    that there are three different copies made.  Do

9    you see where at the bottom it says original and

10   then copy to associate, copy to confidential store

11   file?

12         A.    Yes, I see that.

13         Q.    Are you involved in that process of

14   making sure that there are three separate copies?

15         A.    No.  It was on our old form that we

16   used to have.  I don't know why there's still this

17   on it.  It was a three-part before they went into,

18   like, a document that came out over the e-mail

19   from corporate.

20         Q.    So in 2003 where would you get this

21   corrective action form, from your computer or from

22   a hard copy?

23         A.    From a computer.

24         Q.    And this is all your handwriting that

163

1        Q.    How did you know that it was because
2    Mr. Eldridge had overslept?
3        A.    Because when I -- in the morning when I
4    called and he wasn't there or I could have been
5    there, I don't know which it was, but when he got
6    there or -- I would have the office have him call
7    me when he got in and I asked him why he was late
8    and that's the reason that he gave me.
9        Q.    Were you in Franklin if it was your day
10   off on August 29th?
11       A.    Could have been.
12       Q.    So it was your practice on days off to
13   still sometimes go into the office?
14       A.    Yes.
15       Q.    And you recall having a specific
16   conversation with Mr. Eldridge at some point that
17   morning in which he explained to you he had
18   overslept?
19       A.    The only time I'd document was if I had
20   talked to him or if I have seen him myself.
21   That's the only time that I document it.  If I
22   heard and he didn't admit to it and I didn't see
23   it or know that he wasn't there to talk to, then I
24   could not document it.

164

1          Q.    You just said the only time you would

2     document it is if you were there to see it

3     yourself or spoke directly with him?  Is that -- I

4     just wanted to repeat that correctly.

5          A.    The only time I documented it is if I

6     witnessed it firsthand myself or if I called him

7     from on the road and he was not there and he

8     clearly was not -- and his truck was not in the

9     parking lot and his associates said that he had

10    never been there yet.  I would ask them when he

11    got in to give me a call and I would ask him why

12    he was late.  Then he would tell me a reason why

13    he was late.

14          So, I knew, in fact, he admitted to

15    why -- I mean, he admitted to being late and he

16    told me the reason why he was late.  So then I

17    felt that I had enough to document it at that time

18    because he was admitting to it.

19          Q.    So for every time there was a notation

20    in Exhibit 3 you had a conversation directly with

21    Mike Eldridge?

22          A.    Directly with him, yes.

23               MS. KRAUSS:  Objection.

24          Q.    On Exhibit 3, if you turn to page --

174

1     Q.    There's no date that appears either on

2    this page or the third page of Exhibit 12; is that

3    fair to say?

4     A.    There is no date.

5          MS. KRAUSS:  Did you look to --

6     Q.    And if you can flip to the next page?

7     A.    I'm sorry.  There's dates but nothing

8    has been signed.

9     Q.    Well, there's lines for dates but

10   there's no dates written.

11    A.    Right.  There's no actual dates.

12    Q.    Do you recall, was this ever given to

13   Mr. Eldridge?

14    A.    I believe I reviewed it with him, yes.

15    Q.    And when did that occur?

16    A.    I believe at the same time that I gave

17   him this, we reviewed the action plan along with

18   it.

19    Q.    When you gave him the first page of

20   Exhibit 12, the final written warning?

21    A.    Yes.

22    Q.    And Exhibit 12 you dated at the top

23   10/2/2003?

24    A.    Yes.

175

1        Q.    And you believe that you actually gave

2    it to Mr. Eldridge on the date that he signed it,

3    on October 8th, 2003?

4        A.    Yes.

5        Q.    Why would you have waited the six days

6    to present this to Mr. Eldridge?

7        A.    Due to schedule, traveling on the road,

8    him having time.  We needed to sit down and

9    discuss it at a good time.  So some time elapsed

10   between when the actual incident happened and the

11   date that I could sit down with the employee to go

12   over it.

13       Q.    According to the weekly schedule which

14   is Exhibit 3, looking at the Bates stamp page 128,

15   it appears that both you and Mr. Eldridge were

16   scheduled to be in the new Natick location on

17   October 8th?

18       A.    Mm-hmm.

19       Q.    Do you recall if that is where the

20   conversation about this final written warning

21   occurred?

22       A.    I believe it took place in my office.

23       Q.    You had an office in new Natick, I

24   presume?

176

1       A.    No, in Franklin.  I'm sorry.

2       Q.    Would there have been the opportunity

3   for both of you to travel to the Franklin location

4   if you were both scheduled in the Natick location

5   on October 8th?

6       A.    Yes.  Probably we could have gotten

7   done early that day and went back there.  I can't

8   recall much, but I would have done it in my office

9   in Franklin.  I wouldn't have done it at a store

10  location.

11      Q.    And what discussion did you have about

12  the action plan with Mr. Eldridge?

13      A.    What discussion did I have with him?

14      Q.    Yes.

15      A.    I would have just went over it and

16  asked if he had any input because there's always

17  room for him to have an associate come in on here

18  as well and I asked him if he understood.  He said

19  yes.  And I told him this was serious because it

20  was a final written warning and I told him if the

21  behavior continued, that he would be terminated.

22            So we went over the action plan.  He

23  agreed that he needs to be on time.  Again we

24  talked about schedule.  Is there anything I can do

177

1    to change your schedule to make you be on time,

2    because I told him the importance of, you know,

3    his staff knowing that he's on time and that they

4    could count on him for direction.

5           I talked to him about leaving a few

6    minutes earlier.  We talked about planning his

7    schedule better, you know, taking a look at it the

8    week before, prior, to make sure that it was going

9    to work for him.

10   Q.    And what was Mr. Eldridge's response in

11   this discussion?

12   A.    From what I remember he was -- he was

13   pretty upset that he was on a final written

14   warning for tardiness because I think he felt --

15   he gave me the assumption that he was -- he didn't

16   need to stick to any type of schedule because he

17   was a manager, and I kind of told him that we all

18   need to stick to a schedule.  It's important that

19   the staff know where we are, so if something does

20   come up, that we're available to them.

21   Q.    And --

22   A.    You know, he was pretty quiet.  He

23   knew I was serious about the next step, if it did

24   continue, that termination would be the next

178

1    result.

2        Q.    So this action plan is an important

3    document?

4        A.    It's -- yeah, it's important, but I

5    think it's important that he understands what the

6    expectations are and these were all written down

7    and gone over with him on a number of occasions,

8    the same type of thing.

9        Q.    Had you given action plans to any other

10   employees in 2003?

11       A.    On absence and tardiness?

12       Q.    For any reason?

13       A.    I believe I did.

14       Q.    Was it your practice to have the

15   employee sign and date it?

16       A.    It was the front copy that I was more

17   concerned about.

18       Q.    So the action plan is a part of the

19   corrective action form?

20       A.    Sometimes.

21       Q.    You presented the corrective action

22   form, the action plan and the performance review

23   all on the same day to Mr. Eldridge?

24       A.    I believe so, yes.

179

1      Q.    Were you concerned about the fact that

2   the performance appraisal rated Mr. Eldridge as

3   meeting requirements in regard to dependability

4   and time management?

5      A.    You know, I explained to him, too, that

6   I had did it a long time ago and I had that

7   conversation with him that, you know, we do

8   reviews back in July and the performance has

9   gotten considerably worse.

10            So, when I did that, I went over that

11   and touched on it verbally, and then after the

12   review was done, then I talked to him about the

13   final written warning.

14      Q.    Okay.

15      A.    Because once they're done, I can't

16   touch them after corporate signs off on them.

17            MS. CHICOINE:  Can I have this marked

18   as our next exhibit.

19                  (Corrective Action Form,

20   dated 9/23/03, was marked Exhibit No. 13 for

21   identification.)

22                  (Original Correction Action

23   Form, dated 9/23/03, consisting of three pages,

24   was marked Exhibit No. 13A for identification.)

180

1                    (Brief recess.)

2              MS. CHICOINE:  Back on the record.

3         Q.    You have in front of you Exhibit 13 and

4    Exhibit 13A.  13A is the original of Exhibit 13;

5    is that true?

6         A.    Yes.

7         Q.    And 13A consists of three pages.  Can

8    you describe what the two pages are that are

9    attached to the front page?

10        A.    It's the personnel performance action

11   plan.

12        Q.    And in Exhibit 13A it's not filled out

13   in any way?

14        A.    No.

15        Q.    And why is that?

16        A.    Sometimes I would do it and sometimes

17   I wouldn't, depending on the situation.  If it

18   was -- this is a black and white issue, transfer

19   truck paperwork.  There's no real action plan.

20   You have to get it right the first time because

21   you're matching up numbers.  There's no real

22   action plan.  You need to do it.

23             If there was a performance problem, you

24   go into more of an action plan and you explain how

181

1    you can better your performance.

2        Q.    On Exhibit 13, can you read what you've

3    written in Section IV, or I should ask you, is

4    that your handwriting in Section IV?

5        A.    In Section IV, yes.

6        Q.    And could you read what you've written,

7    please?

8        A.    Transfer truck paperwork on 9/23/2003

9    was not done right.  Items were missing from the

10   paperwork.  Items on the truck did not have

11   paperwork to match.

12       Q.    And below that you have some

13   handwriting, also?

14       A.    Have talked to Mike on 8/27, 9/3,

15   9/10,, 2003, about making sure when he signs on

16   the transfer trucks, the paperwork is right.

17       Q.    Is this the issue about inventory being

18   transferred between facilities?

19       A.    Yes, transferred from one facility to

20   another facility.  Paperwork is created on both

21   ends and both ends have to check it in to make

22   sure that the trucks and the paperwork match up.

23       Q.    And you had specific discussions that

24   you're referencing on three different dates prior

182

1    to this corrective action?

2        A.    Three different dates, 8/27, 9/3 and

3    9/10, yes.

4        Q.    And those were three different

5    discussions in person with Mike about this problem

6    with the transfer truck paperwork?

7        A.    Yes.

8        Q.    And what was Mike's explanation for

9    this situation, if any?

10       A.    To my recollection he said that he

11   knows he is just overwhelmed, busy, and he will

12   make sure that he signs off and counts the

13   pieces.

14       Q.    And was this document also presented to

15   Mr. Eldridge on October 8th?

16       A.    I did not sign and date, so I can't --

17   I don't -- I don't recall if it was that date or

18   not.

19       Q.    Do you know if Mr. Eldridge signed this

20   in front of you?

21       A.    Yes, he did.

22       Q.    Do you know if he dated it in front of

23   you?

24       A.    Yes.  He dated it in front of me.

183

1      Q.    And do you think he signed and dated it
2    on the same day that you gave it to him?
3      A.    I didn't -- I didn't do the date myself
4    down there, so I wouldn't really --
5      Q.    But do you recall from the meeting
6    whether he signed it at the same time that you
7    discussed it?
8      A.    At the same time I sat down with him,
9    yes.
10     Q.    And do you recall -- I think I just
11   asked you this, but do you recall discussing this
12   with -- in tandem with the performance appraisal
13   that was given and the correction active action
14   form that we looked at as Exhibit 12?
15     A.    I don't remember that, if it was all in
16   tandem to the same date.  I'm sorry.  I don't
17   remember off the top of my head.
18     Q.    This Exhibit 13 is dated September 23rd
19   at the top.  Although you don't recall the exact
20   date, it appears there was some delay in your
21   presenting this to Mr. Eldridge; is that fair to
22   say?
23     A.    That's fair to say.
24     Q.    Do you know why you didn't give it to

185

1        Q.    Did you exchange any e-mails with Mr.
2    Elley about the issues that are in Exhibit 12 or
3    Exhibit 13?
4        A.    I don't remember if I did e-mail.  I
5    would have -- I know I would have talked to him
6    for sure on the phone.
7        Q.    Did you ever exchange e-mails with Mr.
8    Elley about employee performance issues?
9        A.    I don't recall.
10                   (Corrective Action Form,
11   dated 7/21/03, was marked Exhibit No. 14 for
12   identification.)
13                   (Original Corrective Action
14   Form, dated 7/21/03, was marked Exhibit No. 14A
15   for identification.)
16       Q.    You now have Exhibit 14 and 14A in
17   front of you?
18       A.    Mm-hmm.
19       Q.    And is 14A the original of the
20   corrective action form that's Exhibit 14?
21       A.    Yes.
22       Q.    The date of incident in the top
23   right-hand corner, is that July or June that you
24   have there, seven or six?

COPLEY COURT REPORTING

186

1          A.     It looks like seven to me.

2          Q.     And do you recall the detail of the

3     incident you're referencing in Section IV on

4     Exhibit 14?

5          A.     Do I recall it?

6          Q.     Yes.

7          A.     Yes.

8          Q.     What was it that occurred?

9          A.     Mike was supposed to be at Quincy.  I

10    can't remember the exact time.  And he was

11    scheduled there to be of help.  I can't remember

12    the actual -- what he was supposed to do there,

13    but the store called and asked where he was and I

14    told him that -- let me find out.

15             I called the warehouse.  He wasn't at

16    the warehouse.  The store called back and said,

17    oh, he just showed up.

18         Q.     And what time was he scheduled to be at

19    Quincy?

20         A.     I don't recollect unless I look on his

21    schedule.

22         Q.     If you look at Exhibit 3, the Bates

23    stamp page 142, I'm referencing now the notation

24    for Monday, July 21st, 2003 in Mr. Eldridge's

187

1   schedule.  Is that all your handwriting?

2        A.    Yes, around the 21st.

3        Q.    When this schedule was originally put

4   together, was there no specific start time for Mr.

5   Eldridge in Quincy?

6        A.    I believe we discussed it at 10:00 he

7   would be there.  That's when the store opened.

8        Q.    When did you discuss that?  Do you know

9   how far in advance of the Monday?

10       A.    The week before on our conference call

11  because I had all different managers going

12  different places.  So I would have discussed it

13  the week before, probably on the Wednesday of the

14  week before.  That's when our conference calls

15  were.  So the store knew what time he was supposed

16  to be there as well.

17       Q.    And did you have any discussion with

18  Mr. Eldridge why he started at 11:15 that day?

19       A.    I can't recall the reason why he was

20  late that day.

21       Q.    But you believe that you spoke with him

22  that day?

23       A.    Yes, I did.  I called him at the store

24  actually after the store called me.

188

1      Q.    On Exhibit 14, your last handwritten

2   sentence in Section IV, could you read that in?

3   It starts off, "You need to be on time."

4      A.    You need to be on time or another

5   corrective action will take place.

6      Q.    Do you say that's another "corrective

7   action will take place"?

8      A.    Need to be on time or forth corrective

9   action will take place.  It looks like forth

10  corrective action or before.  That's before.

11     Q.    You're saying that that references

12  before?

13     A.    I'm sorry.  It's been a long time.

14  Need to be on time or -- before corrective action

15  will take place.

16     Q.    I'm just trying to understand whether

17  you were referencing a fourth like No. 4?

18     A.    I'm dyslexic so sometimes I write

19  things differently than I'm meaning.  Another one

20  will take place.  Going forth another one will

21  take place if the behavior didn't --

22     Q.    So there was no prior corrective action

23  to your knowledge before July 21st?

24     A.    Documented conversations happened

189

1      before July 21st, starting back in February.

2          Q.    And these conversations were documented

3      in your Franklin planner?

4          A.    Yes.

5          Q.    And nowhere else?

6          A.    Nowhere else.

7          Q.    And there's no record of them now?

8          A.    No record of them today.

9          Q.    And this Exhibit 14 that we're looking

10     at you presented to Mr. Eldridge on what date; do

11     you think?

12         A.    He signed it 7/27.  I had signed it

13     7/21/2003.

14         Q.    Do you have a recollection of what day

15     you actually gave it to him?

16         A.    No.

17         Q.    Was this before or after you completed

18     his performance appraisal for that year?

19         A.    This was after.

20         Q.    And at no point between the time that

21     you filled out the performance appraisal in early

22     July and when you gave it to him on October 8th

23     did you feel that the performance appraisal needed

24     to be corrected in regard to this tardiness

190

1    issue?

2                    MS. KRAUSS:   Objection.

3        A.    Can you rephrase that?

4        Q.    From the time you filled out the

5    performance appraisal which is Exhibit 11 --

6        A.    Right.

7        Q.    -- there was no change made to any of

8    the ratings for Mr. Eldridge?

9        A.    There was no changes, no, on the

10   performance review.

11       Q.    You say in -- you just testified that

12   the discussions about Mr. Eldridge's tardiness had

13   started in February of 2003?

14       A.    I said February/March.

15       Q.    And the first references you have on

16   Exhibit 14 for tardiness are for June.  Was there

17   a reason why you didn't reference any earlier

18   tardy incidents?

19       A.    Because they weren't over the number

20   of, you know, to take the documentation.  They

21   were, you know, when I would see it or witness it,

22   it was right on the spot that I would coach to it,

23   and I didn't notice a pattern back at that time.

24       Q.    You didn't notice any pattern of

191

1    tardiness until July of 2003?

2              MS. KRAUSS:  Objection.

3         A.    No.    There was a pattern beforehand.

4    There was a pattern beforehand, but it wasn't as

5    frequent as I saw where it was going to.

6         Q.    Now, these exhibits that we've had the

7    originals marked, 11, 12, 13 and 14, do you know

8    if these were taken out of Mr. Eldridge's file to

9    provide to the Department of Unemployment

10   Assistance?

11        A.    Yes.  I believe that they were

12   requesting them, yes.

13        Q.    And was it Becky DesRosiers that

14   physically removed these documents from Mr.

15   Eldridge's personnel file, if you know?

16        A.    I believe, yes, she did.

17        Q.    Were you involved in preparing a copy

18   of Mr. Eldridge's personnel file after he

19   requested it?

20             MS. KRAUSS:  Objection.  Go ahead.

21        A.    HR called me and asked me to send it to

22   them.  I believe I talked to Becky to have her

23   pack it up and overnight it to them.

24        Q.    Where was Mr. Eldridge's personnel file

212

1          C E R T I F I C A T E

2

3              I, **DENNA A. HAMILTON**, do hereby certify
   that I have read the foregoing transcript of my
4  testimony given on April 27, 2006, and I further
   certify that said transcript is a true and
5  accurate record of said testimony (with the
   exception of the following corrections listed
6  below):

7  Page      Line       Correction

8   3&         &          yes

9  _____

10 _____

11 _____

12 _____

13 _____

14 _____

15   DENNA  ANN  HAMILTON

16       MAN  6/3/07

17                       She

18

19 Dated at _Arlington_____, this _18_ day

20 of _MAY___, 2006.

21            _Denna A. Hamiltell_

22            DENNA A. HAMILTON

23 Signed under the pains and penalties of perjury.

24            _Patricia A. Potter_

Patricia A. Potter
NOTARY PUBLIC
My commission expires Sept. 3, 2010

# EXHIBIT F

**From:**    Michael Eldridge/Eacorp
**To:**    Sandra Lamenza/Eacorp
**Date:**    Friday, February 21, 2003 09:13AM
**Subject:**    Denna Hamilton



EXHIBIT NO. 5

Margie Simmons

Hi Sandra,

    I want to take the time to let you know that it is a complete JOY to have Denna Hamilton as our DM. The spirit in Franklin and the district is alive and growing. Thanks for picking out a winner!


Mike Eldridge
Boston District
(508) 520-2248 ext. 11
meldridge@ethanalleninc.com

EA 00328

# EXHIBIT G



3 27/06
EXHIBIT NO: 2
Margie Simmons

To:    Mike Eldridge
From:  David Pellicciotti
Date:  07/10/01
Re:

In the past, there have been conversations about the unprofessional nature in which you speak to your employees at certain times. On 03/21/01, we specifically discussed in your written warning your **overall general supervisory skills** as well.

On 06/28/01, an employee has formally complained and in his resignation letter clearly stated his reason for leaving is from your "lack of respect and professionalism" during the phone call you placed to his house on that day. Not only did he state you were rude but that you used vulgarity while questioning him about his reasons for not coming to work that day.

The above is unacceptable behavior from any Ethan Allen employee let alone a supervisor and will not be tolerated. Due to the above situations, your employment with Ethan Allen is terminated as of today.

Employee
_____

Manager
_____

Witness
_____

EA 00076

# EXHIBIT H



3/31/06
EXHIBIT NO. 4
Margie Simmons



Mike Eldridge

DOH   8/5/99

YE review    09/17/01

# ETHAN ALLEN INC.

New
Review again   1/1/02   Appraisal

goin after his goals
(04) Leadership skills

30/60/90              Personnel

9/19/01

EA 00097

## Employee Appraisal Form
### Supervisory Personnel

EA 00098

Name: _Mike Eldridge_    Position: _Warehouse Supervisor_

Date: _9/15/01_    Department: _SDD_

| Significant Performance Categories | Rating |
|---|---|
| **Group Productivity:**<br>nvolves assuring that the work of the group meets requirements for quality, quantity, and cost control. Comments on performance:<br>_A accurate way to help "measure" quality fluctuat as been developed by Mike — Last year goal!! bes well with monitoring OT and getting daily numbers recieved and pulled._ | Below Expectations for the Position ☐<br>Generally Meets Normal Job Requirements ☑<br>Generally Exceeds Normal Job Requirements ☐<br>Very Good Performance ☐<br>Excellent Performance on a Consistent Basis ☐ |
| **Delegation and Control:**<br>volves assuring that each subordinate is held accountable for eting the requirements of his or her job function. Comments performance:<br>_MIA's have improved over the year, Flouds, UPS, RGb and store labels need more ttention by you for accountability reasons_ | Below Expectations for the Position ☐<br>Generally Meets Normal Job Requirements ☑<br>Generally Exceeds Normal Job Requirements ☐<br>Very Good Performance ☐<br>Excellent Performance on a Consistent Basis ☐ |
| **Effective Communication:**<br>olves maintaining a flow of necessary information with ordinates, and working cooperatively with other departments he company. Comments on performance:<br>_than disagreements with Pat, Dan, Jeffrey or Adam e not handled professionally. Partially involved th the cause/reason for an employee quitting_ | Below Expectations for the Position ☑<br>Generally Meets Normal Job Requirements ☐<br>Generally Exceeds Normal Job Requirements ☐<br>Very Good Performance ☐<br>Excellent Performance on a Consistent Basis ☐ |
| **Leadership:**<br>lves creating a climate for achievement, motivation and elopment of subordinates. Comments on performance:<br>_ll needs to work on people skills an communicat ills with co-workers and esp subordinates. cause your job involves supervision + leadership, takes more than a "good personality" to lead._ | Below Expectations for the Position ☑<br>Generally Meets Normal Job Requirements ☑<br>Generally Exceeds Normal Job Requirements ☐<br>Very Good Performance ☐<br>Excellent Performance on a Consistent Basis ☐ |
| **Planning and Organization of Work:**<br>ves developing realistic projections & methods, following ugh, and using available resources effectively. Comments on rmance:<br>_Does set up sheet consistenly now, st p-oactively plan, plot and execute needed jects when needed during slow periods eep clean/ready, 1sles maintained, clean floors etc )_ | Below Expectations for the Position ☐<br>Generally Meets Normal Job Requirements ☑<br>Generally Exceeds Normal Job Requirements ☐<br>Very Good Performance ☐<br>Excellent Performance on a Consistent Basis ☐ |
| **Initiative and Adaptability:**<br>ves responding to unusual demands and changed nstances, moving beyond routine duties. Comments on rmance:_ Reacts well with new challenges demands especially when related with verd sales and satisfying customers needs_ | Below Expectations for the Position ☐<br>Generally Meets Normal Job Requirements ☐<br>Generally Exceeds Normal Job Requirements ☐<br>Very Good Performance ☑<br>Excellent Performance on a Consistent Basis ☐ |

| Performance Improvement Objectives for next appraisal period | Actions Employee will take to meet Objectives |
|---|---|
| 1. *SEE Attached sheet* | 1. |
| 2. | 2. |
| 3. | 3. |

**Summary of Employee Performance. Include any Important Factors or Circumstances not previously mentioned.**

Mike is a great guy to be around and has come a long way in understanding the impact and importance of his role as warehouse supervisor and quality assurance over the year. He has areas to continue to improve in and areas he's mastered see above sections and goals

**Overall**

**Performance Level:**

| Below Expectations for the Position | ☐ | Generally Meets Normal Job Requirements | ☑ |
|---|---|---|---|
| Generally Exceeds Normal Job Requirements | ☐ | Very Good Performance | ☐ |
| | | Excellent Performance on a Consistent Basis | ☐ |

This appraisal had been discussed with the employee by:

_____ Appraiser

_____ Employee   9/17/01

Reviewed by:

_____ Name & Title   D.M. 9/1/01

Comments: _____

Date _____

Date _____

Date _____

EA 00099

 ETHAN ALLEN INC.
ETHAN ALLEN DRIVE • P.O. BOX 1966 • DANBURY, CT 06813-1966

Mike Eldridge YE review goals 09/01

## GOALS

1. Increase individual productivity with more effective use of time.

2. Leadership skills to improve...
   a. More of a professional attitude
   b. Mood setting tone in WH
   c. Your approach & communication to your staff can de-motivate and decrease productivity at times

3. Enforce and control all procedures in the warehouse (safety, OSHA, UPS, MIA's, quality cards, offload paperwk, warehouse isles)

## ACTIONS

1. Submit to me a 30/60/90 day plan by the 1st of each month. This should include both self and warehouse areas.

2. Attend another leadership class on the by the end of Oct/01.
   a. Use professional language as though your' being filmed for a training video
   b. Maintain a positive/supportive proactive approach to problem solving.
   c. Keep your ego out of the work place.

