UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MICHAEL F. ELDRIDGE,<br>　　　　　　　Plaintiff | )<br>)<br>) | Civil Action 04 12506 MEL |
| v. | )<br>) | |
| ETHAN ALLEN, INC.<br>　　　　　　　Defendant | )<br>)<br>) | |

**PLAINTIFF MICHAEL F. ELDRIDGE'S MEMORANDUM OF LAW
IN SUPPORT OF OPPOSITION TO
DEFENDANT ETHAN ALLEN INC.'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Michael F. Eldridge submits this Memorandum of Law in support of his opposition to Defendant Ethan Allen Inc.'s Motion for Summary Judgment.

**FACTS**

Plaintiff's Concise Statement of Disputed Material Facts pursuant to Local Rule 56.1 is incorporated herein by reference.

**ARGUMENT**

**I.　SUMMARY JUDGMENT MAY NOT BE ENTERED ON THIS RECORD.**

Summary judgment is only appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is genuine if "the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party." *United States v. One*

1

*Parcel of Real Prop.*, 960 F.2d 200, 204 (1st Cir. 1992). Thus, the Court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Barbour v. Dynamic Research Corp.*, 63 F.3d 32, 36 (1st Cir. 1995). The burden is on the non-moving party to present facts that demonstrate that there is a "genuine issue for trial." *LeBlanc v. Great American Ins. Co.*, 6 F.3d 836, 841-42 (1st Cir. 1993). It is important to note that in an employment case, "courts must be 'particularly cautious' about granting the employer's motion for summary judgment." *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 167 (1st Cir. 1998). This is especially true where a plaintiff has established a prima facie case and the case turns on the issue of whether the employer's proffered reason for an adverse employment action is merely pretext. *Id.*

## II. DEFENDANT VIOLATED THE FAMILY AND MEDICAL LEAVE ACT BY INTERFERING WITH AND DENYING PLAINTIFF'S SUBSTANTIVE RIGHTS.

It is impermissible for an employer to deny or otherwise interfere with an employee's exercise of, or an employee's attempt to exercise, his or her rights under the Family and Medical Leave Act ("FMLA"). 29 U.S.C. § 2615(a)(1). To establish that Ethan Allen denied and interfered with Plaintiff's attempt to exercise his substantive rights under the FMLA, Plaintiff is only required to demonstrate, by a preponderance of the evidence, that he was entitled to FMLA leave. *Colburn v. Parker Hannifin/Nichols Portland Division*, 429 F.3d 325, 331 (1st Cir. 2005). Specifically, Plaintiff must establish that (1) he falls within the definition of "eligible employee;" (2) Ethan Allen is covered by the FMLA; (3) he qualified for FMLA leave; (4) he provided Ethan Allen with proper notice; and (5) Ethan Allen denied his rights under the FMLA. *Wheeler v. Pioneer Developmental Services, Inc.*, 349 F. Supp. 2d 158, 164 (D. Mass. 2004). It is important to note that the employer's intent is irrelevant. *Colburn*, 429 F.3d at 331.

A.  **Ethan Allen Terminated Mr. Eldridge's Employment to Deny Him FMLA Leave to Which He was Entitled.**

Ethan Allen violated the FMLA by terminating Mr. Eldridge's employment immediately prior to his scheduled FMLA leave. Ethan Allen does not dispute that Mr. Eldridge meets the first four elements enumerated in *Wheeler*. *Wheeler*, 349 F. Supp. 2d at 164. Ethan Allen argues only that it did not deny Mr. Eldridge his substantive rights under the FMLA because the regulations require an employee to schedule FMLA leave in advance. This argument misses the point entirely. Although Ethan Allen authorized Mr. Eldridge to schedule FMLA leave, his termination was calculated to deny him the benefit. Specifically, in early September 2003, Mr. Eldridge learned and informed his supervisor Denna Hamilton ("Hamilton") that he had a meniscal tear in his knee that required immediate surgery to correct the tear and to prevent further damage. Facts, ¶¶ 9, 10, 11. After agreeing to his supervisor's demand to twice delay his surgery, Mr. Eldridge provided Ethan Allen with written notification on October 4, 2003 that his knee surgery was scheduled for October 23, 2003. *See* Exhibit G, EA330; Facts, ¶¶ 13, 19, 20. On October 20, 2003, less than seventy-two hours before his surgery, Ethan Allen terminated Mr. Eldridge's employment. Facts, ¶ 22. These facts satisfy the *Wheeler* elements and unequivocally demonstrate that Ethan Allen violated the FMLA.[1] *Wheeler*, 349 F. Supp. 2d at 164.

