UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MICHAEL F. ELDRIDGE, | ) | Civil Action 04 12506 MEL |
| Plaintiff | ) | |
| v. | ) | |
| | ) | |
| ETHAN ALLEN, INC. | ) | |
| Defendant | ) | |

**PLAINTIFF'S CONCISE STATEMENT OF DISPUTED MATERIAL FACTS
IN SUPPORT OF
OPPOSITION TO ETHAN ALLEN INC.'S MOTION FOR SUMMARY JUDGMENT**

NOW COMES Plaintiff Michael F. Eldridge to submit this Concise Statement of

Disputed Material Facts as to which a genuine triable issue exists pursuant to Local Rule 56.1.

**I.      RESPONSE TO DEFENDANT'S STATEMENT OF MATERIAL FACTS AS TO
WHICH THE MOVING PARTY CONTENDS THERE IS NO GENUINE ISSUE
TO BE TRIED**

1.      Admitted.
2.      Admitted.
3.      Admitted.
4.      Admitted.
5.      Admitted.
6.      Admitted.
7.      Admitted.
8.      Admitted.
9.      Denied.
10.     Admitted.
11.     Denied.
12.     Denied.
13.     Admitted.
14.     Admitted.
15.     Admitted.
16.     Denied.
17.     Denied.
18.     Denied.
19.     Denied.
20.     Denied.
21.     Denied.
22.     Denied.

23.   Denied.
24.   Denied.
25.   Denied.
26.   Denied.
27.   Denied.
28.   Denied.
29.   Denied.
30.   Denied.
31.   Denied.
32.   Plaintiff admits only that Hamilton terminated Plaintiff's employment at the meeting on
      October 20, 2003 and that Louann Starr was present.  Plaintiff denies the remainder of
      the allegations in this paragraph.
33.   Admitted.
34.   Plaintiff admits that the police were summoned to remove him from the premises.
      Plaintiff denies the remainder of the allegations in this paragraph.
35.   Plaintiff admits that Starr reported a knee injury to worker compensation carrier.  Plaintiff
      denies the remainder of the allegations in this paragraph.
36.   Denied.
37.   Admitted.
38.   Admitted.
39.   Admitted.
40.   Admitted.
41.   Admitted.
42.   Admitted.
43.   Admitted.
44.   Admitted.
45.   Admitted.
46.   Admitted.
47.   Admitted.
48.   Admitted.
49.   Admitted.
50.   Denied.
51.   Admitted.
52.   Admitted.
53.   Admitted.
54.   Admitted.
55.   Admitted.
56.   Denied.
57.   Admitted.
58.   Admitted.
59.   Admitted.
60.   Denied.
61.   Admitted.

## II.    PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.    Mr. Eldridge's Exemplary Performance at Ethan Allen

1.    Mr. Eldridge began working for Ethan Allen in 1999 as a truck driver. Exhibit B, Deposition of Michael F. Eldridge ("Eldridge Depo."), pp. 35-36; Defendant's Rule 56.1 Statement, ¶ 4.

2.    As a result of Mr. Eldridge's commendable performance, he received a series of promotions and annual salary increases. Within the first week of his employment, Mr. Eldridge was promoted to the position of supervisor. Exhibit F, Personnel Action Notice EA353.

3.    As a warehouse supervisor Mr. Eldridge's primary duties were to oversee the receipt and delivery of product. Exhibit B, Eldridge Depo. p. 37.

4.    During the period August 2000 through May 2002, Mr. Eldridge received three merit based pay increases. Exhibit F, Personnel Action Notice EA349-351. In December 2002, Mr. Eldridge received a promotion to become the warehouse manager. Exhibit F, Personnel Action Notice EA348.

5.    The last performance appraisal Mr. Eldridge received before Denna Hamilton ("Hamilton") became his direct supervisor is dated May 2002. In this appraisal, Mr. Eldridge's performance exceeded requirements in seven out of ten categories and was rated exceptional in two categories, including "dependability." Exhibit D, Eldridge 2002 Performance Appraisal.

### B.    Mr. Eldridge's Serious Health Condition

6.    In June or July 2003, Mr. Eldridge tore ligaments in both of his knees in a non-work related accident. Exhibit B, Eldridge Depo. p. 140; Defendant's Rule 56.1 Statement, ¶ 38.

7.  In June or July 2003, Mr. Eldridge told Hamilton about the injury he had suffered to his knees because he was "hobbling" around. Exhibit B, Eldridge Depo. p. 156.

8.  Mr. Eldridge first requested time off to address his serious health condition in late August 2003. Defendant's Rule 56.1 Statement, ¶ 41.

9.  MRI tests performed on September 4, 2003 and September 20, 2003 revealed a meniscal tear in each knee. Exhibit B, Eldridge Depo. pp. 145-47; Defendant's Rule 56.1 Statement, ¶¶ 44-45.

10. Both of Mr. Eldridge's treating physicians recommended surgery as soon as possible to correct the meniscal tears revealed by the MRI tests. Exhibit B, Eldridge Depo. pp. 146, 149-50.

11. After receiving the results of his first MRI test sometime after September 4, 2003, Mr. Eldridge notified Hamilton that he needed knee surgery as soon as possible because he was in pain on a daily basis.  Exhibit C, Deposition of Denna Hamilton ("Hamilton Depo."), p. 85; Exhibit B, Eldridge Depo. p. 149-50; Exhibit A, Affidavit of Rebecca Desrosiers ("Desrosiers Aff."), ¶ 6.

12. Mr. Eldridge formally notified Defendant's Human Resources Department of his impending need for FMLA leave on at least two occasions in September 2003. Exhibit B, Eldridge Depo. pp. 153-55; 166; Exhibit A, Desrosiers Aff., ¶ 9.

13. On October 4, 2003, Mr. Eldridge provided Hamilton with written notification that his knee surgery was scheduled for October 23, 2003. Exhibit G, EA330; Exhibit B, Eldridge Depo. pp. 179-82; Exhibit C, Hamilton Depo. pp. 107-109.

14. From the date of his injury through the date the company terminated his employment, Mr. Eldridge worked with pain in both of his knees. Exhibit B, Eldridge Depo. pp. 101, 143-44, 146, 149-50, 160; *see also* Exhibit A, Desrosiers Aff., ¶ 6.

15. From August 2003 through the date the company terminated his employment, Mr. Eldridge was prescribed medication to suppress the pain in his knees. Exhibit B, Eldridge Depo. pp. 101, 149, 152.

16. From August 2003 through the date the company terminated his employment, Mr. Eldridge's knee injury substantially limited the major life activities of standing, walking, climbing stairs, and lifting. Exhibit B, Eldridge Depo. pp. 149, 191.

17. Mr. Eldridge underwent arthroscopic surgery on October 23, 2003 for his left knee and on December 8, 2003 for his right knee. Exhibit B, Eldridge Depo. pp. 192, 194-95; Defendant's Rule 56.1 Statement, ¶¶ 50-51.

**C.     Defendant's Interference with Mr. Eldridge's FMLA Rights**

18. In August 2003 Hamilton denied Mr. Eldridge's request for time off to recover from his knee injury because he was too valuable to the company on the project of opening the new store in Natick, Massachusetts. Exhibit B, Eldridge Depo. p. 159; Defendant's Rule 56.1 Statement, ¶ 41.

19. Hamilton first required Mr. Eldridge to delay his surgery until late September 2003. Exhibit B, Eldridge Depo. p. 150, 160-61; Defendant's Rule 56.1 Statement, ¶ 47.

20. In late September 2003, Hamilton demanded that Mr. Eldridge again delay his surgery, until after the postponed opening of the new store in Natick, Massachusetts.  Mr. Eldridge agreed with great reluctance. Exhibit B, Eldridge Depo. pp. 150, 163, 168; Exhibit A, Desrosiers Aff., ¶¶ 7, 8; Defendant's Rule 56.1 Statement, ¶ 48.

21. Hamilton allowed her direct reports a ten-minute leeway from their scheduled start time, and required her direct reports to call her if they were going to arrive more than ten minutes late. Exhibit C, Hamilton Depo. p. 69.

22.   Hamilton terminated Mr. Eldridge's employment on October 20, 2003, less than seventy-two hours before his scheduled surgery. Exhibit F, Personnel Action Notice EA347.

23.   Mr. Eldridge paid to Ethan Allen his health insurance premium for the pay period October 19, 2003 though October 25, 2003. Exhibit I, Ethan Allen Statement of Earnings 10/18/03-10/25/03.

24.   Due to the cancellation of his health insurance coverage on October 20, 2003, Mr. Eldridge personally incurred liability for medical care costing $8,085.00 for his surgery October 23, 2003 and an additional $11,000.00 for his surgery on December 8, 2003. Plaintiff Michael F. Eldridge's Response to Defendant Ethan Allen's First Set of Interrogatories, Answer 7.

## III.   PLAINTIFF'S STATEMENT OF DISPUTED MATERIAL FACTS AS TO WHICH A GENUINE TRIABLE ISSUE EXISTS

### A.   Hamilton's Selective Discipline of Eldridge

25.   After Hamilton learned about Mr. Eldridge's need for knee surgery, she treated him less favorably than her other direct reports and appeared to be looking for an excuse to terminate his employment. Exhibit A, Desrosiers Aff., ¶ 12.

26.   Hamilton testifies that of her thirteen direct reports in 2003 no one other than Mr. Eldridge was ever late. Exhibit C, Hamilton Depo. pp. 96, 98-100.  However, the Human Resources employee who was responsible for maintaining the records of employee absences and tardiness testifies that numerous other managers who reported directly to Hamilton regularly arrived late for work. Exhibit A, Desrosiers Aff. ¶ 10.

27.   Hamilton had daily discussions only with Mr. Eldridge to check on what time he started work. Exhibit C, Hamilton Depo. p. 95.  She did not check daily on the start times of any of her other twelve direct reports. *Id.* pp. 99-100.

28.     Hamilton did not personally observe Mr. Eldridge's alleged tardiness but instead
        contacted other warehouse employees to ask whether Mr. Eldridge had arrived.  Based on
        these third-party observations, Hamilton allegedly created contemporaneous notes in her
        Franklin Planner and then transferred some of her notes from her Franklin Planner to a
        copy of Mr. Eldridge's weekly schedule.  Hamilton destroyed her 2003 Franklin Planner
        notes. Exhibit C, Hamilton Depo. pp. 67, 137, 162, 171-172.

29.     Shortly after Hamilton first learned about Mr. Eldridge's knee injury in the summer of
        2003 she gave Mr. Eldridge a written warning for "tardiness" on July 21, 2003, a day Mr.
        Eldridge was originally not scheduled to work. Exhibit C, Hamilton Depo. p. 186;
        Exhibit H, Boston District Weekly Schedule 2003, EA 142.

30.     Hamilton signed the only Performance Appraisal she completed for Mr. Eldridge on
        September 5, 2003, before she knew Mr. Eldridge needed knee surgery. Exhibit E,
        Eldridge 2003 Performance Appraisal; Plaintiff's Undisputed Material Facts ¶ 11.

31.     On Mr. Eldridge's 2003 Performance Appraisal, Hamilton rated him as "meets
        requirements" for "dependability."  There is no reference to tardiness in the Future Goals
        and Objectives portion of the 2003 Performance Appraisal. Exhibit E, Eldridge 2003
        Performance Appraisal.

32.     On Mr. Eldridge's 2003 Performance Appraisal, Hamilton rated him as "meets
        requirements" for "time management and productivity." Exhibit E, Eldridge 2003
        Performance Appraisal.

33.     On October 8, 2003, the third workday after Mr. Eldridge provided Hamilton with written
        notification that his knee surgery was scheduled for October 23, 2003, Hamilton
        delivered the 2003 Performance Appraisal along with two "final warning" documents.
        Exhibit K, Corrective Action Forms, EA 195-96, 198; Exhibit C, Hamilton Depo. pp.
        174-75; 181-82.  The "final warning" for "tardiness" presented to Mr. Eldridge on
        October 8, 2003 inaccurately stated Mr. Eldridge was sixty minutes late on September 1,

2003, a day he was scheduled off for Labor Day. Compare Exhibit K, Corrective Action Form, EA 195 with Exhibit H, Boston District Weekly Schedule 2003, EA 131.  The "final warning" dated September 23, 2003 was the first written warning Mr. Eldridge had received for paperwork issues, and he disputed its accuracy. Exhibit K, EA198; Exhibit B, Eldridge Depo. pp. 103-106.

### B.    Mr. Eldridge was a Dedicated Manager

34.    Mr. Eldridge managed the warehouse well.  He had a good relationship with the employees who reported to him. Exhibit A, Desrosiers Aff., ¶ 11; Exhibit B, Eldridge Depo. p. 99.

35.    On occasion Mr. Eldridge would arrive at work later than his scheduled time because he was performing off-site work-related tasks such as purchasing needed warehouse tools, locating wood pallets, or providing transportation for other warehouse employees. Exhibit B, Eldridge Depo. pp. 75-76.

36.    Mr. Eldridge's tasks varied each day, sometimes requiring him to work in a part of the warehouse where other employees would not see him when he first arrived. Exhibit B, Eldridge Depo. p.  80.

37.    Mr. Eldridge did not punch a timeclock. Exhibit B, Eldridge Depo. p.  80.  He would stay late if he came in after his scheduled start time.  Exhibit A, Desrosiers Aff., ¶ 10.

38.    In September and October 2003, Mr. Eldridge occasionally arrived at work later than his scheduled time because the pain medication his doctor had prescribed made him groggy. Exhibit B, Eldridge Depo. pp. 78, 80; Exhibit C, Hamilton Depo. p. 158.

39.    On Saturday, October 11, 2003 Mr. Eldridge had a scheduled day off but agreed to Hamilton's request to assist in the Natick store starting at 8:00 a.m.  Exhibit C, Hamilton Depo. pp. 126-27.  Mr. Eldridge arrived at his usual work site in Franklin at 7:00 a.m. to pick up another employee.  Mr. Eldridge spent a few minutes responding to work-related

questions from customer service and warehouse personnel before learning the other employee had already left for Natick. Exhibit B, Eldridge Depo. pp. 83-86.

40.    On Saturday, October 11, 2003, Mr. Eldridge testified that he arrived at the Natick store at approximately 8:10 a.m. Exhibit B, Eldridge Depo. pp. 83-85. Hamilton testified that two days later she made a notation that Mr. Eldridge had arrived at 9:20 on Saturday, October 11, 2003. Exhibit C, Hamilton Depo. pp. 127-28.

41.    On Friday, October 17, 2003, Hamilton directed Mr. Eldridge to search the Franklin facility for five cartons of material needed at the Natick location. Hamilton requested Mr. Eldridge to deliver the cartons to the Natick store. After hours of searching, Mr. Eldridge found only four of the five cartons. He continued searching past his scheduled departure time along with another Ethan Allen manager. Exhibit B, Eldridge Depo. pp. 90-93; 126-27; Exhibit C, Hamilton Depo. pp. 125-26.

42.    On Saturday, October 18, 2003, Mr. Eldridge drove first to the Franklin facility to get the company van and conduct one more search for the missing carton. Mr. Eldridge called Hamilton to let her know he was on his way. Upon arriving in Natick, another supervisor advised Mr. Eldridge that the missing carton had been found in Natick the previous day. Exhibit B, Eldridge Depo. pp. 90-93; 126-27. Mr. Eldridge was not needed for any other tasks after delivering the cartons and went home. Exhibit B, Eldridge Depo. p. 92. Interestingly, Hamilton again noted that Mr. Eldridge had arrived at exactly 9:20 a.m. Compare Exhibit H, Boston District Weekly Schedule, EA128 with Exhibit H, Boston District Weekly Schedule, EA 129.

43.    Mr. Eldridge worked nineteen of the twenty-three days from September 28, 2003 to October 20, 2003. Exhibit H, Boston District Weekly Schedule 2003, EA 126 to EA 129.

44.    On Monday, October 20, 2003, Mr. Eldridge pulled his back during a furniture delivery in Medfield in the morning. Exhibit B, Eldridge Depo. pp. 113-16. Mr. Eldridge reported

this injury to Hamilton upon her arrival at the Franklin facility at approximately 1:00 p.m. that day.

45.   On November 10, 2003, Mr. Eldridge sought reinstatement from Ethan Allen's Vice President. Exhibit L, Eldridge email to Khruso Elley, EA 278. Exhibit B, Eldridge Depo. p.120.

Respectfully submitted,
Michael F. Eldridge

Date:   September 29, 2006

By his attorneys,

Edward S. Englander (BBO # 54540)
Denise A. Chicoine (BBO # 564152)
ENGLANDER & CHICOINE P.C.
Two Newton Place, Suite 200
Newton, MA 02458-1633
Tel. (617) 964-5400

# Exhibit List

A     Affidavit of Rebecca DesRosiers

B     Deposition of Michael F. Eldridge

C     Deposition of Denna Hamilton

D     2002 Performance Appraisal

E     2003 Performance Appraisal

F     Personnel Action Notices

G     Surgery Scheduling Note

H     Boston District Weekly Schedule 2003

I     Ethan Allen Statement of Earnings

J     Plaintiff Michael F. Eldridge's Response to Defendant Ethan Allen's First Set of Interrogatories

K     Corrective Action Forms

L     Eldridge Email to Khruso Elley

M     Affidavit of Denise A. Chicoine, Esq.



UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

MICHAEL F. ELDRIDGE,         )        Civil Action 04 12506 MEL
           Plaintiff    )
v.                   )
                    )
ETHAN ALLEN, INC.       )
          Defendant    )

## AFFIDAVIT OF REBECCA DESROSIERS

I, Rebecca Desrosiers, depose and say as follows:

1.    My name is Rebecca Desrosiers and I am not a party in the above-captioned matter.

2.    The statements sworn to herein are stated of my own personal knowledge except where I indicate that the statement is upon information and belief and as to those statements I believe them to be true.

3.    I worked at Ethan Allen as an administrative assistant for Human Resources for the Boston District from late 2000 until I voluntarily resigned September 20, 2003.

4.    My job included communicating information from employees to Ethan Allen's corporate offices regarding employee benefits such as health insurance, vacation, and leaves of absence, and maintaining employee files.

5.    During the summer and early fall of 2003 Michael Eldridge spoke to me a number of times about an injury he had suffered to his knees and the medical treatment he needed for his injury.

6.    In early September 2003, Mr. Eldridge told me he would need time off for knee surgery and asked me about the Family Medical Leave Act. Mr. Eldridge indicated that he was in pain and hoped to have the surgery as soon as possible.

7.    During August and September 2003 I spoke with Mr. Eldridge's direct supervisor, Denna Hamilton, about Mr. Eldridge's knee injury and need for surgery. Ms. Hamilton told me that she required Mr. Eldridge to delay his surgery until after the opening of the new store in Natick, Massachusetts.

8.    In early September Mr. Eldridge informed me that, at Ms. Hamilton's request, he did delay his surgery by over one month, until after the scheduled opening of the new store.

9.  In September 2003, Mr. Eldridge informed me of the date in October 2003 on which he had scheduled his knee surgery. I noted the surgery date in Mr. Eldridge's personnel file and communicated to the corporate office Mr. Eldridge's need for FMLA leave in late October 2003.

10. In my role as an administrative assistant for Human Resources, I maintained calendars for absences and tardiness for all employees at Franklin and all the managers in the Boston district who reported to Ms. Hamilton, which included Mr. Eldridge. Mr. Eldridge was one of the more dedicated managers, and if he came in after his scheduled start time he stayed later in the day. Numerous other managers who reported directly to Ms. Hamilton regularly arrived late for work.

11. I worked at the same facility as Mr. Eldridge and observed his work habits on a regular basis. Based on my observations, Mr. Eldridge did a good job managing the warehouse and was well-liked by the employees that reported to him.

12. I observed Ms. Hamilton's interactions with Mr. Eldridge and her other direct reports. After Ms. Hamilton learned about Mr. Eldridge's need for knee surgery, she treated him less favorably than her other direct reports and appeared to be looking for an excuse to terminate his employment.

Signed and sworn to under the pains and penalties of perjury this 5th day of September, 2006.

Rebecca Desrosiers

Rebecca Desrosiers

# Exhibit

# B

1

1           UNITED STATES DISTRICT COURT

2            DISTRICT OF MASSACHUSETTS

3                   CIVIL ACION

4                NO. 04-12506-MEL.

5

6     **************************

7     MICHAEL F. ELDRIDGE,     *

8       PLAINTIFF            *

9     VS.                 *

10    ETHAN ALLEN INC.,      *

11      DEFENDANT          *

12    **************************

13

14         **DEPOSITION of MICHAEL F. ELDRIDGE**, a witness called on behalf of the Defendant, pursuant to the applicable provisions of Massachusetts Rules of Civil Procedure, before Marjorie L. Simmons, a Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts on Monday, March 27, 2006, commencing at 11:15 a.m., at the offices of FOLEY & LARDNER, LLP, 111 Huntington Avenue, Boston, Massachusetts.

**COPY**

**DUNN AND GOUDREAU**
**COURT REPORTING SERVICE INC.**
**ONE STATE STREET**
**BOSTON, MASSACHUSETTS 02109**
**{617} 742-6900**

1         performance review, anything about it?

2   A.    It was outstanding.

3   Q.    I am going to ask you about Ethan Allen/,

4         how did you come to be employed by Ethan

5         Allen?

6   A.    ADS lost the account.  They were the

7         delivery service for Ethan Allen.  They

8         knew me from working for ADS.

9   Q.    Was there a position actually posted that

10        you applied for?

11   A.    No.  They asked me to work for them.

12   Q.    And who asked you to work for Ethan

13        Allen?

14   A.    Dave Pellicciotti.

15   Q.    What was his job title at the time?

16   A.    Warehouse manager.

17   Q.    And did you interview with Dave about the

18        job?