3. Have warehouse meeting every 6 weeks & continue to join in on the srv and driver mtgs.

This is one technique to use as than Here is a perfect

we'll know when your leadership is there, when Jenny / mis don't do there stuff anymore

I hope to be able to leave building and have no problems.

EA 00100

# EXHIBIT I



EA 00049

# ETHAN ALLEN Inc.

Please sign the statement below and return it to your supervisor.

I have received and read my copy of the Ethan Allen Inc. Employee Handbook. I understand this Handbook supersedes all previous editions and policies and that the employer retains sole discretion to, add, modify or delete any provision. My receipt of this Handbook does not create a contract of employment and both Ethan Allen and I retain the right to terminate the employment relationship at any time and for any reason.

Date: _August 5, 1999_

Print Name: _Mike Eldridge_

Signed: _Mike Eldridge_

Retail Handbook
August 21,1998

# EXHIBIT J

Oct 2003

EXHIBIT

4b/b4 kmm

# ETHAN ALLEN INC. - BOSTON DISTRICT - WEEKLY SCHEDULE

| Week Ending:10/4 | SUNDAY9/28 | MONDAY9/29 | TUESDAY9/30 | WEDNESDAY10/1 | THURSDAY10/2 |
|---|---|---|---|---|---|
| Denna Hamilton<br>Franklin | New Natick | New Natick<br>Franklin | New Natick | New Natick | Burlington |
| Louann Starr<br>Franklin | New Natick | New Natick | Franklin | Franklin | Franklin |
| Amy Franks<br>Franklin | OFF | Off<br>Vacation | New Jersey | New Jersey | New Jersey |
| Mike Eldridge<br>Franklin | Natick<br>7AM-3PM | Franklin<br>7AM-3PM | Franklin/Natick<br>7AM-3PM | Franklin<br>8AM-4PM | Franklin<br>8AM-4PM |
| Michael Dupelle<br>Franklin | New Natick | Franklin<br>New Natick | Franklin<br>8:30am-5pm | Franklin<br>8:30am-5pm | Franklin<br>8:30am-5pm |
| Bill Holmes<br>Franklin | OFF | Franklin<br>8:30A-5PM | Franklin<br>8:30A-5PM | Franklin<br>8:30A-5PM | Franklin<br>8:30A-5PM |
| Donna Wilson-Curry<br>Natick | Natick<br>7AM-4PM | Natick<br>8:30AM-5:30PM | Natick<br>8:30AM-5:30PM | OFF | OFF |
| Amy Finley<br>Natick | Natick<br>11AM-6PM | OFF | OFF | Natick<br>11:30AM-8:30PM | Natick<br>11:30AM-8:30PM |
| Ruthie Fowler<br>Natick | New Natick<br>7:00AM-2PM | Natick<br>7:30A-4PM | New Natick<br>7:30A-4PM | Natick<br>7:30A-4PM | Natick<br>7:30A-4PM |
| Cheryl Harvey<br>Natick | OFF | Natick<br>8:30AM-5PM | Natick<br>8:30AM-5PM | Natick<br>8:30AM-5PM | Natick<br>8:30AM-5PM |
| Virginia Klinefelter<br>Natick | OFF | Natick<br>9:30AM-6PM | Natick<br>9:30AM-6PM | Natick<br>9:30AM-6PM | Natick<br>9:30AM-6PM |
| Chrissy Boudreau<br>Natick | OFF | Natick<br>9:30AM-6PM | Natick<br>9:30AM-6PM | Natick<br>9:30AM-6PM | Natick<br>9:30AM-6PM |
| Christopher Eramo<br>Quincy | OFF | OFF | OFF | OFF | Quincy |
| Lisa Greenberg<br>Quincy | OFF | Quincy<br>8AM-5PM | Quincy<br>3AM-8PM | Quincy<br>8AM-5PM | Quincy<br>8AM-5PM |
| Tierney McKay<br>Quincy | OFF | Quincy<br>7:30AM-4PM | Quincy<br>7:30AM-4PM | Quincy<br>7:30AM-4PM | Quincy<br>7:30AM-4PM |
| Paula Coffey<br>Quincy | New Natick<br>9am-5pm | New Natick<br>9AM-5PM | New Natick<br>9AM-5PM | Quincy<br>9AM-5PM | New Natick<br>9AM-5PM |
| Deb Sullivan<br>Quincy | OFF | Quincy<br>9:30AM-5:30PM | Quincy<br>9:30AM-5:30PM | Quincy<br>9:30AM-5:30PM | Quincy<br>9:30AM-5:30PM |
| Kathy Smith<br>Burlington | OFF | Burlington<br>9AM-6PM | Burlington<br>9AM-6PM | Burlington<br>9AM-6PM | Burlington<br>9AM-6PM |
| Jenny Marshall<br>Burlington | Burlington<br>11:30AM-5PM | OFF | OFF | Burlington<br>12PM-8:30PM | Burlington<br>9AM-6PM |
| Suzi Borden<br>Burlington | OFF | Burlington<br>8:30A-5PM | Burlington<br>8:30A-5PM | Burlington<br>8:30A-5PM | Burlington<br>8:30A-5PM |
| Michael Englehardt<br>Burlington | OFF | Burlington<br>7:30AM-4PM | Burlington<br>7:30AM-4PM | Burlington<br>7:30AM-4PM | Burlington<br>7:30AM-4PM |
| Susan Linker<br>Portsmouth | OFF | OFF | OFF | Burlington | Quincy |
| Pat Fecteau<br>Portsmouth | OFF | Portsmouth | Portsmouth | Portsmouth | Portsmouth |
| Bob Marshall<br>Portsmouth | OFF | New Natick<br>8AM-5PM | New Natick<br>8AM-5PM | Portsmouth<br>8AM-5PM | New Natick<br>8AM-5PM |
| McAllister<br>Portsmouth | OFF | Portsmouth<br>8:30AM-5PM | Franklin<br>8:30AM-5PM | Burlington<br>8:30AM-5PM | Burlington<br>8:30AM-5PM |

Oct 4 - times

EA 00126

# 2003

| FRIDAY 10/3 | SATURDAY 10/4 |
|---|---|
| New Natick Franklin | New Natick |
| Franklin | Franlin |
| Franklin | OFF |
| Franklin 7AM-3PM | OFF |
| Franklin 8:30am-5pm | OFF |
| Franklin 8:30A-5PM | OFF |
| Natick 8:30AM-5:30PM | Natick 8:30AM-7:30PM |
| Natick 11:30AM-5:30PM | Natick 11:30AM-730PM |
| Natick 7:30A-4PM | OFF |
| Natick 8:30AM-5PM | OFF |
| Natick 9:30AM-6PM | OFF |
| Natick 9:30AM-6PM | OFF |
| OFF | OFF |
| OFF | OFF |
| Quincy 7:30AM-4PM | OFF |
| New Natick 9AM-5PM | OFF |
| Quincy 9:30AM-5:30PM | OFF |
| OFF | Burlington 9AM-7PM |
| Burlington 9AM-4PM | Burlington 9AM-6PM |
| Burlington 8:30A-5PM | OFF |
| Burlington 7:30AM-4PM | OFF |
| Burlington | Portsmouth |
| OFF | Portsmouth |
| Portsmouth 8AM-5PM | New Natick |
| Portsmouth 8:30AM-5PM | OFF |

EA 00127

# ETHAN ALLEN INC. - BOSTON DISTRICT - WEEKLY SCHEDULE 2003

| | SUNDAY 10/5 | MONDAY 10/6 | TUESDAY 10/7 | WEDNESDAY 10/8 | THURSDAY 10/9 | FRIDAY 10/10 | SATURDAY 10/11 |
|---|---|---|---|---|---|---|---|
| a Hamilton Franklin | OFF | New Natick | New Natick | New Natick | Franklin | New Natick | New Natick |
| m Starr Franklin | OFF | Franklin | Old Natick | Old Natick | Old Natick | Franklin | OFF |
| Fra...e Franklin | OFF | OFF | HUSTON, TX | HUSTON, TX | HUSTON, TX0 | HUSTON, TX | HUSTON, TX |
| Eldridge Franklin | OFF | Franklin 7AM-3PM | New Natick 7AM-3PM | New Natick 7AM-3PM | Franklin 7AM-3PM | New Natick 7AM-3PM | New Natick 8:00 - 12:00 show at 9:2 |
| al Dupelle Franklin | OFF | New Natick 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | New Natick 8:30A-5PM | Franklin 8:30A-5PM | OFF |
| olmes Franklin | OFF | Franklin 8:30A-5PM | Franklin 8:30A-5PM | OFF Vacation | Franklin 8:30A-5PM | Franklin 8:30A-5PM | OFF |
| a Wilson-Curry Natick | OFF | Natick | Natick | Natick | Natick | Natick | Natick |
| e Fowler Natick | OFF | Natick 7:30A-4PM | Natick 7:30A-4PM | Natick 7:30A-4PM | Natick 7:30A-4PM | Natick 7:30A-4PM | OFF |
| I Harvey Natick | Natick 12PM-6PM | Natick 8:30AM-5PM | Natick 8:30AM-5PM | Natick 8:30AM-5PM | Natick 8:30AM-5PM | Natick 8:30AM-5PM | OFF |
| a Klinefelter Natick | OFF | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM |
| y Boudreau Natick | OFF | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM | OFF |
| opher Eramo Quincy | OFF | OFF | D.C. Training | Annapolis Training | Annapolis Training | Annapolis Training | Home from D.C. |
| y McKay Quincy | OFF | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | OFF | OFF | OFF |
| ah Sullivan Quincy | OFF | Quincy 9AM-5:30P | Quincy 9AM-5:30P | Quincy 9AM-5:30P | Quincy 9AM-5:30P | Quincy 9AM-5:30P | OFF |
| Coffey Quincy | OFF | New Natick 9AM-5:30PM | New Natick 9AM-5:30PM | New Natick 9AM-5:30PM | New Natick 9AM-5:30PM | New Natick 9AM-5:30PM | OFF |
| ...I. Burlington | Burlington 9AM-6:30PM | Burlington 9AM-6:30PM | Burlington 9AM-6:30PM | Burlington 9AM-6:30PM | Burlington 9AM-6:30PM | Burlington 9AM-6:30PM | Burlington 9:30AM-7PM |
| Marshall Burlington | Burlington 11:30AM-5PM | Burlington 9AM-6PM | OFF | OFF | Burlington 12PM-8:30PM | Burlington 9AM-6PM | Burlington 9:30-5:30PM |
| orden Burlington | OFF | Burlington 8A-4:30PM | Burlington 8A-4:30PM | Burlington 8A-4:30PM | Burlington 8A-4:30PM | Burlington 8A-4:30PM | OFF |
| I Englehardt Burlington | OFF | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | OFF |
| Linker Portsmouth | Portsmouth | Quincy Training | Quincy Training | Portsmouth Training | Franklin on Truck | Franklin Training | OFF |
| cteau Portsmouth | OFF | Portsmouth | Portsmouth | Quincy | Portsmouth | Portsmouth | Portsmouth |
| arshall Portsmouth | OFF | Natick | Natick | Natick | Natick | Natick | OFF |
| cAllister Portsmouth | OFF | Portsmouth 9AM-5:30PM | Portsmouth 9AM-5:30PM | Burlington 9AM-5:30PM | Burlington 9AM-5:30PM | Portsmouth 9AM-5:30PM | OFF |

EA 00128

# ETHAN ALLEN INC. - BOSTON DISTRICT - WEEKLY SCHEDULE 2003

| Ending 10/18 | SUNDAY 10/12 | MONDAY 10/13 | TUESDAY 10/14 | WEDNESDAY 10/15 | THURSDAY 10/16 | FRIDAY 10/17 | SATURDAY 10/18 |
|---|---|---|---|---|---|---|---|
| a Hamilton / Franklin | New Natick | New Natick | New Natick | New Natick | Franklin | New Natick Portsmouth | OFF |
| an Starr / Franklin | OFF | Franklin - New natick - burlington | Franklin New Natick | New Natick | New Natick | New Natick | OFF |
| Fr...s / Franklin | Houston | Long Island | Long Island | New Natick | Franklin | OFF | OFF |
| Eldridge / Franklin | OFF | Franklin New Natick | Franklin 8AM-4PM | Franklin 8AM-4PM | Franklin 8AM-4PM | Franklin 8AM-4PM | |
| al Dupelle / Franklin | OFF | New Natick | Franklin 8:30A-5PM | New Natick | Franklin 8:30A-5PM | Franklin 8:30A-5PM | OFF |
| icher / Franklin | OFF | Franklin 8:30am-5pm | New Natick | Franklin 8:30am-5pm | Franklin 8:30am-5pm | OFF | OFF |
| a Wilson-Curry / Natick | Natick | OFF | Natick | Natick | Natick | Natick | Natick |
| e Fowler / Natick | OFF | Natick 7:30A-4PM | Natick 7:30A-4PM | Natick 7:30A-4PM | Natick 7:30A-4PM | Natick 7:30A-4PM | OFF |
| l Harvey / Natick | OFF | Natick 8:30AM-5PM | Natick 8:30AM-5PM | Natick 8:30AM-5PM | Natick 8:30AM-5PM | Natick 8:30AM-5PM | OFF |
| la Klinefelter / Natick | OFF | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM | OFF |
| ay Boudreau / Natick | OFF | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM | OFF |
| opher Eramo / Quincy | OFF | Quincy | Quincy | Quincy | Quincy | Quincy | OFF |
| y McKay / Quincy | OFF | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | OFF |
| Coffey / Quincy | OFF | Natick 9AM-5:30PM | Natick 9AM-5:30PM | Natick 9AM-5:30PM | Quincy 9AM-5:30PM | Quincy 9AM-5:30PM | OFF |
| ah Sullivan / Quincy | OFF | Quincy 9:30A-5:30P | Quincy 9:30A-5:30P | Quincy 9:30A-5:30P | Quincy 9:30A-5:30P | Quincy 9:30A-5:30P | OFF |
| 8 / Burlington | Burlington 11:30AM-6PM | Burlington 9AM-6PM | Burlington 9AM-6PM | Burlington 9AM-6PM | Burlington 9AM-6PM | Burlington 9AM-6PM | OFF |
| Marshall / Burlington | OFF | OFF | OFF | OFF | OFF | OFF | OFF |
| orden / Burlington | OFF | Burlington 8AM-6PM | Burlington 8AM-6PM | Burlington 8AM-6PM | Burlington 8AM-6PM | Burlington 8AM-6PM | OFF |
| l Englehardt / Burlington | OFF | New Natick | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | New Natick | New Natick | OFF |
| Linker / Portsmouth | OFF | Portsmouth | Portsmouth | Portsmouth | Burlington | Burlington | OFF |
| deau / Portsmouth | OFF | Portsmouth | Portsmouth | Portsmouth | Portsmouth | Portsmouth | OFF |
| arshall / Portsmouth | OFF | Portsmouth 8AM-4PM | New Natick | New Natick | Portsmouth 9AM-5PM | Portsmouth 8AM-4PM | OFF |
| cAllister / Portsmouth | OFF | Burlington 9AM-5:30PM | Burlington 9AM-5:30PM | Burlington 9AM-5:30PM | Portsmouth 9AM-5:30PM | Portsmouth 9:30A-5:30P | OFF |
| | | | | | | | |
| | | | | | | | |

# ETHAN ALLEN INC. - BOSTON DISTRICT - WEEKLY SCHEDULE 2003

| Week Ending 11/1 | SUNDAY 10/26 | MONDAY 10/27 | TUESDAY 10/28 | WEDNESDAY 10/29 | THURSDAY 10/30 | FRIDAY 10/31 | SATURDAY 1/1 |
|---|---|---|---|---|---|---|---|
| ina Hamilton | Danbury | Danbury | Danbury | Danbury | Franklin | Franklin | OFF |
| Franklin | | | | | Natick | | |
| am Starr | OFF | Franklin | Natick | Burlington | Portsmouth | Franklin | OFF |
| Franklin | | | | | | | |
| y ...ks | Danbury | Danbury | Danbury | Danbury | OFF | Garden City | OFF |
| Franklin | | | | | | | |
| hael Dupelle | OFF | Franklin | Franklin | Franklin | Franklin | Franklin | OFF |
| Franklin | | 8:30A-5PM | 8:30A-5PM | 8:30A-5PM | 8:30A-5PM | 8:30A-6PM | |
| Holmes | OFF | Franklin | Franklin | Franklin | Franklin | Franklin | OFF |
| Franklin | | 8:30A-5PM | 8:30A-5PM | 8:30A-5PM | 8:30A-5PM | 8:30A-5PM | |
| a Richer | | Franklin | Franklin | Franklin | Franklin | Franklin | Franklin |
| Franklin | | 8:30AM-5PM | 8:30AM-5PM | 8AM-2:30PM | 8:30AM-5PM | 8:30AM-5PM | 7AM-1PM |
| na Wilson-Curry | Danbury | Danbury | Danbury | Danbury | Natick | Natick | Natick |
| Natick | | | | | 9am-6pm | 9AM-6PM | 11am-6pm |
| ie Fowler | OFF | Natick | Natick | Natick | Natick | Natick | OFF |
| Natick | | 7:30A-4PM | 7:30A-4PM | 7:30A-4PM | 7:30A-4PM | 7:30A-4PM | |
| ryl Harvey | Natick | Natick | Natick | Natick | Natick | OFF | OFF |
| Natick | 11am-8pm | 8:30AM-5PM | 8:30AM-5PM | 8:30AM-5PM | 8:30AM-5PM | | |
| nia Klinefelter | OFF | Natick | Natick | Natick | Natick | Natick | OFF |
| Natick | | 9:30AM-6PM | 9:30AM-6PM | 9:30AM-6PM | 9:30AM-6PM | 9:30AM-6PM | |
| sey Boudreau | Danbury | Danbury | Danbury | Danbury | OFF | Natick | OFF |
| Natick | | 9:30AM-6PM | 9:30AM-6PM | 9:30AM-6PM | | 9:30AM-6PM | |
| istopher Eramo | Quincy | Danbury | Danbury | Danbury | Quincy | OFF | Quincy |
| Quincy | | | | | 8:30AM-5PM | | 8:30AM-5PM |
| ney McKay | OFF | Quincy | Quincy | Quincy | Quincy | Quincy | OFF |
| Quincy | | 7:30A-4PM | 7:30A-4PM | 7:30A-4PM | 7:30A-4PM | 7:30A-4PM | |
| a Coffey | OFF | Danbury | Danbury | Danbury | Quincy | Quincy | OFF |
| Quincy | | | | | 8:30am-5PM | 8:30am-5PM | |
| orah Sullivan | OFF | Quincy | Quincy | Quincy | Quincy | Quincy | OFF |
| Quincy | | 9:30A-6P | 9:30A-6P | 9:30A-6P | 9:30A-6P | 9:30A-6P | |
| by ...ith | Danbury | Danbury | Danbury | Danbury | Burlington | Burlington | OFF |
| Burlington | | | | | 9am-5:30pm | 9AM-5:30PM | |
| ny Marshall | Danbury | Danbury | Danbury | Danbury | OFF | OFF | Burlington |
| Burlington | | | | | | | 9am-5:30pm |
| l Borden | OFF | Burlington | Burlington | Burlington | Burlington | Burlington | OFF |
| Burlington | | 7:30A-4:320P | 7:30A-4:320P | 7:30A-4:320P | 7:30A-4:320P | 7:30A-4:320P | |
| hael Englehardt | Danbury | Danbury | Danbury | Danbury | Burlington | OFF | OFF |
| Burlington | | | | | 8AM-4PM | | |
| an Linker | Danbury | Danbury | Danbury | Danbury | OFF | Portsmouth | Portsmouth |
| Portsmouth | | | | | | | |
| Fecteau | OFF | Portsmouth | Portsmouth | Portsmouth | Portsmouth | Portsmouth | OFF |
| Portsmouth | | | | | | | |
| Marshall | Danbury | Danbury | Danbury | Danbury | Portsmouth | OFF | OFF |
| Portsmouth | | | | | 9AM-5PM | | |
| McAllister | OFF | Burlington | Burlington | Burlington | Portsmouth | Portsmouth | OFF |
| Portsmouth | | 9AM-5:30PM | 9AM-5:30PM | 9AM-5:30PM | 9AM-5:30PM | 9AM-5:30PM | |