B.  **Ethan Allen Interfered with Mr. Eldridge's FMLA Rights by Manipulatively Twice Delaying his Scheduled Knee Surgery.**

Interfering with the exercise of an employee's rights includes "manipulation by a covered employer to avoid responsibilities under FMLA" such as "changing the essential

---

[1] It is important to note that Ethan Allen cancelled Mr. Eldridge's health insurance benefits immediately upon his termination, less than seventy-two hours before his scheduled surgery. Thus, not only did Mr. Eldridge's termination deny him his right to take FMLA leave but his right to health benefits as an employee of Ethan Allen, which would have covered the costs of his scheduled surgery. Facts, ¶ 24.

3

functions of the job in order to preclude the taking of leave." 29 C.F.R. § 825.220(b)(2). An employee must provide at least thirty (30) days notice before the commencement of FMLA leave and if such notice is not practicable, notice must be given "as soon as practicable" in view of the attendant facts and circumstances. 29 C.F.R. § 825.302(a) and (b). Notice may be verbal and there is no requirement that an employee specifically reference FMLA in his or her request for leave. 29 C.F.R. § 825.302(c). Rather, it is the duty of the employer to ascertain whether FMLA leave, or leave for the purpose of diagnosis or treatment is being sought. 29 C.F.R. § 825.302(c); *Hodgens*, 144 F.3d at 164. In the case at bar, Mr. Eldridge provided notice of his need for FMLA leave as soon as he was able to do so.

Mr. Eldridge tore ligaments in both knees in June or July 2003 and thereafter required prescription pain medication on a daily basis because of the discomfort in his knees. Facts, ¶ 6, 15. When Mr. Eldridge had not recovered from his injury after a scheduled vacation in August 2003, he requested an additional week off to prevent further damage to his knees. Facts, ¶ 18. Hamilton denied Mr. Eldridge's request and did not make any further inquiry of Mr. Eldridge in order to ascertain whether he was invoking his FMLA rights by seeking time off for diagnosis or treatment. *Id.* By failing to make this inquiry, Hamilton violated the FMLA by effectively compelling Mr. Eldridge to forego his FMLA leave.

Mr. Eldridge learned he needed immediate surgery to repair the damage to his knees when he met with his doctor following his September 4, 2003 MRI. Facts, ¶¶ 9, 10. Mr. Eldridge consulted with Hamilton to schedule his leave. Facts, ¶¶ 19, 20. Hamilton first required Mr. Eldridge to delay his surgery until late September 2003. Facts, ¶ 19. In late September 2003, Hamilton demanded that Mr. Eldridge again delay his surgery until after the postponed opening

4

of the new store in Natick, Massachusetts. Facts, ¶ 20. Mr. Eldridge agreed to a further delay with great reluctance. Facts, ¶ 20.

The denial and repeated delays of Mr. Eldridge's FMLA leave request constitute manipulation by Ethan Allen to avoid its obligations under the FMLA. *See* 29 C.F.R. § 825.220(b). Mr. Eldridge was a warehouse supervisor whose primary duties were to oversee the receipt and delivery of product. Facts, ¶ 3. Hamilton required Mr. Eldridge to first forego, and then modify, his taking of FMLA leave by changing the essential functions of Mr. Eldridge's job, stating he was too valuable to the new store opening in Natick, Massachusetts. *See* 29 C.F.R. § 825.220(b)(2); Facts, ¶¶ 18, 19, 20. Further, Mr. Eldridge was sensitive to Ethan Allen's business needs in discussing the scheduling of his leave with Hamilton, but the company utterly disregarded the statutory mandate that scheduling must always be subject to the approval of the health care provider. 29 U.S.C. § 2612(e); 29 C.F.R. § 825.302(e); Facts, ¶¶ 19, 20. The schedule must "best suit the needs of both the employer and the employee." 29 C.F.R. § 825.302(e). Where, as here, the employee's treating physicians recommended surgery as soon as possible and the employee was in pain on a daily basis, the employer's imposition of a six-week delay of the medical procedure is per se manipulative in violation of the language and intent of the FMLA. *See* Facts, ¶¶ 10, 14. Thus, the facts taken in the light most favorable to Mr. Eldridge demonstrate that Ethan Allen interfered with Mr. Eldridge's FMLA rights. Accordingly, Ethan Allen's Motion for Summary Judgment on this issue must be denied.