19   A.    Yes, I did.

20   Q.    Did you interview with anyone else?

21   A.    No.

22   Q.    And when did you start working at Ethan

23        Allen?

24   A.    Sometime around July 8, 1999.

```
 1   Q.   Okay.

 2   A.   Or August 8.  Somewhere around there.

 3   Q.   And what title or position did you hold

 4        when you began working at Ethan Allen?

 5   A.   Shuttle truck driver.

 6   Q.   And to whom were you reporting?

 7   A.   Dave Pellicciotti.

 8   Q.   And could you just briefly tell me what

 9        you did as a shuttle truck driver?

10   A.   I drove the truck from Franklin to one of

11        the four stores.

12   Q.   And so you worked out of Franklin at that

13        time?

14   A.   Yes, I did.

15   Q.   And have you held any other positions at

16        Ethan Allen?

17   A.   Yes.

18   Q.   What was the next position you held after

19        shuttle truck driver?

20   A.   Warehouse supervisor.

21   Q.   And how did you get that position?

22   A.   Dave promoted me.

23   Q.   When did you begin to work in that role?

24   A.   One week later.
```

1    Q.   Did you know there was a chance you would

2         be promoted that soon?

3    A.   No.

4    Q.   What were your responsibilities as

5         warehouse supervisor?

6    A.   To make sure the product came into the

7         building and was put away properly and to

8         make sure that the product was pulled,

9         stacked, and prepared for the delivery

10        service to load the truck.

11   Q.   Were you still making deliveries?

12   A.   Yes.

13   Q.   How often?

14   A.   On a per call emergency basis.

15   Q.   And who did you report to in that

16        position?

17   A.   Dave Pellicciotti.

18   Q.   Were there any other warehouse

19        supervisors?

20   A.   No.

21   Q.   Did you have employees that were

22        reporting directly to you?

23   A.   Yes, I did.

24   Q.   About how many?

```
 1        that in response to your question about

 2        who had reported you?

 3   A.   Correct.

 4   Q.   So when you asked her what days you had

 5        been late, do you remember what her

 6        response was to that?

 7   A.   I don't remember what her response was.

 8   Q.   Was anything else discussed in this

 9        meeting, approximately?

10   A.   I told her -- I believe I said that I --

11        there are various reasons why I would not

12        come in at a time I was scheduled to, for

13        various reasons.

14   Q.   And what did she say?

15   A.   She didn't -- she didn't care.

16   Q.   What were the various reasons that you

17        wouldn't come in as scheduled?

18   A.   There had been times I have gotten phone

19        calls from a prepper that he needed tools

20        or something from a hardware store or

21        Home Depot, asked me if I would stop and

22        get it.

23             And there have been times when

24        employees called me on my cell phone and
```

```
 1        they needed a ride to work, I would have
 2        to go and get them.  There were times
 3        when we needed wood pallets to put our
 4        piles of cardboard on so we could put
 5        them on the trailer, and we didn't have
 6        access to pallets so I would have to go
 7        out and find them.  Those are some
 8        reasons why.
 9   Q.   Did you give that level of detail to
10        Denna?
11   A.   Yes, I did.
12   Q.   And is that actually why you had been
13        late on some of the dates she was
14        mentioning?
15   A.   I don't know.
16   Q.   Do you know if -- were you taking any
17        notes during this conversation?
18   A.   I don't remember.
19   Q.   Was she taking any notes?
20   A.   I don't remember.
21   Q.   Were there any documents involved in that
22        conversation?
23   A.   In July?
24   Q.   Yes, in July of 2003.
```

```
 1        was tardy and again, I couldn't remember

 2        the specific dates of what time I

 3        arrived, what time I was scheduled to

 4        arrive and when.

 5                What I believe I told her, if I

 6        was late it was because I was on

 7        medication from my doctor.

 8   Q.   Okay.  Do you remember next about what

 9        she said?

10   A.   I believe she said that if I was late it

11        was going to mean  -- well, it was going

12        to be more serious, something along those

13        lines.  I don't remember her exact words.

14   Q.   Were you taking any notes during this

15        conversation?

16   A.   I don't believe I was.

17   Q.   Was Denna?

18   A.   I don't remember if she was.

19   Q.   Were there any documents involved in that

20        conversation?

21   A.   Yes.

22   Q.   What were they?

23   A.   I believe it was a write-up for the

24        alleged tardiness for the days she was
```

```
 1            I didn't punch in, I didn't punch out.

 2            So if someone said I was there at 8:45,

 3            maybe that is when she saw me.  Maybe I

 4            was there at 7:15.

 5    Q.      What did you generally -- when you came

 6            in, in the morning,s did you do the same

 7            thing every morning?  Did you go straight

 8            to the warehouse or straight to your

 9            office?

10    A.      No.  Each day is different.

11    Q.      Do you remember anything else that was

12            said during this meeting?

13    A.      I remember telling Denna I felt

14            uncomfortable signing my name there --

15    Q.      Okay.

16    A.      -- if she  -- she told me I had to sign

17            it.

18    Q.      Okay.

19    A.      If I remember right I put in parens

20            "medical" because I was on Vicodin at the

21            time.

22    Q.      Did you and Denna have any further

23            conversations about the medical reasons?

24    A.      That day?
```

```
 1   A.   Correct.

 2   Q.   Was it that same day?

 3   A.   I don't remember.  I don't think so

 4        because that was a Saturday.

 5   Q.   Had you been late to the Natick store?

 6   A.   I got there at 8:10.

 7   Q.   What time were you asked to be there?

 8   A.   8:00.

 9   Q.   Were you scheduled to be at the Franklin

10        store before then?

11   A.   I had made plans to be  -- to meet an

12        employee there at 7:00, to drive over

13        together to save on the cost.

14   Q.   Okay.  What time did you actually arrive

15        at the Franklin store?

16   A.   7:00 a.m.

17   Q.   Who was the other employee that you were

18        meeting?

19   A.   Danny.

20   Q.   What is his last name?

21   A.   I can't remember it right this second.

22   Q.   I will come back to it.  Was Danny at the

23        Franklin store at 7:00?

24   A.   No, not when I was there.
```

```
 1   Q.   Did you ever -- so you went to the Natick
 2        store without Danny?
 3   A.   I went into the Franklin office to find
 4        out, had Danny been there.  Danny Forte.
 5        I walked in to find out if Danny had been
 6        there.  I didn't want to leave if he had.
 7   Q.   And did Danny ever arrive at the Franklin
 8        store?
 9   A.   Yes, he was there.
10   Q.   So you both made it to the Natick store
11        at ten after 8:00?
12   A.   No.  Danny was there at five minutes of
13        7:00.  And when he didn't see my car he
14        went straight to the Natick store.
15   Q.   How long did you wait at the Franklin
16        store?
17   A.   I got there at 7:00.  I walked in and
18        walked out about ten after 7:00.
19   Q.   And did you drive straight to Natick?
20   A.   Yes, I did.
21   Q.   How long does it usually take to get from
22        Franklin to Natick?
23   A.   One hour.
24   Q.   Then was Denna at the Natick store that
```

```
 1        day?

 2   A.   Yes, she was.

 3   Q.   Did she actually know you came late that

 4        day?

 5   A.   She was at the door when I opened up at

 6        8:10.

 7   Q.   When did you talk about the fact that you

 8        were late?  Was it that day you talked

 9        about it?

10   A.   She brought it up to my attention that I

11        was late.

12   Q.   How did she do that?

13   A.   In front of all the temporary workers.

14        In front of Danny Forte she yelled out

15        "You're late."

16   Q.   So was there any other separate meeting

17        other than that or was it just that

18        comment?

19   A.   Later that morning she brought me in a

20        room, a cubicle, an enclosed cubicle.

21   Q.   Was it just the two of you?

22   A.   Yes.

23   Q.   How long did that conversation last?

24   A.   Approximately 15 minutes.
```

```
 1   Q.   If you could just tell me your best

 2        memory of what she said, what you said?

 3   A.   She said she was going to fire me for

 4        being late.

 5   Q.   What did you say?

 6   A.   I told her that I had gone to Franklin to

 7        look for Danny Forte.  And I wasn't sure

 8        if he had been there or not, so I had to

 9        get out of my truck, go into the

10        building.  There were customer service

11        people and warehouse personnel already

12        there.  So I was being asked questions.

13        And I was looking for Danny and answering

14        the questions.

15             I told them I had to get out of

16        there, I had to go over to Natick.  I

17        didn't get out of Franklin until ten

18        after 7:00.

19   Q.   And what did Denna say next?

20   A.   In what way?

21   Q.   Were you fired that day?

22   A.   No.  She asked me why I came over by

23        myself and Danny came over by himself.

24        It was her understanding that we were
```

1        conversation last, did the meeting last?

2    A.   I would say about five minutes.

3    Q.   Tell me as best you can remember what was

4        said during the meeting?

5    A.   She said I was late again.  I told her

6        that I had to go to the Natick -- I mean

7        the Franklin facility to pick up the van

8        that had four cartons that she had -- she

9        had requested the day before.  She had

10        requested five cartons and I found four

11        of them.  And I looked in the warehouse

12        to try and find the fifth carton, I never

13        did find it.  So I got in the van and I

14        drove over to the Natick store and

15        delivered the four cartons.

16    Q.   Do you remember what else was said during

17        the conversation?

18    A.   I remember driving up and saying to

19        Virginia Klinefelter, I could not find

20        the fifth box she wanted but I had found

21        four of them.  She told me that the fifth

22        box was at the Natick store.

23    Q.   Were you talking about this while you

24        were with Denna?  Is this part of that

```
 1              same conversation?

 2      A.      No.  This is with Virginia Klinefelter

 3              when I first pulled up.  I had to give

 4              the boxes to Virginia.

 5      Q.      Did you tell that to Denna when you were

 6              talking to Denna about you being late

 7              that morning, you had been looking for

 8              cartons, couldn't find them?

 9      A.      I did mention it.  And she said she

10              didn't care.

11      Q.      I am just talking about that conversation

12              you had with Denna and Virginia, just

13              that five minutes of conversation.  Did

14              you -- just tell me what else was said

15              during that conversation?

16      A.      With Virginia and --

17      Q.      I thought you said earlier Denna said

18              "you're late again."  You thought

19              Virginia was in that conversation as

20              well?

21      A.      Well, I saw Virginia first because I

22              brought the four boxes to her, and Denna

23              was giving a speech to all of the new

24              designers.  The store was going to be
```

92

1       opening in a few minutes.

2           And then Denna came over to me

3       after she was speaking to the designers.

4       I am not sure if Virginia was within

5       earshot at that time.

6  Q.  So she said "you're late again," what did

7       you say?

8  A.  I told her that I had to find a fifth box

9       that was already at the Natick store.

10      And that I had to go to Franklin and get

11      the van and I told her that I had left a

12      voice mail on her cell phone. She said

13      she'd not gotten it. She had not

14      listened to her phone that morning. She

15      told me I can go home.

16  Q.  Were you scheduled to work a full day?

17  A.  No. All she wanted was those boxes

18      brought over from Franklin to Natick.

19  Q.  Was your son in the truck with you when

20      you came from Franklin to Natick?

21  A.  Yes, he was.

22  Q.  Is that allowed under Ethan Allen's

23      policies?

24  A.  It was extraordinary circumstances and I

```
 1         had no place to put him.
 2    Q.   When did you find out you were going to
 3         need to come in that morning?
 4    A.   Denna had called me Friday afternoon  and
 5         asked me to bring the boxes over at that
 6         point in time.  When -- but I couldn't.
 7         I had to get home to pick my son up.
 8    Q.   And who usually takes care of your son?
 9    A.   Either my wife or my myself.
10    Q.   Were there any other conversations about
11         your being late with Denna?
12    A.   No.
13    Q.   Did anyone beside Denna talk to you about
14         concerns with your being late to work?
15    A.   Not that I can remember.
16    Q.   Okay.
17              MS. KRAUSS:  Let's mark as
18         Exhibit No. 9 this corrective action
19         form.
20                   (Exhibit 9, Corrective action
21                    form, Marked for
                       identification.)
22
23    Q.   Do you recognize this document?
24    A.   Yes.
```

1    Q.    Just generally, what was the purpose of

2          these?

3    A.    To point out an employee's weaknesses,

4          and --

5    Q.    Go ahead.

6    A.    That is all.

7    Q.    Do you remember talking with Denna about

8          her comment, "Mike is a manager.  He

9          needs to be on time.  He has no

10         credibility as a leader because he

11         doesn't set the example."

12   A.    I told her I disagreed with that.

13   Q.    Why did you disagree?

14   A.    She told me that the guys in the

15         warehouse did not look at me as a

16         credible manager.  I disagreed saying

17         that it couldn't be further from the

18         truth, that I had a great working

19         relationship with the men in my

20         warehouse.

21   Q.    What did she say?

22   A.    I don't remember what her answer was.

23   Q.    Just, you know, in terms of your being a

24         manager at other places, do you think it

1       good chance I was on -- I was on Vicodin.

2       And I was in severe pain.  I was taking

3       medication to quell that pain.

4  Q.   And was the medication -- what was it,

5       what was the side effect causing you to

6       be late to work?

7  A.   Vicodin was making me groggy.

8  Q.   Did you ever talk to your doctor about

9       that?

10  A.   That it was making me late for work?

11  Q.   Or just making you groggy, either one.

12  A.   He just told me to follow the medication.

13  Q.   Did you ever ask for a different

14       medication?

15  A.   No.

16  Q.   Did you actually tell your doctor it was

17       making you late for work?

18  A.   No.

19         MS. KRAUSS: This is a good place

20       to break for lunch.

21

22         {Luncheon recess}

23  **BY MS. KRAUSS:**

24  Q.   Mr. Eldridge, I wanted to go back to the

```
 1    Q.   What was this corrective action for?

 2    A.   Denna alleged that the paperwork was not

 3         in order going from Franklin to Natick.

 4    Q.   What did Denna say the problem was with

 5         that paperwork?

 6    A.   What did she say the problem was?

 7    Q.   Yes.

 8    A.   Well, do you want me to read it?

 9    Q.   No.  Why don't you tell me what you

10         remember.  Do you remember discussing

11         this document with Denna?

12    A.   Yes, I remember this.

13    Q.   What do you remember her telling you what

14         the problem was with the paperwork?

15    A.   The problem was we were sending goods,

16         used goods from Franklin to Natick.

17    Q.   What kind of paperwork were you supposed

18         to keep?

19    A.   Well, it says here "Trans trucks

20         paperwork on 9/23/03 was not done right.

21         Items were missing from paperwork.  Items

22         on the truck didn't have paperwork to

23         match."

24    Q.   Okay.
```

```
 1   A.   I don't -- I told Denna I didn't know
 2        what she was talking about.
 3   Q.   What did she say when you said that to
 4        her?
 5   A.   "It is your warehouse, you should know
 6        what I am talking about."
 7   Q.   Right underneath the part you just read,
 8        there is mention of a previous
 9        conversation with you?
10   A.   "Have talk to Mike on 8/27, 9/3, 9/10
11        2003 about making sure when he signs off
12        on the trans truck paperwork is right."
13   Q.   Do you remember talking with Denna about
14        this issue before October 8th?
15   A.   Yes.
16   Q.   Fair to say it was an ongoing issue?
17   A.   No.  The paperwork was right when I sent
18        it over.
19   Q.   Was it right on the earlier dates
20        mentioned here, 8/27, 9/3 and 9/10?
21   A.   Yes, it was.
22   Q.   Where did you think the discrepancy was?
23   A.   The gentleman that was receiving this
24        paperwork, his name was Jackson Rivers.
```

```
 1          And I had terminated Jackson Rivers and

 2          as I was going to terminate him, Jackson

 3          Rivers quit Ethan Allen.  And Denna

 4          called Jackson Rivers at home and asked

 5          him if he wanted to work at the Natick

 6          store instead of the warehouse.

 7    Q.    Did Jackson Rivers work at the Natick

 8          store?

 9    A.    Yes.  It was Jackson Rivers who was

10          receiving my paperwork.

11    Q.    So you think Jackson Rivers was

12          intentionally -- do you think he was

13          intentionally --

14    A.    The way it worked, the transfer truck if

15          it went from Franklin to the Natick

16          store, I had to run all of the paperwork

17          through a gentleman named William Holmes,

18          and he was the office manager and in

19          charge of inventory at both locations.

20    Q.    Okay.

21    A.    So if anything was being sent from

22          Franklin to Natick, I had to have the

23          information from Bill Holmes in order to

24          ship it.  So when I got the information
```

1           from Bill, I gave it to the driver.  The

2           driver drove it over to Natick.  It was

3           at that point that Jackson Rivers was

4           saying that the paperwork was wrong.

5    Q.    Did you ever check what was on the truck

6           against what was on the paperwork?

7    A.    Yes.

8    Q.    Was the paperwork -- so once you got the

9           paperwork back from Bill, am I getting it

10          correct, whatever was on the truck should

11          have matched the paperwork from Bill?

12   A.    Correct.

13   Q.    You said you did that check to make sure

14          that everything matched up?

15   A.    Correct.

16   Q.    So you think it was somewhere on the

17          Natick end that there was a problem?

18   A.    Correct.

19   Q.    And did you tell that to Denna?

20   A.    Yes, I did.

21   Q.    What did Denna -- what, if anything,

22          happened because of that?

23   A.    I was told to sign this paperwork.

24   Q.    Do you know if she ever looked into it

```
1      said that after this October 8 meeting
2      you were late getting to the Natick store
3      on Saturday because you were meeting a
4      coworker.  And you were late on another
5      Saturday because you were bringing
6      cartons over and you were late?
7  A.  Yes.
8  Q.  Were you late at all between that
9      Saturday and the day you were let go?
10 A.  No.
11 Q.  So why don't we move ahead to your last
12     day.  Do you remember what day it was?
13 A.  My last day at Ethan Allen?
14 Q.  Yes.
15 A.  I believe it was October 20.
16 Q.  2003?
17 A.  Yes.
18 Q.  And why don't you tell me about your day
19     at work.  What happened when you went in
20     that day?
21 A.  I had been asked by Mike Duppelle, the
22     customer service manager, if I could go
23     out and deliver a two-piece bedroom
24     dresser on Monday morning to an extremely
```

1    difficult customer, who had either

2    refused delivery or had in-home damage to

3    the product.

4         We had been out to her home on

5    three different occasions with our third

6    party vendor.  And I told Mike I would do

7    it but I would do it only as a last

8    resort.  And when I came in Monday

9    morning Mike said that I had to make that

10    delivery.  So I grabbed a van, grabbed

11    the biggest boy in the warehouse who

12    happened to be Danny Forte, we loaded the

13    pieces in the van, we drove over to

14    Medfield and we completed the delivery.

15   Q.   Did anything unusual happen during the

16    delivery?

17   A.   When I knocked on the door -- I have been

18    in the delivery business for a long time.

19    This woman was extremely agitated at

20    Ethan Allen.  She was extremely skeptical

21    that two men in a white service van could

22    deliver the product.  I asked the woman

23    to please give us a shot.

24         We carried the first piece in.

1    We had put blankets on the railings, and

2    on the floors.  The stairway went up and

3    had a 90 degree angle to your left.  And

4    there was a low overhead which I could

5    see how the previous delivery teams had a

6    very difficult time making this delivery.

7         The bottom piece was the lighter

8    of the two.  We brought that upstairs

9    first.  And we put it in the master

10   bedroom.  The top half is the bigger of

11   the two pieces and it was much more

12   difficult to carry.  Danny has virtually

13   zero experience doing home deliveries.

14   And this woman was very close to me at

15   all times, within 12 inches of my face to

16   the point where I had to ask her to step

17   back and let me do my job.

18        Danny was on the top and I was on

19   the bottom.  And I had to correct for

20   Danny's inexperience.  As we were going

21   upstairs we were twisting the piece to go

22   around the corner and I pulled a muscle

23   in my back.  I sat the piece down.  The

24   problem was Danny didn't know how to

```
 1        carry the top half of the furniture
 2        around the corner.  So I put the piece
 3        down, I asked Danny to come downstairs.
 4        I went upstairs and I talked Danny
 5        through carrying it.  We got it around
 6        the corner, we put it on the pad, a
 7        moving pad, and we pulled it in and set
 8        it up in the customer's home.
 9   Q.   So you were able to keep -- sounds like
10        you switched positions, you were able to
11        help him with the move?
12   A.   Correct.  There was no one else to bail
13        out.
14   Q.   What part of your back was it you pulled?
15   A.   My lower back.  The problem we had was
16        that this piece of furniture had no hand
17        grips on it.  I don't know if you are
18        familiar with furniture but --
19   Q.   I try to stay uninvolved with moving it.
20   A.   There is a bottom.  The top piece rested
21        on the piece.  There was no place to
22        grab.  I kept saying to myself I
23        shouldn't be here, I shouldn't be here
24        but I was there so we completed it.  We
```

```
1                    (Exhibit 13, Illustration,
                        diagram,  Marked for
2                    identification.)

3    Q.   So that "X" you drew is your office?

4    A.   Yes.

5    Q.   Then that heavy line?

6    A.   Is the window.

7    Q.   And you --

8    A.   This is the kitchen  --

9    Q.   Kitchen.

10   A.   -- to the right of my window.

11   Q.   Can you write "kitchen." Label that

12        "kitchen."

13             Could you tell me again what

14        exactly, in as much detail as you can,

15        what did you say to Denna about the

16        delivery?

17   A.   Denna was coming out.  I said, "Denna we

18        made that delivery in Medfield." She

19        said, "How did it go"?  I says, "It went

20        good.  The customer took it.  I hurt my

21        back carrying it upstairs."

22   Q.   What did she say in response?

23   A.   Nothing.  She walked past me.

24   Q.   Did she actually -- did she actually stop
```

1   Q.   Just to make sure I understand, you're

2        not disagreeing though you were late

3        those previous Saturdays, are you?