# ETHAN ALLEN INC. - BOSTON DISTRICT - WEEKLY SCHEDULE 2003

| | SUNDAY 8/31 | MONDAY 9/1 | TUESDAY 9/2 | WEDNESDAY 9/3 | THURSDAY 9/4 | FRIDAY 9/5 | SATURDAY 9/6 |
|---|---|---|---|---|---|---|---|
| a Hamilton / Franklin | OFF | OFF Holiday | Franklin | Natick | Franklin Natick | Quincy Burlington | OFF |
| m Starr / Franklin | OFF | OFF Holiday | Vacation | Franklin | Franklin | Franklin | OFF |
| Frauke / Franklin | OFF | OFF Holiday | Long Island | Long Island | Long Island | Long Island | OFF |
| Eldridge / Franklin | OFF | OFF Holiday | Franklin 8AM-4:30PM | Franklin 8AM-4:30PM | Franklin 6AM-1:30PM | Franklin 8AM-4:30PM | OFF |
| el Dupele / Franklin | OFF | OFF Holiday | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | OFF |
| olmes / Franklin | OFF | OFF Holiday | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | OFF |
| a Wilson-Curry / Natick | Natick 11AM-6PM | OFF | Natick 8:30A-5:30P | Natick 12PM-8:30PM | Natick 9AM-8:30PM | OFF | Natick 12PM-8PM |
| Finley / Natick | Natick 12PM-5PM | Natick 10AM-6PM | Natick 12PM-8:30PM | OFF | OFF | Natick 9AM-5:30PM | Natick 10AM-5:30PM |
| a Fowler / Natick | OFF | OFF Holiday | Natick 7:30A-4PM | Natick 7:30A-4PM | Natick 7:30A-4PM | Natick 7:30A-4PM | |
| y Harvey / Natick | Natick 12PM-5PM | Natick 8:30AM-5PM | Natick 8:30AM-5PM | Natick 8:30AM-5PM | Natick 8:30AM-5PM | Natick 8:30AM-5PM | OFF |
| da Klinefelter / Natick | OFF | OFF Holiday | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Quincy 9:30AM-6PM | Natick 9:30AM-6PM | OFF |
| ay Boudreau / Natick | OFF | OFF Holiday | Quincy 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM | OFF |
| reenberg / Quincy | Quincy 11AM-6PM | Quincy 9AM-6:30PM | Quincy 8AM-5PM | Quincy 8AM-5PM | OFF Holiday | OFF | OFF |
| y McKay / Quincy | OFF | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | OFF |
| / Quincy | OFF | Quincy | Quincy | Quincy | Quincy | Quincy | OFF |
| ...illivan / Quincy | OFF | Quincy | Quincy | Quincy | Quincy | Quincy | OFF |
| Smith / Burlington | Burlington 10AM-5PM | Burlington 9:30AM-6PM | OFF | Burlington 9AM-6PM | Burlington 9AM-6PM | OFF | Burlington 8:30AM-7PM |
| Marshall / Burlington | Portsmouth | Burlington 9:30AM-6PM | Burlington 9:30AM-6PM | Portsmouth | Burlington 9:30AM-6PM | OFF | OFF |
| Jordan / Burlington | OFF | Burlington 8:30A-5PM | Burlington 8:30A-5PM | Burlington 8:30A-5PM | Burlington 8:30A-5PM | Burlington 8:30-5PM | OFF |
| el Englehardt / Burlington | OFF | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | OFF |
| al Manager / Portsmouth | Portsmouth | Portsmouth | Portsmouth | Portsmouth | Portsmouth | Portsmouth | Portsmouth |
| cteau / Portsmouth | Portsmouth | Portsmouth 8:30A-4:30P | Portsmouth 8:30A-4:30P | Portsmouth 9AM-6:30PM | Portsmouth 9AM-6:30PM | Portsmouth 8:30A-4:30P | Portsmouth |
| arshall / Portsmouth | OFF | Portsmouth 8AM-4PM | Portsmouth 9AM-5PM | Portsmouth 9AM-5PM | Portsmouth 9AM-5PM | Portsmouth 8AM-4PM | OFF |
| ods Specialist / Portsmouth | OFF | Portsmouth | Portsmouth | Portsmouth | Portsmouth | Portsmouth | OFF |

sent 2 times

EA 00131

| Name / Location | SUNDAY 9/7 | MONDAY 9/8 | TUESDAY 9/9 | WEDNESDAY 9/10 | THURSDAY 9/11 | FRIDAY 9/12 | SATURDAY 9/13 |
|---|---|---|---|---|---|---|---|
| Anna Hamilton / Franklin | OFF | Portsmouth | Franklin | Franklin | Franklin / Quincy | Franklin / Burlington | OFF |
| ...eann Starr / Franklin | OFF | Franklin | Franklin | Portsmouth | Natick | Burlington | OFF |
| ny Franks / Franklin | Philadelphia | Paoli | Wilmington | Concordville | Lancaster | OFF | Houston |
| kris Eldridge / Franklin | OFF | Franklin | Franklin | Natick | Franklin | Franklin | OFF |
| ...el Dupelle / Franklin | OFF | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | OFF |
| ...Potmen / Franklin | OFF | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | VACATION | OFF |
| nna Wilson-Curry / Natick | OFF | OFF | OFF | OFF | Natick | Natick | OFF |
| y Finley / Natick | Natick 11AM-6PM | Natick 9AM-6PM | Natick 8:30A-5:30P | Natick 11:30A-8:30P | Natick 11:30A-8:30P | Natick 8:30A-5:30P | Natick 8:30A-5:30P |
| ...e Fowler / 11AM-6PM | OFF | Natick 7:30A-4PM | Natick 9AM-6PM | Portsmouth 7:30A-4PM | OFF | Portsmouth 9AM-6PM | 8:30AM-7PM |
| ny Harvey / Natick | OFF | Natick | Natick 7:30A-4PM | Portsmouth | Natick 7:30A-4PM | Natick 7:30A-4PM | OFF |
| nia Kimsfelter / Natick | OFF | Natick 8:30AM-5PM | Natick 8:30AM-5PM | Natick 8:30AM-5PM | Natick 8:30AM-5PM | Natick 8:30AM-5PM | OFF |
| ssy Boudreau / Natick | OFF | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM | OFF |
| ...Greenberg / Natick | OFF | Quincy | Quincy | Quincy | Quincy | Natick | Quincy |
| ...y McKay / Quincy | OFF | Quincy 8AM-5PM | Quincy 8AM-5PM | Quincy 8AM-5PM | Quincy 8AM-5PM | OFF | 8AM-6:30PM |
| ...ddy Coffey / Quincy | OFF | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 8AM-6:30PM | OFF |
| borah Sullivan / Quincy | OFF | Quincy Training | Quincy Training | Quincy Training | Quincy Training | Quincy Training | OFF |
| ...ty Smith / Burlington | Burlington 10AM-5PM | 9:30A-5:30P | 9:30A-5:30P | 9:30A-5:30P | 9:30A-5:30P | 8:30A-5:30P | Burlington 8:30A-7P |
| ...Marshall / Burlington | OFF | OFF | Burlington 9AM-6PM | Burlington 9AM-6PM | OFF | Burlington 9AM-6PM | Portsmouth 8:30A-6PM |
| ...zd Borden / Burlington | OFF | Burlington 9:30A-6PM | Burlington 9:30A-6PM | OFF | Portsmouth 9:30A-6PM | Burlington 9:30A-6PM | OFF |
| ...el Englehardt / Burlington | OFF | Burlington 8:30A-5PM | Burlington 8:30A-5PM | Burlington 8:30A-5PM | Burlington 8:30A-5PM | Burlington 8:30-5PM | OFF |
| ...Fecteau / Portsmouth | Portsmouth | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | Portsmouth |
| eral Manager / Portsmouth | Portsmouth | Portsmouth | Portsmouth | Portsmouth | Portsmouth | Portsmouth | Portsmouth |
| o Marshall / Portsmouth | OFF | Portsmouth | Portsmouth | Portsmouth | Portsmouth | Portsmouth 7:30A-4PM | OFF |
| ren Atkins / Portsmouth | OFF | Portsmouth 8AM-4PM | Portsmouth 9AM-5PM | Portsmouth 9AM-5PM | Portsmouth 9AM-5PM | Portsmouth 8AM-4PM | OFF |

# ETHAN ALLEN INC. - BOSTON DISTRICT - WEEKLY SCHEDULE 2003

| Ending 9/20 | SUNDAY 9/14 | MONDAY 9/15 | TUESDAY 9/16 | WEDNESDAY 9/17 | THURSDAY 9/18 | FRIDAY 9/19 | SATURDAY 9/20 |
|---|---|---|---|---|---|---|---|
| Hamilton<br>Franklin | OFF | Franklin | Natick | Portsmouth | MFK<br>Visit | Franklin<br>Quincy | OFF |
| n Starr<br>Franklin | OFF | Franklin | Burlington | Quincy | Natick<br>Franklin | Franklin | OFF |
| ral<br>Franklin | Houston | Houston | Houston | New Jersey | New Jersey | New Jersey | OFF |
| dridge<br>Franklin | OFF | Franklin<br>8AM-4:30PM | Franklin<br>8AM-4:30PM | Franklin<br>8AM-4:30PM | Franklin<br>8AM-4:30PM | Franklin<br>8AM-4:30PM | OFF |
| l Dupelle<br>Franklin | OFF | Franklin<br>8:30A-5PM | Franklin<br>8:30A-5PM | Franklin<br>8:30A-5PM | MFK<br>Visit | Franklin<br>8:30A-5PM | OFF |
| mes<br>Franklin | OFF | Franklin<br>8:30A-5PM | Franklin<br>8:30A-5PM | Franklin<br>8:30A-5PM | Franklin<br>8:30A-5PM | Franklin<br>8:30A-5PM | OFF |
| Wilson-Curry<br>Natick | Natick<br>11AM-6PM | Natick<br>8:30A-6:30P | Natick<br>8:30A-6:30P | OFF | Natick<br>10:30A-8:30P | OFF | Natick<br>10AM-7PM |
| inley<br>Natick | OFF | OFF | Natick<br>12-8:30PM | Natick<br>9AM-6PM | Natick<br>9AM-6PM | Portsmouth<br>9AM-8PM | Natick<br>8:30A-7PM |
| Fowler<br>Natick | OFF | Natick<br>7:30A-4PM | Burlington<br>Inventory | Natick<br>7:30A-4PM | Natick<br>7:30A-4PM | Natick<br>7:30A-4PM | OFF |
| Harvey<br>Natick | OFF | Natick<br>8:30AM-5PM | Natick<br>8:30AM-5PM | Natick<br>8:30AM-5PM | Natick<br>8:30AM-5PM | Natick<br>8:30AM-5PM | OFF |
| a Klinefelter<br>Natick | OFF | Natick<br>9:30AM-6PM | Natick<br>9:30AM-6PM | Natick<br>9:30AM-6PM | Natick<br>9:30AM-6PM | Natick<br>9:30AM-6PM | OFF |
| y Boudreau<br>Natick | OFF | Natick<br>9:30AM-6PM | Quincy<br>9:30AM-6PM | Natick<br>9:30AM-6PM | Natick<br>9:30AM-6PM | Natick<br>9:30AM-6PM | OFF |
| reenberg<br>Quincy | OFF | Quincy<br>8AM-5PM | Quincy<br>8AM-5PM | Quincy<br>8AM-5PM | Quincy<br>8AM-5PM | OFF | Quincy<br>8AM-6:30PM |
| y McKay<br>Quincy | OFF | Quincy<br>7:30AM-4PM | Quincy<br>7:30AM-4PM | Quincy<br>7:30AM-4PM | Quincy<br>7:30AM-4PM | Quincy<br>7:30AM-4PM | OFF |
| ullivan<br>Quincy | OFF | Quincy<br>9:30A-5:30P | Quincy<br>9:30A-5:30P | Quincy<br>9:30A-5:30P | Quincy<br>9:30A-5:30P | Quincy<br>9:30A-5:30P | OFF |
| l<br>Quincy | OFF | Quincy<br>9AM-5PM | Quincy<br>9AM-5PM | Quincy<br>9AM-5PM | Quincy<br>9AM-5PM | Quincy<br>9AM-5PM | OFF |
| Smith<br>Burlington | OFF | Burlington<br>9AM-6PM | Burlington<br>9AM-6PM | OFF | Burlington<br>9AM-6PM | Burlington<br>9AM-6PM | Burlington<br>8:30A-7PM |
| Marshall<br>Burlington | Burlington | OFF | Portsmouth | Burlington | Burlington | OFF | Portsmouth |
| orden<br>Burlington | OFF | Burlington<br>8:30A-5PM | Burlington<br>8:30A-5PM | Burlington<br>8:30A-5PM | Burlington<br>8:30A-5PM | Burlington<br>8:30-5PM | OFF |
| l Englehardt<br>Burlington | OFF | Burlington<br>7:30AM-4PM | Burlington<br>7:30AM-4PM | Burlington<br>7:30AM-4PM | Burlington<br>7:30AM-4PM | Burlington<br>7:30AM-4PM | OFF |
| l Manager<br>Portsmouth | Portsmouth | Portsmouth | Portsmouth | Portsmouth | Portsmouth | Portsmouth | Portsmouth |
| teau<br>Portsmouth | OFF | Portsmouth<br>8:30A-4:30P | Portsmouth<br>8:30A-4:30P | Portsmouth<br>9AM-6:30PM | Natick<br>9AM-6:30PM | OFF | Portsmouth<br>8:30A-4:30P |
| arshall<br>Portsmouth | OFF | Portsmouth<br>8AM-4PM | Portsmouth<br>9AM-5PM | Natick<br>9AM-5PM | Natick<br>8AM-5PM | Natick<br>8AM-4PM | OFF |
| Allstar<br>Portsmouth | OFF | Portsmouth | Portsmouth | Portsmouth | Portsmouth | Portsmouth | OFF |

EA 00133

# ETHAN ALLEN INC. - BOSTON DISTRICT - WEEKLY SCHEDULE 2003

| Ending 9/27 | SUNDAY 9/21 | MONDAY 9/22 | TUESDAY 9/23 | WEDNESDAY 9/24 | THURSDAY 9/25 | FRIDAY 9/26 | SATURDAY 9/27 |
|---|---|---|---|---|---|---|---|
| Hamilton<br>Franklin | OFF | Franklin | Burlington | Franklin | Natick | OFF | OFF |
| n Starr<br>Franklin | OFF | Franklin | Burlington<br>Danbury | Danbury | Natick<br>New Natick | Franklin | OFF |
| ra<br>Franklin | OFF | Natick | Quincy<br>Burlington | Burlington<br>Quincy | Franklin | Natick | OFF |
| ldridge<br>Franklin | OFF | Franklin<br>7AM-3PM | Franklin<br>10AM-6PM | Franklin<br>7AM-3PM | Franklin<br>7AM-3PM | Franklin<br>7AM-3PM | OFF |
| l Dupelle<br>Franklin | OFF | Franklin<br>8:30A-5PM | Franklin<br>8:30A-5PM | Franklin<br>8:30A-5PM | Franklin<br>8:30A-5PM | Franklin<br>8:30A-5PM | OFF |
| mes<br>Franklin | OFF | Franklin<br>8:30A-5PM | Franklin<br>8:30A-5PM | Franklin<br>8:30A-5PM | Franklin<br>8:30A-5PM | OFF | OFF |
| Wilson-Curry<br>Natick | OFF | Natick<br>8:30AM-6PM | Natick<br>8:30AM-6PM | Natick<br>11AM-8:30PM | OFF | Portsmouth | Natick<br>11:30-7:30 |
| nley<br>Natick | Natick<br>11AM-5:30PM | OFF | OFF | Portsmouth | Natick<br>11AM-8:30PM | Natick<br>9AM-6PM | Natick<br>8:30AM-5:30PM |
| Fowler<br>Natick | OFF | Natick<br>7:30AM-4PM | Natick<br>7:30AM-4PM | Natick<br>7:30AM-4PM | Natick<br>7:30AM-4PM | Natick<br>7:30AM-4PM | OFF |
| Harvey<br>Natick | OFF | Natick<br>8:30AM-6PM | Natick<br>8:30AM-5PM | Burlington<br>8:30AM-5PM | Natick<br>8:30AM-5PM | Natick<br>8:30AM-6PM | OFF |
| la Klinefelter<br>Natick | OFF | Natick<br>9:30AM-6PM | Natick<br>9:30AM-6PM | Natick<br>9:30AM-6PM | Natick<br>9:30AM-6PM | Natick<br>9:30AM-6PM | OFF |
| y Boudreau<br>Natick | OFF | Natick<br>9:30AM-6PM | Natick<br>9:30AM-6PM | Natick<br>9:30AM-6PM | Natick<br>9:30AM-6PM | Natick<br>9:30AM-6PM | OFF |
| reenberg<br>Quincy | OFF | Quincy<br>8AM-5PM | Quincy<br>8AM-5PM | Quincy<br>8AM-5PM | Quincy<br>8AM-5PM | OFF | Quincy<br>8AM-6:30PM |
| y McKay<br>Quincy | OFF | Quincy<br>7:30AM-4PM | Quincy<br>7:30AM-4PM | Quincy<br>7:30AM-4PM | Quincy<br>7:30AM-4PM | Quincy<br>7:30AM-4PM | OFF |
| Coffey<br>Quincy | OFF | Quincy<br>9AM-5PM | Quincy<br>9AM-5PM | Quincy<br>9AM-5PM | Quincy<br>9AM-5PM | Quincy<br>9AM-5PM | OFF |
| ll<br>Quincy | OFF | Quincy<br>9:30AM-5:30PM | Quincy<br>9:30AM-5:30PM | Quincy<br>9:30AM-5:30PM | Quincy<br>9:30AM-5:30PM | Quincy<br>9:30AM-5:30PM | OFF |
| Smith<br>Burlington | Burlington<br>11:30AM-5PM | Burlington<br>9:30AM-6PM | Burlington<br>9:30AM-6PM | Burlington<br>9:30AM-6PM | OFF | Burlington<br>12PM-8:30PM | Burlington<br>9:30AM-7PM |
| Marshall<br>Burlington | OFF | OFF | Burlington | Burlington | Burlington | Portsmouth | Portsmouth |
| orden<br>Burlington | OFF | Burlington<br>8:30A-5PM | Burlington<br>8:30A-5PM | Burlington<br>8:30A-5PM | OFF<br>8:30A-5PM | OFF<br>8:30-5PM | OFF |
| l Englehardt<br>Burlington | OFF | Burlington<br>7:30AM-4PM | Burlington<br>7:30AM-4PM | Burlington<br>7:30AM-4PM | Burlington<br>7:30AM-4PM | Burlington<br>7:30AM-4PM | OFF |
| l Manager<br>Portsmouth | Portsmouth | Portsmouth | Portsmouth | Portsmouth | Portsmouth | Portsmouth | Portsmouth |
| cteau<br>Portsmouth | OFF | Portsmouth | Portsmouth | Portsmouth | OFF | Portsmouth | Portsmouth |
| arshall<br>Portsmouth | OFF | Portsmouth<br>8AM-5PM | Natick<br>9AM-5PM | Natick<br>9AM-5PM | Natick<br>9AM-5PM | Portsmouth<br>8AM-4PM | OFF |
| cAllister<br>Portsmouth | OFF | Franklin<br>9AM-5PM | Burlington<br>9AM-5PM | Portsmouth<br>9AM-5PM | Portsmouth<br>9AM-5PM | Portsmouth<br>9AM-5PM | OFF |
| | | | | | | | |
| | | | | | | | |

EA 00134

# ETHAN ALLEN INC. - RETAIL DIVISION - WEEKLY SCHEDULE 2003

| Ending | SUNDAY 8/3 | MONDAY 8/4 | TUESDAY 8/5 | WEDNESDAY 8/6 | THURSDAY 8/7 | FRIDAY 8/8 | SATURDAY 8/9 |
|---|---|---|---|---|---|---|---|
| Hamilton / Franklin | Danbury | Danbury | Danbury | Burlington Franklin | Portsmouth | OFF | OFF |
| n Starr / Franklin | OFF | Franklin | Franklin | Franklin | Portsmouth | Burlington | OFF |
| Fra... / Franklin | Danbury | Danbury | Danbury | Philadelphia | Philadelphia | Natick | OFF |
| Eldridge / Franklin | OFF | Franklin 8AM-4:30PM | Franklin 8AM-4:30PM | Franklin 8AM-4:30PM | Franklin 8AM-4:30PM | OFF | OFF |
| el Dupelle / Franklin | OFF | Franklin 8:30AM-5PM | Franklin 8:30AM-5PM | Franklin 8:30AM-5PM | Franklin 8:30AM-5PM | Franklin 8:30AM-5PM | OFF |
| imes / Franklin | OFF | Franklin 8:30AM-5PM | Franklin 8:30AM-5PM | Franklin 8:30AM-5PM | Franklin 8:30AM-5PM | Franklin 8:30AM-5PM | OFF |
| Wilson-Curry / Natick | Natick 11AM-6PM | Natick 8:30A-5:30PM | Natick 8:30A-5:30PM | Natick 5:30PM-8:30PM | Natick 2PM-8:30PM | Natick 8:30A-5:30PM | OFF |
| inley / Natick | OFF | OFF | Danbury | Danbury | Danbury | Danbury | Natick 9AM-7PM |
| Fowler / Natick | OFF | Natick 7:30A-4PM | Natick 7:30AM-4PM | Natick 7:30AM-4PM | Natick 7:30AM-4PM | VACATION | OFF |
| Harvey / Natick | OFF | Natick 8:30AM-5PM | Natick 8:30AM-5PM | Natick 8:30AM-5PM | Natick 8:30AM-5PM | Natick 8:30AM-5PM | OFF |
| la Klinefelter / Natick/Quincy | OFF | Natick 11AM-6PM | Natick 9:30A-6PM | Natick 9:30A-6PM | Quincy 9:30A-6PM | Natick 9:30-6PM | OFF |
| y Boudreau / Natick | OFF | Natick 9AM-5:30PM | Quincy 9AM-5:30PM | Natick 9AM-5:30PM | Natick Quincy | VACATION | OFF |
| reenberg / Quincy | OFF | Quincy 8AM-5PM | Quincy 8AM-5PM | Quincy 8AM-5PM | Quincy 8AM-5PM | OFF | Quincy 8AM-6:30PM |
| y McKay / Quincy | OFF | VACATION | VACATION | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | VACATION | OFF |
|  / Quincy | OFF |  |  |  |  |  | OFF |
| S. / Burlington | Burlington 11:30AM-5PM | Burlington 12PM-8:30pm | Burlington 12PM-8:30pm | Burlington 12PM-8:30pm | Burlington 12PM-8:30pm | VACATION | VACATION |
| Marshall / Burlington | OFF | OFF | Danbury | Danbury | Danbury | Danbury | Burlington 9AM-5:30PM |
| orden / Burlington | OFF | Burlington 8:30AM-5PM | Burlington 8:30AM-5PM | Burlington 8:30AM-5PM | Burlington 8:30AM-5PM | Burlington 8:30AM-5PM | OFF |
| l Englehardt / Burlington | OFF | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | OFF |
| Smith / Portsmouth | Portsmouth 11:30PM-5PM | Portsmouth 6:30A-6:30P | Portsmouth 8:30A-6:30P | OFF | OFF | Portsmouth 8:30A-5:30PM | Portsmouth 8:30A-7PM |
| rteau / Portsmouth | OFF | Portsmouth 8:30A-4:30P | Portsmouth 8:30A-4:30P | Portsmouth 9AM-6:30PM | Portsmouth 9AM-6:30PM | Portsmouth 8:30A-4:30P | OFF |
| arshall / Portsmouth | OFF | Portsmouth 8AM-4PM | Portsmouth 9AM-5PM | Portsmouth 9AM-5PM | Portsmouth 9AM-5PM | Portsmouth 8AM-4PM | OFF |
| Atkins / Ports./Burl. | OFF | Portsmouth 9AM-5:30PM | Burlington 9AM-5PM | Burlington 9AM-5:30PM | Burlington 9AM-5PM | Portsmouth 9AM-5:30PM | OFF |

aug 1 kim

| Name | Store | SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|---|---|
| anna Hamilton | Franklin | OFF | Franklin | Quincy | Natick | Burlington | Franklin | OFF |
| jann Starr | Franklin | OFF | Franklin | Jury Duty | Burlington | Portsmouth | Franklin | OFF |
| y Franks | Franklin | OFF | Franklin | Natick | Quincy | Burlington | Natick | OFF |
| eldridge | Franklin | OFF | Natick | | | | | OFF |
| el Dupelle | Franklin | Vacation | Vacation | Vacation | Vacation | Vacation | Vacation | OFF |
| James | Franklin | OFF | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | OFF |
| na Wilson-Curry | Franklin | OFF | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Natick 9AM-6PM |
| Conley | Natick | 11AM-8PM | Franklin 11:30A-8:30P | Natick 7:30A-5:30P | Natick 7:30A-5:30P | Natick 11A-8:30P | Natick 11A-8:30P | Natick 9AM-6PM |
| Fowler | Natick | OFF | Natick | Natick | Natick 9:30A-8:30P | Natick 9:30A-8:30P | Natick 9AM-6PM | Natick 9AM-6PM |
| rry Harvey | Natick | OFF | Natick | Natick | Vacation | Natick | Vacation | OFF |
| lia Klinefelter | Natick | OFF | Natick 8:30AM-5PM | Quincy 8:30AM-5PM | Natick 8:30AM-6PM | Natick 9:30AM-6PM | Natick 8:30A-6PM | OFF |
| ey Boudreau | Natick | OFF | Vacation | Vacation | Vacation | Vacation | Vacation | OFF |
| Greenberg | Natick | OFF | Quincy 8AM-5PM | Quincy 8AM-5PM | Quincy 8AM-5PM | Quincy | Quincy | OFF |
| McKay | Quincy | OFF | Quincy 8AM-5PM | Quincy 8AM-5PM | Quincy 8AM-5PM | Quincy 8AM-5PM | Quincy | Quincy 8AM-8:30PM |
| y Smith | Quincy | OFF | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | OFF |
| Marshall | Burlington | OFF | Burlington 9AM-8PM | Burlington 9AM-8PM | OFF | Burlington 9AM-8PM | Burlington 12-8:30PM | Burlington 9:30A-8PM |
| Borden | Burlington 11:30A-5PM | OFF | Burlington 9AM-8PM | Vacation | OFF | Burlington 9AM-8PM | Burlington 12-8:30PM | Burlington 9:30A-8PM |
| Englehardt | Burlington | OFF | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | Burlington 8:30-5PM | OFF |
| Smith | Burlington | OFF | Vacation | Vacation | Vacation | Vacation | Vacation | Vacation |
| eau | Portsmouth | Portsmouth | Portsmouth | Portsmouth | Portsmouth | Portsmouth | Portsmouth | Portsmouth |
| Marshall | Portsmouth | OFF | Portsmouth 8AM-4PM | Portsmouth 9AM-5PM | Portsmouth 9AM-5PM | Portsmouth 9AM-5PM | Portsmouth 8AM-4PM | OFF |
| n Addins | Portsmouth | OFF | Portsmouth 9AM-4PM | Portsmouth 8:30A-5PM | Portsmouth 9AM-5PM | Portsmouth 9AM-5PM | Portsmouth 8AM-4PM | OFF |
| Portsmouth | OFF | 9AM-5:30PM | 9AM-5PM | 9AM-5PM | 9AM-5PM | 9AM-5PM | 9AM-5:30PM | OFF |

| | SUNDAY | MONDAY 8/18 | TUESDAY 8/19 | WEDNESDAY 8/20 | THURSDAY 8/21 Manager's Meeting | FRIDAY 8/22 | SATURDAY 8/23 |
|---|---|---|---|---|---|---|---|
| anna Hamilton — Franklin | OFF | Franklin | Portsmouth | Natick | Manager's Meeting | Franklin | OFF |
| uaren Starr — Franklin | OFF | Franklin | Danbury | Danbury | Burlington | OFF | OFF |
| ny Franks — Franklin | OFF | Franklin | Danbury | Danbury | OFF | OFF | Toronto |
| kid Eldridge — Franklin | OFF | Franklin 8AM4:30PM | Franklin 8AM4:30PM | Franklin 8AM4:30PM | Franklin 8AM4:30PM | Franklin 8AM4:30PM | OFF |
| aniel Dupelle — Franklin | OFF | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | OFF |
| il Holmes — Franklin | OFF | Vacation | Vacation | Vacation | Vacation | Vacation | OFF |
| anna Wilson-Curry — Franklin | OFF | OFF | Franklin | Natick 9:30A-8:30P | Natick 9:30A-8:30P | Manager's Meeting | Natick 9AM-5:30PM |
| n Finley — Natick | Natick | OFF | Natick | Natick 9:30A-8:30P | Natick 9:30A-8:30P | Manager's Meeting | Natick 9:30A-5:30P |
| le Fowler — Natick 11:30AM-5:30PM | OFF | Vacation | Natick 7:30A-4PM | Natick 9:30A-6:30P | Natick | Natick 9:30A-5:30P | Natick 9AM-5:30PM |
| boly Harvey — Natick | OFF | Natick 8:30AM-5PM | Natick 8:30AM-5PM | Natick 7:30A-4PM | Natick 7:30A-4PM | Natick 7:30A-4PM | OFF |
| ivnie Klinefelter — Natick | OFF | Vacation | Natick 9:30AM-6PM | Natick 8:30AM-5PM | Natick 8:30AM-5PM | Natick 8:30AM-5PM | OFF |
| usey Boudreau — Natick | OFF | Vacation | Vacation | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM | OFF |
| sa Greenberg — Quincy | OFF | Quincy 8AM-5PM | Quincy 8AM-5PM | Quincy 8AM-5PM | Manager's Meeting | Quincy 8AM-5PM | Quincy 8AM-6:30PM |
| ebney McKay — Quincy | OFF | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | OFF |
| sai — Quincy | OFF | Quincy | Quincy | Quincy | Quincy | Quincy | OFF |
| atry Smith — Burlington | Burlington | Burlington | Burlington | Burlington | Manager's Meeting | Burlington | Burlington |
| by Marshall — Burlington | OFF | OFF | Burlington | Burlington | Burlington | Burlington | Burlington |
| Borden — Burlington | OFF | Burlington 8:30A-5PM | Burlington 8:30A-5PM | Burlington 8:30A-5PM | Burlington 8:30A-5PM | Burlington 8:30A-5PM | OFF |
| ichael Englehardt — Burlington | OFF | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | OFF |
| eral Manager — Portsmouth | Portsmouth | Portsmouth | Portsmouth | Portsmouth | Manager's Meeting | Portsmouth | Portsmouth |
| t Dacksau — Portsmouth | OFF | Portsmouth | Portsmouth | Portsmouth | Portsmouth | Portsmouth | OFF |
| b Marshall — Portsmouth | OFF | Portsmouth 8AM-4PM | Portsmouth 8AM-4PM | Portsmouth 8AM-4PM | Portsmouth 8AM-4PM | Portsmouth 8AM-4PM | OFF |
| aren Atkins — Portsmouth | OFF | Portsmouth 9AM-5:30PM | Portsmouth 9AM-5PM | Burlington 9AM-5PM | Portsmouth 9AM-5PM | Portsmouth 9AM-5:30PM | OFF |