    **C.    Ethan Allen Terminated Mr. Eldridge's Employment in Retaliation for his Request for FMLA Leave.**

An employer may not discriminate or retaliate against an employee for exercising his or her rights under the FMLA. 29 C.F.R. § 825.220(c); *Colburn*, 429 F.3d at 331. To analyze a cause of action for retaliation under the FMLA, the same framework that is applied to Title VII

discrimination cases has been adopted. *Hodgens*, 144 F.3d at 161. Specifically, to establish a prima facie case of retaliation, a plaintiff has the burden of proving that (1) he exercised his rights under the FMLA; (2) he was the subject of an adverse employment action; and (3) there was a causal connection between the exercise of his rights and the adverse employment action. *Id.* at 161. If a plaintiff makes this showing, the burden then shifts to the employer to set forth a valid, non-discriminatory reason for the termination. *Id.* The burden thereafter shifts back to the plaintiff to show that the reason stated by the employer for the termination was merely a pretext for retaliation for having requested FMLA leave. *Id.* An employee can prove pretext by showing the employer meted out more lenient treatment to similarly situated employees who did not engage in protected activity. *See Harvey v. Anheuser-Busch, Inc.*, 38 F.3d 968, 972 (8th Cir. 1994).

Ethan Allen concedes in its Motion for Summary Judgment that Mr. Eldridge is able to establish a prima facie case of retaliation but counters that Mr. Eldridge was terminated on October 20, 2003 because of his chronic tardiness. However, the material facts in dispute reveal the proffered reason for Mr. Eldridge's termination is merely a pretext for retaliation. While Ethan Allen asserts Mr. Eldridge repeatedly arrived late for work, the supporting documentation is suspect and there is compelling evidence of selective discipline.

Specifically, the only Performance Appraisal Hamilton completed for Mr. Eldridge rated him as "meets requirements" for "dependability" and for "time management and productivity." Exhibit E, 2003 Performance Appraisal. Hamilton signed the Performance Appraisal on September 5, 2003, before she knew Mr. Eldridge needed knee surgery. Facts, ¶ 30. There is no reference to tardiness in the "Future Goals and Objectives" portion of Hamilton's Performance Appraisal. Facts, ¶ 31. On October 4, 2003 Mr. Eldridge provided Hamilton with written

notification that his knee surgery was scheduled for October 23, 2003. Facts, ¶ 13. On October 8, 2003, Hamilton delivered the 2003 Performance Appraisal along with two "final warning" documents both supposedly dated before her receipt of the surgery notification. Facts, ¶¶ 13, 33.

After Hamilton learned about Mr. Eldridge's need for knee surgery, she treated him less favorably than her other direct reports and manufactured the "final warning" documents as an excuse to terminate his employment. *See* Exhibit A, Desrosiers Aff., ¶ 12; Facts, ¶ 25. Hamilton had daily discussions only with Mr. Eldridge to check on what time he started work; she did not check daily on the start times of any of her other twelve direct reports. Facts, ¶ 27. In addition, Hamilton testifies that of her thirteen direct reports in 2003 no one other than Mr. Eldridge was ever late. Facts, ¶ 26. However, the Human Resources employee who was responsible for maintaining the records of employee absences and tardiness testifies that numerous other managers who reported directly to Hamilton regularly arrived late for work. *Id*. Based on the aforementioned there is clearly a dispute of fact. It must therefore be left to the finder of fact to determine which witness is more credible.