4   A.   Yes, I am disagreeing.  I was at Franklin

5        at 7:00 a.m. which is an Ethan Allen

6        location.  And that was to meet Danny

7        Forte to go over to another Ethan Allen

8        location.  So I was there at 7:00 a.m. It

9        was because of business reasons that I

10       got there at ten after 8:00 to the second

11       Ethan Allen location.

12            On the second Saturday there was

13       no fifth carton on Friday afternoon.

14       Mike Duppelle and I looked through over

15       200 cartons, of which 50 percent of them

16       had no marks on them at all.  And we were

17       expected to find the cartons that Denna

18       had requested.  We found four of them.

19       Mike helped me load them into the van.

20       We didn't get out of there until around

21       6:00 p.m. that night.  For fear of

22       repercussion I looked yet again Saturday

23       morning to do a triple check to make sure

24       that I couldn't find the fifth carton.

127

When I got to the Natick store I apologized to Virginia Klinefelter for finding four boxes and not the fifth. It was at that point in time Virginia told me she only needed four and the fifth was at the store.

Q.  So just to understand you right, you are saying that because you were at some Ethan Allen location at the time you were supposed to be at work that means you were not late?

A.  Correct.  I was at Ethan Allen at 7:00 a.m. on that Saturday.

Q.  But as I understand it Denna wanted you to be at the Natick location?

A.  She wanted me at the Natick location at 8:00.

Q.  You are saying you were at the Franklin location not Natick but Franklin?

A.  At 7:00 a.m. I had to go in to verify that Danny Forte was there.  And while I was in the building, the employees that I deal with on a daily basis were asking me questions, and I had to give them

|   |   |   |
|---|---|---|
| 1 |  | answers.  I told them that I couldn't |
| 2 |  | stay, I had to get over to the new Natick |
| 3 |  | store.  It took me approximately ten |
| 4 |  | minutes to answer the questions they were |
| 5 |  | asking to find out if Danny Forte had |
| 6 |  | been to Franklin on that second Saturday. |
| 7 | Q. | You were looking for cartons in Franklin |
| 8 |  | before you went to Natick? |
| 9 | A. | Correct. |
| 10 | Q. | Did you ever call ahead to anyone else to |
| 11 |  | tell them you were having trouble finding |
| 12 |  | the fifth carton? |
| 13 | A. | No.  I talked to Mike Duppelle about it. |
| 14 |  | And we found four and we double checked |
| 15 |  | and triple checked the remaining cartons. |
| 16 |  | We could not find the -- it was 6:00 at |
| 17 |  | night, so I knew there was no one for me |
| 18 |  | to call at that hour.  The next morning I |
| 19 |  | was there approximately quarter of 9:00. |
| 20 |  | I got to Franklin.  The Natick store |
| 21 |  | didn't open until 10:00.  So there was no |
| 22 |  | one for me to call at the Natick store to |
| 23 |  | verify. |
| 24 | Q. | Back to the meeting where you were let |

1      have savings at the time you were let go?

2  A.   I had a little.  I don't know what the

3      amount was.

4  Q.   You have mentioned a couple of times your

5      knees were hurt.  I want to ask you about

6      that.

7           It is your claim in this lawsuit

8      you injured your knees in the summer of

9      2003, is that correct?

10  A.   Correct.

11  Q.   Was it one knee or both knees?

12  A.   It was both knees.

13  Q.   And how did you do that?

14  A.   Playing basketball, in particular a men's

15      league.

16  Q.   Were both of them injured at the same

17      time?

18  A.   Yes.

19  Q.   What happened, was it a particularly bad

20      fall or just --

21  A.   I don't remember to be honest with you.

22      I thought I was just getting old.

23  Q.   And if you can, can you pinpoint when in

24      the summer it took place?

```
 1    Q.    Was the doctor, at that time,

 2          recommending that you stay home from

 3          work?

 4    A.    No.

 5    Q.    How often were you taking Naprosyn?

 6    A.    Whatever the prescription was.  I don't

 7          recall what it was.

 8    Q.    I know nothing about this medicine. Is it

 9          something like you take once a day or a

10          few times a day or only when you have

11          pain?

12    A.    I don't remember.

13    Q.    And when was your next visit to the

14          doctor?

15    A.    I went on vacation.  I picked -- I wanted

16          to see if seawater did it.  They say

17          seawater helps a lot of things.  My

18          family went to Block Island and I went

19          down to Block Island for a week and when

20          I came back my knees were still sore.

21    Q.    And did you return to Dr. Ravzi, did you

22          to go a different doctor?

23    A.    I went back to Dr. Ravzi, and it was at

24          that point in time that he recommended
```

1      that I have an MRI done on my knees.

2  Q.  So you had gone to Dr. Ravzi once in

3      maybe July of 2003, then the next visit

4      was where he recommended an MRI, is that

5      correct?

6  A.  Correct.  It was in August of 2003.

7  Q.  Do you remember what week you took your

8      vacation?

9  A.  In August.  I am going to say it was

10     either the second or the third week.

11 Q.  Was Dr. Ravzi able to do the MRI or did

12     you go somewhere else?

13 A.  No, we went to South County Hospital.  It

14     was closer to my home.

15 Q.  And do you remember what day the MRI was

16     done?

17 A.  Just remember it was at the last week of

18     August.  He did it for my left knee.

19 Q.  Was the left knee causing you more pain?

20 A.  Well, they both were, but doctor only

21     made the MRI for the left knee.  I had to

22     go back and have an MRI done on my right

23     knee.

24 Q.  Do you remember who at South County

```
 1            Hospital you met with to have the MRI?
 2   A.    MRI people.
 3   Q.    You don't remember a specific doctor's
 4         name or anything?
 5   A.    No.  I -- we had a Dr. Burns review the
 6         MRI.
 7   Q.    Did you when you say "we had Dr. Burns
 8         review it," was that Dr. Ravzi and you?
 9   A.    Correct.  Dr. Ravzi and I, correct.
10   Q.    So how did you find out the results of
11         the MRI?
12   A.    I called Dr. Ravzi and he said that I had
13         a meniscus tear in my left knee.  That I
14         would need surgery to correct it.
15   Q.    Did you talk to Dr. Burns at that time or
16         was it just Dr. Ravzi?
17   A.    I believe it was just Dr. Ravzi at first.
18   Q.    And did they explain to you what a
19         meniscus -- did Dr. Ravzi explain to you
20         what a meniscus tear is?
21   A.    Yes.
22   Q.    Can you explain in layman's terms?
23   A.    The cartilage in between your knee gets
24         squished, it tears.  There was a part
```

```
 1        that was exposed.  That is what was

 2        causing my irritation.

 3   Q.   Okay.  How does the surgery correct it?

 4        Did they explain to you what they do?

 5   A.   They do arthroscopic surgery. They put a

 6        hole in one knee, camera, and the other

 7        hole with the corrective tool.  They

 8        correct it.

 9   Q.   You said during this call Dr. Ravzi said

10        you were going to need surgery.  Did he

11        say when?

12   A.   Well, he said immediately.

13   Q.   Were those his words?

14   A.   No, I am saying it.  He asked me if I was

15        in pain.  And I told him, yes, I was.

16   Q.   Okay.  Then what happened?

17   A.   What transpired next?

18   Q.   Yes, thank you.

19   A.   I had a second MRI done on my right knee.

20        And that came back with a meniscus tear

21        in it also.

22   Q.   Do you remember when that second MRI was

23        done?

24   A.   I am going to say it was the first week
```

```
 1              of September.
 2    Q.    And so approximately a couple of weeks
 3          after the left knee MRI?
 4    A.    I don't know whether it was a couple.
 5          Maybe one week, maybe two weeks.  It
 6          depends when we can get the scheduling
 7          in.
 8    Q.    Was Dr. Ravzi the one who told you the
 9          results of the second MRI?
10    A.    Correct.
11    Q.    And just going back to Dr. Ravzi with
12          your left knee, did he say how long the
13          surgery -- what details did he give you
14          about the surgery?
15    A.    None.  He recommended that we go to a
16          specialist that could perform the
17          surgery.  And that is when I recommended
18          Dr. Burns because he was close to my
19          house.
20    Q.    You actually recommended Dr. Burns?
21    A.    Yes.  Dr. Burns had done surgery on my
22          son previously.  He did an exceptional
23          job.  He's surgeon for the University of
24          Rhode Island.
```

```
 1         Vicodin for me.

 2   Q.    And when did he start prescribing Vicodin

 3         for you?  Was it after the MRI?

 4   A.    No, I am going to say it was before

 5         because I told him the pain was not going

 6         away.  I had a very difficult time

 7         walking and climbing stairs.

 8   Q.    And do you remember how frequently you

 9         were taking Vicodin?

10   A.    Whatever the prescription was.

11   Q.    I'll ask you the same question, is it

12         sort of once a day or a couple of times a

13         day?

14   A.    Whatever was on the bottle.  I took

15         whatever the doctor was saying.

16   Q.    And when was the first time you saw

17         Dr. Burns?

18   A.    I believe it was in early September.

19   Q.    Tell me about that visit?

20   A.    Well, he read the MRI, he told me that --

21         he told me that I had a meniscus tear.

22         He showed me where it was.  He says,

23         "You're in a lot of pain," I said, "Yes I

24         am, doctor."  And he said, "You should
```

1       get that corrected as soon as possible."

2  Q.  At this point was he just looking at the

3       left knee MRI or both MRIs?

4  A.  I am not sure if the second one come in.

5       I think -- I really don't remember if the

6       second, one how close it was.

7  Q.  And so at this meeting with Dr. Burns

8       were you actually able to set a date for

9       surgery at that time?

10  A.  I had asked him -- I had asked Denna if I

11       could have surgery in the early part of

12       September.  And she had asked me to stay

13       on until the Natick store opened.  I was

14       under the impression the Natick store

15       closed, which was the part that I was

16       affiliated with, the old store.  When I

17       went to Denna I asked her if I could take

18       time off to have corrective surgery, she

19       asked me if I could again stay on now to

20       October 18th, which was the grand

21       opening.  We had set a date.  And with

22       great reluctance I said I would.

23  Q.  I am just trying to get a sense when you

24       and Dr. Burns set the surgery then?

```
 1              go up to see Doctor Ravzi anymore.

 2    Q.   So just with Dr. Burns then.  You saw him

 3         in September, then you don't remember if

 4         you ever saw him before you had the

 5         surgery again?

 6    A.   I don't know if I did or not.  I think

 7         after two prescriptions for Vicodin the

 8         doctor has to see you again.  So I might

 9         have went in to see him, have him take a

10         look at my knee so I can get another

11         prescription.

12    Q.   Were there any other doctors that you saw

13         about your knees?

14    A.   No.

15    Q.   When was the first time you told anyone

16         at Ethan Allen about your injuries?

17    A.   The next day I told Bill Holmes.

18    Q.   The next day after the basketball game

19         you told Holmes about your knees?

20    A.   Yes.

21    Q.   Bill Holmes was the office manager?

22    A.   Correct.

23    Q.   What did you tell Bill?

24    A.   I told him that I had hurt my knees
```

1       playing basketball.  I used to have to

2       work with Bill because he was in charge

3       of inventory.  So if we had any questions

4       on any misallocated or missing pieces, I

5       had to sit next to his desk and go over

6       it with him.  I remember having great

7       difficulty sitting down.

8   Q.  Was anyone else with you when you told

9       Bill Holmes?

10  A.  There was another gentleman that is in

11      the office, I don't know if he overheard.

12  Q.  Were you requesting any accommodation

13      from Bill Holmes at that point for your

14      knees?

15  A.  No.

16  Q.  When was the next time you told anyone at

17      Ethan Allen about your knee injury?

18  A.  I talked to Becky DesRosiers who was our

19      human resource girl.  I -- when I knew I

20      was going to have surgery, I wanted to

21      make sure that all of my insurance and my

22      shots and short-term disability were

23      current and up-to-date.

24  Q.  So it sounds like maybe that conversation

1      would have taken place in September, is

2      that correct?

3  A.  Becky left us in -- Becky left Ethan

4      Allen in early September so I would have

5      thought it would have been more August.

6  Q.  I am not trying to be difficult I am --

7      it sounds like you didn't know until you

8      talked to Doctor Ravzi about the MRI?

9  A.  I got the results for the left knee in

10     late August.

11 Q.  What did you tell Becky about the surgery

12     that you were planning?

13 A.  Well, I told her that I had torn

14     ligaments in my knee, I would be needing

15     some time off to have corrective surgery.

16 Q.  Where did this conversation take place?

17 A.  At her desk.

18 Q.  And was anyone else present?

19 A.  I don't remember if anybody else was

20     present.

21 Q.  Did you tell Becky DesRosiers how much

22     time you were going to need off for

23     surgery?

24 A.  No.  I had no idea.

1  Q.  So you had no idea at the time either how

2      much time you were going to need?

3  A.  No.

4  Q.  What was Becky's response when you told

5      her about that?

6  A.  She just made a note of it.  And I -- I

7      had told Denna about my knees and that I

8      had hurt them and that I would be needing

9      corrective surgery.

10 Q.  Did Becky ever get back to you to let you

11     know if everything was in order?  I think

12     you mentioned you wanted to know about

13     the insurance?

14 A.  Yes.  She -- I went to her, and when I

15     found out she was leaving us, I asked her

16     if everything was in order.  She said

17     yes, it was.

18 Q.  Now, you mentioned that you told Denna.

19     When did you tell Denna about your knee

20     injuries?

21 A.  I don't remember the exact time I first

22     told her.  It might have been June or

23     July.

24 Q.  How did it come up?

1    A.    I was hobbling.

2    Q.    Did she ask you or --

3    A.    No, I told her.

4    Q.    Okay.

5    A.    When I came back from vacation my knees

6          were -- I was convinced at that point in

7          time my -- something was wrong with my

8          knees.  And I had another week's vacation

9          owed me.  And I had asked Denna if I

10         could take another week off.  She said,

11         no.

12   Q.    I am trying to get done with the first

13         conversation.  So you remember telling

14         Denna, if I understand your testimony, in

15         June or July about your knees because you

16         were hobbling?

17   A.    Yes.

18   Q.    And at that point were you asking for any

19         kind of accommodations because of your

20         knees?

21   A.    No.

22   Q.    And so then the next time you talked to

23         Denna about your knees was after you took

24         this vacation to Block Island?

```
 1          employees in the warehouse that were
 2          requesting time off.  That was denied
 3          also.
 4    Q.    There's the closing of the old Natick
 5          store that was scheduled for the end of
 6          September?
 7    A.    Correct.
 8    Q.    How did you go about requesting this?
 9          Did you say "Can I have another week of
10          vacation?"  What exactly do you remember
11          saying?
12    A.    I think I asked for another week's
13          vacation and was just told no.
14    Q.    Did you mention anything about your knees
15          during the conversation?
16    A.    Yes.
17    Q.    What did you say about your knees?
18    A.    Well, I told them my knees were hurting
19          and she said I was too valuable to the
20          company and too valuable in these
21          transactions to take time off.
22    Q.    What was your response?
23    A.    I could understand.
24    Q.    What do you mean by that, why could you
```

```
 1        understand?

 2   A.   Well, we were shipping out between

 3        $300,000 and $500,000 worth of products.

 4        No one knew it better than me in the

 5        building.

 6   Q.   So during this conversation did you have

 7        any doctor's note or anything like that

 8        with you?

 9   A.   Not at this time.

10   Q.   Was this something that your doctors were

11        telling you you should ask for?

12   A.   The time off?

13   Q.   Yes.

14   A.   I had a doctor tell me, Dr. Burns had

15        told me that -- he asked me if I was in

16        pain, I said, yes, I am.  He asked me why

17        I wasn't having corrective surgery.  I

18        told him about the store.  That was the

19        gist of it.

20   Q.   But that was  -- it sounds like you met

21        with Dr. Burns after you had talked to

22        Denna and Becky, is that fair to say?

23   A.   Well, I had asked Denna when I could take

24        time off to have my knee surgeries.  She
```

```
 1          said after September.  This was early
 2          September.
 3     Q.   So I am just trying to plot all of these
 4          out on a timeline.  So you got back from
 5          vacation, you met with Denna and Becky,
 6          and asked for another week of vacation,
 7          is that correct?
 8     A.   Correct.
 9     Q.   And during that conversation were you
10          also asking for time off for surgery?
11     A.   No.  No.  I was just --
12     Q.   That was later?
13     A.   It was later, correct.
14     Q.   So I am just talking about the extra week
15          of vacation then.
16     A.   Yes.
17     Q.   So they said, no.  You understood.  When
18          was the next time you talked to Denna
19          about your knees?
20     A.   After I had my MRI readings.
21     Q.   How did that conversation come up?
22     A.   I had told her that I had an MRI done,
23          that I had a torn meniscus and I needed
24          corrective surgery.
```

1   Q.   Did you have anything from your doctor

2        during that conversation, not the MRI,

3        but anything else that backed up what you

4        were saying about the need for surgery?

5   A.   I don't remember.

6   Q.   When was the next time you remember

7        talking to Denna about your knee surgery?

8   A.   I remember it was the end of September

9        and I told her I wanted to set up surgery

10       and I wanted it ASAP.

11            She asked if I could wait until

12       after the new store opened.  And the date

13       for that was October 18th.  So anything

14       after October 18th would have been okay.

15  Q.   Do you remember where that conversation

16       took place?

17  A.   Either Natick or Franklin, I don't

18       remember the exact location.

19  Q.   Do you remember if anyone else was

20       present?

21  A.   I don't remember that.

22  Q.   Do you remember if you had any kind of

23       medical documentation at that point to

24       show Denna?

```
 1   Q.   Do you remember if anyone else was around

 2        when you were going over it?

 3   A.   When I put it in there?

 4   Q.   On the note with the October 23 date, do

 5        you remember anyone else being there?

 6   A.   I am going to say either Erin Richer --

 7        she has a married name now, I don't know

 8        what it is, she was new or  Louann, the

 9        resource girl.  I showed her the form for

10        the surgery.  And I -- that is when I

11        Xeroxed a copy and put it in Denna's

12        folder.

13   Q.   Do you remember if Erin was around when

14        you actually talked about the form with

15        Denna?

16   A.   With Denna present?

17   Q.   Yes.

18   A.   I don't remember.  I did talk to her with

19        Becky DesRosiers around.

20   Q.   So please describe for me the

21        conversation you had with Becky and with

22        Denna about this form with the October 23

23        date?

24   A.   Becky wasn't there at that time.
```

1  A.   I don't know.  It would have been the

2       last day.  I was under the impression my

3       commitment was done to the new store as

4       of the end of September.  It was at that

5       point in time I said to Denna, can I set

6       my appointment now for the surgery.  That

7       is when she told me, no, I need you for

8       another three weeks.  I am going to say

9       it was sometime I think -- we worked a

10      Sunday that day, the last -- whatever the

11      last day of September of that year was.

12      For some reason I thought it was a

13      Sunday.

14 Q.   There was never a conversation where you

15      said to Denna the October 23 is open, do

16      I have your permission to book it October

17      23?  It wasn't that specific?

18 A.   No.  It was the other way around.  I had

19      asked her, do you need me anymore.  I

20      wanted to get it done ASAP.