EA 00137

# ETHAN ALLEN INC. - BOSTON DISTRICT - WEEKLY SCHEDULE 2003

| Ending 8/30 | SUNDAY 8/24 | MONDAY 8/25 | TUESDAY 8/26 | WEDNESDAY 8/27 | THURSDAY 8/28 | FRIDAY 8/29 | SATURDAY 8/30 |
|---|---|---|---|---|---|---|---|
| Hamilton / Franklin | OFF | Franklin | Portsmouth | Natick | Quincy | OFF | Burlington |
| n Starr / Franklin | OFF | Franklin | Franklin | Quincy | Franklin | Vacation | OFF |
| / Franklin | Toronto | Toronto | Toronto | Toronto | Toronto | OFF | Quincy |
| dridge / Franklin | OFF | Franklin 8AM-4:30PM | Franklin 8AM-4:30PM | Franklin 8AM-4:30PM | Franklin 8AM-4:30PM | Franklin 7am-3:30PM | OFF |
| el Dupelle / Franklin | OFF | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Portsmouth 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | OFF |
| mes / Franklin | OFF | Vacation | Franklin 8:30A-5PM | Quincy 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | OFF |
| Wilson-Curry / Natick | Natick 11AM-6PM | Natick 8:30A-6:30P | Natick 12P-8:30P | Natick 8:30A-5:30P | OFF | OFF | Natick 8:30A-5PM |
| inley / Natick | Natick 11AM-6PM | OFF | OFF | Natick 8:30A-5:30P | Natick 12P-8:30P | Natick 8:30A-5:30P | Natick 10:30A-7:30P |
| Fowler / Natick | OFF | Natick 7:30A-4PM | Natick 7:30A-4PM | Quincy 7:30A-4PM | Natick 7:30A-4PM | Natick 7:30A-4PM | OFF |
| Harvey / Natick | OFF | Natick 8:30AM-5PM | Natick 8:30AM-5PM | Quincy 8:30AM-5PM | Natick 8:30AM-5PM | Natick 8:30AM-5PM | OFF |
| la Klinefelter / Natick | OFF | Natick 9:30PM-6PM | Quincy 9:30AM-6PM | Natick 9:30AM-6PM | Quincy 9:30AM-6PM | Natick 9:30AM-6PM | OFF |
| y Boudreau / Natick | OFF | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Vacation | Vacation | OFF |
| reenberg / Quincy | OFF | Quincy 8AM-5PM | Quincy 8AM-5PM | Quincy 8AM-5PM | Quincy 8AM-5PM | OFF | Quincy 8AM-6:30PM |
| y McKay / Quincy | OFF | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | OFF |
| h Sullivan / Quincy | OFF | Quincy 9AM-5PM | Quincy 9AM-5PM | Quincy 9AM-5PM | Quincy 9AM-5PM | Quincy 9AM-5PM | OFF |
| / Quincy | OFF | Quincy | Quincy | Quincy | Quincy | Quincy | OFF |
| Smith / Burlington | Burlington 11:30AM-5PM | OFF | Burlington 9AM-6PM | Burlington 9AM-6PM | Burlington 9AM-6PM | OFF | Burlington 9AM-7PM |
| Marshall / Burlington | OFF | Burlington 9AM-6PM | Burlington 9AM-6PM | Burlington 9AM-6PM | OFF | Burlington 9AM-6PM | Burlington 9AM-6PM |
| rden / Burlington | OFF | Burlington 8:30A-5PM | Burlington 8:30A-5PM | Burlington 8:30A-5PM | Burlington 8:30A-5PM | Burlington 8:30-5PM | OFF |
| l Englehardt / Burlington | OFF | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | OFF |
| Manager / Portsmouth | Portsmouth | Portsmouth | Portsmouth | Portsmouth | Portsmouth | Portsmouth | Portsmouth |
| teau / Portsmouth | OFF | Portsmouth | Portsmouth | Quincy | Portsmouth | OFF | Portsmouth |
| rshall / Portsmouth | OFF | Vacation | Vacation | Vacation | Portsmouth 9AM-5PM | Portsmouth 8AM-4PM | OFF |
| tkins / Portsmouth | OFF | Vacation | Vacation | Burlington 9AM-5PM | Portsmouth 9AM-5PM | Portsmouth 9AM-5:30PM | OFF |

EA 00138

# ETHAN ALLEN INC. - RETAIL DIVISION - WEEKLY SCHEDULE 2003

| Week Ending 7/5 | SUNDAY 6/29 | MONDAY 6/30 | TUESDAY 7/1 | WEDNESDAY 7/2 | THURSDAY 7/3 | FRIDAY 7/4 | SATURDAY 7/5 |
|---|---|---|---|---|---|---|---|
| Hamilton / Franklin | OFF | Franklin | Natick | Quincy | Burlington Franklin | OFF | Natick |
| Starr / Franklin | OFF | TBD | Burlington | Burlington | Vacation | HOLIDAY | OFF |
| ?s / Franklin | OFF | New Jersey | New Jersey | New Jersey | Burlington | HOLIDAY | OFF |
| Eldridge / Franklin | OFF | Franklin 7AM-3PM | Franklin 8AM-4PM | Franklin 8AM-4PM | Franklin 7AM-3PM | HOLIDAY | OFF |
| Dupelle / Franklin | OFF | Franklin 8:30AM-5PM | Natick Franklin | Franklin 8:30A-5PM | Franklin 8:30A-5PM | HOLIDAY | OFF |
| Holmes / Franklin | OFF | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | HOLIDAY | OFF |
| Wilson-Curry / Natick | OFF | OFF | Quincy | Quincy | Burlington Natick | Natick | Natick |
| Finley / Natick | Natick | Natick | Natick | Natick | Natick | Natick | Natick |
| Fowler / Natick | OFF | Natick 7:30AM-4PM | Natick 7:30AM-4PM | Natick 7:30AM-3PM | Natick 7:30AM-4PM | Natick 7:30AM-4PM | OFF |
| Harvey / Natick | OFF | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM | OFF |
| Klinefelter / Natick/Quincy | OFF | OFF COMP. DAY | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Quincy 9:30AM-6PM | Natick 9:30AM-6PM | OFF |
| Schramek / Natick | Maternity leave | Maternity leave | Maternity leave | Maternity leave | Maternity leave | Maternity leave | Maternity leave |
| Greenberg / Quincy | OFF | Quincy 8AM-5PM | OFF | Quincy 8AM-5PM | Burlington Quincy | Quincy 9AM-5PM | Quincy 11AM-6PM |
| McKay / Quincy | OFF | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | OFF |
| Boudreau / Quincy | OFF | Quincy 9:30AM-5PM | Quincy 9:30AM-5PM | Quincy 9:30AM-5PM | Quincy 9:30AM-5PM | Quincy 9:30AM-5PM | OFF |
| / Burlington | OFF | Natick 9AM-6PM | Burlington 9AM-6PM | OFF | Burlington 9AM-6PM | Burlington 9AM-6PM | Burlington 8:30A-7PM |
| Marshall / Burlington | OFF | Burlington 9AM-5:30PM | Burlington 12-8:30PM | Burlington 9AM-5:30PM | Burlington Mgr. Meeting 9AM-5:30pm | OFF | Burlington 9AM-5:30PM |
| orden / Burlington | OFF | Burlington 8AM-4:30PM | Burlington 8AM-4:30PM | Vacation | Vacation | Vacation | Vacation |
| Englehardt / Burlington | OFF | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | OFF | OFF |
| Smith / Portsmouth | Portsmouth 11:30-5PM | OFF | Portsmouth 8:30-6:30 | Portsmouth 8:30-6:30 | Burlington Portsmouth | Portsmouth 8:30-5PM | Portsmouth 8:30-5PM |
| eau / Portsmouth | OFF | Portsmouth 8:30-6:30 | Portsmouth 8:30-5:30 | OFF | Portsmouth 8:30-5:30 | Portsmouth 8:30-5PM | Portsmouth 8:30-5PM |
| arshall / Portsmouth | OFF | Portsmouth 9AM-5PM | Portsmouth 9AM-5PM | Portsmouth 9AM-5PM | Portsmouth 9AM-5PM | Portsmouth 9AM-5PM | OFF |
| Atkins / Ports./Burl. | OFF | Burlington 9AM-5:30PM | Portsmouth 9AM-5PM | Burlington 9AM-5:30PM | Burlington 9AM-5PM | Portsmouth 9AM-5:30PM | OFF |

July 1 time

EA 00139

# ETHAN ALLEN INC. - RETAIL DIVISION - WEEKLY SCHEDULE 2003

| Employee 7/12 | SUNDAY 7/6 | MONDAY 7/7 | TUESDAY 7/8 | WEDNESDAY 7/9 | THURSDAY 7/10 | FRIDAY 7/11 | SATURDAY 7/12 |
|---|---|---|---|---|---|---|---|
| Hamilton Franklin | OFF | OFF HOLIDAY | VACATION | VACATION | VACATION | VACATION | OFF |
| n Starr Franklin | OFF | Burlington | Portsmouth | Burlington | Portsmouth | Burlington | OFF |
| E( ) Franklin | OFF | OFF | Burlington | Natick | Quincy Franklin | Portsmouth | OFF |
| ldridge Franklin | OFF | Franklin 8AM-5PM | Franklin 8AM-4PM | Franklin 7:30AM-4PM | Franklin 7AM-3:30PM | Franklin 7AM-3:30PM | OFF |
| el Dupelle Franklin | OFF | VACATION | VACATION | VACATION | VACATION | VACATION | OFF |
| imes Franklin | OFF | Franklin 8:30AM-5PM | Franklin 8:30AM-5PM | Franklin 8:30AM-5PM | Franklin 8:30AM-5PM | Burlington 8:30AM-5PM | OFF |
| Wilson-Curry Natick | Natick | Natick | Natick | OFF | OFF | Natick | Natick |
| inley Natick | Natick | OFF | Franklin | Natick | Natick | OFF | Natick |
| Fowler Natick | OFF | Natick 7:30A-4PM | Natick 7:30A-4PM | Natick 7:30A-4PM | Natick 7:30A-4PM | Natick 7:30A-4PM | OFF |
| Harvey Natick | OFF | Natick 9:30A-6PM | Natick 9:30A-6PM | Natick 9:30A-6PM | Natick 9:30A-6PM | Natick 9:30A-6PM | OFF |
| la Kilnefelter Natick/Quincy | OFF | Natick 9:30A-6PM | Natick 9:30A-6PM | OFF COMP.DAY | Quincy 9:30A-6PM | Natick 9:30-6PM | OFF |
| y Boudreau Natick | OFF | Quincy 9:30AM-5PM | Natick 9:30AM-5PM | Natick 9:30AM-5PM | Natick 9:30AM-5PM | Quincy 9:30AM-5PM | OFF |
| reenberg Quincy | Quincy 11-5:30 | OFF | Quincy 8AM-5PM | Quincy 8AM-5PM | Quincy 8AM-8PM | OFF | OFF HOLIDAY |
| y McKay Quincy | OFF | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | OFF |
| Quincy | OFF | | | | | | OFF |
| B( ) Burlington | Burlington 11:30-5:30 | Burlington 9:30-6:00 | OFF | Burlington 9:30-6:00 | Burlington 9:30-6:00 | OFF | Burlington 8:30-7:00 |
| Marshall Burlington | Burlington 11:30A-5P | Burlington 9AM-5:30PM | Burlington 10A-8:30PM | OFF | OFF | Burlington 9AM-5:30PM | Burlington 9AM-5:30PM |
| rden Burlington | OFF | Burlington 8:30AM-5PM | Burlington 8:30AM-5PM | Burlington 8:30AM-5PM | Burlington 8:30AM-5PM | Burlington 8:30AM-5PM | OFF |
| I Englehardt Burlington | OFF | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | OFF |
| Smith Portsmouth | Portsmouth 11AM-5PM | Portsmouth 8:30A-6:30P | Portsmouth 8:30A-6:30P | OFF | Portsmouth 8:30A-6:30P | Portsmouth 8:30AM-12:30P | Portsmouth 8:30A-7P |
| teau Portsmouth | OFF | Portsmouth 8:30A-5:30P | Portsmouth 8:30A-5:30P | Portsmouth 8:30A-5:30P | Portsmouth 8:30A-5:30P | Portsmouth 8:30A-5:30P | OFF |
| rshall Portsmouth | OFF | Portsmouth 8AM-4PM | Portsmouth 9AM-5PM | Portsmouth 9AM-5PM | Portsmouth 9AM-5PM | Portsmouth 8AM-4PM | OFF |
| Akins Ports./Burl. | OFF | Portsmouth 9AM-5:30PM | Burlington 9AM-5PM | Portsmouth 9AM-5:30PM | Portsmouth 9AM-5PM | Portsmouth 9AM-5:30PM | OFF |

EA 00140

# ETHAN ALLEN INC. - BOSTON DISTRICT - WEEKLY SCHEDULE 2003

| Week Ending 7/19 | SUNDAY 7/13 | MONDAY 7/14 | TUESDAY 7/15 | WEDS. 7/16 | THURSDAY 7/17 | FRIDAY 7/18 | SATURDAY 7/19 |
|---|---|---|---|---|---|---|---|
| nna Hamilton Franklin | OFF | Portsmouth Franklin | Franklin | Natick | Portsmouth | Natick | OFF |
| uann Starr Franklin | OFF | Burlington | Portsmouth | Burlington | Burlington | Burlington | OFF |
| y ..nks Franklin | OFF | VACATION | VACATION | VACATION | VACATION | VACATION | OFF |
| a Eldridge Franklin | OFF | Franklin 8AM-4:30PM | Franklin 8AM-4:30PM | Franklin 7:30AM-5PM | Franklin 8AM-4PM | Franklin 8AM-4:30PM | OFF |
| chael Dupelle Franklin | OFF | Franklin 8:30AM-5PM | Franklin 8:30AM-5PM | Franklin 8:30AM-5PM | Franklin 8:30AM-5PM | Franklin 8:30AM-5PM | OFF |
| i Holmes Franklin | OFF | Pittsburgh | Pittsburgh | Pittsburgh | Pittsburgh | Pittsburgh | OFF |
| nna Wilson-Curry Natick | Natick | Natick | Natick | Natick | Natick | Natick | Natick |
| y Finley Natick | OFF | OFF | OFF Comp.Day 7/4 | Natick 9:30AM-6PM | Natick 11AM-7PM | Natick 9:30AM-6PM | Natick 9AM-7PM |
| hie Fowler Natick | OFF | Natick 7:30AM-4PM | Natick 7:30AM-4PM | Natick 7:30AM-4PM | Natick 7:30AM-4PM | Natick 7:30AM-4PM | |
| ryl Harvey Natick | OFF | Natick 9:30A-6PM | Natick 9:30A-6PM | Natick 9:30A-6PM | Natick 9:30A-6PM | Natick 9:30A-6PM | OFF |
| jinia Klinefelter Natick/Quincy | OFF | Natick 9:30A-6PM | Natick 9:30A-6PM | Natick 9:30A-6PM | Natick 9:30A-6PM | Natick 9:30A-6PM | OFF |
| issy Boudreau Natick | OFF | Natick 9:30AM-5PM | Natick 9:30AM-5PM | Natick 9:30AM-5PM | Natick 9:30AM-5PM | Natick 9:30AM-5PM | OFF |
| i Greenberg Quincy | OFF | Quincy 8AM-5PM | Quincy 8AM-5PM | Quincy 8AM-5PM | Quincy 8AM-5PM | OFF | Quincy 8AM-6:30PM |
| ney McKay Quincy | OFF | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | OFF |
| al Quincy | OFF | Quincy | Quincy | Quincy | Quincy | Quincy | OFF |
| ny ..ith Burlington | Burlington 11:30A-5PM | Franklin 9AM-6PM | OFF | Burlington 9AM-6PM | OFF | Burlington 9AM-6PM | Burlington 8:30A-7P |
| ny Marshall Burlington | OFF | Burlington 9AM-6PM | Burlington 9AM-6PM | OFF | Burlington 9AM-6PM | Burlington 11:30A-8:30P | Burlington 8:30A-5:30P |
| I Borden Burlington | OFF | Burlington 8AM-5PM | Burlington 8AM-5PM | Burlington 8AM-5PM | Burlington 8AM-5PM | Burlington 8AM-5PM | OFF |
| uel Englehardt Burlington | OFF | Burlington 7:30A-4:30P | Burlington 7:30A-4:30P | Burlington 7:30A-4:30P | Burlington 7:30A-4:30P | Burlington 7:30A-4:30P | OFF |
| ryl Smith Portsmouth | OFF | Portsmouth 8:30A-6:30P | Portsmouth 8:30A-6:30P | Portsmouth 9AM-6:30PM | OFF | Portsmouth 8:30A-5:30P | Portsmouth 8:30A-5:30P |
| Fecteau Portsmouth | OFF | Portsmouth 10AM-6:30PM | Portsmouth 10AM-6:30PM | Portsmouth 9AM-5:30PM | Portsmouth 8:30AM-5PM | Portsmouth 8:30AM-5PM | OFF |
| Marshall Portsmouth | OFF | Portsmouth 8AM-4PM | Portsmouth 9AM-6PM | Portsmouth 9AM-5PM | Portsmouth 9AM-5PM | Portsmouth 8AM-4PM | OFF |
| n Atkins Ports./Burl. | OFF | VACATION | VACATION | VACATION | VACATION | VACATION | OFF |

# ETHAN ALLEN INC. - RETAIL DIVISION - WEEKLY SCHEDULE 2003

| Ending 7/26 | SUNDAY 7/20 | MONDAY 7/21 | TUESDAY 7/22 | WEDNESDAY 7/23 | THURSDAY 7/24 | FRIDAY 7/25 | SATURDAY 7/26 |
|---|---|---|---|---|---|---|---|
| Hamilton Franklin | OFF | Franklin | Burlington | Quincy | Natick | Natick Franklin | OFF |
| n Beier Franklin | OFF | Franklin | Portsmouth | Franklin | Burlington | Burlington | OFF |
| Franks Franklin | OFF | Franklin | NYC | NYC | Quincy Franklin | VACATION | OFF |
| Eldridge Franklin | OFF | Quincy 10-6 Snow 11/15 | Franklin 8AM-4PM | Franklin 8AM-4PM | Franklin 8AM-4PM | OFF | OFF |
| el Dupelle Franklin | OFF | Franklin 8:30AM-5PM | Franklin 8:30AM-5PM | Franklin 8:30AM-5PM | Franklin 8:30AM-5PM | Franklin 8:30AM-5PM | OFF |
| mes Franklin | OFF | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | OFF |
| Wilson-Curry Natick | Natick 11AM-6PM | Natick 9AM-6:30PM | Natick 9AM-5:30PM | Natick 12-8:30pm | Natick 9AM-6PM | OFF | OFF |
| nley Natick | OFF | OFF | OFF July 4th holiday | Natick 9:30A-6PM | Natick 12-8:30PM | Natick 9:30A-6PM | Natick 9AM-7PM |
| Fowler Natick | OFF | Natick 7:30AM-4PM | Natick 7:30AM-4PM | Natick 7:30AM-4PM | Natick 9:30-6PM | Natick 7:30AM-4PM | OFF |
| Harvey Natick | OFF | VACATION | VACATION | VACATION | VACATION | Natick 9:30-6:00 | OFF |
| a Klinefelter Natick/Quincy | OFF | Natick 9:30A-6PM | Quincy 9:30A-6PM | Natick 9:30A-6PM | Quincy 9:30A-6PM | Natick 9:30A-6PM | OFF |
| le Boudreau Natick | OFF | Quincy 9:30AM-5PM | Quincy 9:30AM-5PM | Natick 9:30AM-5PM | Natick 9:30AM-5PM | Quincy Natick | OFF |
| eenberg Quincy | Quincy 11:30AM-5PM | Quincy 8AM-5PM | Quincy 8AM-5PM | Quincy 8AM-5PM | OFF July 4th holiday | OFF | OFF |
| McKay Quincy | OFF | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | OFF |
| Quincy | OFF | Quincy | Quincy | Quincy | Quincy | Quincy | OFF |
| Smith Burlington | OFF | Burlington 9AM-6PM | Burlington 9AM-6PM | OFF | Burlington 9AM-6PM | Burlington 12-8:30PM | Burlington 9AM-7PM |
| Marshall Burlington | Burlington 11:30A-5PM | Burlington 9AM-6PM | Burlington 9AM-6PM | Burlington 9AM-6PM | OFF | OFF | OFF July 4th holiday |
| nden Burlington | OFF | Burlington 8AM-5PM | Burlington 8AM-5PM | Burlington 8AM-5PM | Burlington 8AM-5PM | Burlington 8AM-5PM | OFF |
| l Englehardt Burlington | OFF | Burlington 7:30A-4:30P | Burlington 7:30A-4:30P | Burlington 7:30A-4:30P | Burlington 7:30A-4:30P | Burlington 7:30A-4:30P | OFF |
| Smith Portsmouth | Portsmouth 12-5PM | Portsmouth 8:30A-6:30P | Portsmouth 8:30A-6:30P | Portsmouth 8:30A-6:30P | OFF | Portsmouth 8:30A-12:30P | Portsmouth 10AM-7PM |
| eau Portsmouth | OFF | VACATION | VACATION | VACATION | VACATION | VACATION | OFF |
| rshall Portsmouth | OFF | Portsmouth 8AM-4PM | Portsmouth 9AM-5PM | Portsmouth 9AM-5PM | Portsmouth 9AM-5PM | Portsmouth 8AM-4PM | OFF |
| kine Ports./Burl. | OFF | Burlington 9AM-5:30PM | Burlington 9AM-5:30PM | Burlington 9AM-5:30PM | Portsmouth 9AM-5PM | Portsmouth 9AM-5PM | OFF |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