In addition to singling out Mr. Eldridge for scrutiny, the substance of Hamilton's testimony about Mr. Eldridge's tardiness is unreliable. First, Mr. Eldridge did not punch a timeclock and Hamilton did not observe Mr. Eldridge arriving late, but instead relied on reports from other warehouse employees. Facts, ¶¶ 28. Based on these third-party party observations Hamilton allegedly created contemporaneous notes in her Franklin Planner. She then transferred some of the notes to a copy of Mr. Eldridge's weekly schedule. *Id*. The notes no longer exist because Hamilton destroyed her 2003 Franklin Planner. *Id*. Second, there were a number of reasons other warehouse employees may not have seen Mr. Eldridge at the start of a shift, such as where in the warehouse he was working, or if Mr. Eldridge was performing off-site work-

related tasks such as purchasing needed warehouse tools or locating wood pallets. Facts, ¶¶ 35, 36.

Shortly after Hamilton first learned about Mr. Eldridge's knee injury in the summer of 2003 she gave Mr. Eldridge a written warning for "tardiness" on July 21, 2003, a day Mr. Eldridge was not originally scheduled to work. Facts, ¶ 29. A "final warning" for "tardiness" presented to Mr. Eldridge on October 8, 2003 inaccurately stated Mr. Eldridge was sixty minutes late on September 1, 2003, a day he was scheduled off for Labor Day. Facts, ¶ 33. Another "final warning" dated September 23, 2003, also presented to Mr. Eldridge on October 8, 2003, was the first written warning Mr. Eldridge had received for paperwork issues, and he had a good-faith basis to dispute its accuracy. *Id.* While Mr. Eldridge concedes that he occasionally arrived at work later than his scheduled time in September and October 2003 because his prescribed pain medication made him groggy, he would stay late to make up the time. Exhibit A, Desrosiers Aff., ¶ 10; Facts ¶¶ 37, 38.

Ethan Allen's alleged reason for terminating Mr. Eldridge's employment was that he was tardy twice after October 8, 2003. Defendant's Rule 56.1 Statement, ¶ 26. The first incident was on Saturday, October 11, 2003. Mr. Eldridge had a scheduled day off but agreed to Hamilton's request to assist in the Natick store starting at 8:00 a.m. Facts, ¶ 39. On Saturday, October 11, 2003, Mr. Eldridge arrived at his usual work site in Franklin at 7:00 a.m. to pick up another employee. *Id.* Mr. Eldridge spent a few minutes responding to work-related questions from customer service and warehouse personnel before learning the other employee had already left for Natick. *Id.* Mr. Eldridge then arrived at the Natick store within the ten-minute leeway Hamilton allowed, at approximately 8:10 a.m. Facts, ¶¶ 21, 40. Two days later, Hamilton made

a note that Mr. Eldridge arrived at 9:20 a.m. Facts, ¶ 40. There is clearly a dispute of fact as to whether Mr. Eldridge was late on October 11, 2003.

The second incident on Saturday, October 18, 2003 related to events that started on the previous day. On Friday, October 17, 2003, Hamilton directed Mr. Eldridge to search the Franklin facility for five cartons of material needed at the Natick location. Facts, ¶ 41. Hamilton requested Mr. Eldridge to deliver the cartons to the Natick store. *Id.* After hours of searching, Mr. Eldridge found only four of the five cartons. *Id.* He continued searching past his scheduled departure time along with another Ethan Allen manager. *Id.* On Saturday, October 18, 2003, Mr. Eldridge was not needed in the Natick location for any tasks other than to deliver the cartons. Facts, ¶ 42. Mr. Eldridge drove first to the Franklin facility to get the company van and diligently conducted one more search for the missing carton. *Id.* It was not until Mr. Eldridge arrived in Natick that another supervisor advised him that the missing carton had been found at the Natick store the previous day. *Id.* Hamilton's documentation again notes that Mr. Eldridge arrived at 9:20 a.m. Facts, ¶ 42. It is a highly unlikely coincidence that Mr. Eldridge arrived late at exactly the same time two Saturdays in a row. Thus, the facts taken in the light most favorable to Mr. Eldridge demonstrate Hamilton manipulated the circumstances to claim that he was tardy.