21 Q.   She said any time after the 18th?

22 A.   Correct.

23 Q.   And that is when you got the note of the

24      23rd date?

```
 1              Marked for identification.)

 2

 3    Q.    Do you recognize what has been marked as

 4          Exhibit No. 20?

 5    A.    Yes.

 6    Q.    What is this?

 7    A.    It is a copy of the schedule for the knee

 8          surgery.

 9    Q.    If -- comparing this to Exhibit No. 19, I

10          believe in front of you, looks like there

11          is handwriting on the top left corner of

12          Exhibit No. 20?

13    A.    Yes.

14    Q.    And is that your handwriting?

15    A.    Yes.

16    Q.    Could you read that into the record

17          please.

18    A.    "Marie, I gave this to Denna Hamilton on

19          October 4th.  I also informed her of this

20          date that I wanted FMLA.  Mike Eldridge."

21    Q.    Who is Marie?

22    A.    She's human resources down in Danbury,

23          Connecticut.

24    Q.    Do you know her last name?
```

```
 1   A.   No.  She's the only Marie in the human

 2        resources department.

 3   Q.   And when did you send this to Marie?

 4   A.   I don't remember.

 5   Q.   And your note says you told Denna you

 6        wanted FMLA.  First let me back up, is

 7        October 4, does that sound like the date

 8        when you provided this form to Denna?

 9   A.   If it was a Saturday then, yes.

10   Q.   And did you actually say "FMLA" to Denna?

11        Do you remember having a conversation

12        with her using that term?

13   A.   I told her, yes.

14   Q.   Could you tell me what you remember

15        saying about "FMLA" in particular?

16   A.   To Denna?

17   Q.   Yes.

18   A.   I remember saying that I was concerned

19        that I didn't know how much time I was

20        going to need for the surgery, and that I

21        had short-term disability.  And that I

22        would need possible FMLA if the time went

23        over what I had on Ethan Allen.

24   Q.   And what did she say in response?
```

```
1    A.   What did Denna say?

2    Q.   Yes.

3    A.   I don't remember.

4    Q.   Do you remember any other discussion with

5         Denna where you discussed FMLA leave in

6         particular?

7    A.   I can't pinpoint a time, no.

8    Q.   And even without pinpointing a time, do

9         you remember speaking to her about it?

10   A.   Yes.  I just remember the day she asked

11        me how much time it was going to take for

12        this.  I told her I didn't know.

13   Q.   When did she ask you that question?

14   A.   When she asked me -- when I told her I

15        needed knee surgery, she asked me how

16        long I would be out of work.  I told her

17        I didn't know.

18   Q.   Okay.  That was back in September?

19   A.   No.  I would have said it would have been

20        right around here when we had the actual

21        schedule.

22   Q.   But if I understand your testimony

23        correctly, it sounds like at some point

24        in September didn't you tell her you
```

```
 1              needed surgery, she said after the store

 2              opens?

 3     A.       Correct.  For the surgery, correct.

 4     Q.       Then this October 4th it sounds like was

 5              a separate conversation where you

 6              actually knew the date?

 7     A.       Correct.  I knew I was going to have

 8              surgery on the 23rd.  And I believe that

 9              is when she asked how much time was I

10              going to miss from work.  I told her I

11              didn't know.

12     Q.       I see.  Got it.

13                   MS. KRAUSS; let's mark this U.S.

14              Department of Labor form as Exhibit No.

15              21.

16                        (Exhibit 21, U.S. Department of
                          Labor form, Marked for
17                        identification.)

18

19     Q.       Do you recognize what has been marked as

20              Exhibit No. 21?

21     A.       Yes.

22     Q.       What is this?

23     A.       It is a form my doctor filled out.

24     Q.       And which doctor filled this out?
```

191

```
 1    A.    I don't remember.

 2    Q.    Do you have any memory of showing this to

 3          the Department of Labor?  By that I mean

 4          Exhibit No. 23?

 5    A.    I don't remember if I showed them that

 6          one.

 7    Q.    What's the current status of your knee

 8          injuries?

 9    A.    As of today?

10    Q.    Yes.

11    A.    They feel good.

12    Q.    At the time that you were having pain,

13          the summer, fall of 2003, what types of

14          physical activities were typical to

15          impossible for you to perform?

16    A.    Standing on my feet for great lengths of

17          time, walking for great lengths of time.

18          Lifting.

19    Q.    When you say long periods of time, can

20          you estimate for me how long you could

21          stand or walk?

22    A.    Half an hour to an hour.

23    Q.    How about lifting, is there any sort

24          of -- did you have a weight in mind
```

```
 1            beyond which it became painful?

 2   A.   No.

 3   Q.   How heavy do you think the dresser was

 4            you had to move on October 20th?

 5   A.   I would say that weighed over 200 pounds.

 6   Q.   That was the heavy top piece?

 7   A.   Yes.  It was two pieces.  The top piece

 8            was the heavier of the two.

 9   Q.   You had -- you still you went ahead with

10            your surgery on October 23, correct?

11   A.   Correct.

12   Q.   How long after that surgery were you

13            incapable of working?

14   A.   How long was I -- was I incapable of

15            working?

16   Q.   Yes.

17   A.   I would say two weeks, two weeks.

18   Q.   What did you do during those two weeks?

19   A.   Stayed off my knees.

20   Q.   Were you -- did you stay overnight at the

21            hospital?

22   A.   I don't believe so.

23   Q.   So you were home later that day on the

24            23rd?
```

194

```
 1            to walk, walk on the sand.
 2    Q.    About how long after the surgery did it
 3            take for your left knee to be feeling
 4            back to normal?
 5    A.    It was tough to take because my right
 6            knee was still hurting.
 7    Q.    I imagine it would be tough.  Was it
 8            feeling better by the time of the right
 9            knee surgery?
10    A.    I was on Vicodin the whole time.  I
11            couldn't pinpoint it.
12    Q.    Were there any other complications with
13            your left knee?
14    A.    No, my left knee felt good.
15    Q.    And did you go back to Dr. Burns after
16            your surgery on your left knee about your
17            left knee?
18    A.    Just for the checkup to the --
19            postcheckup.
20    Q.    You haven't needed any treatment on your
21            left knee since then?
22    A.    No.
23    Q.    And how about your right knee, when did
24            the surgery on your right knee get
```

195

1          scheduled?

2    A.    I don't remember when it got scheduled.

3          But I remember it was December 8.

4    Q.    Was the right knee surgery scheduled

5          after you had the left knee surgery?

6    A.    Yes.  Yes, I remember the doctor saying

7          he wanted up to six weeks in between.

8    Q.    And how was the recovery for your right

9          knee?

10   A.    That was much more difficult.

11   Q.    In what way?

12   A.    The -- my leg swelled up, and I would say

13         within a week after I had the surgery.

14         They thought I had a possible blood clot.

15         So they had -- I had to go to the

16         hospital and have some machine that reads

17         if you have a blood clot.

18   Q.    Did you have to stay overnight at the

19         hospital when you came back for either

20         the right knee surgery or for that visit

21         to check out the blood clot?

22   A.    No.  I went there and the woman did her

23         thing and that was it.

24   Q.    Was there actually a blood clot?

# Exhibit

# C

1



VOLUME:  I
PAGES:  1 through 213
EXHIBITS:  See Index

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
MICHAEL F. ELDRIDGE,                )
                Plaintiff,          )
                                    )  Civil Action
        VS.                         )  No. 04-12506-MEL
                                    )
ETHAN ALLEN, INC.,                  )
                Defendant.          )
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**DEPOSITION OF DENNA A. HAMILTON,**
a witness called on behalf of the Plaintiff, taken
pursuant to the provisions of the Federal Rules
of Civil Procedure, before Kathleen M. McHugh, a
Registered Professional/Certified Shorthand
Reporter (#120093) and Notary Public in and for
the Commonwealth of Massachusetts, at the offices
of Englander & Chicoine, P.C., Two Newton Place,
Newton, Massachusetts, on Thursday, April 27,
2006, commencing at 10:06 a.m.

COPLEY COURT REPORTING
101 Tremont Street
Boston, Massachusetts 02108
(617) 423-5841

51

1          Q.    What individuals were speaking with you

2     from the warehouse?

3          A.    Philip, Jack, Bill Lopez.

4          Q.    Any others that you recall?

5          A.    Ray would have conversations with me

6     from time to time, Ray Carbonneau.

7          Q.    Any others?

8          A.    Those are really the four that would

9     talk to me the most.

10         Q.    Do you recall Philip's last name?

11         A.    I can't think of it off -- right now.

12         Q.    Was it Philip Cole?

13         A.    Yes.

14         Q.    And what types of problems did Philip

15    Cole report to you about the warehouse?

16         A.    He would report that the workload was

17    distributed unfairly.  He would report that Mike

18    was -- he would tell me that Mike didn't show up

19    on time and they had to wait outside.  He'd be

20    frustrated because they had a lot of work to

21    do and Mike was not around in the mornings to

22    distribute out the work and he was supposed to be

23    in at a certain time.  So Mike was not there to do

24    that so he had to pick up the slack.  He felt that

52

1    he worked harder than Mike.

2              Basically he was really upset just

3    because the team was -- was not -- not a team.

4    They were arguing a lot with each other.

5         Q.    What types of problems did Jack report

6    to you about the warehouse under Mr. Eldridge?

7         A.    He said that Mike had a temper.  Mike

8    would yell and swear at him.  He thought that was

9    wrong.  He said again the workload -- complained

10   about the workload between the employees not being

11   distributed out.  He said it was pure chaos in the

12   warehouse.  He also talked to me about the

13   Richie's Delivery guys did not respect Michael

14   Eldridge as well.

15        Q.    The what people?

16        A.    They're called Richie's.  They're the

17   outside contractor who delivered our furniture.

18        Q.    Anything else that Jack talked to you

19   about?

20        A.    Not that I can remember.

21        Q.    What types of things did Bill Lopez

22   report to you about the warehouse under Mr.

23   Eldridge?

24        A.    Bill has been with Ethan Allen for over

67

1          A.     Or being there.

2          Q.     Or being there?

3          A.     Yes.

4          Q.     How frequently when you would call

5    would Mr. Eldridge not be available?

6          A.     How frequently?

7          Q.     How many times in a given week or

8    month?

9          A.     It just depended on the week or the

10   month.

11         Q.     And who would you speak with when you

12   would call the warehouse?

13         A.     Whoever answered the phone.  Multiple

14   people answer the phone.

15         Q.     And it was clear to you that he had not

16   shown up for work that day?

17         A.     Yeah, because they would check out in

18   the parking lot.  He drove a pickup truck.  He

19   would check in with the office when he got there

20   and then they would go ask Philip or Bill or

21   whoever was out in the warehouse.

22                We had an overhead paging system.

23   You can hear it clearly from every angle in the

24   building.  So they'd overhead page him.  They'd go

69

1      A.    Yes.

2      Q.    -- from the schedule.  How late?  Would

3  it matter to you or --

4      A.    I said a verbal ten minutes.  Because

5  of where we live, there's always a ten-minute

6  leeway that still exists to this day in my

7  district.

8      Q.    And so what were the procedures for

9  employees starting a work shift, like, you said

10  that Mr. Eldridge had to check in with the office?

11      A.    I'm sorry.  Can you rephrase that

12  question?

13      Q.    What's the general procedure for an

14  employee in the Boston district to start the

15  workday?  Do they punch a time clock?

16      A.    Yes, they do.  I'm sorry.  In Franklin

17  they punch a time clock.

18      Q.    In Franklin do the managers also punch

19  a time clock?

20      A.    No.  They write down on their time

21  card.  Some did.  Some wrote down.  It depended on

22  what they wanted to do.  Some punched.

23      Q.    And so some managers punched a time

24  clock?

70

1          A.    Yes.

2          Q.    And some managers would write on a time

3    card their start and end times of their shift?

4          A.    Mm-hmm.

5          Q.    And then would you oversee that

6    documentation?  I mean, did you check that

7    documentation on a regular basis?

8          A.    Yes.  We had to sign off on it once a

9    week, so I'd go through and look at it.

10         Q.    In your conversations with Mr. Eldridge

11   about the tardiness problem before the first

12   written warning, what was Mr. Eldridge's response

13   to you?

14         A.    He said he knew he had an issue.  He

15   said he would be working on it.  We talked about

16   maybe changing his time in.  I wanted to work with

17   him on it because it was really important for me

18   that one of the leaders in the district be on

19   time, especially the warehouse manager, because a

20   lot is riding on when he gets in.

21              You know, setting an example, you have

22   to coach by, you know, doing it right yourself,

23   and he understood and he told me that he would

24   work on it.  That was the end of the really

72

1    summer of 2003?

2        A.    The same way I became aware, either I

3    witnessed it myself or I called him and he was not

4    there or I was meeting him at another location and

5    he agreed upon the time that we would arrive there

6    and he didn't show up.

7        Q.    What other locations did you meet Mr.

8    Eldridge at?

9        A.    The only -- the project that we were

10   working on over the summer was the Natick

11   relocation.  So Natick -- there was a few times

12   that we were supposed to meet at Natick at a

13   certain time.  He was scheduled off on those days

14   and he agreed upon the time.

15            I had other people would be there

16   because they were scheduled off as well.  So we

17   had to have a conversation of what time we were

18   meeting and I left it up to him because he was

19   coming from Rhode Island.  So he needed to tell us

20   the time that he'd be there.

21       Q.    And you said he never showed up?

22       A.    I'm sorry?

23       Q.    I thought you had testified to that

24   just moments ago, that there were times that he

73

1   was supposed to meet you in Natick and he did not

2   show up?

3       A.    On time.

4       Q.    How late would he be coming to the

5   Natick location?

6       A.    The two times that I can recall right

7   now, I believe over an hour was one and I believe,

8   I'm estimating, 45 minutes was the other time.

9       Q.    And when did these two occasions that

10  you can recall occur?

11      A.    Those were his last two times that he

12  was tardy, fall, in the fall time period.

13              MS. KRAUSS:  Can we take a break just

14  for five minutes?

15                      (Recessed at 11:24 a.m.)

16                      (Paid Time Off Request Form,

17  dated 7/17/03, was marked Exhibit No. 2 for

18  identification.)

19                      (Group of Weekly Schedules,

20  consisting of 31 pages, was marked Exhibit No. 3

21  for identification.)

22                      (Group of Weekly Attendance

23  Records, consisting of nine pages, was marked

24  Exhibit No. 4 for identification.)

85

1    That's all I really knew about -- I mean, he

2    didn't walk funny or he didn't limp or anything of

3    that nature.

4         Q.    When did you first become aware that

5    Mr. Eldridge would need surgery for his knees?

6         A.    I believe in September.

7         Q.    And how did you become aware of that in

8    September?

9         A.    He told me that he needed to go see a

10   doctor because his knees were bothering him and he

11   needed to have surgery, I believe.

12        Q.    And where did this conversation occur?

13        A.    I believe in my office.

14        Q.    At which location?

15        A.    Franklin.

16        Q.    And when in September, do you think?

17   Was it before or after Labor Day?

18        A.    I don't have the exact date.  I don't

19   remember the exact date.

20        Q.    But Mike's disclosure to you at that

21   time was that he needed to see a doctor about

22   scheduling surgery?  Is that what you --

23        A.    Yes.  That's what I recollect.

24        Q.    Was Mr. Eldridge asking you to do

87

1    gone through it once before, so he had known what

2    the surgery was like before in the past.

3         Q.    So the first time he gave you a date

4    was not until his weekly schedule was drawn up for

5    late October?

6              MS. KRAUSS:  Objection.

7         A.    To my knowledge, yes.

8         Q.    Let me show you what's been marked as

9    Exhibit 3.  This stack now in its entirety is

10   Exhibit 3.  Now that you've had an opportunity to

11   begin reviewing Exhibit 3, I'd like to ask you,

12   first, is this the list of your direct reports

13   from 2003?

14        A.    No.

15        Q.    Can you identify looking at this list

16   who were your direct reports?

17        A.    Louann Starr, Amy Franks, Mike

18   Eldridge, Michael Dupelle, Donna Curry-Wilson,

19   Christopher, Lisa Greenberg, Kathy Smith, Jenny

20   Marshall, Sue Linker, Pat Fecteau, and that's --

21        Q.    Christopher Eramo was who you had

22   mentioned earlier as Chris from Quincy?

23        A.    Yes.

24        Q.    Lisa Greenberg, is she still with Ethan

95

1    that in your Franklin planner?

2        A.    Correct.

3        Q.    And then at some point you would

4    transfer that note from your Franklin planner onto

5    the weekly schedule?

6        A.    Yes.

7        Q.    Did you ever give these weekly

8    schedules with your notes to Mr. Eldridge?

9        A.    No, because I had the dates on the

10   documentation.  So he had the dates.  He knew when

11   he was late.  And I have the reasons why.  So I

12   discussed each one of the dates that I had put

13   on the warnings to him and he agreed with them

14   because he signed them.  I mean, he knew he was

15   late.  I had daily discussions.  So he knew he was

16   late.  And then when I documented it and gave it

17   to him, he had the dates on the documentations.

18       Q.    And you're talking about the warning

19   documentation that you gave him?

20       A.    The warnings, yes.

21       Q.    Did you keep notes about any other of

22   your direct reports?

23       A.    Yes.

24       Q.    And which of your direct reports did

96

1    you keep notes on?

2         A.    Donna Curry-Wilson.  I kept notes on

3    Louann Starr.  I kept notes on Sue Linker, some

4    performance issues that I was coaching on.

5         Q.    Did you know the start times or

6    tardiness of Louann Starr, Donna Wilson-Curry or

7    Susan Linker?

8         A.    They didn't have tardy or absence

9    problems.

10        Q.    Did any of your other direct reports

11   other than Mr. Eldridge have any tardiness or

12   absentee problems in 2003?

13        A.    Not to my knowledge.

14        Q.    Were you checking about the start times

15   of all your direct reports the way you checked on

16   Mr. Eldridge in 2003?

17        A.    Yes.  I called the store, the same type

18   of thing.  I'd be at the store.  They were never

19   late when I was there.  So, I mean, if they were

20   late, you know, they were not -- if they were

21   late, I would have done the same thing that I did

22   with Mr. Eldridge, just have conversations, but

23   not to my knowledge nobody was late.

24        Q.    So the other -- there were 11 direct

98

1      A.     It was a mutual decision.

2      Q.     Any other individuals based on your

3  review of Exhibit 3 that were your direct reports

4  in this time frame?

5      A.     Mike Costello.

6      Q.     And what page does Mike Costello's name

7  appear on?

8      A.     On 154.

9      Q.     So this is the week ending April 12th,

10  2003.  Did Mr. Costello leave Ethan Allen at some

11  point between April and October, 2003?

12      A.     Yes.

13      Q.     Did he leave voluntarily?

14      A.     Yes.

15      Q.     So in this time frame covered by

16  Exhibit 3 which actually, would you agree, is from

17  the beginning of April, 2003 through the first two

18  weeks of October -- actually all of October, 2003

19  with the -- with one exception.  Here's my

20  question.

21           In this time frame you had at some

22  point as many as 14 direct reports?

23      A.     I would have to count it to be exact.

24      Q.     Okay.  Let's count.  We have Louann

99

1    Starr, Amy Franks, Mike Eldridge, Michael Dupelle,

2    Bill Holmes, Donna Wilson-Curry, Christopher

3    Eramo, Lisa Greenberg, Kathy Smith, Jenny

4    Marshall, Susan Linker, Pat Fecteau, Cheryl Smith

5    and the last person you identified as Costello?

6         A.    Yes.

7         Q.    So that appears to be 13 direct

8    reports.

9              MS. KRAUSS:    Objection.    Did she say

10   Bill Holmes?  Did you say Bill Holmes?

11             THE WITNESS:    No.

12             MS. KRAUSS:    Okay.

13        Q.    So I come up with 13; is that

14   accurate?

15        A.    Direct reports at one time or within

16   the year?

17        Q.    Within this time frame that we're

18   looking at, April, 2003 to October, 2003?

19        A.    That reported in to me?

20        Q.    Yes.

21        A.    Thirteen.

22        Q.    And you checked on the start times of

23   all 13 of your direct reports every day during

24   April to October, 2003?

100

1       A.      Not every day.

2       Q.      How frequently did you verify the start

3   times of all your direct reports in the period

4   April to October, 2003?

5       A.      Verify meaning -- can you explain

6   verifying?

7       Q.      To determine if they were at the

8   location they were supposed to be as their

9   schedule stated?

10      A.      It was random.  I'd call on the

11  weekends.  I would call during the week, and, you

12  know, I'd -- I put out to all my managers, you

13  know, I gave them ten-minute lead time.  If they

14  were going to be later than ten minutes, they just

15  needed to let me know.

16              So I would call randomly to check on

17  it.  I don't know how frequently I would do it.

18  It wouldn't be an everyday practice, but it would

19  be on a consistent basis.

20      Q.      So on a consistent basis for all 13 of

21  your direct reports you would verify that they

22  were starting within ten minutes of when the

23  schedule stated?

24      A.      Yes.  They would sign in, the managers

107

Q.    I show you what's been marked as
Exhibit 5.  Do you recall when you first received
this document that is now Exhibit 5?

MS. KRAUSS:  Objection.

A.    I don't remember this document.

Q.    You don't remember seeing this document
in 2003?

A.    No.

Q.    You don't have any recollection of
discussing this document with Mr. Eldridge?

A.    I remember him giving me some type of
note with the surgery date on it.  That's what I
recollect.

Q.    And what was the note that you
recollect?  Was it -- please describe that note.

A.    I just remember the date, the date of
the surgery.  That's what I remember.

Q.    Was it a handwritten note from Mr.
Eldridge to you?

A.    No.  It was from a doctor's office.
It had similar -- I remember seeing the doctor's
headings on it.  It looked like from a doctor's --
what I recollect, it looked like from a doctor's
pad saying a surgery date.

108

1       Q.    Did it have the same date as what's

2  listed on Exhibit 5?

3       A.    The surgery date, October the 23rd,

4  '03?

5       Q.    Yes.

6       A.    Yes.

7       Q.    And when do you think you received the

8  note that you recollect?

9       A.    A few weeks before the date, week and a

10  half, ten days, few weeks, I got the note.

11       Q.    So does that change your testimony from

12  earlier that you first learned about the surgery

13  date when Mr. Eldridge created his weekly schedule

14  for October 19th?

15       A.    It was on my desk, so, you know, I

16  don't remember the exact date.  They had to

17  coincide with each other when I got the schedule

18  and the note.

19       Q.    The schedule is created the week

20  before --

21       A.    Prior, yes.

22       Q.    -- coming up.  And the note -- the note

23  that you received, you would just -- you just

24  testified, I thought, was a few weeks before the

109

1    surgery?

2        A.    I'm sorry.  A few weeks, it could have

3    been on my desk a few weeks before.  It coincided

4    with the schedule.  So I had it.  I gave it back

5    to Becky to file it in the file.

6            So I just remember it being on my

7    desk.  I can't tell you what date, a few weeks

8    before.  It could have been ten days before.  I

9    can't tell you exactly.

10       Q.    And when the note that you recollect

11   which is different than what we're looking at on

12   Exhibit 5, when you received that note, did you

13   just find it on your desk?

14       A.    It was on my desk, yes.

15       Q.    Was there any discussion with Mr.

16   Eldridge about the note?

17       A.    No, because I knew he had said that he

18   was going to the doctor.  So I knew that it was

19   coming.  So I don't remember having a discussion

20   when I got the note, no.

21       Q.    When you got the note, did you have any

22   questions about how much time Mr. Eldridge would

23   be taking off?

24       A.    I knew it was a few days and I don't

125

1    store was not open yet.  So, you know, I was kind

2    of nervous about that, so I did not know the

3    product was wrong until after he had left.  I was

4    not aware of that.

5        Q.    And so there was no discussion with

6    Mr. Eldridge that Saturday morning about any tasks

7    he had been doing in Franklin related to finding

8    this merchandise?

9        A.    To my knowledge he had loaded it up the

10   night before because that's what he told me he was

11   doing.