EA 00142

# ETHAN ALLEN INC. - RETAIL DIVISION - WEEKLY SCHEDULE 2003

| Ending 8/2 | SUNDAY 7/27 | MONDAY 7/28 | TUESDAY 7/29 | WEDNESDAY 7/30 | THURSDAY 7/31 | FRIDAY 8/1 | SATURDAY 8/2 |
|---|---|---|---|---|---|---|---|
| a Hamilton Franklin | OFF | Franklin | Portsmouth | Natick | Danbury | Natick Franklin | OFF |
| m Starr Franklin | OFF | Franklin | Quincy | Burlington | Danbury | Franklin | OFF |
| Franke Franklin | OFF | Franklin | Portsmouth | Natick | VACATION | VACATION | OFF |
| Eldridge Franklin | OFF | Franklin 8AM-4:30PM | Franklin 8AM-4:30PM | Franklin 8AM-4:30PM | Franklin 8AM-4:30PM | Franklin 8AM-4:30PM | OFF |
| al Dupelle Franklin | OFF | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | OFF |
| olmes Franklin | OFF | Franklin 8:30A-5PM | Quincy 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | OFF |
| a Wilson-Curry Natick | OFF | OFF | Natick 8:30A-5:30P | Natick 10A-8:30PM | Natick 7:30A-8:30PM | Natick 8:30A-5:30P | Natick 9AM-6PM |
| Finley Natick | Natick 12-5PM | Natick 12-8:30PM | OFF | Natick 10AM-8:30PM | Natick 7:30A-8:30PM | OFF | Natick 9AM-5:30PM |
| a Fowler Natick | OFF | Natick 7:30AM-4PM | Natick 7:30AM-4PM | Natick 7:30AM-3PM | Natick 7:30AM-4PM | Natick 7:30AM-4PM | OFF |
| t Harvey Natick | OFF | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM | OFF |
| la Klinefelter Natick/Quincy | OFF | Natick 9:30AM-6PM | Quincy 9:30AM-6PM | Natick 9:30AM-6PM | Quincy 9:30AM-6PM | Natick 9:30AM-6PM | OFF |
| y Boudreau Natick | OFF | Quincy 9:30AM-5PM | Quincy 9:30AM-5PM | Natick 9:30AM-5PM | Natick 9:30AM-5PM | Quincy Natick | OFF |
| reenberg Quincy | OFF | Quincy 8AM-5PM | Quincy 8AM-5PM | Quincy 8AM-5PM | Quincy 8AM-5PM | OFF | Quincy 8AM-6:30PM |
| y McKay Quincy | OFF | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | OFF |
| Quincy | OFF | Quincy | Quincy | Quincy | Quincy | Quincy | OFF |
| Sm... Burlington | Burlington 11:30-5PM | Burlington 9AM-6PM | Burlington 9AM-6PM | Burlington 9AM-8:30PM | OFF | OFF | OFF COMP. DAY |
| Marshall Burlington | OFF | Burlington 9AM-6PM | OFF | Burlington 12PM-8:30PM | Burlington 8AM-6PM | Burlington 9AM-6PM | Burlington 9AM-5:30PM |
| orden Burlington | OFF | Burlington 8AM-4:30PM | Burlington 8AM-4:30PM | Burlington 8AM-4:30PM | Burlington 8AM-4:30PM | Burlington 8AM-4:30PM | OFF |
| l Englehardt Burlington | OFF | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | OFF |
| Smith Portsmouth | OFF | Portsmouth 8:30A-6:30P | Portsmouth 8:30A-2:30P | Portsmouth 8:30A-8PM | Portsmouth 8:30A-6:30P | Portsmouth 8:30A-5:30P | Portsmouth 8:30A-12:30P |
| eau Portsmouth | OFF | Portsmouth 8:30A-5:30P | Portsmouth 8:30A-6:30P | Portsmouth 8:30A-5:30P | Portsmouth 8:30A-5:30P | OFF | Portsmouth 8:30A-5:30P |
| rshall Portsmouth | OFF | Portsmouth 8AM-4PM | Portsmouth 9AM-5PM | Portsmouth 9AM-5PM | Portsmouth 9AM-5PM | Portsmouth 8AM-4PM | OFF |
| lkins Ports./Burl. | OFF | Portsmouth 9AM-5PM | Portsmouth 9AM-5PM | Portsmouth 9AM-5PM | Burlington 9AM-5:30PM | Burlington 9AM-5:30PM | OFF |

EA 00143

# ETHAN ALLEN INC. - RETAIL DIVISION - WEEKLY SCHEDULE 2003

| | SUNDAY 6/1 | MONDAY 6/2 | TUESDAY 6/3 | WEDNESDAY 6/4 | THURSDAY 6/5 | FRIDAY 6/6 | SATURDAY 6/7 |
|---|---|---|---|---|---|---|---|
| Hamilton / Franklin | OFF | Franklin | Quincy | Burlington | Franklin Natick | Natick | OFF |
| nn Starr / Franklin | OFF | OFF | OFF | OFF | OFF | OFF | OFF |
| Franks / Franklin | OFF | LONG ISLAND | LONG ISLAND | LONG ISLAND | LONG ISLAND | LONG ISLAND | OFF |
| Eldridge / Franklin | OFF | Franklin 7AM-3PM | Franklin 7AM-3PM | Franklin 7AM-3PM | Franklin 7AM-3PM | Franklin 7AM-3PM | OFF |
| sl Dupelle / Franklin | OFF | Franklin 8:30AM-5PM | Natick Franklin | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30AM-5PM | OFF |
| olmes / Franklin | OFF | Franklin 8AM-4:30PM | Franklin 8AM-4:30PM | Franklin 8AM-4:30PM | Franklin 8AM-4:30PM | Franklin 8AM-4:30PM | OFF |
| Smith / Natick | Natick 11:30A-5PM | Natick 8AM-6PM | Natick 11:30A-8:30P | Natick 11:30A-8:30P | OFF | OFF | Natick 8:30AM-7PM |
| Finley / Natick | Natick 12PM-5PM | OFF | OFF | Natick 9AM-6PM | Natick 12PM-8:30PM | Natick 9AM-6PM | OFF HOLIDAY |
| Fowler / Natick | OFF | Natick 7:30AM-4PM | Natick 7:30AM-4PM | Natick 7:30AM-4PM | Natick 7:30AM-4PM | Natick 7:30AM-4PM | OFF |
| Harvey / Natick | OFF | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM | OFF |
| la Klinefelter / Natick/Quincy | OFF | Natick 9:30AM-6PM | Quincy 9:30AM-6PM | Natick 9:30AM-6PM | Quincy 9:30AM-6PM | Natick 9:30AM-6PM | OFF |
| Schramek / Natick | Maternity leave | Maternity leave | Maternity leave | Maternity leave | Maternity leave | Maternity leave | Maternity leave |
| reenberg / Quincy | OFF | Quincy 8AM-5PM | Quincy 8AM-5PM | Quincy 8AM-5PM | Quincy 8AM-5PM | OFF | Quincy 8AM-6:30PM |
| y McKay / Quincy | OFF | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Vacation | OFF |
| y Boudreau / Quincy | OFF | Quincy 9:30AM-5PM | Natick 9:30AM-5PM | Quincy 9:30AM-5PM | Quincy 9:30AM-5PM | Natick 9:30AM-5PM | OFF |
| Sl... / Burlington | Burlington | Burlington | Burlington | Burlington | Burlington | Burlington | Burlington |
| Marshall / Burlington | OFF | Burlington 9AM-5:30PM | Burlington 10AM-6:30PM | Burlington 9AM-5:30PM | OFF | Burlington 9AM-5:30PM | Burlington 8:3DAM-5PM |
| Kyricos / Burlington | OFF | Burlington 8AM-4:30PM | Burlington 8AM-4:30PM | Burlington 8AM-4:30PM | Burlington 8AM-4:30PM | Burlington 8AM-4:30PM | OFF |
| l Englehardt / Burlington | OFF | Burlington 7:30AM-4PM | Natick 9:30AM-5PM | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | OFF |
| Smith / Portsmouth | Portsmouth 11AM-5PM | Portsmouth 10AM-6PM | OFF | Portsmouth 10AM-6PM | OFF | Portsmouth 12PM-8PM | Portsmouth 8:30AM-7PM |
| seau / Portsmouth | OFF | Portsmouth 8:30AM-4:30PM | Portsmouth 10AM-6PM | OFF | Portsmouth 8:30AM-4:30PM | Portsmouth 8AM-4PM | Portsmouth 8:30AM-4PM |
| rshall / Portsmouth | OFF | Portsmouth 9AM-5PM | Natick 9:30AM-5PM | Portsmouth 9AM-5PM | Portsmouth 9AM-5PM | Portsmouth 9AM-5PM | OFF |
| tkins / Ports./Burl. | OFF | Burlington 9AM-5:30PM | Portsmouth 9AM-5PM | Burlington 9AM-5:30PM | Portsmouth 9AM-5PM | Burlington 9AM-5:30PM | OFF |

June 4 times late

EA 00144

# ETHAN ALLEN INC. - RETAIL DIVISION - WEEKLY SCHEDULE 2003

| Name / Location | | | | | | | |
|---|---|---|---|---|---|---|---|
| enna Hamilton<br>Franklin | OFF | Franklin | Portsmouth | Natick<br>Franklin | Franklin<br>Quincy | Natick | OFF |
| ousan Starr<br>Franklin | OFF | OFF | OFF | OFF | Burlington | Burlington | OFF |
| my Franks<br>Franklin | OFF | PHILADELPHIA | PHILADELPHIA | PHILADELPHIA | PHILADELPHIA | PHILADELPHIA | OFF |
| ike Eldridge<br>Franklin | OFF | Franklin<br>8AM-5PM | Franklin<br>8AM-4PM | Franklin<br>7:30AM-4PM | JURY<br>DUTY | Franklin<br>7AM-3:30PM | OFF |
| ichael Dupelle<br>Franklin | OFF | Franklin<br>8:30AM-5PM | Franklin<br>8:30AM-5PM | Franklin<br>8:30A-5PM | Franklin<br>8:30A-5PM | Franklin<br>8:30A-5PM | OFF |
| ill Holmes<br>Franklin | OFF | Franklin<br>Burlington | Franklin<br>8AM-4:30PM | Franklin<br>8AM-4:30PM | Franklin<br>8AM-4:30PM | Burlington<br>8AM-4:30PM | OFF |
| athy Smith<br>Natick | Natick<br>11:30AM-5PM | Natick<br>9:30AM-6PM | OFF | Natick<br>11:30AM-8:30PM | Natick<br>11:30AM-8:30PM | OFF | Natick<br>9AM-7PM |
| my Finley<br>Natick | OFF | OFF | Natick<br>9AM-5:30PM | Natick<br>9AM-5:30PM | Natick<br>12PM-8:30PM | OFF<br>HOLIDAY | Natick<br>9AM-5:30PM |
| uthie Fowler<br>Natick | OFF | Natick<br>7:30A-4PM | Natick<br>7:30AM-4PM | Natick<br>7:30AM-4PM | Natick<br>7:30AM-4PM | Natick<br>7:30AM-4PM | OFF |
| heryl Harvey<br>Natick | OFF | Natick<br>9:30A-6PM | OFF<br>HOLIDAY | OFF<br>PERSONAL | Natick<br>9:30A-6PM | Natick<br>9:30A-6PM | OFF |
| rginia Klinefelter<br>Natick | OFF | Natick<br>9:30A-6PM | Natick<br>9:30A-6PM | Natick<br>9:30A-6PM | Natick<br>9:30A-6PM | Natick<br>9:30-6PM | OFF |
| arcy Schramek<br>Natick | Maternity<br>leave | Maternity<br>leave | Maternity<br>leave | Maternity<br>leave | Maternity<br>leave | Maternity<br>leave | Maternity<br>leave |
| sa Greenberg<br>Quincy | OFF | Quincy<br>8AM-5PM | Quincy<br>8AM-5PM | Quincy<br>8AM-5PM | Quincy<br>9AM-9PM | OFF | Quincy<br>8AM-6:30PM |
| arney McKay<br>Quincy | OFF | Quincy<br>7:30AM-4PM | Quincy<br>7:30AM-4PM | Quincy<br>7:30AM-4PM | Quincy<br>7:30AM-4PM | Quincy<br>7:30AM-4PM | OFF |
| arl Boudreau<br>Quincy | OFF | Quincy<br>9:30AM-5PM | Quincy<br>9:30AM-5PM | Quincy<br>9:30AM-5PM | JURY<br>DUTY | Quincy<br>9:30AM-5PM | OFF |
| eneral Manager<br>Burlington | Burlington | Burlington | Burlington | Burlington | Burlington | Burlington | Burlington |
| my Marshall<br>Burlington | Burlington<br>11AM-5PM | Burlington<br>9AM-5:30PM | Burlington<br>10AM-8:30PM | OFF | Burlington<br>12PM-8:30PM | OFF | Burlington<br>8:30AM-5PM |
| anne Kyricos<br>Burlington | OFF | Burlington<br>8AM-4:30PM | Burlington<br>8AM-4:30PM | Burlington<br>8AM-4:30PM | Burlington<br>8AM-4:30PM | Burlington<br>8AM-4:30PM | OFF |
| chael Englehardt<br>Burlington | OFF | Burlington<br>7:30AM-4PM | Burlington<br>7:30AM-4PM | Burlington<br>7:30AM-4PM | Burlington<br>12PM-8:30PM | Burlington<br>7:30AM-4PM | OFF |
| eryl Smith<br>Portsmouth | OFF | Portsmouth<br>8:30A-6:30P | OFF | Portsmouth<br>8:30A-6:30P | Portsmouth<br>8:30A-8:30P | Portsmouth<br>12:30P-8:30P | Portsmouth<br>8:30P-7P |
| t Fecteau<br>Portsmouth | OFF | Portsmouth<br>10A-6:30P | Portsmouth<br>10A-6:30P | OFF | Portsmouth<br>10:30A-8:30P | Portsmouth<br>8:30A-5PM | OFF<br>HOLIDAY |
| b Marshall<br>Portsmouth | OFF | Portsmouth<br>8AM-4PM | Portsmouth<br>9AM-5PM | Portsmouth<br>9AM-5PM | Portsmouth<br>9AM-5PM | Portsmouth<br>8AM-4PM | OFF |
| ren Atkins<br>Ports./Burl. | OFF | Portsmouth<br>9AM-5PM | Burlington<br>9AM-5:30PM | Natick<br>9AM-5PM | Burlington<br>10:30A-8:30P | Portsmouth<br>9AM-5PM | OFF |

EA 00145

## ETHAN ALLEN INC. - BOSTON DISTRICT - WEEKLY SCHEDULE 2003

| Employee / Location | | | | | | | |
|---|---|---|---|---|---|---|---|
| Donna Hartshall / Franklin | | | | | | | OFF |
| Louann Starr / Franklin | OFF | Burlington | Burlington | Burlington | Burlington | Burlington | OFF |
| Amy Franks / Franklin | OFF | Franklin | Burlington | Burlington | Atlanta | Atlanta | OFF |
| Mike Eldridge / Franklin | OFF | Franklin 8AM-4PM | Franklin 8AM-4:30PM | Franklin 8AM-4:30PM | Franklin 8AM-4PM | Franklin 7:30A-3:30P | OFF |
| Michael Dupelle / Franklin | OFF | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | OFF |
| Bill Holmes / Franklin | OFF | Franklin 8AM-4:30PM | OFF | Franklin 8AM-4:30PM | Franklin 8AM-4:30PM | Franklin 8AM-4:30PM | OFF |
| Donna Wilson-Curry / Natick | OFF | Franklin | Burlington | Burlington | Atlanta | Atlanta | Natick |
| Amy Finley / Natick | Natick 11:30A-5PM | OFF | OFF | Natick 9:30A-6PM | Natick 12P-8:30P | Natick 9:30A-6PM | Natick 9AM-5:30PM |
| Ruthie Fowler / Natick | OFF | Natick 7:30AM-4PM | Natick 7:30AM-4PM | Natick 7:30AM-4PM | Burlington 7:30AM-4PM | Natick 7:30AM-4PM | OFF |
| Cheryl Harvey / Natick | OFF | Natick 9:30A-6PM | Natick 9:30A-6PM | Natick 9:30A-6PM | Natick 9:30A-6PM | Natick 9:30A-6PM | OFF |
| Virginia Klinefelter / Natick/Quincy | OFF | Natick 9:30A-6PM | Quincy 9:30A-6PM | Natick 9:30A-6PM | Quincy 9:30A-6PM | Natick 9:30A-6PM | OFF |
| Darcy Schramek / Natick | Maternity leave | Maternity leave | Maternity leave | Maternity leave | Maternity leave | Maternity leave | Maternity leave |
| Lisa Greenberg / Quincy | Quincy 11AM-5:30PM | Quincy 8AM-5PM | OFF | Quincy 8AM-5PM | Atlanta | Atlanta | OFF |
| Tierney McKay / Quincy | OFF | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | OFF |
| Chrisey Boudreau / Quincy | OFF | Quincy 9AM-5PM | Quincy 9AM-5PM | Quincy 9AM-5PM | Quincy 9AM-5PM | Quincy 9AM-5PM | OFF |
| Kathy Smith / Burlington | OFF | Natick 9:30PM-6PM | Burlington 11:30A-8:30P | Burlington 9:30A-1:30P | Atlanta | Atlanta | Natick 9AM-7PM |
| Jenny Marshall / Burlington | OFF | OFF | Burlington 12PM-8:30P | Burlington 9AM-5:30PM | Atlanta | Atlanta | Burlington 8:30AM-5PM |
| Suzi Borden / Burlington | OFF | Burlington 8:30AM-5PM | Burlington 8:30AM-5PM | Burlington 8:30AM-5PM | Burlington 8:30AM-5PM | Burlington 8:30AM-5PM | OFF |
| Michael Englehardt / Burlington | OFF | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | OFF |
| Sheryl Smith / Portsmouth | Portsmouth 11:30AM-5PM | Portsmouth 8:30A-6:30PM | Portsmouth 9:30A-8:30A | OFF | Atlanta | Atlanta | Portsmouth 8:30AM-7PM |
| Pat Fecteau / Portsmouth | OFF | Portsmouth 10AM-6:30PM | Portsmouth 8:30A-6:30P | Portsmouth 10AM-6:30PM | Portsmouth 8:30A-5PM | Portsmouth 8:30A-5PM | OFF |
| Bob Marshall / Portsmouth | OFF | Portsmouth 8AM-4PM | Portsmouth 9AM-5PM | Portsmouth 9AM-5PM | Portsmouth 9AM-5PM | Portsmouth 8AM-5PM | OFF |
| Karen Atkins / Ports./Burl. | OFF | Burlington 9AM-5:30PM | Portsmouth 9AM-5PM | Burlington 9AM-5:30PM | Portsmouth 9AM-5PM | Burlington 9AM-5:30PM | OFF |

EA 00146

## ETHAN ALLEN INC. - RETAIL DIVISION - WEEKLY SCHEDULE 2003

| Ending 6/28 | SUNDAY 6/22 | MONDAY 6/23 | TUESDAY 6/24 | WEDNESDAY 6/25 | THURSDAY 6/26 | FRIDAY 6/27 | SATURDAY 6/28 |
|---|---|---|---|---|---|---|---|
| Hamilton<br>Franklin | OFF | Franklin | Portsmouth | Quincy | Burlington | Natick<br>Franklin | OFF |
| Starr<br>Franklin | OFF | Franklin | Burlington | Portsmouth | Portsmouth | Burlington | OFF |
| ranks<br>Franklin | OFF | Franklin | Franklin | Natick | Burlington | Burlington | OFF |
| idridge<br>Franklin | OFF | Franklin<br>7AM-3:30PM | Franklin<br>8AM-4:30PM | Franklin<br>8AM-4:30PM | Franklin<br>7:30AM-4PM | Franklin<br>6:30AM-2:30P | OFF |
| Dupelle<br>Franklin | OFF | Franklin<br>8:30A-5PM | Portsmouth<br>Franklin | Quincy<br>Franklin | Burlington<br>Franklin | Natick<br>Franklin | OFF |
| imes<br>Franklin | OFF | Franklin<br>8:30A-5PM | Franklin<br>8:30A-5PM | Franklin<br>8:30A-5PM | Franklin<br>8:30A-5PM | Franklin<br>8:30A-5PM | OFF |
| Wilson-Curry<br>Natick | OFF | Natick | Natick | Franklin | Burlington | Natick | OFF |
| nley<br>Natick | OFF | OFF | Natick<br>9AM-6PM | Natick<br>9AM-6PM | Natick<br>11:30A-8:30P | Natick<br>9AM-6PM | Natick<br>9AM-5:30PM |
| Fowler<br>Natick | OFF | Natick<br>7:30AM-4PM | Natick<br>7:30AM-4PM | Natick<br>7:30AM-4PM | Natick<br>7:30AM-4PM | Natick<br>7:30AM-4PM | OFF |
| Harvey<br>Natick | OFF | Natick<br>9:30A-6PM | Natick<br>9:30A-6PM | Natick<br>9:30A-6PM | Natick<br>9:30A-6PM | Natick<br>9:30A-6PM | OFF |
| Klinefelter<br>Natick/Quincy | OFF | Quincy<br>9:30A-6PM | Natick<br>9:30A-6PM | Quincy<br>9:30A-6PM | Natick<br>9:30A-6PM | Quincy<br>9:30A-6PM | OFF |
| Schramek<br>Natick | Maternity<br>leave | Maternity<br>leave | Maternity<br>leave | Maternity<br>leave | Maternity<br>leave | Maternity<br>leave | Maternity<br>leave |
| enberg<br>Quincy | OFF | Quincy<br>8AM-5PM | Quincy<br>8AM-5PM | Quincy<br>8AM-5PM | Quincy<br>Burlington | OFF | OFF |
| McKay<br>Quincy | OFF | Quincy<br>7:30AM-4PM | Quincy<br>7:30AM-4PM | Quincy<br>7:30AM-4PM | Quincy<br>7:30AM-4PM | Quincy<br>7:30AM-4PM | OFF |
| Boudreau<br>Quincy | OFF | Quincy<br>9AM-5PM | Quincy<br>9AM-5PM | Quincy<br>9AM-5PM | Quincy<br>9AM-5PM | Quincy<br>9AM-5PM | OFF |
| Smith<br>Burlington | Burlington<br>12PM-5PM | Burlington<br>9AM-6PM | Burlington<br>9AM-6PM | OFF | OFF | Burlington<br>11:30a-8:30p | Burlington<br>9AM-7PM |
| Marshall<br>Burlington | Burlington<br>11AM-5PM | Burlington<br>9AM-5:30PM | Burlington<br>10AM-8:30PM | Burlington<br>9AM-5:30PM | Personal Day | OFF | OFF |
| rden<br>Burlington | OFF | Burlington<br>8:30AM-5PM | Burlington<br>8:30AM-5PM | Burlington<br>8:30AM-5PM | Burlington<br>8:30AM-5PM | Burlington<br>8:30AM-5PM | OFF |
| Englehardt<br>Burlington | OFF | Burlington<br>7:30AM-4PM | Natick<br>7:30AM-4PM | Burlington<br>7:30AM-4PM | Burlington<br>7:30AM-4PM | Burlington<br>7:30AM-4PM | OFF |
| Smith<br>Portsmouth | OFF | Portsmouth<br>8:30A-6:30P | Portsmouth<br>8:30A-6:30P | Portsmouth<br>8:30A-6:30P | Portsmouth<br>8:30A-6:30P | Portsmouth<br>12:30p-8:30p | Portsmouth<br>8:30A-5:30P |
| teau<br>Portsmouth | OFF | Portsmouth<br>10AM-5:30PM | Portsmouth<br>10AM-5:30PM | Portsmouth<br>10AM-5:30PM | Portsmouth<br>8:30A-5:30P | Portsmouth<br>8:30A-5:30P | OFF |
| rshall<br>Portsmouth | OFF | Portsmouth<br>8AM-4PM | Portsmouth<br>9AM-5PM | Portsmouth<br>9AM-5PM | Portsmouth<br>9AM-5PM | Portsmouth<br>8AM-4PM | OFF |
| Atkins<br>Ports./Burl. | OFF | Portsmouth<br>9AM-5PM | Portsmouth<br>9AM-5:30PM | Portsmouth<br>9AM-5PM | Portsmouth<br>9AM-5:30PM | Portsmouth<br>9AM-5PM | OFF |