*Degan v. Goldwell of New England Inc.* describes "a burden that is relatively low" to establish a causal connection between a plaintiff's FMLA request and termination from employment. 2006 WL 300425 *3 (Slip Copy) (D. Mass.) (Feb. 6, 2006). Even more egregious than the plaintiff's situation in *Degan*, Mr. Eldridge was terminated just two weeks after he notified his supervisor of the date his FMLA would commence. *See id.* Facts, ¶ 13, 22. The timing of Mr. Eldridge's termination was suspicious, not only because of the short interval between the FMLA notification on October 4, 2003 and his termination on October 20, 2003, but

9

also because Hamilton terminated Mr. Eldridge just prior to his scheduled surgery. *Id.* Third, once Hamilton learned of Mr. Eldridge's need for surgery, she began requiring more hours of him, including two consecutive Saturdays in October 2003 which were scheduled days off for Mr. Eldridge. Facts, ¶¶ 39, 42. Combined with the evidence of Hamilton's animus and selective discipline, the facts compel the denial of Ethan Allen's Motion for Summary Judgment on the issue of retaliation.[2]

### III. DEFENDANT UNLAWFULLY DISCRIMINATED AGAINST PLAINTIFF BECAUSE OF A HANDICAP.

It is impermissible for an employer to discriminate against an employee because of a handicap if that individual is capable of performing the essential functions of the job with a reasonable accommodation. M.G.L. ch. 151B § 4(16). To analyze a cause of action for employment discrimination under M.G.L. ch. 151B in the absence of direct evidence, the same framework that is applied to Title VII discrimination cases has been adopted. *Blare v. Husky Injection Molding Systems, Inc.*, 419 Mass. 437, 441 (1995). To establish a prima facie case of employment discrimination on account of a handicap, a plaintiff must demonstrate by a preponderance of the evidence that (1) he is handicapped within the meaning of statute; (2) he is qualified to perform the essential functions of the job with or without reasonable accommodation; (3) he was terminated; and (4) the position he had occupied remained open following his termination and the employer sought to fill it. *Dartt v. Browning-Ferris Indus., Inc.*, 427 Mass. 1, 2, 6 (1998). The plaintiff is not required to prove that he was terminated "solely" as a result of his handicap. *Id.* at 2. By meeting this burden, the plaintiff creates a

---

[2] As further evidence of Ethan Allen's animus toward Mr. Eldridge, Mr. Eldridge paid to Ethan Allen his health insurance premium for the pay period after his termination, October 19, 2003 through October 25, 2003. Mr. Eldridge was not covered by Ethan Allen's health insurance plan during this period and this money has never been refunded to him. Exhibit I, Ethan Allen Statement of Earnings 10/18/03-10/25/03. Facts, ¶ 23.

10

presumption of discrimination that the employer may rebut by producing credible evidence that it had a lawful, non-discriminatory reason for terminating the plaintiff's employment. *Wheelock College v. MCAD*, 371 Mass. 130, 136, 138 (1976). If the employer is able to do so, the burden shifts back to the plaintiff to demonstrate that the stated reason for his termination was not the actual reason but merely pretext for discrimination. *Id.* at 139.

### A.    Mr. Eldridge is Able to Establish a Prima Facie Case of Employment Discrimination Because He was Handicapped Under State Law.

Under state law, an employee is handicapped if he or she (1) has a physical or mental impairment that substantially limits a major life activity; (2) has a record of having such an impairment; or (3) is regarded as having such an impairment. M.G.L. ch. 151B § 1(17). It is undisputed that major life activities include "caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." M.G.L. ch. 151B § 1(20).

Based on the plain language of the statute, qualifying major life activities are not limited to the tasks of employment. Despite this, Ethan Allen maintains that Mr. Eldridge's knee injury did not substantially limit a major life activity because it did not prevent him from performing the duties of his job as a Warehouse Manager. Mr. Eldridge was handicapped from August 2003 through the date the company terminated his employment because Mr. Eldridge's knee injury substantially limited his major life activities of standing, walking, climbing stairs, and lifting. *See* 29 C.F.R. 1630.2(i); Facts, ¶ 16.