12       Q.    And when did he tell you that?

13       A.    Friday.

14       Q.    Friday night.  When did you speak

15   with --

16       A.    Friday afternoon.

17       Q.    When on Friday did you speak with

18   Mr. Eldridge?

19       A.    In the afternoon because Virginia

20   needed to talk to him to tell him what she needed

21   because he was still looking for some things and

22   he had a hard time finding them.  So I had put her

23   in touch.

24            We had that discussion and we had had

126

1    that discussion because he was loading it up and

2    he had a hard time finding it and I said for him

3    to call Virginia because she knew what the boxes

4    were labeled because she had cleaned the design

5    center up from the old store.

6        Q.    And so it's your memory that after

7    Mr. Eldridge left on Saturday, the 18th, Virginia

8    still didn't have all the product that she was

9    looking for?

10       A.    Yes.  She had talked to me that day.

11       Q.    Was there another Saturday in October,

12   2003 that you requested or was there another

13   Saturday in October, 2003 that Mr. Eldridge worked

14   on his day off?

15       A.    Yes, I believe there was.

16       Q.    And did you request him to work his day

17   off on that other Saturday in October, 2003?

18       A.    I believe we discussed it as a team,

19   what we needed to do to get the job done the

20   Saturday before, and again to my recollection he

21   probably volunteered because I'd never make

22   somebody work on their day off.

23       Q.    So this is, you say, the Saturday

24   before, Saturday, October 11th?

127

1      A.    It was the Saturday before the 18th,

2   correct.

3      Q.    So this is -- I'm referring to Exhibit

4   3, the page Bates-stamped 128, and you stated that

5   you would not have asked Mr. Eldridge to work that

6   Saturday?

7      A.    I could have asked.  I'm not sure if he

8   volunteered or I asked him on that Saturday.

9      Q.    And who would have set the start time

10  for Saturday, October 11th, 2003?

11     A.    I think we were with a team with

12  Richie's that day.  My recollection is we were

13  meeting drivers from Richie's.  So we would have

14  talked amongst the group what time our start time

15  would have been.

16     Q.    And what happened that morning in

17  regard to Mr. Eldridge?

18     A.    He had two reasons, I remember.  He was

19  going to pick somebody up at Franklin.  That

20  person never showed up.  And then there was an

21  accident, he said, on the freeway that day.

22     Q.    So what time did Mr. Eldridge arrive on

23  October 11th, 2003?

24     A.    It looks like 9:20.

128

1    Q.    And when did you make that note, do you

2  think, on our Exhibit 3?

3    A.    I probably made it on Monday, on the

4  following Monday, because I would have done that

5  on that Monday.

6    Q.    So, when Mr. Eldridge showed up, he

7  explained to you that he was supposed to meet

8  another employee of Ethan Allen?

9    A.    He said he was going to pick somebody

10  up that morning, the morning of.  He said he had

11  stopped at Franklin to try and pick somebody up

12  because somebody didn't have transportation.  I

13  can't remember the actual person.  Then he said he

14  left from there and then there was an accident on

15  495.

16    Q.    Did that other employee work in Natick

17  that day; do you remember?

18    A.    I can't remember.  I don't remember who

19  it was.

20    Q.    Was it Daniel Forte?

21    A.    It could have been.

22    Q.    And do you know if Daniel Forte worked

23  in the new Natick location that Saturday?

24    A.    I don't remember.  We had so many

137

1        Q.    And in regard to your Franklin planner

2    that you kept for this time period, for all of

3    2003, you stated that you got rid of it in early

4    2004?

5        A.    When I switch over my -- I take the

6    guts out of it, put my new ones in, toss my old

7    ones.

8        Q.    Is that the recommended practice for

9    using the Franklin planner --

10            MS. KRAUSS:  Objection.

11       Q.    -- to eliminate the contents each year?

12       A.    I don't know.  It's just what I do.

13       Q.    After you had the problem with your

14   computer in -- well, you're not sure when the

15   problem with your computer was, 2003 or 2004?

16       A.    Two years ago, a year and a half or two

17   years.

18       Q.    Was your computer replaced?

19       A.    No.  It was my Lotus Notes that went

20   crazy and I keep all my documents in Lotus Notes

21   mostly unless it's a -- something I switched or

22   take out of my Lotus Notes and put onto my desktop

23   or into a file.  So it was just my Lotus Notes.

24       Q.    And did the Lotus Notes contain the

158

1      Q.    So you don't know what this was that

2  Becky DesRosiers was attaching, these various

3  documents?

4      A.    I can assume, but Becky did the work so

5  I don't know if that's what she was relating to.

6      Q.    Page one is a corrective action form

7  addressed to Mr. Eldridge.  Is that your signature

8  at the bottom?

9      A.    Yes.

10     Q.    And who wrote "medical reason" next to

11  the date 10/8/03?

12     A.    Michael did.

13     Q.    And what discussion did you have with

14  him?

15     A.    He said he was taking medication,

16  causing him to oversleep.

17     Q.    Did he explain what type of medication?

18     A.    No.

19     Q.    Did you ask anything more about it?

20     A.    No, because I know that's not my place

21  to ask those questions.  But I did tell him that

22  if he had medical issues, he should get a doctor's

23  note and bring it in to me.

24     Q.    This was given to Mr. Eldridge on the

162

1       A.    Yes.

2       Q.    Was there more detail in the Franklin

3   planner than what appeared on Exhibit 3?

4       A.    To my recollection there could have

5   been more detail, yes.

6       Q.    Was that detail from the Franklin

7   planner captured anywhere else in your Lotus

8   Notes?

9       A.    Not to my knowledge.

10      Q.    And turning on Exhibit 3 to the page

11  for August 29th, 2003, which is Bates-stamped 138

12  at the bottom, your note there for Friday, August

13  29th, in Mr. Eldridge's schedule, can you read the

14  numbers that you wrote there?

15      A.    8:30.

16      Q.    And that relates to what you wrote on

17  Exhibit 12, 8/29, late 90 minutes?

18            MS. KRAUSS:   Objection.

19      A.    Where is it?

20      Q.    In your handwritten notes in Section IV

21  of Exhibit 12, starting on line two, you have the

22  reference to this date, I believe, 8/29/2003?

23      A.    Yes.  If he came in at 8:30 that day,

24  he would have been an hour and a half late.

COPLEY COURT REPORTING

171

1          Q.    Would it have been at the same time as

2     you were filling out Exhibit 12?

3          A.    Not necessarily.

4          Q.    Would it have been at Mr. Farfaglia's

5     request on October 20th?

6                MS. KRAUSS:  Objection.  Go ahead.

7          A.    No, because I was doing it all the

8     way -- midway through I started this because it

9     was just easier for me to look at the dates

10    instead of writing in my notes.  So I'd have a

11    schedule to look at.  So midway through I would

12    say I went to this.

13         Q.    But were you doing it each week

14    starting midway through?

15               MS. KRAUSS:  Objection.

16         A.    I'm sorry.  Could you rephrase the

17    question?

18         Q.    Were you making contemporaneous notes

19    with problems with Mr. Eldridge's tardiness on a

20    weekly basis?

21               MS. KRAUSS:  Objection.

22         A.    On my Franklin planner?

23         Q.    On this weekly schedule.  I'm trying to

24    find out how the information got on the weekly

172

1    schedule.

2              MS. KRAUSS:   Objection.

3         A.    How it got there.

4         Q.    Or when, how frequently it was

5    transcribed onto the weekly schedule?

6         A.    It depended where I had some down time

7    where I could transfer my notes to this and I'd

8    have to print these out.  So it could have been

9    every two weeks.  I mean, I couldn't remember

10   exactly what day I went and did it each time.  It

11   could have been two weeks.  It could have been

12   three weeks.  It could have been weekly.

13        Q.    Since this time, since 2003, have you

14   ever done this for any other employee?

15        A.    Did what?

16        Q.    Printed a weekly schedule and kept

17   track of performance issues?

18        A.    I did it a lot in my Franklin planner.

19   Performance issues were a different -- tardy and

20   absence is something different than performance

21   issues, but I kept track of everybody's issues in

22   my Franklin planner.

23        Q.    And were there any other employees in

24   the entire time that you worked at Ethan Allen who

174

1      Q.    There's no date that appears either on

2    this page or the third page of Exhibit 12; is that

3    fair to say?

4      A.    There is no date.

5            MS. KRAUSS:  Did you look to --

6      Q.    And if you can flip to the next page?

7      A.    I'm sorry.  There's dates but nothing

8    has been signed.

9      Q.    Well, there's lines for dates but

10   there's no dates written.

11     A.    Right.  There's no actual dates.

12     Q.    Do you recall, was this ever given to

13   Mr. Eldridge?

14     A.    I believe I reviewed it with him, yes.

15     Q.    And when did that occur?

16     A.    I believe at the same time that I gave

17   him this, we reviewed the action plan along with

18   it.

19     Q.    When you gave him the first page of

20   Exhibit 12, the final written warning?

21     A.    Yes.

22     Q.    And Exhibit 12 you dated at the top

23   10/2/2003?

24     A.    Yes.

175

1      Q.    And you believe that you actually gave

2    it to Mr. Eldridge on the date that he signed it,

3    on October 8th, 2003?

4      A.    Yes.

5      Q.    Why would you have waited the six days

6    to present this to Mr. Eldridge?

7      A.    Due to schedule, traveling on the road,

8    him having time.  We needed to sit down and

9    discuss it at a good time.  So some time elapsed

10   between when the actual incident happened and the

11   date that I could sit down with the employee to go

12   over it.

13     Q.    According to the weekly schedule which

14   is Exhibit 3, looking at the Bates stamp page 128,

15   it appears that both you and Mr. Eldridge were

16   scheduled to be in the new Natick location on

17   October 8th?

18     A.    Mm-hmm.

19     Q.    Do you recall if that is where the

20   conversation about this final written warning

21   occurred?

22     A.    I believe it took place in my office.

23     Q.    You had an office in new Natick, I

24   presume?

181

1    you can better your performance.

2        Q.    On Exhibit 13, can you read what you've

3    written in Section IV, or I should ask you, is

4    that your handwriting in Section IV?

5        A.    In Section IV, yes.

6        Q.    And could you read what you've written,

7    please?

8        A.    Transfer truck paperwork on 9/23/2003

9    was not done right.  Items were missing from the

10   paperwork.  Items on the truck did not have

11   paperwork to match.

12       Q.    And below that you have some

13   handwriting, also?

14       A.    Have talked to Mike on 8/27, 9/3,

15   9/10,, 2003, about making sure when he signs on

16   the transfer trucks, the paperwork is right.

17       Q.    Is this the issue about inventory being

18   transferred between facilities?

19       A.    Yes, transferred from one facility to

20   another facility.  Paperwork is created on both

21   ends and both ends have to check it in to make

22   sure that the trucks and the paperwork match up.

23       Q.    And you had specific discussions that

24   you're referencing on three different dates prior

182

1     to this corrective action?

2          A.     Three different dates, 8/27, 9/3 and

3     9/10, yes.

4          Q.     And those were three different

5     discussions in person with Mike about this problem

6     with the transfer truck paperwork?

7          A.     Yes.

8          Q.     And what was Mike's explanation for

9     this situation, if any?

10         A.     To my recollection he said that he

11    knows he is just overwhelmed, busy, and he will

12    make sure that he signs off and counts the

13    pieces.

14         Q.     And was this document also presented to

15    Mr. Eldridge on October 8th?

16         A.     I did not sign and date, so I can't --

17    I don't -- I don't recall if it was that date or

18    not.

19         Q.     Do you know if Mr. Eldridge signed this

20    in front of you?

21         A.     Yes, he did.

22         Q.     Do you know if he dated it in front of

23    you?

24         A.     Yes.   He dated it in front of me.

186

1         A.    It looks like seven to me.

2         Q.    And do you recall the detail of the

3    incident you're referencing in Section IV on

4    Exhibit 14?

5         A.    Do I recall it?

6         Q.    Yes.

7         A.    Yes.

8         Q.    What was it that occurred?

9         A.    Mike was supposed to be at Quincy.   I

10   can't remember the exact time.   And he was

11   scheduled there to be of help.   I can't remember

12   the actual -- what he was supposed to do there,

13   but the store called and asked where he was and I

14   told him that -- let me find out.

15             I called the warehouse.   He wasn't at

16   the warehouse.   The store called back and said,

17   oh, he just showed up.

18        Q.    And what time was he scheduled to be at

19   Quincy?

20        A.    I don't recollect unless I look on his

21   schedule.

22        Q.    If you look at Exhibit 3, the Bates

23   stamp page 142, I'm referencing now the notation

24   for Monday, July 21st, 2003 in Mr. Eldridge's

# Exhibit

# D

# PERFORMANCE APPRAISAL
## SUPERVISORY PERSONNEL

EXHIBIT
Hamilton
#7
4-27-06  KMM

**Name: Mike Eldridge**

**Position: Warehouse Supervisor**

**Location: Franklin**

**Hire Date: 08/05/99**

The performance appraisal is designed to help identify accomplishments and areas of development, and to plan the goals for the coming year. As you complete the appraisal consider the performance of the employee over the entire period since the last review. Score each section individually including written comments regarding specific performance for each category.

## PERFORMANCE RATINGS:

| 5 | **Exceptional:** Performance consistently exceeds goals and job requirements. Performance is exceptional, and sustained over the review period. |

| 4 | **Exceeds Requirements:** Performance exceeds most goals and job requirements. Accomplishments are above job demands. |

| 3 | **Meets Requirements:** Performance consistently meets goals and job requirements. Accomplishments are clearly in accord with job demands. |

| 2 | **Needs Improvement:** Improvement is required. Performance is close to meeting goals and job requirements, but falls short of expectations. |

| | **Unsatisfactory:** Performance consistently does not meet goals and job requirements. Performance improvement is required. |

**A. Leadership:** Develops effective business strategies. Communicates organizational goals clearly. Values the employees of the organization and their contributions. Takes responsibility for his/her decisions. Establishes an environment of trust through fair and just business practices. Inspires others through an unyielding commitment to a vision and high personal standards of excellence.

| SCORE | COMMENTS |
| --- | --- |
| 4 | His people skills have come a long way over the year. Leads well by example, the classes and self evaluations have much improved Mikes leadership skills |

**Coaching/Training/Motivation:** Guides the development of skills and performance by building confidence and self-esteem, and playing the roles of trainer, coach and career counselor. Provides prompt feedback with suggested development exercises to build performance. Performs timely review and appraisal of subordinates. Demonstrates ability to motivate subordinates. Encourages teambuilding.

| SCORE | COMMENTS |
| --- | --- |
| | Group works well as a team under Mike. Does a excceding job in trying to keep each employee part of a team and motivated |

**C. Innovation:** Develops relevant new ideas and implements new programs to address the changing needs of the company. Refines and improves existing methods and procedures.

| SCORE | COMMENTS |
|-------|----------|
| 4 | Continues to look for new ways to improve the flow and organization in the back. (ie: Prep move, storage area, offloads, staging, inspecting, blues, MIA's always are being refined by him) |

**D. Judgment/Decision Making:** Uses analytical skills to obtain and evaluate facts. Analyzes information logically and fairly to reach valid conclusions. Takes appropriate action.

| SCORE | COMMENTS |
|-------|----------|
| 4 | Has come a long way with not jumping to conclusions anymore. Keeps safety a focus at all times, and uses sound judgement when dealing with service techs and driver routes. |

**E. Dependability:** Manages the workforce activity so that tasks are completed on a timely basis and to the expected standards. Attains short-term and long-term goals. Delegates appropriately and holds subordinates accountable for performance objectives.

| SCORE | COMMENTS |
|-------|----------|
| 5 | You can always count on Mike to be there daily. Holds crew accountable for actions and stays objective |

**Time Management/Productivity:** Prioritizes effectively and consistently meets deadlines. Understands and works toward company objectives. Maximizes personal effectiveness and efficiency.

| CORE | COMMENTS |
|------|----------|
| 3 | Does well in daily planning & focus. Needs to work more with building steps long range planning. MIA's under control and works with Dave with 30/60/90 day plans |

**Interpersonal Relationships/Communication:** Creates an environment where information is shared among all parties. Works cooperatively with peers and subordinates to achieve results and is responsive to the requirements of other functions. Maintains effective channels of communication for information throughout the store, service center and company.

| ORE | COMMENTS |
|-----|----------|
| 5 | Has come along way with his skills and remains professional at all times. |

**H. Organization/Planning/Follow-up:** Develops realistic projections and methods, uses available resources effectively. Develops and implements plans of action with appropriate benchmarks.

| SCORE | COMMENTS |
|---|---|
| 4 | Plans day well and works good through his people to get the daily jobs done. Follow up is good for the most part, damaged racks and tipped furniture need addressing ASAP |

**I. Initiative/Adaptability:** Responds positively to unusual demands and changed circumstances. Has a clear understanding of priorities, uses initiative and foresight in carrying out assignments. Contributes new ideas.

| SCORE | COMMENTS |
|---|---|
| 4 | Takes initiative to resolve internal concerns (ie: MIA's quality, staging, etc) |

**J. Attitude/Work Ethic:** Performs all responsibilities in a focused and dependable manner. Attitude is positive and cooperative. Operates and communicates with the best interest of the company as the top priority. Represents the company in a positive manner when interacting with customers and other business associates.

| SCORE | COMMENTS |
|---|---|
| 4 | Has positive attitude and great work ethic. Represents Ethan Allen professionally. |

**Summary Comments**

Mike has come a long way over the past year. His big picture view of the district and company is always in focus. Helps out in warehouse and deliveries or whatever department when we have the needs. Works well with short staff at times and still remains positive. He is a real big asset to our Disrtict.

# APPRAISAL REVIEW SCORE = <u>80</u>

| | |
|---|---|
| 96 to 100 | Excellent |
| 76 to 95 | Exceeds Requirements |
| 56 to 75 | Meets Requirements |
| 36 to 55 | Needs Improvement |
| 35 and Below | Unsatisfactory |

## APPRAISAL REVIEW DETAIL

| Category | Score | Multiplier | Final Score |
|---|---|---|---|
| Leadership | 4 | 2 | 8 |
| Coaching/Training/Motivation | 4 | 2 | 8 |
| Innovation | 4 | 2 | 8 |
| Judgment/Decision Making | 4 | 2 | 6 |
| Dependability | 5 | 2 | 10 |
| Time Management/Productivity | 3 | 2 | 6 |
| Interpersonal Relations/Communication | 5 | 2 | 10 |
| Organization/Planning/Follow-Up | 4 | 2 | 8 |
| Initiative/Adaptability | 4 | 2 | 8 |
| Company/Customer Support | 4 | 2 | 8 |
| Total | | | 80 |

**This Performance Appraisal includes an attachment with a review of specific tasks associated with the position.**   ☐ Yes   ☑ No

# FUTURE GOALS AND OBJECTIVES

**Performance Improvement Objectives**                    **Action Plans**

| Performance Improvement Objectives | Action Plans |
|---|---|
| 1. Enforce and control all procedures in warehouse (safety, OHSA, UPS, MIA's, offloads paperwork, and warehouse isles) | 1. Continue to have meeting every 6 weeks with WH crew, prep & driving teams. Do these with Dave P and solo |
| 2. Train a new WL to both our EA/Franklin procedures. | 2. Side by side training with you & Ray. Videos and hands on experience. Reviewed with new WL |
| 3. Increase with cross training with Dave to understand the details of problems & proceudures for cust serv perspective and the positive effect that the warehouse can have on return rates. | 3. Spend 1/2 day month with Dave in service covering different topics |

**Comments on Future Goals and Objectives**

is appraisal has been discussed with the employee by:

praiser: _____    Date: _5/2/02_

ployee: _____    Date: _____

wed by: _____    Date: _5/8/02_
**District Manager**

)ivision Supervisory Performance Appraisal – April 2002

# Exhibit

# E

# PERFORMANCE APPRAISAL
## SUPERVISORY PERSONNEL

DOC #1
PG #1

**Name:** Mike Eldridge                    **Position:**

**Location:**                                **Hire Date:**

---

The performance appraisal is designed to help identify accomplishments and areas of development, and to plan the goals for the coming year. As you complete the appraisal consider the performance of the employee over the entire period since the last review. Score each section individually including written comments regarding specific performance for each category.

## PERFORMANCE RATINGS:

| 5 | **Exceptional:** Performance consistently exceeds goals and job requirements. Performance is exceptional, and sustained over the review period.

| 4 | **Exceeds Requirements:** Performance exceeds most goals and job requirements. Accomplishments are above job demands.

| 3 | **Meets Requirements:** Performance consistently meets goals and job requirements. Accomplishments are clearly in accord with job demands.

| 2 | **Needs Improvement:** Improvement is required. Performance is close to meeting goals and job requirements, but falls short of expectations.

| | **Unsatisfactory:** Performance consistently does not meet goals and job requirements. Performance improvement is required.