EA 00147

May 2003

## ETHAN ALLEN INC. - RETAIL DIVISION - WEEKLY SCHEDULE 2003

| Ending 5/03 | SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|---|
| Hamilton Franklin | OFF | Franklin | Quincy | Natick | Portsmouth Burlington | Franklin Natick | OFF |
| Starr Franklin | OFF | Franklin 8:30AM-5PM | Quincy 10:30A-7PM | Franklin 8:30A-5:30P | Natick 9AM-5:30PM | Franklin 8:30A-5PM | OFF |
| ranks Franklin | OFF | Natick | Quincy | OFF | Natick | Chamber Home Show | Natick |
| Idridge Franklin | OFF | Franklin 6:30A-2:30PM | Franklin 7:30a-4:00P | Franklin 6:30A-2:30PM | Franklin 7:30AM-4PM | Franklin 7AM-3PM | OFF |
| Dupelle Franklin | OFF | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | OFF |
| Imes Franklin | OFF | Franklin 8AM-4:30PM | Franklin 8AM-4:30PM | Franklin 8AM-4:30PM | OFF Easter | Franklin 8AM-4:30PM | OFF |
| Smith Natick | Natick 9AM-5:30PM | Natick 9:30A-8:30P | Natick 9:30A-8:30P | Natick 11:30A-8:30A | OFF | OFF | OFF comp. Day |
| nley Natick | OFF | Natick 9AM-5PM | OFF | Vacation | Vacation | Vacation | Vacation |
| Fowler Natick | OFF | Natick 7:30A-4PM | Natick 7:30AM-4PM | Natick 7:30AM-4PM | Natick 7:30AM-4PM | Natick 7:30AM-4PM | OFF |
| Harvey Natick | OFF | Natick 9:30A-6PM | Natick 9:30A-6PM | Natick 9:30A-6PM | Natick 9:30A-6PM | Natick 9:30A-6PM | OFF |
| Klinefelter Natick/Quincy | OFF | Natick 9:30A-6PM | Natick 9:30A-6PM | Workroom Natick | Quincy 9:30A-6PM | Natick 9:30A-6PM | OFF |
| Schramek Natick | Maternity leave | Maternity leave | Maternity leave | Maternity leave | Maternity leave | Maternity leave | Maternity leave |
| enberg Quincy | Quincy 11AM-5PM | Quincy 8AM-5PM | Quincy 8AM-5PM | Quincy 8AM-5PM | Quincy OFF | Quincy OFF | Quincy 8AM-6PM |
| McKay Quincy | OFF | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | OFF |
| Boudreau Quincy | OFF | Quincy 9AM-5PM | Natick 9AM-5PM | Natick 9AM-5PM | Quincy 9AM-5PM | Quincy 9AM-5PM | OFF |
| Maneger Burlington | Burlington | Burlington | Burlington | Burlington | Burlington | Burlington | Burlington |
| Marshall Burlington | OFF | Burlington 8AM-4:30PM | Burlington 12P-8:30P | Burlington 9A-5:30P | OFF | Burlington 9A-5:30P | Burlington 8:30A-5P |
| Kyricos Burlington | OFF | OFF Holiday | Burlington 8AM-4:30PM | Burlington 8AM-4:30PM | Burlington 8AM-4:30PM | Burlington 8AM-4:30PM | OFF |
| Englehardt Burlington | OFF | Burlington 7:30AM-4PM | Natick 7:30AM-4PM | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | OFF |
| Smith Portsmouth | Portsmouth 11:30A-5:30P | Portsmouth 8:30A-6:30P | Portsmouth 8:30A-6:30P | Portsmouth 8:30A-2:30P | OFF | Portsmouth 12:30A-8:30P | Portsmouth 8:30A-7:30P |
| eau Portsmouth | OFF | OFF | Portsmouth 10A-6:30P | Portsmouth 10A-6:30P | Portsmouth 8:30A-5PM | Portsmouth 8:30A-5PM | OFF Holiday |
| rshall Portsmouth | OFF | OFF Holiday | Portsmouth 9AM-5PM | Portsmouth 9AM-5PM | Portsmouth 9AM-5PM | Natick 9AM-5PM | OFF |
| Atkins Ports./Burl. | OFF | Portsmouth 9AM-5PM | Burlington 9AM-5PM | Portsmouth 9AM-5PM | Burlington 9AM-5PM | Portsmouth 9AM-5PM | OFF |

MAY 5 times late

## ETHAN ALLEN INC. - RETAIL DIVISION - WEEKLY SCHEDULE 2003

| ending:8/10 | SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|---|
| Hamilton Franklin | OFF | Franklin | Natick | Franklin | Franklin | OFF Holiday | OFF |
| Starr Franklin | OFF | Franklin 8:30AM-5PM | Franklin 8:30AM-5PM | Franklin 8:30A-5PM | Franklin 9:30AM-6PM | Franklin 9AM-5:30PM | OFF |
| anks Franklin | OFF | OFF | Burlington | Burlington | Franklin | Natick | OFF |
| dridge Franklin | OFF | Franklin 6:30AM-2:30PM | Franklin 7:30AM-4:00PM | Franklin 6:30AM-2:30PM | Franklin 7:30AM-4PM | Franklin 7AM-3PM | OFF |
| Dupelle Franklin | OFF | Franklin 8:30AM-5PM | Franklin 8:30AM-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | OFF |
| mes Franklin | OFF | Franklin 8AM-4:30PM | OFF | OFF | OFF | Franklin 8AM-4:30PM | OFF |
| Smith Natick | OFF | Natick 8:30A-8:30P | Natick 11:30A-8:30P | Natick 11:30A-8:30P | OFF | Natick 11:30A-8:30P | Natick |
| nley Natick | OFF | OFF | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM |
| Fowler Natick | OFF | Natick 7:30AM-4PM | Natick 7:30AM-4PM | Natick 7:30AM-4PM | Natick 7:30AM-4PM | Natick 7:30AM-4PM | OFF |
| Harvey Natick | OFF | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM | OFF |
| Klinefelter Natick/Quincy | OFF | Natick 9:30AM-6PM | Quincy 9:30AM-6PM | Natick 9:30AM-6PM | Quincy 9:30AM-6PM | Natick 9:30AM-6PM | OFF |
| Schramek Natick | Maternity leave | Maternity leave | Maternity leave | Maternity leave | Maternity leave | Maternity leave | Maternity leave |
| eenberg Quincy | Quincy 11am-5pm | Quincy 8am-5pm | Quincy 8am-5pm | OFF | Quincy 8am-5pm | OFF | Quincy 8:30A-6:30P |
| McKay Quincy | OFF | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | OFF |
| Boudreau Quincy | OFF | Quincy 9:30AM-5PM | Quincy 9:30AM-5PM | Quincy 9:30AM-5PM | Quincy 9:30AM-5PM | Quincy 9:30AM-5PM | OFF |
| Manager Burlington | Burlington | Burlington | Burlington | Burlington | Burlington | Burlington | Burlington |
| Marshall Burlington | Burlington 11AM-5PM | Burlington 9AM-5:30PM | Burlington 10AM-8:30PM | OFF | OFF | Burlington 9AM-5:30PM | Burlington 8:30AM-5PM |
| Kyricos Burlington | OFF | Burlington 8AM-4:30PM | Burlington 8AM-4:30PM | Burlington 8AM-4:30PM | Burlington 8AM-4:30PM | Burlington 8AM-4:30PM | OFF |
| Englehardt Burlington | OFF | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | OFF |
| Smith Portsmouth | Portsmouth 11:30A-5PM | Portsmouth 8:30AM-6:30PM | Portsmouth 8:30AM-12PM | Portsmouth 8:30AM-6:30PM | OFF | Portsmouth 12:30P-8:30P | Portsmouth 8:30A-7PM |
| teau Portsmouth | OFF | Portsmouth 10AM-6:30PM | Portsmouth 10AM-6:30PM | OFF | Portsmouth 9:30AM-6:30PM | Portsmouth 9:30AM-5PM | Portsmouth 8:30AM-4PM |
| rshall Portsmouth | OFF | Portsmouth 8AM-4PM | Portsmouth 9AM-5PM | Portsmouth 9AM-5PM | Portsmouth 9AM-5PM | Portsmouth 8AM-4PM | OFF |
| Atkins Ports./Burl. | OFF | Burlington 9AM-5:30PM | Portsmouth 9AM-5PM | Burlington 9AM-5:30PM | Portsmouth 9AM-5PM | Burlington 9AM-5:30PM | OFF |

EA 00149

## ETHAN ALLEN INC. - RETAIL DIVISION - WEEKLY SCHEDULE 2003

| | SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|---|
| Hamilton Franklin | OFF | Franklin | Burlington | on road with Delivery | Natick Franklin | Natick | OFF |
| Starr Franklin | OFF | Franklin 8:30AM-5PM | Burlington 9:30AM-6PM | Quincy 10:30AM-7PM | Franklin 8:30AM-5PM | Burlington 9AM-5:30PM | OFF |
| anks Franklin | OFF | Franklin | Burlington | Natick | Portsmouth | Portsmouth | Natick meeting |
| dridge Franklin | OFF | Franklin 6:30A-2:30P | Franklin 7:30AM-4PM | Franklin 6:30A-2:30P | Franklin 7:30AM-4PM | Franklin 7AM-3PM | OFF |
| Dupelle Franklin | OFF | Franklin 8:30AM-5PM | Franklin 8:30AM-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | OFF |
| mes Franklin | OFF | Franklin 8AM-4:30PM | Franklin 8AM-2PM | Franklin 8AM-4:30PM | Franklin 8AM-4:30PM | Franklin 8AM-4:30PM | OFF |
| mith Natick | Natick 11AM-5PM | Natick 9:30A-8:30P | OFF | OFF | Natick 9:30A-6PM | Natick 11:30A-8:30P | Natick 9AM-7PM |
| nley Natick | OFF | OFF | Natick 9:30A-6PM | Natick 9:30A-6PM | Natick 12PM-8:30PM | Natick 9:30A-6PM | Natick 9AM-5:30PM |
| Fowler Natick | OFF | Natick 7:30A-4PM | Natick 7:30A-4PM | Natick 7:30A-4PM | Natick 7:30A-4PM | Natick 7:30AM-4PM | OFF |
| Harvey Natick | OFF | Natick 9:30A-6PM | Natick 9:30A-6PM | Natick 9:30AM-Noon | Natick 9:30A-6PM | Natick 9:30A-6PM | OFF |
| Klinefelter Natick/Quincy | OFF | Natick 9:30A-6PM | Natick 9:30A-6PM | Natick 9:30A-6PM | Natick 9:30A-6PM | Natick 9:30-6PM | OFF |
| chramek Natick | Maternity leave | Maternity leave | Maternity leave | Maternity leave | Maternity leave | Maternity leave | Maternity leave |
| enberg Quincy | OFF | Quincy 8AM-5PM | Quincy 8AM-5PM | Quincy 8AM-5PM | Quincy 8AM-5PM | OFF | Quincy 8:30A-6:30P |
| McKay Quincy | OFF | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | OFF |
| Boudreau Quincy | OFF | Quincy 9:30AM-5PM | Quincy 9:30AM-5PM | Quincy 9:30AM-5PM | Natick 9:30AM-5PM | Natick 9:30AM-5PM | OFF |
| Manager Burlington | Burlington | Burlington | Burlington | Burlington | Burlington | Burlington | Burlington |
| arshall Burlington | Burlington 11AM-5PM | Burlington 9AM-5:30PM | Burlington 10AM-8:30PM | OFF | OFF | Burlington 9AM-5:30PM | Burlington 8:30AM-5PM |
| Kyricos Burlington | OFF | Burlington 8AM-4:30PM | Burlington 8AM-4:30PM | Burlington 8AM-4:30PM | Burlington 8AM-4:30PM | Burlington 8AM-4:30PM | OFF |
| Englehardt Burlington | OFF | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | OFF |
| mith Portsmouth | OFF | Portsmouth 8:30A-6:30P | Portsmouth 8:30A-6:30P | Portsmouth 8:30A-6:30P | OFF | Portsmouth 12:30P-8:30P | Portsmouth 8:30A-7:30P |
| eau Portsmouth | OFF | Portsmouth 10A-6:30P | Portsmouth 10A-6:30P | OFF | Portsmouth 9:30A-5:30P | Portsmouth 9:30A-5:30P | OFF HOLIDAY |
| rshall Portsmouth | OFF | Portsmouth 8AM-4PM | Portsmouth 9AM-5PM | Portsmouth 9AM-5PM | Portsmouth 9AM-5PM | Portsmouth 8AM-4PM | OFF |
| tkins Ports./Burl. | OFF | Portsmouth 9AM-5PM | Burlington 9AM-5:30PM | Portsmouth 9AM-5PM | Burlington 9AM-5:30PM | Portsmouth 9AM-5PM | OFF |

EA 00150

# ETHAN ALLEN INC. - BOSTON DISTRICT - WEEKLY SCHEDULE 2003

| Ending 5/24 | SUNDAY 5/18 | MONDAY 5/19 | TUESDAY 5/20 | WEDNESDAY 5/21 | THURSDAY 5/22 | FRIDAY 5/23 | SATURDAY 5/24 |
|---|---|---|---|---|---|---|---|
| a Hamilton / Franklin | OFF | Franklin | Quincy | Natick | Franklin | Portsmouth | Burlington |
| nn Starr / Franklin | OFF | Franklin 8:30AM-5PM | Franklin 11AM-6PM | Franklin 8:30AM-5PM | Franklin 8AM-4PM | OFF | OFF |
| Franks / Franklin | OFF | Franklin | Franklin | Quincy | Portsmouth | OFF HOLIDAY | OFF |
| Eldridge / Franklin | OFF | Franklin 7AM-3PM | OFF | Franklin 6:30AM-2:30PM | Franklin 7AM-3PM | Franklin 7:30A-3:30P | OFF |
| ael Dupelle / Franklin | OFF | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | OFF |
| iolmes / Franklin | OFF | Franklin 8AM-4:30PM | Franklin 8AM-4:30PM | Franklin 8AM-4:30PM | Franklin 8AM-4:30PM | Franklin 8AM-4:30PM | OFF |
| y Smith / Natick | OFF | Natick 9AM-6:30PM | Natick 9AM-6:30PM | Natick 9AM-6:30PM | OFF | Natick 11:30A-8:30P | Natick 9AM-7PM |
| Finley / Natick | Natick 11:30A-5PM | OFF | OFF | Natick 9AM-6PM | Natick 11A-8:30P | Natick 9AM-6PM | Natick 9AM-5:30PM |
| le Fowler / Natick | OFF | Natick 7:30AM-4PM | Natick 7:30AM-4PM | Natick 7:30AM-4PM | Burlington 7:30AM-4PM | Natick 7:30AM-4PM | OFF |
| yf Harvey / Natick | OFF | Natick 9:30A-6PM | Natick 9:30A-6PM | Natick 9:30A-6PM | Burlington 9AM-3PM | Natick 9:30A-6PM | OFF |
| nia Kilnefelter / Natick/Quincy | OFF | Natick 9:30A-6PM | Quincy 9:30A-6PM | Natick 9:30A-6PM | Quincy 9:30A-6PM | Natick 9:30A-6PM | OFF |
| y Schramek / Natick | Maternity leave | Maternity leave | Maternity leave | Maternity leave | Maternity leave | Maternity leave | Maternity leave |
| Greenberg / Quincy | Quincy 8AM-6:30PM | Quincy 8AM-5PM | Quincy 8AM-5PM | Quincy 8AM-5PM | OFF | OFF | Quincy 11:30A-5PM |
| ay McKay / Quincy | OFF | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | OFF |
| iay Boudreau / Quincy | OFF | Quincy 9AM-5PM | Quincy 9AM-5PM | Natick 9AM-5PM | Quincy 9AM-5PM | Quincy 9AM-5PM | OFF |
| iral Manager / Burlington | Burlington | Burlington | Burlington | Burlington | Burlington | Burlington | Burlington |
| y Marshall / Burlington | Burlington 11AM-5PM | Burlington 9AM-5:30PM | Burlington 10AM-8:30PM | OFF | OFF | Burlington 9AM-5:30PM | Burlington 8:30AM-5PM |
| na Kyricos / Burlington | OFF | Burlington 8:30A-5PM | Burlington 8:30A-5PM | Burlington 8:30A-5PM | Burlington 8:30A-5PM | Burlington 8:30-6PM | OFF |
| ael Englehardt / Burlington | OFF | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | OFF |
| yl Smith / Portsmouth | Portsmouth 11:30A-5PM | Portsmouth 8:30A-6:30P | OFF | Portsmouth 8:30A-6:30P | Portsmouth 10AM-12PM | Portsmouth 12:30P-8:30P | Portsmouth 8:30A-7PM |
| ecteau / Portsmouth | OFF | OFF | Portsmouth 10AM-6:30PM | OFF | Portsmouth 10AM-6:30PM | Portsmouth 8:30AM-5PM | Portsmouth 8:30AM-5PM |
| Marshall / Portsmouth | OFF | Portsmouth 9AM-5PM | Portsmouth 9AM-5PM | Portsmouth 9AM-5PM | Portsmouth 9AM-5PM | Portsmouth 8AM-4PM | OFF |
| n Atkins / Ports./Burl. | OFF | Burlington 9AM-5:30PM | Portsmouth 9AM-5PM | Burlington 9AM-5:30PM | Portsmouth 9AM-5PM | Burlington 9AM-5:30PM | OFF |

EA 00151

## ETHAN ALLEN INC. - RETAIL DIVISION - WEEKLY SCHEDULE 2003

| SCHEDULE 5/31 | SUNDAY 5/25 | MONDAY 5/26 | TUESDAY 5/27 | WEDNESDAY 5/28 | THURSDAY 5/29 | FRIDAY 5/30 | SATURDAY 5/31 |
|---|---|---|---|---|---|---|---|
| Hamilton Franklin | OFF | OFF HOLIDAY | Franklin | Burlington Franklin | Natick | Portsmouth | OFF |
| Starr Franklin | OFF | OFF | OFF | OFF | OFF | OFF | OFF |
| anks Franklin | OFF | OFF HOLIDAY | Quincy | Burlington | Franklin | Burlington Quincy | OFF |
| dridge Franklin | OFF | OFF HOLIDAY | OFF | Franklin | Franklin | Franklin | OFF |
| Dupelle Franklin | OFF | OFF HOLIDAY | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | OFF |
| nes Franklin | OFF | OFF HOLIDAY | Franklin 8AM-4:30PM | Franklin 8AM-4:30PM | Franklin 8AM-4:30PM | Franklin 8AM-4:30PM | OFF |
| mith Natick | Natick 12PM-5PM | Natick 10AM-6PM | Natick 11:30A-8:30P | Natick 11:30A-8:30P | OFF | OFF | Natick 9AM-7PM |
| nley Natick | Natick 12PM-5PM | Natick 10AM-6PM | OFF | OFF | Natick 11:30A-8:30P | Natick 9:30A-6PM | Natick 9AM-5:30PM |
| Fowler Natick | Natick 12PM-5PM | | Natick 7:30AM-4PM | Natick 7:30AM-4PM | Natick 7:30AM-4PM | OFF HOLIDAY | OFF |
| Harvey Natick | OFF | Natick 9:30A-6PM | Burlington 9:30A-6PM | OFF JURY DUTY | Burlington 9:30A-6PM | Natick 9:30A-6PM | OFF |
| Klinefelter Natick/Quincy | OFF | Quincy 9:30A-6PM | Natick 9:30A-6PM | Quincy 9:30A-6PM | Natick 9:30A-6PM | Quincy 9:30A-6PM | OFF |
| chramek Natick | Maternity leave | Maternity leave | Maternity leave | Maternity leave | Maternity leave | Maternity leave | Maternity leave |
| eenberg Quincy | Quincy 11AM-6PM | Quincy 8AM-7PM | Quincy 8AM-5PM | Quincy 8AM-5PM | OFF | OFF | Quincy 8AM-6:30PM |
| McKay Quincy | OFF | OFF | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | OFF |
| Boudreau Quincy | OFF | OFF | Quincy 9AM-5PM | Quincy 9AM-5PM | Natick 9AM-5PM | Quincy 9AM-5PM | OFF |
| Manager Burlington | Burlington | Burlington | Burlington | Burlington | Burlington | Burlington | Burlington |
| arshall Burlington | Burlington 11:30A-5PM | Burlington 9AM-5:30PM | Burlington 10AM-8:30PM | OFF | OFF | Burlington 8AM-5:30PM | OFF HOLIDAY |
| Kyricos Burlington | OFF | Burlington 8AM-4:30PM | Burlington 8AM-4:30PM | Burlington 8AM-4:30PM | Burlington 8AM-4:30PM | Burlington 8AM-4:30PM | OFF |
| Englehardt Burlington | OFF | Burlington 7:30AM-4PM | Natick 7:30AM-4PM | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | OFF |
| Smith Portsmouth | Portsmouth 11:30A-5PM | Portsmouth 8:30A-6:30P | OFF | Portsmouth 8:30A-6:30P | OFF | Portsmouth 12:30P-8:30P | Portsmouth 8:30AM-7PM |
| teau Portsmouth | OFF | Portsmouth 10A-6:30P | Portsmouth 10A-6:30P | OFF | Portsmouth 8:30A-5:30P | Portsmouth 8:30A-5:30P | Portsmouth 8:30A-5:30P |
| rshall Portsmouth | OFF | OFF HOLIDAY | Portsmouth 9AM-5PM | Portsmouth 9AM-5PM | VACATION | VACATION | OFF |
| tkins Ports./Burl. | OFF | Portsmouth 9AM-5PM | Portsmouth 9AM-5:30PM | Portsmouth 9AM-5PM | Portsmouth 9AM-5:30PM | Portsmouth 9AM-5PM | OFF |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | EA 00152 | | |
| | | | | | | | |

*April 2003*

# ETHAN ALLEN INC. - RETAIL DIVISION - WEEKLY SCHEDULE 2003

| ndings.'05 | SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|---|
| Hamilton Franklin | OFF | Franklin | Quincy | Natick | Franklin | Portsmouth Burlington | Mystery Store |
| Starr Franklin | OFF | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Burlington 8:30-5PM | OFF |
| anks Franklin | OFF | Quincy | Portsmouth | Burlington | Quincy | Franklin | OFF |
| dridge Franklin | OFF | Franklin 6:30A-2:30PM | Franklin 7:30a-4:00P | Franklin 6:30A-2:30PM | Franklin 7:30AM-4PM | Franklin 7AM-3PM | OFF |
| Dupelle Franklin | OFF | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | OFF |
| mes Franklin | OFF | Franklin 8AM-4:30PM | Franklin 8AM-4:30PM | Franklin 8AM-4:30PM | OFF | Franklin 8AM-4:30PM | OFF |
| mith Natick | Natick 11:30A-5PM | Natick 9:30A-8:30P | Natick 11:30A-8:30P | Natick 9:30A-8:30P | Natick 11:30A-8:30PM | OFF | Natick 9AM-7PM |
| McFadden Natick | OFF | OFF | VACATION | VACATION | VACATION | VACATION | VACATION |
| Fowler Natick | OFF | Natick 7:30A-4PM | Natick 7:30AM-4PM | Natick 7:30AM-4PM | Natick 7:30AM-4PM | Natick 7:30AM-4PM | OFF |
| Harvey Natick | OFF | Natick 9:30A-6PM | Natick 9:30A-6PM | Natick 9:30A-6PM | Natick 9:30A-6PM | Natick 9:30A-6PM | OFF |
| eenberg Quincy | Quincy 12PM-5PM | OFF | Quincy 9AM-5PM | Burl. 9AM-1PM Quincy 2P-5P | Quincy 9AM-5PM | OFF | Quincy 8AM-6:30PM |
| MacDonald Quincy | OFF | Quincy 9AM-5PM | Quincy 9AM-5PM | Burl. 9AM-1PM Quincy 2P-5P | Quincy 9AM-5PM | OFF | Quincy 8AM-6:30PM |
| McKay Quincy | OFF | Quincy 7AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | OFF |
| Costello Burlington | OFF | Burlington 8:30A-5PM | Burlington 8:30A-5PM | Burlington 12PM-8:30PM | Burlington 8:30A-5PM | OFF | Burlington 8AM-5PM |
| Marshall Burlington | Burlington 11AM-5PM | Burlington 9AM-5:30PM | Burlington 10AM-8:30PM | OFF | OFF | Burlington 9AM-5:30PM | Burlington 8AM-5PM |
| Kyricos Burlington | OFF | Burlington 8:30A-5PM | Burlington 8:30A-5PM | Burlington 8:30A-5PM | Burlington 8:30A-5PM | Burlington 8:30A-5PM | OFF |
| Smith Portsmouth | OFF | Portsmouth 8:30A-5PM | Portsmouth 8:30A-5PM | Portsmouth 8:30A-6PM | OFF | Portsmouth 8:30A-8:30P | Portsmouth 11:30A-5:30P |
| teau Portsmouth | OFF | Portsmouth 10A-6:30PM | Portsmouth 10A-6:30PM | OFF | Portsmouth 10A-6:30PM | Portsmouth 10A-6:30PM | Portsmouth 8:30A-5PM |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  | April | 5 Iates |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  | EA 00153 |  |
|  |  |  |  |  |  |  |  |