Ethan Allen also asserts that the temporary nature of Mr. Eldridge's injury precluded him from being handicapped within the meaning of the statute. However, the critical inquiry is whether Mr. Eldridge was handicapped at the time relevant to this cause of action – his termination. *Keeling v. Wilfert Brothers Realty Co.*, 22 MDLR 201 (2000); *aff'd by Keeling v. Wilfert Brothers Realty Co.*, 2002 WL 31318563 (May 22, 2002); *aff'd by Wilfert Bros. Realty*

11

*Co. v. MCAD*, 20 Mass. L. Rptr. 611 (2006) (temporary incapacity due to torn ligament in knee held to be a disability); *Dahill v. Police Dep't of Boston*, 434 Mass. 233, 239 (2001) (substantial deference shall be given to MCAD's interpretation of M.G.L. ch. 151B even though it does not carry the force of law). The evidence unequivocally establishes that Mr. Eldridge was handicapped both prior to and at the time of his termination. Specifically, his physical impairment substantially limited the aforementioned major life activities.

Additionally, it is Ethan Allen's position that due to Mr. Eldridge's chronic tardiness, he was not qualified to perform the essential functions of his job with or without a reasonable accommodation. Once again the evidence does not support Ethan Allen's position. Despite his impairment, Mr. Eldridge was at all times able to perform the essential functions of the job. As mentioned previously, the documentation and other evidence related to Mr. Eldridge's tardiness is both suspect and unreliable. In addition, on those occasions that Mr. Eldridge concedes that he did arrive at work later than his scheduled time in September and October 2003 (because he was performing business-related tasks off-site or because his prescribed pain medication made him groggy), he stayed late to make up the time and completed all assigned tasks. Facts, ¶¶ 36, 37, 38.

Furthermore, whether attendance strictly according to schedule was an essential function of Mr. Eldridge's position is a disputed material fact. Whether a function is essential to a job must be determined on a case-by-case basis in view of the attendant facts and circumstances. *Ward v. Massachusetts Health Research Institute, Inc.*, 209 F.3d 29, 35 (1st Cir. 2000). The burden of proof is on the defendant. *Id.* Ethan Allen highlights the language of its employee handbook, which states that repeated incidents of absence or lateness may subject an employee to disciplinary action. However, Ethan Allen has produced no evidence that strict adherence to a

scheduled start time was an essential function of Mr. Eldridge's job as a Warehouse Manager. Hamilton testified that she allowed her direct reports a ten-minute leeway from their scheduled start time. Facts, ¶ 21. Mr. Eldridge testified that his tasks varied daily and he did not punch a timeclock. Facts, ¶¶ 36, 37. Further, Mr. Eldridge had discretion regarding the manner and order in which he performed his tasks, as indicated by his 2003 Performance Appraisal. Exhibit E, 2003 Performance Appraisal. Hamilton rated Mr. Eldridge as "meets requirements" for "time management and productivity," defined as "prioritizes effectively and consistently meets deadlines." *Id.* Therefore, arriving precisely according to schedule was not an essential requirement of Mr. Eldridge's job. These facts require the denial of Ethan Allen's Motion for Summary Judgment.

### B. Mr. Eldridge is Able to Establish a Prima Facie Case of Discrimination Because Hamilton Perceived Mr. Eldridge as Handicapped.

Independent of whether Mr. Eldridge's knee injury constituted a handicap within the meaning of M.G.L. ch. 151B, Mr. Eldridge asserts a claim of discrimination based on perceived handicap. The evidence indisputably establishes that Hamilton was aware of Mr. Eldridge's injury. Hamilton first became aware that Mr. Eldridge had suffered an injury to his knee in June or July 2003. Facts, ¶ 7. Thereafter, Mr. Eldridge requested time off to prevent further damage to his knees in August 2003 and twice requested FMLA leave to undergo surgery to repair the meniscal tears in his knees. Facts, ¶¶ 18, 19, 20. Combined with Hamilton's disparate treatment of Mr. Eldridge which thereafter ensued (*see supra* argument II.C.), there is ample support for the notion that Hamilton perceived Mr. Eldridge as handicapped from August 2003 until the date of his termination, October 20, 2003. *See Katz v. City Metal Co.*, 87 F.3d 26, 32-33 (1st Cir. 1996) (plaintiff presented evidence of employer's knowledge of medical problems and

limitations, giving the jury sufficient evidence to conclude that the employer perceived him as handicapped).