---

**A. Leadership:** Develops effective business strategies. Communicates organizational goals clearly. Values the employees of the organization and their contributions. Takes responsibility for his/her decisions. Establishes an environment of trust through fair and just business practices. Inspires others through an unyielding commitment to a vision and high personal standards of excellence.

| SCORE | COMMENTS |
|-------|----------|
| 2 | Needs to develop a plan to be more effective as a leader. Needs to work out individual coaching methods to best grow the team. |

**B. Coaching/Training/Motivation:** Guides the development of skills and performance by building confidence and self-esteem, and playing the roles of trainer, coach and career counselor. Provides prompt feedback with suggested development exercises to build performance. Performs timely review and appraisal of subordinates. Demonstrates ability to motivate subordinates. Encourages teambuilding.

| SCORE | COMMENTS |
|-------|----------|
| | Has to have all team member understanding the safety guidelines of the company. Have a plan to develop others to reach the next level. Would like to see team meetings to create a friendly work environment with postive atomsphere and empolyee input. |

EXHIBIT
HAMILTON
#11

EA 00190

C. **Innovation:** Develops relevant new ideas and implements new programs to address the changing needs of the company. Refines and improves existing methods and procedures.

| SCORE | COMMENTS |
|-------|----------|
| 2 | Needs to look for more cost efficient ways to refine and improve the procedures, so the warehouse runs better. Has to take the time to research alternatives and have the best soltion in place. |

D. **Judgment/Decision Making:** Uses analytical skills to obtain and evaluate facts. Analyzes information logically and fairly to reach valid conclusions. Takes appropriate action.

| SCORE | COMMENTS |
|-------|----------|
| 2 | Needs to get team buy in when change is involved. Need to communicate with management on decisions that affect the bottom line. |

E. **Dependability:** Manages the workforce activity so that tasks are completed on a timely basis and to the expected standards. Attains short-term and long-term goals. Delegates appropriately and holds subordinates accountable for performance objectives.

| SCORE | COMMENTS |
|-------|----------|
| 3 | Have to be on time for work to set the example for your team. Also your team needs to know your schedule so they know when you will be in the building. |

F. **Time Management/Productivity:** Prioritizes effectively and consistently meets deadlines. Understands and works toward company objectives. Maximizes personal effectiveness and efficiency.

| SCORE | COMMENTS |
|-------|----------|
| 3 | Needs to work from a daily priority list and have a game plan in place on what needs to be done for the day. You work well under preasure, but need to be aware that you can make mistakes by moving too fast. You need to prioritize duties and multitask when working on multiple hot issues. |

G. **Interpersonal Relationships/Communication:** Creates an environment where information is shared among all parties. Works cooperatively with peers and subordinates to achieve results and is responsive to the requirements of other functions. Maintains effective channels of communication for information throughout the store, service center and company.

| SCORE | COMMENTS |
|-------|----------|
| 2 | Needs to work on communication style with your team members and peers. Being on the same team having the same goal in mind. |

**H. Organization/Planning/Follow-up:** Develops realistic projections and methods, uses available resources effectively. Develops and implements plans of action with appropriate benchmarks.

| SCORE | COMMENTS |
|-------|----------|
| 2 | You need to organize your work environment. Develop a plan/ system to organize your workspace both for your own benefit and as an exampe to your team members. |

**I. Initiative/Adaptability:** Responds positively to unusual demands and changed circumstances. Has a clear understanding of priorities, uses initiative and foresight in carrying out assignments. Contributes new ideas.

| SCORE | COMMENTS |
|-------|----------|
| 2 | Would like to see you inspire others to boost work ethic and improve moral. The goal should be to foster an environment of team work and alternative thinking for problem situations. |

**J. Attitude/Work Ethic:** Performs all responsibilities in a focused and dependable manner. Attitude is positive and cooperative. Operates and communicates with the best interest of the company as the top priority. Represents the company in a positive manner when interacting with customers and other business associates.

| SCORE | COMMENTS |
|-------|----------|
| 3 | Has a postive attitude in most cases, needs to take responsibility like an owner of the warehouse. Has a great impact when handing customer issues. |

**Summary Comments**

Coaches and deveops talent

1. Accurately assesses strengths and development needs of the team, gives timely specific feedback, provides clear road map to achieve goals.

2. Partnership

Creates atmosphere in which timely and accurate information flows smoothly between self and others.

DOC. #1

PG #4

# APPRAISAL REVIEW SCORE = <u>46</u>

| 96 to 100 | Excellent |
|-----------|-----------|
| 76 to 95 | Exceeds Requirements |
| 56 to 75 | Meets Requirements |
| 36 to 55 | Needs Improvement |
| 35 and Below | Unsatisfactory |

## APPRAISAL REVIEW DETAIL

| Category | Score | Multiplier | Final Score |
|----------|-------|------------|-------------|
| Leadership | 2 | 2 | 4 |
| Coaching/Training/Motivation | 2 | 2 | 4 |
| Innovation | 2 | 2 | 4 |
| Judgment/Decision Making | 2 | 2 | 4 |
| Dependability | 3 | 2 | 6 |
| Time Management/Productivity | 3 | 2 | 6 |
| Interpersonal Relations/Communication | 2 | 2 | 4 |
| Organization/Planning/Follow-Up | 2 | 2 | 4 |
| Initiative/Adaptability | 2 | 2 | 4 |
| Company/Customer Support | 3 | 2 | 6 |
| **Total** | | | 46 |

| | | | |
|---|---|---|---|
| **This Performance Appraisal includes an attachment with a review of specific tasks associated with the position.** | ☐ Yes | ☐ No | |

## FUTURE GOALS AND OBJECTIVES

**Performance Improvement Objectives**          **Action Plans**

| | |
|---|---|
| 1. Communication | 1. solicits input from others<br>2. gets team buy in<br>3. establish a communication processes |
| 2. Safty training and team meetings | 2.<br>1. Have a plan for training<br>2. have check list in place<br>3. once a month meeting on expecation |
| 3. Inventory control | 3.<br>1. organize and accountability for all control<br>2. keep team well informed about issues concering warehouse matters. |

## Comments on Future Goals and Objectives

...ve a plan in place for training and development of you and your team. Cross training your team to cover vacations and absences. Make warehouse run like a machine regardless of staffing levels, work load or other disruptive issues.

**This appraisal has been discussed with the employee by:**

Appraiser: _____  Date: _____

Employee: _____  Date: 10/8/03

R..ewed by: _____  Date: 9/5/2003
~~District Manager~~

# Exhibit



ETHAN ALLEN INC.
ETHAN ALLEN DRIVE • P.O. BOX 1966 • DANBURY, CT 06813-1966
*PLEASE USE BALLPOINT PEN*

# PERSONNEL ACTION NOTICE

☐ Corporate Headquarters          ☐ Distribution Center          ☒ Exempt          ☒ Full Time
☒ Retail Division                 ☐ Manufacturing Division
☒ Service Center

Location __Franklin Service Center__

Name __Mike Eldridge__                    Position __Driver__

Social Security Number __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__   Date of Birth* __6/21/56__   Effective Date __8/16/99__

Department __OSC__   Department Number __801__   Average Hours/Week __40__

**(Check One)**

☐ Hire                              ☒ Change of Status          ☒ Salary                    ☐ Terminate
☐ Reinstate (30 days or less)       (Check All That Apply)      (Check All That Apply)      (Check One)
☐ Rehire (30 days or more)          ___ Leave of Absence (L)    ___ Merit                   ___ Voluntary
☐ Recall from layoff                ___ Return from L.O.A.      ☒ Promotion                 ___ Discharge
                                    ☒ Department Transfer       ___ Adjustment              ___ Workforce Reduction
                                    ___ Payroll Transfer        ___ Other Pay               ___ Other _____
                                    ☒ Job Change
                                                                                            _____
                                                                                            Last Day Worked

|  | Present Status (From) | | Proposed Status (To) |
|---|---|---|---|
| Position | From Driver | to | Asst Warehouse Manager |
| Job Code | 801 | to | 401 |
| % Thru Range |  |  |  |
| Pay Class | ☐ Hourly   ☐ Weekly   ☐ Bi-Weekly | | |
| Pay Amount |  | | 32,000/yr |
| Type Increase |  | | |
| Grade | Non-Exempt | | New Grade Exempt |
| Date of Last Increase |  | | |

Special Action or Instructions: __Please note above Changes__

_Pellicciotti_                _Camerota_              _____        _____
Signature of                 Signature of             Signature of             Signature of
Originator                   Site Manager,            Human Resources          Chairman
                             Department Head          Department               (if applicable)
                             or
                             Vice President

**New Hires Only**

   **Blue-Payroll**          **Pink-Personnel**        **Yellow-Insurance**       **Green-Supervisor**

Form 37 - R Rev. 5/97

EA 00353

# ETHAN ALLEN INC.

ETHAN ALLEN DRIVE • P.O. BOX 1966 • DANBURY, CT 06813-1966

**PLEASE USE BALLPOINT PEN**

## PERSONNEL ACTION NOTICE

☒ Corporate Headquarters     ☐ Distribution Center     ☒ Exempt     ☐ Full Time
☐ Retail Division            ☐ Manufacturing Division  ☐ Non-Exempt ☐ Part Time
☒ Service Center

Location: Franklin Service Center
Name: Mike Eldridge                Position: Warehouse Supervisor
Social Security Number: 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    Date of Birth*: ———    Effective Date: 8/31/00
Department: OSC     Department Number: 800    Average Hours/Week: 40

(Check One)

☐ Hire                          ☐ Change of Status          ☒ Salary              ☐ Terminate
☐ Reinstate (30 days or less)   (Check All That Apply)      (Check All That Apply)   (Check One)
☐ Rehire (30 days or more)      ___ Leave of Absence (L)    ☒ Merit               ___ Voluntary
☐ Recall from layoff            ___ Return from L.O.A.      ___ Promotion         ___ Discharge
                                ___ Department Transfer     ___ Adjustment        ___ Workforce Reduction
                                ___ Payroll Transfer        ___ Other Pay         ___ Other _____
                                ___ Job Change

Last Day Worked

|                      | Present Status (From) |        |           | Proposed Status (To) |
|----------------------|-----------|-----------|-----------|----------------------|
| Position             |           |           |           |                      |
| Job Code             |           |           |           |                      |
| % Thru Range         |           |           |           |                      |
| Pay Class            | ☐ Hourly  | ☒ Weekly  | ☐ Bi-Weekly |                    |
| Pay Amount           | 7/1/99/wk  37,000/Annual |    |  to  | 39000/Amount $ 750/wk |
| Type Increase        |           |           |           |                      |
| Grade                |           |           |           | New Grade            |
| Date of Last Increase|           |           |           |                      |

Special Action or Instructions: Year end review favorable   increase to 39K annual

3.23
3.14
2250

Signature of          Signature of           Signature of          Signature of
Originator            Site Manager,          Human Resources       Chairman
                      Department Head        Department            (if applicable)
                      or
                      Vice President

EA 00351

**New Hires Only**

Blue-Payroll        Pink-Personnel        Yellow-Insurance        Green-Supervisor

Form 37 - R Rev. 5/97

# ETHAN ALLEN INC.

ETHAN ALLEN DRIVE • P.O. BOX 1966 • DANBURY, CT 06813-1966

**PLEASE USE BALLPOINT PEN**

## PERSONNEL ACTION NOTICE

☐ Corporate Headquarters    ☐ Distribution Center    ☒ Exempt    ☒ Full Time
☒ Retail Division    ☐ Manufacturing Division    ☐ Non-Exempt    ~~Part Time~~
☒ Service Center

Location _Franklin Service Center_
Name _Michael F. Eldridge_    Position _Warehouse Supervisor_
Social Security Number _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_    Date of Birth* _____    Effective Date _2/18/02_
Department _OSC_    Department Number _807_    Average Hours/Week _40_

(Check One)
☐ Hire    ☐ Change of Status    ☒ Salary    ☐ Terminate
☐ Reinstate (30 days or less)    (Check All That Apply)    (Check All That Apply)    (Check One)
☐ Rehire (30 days or more)    ___ Leave of Absence (L)    ☒ Merit    ___ Voluntary
☐ Recall from layoff    ___ Return from L.O.A.    ___ Promotion    ___ Discharge
    ___ Department Transfer    ___ Adjustment    ___ Workforce Reduction
    ___ Payroll Transfer    ___ Other Pay    ___ Other _____
    ___ Job Change
    _____ Last Day Worked

|  | Present Status (From) | Proposed Status (To) |
|---|---|---|
| Position | Asst WH Mgr | Asst WH Mgr |
| Job Code | 30 | 37 |
| % Thru Range |  |  |
| Pay Class | ☐ Hourly  ☒ Weekly  ☐ Bi-Weekly |  |
| Pay Amount | $750/week | $775/week |
| Type Increase |  |  |
| Grade |  | New Grade |
| Date of Last Increase | 8/31/00 |  |

Special Action or Instructions: _New annual review date_

_(signature)_
Signature of
Originator

_(signature)_
Signature of
Site Manager,
Department Head
or
Vice President

_(signature)_
Signature of
Human Resources
Department

Signature of
Chairman
(if applicable)

EA 00350

*New Hires Only

**Blue-Payroll      Pink-Personnel      Yellow-Insurance      Green-Supervisor**

Form 37 - R Rev. 5/97

# ETHAN ALLEN INC.

ETHAN ALLEN DRIVE • P.O. BOX 1966 • DANBURY, CT 06813-1966

**PLEASE USE BALLPOINT PEN**

## PERSONNEL ACTION NOTICE

RECEIVED

MAY 14 2002

CENTRAL DEPT.

- [ ] Corporate Headquarters
- [x] Retail Division
- [x] Service Center
- [ ] Distribution Center
- [ ] Manufacturing Division

- [x] Exempt    [x] Full Time
- [ ] ~~Exempt~~    [ ] Part Time

Location  Franklin Service Center
Name  Mike Eldridge        Position  Warehouse supervisor
Social Security Number  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   Date of Birth*  _____   Effective Date  5/1/02
Department  OSC        Department Number  8250   Average Hours/Week  40

(Check One)

- [ ] Hire
- [ ] Reinstate (30 days or less)
- [x] Rehire (30 days or more)
- [ ] Recall from layoff

- [ ] Change of Status
  (Check All That Apply)
  ___ Leave of Absence (L)
  ___ Return from L.O.A.
  ___ Department Transfer
  ___ Payroll Transfer
  ___ Job Change

- [x] Salary
  (Check All That Apply)
  [x] Merit
  ___ Promotion
  ___ Adjustment
  ___ Other Pay

- [ ] Terminate
  (Check One)
  ___ Voluntary
  ___ Discharge
  ___ Workforce Reduction
  ___ Other

  _____
  Last Day Worked

| | Present Status (From) | Proposed Status (To) |
|---|---|---|
| Position | Asst Wh mgr | Asst Wh mgr |
| Job Code | 32 | 28 |
| % Thru Range | | |
| Pay Class | [ ] Hourly  [x] Weekly  [ ] Bi-Weekly | |
| Pay Amount | 775/wk | 781.29/wk |
| Type Increase | | |
| Grade | | New Grade |
| Date of Last Increase | 2/15/02 | |

Special Action or Instructions:  Store 80

_____

Signature of Originator

Signature of Site Manager, Department Head or Vice President

Signature of Human Resources Department

Signature of Chairman (if applicable)

**\*New Hires Only**

Blue-Payroll    Pink-Personnel    Yellow-Insurance    Green-Supervisor

Form 57 - R Rev. 5/97

EA 00349

# ETHAN ALLEN INC.

ETHAN ALLEN DRIVE • P.O. BOX 1966 • DANBURY, CT 06813-1966
*PLEASE USE BALLPOINT PEN.*

RECEIVED

## PERSONNEL ACTION NOTICE

JAN 1 0 2003

BEN/INS. DEPT.

- ☐ Corporate Headquarters
- ☒ Retail Division
- ☐ Service Center
- ☐ Distribution Center
- ☐ Manufacturing Division
- ☒ Exempt
- ☐ Non-Exempt
- ☒ Full Time
- ☐ Part Time

Location  Franklin Service Center - Boston
Name  Mike Eldridge  Position  Warehouse Supervisor
Social Security Number  018 48 7122  Date of Birth  6 21 56  Effective Date  Dec 23 2003
Department  O C  Department Number  80C  Average Hours/Week  40 Hrs.

(Check One)

- ☐ Hire
- ☐ Reinstate (30 days or less)
- ☐ Rehire (30 days or more)
- ☐ Recall from layoff

☐ Change of Status
(Check All That Apply)
___ Leave of Absence (L)
___ Return from L.O.A.
___ Department Transfer
___ Payroll Transfer
___ Job Change

☒ Salary
(Check All That Apply)
___ Merit
X Promotion
___ Adjustment
___ Other Pay

☐ Terminate
(Check One)
___ Voluntary
___ Discharge
___ Workforce Reduction
___ Other

Last Day Worked

| | Present Status (From) | Proposed Status (To) |
|---|---|---|
| Position | Warehouse Supervisor | Warehouse Manager |
| Job Code | | |
| % Thru Range | | |
| Pay Class | ☐ Hourly  ☒ Weekly  ☐ Bi-Weekly | |
| Pay Amount | | |
| Type Increase | Warehouse Manager | |
| Grade | $ 41,500.00 | New Grade  $ 45,000.00 |
| Date of Last Increase | | |

Special Action or Instructions:  Mike replaces Dave Rellicant who
resigned  ... $36,000.00

| Signature of Originator | Signature of Site Manager Department Head or Vice President | Signature of Human Resources Department | Signature of Chairman (if applicable) |
|---|---|---|---|

EA 00348

*New Hires Only

**Blue-Payroll**     **Pink-Personnel**     **Yellow-Insurance**     **Green-Supervisor**

Form 37 - R Rev. 5/97

# ETHAN ALLEN INC.

ETHAN ALLEN DRIVE • P.O. BOX 1966 • DANBURY, CT 06813-1966

**PLEASE USE BALLPOINT PEN**

**RECEIVED**

**OCT 2 2 2005**

BENJINS DEPT

## PERSONNEL ACTION NOTICE

☐ Corporate Headquarters
☐ Distribution Center
☐ Retail Division
☐ Manufacturing Division
☒ Service Center
☐ Ethan Allen Marketing Corporation

☒ Exempt ☒ Full Time
☐ Non-Exempt ☐ Part Time

Location: **Franklin MA**
Name: **Michael Eldridge**    Position: **Warehouse Manager**
Social Security Number: **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**   Date of Birth: **6/21/50**   Effective Date: **10/20/13**
Department: **OSC**    Department Number: **800**   Average Hours/Week:

(Check One)
☐ Hire
☐ Reinstate (30 days or less)
☐ Rehire (30 days or more)
☐ Recall from layoff

☒ Change of Status
(Check All That Apply)
___ Leave of Absence
___ Return from L.O.A.
___ Department Transfer
___ Payroll Transfer
___ Job Change
___ Hours

☐ Salary
(Check All That Apply)
___ Merit
___ Promotion
___ Adjustment
___ Other Pay

☒ Terminate
(Check One)
___ Voluntary
✓ Discharge
___ Workforce Reduction
___ Other _____

Last Day Worked

| | Present Status (From) | | | Proposed Status (To) |
|---|---|---|---|---|
| Position | | | | |
| Job Code | | | | |
| % Thru Range | | | | *Terminate* |
| Pay Class | ☐ Hourly | ☐ Weekly | ☐ Bi-Weekly | |
| Pay Amount | | | | |
| Type Increase | | | | |
| Grade | | | | New Grade |
| Date of Last Increase | | | | |

Special Action or Instructions: _____

Signature of Originator

Signature of Site Manager Department Head or Vice President

Signature of Human Resources Department

Signature of Chairman (if applicable)

*New Hires Only

**Blue-Payroll      Pink-Personnel      Yellow-Insurance      Green-Supervisor**

Form 37 - R Rev. 3/99

EA 00347

# Exhibit



G

*Marie,*
*I gave this to Oct. 1st*
*Donna Hamilton on this*
*I also informed her of this*
*date that I wanted*
*FMLA ! Mike Eldridge*

# South County Orthopedics
## & Physical Therapy, Inc.

One High Street
Wakefield, RI 02879
Tel. 401.789.1422
Fax. 401.782.6810

www.scortho.com

Joseph B. Fitzgerald, MD
Robert C. Marchand, MD
David B. Burns, DO
Mark A. Coppes, MD

Rick Moffitt, PA
John Rodger, PA

Date: _Oct 3, 03_

EXHIBIT
HAMILTON
#5
4/27/06 Mmm

Dear _Michael Eldridge_

Welcome to South County Orthopedic & Physical Therapy Surgical Services.

Your surgery has been scheduled for _Oct 23, 03_ at South County Hospital.  South County Hospital surgical department will contact you the night before surgery instructing you on what time to arrive at the hospital.

The following appointments are scheduled for you at our office at One High Street, Wakefield.

- **Pre-operative appointment:** _done_

  **with Dr.** _____

- **Physical Therapy (if needed):** _____

- **Post-operative appointment:** _Oct 28 @ 4:00_

  **with Dr.** _Burns_

All patients should contact their primary medical doctor prior to having surgery to obtain medical clearance.

If you have any questions please do not hesitate to call me directly at (401) 789-1422 ext. 12.