## ETHAN ALLEN INC. - RETAIL DIVISION - WEEKLY SCHEDULE 2003

| Ending 3/12 | SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|---|
| Hamilton Franklin | OFF | Franklin | Quincy | Danbury | Franklin | Personal Day | OFF |
| n Starr Franklin | OFF | Franklin 8:30AM-5PM | Franklin 8:30AM-5PM | Natick 9AM-5:30PM | Natick 9AM-5:30PM | Franklin 8:30AM-5PM | OFF |
| ranks Franklin | OFF | Natick Franklin | Danbury | Danbury | Danbury | Franklin | OFF |
| ldridge Franklin | OFF | Franklin 6:30AM-2:30PM | Franklin 7:30AM-4:00PM | Franklin 6:30AM-2:30PM | Franklin 7:30AM-4PM | Franklin 7AM-3PM | OFF |
| l Dupelle Franklin | OFF | Franklin 8:30AM-5PM | Franklin 8:30AM-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | OFF |
| mes Franklin | OFF | Franklin 8AM-4:30PM | Franklin 8AM-4:30PM | Franklin 8AM-4:30PM | Franklin 8AM-4:30PM | Franklin 8AM-4:30PM | OFF |
| Smith Natick | ? | OFF | Natick 11:30A-8:30P | Natick 9AM-8:30PM | Natick 9AM-8:30PM | OFF | Natick 9AM-7PM |
| McFadden Natick | OFF | Natick 8:30AM-5:30PM | OFF | Natick 8:30AM-5:30PM | Natick 8:30AM-5:30PM | Natick 12PM-8:30PM | Natick 9AM-5PM |
| Fowler Natick | OFF | Natick 7:30AM-4PM | Natick 7:30AM-4PM | Natick 7:30AM-4PM | Natick 7:30AM-4PM | Natick 7:30AM-4PM | |
| Harvey Natick | OFF | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM | OFF |
| eenberg Quincy | Quincy 11AM-5:30PM | Quincy 8AM-5PM | Quincy 8AM-5PM | OFF | Quincy 8AM-5PM | OFF | Quincy 8AM-6:30PM |
| MacDonald Quincy | Quincy 11AM-5:30PM | OFF | Quincy 8AM-5:50PM | Danbury | Danbury | OFF | Quincy 8AM-6:30PM |
| McKay Quincy | OFF | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | OFF |
| Costello Burlington | Burlington 11AM-5PM | OFF | OFF | Burlington 11AM-8:30PM | Burlington 8AM-5PM | OFF | Burlington 8AM-5PM |
| Marshall Burlington | Burlington 11AM-5PM | Burlington 9AM-5:30PM | Burlington 10A-8:30PM | OFF | OFF | Burlington 9AM-5:30PM | Burlington 8AM-5PM |
| Kyricos Burlington | OFF | VACATION | VACATION | VACATION | VACATION | VACATION | OFF |
| Smith Portsmouth | Portsmouth 11:30A-5:30P | OFF | Portsmouth 8:30A-6:30P | Portsmouth 8:30A-6:30P | OFF | Portsmouth 12:30P-8:30P | Portsmouth 8:30A-7:30P |
| eau Portsmouth | Portsmouth 12PM-5PM | Portsmouth 10AM-6:30PM | OFF | OFF | Portsmouth 8:30AM-5PM | Portsmouth 8:30AM-5PM | Portsmouth 8:30AM-5PM |

EA 00154

# ETHAN ALLEN INC. - RETAIL DIVISION - WEEKLY SCHEDULE 2003

| Name | SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|---|
| Donna Hamilton / Franklin | OFF | Franklin | Portsmouth | Burlington | Quincy wkrm 9-12 | Franklin Natick | OFF |
| coleen Starr / Franklin | OFF | Franklin 8:30AM-5PM | Franklin 8:30AM-5PM | Franklin 8:30AM-5PM | Burlington 8:30AM-5PM | Franklin 8:30A-5PM | OFF |
| amy Franks / Franklin | OFF | Franklin | Portsmouth | Natick | Vacation | Vacation | --- |
| kim Eldridge / Franklin | Franklin 8AM-2PM | Franklin 6:30A-2:30PM | Franklin 7:30a-4:00P | Franklin 6:30A-2:30PM | Franklin 7:30AM-3PM | Franklin 7AM-3PM | OFF |
| Richard Dupuis / Franklin | OFF | Franklin 8:30AM-5PM | Franklin 8:30AM-5PM | Franklin 8:30AM-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | OFF |
| Jill Holmes / Franklin | OFF | Franklin 8AM-4:30PM | Franklin 8AM-2PM | Franklin 8AM-4:30PM | Franklin 8AM-4:30PM | Franklin 8AM-4:30PM | OFF |
| Kathy Smith / Franklin | Natick 10AM-5:30PM | Natick 8:30AM-6PM | Natick 9:30AM-6PM | OFF | Natick 12:30PM-8:30P | Natick 9:30AM-6PM | Natick 9AM-7PM |
| lynne McFadden / Natick | OFF | OFF | OFF | OFF | OFF | OFF | OFF |
| ...bbie Fowler / Natick | OFF | Natick 7:30A-4PM | Natick 7:30AM-4PM | Natick 7:30AM-4PM | Natick 7:30AM-4PM | Natick 7:30AM-4PM | OFF |
| Cheryl Harvey / Natick | OFF | Natick 8:30A-6PM | Natick 8:30A-6PM | Natick 9:30A-6PM | Natick 9:30A-6PM | Natick 9:30A-6PM | OFF |
| Lea Greenberg / Quincy | Quincy 11AM-5:30PM | Quincy 8AM-5PM | Quincy 8AM-5PM | OFF | Quincy 8AM-5PM | Quincy OFF | Quincy 11AM-5:30PM |
| ...mes MacDonald / Quincy | OFF | OFF | Quincy 9AM-6PM | Quincy 9AM-6PM | Quincy 9AM-6PM | Quincy 9AM-6PM | Quincy 8AM-8PM |
| tommy McKay / Quincy | OFF | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | OFF |
| Michael Costello / Quincy | OFF | Burlington 8AM-5PM | Burlington 8AM-5PM | Burlington 12PM-8:30PM | Burlington 8AM-5PM | OFF | Burlington 8AM-5PM |
| ...enny Marshall / Burlington | Burlington 11AM-5PM | Burlington 9AM-5:30PM | Burlington 10AM-6:30PM | OFF | OFF | Burlington 9AM-5:30PM | Burlington 8AM-5PM |
| ...eanne Kyrkos / Burlington | OFF | Burlington 8:30AM-5PM | Burlington 8:30AM-5PM | Burlington 8:30AM-5PM | Burlington 8:30AM-5PM | Burlington 8:30AM-5PM | OFF |
| cheryl Smith / Portsmouth | Portsmouth 11:30A-5:30P | Portsmouth 8:30A-6:30P | OFF | Portsmouth 8:30A-6:30P | OFF | Portsmouth 12:30P-8:30 | Portsmouth 8:30AM-7PM |
| ...al Favreau / Portsmouth | OFF | Portsmouth 8:30A-6:30P | Portsmouth 10AM-6:30PM | Portsmouth 8:30AM-5PM | Portsmouth 8:30AM-5PM | Portsmouth 8:30AM-7PM | Portsmouth 8:30AM-5PM |

EA 00155

## ETHAN ALLEN INC. - BOSTON DISTRICT - WEEKLY SCHEDULE 2003

| Ending 4/26 | SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|---|
| Hamilton<br>Franklin | Closed | | Burlington<br>mgrs. Meeting | Franklin<br>fish meeting | | | OFF |
| n Starr<br>Franklin | Closed | Franklin<br>8:30A-5PM | Portsmouth<br>9A-6:30P | Franklin<br>8:30AM-5PM | Burlington<br>9A-5:30PM | Franklin<br>8:30A-5PM | OFF |
| ranks<br>Franklin | Closed | Vacation<br>Day | Burlington<br>mgrs. Meeting | Franklin<br>fish meeting | Burlington<br>Natick | Natick | OFF |
| Eldridge<br>Franklin | Closed | Franklin<br>6:30A-2:30P | Franklin<br>7:30AM-4PM | Franklin<br>6:30A-2:30P | Franklin<br>7:30AM-4PM | Franklin<br>7AM-3PM | OFF |
| el Dupelle<br>Franklin | Closed | Franklin<br>8:30A-5PM | Franklin<br>8:30A-5PM | Franklin<br>8:30A-5PM | Franklin<br>8:30A-5PM | Franklin<br>8:30A-5PM | OFF |
| olmes<br>Franklin | Closed | Franklin<br>8AM-4:30PM | Franklin<br>8AM-4:30PM | Franklin<br>8AM-4:30PM | Franklin<br>8AM-4:30PM | Franklin<br>8AM-4:30PM | OFF |
| Smith<br>Natick | Closed | Natick<br>9:30A-6PM | Burlington<br>mgrs. Meeting | OFF | Natick<br>9:30A-6PM | OFF | Natick<br>8:30A-7P |
| Finley<br>Natick | Closed | Franklin<br>Meeting | Burlington<br>mgrs. Meeting | Franklin<br>Meeting | Burlington<br>Ops. Meeting | Natick<br>9AM-5PM | OFF |
| Fowler<br>Natick | Closed | Natick<br>8AM-4PM | Natick<br>8AM-4PM | Natick<br>8AM-4PM | Natick<br>8AM-4PM | Natick<br>8AM-4PM | OFF |
| Harvey<br>Natick | Closed | Natick<br>9:30A-6PM | Natick<br>9:30A-6PM | Natick<br>9:30A-6PM | Natick<br>9:30A-6PM | Natick<br>9:30A-6PM | OFF |
| la Klinefelter<br>Natick/Quincy | Closed | Natick<br>9:30A-6PM | Quincy<br>9:30A-6PM | Natick<br>9:30A-6PM | Quincy<br>9:30A-6PM | Natick<br>9:30-noon | OFF |
| Schramek<br>Natick | Closed | Maternity<br>leave | Maternity<br>leave | Maternity<br>leave | Maternity<br>leave | Maternity<br>leave | Maternity<br>leave |
| reenberg<br>Quincy | Closed | Quincy<br>8AM-5PM | Quincy<br>8AM-5PM | Quincy<br>8AM-5PM | Quincy<br>8AM-5PM | OFF | OFF |
| MacDonald<br>Quincy | Closed | OFF | Quincy<br>9AM-6PM | Quincy<br>9AM-6PM | OFF | Quincy<br>9AM-6PM | Quincy<br>8AM-6PM |
| y McKay<br>Quincy | Closed | Quincy<br>7AM-4PM | Quincy<br>7AM-4PM | Quincy<br>7AM-4PM | Quincy<br>7AM-4PM | Quincy<br>7AM-4PM | OFF |
| y Boudreau<br>Quincy | Closed | Franklin<br>Visual Meeting | Quincy<br>9AM-5PM | Quincy<br>9AM-5PM | Natick<br>9AM-5PM | Vacation<br>Day | OFF |
| el Costello<br>Burlington | Closed | Burlington<br>8AM-5PM | Holiday | Burlington<br>8AM-5PM | Burlington<br>8AM-5PM | OFF | OFF |
| Marshall<br>Burlington | Closed | Burlington<br>9AM-5:30PM | Burlington<br>10AM-8:30PM | OFF | OFF | Burlington<br>9AM-5:30PM | Burlington<br>8AM-5PM |
| e Kyrlcos<br>Burlington | Closed | Burlington<br>8:30A-5PM | Burlington<br>8:30A-5PM | Burlington<br>8:30A-5PM | Burlington<br>8:30A-5PM | Burlington<br>8:30-5PM | OFF |
| el Englehardt<br>Burlington | Closed | Franklin<br>Visual Meeting | Burlington<br>7:30AM-4PM | Burlington<br>7:30AM-4PM | Burlington<br>7:30AM-4PM | Burlington<br>7:30AM-4PM | OFF |
| Smith<br>Portsmouth | Closed | OFF | Burlington<br>mgrs. Meeting | Portsmouth<br>8:30A-6:30P | Portsmouth<br>8:30A-5:30P | Portsmouth<br>8:30A-5:30P | Portsmouth<br>8:30A-7P |
| cleau<br>Portsmouth | Closed | Portsmouth<br>8:30A-6:30P | Portsmouth<br>8:30A-6:30P | OFF | Franklin<br>Ops. Meeting | Portsmouth<br>12P-8:30P | OFF |
| arshall<br>Portsmouth | Closed | Franklin<br>Visual Meeting | Portsmouth<br>9AM-5PM | Portsmouth<br>9AM-5PM | Portsmouth<br>9AM-5PM | Portsmouth<br>8AM-4PM | OFF |
| Atkins<br>Ports./Burl. | Closed | Burlington<br>9AM-5PM | Portsmouth<br>9AM-5PM | Burlington<br>9AM-5PM | Portsmouth<br>9AM-5PM | Burlington<br>9AM-5PM | OFF |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

EA 00156

# EXHIBIT K

# PERFORMANCE APPRAISAL
## SUPERVISORY PERSONNEL

DOC #1
PG #1

**Name: Mike Eldridge**     **Position:**

**Location:**     **Hire Date:**

The performance appraisal is designed to help identify accomplishments and areas of development, and to plan the goals for the coming year. As you complete the appraisal consider the performance of the employee over the entire period since the last review. Score each section individually including written comments regarding specific performance for each category.

## PERFORMANCE RATINGS:

**5**   **Exceptional:** Performance consistently exceeds goals and job requirements. Performance is exceptional, and sustained over the review period.

**4**   **Exceeds Requirements:** Performance exceeds most goals and job requirements. Accomplishments are above job demands.

**3**   **Meets Requirements:** Performance consistently meets goals and job requirements. Accomplishments are clearly in accord with job demands.

**2**   **Needs Improvement:** Improvement is required. Performance is close to meeting goals and job requirements, but falls short of expectations.

  **Unsatisfactory:** Performance consistently does not meet goals and job requirements. Performance improvement is required.

---

**A. Leadership:** Develops effective business strategies. Communicates organizational goals clearly. Values the employees of the organization and their contributions. Takes responsibility for his/her decisions. Establishes an environment of trust through fair and just business practices. Inspires others through an unyielding commitment to a vision and high personal standards of excellence.

| SCORE | COMMENTS |
|---|---|
| 2 | Needs to develop a plan to be more effective as a leader. Needs to work out individual coaching methods to best grow the team. |

**B. Coaching/Training/Motivation:** Guides the development of skills and performance by building confidence and self-esteem, and playing the roles of trainer, coach and career counselor. Provides prompt feedback with suggested development exercises to build performance. Performs timely review and appraisal of subordinates. Demonstrates ability to motivate subordinates. Encourages teambuilding.

| CORE | COMMENTS |
|---|---|
| ( | Has to have all team member understanding the safety guidelines of the company. Have a plan to develop others to reach the next level. Would like to see team meetings to create a friendly work environment with postive atomsphere and employee input. |



EXHIBIT
HAMILTON
#11
4/31/06  Kmm

EA 00190

C. **Innovation:** Develops relevant new ideas and implements new programs to address the changing needs of the company. Refines and improves existing methods and procedures.

| SCORE | COMMENTS |
|---|---|
| 2 | Needs to look for more cost efficient ways to refine and improve the procedures, so the warehouse runs better. Has to take the time to research alternatives and have the best solution in place. |

D. **Judgment/Decision Making:** Uses analytical skills to obtain and evaluate facts. Analyzes information logically and fairly to reach valid conclusions. Takes appropriate action.

| SCORE | COMMENTS |
|---|---|
| 2 | Needs to get team buy in when change is involved. Need to communicate with management on decisions that affect the bottom line. |

E. **Dependability:** Manages the workforce activity so that tasks are completed on a timely basis and to the expected standards. Attains short-term and long-term goals. Delegates appropriately and holds subordinates accountable for performance objectives.

| SCORE | COMMENTS |
|---|---|
| 3 | Have to be on time for work to set the example for your team. Also your team needs to know your schedule so they know when you will be in the building. |

F. **Time Management/Productivity:** Prioritizes effectively and consistently meets deadlines. Understands and works toward company objectives. Maximizes personal effectiveness and efficiency.

| SCORE | COMMENTS |
|---|---|
| 3 | Needs to work from a daily priority list and have a game plan in place on what needs to be done for the day. You work well under preasure, but need to be aware that you can make mistakes by moving too fast. You need to prioritize duties and multitask when working on multiple hot issues. |

G. **Interpersonal Relationships/Communication:** Creates an environment where information is shared among all parties. Works cooperatively with peers and subordinates to achieve results and is responsive to the requirements of other functions. Maintains effective channels of communication for information throughout the store, service center and company.

| SCORE | COMMENTS |
|---|---|
| 2 | Needs to work on communication style with your team members and peers. Being on the same team having the same goal in mind. |

**H. Organization/Planning/Follow-up:** Develops realistic projections and methods, uses available resources effectively. Develops and implements plans of action with appropriate benchmarks.

| SCORE | COMMENTS |
|-------|----------|
| 2 | You need to organize your work environment. Develop a plan/ system to organize your workspace both for your own benefit and as an exampe to your team members. |

**I. Initiative/Adaptability:** Responds positively to unusual demands and changed circumstances. Has a clear understanding of priorities, uses initiative and foresight in carrying out assignments. Contributes new ideas.

| SCORE | COMMENTS |
|-------|----------|
| 2 | Would like to see you inspire others to boost work ethic and improve moral. The goal should be to foster an environment of team work and alternative thinking for problem situations. |

**J. Attitude/Work Ethic:** Performs all responsibilities in a focused and dependable manner. Attitude is positive and cooperative. Operates and communicates with the best interest of the company as the top priority. Represents the company in a positive manner when interacting with customers and other business associates.

| SCORE | COMMENTS |
|-------|----------|
| ( 3 | Has a postive attitude in most cases, needs to take responsibility like an owner of the warehouse. Has a great impact when handing customer issues. |

**Summary Comments**

Coaches and deveops talent

1. Accurately assesses strengths and development needs of the team, gives timely specific feedback, provides clear road map to achieve goals.

2. Partnership

Creates atmosphere in which timely and accurate information flows smoothly between self and others.

(

# APPRAISAL REVIEW SCORE = <u>46</u>

DOC. #1

PE#4

| 96 to 100 | Excellent |
| 76 to 95 | Exceeds Requirements |
| 56 to 75 | Meets Requirements |
| 36 to 55 | Needs Improvement |
| 35 and Below | Unsatisfactory |

## APPRAISAL REVIEW DETAIL

| Category | Score | Multiplier | Final Score |
|---|---|---|---|
| Leadership | 2 | 2 | 4 |
| Coaching/Training/Motivation | 2 | 2 | 4 |
| Innovation | 2 | 2 | 4 |
| Judgment/Decision Making | 2 | 2 | 4 |
| Dependability | 3 | 2 | 6 |
| Time Management/Productivity | 3 | 2 | 6 |
| Interpersonal Relations/Communication | 2 | 2 | 4 |
| Organization/Planning/Follow-Up | 2 | 2 | 4 |
| Initiative/Adaptability | 2 | 2 | 4 |
| Company/Customer Support | 3 | 2 | 6 |
| **Total** | | | **46** |

This Performance Appraisal includes an attachment with a review of specific tasks associated with the position.    ☐ Yes    ☐ No

# FUTURE GOALS AND OBJECTIVES

| Performance Improvement Objectives | Action Plans |
|---|---|
| 1. Communication | 1. solicits input from others<br>2. gets team buy in<br>3. establish a communication processes |
| 2. Safty training and team meetings | 2.<br>1. Have a plan for training<br>2. have check list in place<br>3. once a month meeting on expecation |
| 3. Inventory control | 3.<br>1. organize and accountability for all control<br>2. keep team well informed about issues concering warehouse matters. |

## Comments on Future Goals and Objectives

(   )e a plan in place for training and development of you and your team. Cross training your team to cover vacations and absences. Make warehouse run like a machine regardless of staffing levels, work load or other disruptive issues.

## This appraisal has been discussed with the employee by:

Appraiser:_____    Date:_____

Employee: _Nicole Delridge_    Date: _10/8/03_

Reviewed by: _D__ Hull_  Date: _9/5/2003_
        ~~District Manager~~

# EXHIBIT L

Doc #4

# Ethan Allen
## CORRECTIVE ACTION FORM

**I.**   Associate Name: _Mike Eldridge_   Date of Incident: _8-21 2003_
Store/Dept: _WH_   Date of Conversation: _____
Position: _WH manager_

**II.**   **Action**
☐ Documented Conversation   ☒ Warning   ☐ Separation
☐ Final Warning or Probation   ☐ Suspension

EXHIBIT
HAMILTON
#14
7/27/06   KMM

**III.**   **Identify Problem Performance or Unacceptable Behavior***

**Problem Performance**
☐ Unsatisfactory sales performance
☐ Unsatisfactory customer service
☐ Unsatisfactory job performance
☐ Other (describe below):
   X Not flowing company's policies

**Unacceptable Behaviors**
☒ Absenteeism or tardiness
☐ Excessive socializing, personal phone calls or personal long distance phone calls
☐ Abuse of discount privileges
☐ Falsification of application document, company records, or time cards

**Unacceptable Behaviors (Continued)**
☐ Harassment
☐ Insubordination
☐ Intentional or grossly negligent damage to company property
☐ Leaving company premises without authorization
☐ Non-compliance with dress code (including name badge)
☐ Possessing or reporting to work under the influence of alcohol or drugs
☐ Removing merchandise without proper paperwork
☐ Soliciting on Company premises
☐ Violation of Loss Prevention Policies
☐ Other (describe below):

* This list is not all inclusive of behaviors/situations leading to corrective action, up to and including separation.

**IV.**   **Brief description of current incident.**

_On July 21 Mike was schudle at Quincy. He was one hour 15 min late for work_

**Brief description of previous conversations/actions taken regarding this issue. Include dates.**

_on the month of June. Mike was late on 3 days. this Behavior for a manager sets a Bad Exsample for his team you need to be on time or fourth corrective action on ACG_

**Brief description of consequences should the problem continue** (warning statement and follow-up date, or probationary guideline and time frame).

**V.**   Attachments (if required):   ☐ Action Plan   ☐ Additional Explanation   ☐ No Attachments

**VI.**   Associate's Comments: _____

**VII.**   Associate's Signature: _____   Date: _7/27/03_
Manager's Signature: _____   Date: _____
DM Signature: _____   Date: _7/21/2003_

Original - HR (Corporate)        Copy - Associate        Copy - Confidential Store File

EA 00201

# EXHIBIT M

Ethan Allen
## CORRECTIVE ACTION FORM

DOC #2

I.   Associate Name: MiKE Eldridge    Date of Incident: 10/2/2003 page # 1
     Store/Dept: PRanKlin
     Position: Warhuse manager    Date of Conversation: _____

EXHIBIT
HAmilcTon
#12
4/27/06  Kmm

II.  **Action**
     ☐ Documented Conversation    ☐ Warning         ☐ Separation
     ☒ Final Warning or Probation  ☐ Suspension

III. **Identify Problem Performance or Unacceptable Behavior***

**Problem Performance**
☐ Unsatisfactory sales performance
☐ Unsatisfactory customer service
☐ Unsatisfactory job performance
☐ Other (describe below):
   X Not flowing company's policies

**Unacceptable Behaviors**
☒ Absenteeism or tardiness
☐ Excessive socializing, personal phone calls or
  personal long distance phone calls
☐ Abuse of discount privileges
☐ Falsification of application document, company
  records, or time cards

**Unacceptable Behaviors (Continued)**
☐ Harassment
☐ Insubordination
☐ Intentional or grossly negligent damage to
  company property
☐ Leaving company premises without authorization
☐ Non-compliance with dress code (including name
  badge)
☐ Possessing or reporting to work under the
  influence of alcohol or drugs
☐ Removing merchandise without proper paperwork
☐ Soliciting on Company premises
☐ Violation of Loss Prevention Policies
☐ Other (describe below):

* This list is not all inclusive of behaviors/situations leading to corrective action, up to and including separation.