### C. Mr. Eldridge was a Qualified Handicapped Person Because He Suffered a Work-Related Injury.

Despite Ethan Allen's argument to the contrary, Mr. Eldridge's work-related injury to his back properly serves as a basis for a charge of employment discrimination. An employee who has sustained a work-related injury but remains capable of performing the essential functions of a particular job, with or without reasonable accommodation, is deemed to be a qualified handicapped person within the meaning of M.G.L. ch. 151B. M.G.L. ch. 152 § 75B(1).

Mr. Eldridge pulled his back during a furniture delivery in Medfield, Massachusetts on the morning of October 20, 2003. Facts, ¶ 44. Mr. Eldridge reported he had sustained a work-related injury to Hamilton at approximately 1:00 p.m. that afternoon and he was terminated a few hours later. *Id.* As mentioned previously, Mr. Eldridge remained at all times capable of performing the essential functions of his position as a Warehouse Manager. Thus, Mr. Eldridge's back injury rendered him a qualified handicapped person within the meaning of M.G.L. ch. 151B. Because "the burden of establishing a prima facie case of disparate treatment is not onerous," Mr. Eldridge has met the threshold requirement in regard to handicap discrimination when the facts are taken in the light most favorable to him. *Radvilas v. Stop & Shop, Inc.,* 18 Mass. App. Ct. 431, 441 (1984).

### D. Ethan Allen's Stated Reason for Mr. Eldridge's Termination is Merely a Pretext for Discrimination on the Basis of a Handicap.

The evidence unequivocally establishes that Hamilton treated Mr. Eldridge less favorably than similarly situated employees who were not handicapped or perceived as handicapped. *See Matthews v. Ocean Spray Cranberries, Inc.,* 426 Mass. 122, 129 (1997). To begin, Hamilton

singled Mr. Eldridge out for disparate treatment after becoming aware of his handicap by checking, on a daily basis, when he arrived for work, but not doing the same for any of her other direct reports. Facts, ¶ 27. In support of her actions, Hamilton testifies that of her thirteen direct reports in 2003, Mr. Eldridge was the only employee who ever arrived to work late. Facts, ¶ 26. However, the Human Resources employee who maintained the records of employee tardiness testifies to the contrary, stating that a significant number of Hamilton's direct reports regularly arrived late for work. Facts, ¶ 26. Despite this, Mr. Eldridge was the only one of Hamilton's direct reports who received warnings for tardiness. The warnings were inaccurate and inherently unreliable. *See supra* argument II.C. Finally, Hamilton required Mr. Eldridge to work on his days off on two consecutive Saturdays and then manipulated the circumstances to make it appear he was late. Facts, ¶¶ 39, 42. Therefore, Mr. Eldridge is able to establish that the stated reason for his termination was a mere pretext for discrimination, requiring the denial of Ethan Allen's Motion for Summary Judgment on the issue of discrimination based on an actual or perceived handicap.

IV. **DEFENDANT VIOLATED THE MASSACHUSETTS WORKER'S COMPENSATION ACT.**

    A. **Ethan Allen Terminated Plaintiff in Retaliation for Reporting a Work-Related Injury.**

It is impermissible for an employer to discharge or otherwise discriminate against an employee in retaliation for exercising a right that is protected by the Massachusetts Worker's Compensation Act ("WCA"). M.G.L. ch. 152 § 75B(2). In order to establish that he was terminated in violation of the WCA, Plaintiff must prove that (1) he engaged in an activity that is protected by the WCA; (2) Ethan Allen was aware that he engaged in the protected activity; (3)

he was thereafter the subject of an adverse employment action; and (4) but for his exercise of a right that is protected by the WCA, he would not have been subject to the adverse employment action. *Benoit v. Technical Mfg. Corp.*, 331 F.3d 166, 177 (1st Cir. 2003).