Sincerely,

_Jeanne_

Jeanne S. Chappel
Surgical Scheduler

EA 00330

# Exhibit

# H

EXHIBIT
MILTON
#3
4/5/06  Kmm

Oct 2005

## ETHAN ALLEN INC. - BOSTON DISTRICT - WEEKLY SCHEDUL

| Week Ending:10/4 | SUNDAY 9/28 | MONDAY 9/29 | TUESDAY 9/30 | WEDNESDAY 10/1 | THURSDAY 10/2 |
|---|---|---|---|---|---|
| Denna Hamilton — Franklin | New Natick | New Natick Franklin | New Natick | New Natick | Burlington Franklin |
| Louann Starr — Franklin | New Natick | New Natick | Franklin | Franklin | Franklin |
| Amy Franks — Franklin | OFF | Off Vacation | New Jersey | New Jersey | New Jersey |
| Mike Eldridge — Franklin | Natick 7AM-3PM | Franklin 7AM-3PM | Franklin/Natick 7AM-3PM | Franklin 8AM-4PM | Franklin 8AM-4PM |
| Michael Dupelle — Franklin | New Natick | Franklin New Natick | Franklin 8:30am-5pm | Franklin 8:30am-5pm | Franklin 8:30am-5pm |
| Bill Holmes — Franklin | OFF | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM |
| Donna Wilson-Curry — Natick | Natick 7AM-4PM | Natick 8:30AM-5:30PM | Natick 8:30AM-5:30PM | OFF | OFF |
| Amy Finley — Natick | Natick 11AM-6PM | OFF | OFF | Natick 11:30AM-8:30PM | Natick 11:30AM-8:30PM |
| Ruthie Fowler — Natick | New Natick 7:00AM-2PM | Natick 7:30A-4PM | New Natick 7:30A-4PM | Natick 7:30A-4PM | Natick 7:30A-4PM |
| Cheryl Harvey — Natick | OFF | Natick 8:30AM-5PM | Natick 8:30AM-5PM | Natick 8:30AM-5PM | Natick 8:30AM-5PM |
| Virginia Klinefelter — Natick | OFF | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM |
| Chrissy Boudreau — Natick | OFF | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM |
| Christopher Eramo — Quincy | OFF | OFF | OFF | OFF | Quincy |
| Lisa Greenberg — Quincy | OFF | Quincy 8AM-5PM | Quincy 3AM-8PM | Quincy 8AM-5PM | Quincy 8AM-5PM |
| Tierney McKay — Quincy | OFF | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM |
| Paula Coffey — Quincy | New Natick 9am-5pm | New Natick 9AM-5PM | New Natick 9AM-5PM | Quincy 9AM-5PM | New Natick 9AM-5PM |
| Deb Sullivan — Quincy | OFF | Quincy 9:30AM-5:30PM | Quincy 9:30AM-5:30PM | Quincy 9:30AM-5:30PM | Quincy 9:30AM-5:30PM |
| Kathy Smith — Burlington | OFF | Burlington 9AM-6PM | Burlington 9AM-6PM | Burlington 9AM-6PM | Burlington 9AM-6PM |
| Jenny Marshall — Burlington | Burlington 11:30AM-5PM | OFF | OFF | Burlington 12PM-8:30PM | Burlington 9AM-6PM |
| Suzi Borden — Burlington | OFF | Burlington 8:30A-5PM | Burlington 8:30A-5PM | Burlington 8:30A-5PM | Burlington 8:30A-5PM |
| Michael Englehardt — Burlington | OFF | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM |
| Susan Linker — Portsmouth | OFF | OFF | OFF | Burlington | Quincy |
| Pat Fecteau — Portsmouth | OFF | Portsmouth | Portsmouth | Portsmouth | Portsmouth |
| Bob Marshall — Portsmouth | OFF | New Natick 8AM-5PM | New Natick 8AM-5PM | Portsmouth 8AM-5PM | New Natick 8AM-5PM |
| i McAllister — Portsmouth | OFF | Portsmouth 8:30AM-5PM | Franklin 8:30AM-5PM | Burlington 8:30AM-5PM | Burlington 8:30AM-5PM |

Oct 4 - times

EA 00126

2003

| FRIDAY 10/3 | SATURDAY 10/4 |
|---|---|
| New Natick Franklin | New Natick |
| Franklin | Franlln |
| Franklin | OFF |
| Franklin 7AM-3PM | OFF |
| Franklin 8:30am-5pm | OFF |
| Franklin 8:30A-5PM | OFF |
| Natick 8:30AM-5:30PM | Natick 8:30AM-7:30PM |
| Natick 11:30AM-5:30PM | Natick 11:30AM-730PM |
| Natick 7:30A-4PM | OFF |
| Natick 8:30AM-5PM | OFF |
| Natick 9:30AM-6PM | OFF |
| Natick 9:30AM-6PM | OFF |
| OFF | OFF |
| OFF | OFF |
| Quincy 7:30AM-4PM | OFF |
| New Natick 9AM-5PM | OFF |
| Quincy 9:30AM-5:30PM | OFF |
| OFF | Burlington 9AM-7PM |
| Burlington 9AM-4PM | Burlington 9AM-6PM |
| Burlington 8:30A-5PM | OFF |
| Burlington 7:30AM-4PM | OFF |
| Burlington | Portsmouth |
| OFF | Portsmouth |
| Portsmouth 8AM-5PM | New Natick |
| Portsmouth 8:30AM-5PM | OFF |

EA 00127

# ETHAN ALLEN INC. - BOSTON DISTRICT - WEEKLY SCHEDULE 2003

| Ending:10/11 | SUNDAY10/5 | MONDAY10/6 | TUESDAY10/7 | WEDNESDAY10/8 | THURSDAY10/9 | FRIDAY10/10 | SATURDAY10/11 |
|---|---|---|---|---|---|---|---|
| **Hamilton** Franklin | OFF | New Natick | New Natick | New Natick | Franklin | New Natick | New Natick |
| n Starr Franklin | OFF | Franklin | Old Natick | Old Natick | Old Natick | Franklin | OFF |
| ranks Franklin | OFF | OFF | HUSTON , TX | HUSTON, TX | HUSTON, TX0 | HUSTON, TX | HUSTON, TX |
| Idridge Franklin | OFF | Franklin 7AM-3PM | New Natick 7AM-3PM | New Natick 7AM-3PM | Franklin 7AM-3PM | New Natick 7AM-3PM | OFF natick 8:00-12:00 snow up at 9:20 |
| l Dupelle Franklin | OFF | New Natick 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | New Natick 8:30A-5PM | Franklin 8:30A-5PM | OFF |
| imes Franklin | OFF | Franklin 8:30A-5PM | Franklin 8:30A-5PM | OFF Vacation | Franklin 8:30A-5PM | Franklin 8:30A-5PM | OFF |
| **Wilson-Curry** Natick | OFF | Natick | Natick | Natick | Natick | Natick | Natick |
| **Fowler** Natick | OFF | Natick 7:30A-4PM | Natick 7:30A-4PM | Natick 7:30A-4PM | Natick 7:30A-4PM | Natick 7:30A-4PM | OFF |
| **Harvey** Natick | Natick 12PM-6PM | Natick 8:30AM-5PM | Natick 8:30AM-5PM | Natick 8:30AM-5PM | Natick 8:30AM-5PM | Natick 8:30AM-5PM | OFF |
| a Klinefelter Natick | OFF | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM |
| y Boudreau Natick | OFF | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM | OFF |
| pher Eramo Quincy | OFF | OFF | D.C. Training | Annapolis Training | Annapolis Training | Annapolis Training | Home from D.C. |
| y McKay Quincy | OFF | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | OFF | OFF | OFF |
| h Sullivan Quincy | OFF | Quincy 9AM-5:30P | Quincy 9AM-5:30P | Quincy 9AM-5:30P | Quincy 9AM-5:30P | Quincy 9AM-5:30P | OFF |
| Coffey Quincy | OFF | New Natick 9AM-5:30PM | New Natick 9AM-5:30PM | New Natick 9AM-5:30PM | New Natick 9AM-5:30PM | New Natick 9AM-5:30PM | OFF |
| Sham Burlington | Burlington | Burlington 9AM-6:30PM | Burlington 9AM-6:30PM | Burlington 9AM-6:30PM | Burlington 9AM-6:30PM | Burlington 9AM-6:30PM | Burlington 8:30AM-7PM |
| Marshall Burlington | Burlington 11:30AM-5PM | Burlington 9AM-6PM | OFF | OFF | Burlington 12PM-8:30PM | Burlington 9AM-6PM | Burlington 8:30-5:30PM |
| orden Burlington | OFF | Burlington 8A-4:30PM | Burlington 8A-4:30PM | Burlington 8A-4:30PM | Burlington 8A-4:30PM | Burlington 8A-4:30PM | OFF |
| l Englehardt Burlington | OFF | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | OFF |
| Linker Portsmouth | Portsmouth | Quincy Training | Quincy Training | Portsmouth Training | Franklin on Truck | Franklin Training | OFF |
| teau Portsmouth | OFF | Portsmouth | Portsmouth | Quincy | Portsmouth | Portsmouth | Portsmouth |
| arshall Portsmouth | OFF | Natick | Natick | Natick | Natick | Natick | OFF |
| Allister Portsmouth | OFF | Portsmouth 9AM-5:30PM | Burlington 9AM-5:30PM | Burlington 9AM-5:30PM | Burlington 9AM-5:30PM | Portsmouth 9AM-5:30PM | OFF |

EA 00128

| Ending:10/18 | SUNDAY10/12 | MONDAY10/13 | TUESDAY10/14 | WEDNESDAY10/15 | THURSDAY10/16 | FRIDAY10/17 | SATURDAY10/18 |
|---|---|---|---|---|---|---|---|
| Hamilton / Franklin | New Natick | New Natick | New Natick | New Natick | Franklin | New Natick Portsmouth | OFF |
| n Starr / Franklin | OFF | Franklin - New natick - burlington | Franklin New Natick | New Natick | New Natick | New Natick | OFF |
| ranks / Franklin | Houston | Long Island | Long Island | Natick | Franklin | Franklin | |
| ldridge / Franklin | OFF | Franklin New Natick | Franklin 8AM-4PM | Franklin 8AM-4PM | Franklin 8AM-4PM | Franklin 8AM-4PM | OFF |
| l Dupelle / Franklin | OFF | New Natick | Franklin 8:30A-5PM | New Natick | Franklin 8:30A-5PM | Franklin 8:30A-5PM | OFF |
| icher / Franklin | OFF | Franklin 8:30am-5pm | New Natick | Franklin 8:30am-5pm | Franklin 8:30am-5pm | OFF | OFF |
| Wilson-Curry / Natick | Natick | OFF | Natick | Natick | Natick | Natick | Natick |
| Fowler / Natick | OFF | Natick 7:30A-4PM | Natick 7:30A-4PM | Natick 7:30A-4PM | Natick 7:30A-4PM | Natick 7:30A-4PM | OFF |
| Harvey / Natick | OFF | Natick 8:30AM-5PM | Natick 8:30AM-5PM | Natick 8:30AM-5PM | Natick 8:30AM-5PM | Natick 8:30AM-5PM | OFF |
| a Klinefelter / Natick | OFF | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM | OFF |
| y Boudreau / Natick | OFF | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM | OFF |
| pher Eramo / Quincy | OFF | Quincy | Quincy | Quincy | Quincy | Quincy | OFF |
| y McKay / Quincy | OFF | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | OFF |
| Coffey / Quincy | OFF | Natick 9AM-5:30PM | Natick 9AM-5:30PM | Natick 9AM-5:30PM | Quincy 9AM-5:30PM | Quincy 9AM-5:30PM | OFF |
| sh Sullivan / Quincy | OFF | Quincy 9:30A-5:30P | Quincy 9:30A-5:30P | Quincy 9:30A-5:30P | Quincy 9:30A-5:30P | Quincy 9:30A-5:30P | OFF |
| s / Burlington | Burlington 11:30AM-5PM | Burlington 9AM-6PM | Burlington 9AM-6PM | Burlington 9AM-6PM | Burlington 9AM-6PM | Burlington 9AM-6PM | OFF |
| Marshall / Burlington | OFF | OFF | OFF | OFF | OFF | OFF | OFF |
| orden / Burlington | OFF | Burlington 8AM-6PM | Burlington 8AM-6PM | Burlington 8AM-6PM | Burlington 8AM-6PM | Burlington 8AM-6PM | OFF |
| l Englehardt / Burlington | OFF | New Natick | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | New Natick | New Natick | OFF |
| Linker / Portsmouth | OFF | Portsmouth | Portsmouth | Portsmouth | Burlington | Burlington | OFF |
| cteau / Portsmouth | OFF | Portsmouth | Portsmouth | Portsmouth | Portsmouth | Portsmouth | OFF |
| arshall / Portsmouth | OFF | Portsmouth 8AM-4PM | New Natick | New Natick | Portsmouth 9AM-5PM | Portsmouth 8AM-4PM | OFF |
| cAllister / Portsmouth | OFF | Burlington 9AM-5:30PM | Burlington 9AM-5:30PM | Burlington 9AM-5:30PM | Portsmouth 9AM-5:30PM | Portsmouth 9:30A-5:30P | OFF |

EA 00129

# ETHAN ALLEN INC. BOSTON DISTRICT WEEKLY SCHEDULE 2003

| Ending:9/6 | SUNDAY8/31 | MONDAY9/1 | TUESDAY9/2 | WEDNESDAY9/3 | THURSDAY9/4 | FRIDAY9/5 | SATURDAY9/6 |
|---|---|---|---|---|---|---|---|
| Hamilton Franklin | OFF | OFF Holiday | Franklin | Natick | Franklin Natick | Quincy Burlington | OFF |
| n Starr Franklin | OFF | OFF Holiday | Vacation | Franklin | Franklin | Franklin | OFF |
| ranks Franklin | OFF | OFF Holiday | Long Island | Long Island | Long Island | Long Island | OFF |
| ldridge Franklin | OFF | OFF Holiday | Franklin 8AM-4:30PM | Franklin 8AM-4:30PM | Franklin 6AM-1:30PM | Franklin 8AM-4:30PM | OFF |
| l Dupelle Franklin | OFF | OFF Holiday | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | OFF |
| lmes Franklin | OFF | OFF Holiday | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | OFF |
| Wilson-Curry Natick | Natick 11AM-6PM | OFF | Natick 8:30A-5:30P. | Natick 12PM-8:30PM | Natick 9AM-8:30PM | OFF | Natick 12PM-8PM |
| inley Natick | Natick 12PM-5PM | Natick 10AM-6PM | Natick 12PM-8:30PM | OFF | OFF | Natick 9AM-5:30PM | Natick 10AM-5:30PM |
| Fowler Natick | OFF | OFF Holiday | Natick 7:30A-4PM | Natick 7:30A-4PM | Natick 7:30A-4PM | Natick 7:30A-4PM | OFF |
| Harvey Natick | Natick 12PM-5PM | Natick 8:30AM-5PM | Natick 8:30AM-5PM | Natick 8:30AM-5PM | Natick 8:30AM-5PM | Natick 8:30AM-5PM | OFF |
| a Klinefelter Natick | OFF | OFF Holiday | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Quincy 9:30AM-6PM | Natick 9:30AM-6PM | OFF |
| y Boudreau Natick | OFF | OFF Holiday | Quincy 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM | Natick 9:30AM-6PM | OFF |
| reenberg Quincy | Quincy 11AM-6PM | Quincy 9AM-6:30PM | Quincy 8AM-5PM | Quincy 8AM-5PM | OFF Holiday | OFF | OFF |
| y McKay Quincy | OFF | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | OFF |
| Quincy | OFF | Quincy | Quincy | Quincy | Quincy | Quincy | OFF |
| h Sullivan Quincy | OFF | Quincy | Quincy | Quincy | Quincy | Quincy | OFF |
| Smith Burlington | Burlington 10AM-5PM | Burlington 9:30AM-6PM | OFF | Burlington 9AM-6PM | Burlington 9AM-6PM | OFF | Burlington 8:30AM-7PM |
| Marshall Burlington | Portsmouth | Burlington 9:30AM-6PM | Burlington 9:30AM-6PM | Portsmouth | Burlington 9:30AM-6PM | OFF | OFF |
| orden Burlington | OFF | Burlington 8:30A-5PM | Burlington 8:30A-5PM | Burlington 8:30A-5PM | Burlington 8:30A-5PM | Burlington 8:30-5PM | OFF |
| l Englehardt Burlington | OFF | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | Burlington 7:30AM-4PM | OFF |
| al Manager Portsmouth | Portsmouth | Portsmouth | Portsmouth | Portsmouth | Portsmouth | Portsmouth | Portsmouth |
| cteau Portsmouth | Portsmouth | Portsmouth 8:30A-4:30P | Portsmouth 8:30A-4:30P | Portsmouth 9AM-6:30PM | Portsmouth 9AM-6:30PM | Portsmouth 8:30A-4:30P | Portsmouth |
| arshall Portsmouth | OFF | Portsmouth 8AM-4PM | Portsmouth 9AM-5PM | Portsmouth 9AM-5PM | Portsmouth 9AM-5PM | Portsmouth 8AM-4PM | OFF |
| ods Specialist Portsmouth | OFF | Portsmouth | Portsmouth | Portsmouth | Portsmouth | Portsmouth | OFF |

sept 2 times

# ETHAN ALLEN INC. - RETAIL DIVISION - WEEKLY SCHEDULE 2003

| Ending:7/26 | SUNDAY 7/20 | MONDAY 7/21 | TUESDAY 7/22 | WEDNESDAY 7/23 | THURSDAY 7/24 | FRIDAY 7/25 | SATURDAY 7/26 |
|---|---|---|---|---|---|---|---|
| Hamilton / Franklin | OFF | Franklin | Burlington | Quincy | Natick | Natick Franklin | OFF |
| r Carr / Franklin | OFF | Franklin | Portsmouth | Franklin | Burlington | Burlington | OFF |
| ranks / Franklin | OFF | Franklin | NYC | NYC | Quincy Franklin | VACATION | OFF |
| ldridge / Franklin | OFF | Quincy 10-6 Sat 11-5 | Franklin 8AM-4PM | Franklin 8AM-4PM | Franklin 8AM-4PM | OFF | OFF |
| al Dupelle / Franklin | OFF | Franklin 8:30AM-5PM | Franklin 8:30AM-5PM | Franklin 8:30AM-5PM | Franklin 8:30AM-5PM | Franklin 8:30AM-5PM | OFF |
| lmes / Franklin | OFF | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | Franklin 8:30A-5PM | OFF |
| Wison-Curry / Natick | Natick 11AM-6PM | Natick 9AM-5:30PM | Natick 9AM-5:30PM | Natick 12-8:30pm | Natick 9AM-6PM | OFF | OFF |
| inley / Natick | OFF | OFF | Natick July 4th holiday | Natick 9:30A-6PM | Natick 12-8:30PM | Natick 9:30A-6PM | Natick 9AM-7PM |
| Fowler / Natick | OFF | Natick 7:30AM-4PM | Natick 7:30AM-4PM | Natick 7:30AM-4PM | Natick 9:30-6PM | Natick 7:30AM-4PM | OFF |
| Harvey / Natick | OFF | VACATION | VACATION | VACATION | VACATION | Natick 9:30-6:00 | OFF |
| a Klinefelter / Natick/Quincy | OFF | Natick 9:30A-6PM | Quincy 9:30A-6PM | Natick 9:30A-6PM | Quincy 9:30A-6PM | Natick 9:30A-6PM | OFF |
| e Boudreau / Natick | OFF | Quincy 9:30AM-5PM | Quincy 9:30AM-5PM | Natick 9:30AM-5PM | Natick 9:30AM-5PM | Quincy Natick | OFF |
| eenberg / Quincy | Quincy 11:30AM-5PM | Quincy 8AM-5PM | Quincy 8AM-5PM | Quincy 8AM-5PM | OFF July 4th holiday | OFF | OFF |
| McKay / Quincy | OFF | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | Quincy 7:30AM-4PM | OFF |
| / Quincy | OFF | Quincy | Quincy | Quincy | Quincy | Quincy | OFF |
| Smith / Burlington | OFF | Burlington 9AM-6PM | Burlington 9AM-6PM | OFF | Burlington 9AM-6PM | Burlington 12-8:30PM | Burlington 9AM-6PM |
| Marshall / Burlington | Burlington 11:30A-5PM | Burlington 9AM-6PM | Burlington 9AM-6PM | Burlington 9AM-6PM | OFF | OFF | OFF July 4th holiday |
| rden / Burlington | OFF | Burlington 8AM-5PM | Burlington 8AM-5PM | Burlington 8AM-5PM | Burlington 8AM-5PM | Burlington 8AM-5PM | OFF |
| l Englehardt / Burlington | OFF | Burlington 7:30A-4:30P | Burlington 7:30A-4:30P | Burlington 7:30A-4:30P | Burlington 7:30A-4:30P | Burlington 7:30A-4:30P | OFF |
| Smith / Portsmouth | Portsmouth 12-5PM | Portsmouth 8:30A-6:30P | Portsmouth 8:30A-6:30P | Portsmouth 8:30A-6:30P | OFF | Portsmouth 8:30A-12:30P | Portsmouth 10AM-7PM |
| teau / Portsmouth | OFF | VACATION | VACATION | VACATION | VACATION | VACATION | OFF |
| rshall / Portsmouth | OFF | Portsmouth 8AM-4PM | Portsmouth 9AM-5PM | Portsmouth 9AM-5PM | Portsmouth 9AM-5PM | Portsmouth 8AM-4PM | OFF |
| tkins / Ports./Burl. | OFF | Burlington 9AM-5:30PM | Burlington 9AM-5:30PM | Burlington 9AM-5:30PM | Portsmouth 9AM-5PM | Portsmouth 9AM-5PM | OFF |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

EA 00142

# Exhibit

# I



**ETHAN ALLEN INC**
ETHAN ALLEN DR
DANBURY CT 06810

CHECK NO. 020097
CHECK DATE 10/30/03
PERIOD ENDING 10/25/03
PAY FREQUENCY WEEKLY
PAY PERIOD 10/19/03 10/25/03

MICHAEL F ELDRIDGE
97 WHITFORD STREET
WAKEFIELD RI 02819

ID NUMBER 330002384   FED: MARRIED .03
BASE RATE 865.38   ST1: .02
SSN   ST2:

STATUS EXEMPT  TAX ADJUSTMENTS
FED: S1
D1/OC:
LOCAL:

STATE AND LOCAL CODES
PRI MA LOC1   LOC3
SEC   LOC2   LOC4
LOC5

**IMPORTANT MESSAGE**

## HOURS AND EARNINGS

| DESCRIPTION | CURRENT HOURS/UNITS | EARNINGS | Y-T-D HOURS/UNITS | EARNINGS |
|---|---|---|---|---|
| VACATION | 32.00 | 692.16 | 80.00 | 692.16 |
| REGULAR | | | 1608.00 | 37216.24 |
| PERSONAL | | | 8.00 | .00 |
| SICK | | | 32.00 | .00 |
| HOLIDAY | | | 48.00 | .00 |
| TOTAL H/E | 32.00 | 692.16 | 1776.00 | 37908.40 |

### PRE-TAX ITEMS
| | | | | |
|---|---|---|---|---|
| 401K | | 41.53 | | 1599.14 |
| PDENT | | 15.00 | | 660.00 |
| PMED | | 28.90 | | 1271.60 |
| TOTAL PRE-TAX | | 85.43 | | 3530.74 |
| TOTAL | 32.00 | 606.73 | 1776.00 | 34377.66 |

## TAXES AND DEDUCTIONS

| DESCRIPTION | CURRENT AMOUNT | Y-T-D AMOUNT |
|---|---|---|
| SO SEC TAX | 40.19 | 2240.99 |
| MEDICARE TAX | 9.40 | 524.10 |
| FED INC TAX | 27.40 | 2494.38 |
| PRI STATE TAX | 27.77 | 1522.62 |
| TOTAL TAXES | 104.76 | 6782.09 |

### AFTER-TAX DEDUCTIONS
| | | |
|---|---|---|
| 401K LOAN | 48.20 | 2120.80 |
| LTD | 4.33 | 188.61 |
| ADD LIFE | 3.53 | 154.54 |
| TOTAL PER DED | 56.06 | 2463.95 |

## SPECIAL INFORMATION

TO DATE ADD LIFE    154.54

FAX #
617-727-7037
Attn: Sherry

CERIDIAN

| | GROSS | PRE-TAX | TAXABLE WAGES | LESS TAXES | LESS DED | EQ NET PAY |
|---|---|---|---|---|---|---|
| CURRENT | 692.16 | 85.43 | 606.73 | 104.76 | 56.06 | 445.91 |
| Y-T-D | 38078.58 | 3530.74 | 34545.84 | 6782.09 | 583.15 | 27179.60 |

Statement Of Earnings     Detach at perforation below and keep for your records.     A Payroll Service By Ceridian

0026

# Exhibit

# J

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

MICHAEL F. ELDRIDGE,        )        Civil Action 04 12506 MEL
            Plaintiff   )
                      )
v.                     )
                      )
ETHAN ALLEN, INC.        )
            Defendant  )

## PLAINTIFF MICHAEL F. ELDRIDGE'S RESPONSE TO DEFENDANT ETHAN ALLEN'S FIRST SET OF INTERROGATORIES

Interrogatory 1

Identify each person, excluding Plaintiff's attorney(s), with whom Plaintiff has communicated regarding the allegations in his Complaint, including Plaintiff's allegations regarding damages and a description of the substance of each communication.