IV.  **Brief description of current incident.**

Mike was on warning 7-21-2003, the tardiness has been more frequent. 8/29/2003 over sleep late 90 min's  9-1-2003 late 60 min, oversleep, 9/19 going to meet a co-worker one hour late  10/2 2 hour late 10/2 .45 late to close.

**Brief description of previous conversations/actions taken regarding this issue. Include dates.**

July 21/57

**Brief description of consequences should the problem continue (warning statement and
follow-up date, or probationary guideline and time frame).**

V.   Attachments (if required): ☐ Action Plan  ☐ Additional Explanation  ☐ No Attachments

VI.  Associate's Comments: _____

VII. Associate's Signature:
     Manager's Signature: _____   Date: _____
     DM Signature: _____          Date: 10/8/03 (Medical)
                                            Date: _____   reason

Original - HR (Corporate)    Copy - Associate    Copy - Confidential Store File

EA 00195

# ETHAN ALLEN
## PERSONAL PERFORMANCE ACTION PLAN

*Doc#a*
*page #*

The goal of this Action Plan is to assist you with improving your performance to a satisfactory performance level.

- The Action Plan describes the gap(s) in your performance and the specific action needed improve your performance.
- During the time frame indicated below, you will meet regularly with your supervisor to discuss progress.
- Once your performance is at the level of Meets Expectations, you will be removed from this action plan with the understanding that improved performance must be ongoing.
- Should your performance not improve to an acceptable level , it will result in further corrective action up to and including separation.

**▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓**

**Associate Name:** Mike Eldridge

**Associate #:**

**Store Name/R#:**

**Position:**

**▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓**

**Start Date:**          **End Date:**

**▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓**

**Performance Gap(s)** *(list specifics)*

need to be on time for work .

**Specific Example(s)**

mike is a manager He needs to be on time. He has no credibility as a leader, because he doesn't set the exsample.

**Action Steps**

Plan your schudle
Plan to be at work Early.
leave 15 min Early everyday.

DOC #2
page #

**Tools Available**

**Meeting Dates**

Associate Signature: _____    Date: _____

Supervisor Signature: _____    Date: _____

District Manager Signature: _____    Date: _____

\* *Attach this Action Plan to the Corrective Action form and provide one complete copy to the Associate. Send signed original to Human Resources.*

**EA 00197**

# EXHIBIT N

Ethan Allen
**CORRECTIVE ACTION FORM**

*page #1*

**I.**  Associate Name: M.KE Eldridge    Date of Incident: 9-23-2003
Store/Dept: Franklin    Date of Conversation: W4 managew
Position: Manager

**II.  Action**

☐ Documented Conversation    ☐ Warning    ☐ Separation
☒ Final Warning or Probation    ☐ Suspension

EXHIBIT
Hamilton
#13
1/27/06 MMh

**III.  Identify Problem Performance or Unacceptable Behavior***

**Problem Performance**
☐ Unsatisfactory sales performance
☐ Unsatisfactory customer service
☐ Unsatisfactory job performance
☐ Other (describe below):
  XNot flowing company's policies

**Unacceptable Behaviors**
☐ Absenteeism or tardiness
☐ Excessive socializing, personal phone calls or personal long distance phone calls
☐ Abuse of discount privileges
☐ Falsification of application document, company records, or time cards

**Unacceptable Behaviors (Continued)**
☐ Harassment
☐ Insubordination
☐ Intentional or grossly negligent damage to company property
☐ Leaving company premises without authorization
☐ Non-compliance with dress code (including name badge)
☐ Possessing or reporting to work under the influence of alcohol or drugs
☐ Removing merchandise without proper paperwork
☐ Soliciting on Company premises
☐ Violation of Loss Prevention Policies
☐ Other (describe below):

* This list is not all inclusive of behaviors/situations leading to corrective action, up to and including separation.

**IV.  Brief description of current incident.**

Tran Teucks paper work on 9-23-2003 was not Done Right Item were missing from paper work. Item on the truck Did't Have paper work to match.

**Brief description of previous conversations/actions taken regarding this issue. Include dates.**

# Have talk to mike on 8-27, 9-3, 9-10 2003 about making sure when He signs it on the tran truck paper work its wright.

**Brief description of consequences should the problem continue (warning statement and follow-up date, or probationary guideline and time frame).**

**V.**  Attachments (if required):  ☐ Action Plan    ☐ Additional Explanation    ☐ No Attachments

**VI.**  Associate's Comments:

**VII.**  Associate's Signature:    Date:
Manager's Signature:    Date: 10/8/03
DM Signature:    Date:

Original - HR (Corporate)    Copy - Associate    Copy - Confidential Store File

EA 00198

# EXHIBIT O



3/27/06
EXHIBIT NO. 30
Margie Simmons

**Charlie Farfaglia**
11/07/2003 11:13 AM

To: Denna Hamilton/Eacorp@Eacorp
cc:
Subject: letter from M Eldridge

Mr. Kathwari,

    I am writing to you because I have no other direction to turn.

    I was wrongfully terminated from my position of Franklin Warehouse Manager on Oct. 20,2003 by my District Manager Denna Hamilton. The reasons for termination were tardiness on Oct.4th and Oct.11th, at the New Natick store location. Denna told me that I was 10 minutes late on Oct. 4th when I arrived at the Natick store at 8:10 am. I contend that I was not late for work at Ethan Allen because I reported to my home base, Franklin Distribution at 7am, to meet with my co-worker Danny Forte . I then proceeded to Natick, in my own vehicle and arrived at 8:10 because I hit unsuspecting traffic on the Mass. Pike from a accident back up. The following week I was told by Denna Hamilton that I was again late one hour when I arrived in the New Natick Store at 10am. Once again, I contend that I was not late for I had to arrive at Franklin Distribution to pick up the company van full of cartons that Denna had requested the day before after 4pm. I had received a call from Denna saying that she was looking for and needed a half dozen samples that had been accidentally sent to Franklin from the New Natick Store days earlier. Denna also requested a very important carton ( EA kids products) that the New Natick store needed. I, along with Michael Dupelle (Franklin Customer Service Manager) stayed until 6pm, Friday Oct. 10th, looking for these products. Michael and I found everything except the EA Kids carton. The next morning, fearing the wrath of Denna for "not knowing my warehouse" I again did a double check looking for the EA Kids carton. The same warehouse weeks earlier, in your visit to Franklin, Denna had complimented me on having the place looking good for your visit. When I couldn't find the carton, I was scared of getting chewed out by Denna and I dreaded the drive to Natick. Another problem I had was the fact that I had my little boy Marcus Furey Eldridge with me. With Denna's demand that I bring over the 6 cartons on a Saturday morning, at such a late hour on Friday afternoon, left me with no options for a baby-sitter. One of the traits that I love about you is the support you have for your workers and their families. I must say that Denna needs alot of work in that area.....I also called and left a message on Denna's cell phone at 8am when I realized that I had to feed, dress, and prepare my son for the 85 mile ride (one way)  Denna was making me perform for these important cartons.

When I arrived in Natick at 10am prompt, I was greeted my Virginia Klingfelter (Natick Softgoods Specialist) and her deep appreciation that I had driven all the way to Natick from my home, on my regular day off, to bring her some EXTRA samples she MIGHT OF NEEDED. When I told Virginia that I couldn't locate the EA Kids carton, Virginia told me herself and Denna had found it Friday afternoon, already set up. I was upset that I had never received a phone call with this information for I had wasted valuable time looking for the EA Kids carton, I ask you, "What kind of DM would do that to her two managers?" I helped Virginia unload the cartons and loaded a few things that were being sent back to Franklin. I then went and found Denna to see if there was anything else she wanted me to do. I was greeted with the evil stare and with a threatening voice, Denna snapped at me,"YOUR LATE!" I told her I was late  because I had to give the warehouse another look for the EA Kids carton and she just walked away, degrading me in front of my little boy. I felt humiliated and embarrassed to tell my son that she was my boss and that everything was going to be alright.

On Monday morning, I showed up for work and resumed my normal warehouse duties. A few days earlier I had been asked by Michael Dupelle if I could help solve a problem customer in Medfield,Mass. I asked Michael what the problem was and he said he had a customer that had three delivery problems in the past few months and was still waiting for her furniture.. With my knowledge of home delivery service would I be willing to deliver the piece with a warehouse worker? I have had 20 years experience in the home delivery business and I said okay, anything to get a EA customer satisfied. I proceeded to Medfield with a co-worker Danny Forte and proceeded to make the delivery with a very,very angry and suspect customer. It took me the 10 minutes to calm her down and convince her that we could solve her problem once and for all. Danny and I proceeded to get the piece up and around the difficult stairway, into her bedroom. While I was attempting to carry the piece up and around a corner, I hurt my back. I must say my pride and determination to get the piece in without incident hid my pain. I did not want to get our valued EA customer any more concern than she already had...I kept the pain to myself. I did switch ends with Danny so the customer couldn't see me grimacing with pain. I have both the customer and Danny Forte as witnesses to

EA 00275

this action.

When I returned to Franklin, my back was really sore. I was preparing the warehouse for my absence, for I had knee surgery planned for Oct. 23rd . I had injured myself playing basketball in June trying to get back into shape. Denna knew I had two bad knees and that I was going to have surgery to correct the problems. I had visited the medical doctor Franklin's Ethan Allen always uses for our medical needs, Dr. Ravzi. At first Dr. Razvi thought I had strained my knees and he gave me some pain medication and told me to rest. I never missed any work! After awhile, I returned to Dr. Razvi to complain that the pain was the same. Dr. Ravzi then send me to have MRI's performed on each knee. It was thru these MRI's that Dr. Ravzi learned that I had torn the MCL on my left knee and possibly on my right knee. Ethan Allen -Boston was in the mist of relocating the old Natick to the New Natick store. I asked for time off but was told by Denna ," You are too valuable in the transition to take a leave of absence, I was cleaning out the old product for clearance, over $400,000.worth..... and that I could take time off after the store move was complete". In being a dedicated employee, I accepted and continued to work in extreme pain, fighting the pain with prescribed medication from Dr. Ravzi and from my specialist, Dr. Burns. I worked Sunday, Sept. 28th thru Saturday, Oct.4th and Denna Hamilton writes me up for being 10 minutes late?

When Denna finally arrived in Franklin on the afternoon of the 20th. I mentioned to her that I had strained my back, making the delivery in the morning. Denna walked right past me, little did I know at the time that she had already made up her mind to terminate me. I thought it odd that she didn't ask how it happened, or even if I was alright. I thought Denna was still mad at me for Saturday's embarrassing scenes, (that she caused). I always informed Denna of any physical problems that I had, as is Ethan Allen policy. As a matter of a fact, a short time earlier I thought I had a possible hernia. I knocked on Denna's door and informed her that I was hurting and would keep an eye on the pain (possible hernia) Denna looked up and starting laughing, saying in a laughing tone that "Everyone is telling me their injuries" I must of given her a puzzled look because she blurted out ," Jackson Rivers has a twisted vein on his penis and has taken some time off" Needless to say I was quite shocked and felt very uncomfortable with that personal information. I often wonder how many other employees know about Jackson Rivers penis problem.. I immediately walked out of her office back to mine....wondering what kind of professional manager would tell a sub-manager something as personal as that..... If you want to check this out, Jackson Rivers was working at the Natick store, not in Franklin where he had started months earlier. I would never of been privy to personal medical information like that. Mr. Kathwari, I sincerely doubt that you would EVER carry yourself as Denna Hamilton freely does. I always thought that private medical information was, ......private. Needless to say, I was called into Denna's office around 3:30pm and Louann Starr was sitting in Denna's office. Denna asked me to take a seat. I was surprised that no other managers were present. I sincerely thought, with the New Natick store soft opening on Oct. 18th that Denna was going to congratulate me for a job well done. Instead Denna brings up the Oct. 4th and 11th time issues. I was shocked and scared, what was happening? Denna started to attack me with accusations about tardiness and I explained that she knew I was on prescribed medication and that I was not up to 101% performance. Denna attacked me about my relationship with Louann and Michael Dupelle, attacked me psychologically, saying that the employee's under my management hated me and complained to her daily. As a matter of fact, I get along very well with the men under my management and I had a open door policy. All of a sudden Denna said "termi......" and I got up, angry and very upset at the events that were happening right in front of my eyes. I walked out of Denna's office and proceeded to slip and hit Michelle's partition as I was walking to my desk. My right knee had given out. Upset and angry that Denna had tried to terminate me 2 days before I was to go out on the FMLA and with my knee sore, I walked back toward Denna's office and told her I had just slipped and banged my knee and turned around and went to clean out my office. Denna comes into my office and tells me,"it's nothing personal" . What kind of manager comes into a terminated individual's office and says something like that? A few minutes later the Franklin Police showed up and ask me for the company keys to the building. I told the officer that they were out in my truck and that the officer made me go out and get them immediately. After I handed the keys to the police officer I was told not to go back into the building by Denna and that my personal belongings would be shipped to my home address. I was escorted to my vehicle by the police.

I drove myself to Milford Med Care to get my back check out by Dr. Ravzi. When I arrived in Milford, I told the staff what had happened in Medfield,Mass. that morning and got a note from Dr. Ravzi to take the rest of the week off for rest. I have never been back to Franklin.

How can a manager, never arrested in his life, be treated like a common criminal? I must say I was very ashamed at the behavior of the Ethan Allen representatives representing you that day as managers.

The very next day, I get a call from Travelers and was "Interrogated aggressively by a Travelers investigated ( I do believe that the conversation was taped). It was reported by Louann Starr that I was going to file a workers Comp claim on my knee. Who in their right mind would file a workers claim for a knee that they had scheduled in 72 hours for surgery? A surgery that they had been planing for 6-8 weeks? Needless to say, Travelers denied my claim, my actual claim was never sent to Travelers and I gave Travelers the names of the witness to my accident that happened at 10:30 in the MORNING! I must tell you that my two witnesses are very scared for their jobs if they say anything. Most employee's in the Boston District are working in fear, we never had this problem with Lisa Brown.
Mr. Kathwari, I loved working for Ethan Allen from the first day I was officially hired Aug. 5th,1999 to present. I do not like the way my name and reputation have been slandered. I do not like the way my rights were denied by Ethan Allen in regards to FMLA or my rights to a truthful hearing on my injured back via Workers Comp. Myself and my family are in dire straits right now and Ethan Allen's Denna Hamilton and Louann Starr have put me in this position. I had my surgery on my left knee on Oct. 23rd and I can not work. I tried called Khruso and Charlie Farfaglia but neither one of them ever returned my call. The Boston District is ripe for disaster, the gossip queen herself is always opening her mouth, I hear, 3 weeks out of Franklin that Donna Wilson-Curry, along with Cheryl Harvey are on their way but....they are next on Denna's hit list. My position is going to be offered to Brett Condon ( a good man) and Rebecca Derbisers is coming back to Franklin...How do I know all this, from Denna Hamilton's big mouth. I plan on fighting for my rights. How many good people have had their Ethan Allen careers destroyed by Denna Hamilton?

I know I have made some pretty tough comments but I've learned from my mentor Denna Hamilton to take the "emotion" out of managing.

EA 00277

# EXHIBIT P

# ETHAN ALLEN ACCIDENT REPORT
## Franklin

**REPORT OF JOB ACCIDENT: employee's preliminary report of work-related injury to employer**

WORKER'S REPORT OF ACCIDENT

Date of report _10/21_                                    No. _____

Report filled out by _LOUANN STARR_     Title _Controller_
Location _FRANKLIN BC_

The following worker reports an injury sustained in the work-related accident described below.

1. Worker's name _Michael ELDRIDGE_

2. Worker's address _97 Whitford St_

   City _Wakefield_                          Home # (401) 797-8284

   State _RI_          SS# _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_

   Zip _02879_             DOB 6/21/56

3. Date of injury                    Time of injury
      10/20/03                         afternoon

4. Address/place where injury happened _10 Kenwood Circle_

5. Description of injury and part of body affected _Knee_

6. Signature of worker _TERMINATED  10/20/03 – PERFORMANCE ISSUES_


Travelers Insurance (1-800-832-7839) called? ✓ YES _____ NO  Report taken by: _____

Employee Claim Number _AJN6467_

Medical Bills are to be sent to:        Travelers Insurance Company
                                        PO Box 1450
                                        Middleboro, MA 02344
CLAIM # AJN6467                         Phone 1-800-422-3340 Fax 1-877-786-5584

# EXHIBIT Q

SOUTH COUNTY HOSPITAL
100 KENYON AVENUE
WAKEFIELD, RHODE ISLAND 02879

EXHIBIT NO. 17
Margie Simmons

NAME: ELDRIDGE,MICHAEL F
MRN: 147405
DOB: 08/21/1956    AGE/SEX: 47Y M    EXAM DATE: 09/04/2003    PT LOC: MAGNETIC R MRI
ORD PHY: RAZVI,SYED
EXAM:   L    MRI LOWER JOINT
                                    DICTATION DATE: 09/05/2003
                            TRANSCRIBED: 09/05/2003 mc

LEFT MRI LOWER JOINT, 9/4/03:

MRI of the left knee was performed due to left knee pain.

TECHNIQUE: An extremity coil was utilized. Axial fast spin echo
T2 weighted, sagittal proton density and T2 weighted, coronal
spin echo proton density weighted, and coronal STIR images were
obtained.

FINDINGS: There is a fairly large horizontal tear in the posterior horn of
the medial meniscus extending to the inferior articular surface. The
anterior horn remains intact. A small focus of high signal is seen in the
body of the lateral meniscus, suspicious for a small radial tear. The
anterior and posterior horns appear intact. There is a small focus of
chondromalacia at patella and the medial facet. No other osteochondral
lesion, fracture, or marrow abnormality is seen. The cruciate ligaments,
collateral ligaments, and extensor mechanism are intact. No abnormal fluid
is seen.

IMPRESSION: Tear in the posterior horn of the medial meniscus. There are
changes suspicious for a small radial tear in the body of the lateral
meniscus. There is a small focus of chondromalacia patella.

INTERPRETED BY: BLECHMAN MD, JAMES
Attending Radiologist BLECHMAN MD, JAMES

                        James W. Blechman, M.D.
                        Diagnostic Radiologist
                        Electronic Signature

TRANSCRIBED BY: MC
CC:

            Final

        *SOUTH COUNTY HOSPITAL*

SOUTH COUNTY HOSPITAL
100 KENYON AVENUE
WAKEFIELD, RHODE ISLAND 02879

NAME: ELDRIDGE,MICHAEL F
MRN: 147405
DOB: 08/21/1956        EXAM DATE: 09/04/2003
ORD PHY: RAZVI,SYED    AGE/SEX: 47Y M    PT LOC: MAGNETIC R MRI
EXAM: L    MRI LOWER JOINT
                                        DICTATION DATE: 09/05/2003
                            TRANSCRIBED: 09/05/2003 mc

LEFT MRI LOWER JOINT, 9/4/03:

MRI of the left knee was performed due to left knee pain.

TECHNIQUE: An extremity coil was utilized. Axial fast spin echo
T2 weighted, sagittal proton density and T2 weighted, coronal
spin echo proton density weighted, and coronal STIR images were
obtained.

FINDINGS: There is a fairly large horizontal tear in the posterior horn of
the medial meniscus extending to the inferior articular surface. The
anterior horn remains intact. A small focus of high signal is seen in the
body of the lateral meniscus, suspicious for a small radial tear. The
anterior and posterior horns appear intact. There is a small focus of
chondromalacia at patella and the medial facet. No other osteochondral
lesion, fracture, or marrow abnormality is seen. The cruciate ligaments,
collateral ligaments, and extensor mechanism are intact. No abnormal fluid
is seen.

IMPRESSION: Tear in the posterior horn of the medial meniscus. There are
changes suspicious for a small radial tear in the body of the lateral
meniscus. There is a small focus of chondromalacia patella.

INTERPRETED BY: BLECHMAN MD, JAMES
Attending Radiologist BLECHMAN MD, JAMES

                    James W. Blechman, M.D.
                    Diagnostic Radiologist
                    Electronic Signature

TRANSCRIBED BY: MC
CC:
            Final

        *SOUTH COUNTY HOSPITAL*

EA 00245

# EXHIBIT R

SOUTH COUNTY HOSPITAL
100 KENYON AVENUE
WAKEFIELD, RHODE ISLAND 02879

3/27/06
EXHIBIT NO 18

Margie Simmons

NAME: ELDRIDGE, MICHAEL F
MRN: 147405          EXAM DATE: 09/20/2003
DOB: 06/21/1956    AGE/SEX: 47Y M    PT LOC: MAGNETIC R  MRI
ORD PHY: RAZVI, SYED

EXAM:  R   MRI LOWER JOINT          DICTATION DATE: 09/20/2003
                                TRANSCRIBED:  09/20/2003 dd

MRI OF THE RIGHT KNEE:

INDICATION: Pain.

TECHNIQUE: An extremity coil was utilized. Axial fast spin echo
T2 weighted, sagittal proton density and T2 weighted, coronal
spin echo proton density weighted, and coronal STIR images were
obtained.

FINDINGS: There is a small effusion and a small Baker cyst. The extensor
mechanism and anterior and posterior cruciate ligaments are intact.
Degenerative signal is noted in the posterior horn of the medial meniscus
but no meniscal tear is demonstrated. Fibrillation of the patella
cartilage is suggested. The medial collateral ligament and lateral
ligamentous complex are intact. No marrow lesion is demonstrated.

IMPRESSION:
1. Small effusion and small Baker cyst.
2. Chondromalacia patella.
3. No meniscal tear.

INTERPRETED BY: SMITH MD, ALLISON MARIE
Attending Radiologist SMITH MD, ALLISON MARIE
                        Allison Smith M.D.
                        Diagnostic Radiologist
                        Electronic Signature

TRANSCRIBED BY: DD
CC:

            Final

        "SOUTH COUNTY HOSPITAL"

0054

# EXHIBIT S

# South County Orthopedics & Physical Therapy, Inc.

One High Street
Wakefield, RI 02879
Tel. 401.789.1422
Fax. 401.782.6810

www.scortho.com

Joseph B. Fitzgerald, MD
Robert G. Marchand, MD
David B. Burns, DO
Mark A. Coppes, MD

Rick Moffitt, PA
John Rodger, PA

Date: _Oct 8, 03_

Dear _Michael Eldridge_

EXHIBIT NO. 19
Margie Simmons

Welcome to South County Orthopedic & Physical Therapy Surgical Services.

Your surgery has been scheduled for _Oct 23, 03_ at South County Hospital. South County Hospital surgical department will contact you the night before surgery instructing you on what time to arrive at the hospital.

The following appointments are scheduled for you at our office at One High Street, Wakefield.

- **Pre-operative appointment:** _done_
  - **with Dr.** _____

- **Physical Therapy (if needed):** _____

- **Post-operative appointment:** _Oct 28 @ 4:00_
  - **with Dr.** _Burns_

All patients should contact their primary medical doctor prior to having surgery to obtain medical clearance.

If you have any questions please do not hesitate to call me directly at (401) 789-1422 ext. 12.

Sincerely,

Jeanne S. Chappel
Surgical Scheduler

0020

# EXHIBIT T

# South County Orthopedics & Physical Therapy, Inc.

One High Street
Wakefield, RI 02879
Tel. 401.789.1422
Fax. 401.782.6810

www.scortho.com

Joseph B. Fitzgerald, MD
Robert C. Marchand, MD
David B. Burns, DO
Mark A. Coppes, MD
————
Rick Moffitt, PA
John Rodger, PA

Date: *Nov 19, 03*

```
327/06
EXHIBIT NO. 38
Margie Simmons
```

Dear *Michael Eldridge*

Welcome to South County Orthopedic & Physical Therapy Surgical Services.

Your surgery has been scheduled for *Dec 8, 03* at South County Hospital. South County Hospital surgical department will contact you the night before surgery instructing you on what time to arrive at the hospital.

The following appointments are scheduled for you at our office at One High Street, Wakefield.

- **Pre-operative appointment:** *done*

    **with Dr.** _____

- **Physical Therapy (if needed):** _____

- **Post-operative appointment:** *Dec 16 @ 4:00*

    **with Dr.** *Burns*

All patients should contact their primary medical doctor prior to having surgery to obtain medical clearance.

If you have any questions please do not hesitate to call me directly at (401) 789-1422 ext. 12.

Sincerely,

*Jeanne*

Jeanne S. Chappel
Surgical Scheduler

0058