Mr. Eldridge pulled his back during a furniture delivery on the morning of October 20, 2003. Facts, ¶ 44. Mr. Eldridge reported this work-related injury to Hamilton upon her arrival at the Franklin facility at approximately 1:00 p.m. that afternoon.[3] *Id.* Mr. Eldridge was terminated a few hours later. Facts, ¶ 22. Ethan Allen argues that Hamilton made the decision to terminate Mr. Eldridge's employment prior to learning that Mr. Eldridge had sustained a work-related injury. Hamilton's self-serving testimony is the only evidence that has been offered in support of Ethan Allen's position. If Mr. Eldridge's tardiness on Saturday, October 18, 2003 was truly the event which precipitated his termination, Hamilton would have fired him that day. As such, when the decision to terminate Mr. Eldridge's employment was made remains a material dispute of fact to be resolved by the fact finder.

In addition to his claim that the timing of his termination gives rise to an inference of retaliation under the WCA, Mr. Eldridge asserts that the stated reason for his termination, chronic tardiness, is merely pretext. As detailed above, Mr. Eldridge was treated differently than Hamilton's other direct reports. Specifically, Hamilton required Mr. Eldridge to work on his days off on two consecutive Saturdays and then unfairly utilized his arrival time as the basis for his termination only a few hours after Mr. Eldridge reported his work-related injury to Hamilton. Defendant's Rule 56.1 Statement, ¶ 26; Facts, ¶¶ 39, 42. Therefore, but for the exercise of his rights under the WCA, Mr. Eldridge would not have been terminated.

---

[3] Both parties concede that the law remains unsettled as to whether merely informing one's employer that one has sustained a work-related injury rises to the level of an activity that is protected under the WCA. *See e.g. Piderit v. Siegal & Sons Investments, Ltd.*, 55 Mass. App. Ct. 1 (2002), *review denied* 437 Mass. 1107; *Ourfalian v. Aro Mfg. Co.*, 31 Mass. App. Ct. 294 (1991).

### B.     Ethan Allen Violated the WCA by Failing to Provide Mr. Eldridge a Rehiring Preference.

The WCA stipulates that a former employee, who has lost his or her job as a result of sustaining a work-related injury that is compensable under the WCA must be given preference over new applicants upon reapplication. M.G.L. ch. 152 § 75A. Ethan Allen contends that it has not violated M.G.L. ch. 152 § 75A on the grounds that Mr. Eldridge did not apply for re-employment with Ethan Allen following his termination. Mr. Eldridge did communicate with one of Ethan Allen's vice presidents seeking to be rehired. Exhibit L, Eldridge Email to Khruso Elley. There was no follow-up to this communication, although it is clear Ethan Allen would have had to fill Mr. Eldridge's Warehouse Manager position. Accordingly, Ethan Allen is not entitled to summary judgment on Mr. Eldridge's claims under the WCA.

## CONCLUSION

The evidence clearly establishes that Ethan Allen violated the FMLA, M.G.L. ch. 151B, and the WCA. As detailed herein, Mr. Eldridge was treated differently than Hamilton's other direct reports once Hamilton learned of Mr. Eldridge's knee injury, a serious health condition under the FMLA and an actual or perceived handicap within the meaning of M.G.L. ch. 151B. Ethan Allen ultimately terminated Mr. Eldridge immediately prior to the onset of his FMLA leave and only several hours after Mr. Eldridge reported to Hamilton that he had sustained a work-related injury. The facts taken in the light most favorable to Mr. Eldridge, together with all reasonable inferences, establish a prima facie case under each count of the Complaint and demonstrate the pretextual nature of the employer's proffered reason for Mr. Eldridge's termination. Thus, Defendant's Motion for Summary Judgment must be denied in its entirety.

                                        Respectfully submitted,
                                        Michael F. Eldridge

                                        By his attorneys,

Date:   September 29, 2006

                                        Edward S. Englander (BBO # 154540)
                                        Denise A. Chicoine (BBO # 564152)
                                        ENGLANDER & CHICOINE P.C.
                                        Two Newton Place, Suite 200
                                        Newton, MA 02458-1633
                                        Tel. (617) 964-5400