**Response 1**

**I have discussed all the facts of my case with my wife Carol Eldridge.**

Interrogatory 2

Identify by name and address each person whom Plaintiff expects to call as a fact witness at the trial of this matter, stating with respect to each such person a summary of the facts to which each such person is expected to testify.

**Response 2**

a.    **Denna Hamilton**
    **Ms. Hamilton is expected to testify about my job performance and the reason(s) she terminated me.**

b.    **Rebecca DesRosiers**
    **Ms. DesRosiers is expected to testify about my application for FMLA leave.**

c.    **Erin Richer Lalonde**
    **Ms. Lalonde is expected to testify about my application for FMLA leave.**

d.    **Daniel Forte**
    **Mr. Forte is expected to testify about the events which occurred on October 20, 2003 during a furniture delivery which resulted in an injury to me.**

**Plaintiff reserves the right to supplement this list in a timely manner.**

Interrogatory 3
Identify by name, address, and field of expertise each person whom Plaintiff expects to call as an expert witness at the trial of this matter, stating with respect to each such person:
a.     the subject matter on which each such expert is expected to testify;
b.     a summary of the facts and/or opinions to which each such expert is expected to testify; and,
c.     a summary of the grounds for each such expert opinion.

**Response 3**

**Plaintiff has not identified an expert.  Plaintiff reserves the right to supplement this response in a timely manner.**

Interrogatory 4
Identify by the corresponding Bates-stamped number on the document, the author of all handwritten documents and handwritten notes on documents produced in response to Defendant's First Set of Requests for Production of Documents to the extent the author of such handwriting is not otherwise identified by name on the face of the document.

**Response 4**

| Bates No. | Author |
|---|---|
| **01** | **Upon information and belief, Syed Razvi M.D.** |
| **04, 05, 21-24, 60** | **Upon information and belief, David B. Burnes D.O., with the exception of the address and telephone number, which is my handwriting.** |
| **55-57** | **I do not know** |
| **02,03, 26, 27, 37-42, 73,76 80, 81, 85, 86** | **Me** |

Interrogatory 5
Please state whether, from the period of January 1, 2000 to the present, Plaintiff has been treated by any psychologist, psychiatrist, social worker, counselor or any other mental health professional for any condition. If Plaintiffs answer is in the affirmative, please state:
a.     the name and address of each such treating professional;
b.     the reason or purpose for seeking treatment;
c.     the dates of treatment and/or counseling;

d.    any known diagnosis;

e.    any medications that were prescribed and the dates of usage;

f.    Plaintiff's prognosis, if any; and,

g.    any plan for continuing treatment.

## Response 5
**Plaintiff objects to this interrogatory request on the grounds that it is not reasonably calculated to lead to the discovery of admissible evidence as it seeks information which is not relevant to any of the claims or defenses in this matter.**

Interrogatory 6

To the extent not already provided, identify each person from whom Plaintiff has received any medical, psychiatric or psychological treatment or therapy from January 1, 2000 to the present.

## Response 6
**Plaintiff objects to this interrogatory request on the grounds that it is overly broad and seeks information which is not relevant to any of the claims or defenses in this matter.  Without waiving and subject to this objection, plaintiff responds as follows:**

**During 2003 I received medical treatment from:**

> **Dr. David B. Burns**
> **South County Orthopedics and Physical Therapy, Inc.**
> **One High Street, Wakefield, RI 02879**

> **Dr. Syed Razvi**
> **Milford Med-Care**
> **160 South Main Street, Milford, MA 01757**

Interrogatory 7

State the nature and amount of all monetary damages Plaintiff is seeking to recover in this action, including but not limited to any alleged damages for lost wages, emotional distress, any other compensatory damages, punitive damages and attorneys' fees, including in your answer the basis for each such calculation.

## Response 7

| | |
|---|---|
| **Lost wages and benefits 10/21/03 - present** | **$  70,000.00** |
| **Uninsured medical bills 2003** | **$  19,496.44** |
| **Emotional Distress Damages** | **$  75,000.00** |
| **Liquidated Damages (FMLA violation) and** | |
| **Attorneys Fees (Chapter 151B violation)** | **$110,000.00** |

Interrogatory 8

Identify each and every person with whom Plaintiff has been employed since October 20, 2003, including self employment, and state the period during which he is or was employed by each such person; the position or positions he held with each such person; whether the position was full-time or part-time; the dates during which he held each such position; and, if applicable, state the date upon which his employment with each such person ended and the reasons for that occurrence.

**Response 8**

a.  **General Transportation Services**
    **Manager and Trainer**
    **May 2004 to October 2004**
    **laid-off**

b.  **Home Delivery Repairs**
    **April 2005 to July 2005, self-employed**
    **company went out of business**

c.  **Advanced Delivery Services**
    **Regional Manager**
    **July 2005 to December 2005**
    **resigned for better opportunity**

d.  **New England Delivery Service**
    **Vice President**
    **January 2006 through present**

Interrogatory 9

Identify each and every person with whom Plaintiff has made any formal or informal application or inquiry for employment since January 1, 2003, indicating the name of the entity contacted, the position sought, and the date of each application or inquiry.

**Response 9**

**During 2004 and 2005, I regularly checked local newspapers and websites and made numerous calls for prospective jobs. I received approximately eight interviews for jobs I was not offered or which I declined.**

Interrogatory 10

State Plaintiff's total earnings from any employment or employment-related activity, including self employment, during the period of October 20, 2003 to the present and the source or sources of such earnings. If more than one source, please specify the amount for each source and the dates such income was received.

## Response 10

In 2004 and 2005, I earned approximately $32,000.00 each year from my employment.

## Interrogatory 11
Please state Plaintiff's total earnings from any worker's compensation, unemployment, disability, and/or public assistance benefits during the period of October 20, 2003 to the present, and the source or sources of such earnings. If more than one source, please specify the amount for each source and the dates such earnings were received.

## Response 11

**Massachusetts Division of Unemployment Assistance**
**October 21, 2003 to May 2004**
**$11,908.00**

**Rhode Island Unemployment**
**October 2004 to April 2005**
**Approximately $11,000.00**

Signed under the pains and penalties of perjury this   day of February, 2005.

Michael F. Eldridge

As to all objections

Edward S. Englander (BBO # 154540)
Denise A. Chicoine (BBO # 564152)
ENGLANDER & CHICOINE P.C.
Two Newton Place, Suite 200
Newton, MA 02458-1633
Tel. (617) 964-5400

# Exhibit



# K

**Ethan Allen**
### CORRECTIVE ACTION FORM

**I.**  Associate Name: _MiKE EldRidge_  Date of Incident: _7-21 2003_
  Store/Dept: _WH_  Date of Conversation: _____
  Position: _WH manager_

**II.**  **Action**
  ☐ Documented Conversation  ☒ Warning  ☐ Separation
  ☐ Final Warning or Probation  ☐ Suspension

  EXHIBIT
  HAMILTON
  #14
  4/27/06  KMM

**III.**  **Identify Problem Performance or Unacceptable Behavior***

**Problem Performance**
☐ Unsatisfactory sales performance
☐ Unsatisfactory customer service
☐ Unsatisfactory job performance
☐ Other (describe below):
  X Not flowing company's policies

**Unacceptable Behaviors**
☒ Absenteeism or tardiness
☐ Excessive socializing, personal phone calls or personal long distance phone calls
☐ Abuse of discount privileges
☐ Falsification of application document, company records, or time cards

**Unacceptable Behaviors (Continued)**
☐ Harassment
☐ Insubordination
☐ Intentional or grossly negligent damage to company property
☐ Leaving company premises without authorization
☐ Non-compliance with dress code (including name badge)
☐ Possessing or reporting to work under the influence of alcohol or drugs
☐ Removing merchandise without proper paperwork
☐ Soliciting on Company premises
☐ Violation of Loss Prevention Policies
☐ Other (describe below):

* This list is not all inclusive of behaviors/situations leading to corrective action, up to and including separation.

**IV.**  **Brief description of current incident.**

On July 21 mike was schydle At Quincy
He was one hour 15 min late for work.

**Brief description of previous conversations/actions taken regarding this issue.** Include dates.

on the month of June m.ke was late
on 3 Days, this Behavior for a manager
sets a Bad Exsample for his team. You
need to be on time or fourth corrective Action w
hart to take place

**Brief description of consequences should the problem continue** (warning statement and follow-up date, or probationary guideline and time frame).

**V.**  Attachments (if required): ☐ Action Plan  ☐ Additional Explanation  ☐ No Attachments

**VI.**  Associate's Comments: _____

**VII.**  Associate's Signature: _____  Date: _7/27/03_
  Manager's Signature: _____  Date: _____
  DM Signature: _____  Date: _7/21/2003_

Original - HR (Corporate)    Copy - Associate    Copy - Confidential Store File

EA 00201

*DOC #2*

**CORRECTIVE ACTION FORM**

**I.**   Associate Name: _MiKE Eldridge_   Date of Incident: _10/2/2003_ *page#1*
Store/Dept: _Franklin_   Date of Conversation: _____
Position: _Warhause Manager_

**II.**   **Action**

☐ Documented Conversation     ☐ Warning     ☐ Separation
☒ Final Warning or Probation   ☐ Suspension

EXHIBIT
HAMILTON
#12
PERIOD 800-631-6989
4/27/06  KMM

**III.**   **Identify Problem Performance or Unacceptable Behavior***

**Problem Performance**
☐ Unsatisfactory sales performance
☐ Unsatisfactory customer service
☐ Unsatisfactory job performance
☐ Other (describe below):
   X Not flowing company's policies

**Unacceptable Behaviors**
☒ Absenteeism or tardiness
☐ Excessive socializing, personal phone calls or personal long distance phone calls
☐ Abuse of discount privileges
☐ Falsification of application document, company records, or time cards

**Unacceptable Behaviors (Continued)**
☐ Harassment
☐ Insubordination
☐ Intentional or grossly negligent damage to company property
☐ Leaving company premises without authorization
☐ Non-compliance with dress code (including name badge)
☐ Possessing or reporting to work under the influence of alcohol or drugs
☐ Removing merchandise without proper paperwork
☐ Soliciting on Company premises
☐ Violation of Loss Prevention Policies
☐ Other (describe below):

\* This list is not all inclusive of behaviors/situations leading to corrective action, up to and including separation.

**IV.**   **Brief description of current incident.**
_Mike was on warning 7-21-2003, the tardiness has been more frequent. 8/29/2003 over sleep late 90 min's, 9-1-2003 late 60 min, oversleep, 9/19 going to meet a co-worker one hour late, 10/2 2 hour late_

**Brief description of previous conversations/actions taken regarding this issue. Include dates.**
_10/2 45 late to work._
_July 21st_

**Brief description of consequences should the problem continue** (warning statement and follow-up date, or probationary guideline and time frame).

**V.**   Attachments (if required):   ☐ Action Plan   ☐ Additional Explanation   ☐ No Attachments

**VI.**   Associate's Comments: _____

**VII.**   Associate's Signature: _[signature]_   Date: _10/8/03_ (Nedical)
Manager's Signature: _[signature]_   Date: _____ reason
DM Signature: _____   Date: _____

Original - HR (Corporate)     Copy - Associate     Copy - Confidential Store File

EA 00195

Doc#2
page#?

# ETHAN ALLEN
## PERSONAL PERFORMANCE ACTION PLAN

The goal of this Action Plan is to assist you with improving your performance to a satisfactory performance level.
- The Action Plan describes the gap(s) in your performance and the specific action needed improve your performance.
- During the time frame indicated below, you will meet regularly with your supervisor to discuss progress.
- Once your performance is at the level of Meets Expectations, you will be removed from this action plan with the understanding that improved performance must be ongoing.
- Should your performance not improve to an acceptable level , it will result in further corrective action up to and including separation.

## ASSOCIATE INFORMATION

**Associate Name:** Mike Eldridge                    **Associate #:**

**Store Name/R#:**                                    **Position:**

## ACTION PLAN DATES

**Start Date:**                **End Date:**

## PERFORMANCE ACTION PLAN INFORMATION

**Performance Gap(s)** *(list specifics)*

need to Be on time for work .

**Specific Example(s)**

Mike is a manager He needs to Be on time. He
has no Credlablity as a leader, Because he doesn't set
the exsample.

**Action Steps**

Plan your Schudle
Plan to Be at work Early
leave 15min Early every day.

Rew. 10/02/03

EA 00196

**Tools Available**

**Meeting Dates**

Associate Signature: _____    Date:_____

Supervisor Signature: _____    Date:_____

District Manager Signature: _____    Date:_____

*\* Attach this Action Plan to the Corrective Action form and provide one complete copy to the Associate. Send signed original to Human Resources.*

**Ethan Allen**
**CORRECTIVE ACTION FORM**

I. Associate Name: M.K.E. Eldridge    Date of Incident: 9-23-2003
   Store/Dept: Franklin    Date of Conversation: WH manager
   Position: Manager

II. **Action**

☐ Documented Conversation    ☐ Warning    ☐ Separation
☒ Final Warning or Probation    ☐ Suspension

EXHIBIT
HAMILTON
#13
1/27/06 KMM

III. **Identify Problem Performance or Unacceptable Behavior***

**Problem Performance**
☐ Unsatisfactory sales performance
☐ Unsatisfactory customer service
☐ Unsatisfactory job performance
☐ Other (describe below):
   X Not flowing company's policies

**Unacceptable Behaviors**
☐ Absenteeism or tardiness
☐ Excessive socializing, personal phone calls or personal long distance phone calls
☐ Abuse of discount privileges
☐ Falsification of application document, company records, or time cards

**Unacceptable Behaviors (Continued)**
☐ Harassment
☐ Insubordination
☐ Intentional or grossly negligent damage to company property
☐ Leaving company premises without authorization
☐ Non-compliance with dress code (including name badge)
☐ Possessing or reporting to work under the influence of alcohol or drugs
☐ Removing merchandise without proper paperwork
☐ Soliciting on Company premises
☐ Violation of Loss Prevention Policies
☐ Other (describe below):

* This list is not all inclusive of behaviors/situations leading to corrective action, up to and including separation.

IV. **Brief description of current incident.**

Tran Trucks paper work on 9-23-2003 was not Done Right Item were missing from paper work. Item on the truck Didn't Have paper work to match.

**Brief description of previous conversations/actions taken regarding this issue. Include dates.**

# Have talk to mike on 8-27, 9-3, 9-10 2003 about making sure when he signs of on the tran truck paper work its wright.

**Brief description of consequences should the problem continue** (warning statement and follow-up date, or probationary guideline and time frame).

_____
_____
_____
_____

V. Attachments (if required): ☐ Action Plan   ☐ Additional Explanation   ☐ No Attachments

VI. Associate's Comments: _____

VII. Associate's Signature: _____    Date: _____
    Manager's Signature: _____    Date: 10/8/03
    DM Signature: _____    Date: _____

Original - HR (Corporate)        Copy - Associate        Copy - Confidential Store File

EA 00198

# Exhibit



# L



"Mike Eldridge"
<mike12493@myexcel.
com>

To: "Denna Hamilton" <dhamilton@ethanalleninc.com>
cc:
Subject: Fw: Why Mike Eldridge in Franklin?

11/11/2003 10:27 PM
Please respond to "Mike
Eldridge"

EXHIBIT NO. 35

Margie Simmons

----- Original Message -----
**From:** Mike Eldridge
**To:** Khruso Elley
**Cc:** Mike Eldridge
**Sent:** Monday, November 10, 2003 5:48 PM
**Subject:** Why Mike Eldridge in Franklin?

Khruso,

I'm writing you today because I always respect you and your position at Ethan Allen. I am very disappointed that you or Charlie never returned any of my phone calls. After 4 years of faithful service to Franklin-Ethan Allen I am abruptly terminated on trumped up charges and I get the cold shoulder from my you? I am amazed that you wouldn't or didn't want to hear my side of the story. We both know that Denna Hamilton is carving the heart out of the Boston District. How many more good people are going to suffer before you step in? Everyone in the Boston District are working in fear and for good reason. If you cross Denna or Louann Starr you are gone. Those two will make your life impossible and subvert any and all efforts to do well. Let me give you some examples...:.

When I was attempting to keep safety a everyday priority, Louann, with Denna's blessings, would not let me upkeep and repair the Toyota pickers that we spend $23,000 each. The Toyota's need upkeep, wheel's get broken, the computer systems need upkeep and maintenance. On a daily basis, our good men were and are working with equipment that needs maintenance that has not been repaired. Louann Starr sent a letter to Toyota that all transactions must be authorized by her or Denna. Guess how many have been authorized? NONE I did hear that Toyota was called AFTER I was terminated, but only because Denna feared a call from OSHA. I did not fear OSHA, in my opinion the fear of OSHA coming at any moment made me a better safety officer. After all, a OSHA certified warehouse is a safe and clean warehouse.
I asked for and was offered $100.00 from Denna to "repair" the racks.....As I mentioned when you were last out in Franklin, our racks are old and need major repairs. Many frames are bent from pickers hitting them (bad wheels · cause the machines to waddle down the aisles) whacking racking arms. I would estimate that we have at least 6 bent arms in Franklin. If an arm is bent and a warehouse worker steps on them, he will fall threw and hurt himself. The electrical batteries, where we charge the pickers at night, are all out of whack, still on the skids when they came to Franklin and are definite a safety issue.
Franklin currently has new employee's driving and using the Toyota pickers, they are not qualified to use them and if they hurt or get hurt using them, a major lawsuit could follow.
When I was clearing out the "old product", shipping them to our Old Natick store for clearance, I estimate there was and still is over $50,000. of Ethan Allen products in Franklin but NOT IN THE SYSTEM. When I started to do some research I was told by Louann to forget about it. What kind of comptroller says that? We ended up sending some of the pieces to Old Natick and sold then as parts, at a tremendous discount.( but they weren't in the books and it looked like a straight profit!!) I did sent over 20 ( 10 tables and 10 sofa's) for parts. The rest are still in Franklin, we were researching them and planning on selling them in a warehouse sale next spring.
As for me getting terminated, Khurso, I loved being a warehouse manager for Ethan Allen. When Dave P. left Franklin, we had NO PROBLEMS, getting the product into or out of Franklin. I never wanted to be anything but a Ethan Allen warehouse manager. I have been "set up" for failure by Denna and Louann. I never caused any problems but solved many. I have contacted the federal labor board and sent Gina a copy of my FMLA medical form (filled out and signed by my doctor) I have every intention of fighting for my job and back pay. My question to you is,". How many more good people are going to gone by the time I come back?

EA 00278

I loved working for you, you were a great boss.

Respectfully yours,

Mike Eldridge
401-792-8284

EA 00279

# Exhibit

# M

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

MICHAEL F. ELDRIDGE,           )         Civil Action 04 12506 MEL
                 Plaintiff    )
v.                       )
                       )
ETHAN ALLEN, INC.          )
               Defendant   )

### AFFIDAVIT OF DENISE A. CHICOINE, ESQ.

I, Denise A. Chicoine, depose and state as follows:

1.     I am an attorney in good standing in the Commonwealth who represents the Plaintiff in the above-captioned matter.

2.     Attached as Exhibit B and Exhibit C are true and accurate copies of deposition transcripts in this matter.

3.     Attached as Exhibits D through I, Exhibit K, and Exhibit L are true and accurate copies of exhibits from depositions or documents previously produced in discovery.

Signed and sworn to under the pains and penalties of perjury this twenty-ninth day of September 2006.

Denise A. Chicoine