UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

MICHAEL F. ELDRIDGE,                    )
                                        )
            Plaintiff,                  )
                                        )
v.                                      )
                                        )
ETHAN ALLEN, INC.                       )    CIVIL ACTION
                                        )    NO. 04-12506-MEL
            Defendant.                  )
                                        )

## DEFENDANT'S UNOPPOSED MOTION FOR LEAVE TO FILE REPLY BRIEF

Pursuant to LR 7.1(B)(3), Defendant, Ethan Allen, Inc. (now known as "Ethan Allen Retail, Inc.") ("Ethan Allen"),[1] hereby moves for leave to file a reply brief to Plaintiff's Opposition to Defendant's Motion for Summary Judgment. Ethan Allen's proposed reply brief is attached hereto as Exhibit A. In support of this Motion, Ethan Allen states that a reply brief is necessary to address and clarify several issues raised in Plaintiff's Opposition, which will be of assistance to the Court in ruling on Defendant's Motion for Summary Judgment. Plaintiff's counsel does not oppose this Motion.

WHEREFORE, Ethan Allen respectfully requests that it be allowed to file the attached Memorandum in Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment.

---

[1] As of July 1, 2005, Ethan Allen, Inc.'s name changed to Ethan Allen Retail, Inc.

Respectfully submitted,

ETHAN ALLEN INC.

/s/: Heather C. Krauss
Barry A. Guryan, BBO # 214920
bguryan@foley.com
Heather C. Krauss, BBO # 644457
hkrauss@foley.com
FOLEY & LARDNER LLP
111 Huntington Avenue
26th Floor
Boston, MA 02199
Tel: (617) 342-4000
Fax: (617) 342-4001

Dated: October 24, 2006

## CERTIFICATE OF SERVICE

I, Heather C. Krauss, hereby certify that on October 24, 2006, a true copy of the foregoing document was served electronically upon counsel for Plaintiff:

Denise A. Chicoine, Esq.
Englander & Chicoine, P.C.
Two Newton Place
Suite 200
Newton, MA 02458-1634

/s/: Heather C. Krauss
Heather C. Krauss

## LOCAL RULE 7.1 CERTIFICATION

Pursuant to LR 7.1, I hereby certify that counsel for Defendant and counsel for Plaintiff conferred by telephone on October 24, 2006 in good faith, and that counsel for Plaintiff does not oppose Defendant's Motion for Leave to File Reply Brief.

Dated: October 24, 2006

/s/: Heather C. Krauss
Heather C. Krauss

**Exhibit A**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| MICHAEL F. ELDRIDGE, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ETHAN ALLEN, INC. | ) | CIVIL ACTION |
| | ) | NO. 04-12506-MEL |
| Defendant. | ) | |

## DEFENDANT'S MEMORANDUM IN REPLY
## TO PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

Defendant, Ethan Allen, Inc. (now known as "Ethan Allen Retail, Inc.") ("Ethan Allen"),[1]

hereby submits the following Memorandum in Reply to Plaintiff's Opposition to Defendant's

Motion for Summary Judgment ("Opposition" or "Opp.").

I.    Plaintiff Cannot Establish that his Knee Injury Constituted a Handicap or Perceived
      Handicap within the Meaning of Mass. Gen. Laws ch. 151B.

As an initial matter, Plaintiff's Opposition fails to raise issues sufficient to preclude

dismissal of his claim for violation of Mass. Gen. Laws ch. 151B ("Chapter 151B") because he

has not demonstrated that he had a handicap or a perceived handicap. Plaintiff asserts in his

Opposition that his "knee injury substantially limited his major life activities of standing,

walking, climbing stairs and lifting." (Opp. at 11.) To support this assertion, Plaintiff rests

entirely on selected portions of his deposition where he describes the physical effects of his knee

injury.[2] Because Plaintiff has not submitted any evidence beyond his own conclusory testimony,

---

[1] As of July 1, 2005, Ethan Allen, Inc.'s name changed to Ethan Allen Retail, Inc.

[2] The pages cited from Plaintiff's deposition transcript reveal that he merely testified that the activities that were difficult or impossible for him to perform while he was feeling the effects of his knee injury were standing and walking for great lengths of time, which he defined to be half an hour to an hour, and climbing. (Def.'s Statement of

such as medical evidence documenting any restrictions or substantial limitations on major life activities that he may have had as a result of his condition, he fails to establish that he was substantially limited in one or more major life activities.  See, e.g., Calef v. The Gillette Co., 322 F.2d 75 (1st Cir. 2003) (merely pointing to a medical diagnosis is not enough to establish a substantial limitation on major life activities); Zades v. Lowe's Home Centers, Inc., 03-30269-MAP, 2006 WL 2563456, at *12 (D.Mass. 2006) (plaintiff's conclusory statement that she was disabled and her description of diagnosis and its physical effects in her deposition was insufficient to establish that she was disabled); Poh v. Massachusetts Correction Officers Federated Union, 03-11987-RWZ, 2006 WL 1877089, at *2 (D.Mass. 2006) (plaintiff did not prove disability, in part, because plaintiff provided no evidence of a substantial limitation on major life activities beyond his own affidavit); Machin-Rodrigeuz v. C & C Partnership Coca Cola Puerto Rico, 03-1746 SEC, 2005 WL 2293574, at *3-4 (D. Puerto Rico 2005) (medical evidence stating diagnosis and treatment, without any specific information as to how said diagnosis substantially affects major life activities, and plaintiff's affidavit were not enough to shoulder summary judgment burden of proving disability).[3]

Furthermore, Plaintiff fails to effectively counter Ethan Allen's argument that an isolated, temporary medical condition such as his torn knee meniscus is not a handicap within the meaning of Chapter 151B.  See Cormier v. Littlefield, 112 F.Supp.2d 196, 198-99 (D.Mass.

Undisputed Facts ("SUF"), filed with Def.'s Motion for Summary Judgment, at ¶ 53.)  As for Plaintiff's contention that he was substantially impaired in the major life activity of lifting, this allegation is belied by his testimony that he was able to help deliver a very heavy dresser weighing 200 pounds on his last day of work at Ethan Allen.  (Def.'s SUF at ¶¶ 53, 57.)
[3] Chapter 151B defines "handicap" in a manner "essentially identical" to the federal definition of disability under the Americans with Disabilities Act.  See Dahill v. Police Dep't of Boston, 434 Mass. 233, 237 (2001).  Consequently, courts typically conduct a single analysis for federal and state discrimination claims and regularly find that a plaintiff who cannot prove a substantial limitation of a major life activity is neither disabled within the meaning of the ADA nor handicapped under Chapter 151B.  See Poh, 2006 WL 1877089, at *3.

2

2000); Hallgren v. Integrated Financial Corp., 42 Mass. App. Ct. 686, 688 (1997). Indeed, he has ignored the numerous cases cited by Ethan Allen in its memorandum supporting its Motion for Summary Judgment in which plaintiffs with the same injury as Plaintiff sustained, and/or who had corrective arthroscopic surgery as he did, were held to not be disabled. See, e.g., Hartwell v. Lifetime Doors, Inc., No. Civ. A. 05-2115, 2006 WL 381685 (E.D.Pa., Feb. 16, 2006) (shoulder injury requiring arthroscopic surgery and physical therapy held not to be a disability because it was not permanent or of long-term duration); Hawrych v. Custom Plastics, Inc., No. 98 C 4848, 2000 WL 33121063 (N.D.Ill., June 5, 2000) (employee who suffered a knee injury, underwent arthroscopic surgery, was medically restricted from performing certain types of work at his job for several months, but who was cleared to work without restrictions fourteen months after initial injury had only a temporary injury rather than a disability); Murray v. Sysco Corp., NO. CIVA96CV1073RSP/DHN, 1998 WL 160826 (N.D.N.Y., Apr. 2, 1998) (torn meniscus, requiring outpatient arthroscopic surgery, had only a transitory effect and was not a disability within meaning of ADA); Kelleher v. Solopak Pharm., Inc., No. 96 C 7743, 1997 WL 610779 (N.D.Ill., Sept. 26, 1997) (knee injury resulting in arthroscopic surgery not a disability); Blanton v. Winston Printing Co., 868 F.Supp. 804 (M.D.N.C., Mar. 22, 1994) (knee injury, a torn medial meniscus, held to be a temporary impairment rather than a disability).

Moreover, the lone case Plaintiff cites to in support of his contention that the temporary nature of his injury does not preclude him from being handicapped within the meaning of Chapter 151B is completely distinguishable from the instant facts. In that case, Keeling v. Wilfert Brothers Realty Co., 22 MDLR 201, 2000 WL 33665360 (2000), the complainant, a maintenance worker, tore a ligament in his knee while he was working. See id. at *3. The injury required "extensive physical therapy," and the complainant "walked with a crutch, a brace and

3

cane while his injury healed." Id. Because his was a work-related injury, the complainant applied for and received worker's compensation benefits for over three months, and he was on leave from work throughout that time. See id. The complainant introduced medical records regarding his injury at the Massachusetts Commission Against Discrimination ("MCAD") hearing, including a statement from a doctor indicating that he was disabled from his full work duties. See id. Upon his return to work, his doctor placed restrictions on him, prohibiting him from lifting more than thirty pounds and from bending and picking weeds. See 2006 WL 33665360, at * 4. Under these facts, the MCAD concluded that the complainant was handicapped because (1) his physical impairment substantially limited him in one or more of his major life activities; (2) he had a record of such impairment; and, (3) he had sustained a work-related injury and was considered "handicapped" under Chapter 151B pursuant to Mass. Gen. Laws ch. 152, § 75B. See id. Most significantly for purposes of its potential application to this case, the employer in Keeling did not argue that the complainant was not handicapped; therefore, the MCAD never addressed the temporary injury issue presented by Ethan Allen.

Here, by way of contrast, Plaintiff sustained a non-work related knee injury. Consequently, he did not receive worker's compensation benefits and is not considered handicapped by virtue of Mass. Gen. Laws ch. 172, § 75B. Plaintiff did not undergo any physical therapy for his knees before or after his surgery, let alone "extensive" physical therapy, and he never missed work because of his knee injury. (Def.'s SUF at ¶¶ 52, 53.) Plaintiff has submitted no medical records indicating that he was disabled from his full duties as Warehouse Manager, either. Thus, the Keeling case is not only factually inapposite, but also it does not even address Ethan Allen's argument that an isolated, temporary injury such as a torn meniscus requiring arthroscopic surgery is not a handicap within the meaning of Chapter 151B.

4

Finally, Plaintiff's assertion that the critical inquiry is whether he was handicapped at only one point in time, (see Opp. at 11), lacks common sense. By Plaintiff's reasoning, someone who is terminated with a simple broken arm would be "handicapped" under Chapter 151B because, at the time of the termination, a broken arm could substantially limit, *inter alia*, one's ability to lift. Neither the MCAD's guidelines nor case law suggest that such isolated, temporary medical problems are handicaps or were intended to constitute handicaps, however. See Cormier, 112 F.Supp.2d at 198-99; Hallgren, 42 Mass. App. Ct. at 688; MCAD *Guidelines: Employment Discrimination on the Basis of Handicap* II.A.6 (1998).

Plaintiff's contention that Ethan Allen perceived or regarded him to be handicapped because of his knee injury misses the mark as well. A plaintiff "cannot merely show that his employer perceived him as *somehow* disabled; rather, he must prove that the employer regarded him as disabled *within the meaning of the ADA* [or Chapter 151B]." Bailey v. Georgia-Pacific Corp., 306 F.3d 1162, 1169 (1st Cir. 2002) (emphasis in original). Thus, the evidence that Plaintiff's supervisor, Denna Hamilton, was aware of his knee injury and that he had requested time off for surgery is insufficient to establish that she perceived him to be substantially limited in a major life activity. Hamilton's purported denial of his request for time off and her alleged repeated requests that he postpone his surgery suggest, if anything, that she did *not* believe him to have a substantial limitation in any major life activities. See Zades, 2006 WL 2563456, at *13.

In short, the evidence on which Plaintiff relies is insufficient to establish that he was actually handicapped or that he was perceived by Ethan Allen to have a handicap. Consequently, his Chapter 151B claim merits dismissal in its entirety.

II.    Plaintiff Fails to Establish Evidence Sufficient to Establish that Ethan Allen's Reason for
Terminating Him was a Pretext for a Retaliatory Motive.

Plaintiff has also failed to adduce evidence sufficient to establish that Ethan Allen's articulated reason for his termination – his chronic tardiness – was a pretext for a retaliatory motive in violation of the Family and Medical Leave Act ("FMLA") or Chapter 151B.

As an initial matter, Plaintiff states or omits facts in a misleading manner throughout his Opposition in an effort to avoid the inescapable conclusion that Ethan Allen's concerns with his tardiness predated his alleged requests for time off because of his knee injury.  Ethan Allen submits that this is because "[w]here, as here, adverse employment actions or other problems with an employee predate any knowledge that the employee has engaged in protected activity, it is *not permissible* to draw the inference that subsequent adverse actions, taken after the employer acquires such knowledge, are motivated by retaliation."  Mole v. University of Massachusetts, 442 Mass. 582, 594 (2004) (emphasis added).  See also Hodgens v. General Dynamics Corp., 144 F.3d 151, 170-71 (1st Cir. 1998) (circumstantial fact of temporal proximity between protected activity and adverse employment action weakened considerably by history of plaintiff's poor work performance).  For example, Plaintiff claims that the warning he received on July 21, 2003 was unwarranted because he was not scheduled to work that day.  (Opp. at 8.) However, the schedule cited in support of this statement indicates that he was, indeed, scheduled to work at Ethan Allen's Quincy location on July 21, 2003, but that he did not arrive until over an hour after his scheduled starting time.  (Def.'s SUF at Exhibit J.)  The schedule notation, therefore, corroborates the written warning given to him and Hamilton's testimony that he was tardy that day and that she received a call from the Quincy location inquiring as to Plaintiff's whereabouts because he was late.  Furthermore, Plaintiff conceded at his deposition that it is possible that he was late on the dates listed in the warning.  (Def.'s SUF at ¶ 19.)  Thus,

6

Plaintiff's current contention that he was not scheduled to work on July 21, 2003 is completely unfounded and contrary to the evidence.

By way of another example, Plaintiff suggests that the final written warning given to him on October 8, 2003 for tardiness was motivated by an unlawful animus because Hamilton gave him a rating of "3," or "meets requirements" in the "Dependability" category on his annual performance appraisal. (Opp. at 6.) However, Plaintiff completely omits any reference to Hamilton's testimony explaining that *when she completed the evaluation back in July 2003*, she gave Plaintiff the benefit of the doubt by giving him a rating of "meets requirements" in the "Dependability" category. (Def.'s SUF at ¶ 18.) Plaintiff also conveniently neglects to mention that Ms. Hamilton wrote in the notes section for this category that Plaintiff needed "to be on time for work to set the example for your team." (Id.) He also fails to disclose that Hamilton gave him only forty-six of one hundred points on his performance evaluation, which is equivalent to the second-lowest rating of "Needs Improvement." (Id.) When Ms. Hamilton met with Plaintiff to review his appraisal on October 8, 2003, she explained that although she had given him a rating of "meets requirements" in the "Dependability" category, she had completed the appraisal back in July. (Id. at ¶ 21.) She informed him that his performance had become considerably worse since then. (Id.) A full review of the undisputed facts compels the conclusion that Hamilton had been concerned about Plaintiff's tardiness well before he ever allegedly asked for time off due to his knee injury.

As for Plaintiff's contention that he was treated differently than similarly situated employees, his evidence is, again, based on selective or speculative evidence. Plaintiff asserts that Hamilton had daily discussions only with Plaintiff to check on start times, that she did not check daily the start times of any other direct reports, and that she testified that no one other than

Plaintiff was ever late. (Opp. at 7.) Hamilton's actual deposition testimony was that she kept notes on other direct reports with performance issues, and that she randomly checked the start times of her direct reports the same way that she checked on Plaintiff. (Def.'s SUF at Exhibit E at 95-96; Hamilton Dep. at 99-100, attached hereto as Exhibit A.) She also testified that, to her knowledge, none of the other managers reporting to her had the same problems with consistent tardiness as Plaintiff did. (Def.'s SUF at ¶ 36.) Even if Rebecca DesRosiers, a former administrative support employee, personally observed "numerous other managers who reported directly to Ms. Hamilton regularly arrive[] late for work," Hamilton was only at the Franklin Service Center from one and one-half days to three days per week in 2003 (Def.'s SUF at ¶ 7), and there is no indication that DesRosiers ever shared her observations with Hamilton. The only times that Hamilton documented Plaintiff's tardiness incidents were when she personally observed him arriving late, or when he admitted to being late during conversations with her. (Def.'s SUF at ¶ 16.) Furthermore, the Affidavit submitted by DesRosiers is completely lacking any detail to support her conclusory allegation that Hamilton treated Plaintiff "less favorably than her other direct reports" and should be disregarded. Finally, Plaintiff wrote in post-termination e-mails to Ethan Allen's upper management that "*everyone* in the Boston District are [sic] working in fear and for good reason," that "*most employees* in the Boston District are working in fear," that Hamilton would "make your life impossible and subvert any and all efforts to do well," that others were next on "Denna's hit list," and questioned *how many more "good people"* were going to be terminated by Hamilton. See Exhibit B. It is clear that Plaintiff himself did not believe that he was being singled out for disparate treatment by Hamilton. There is no admissible evidence of selective discipline.

The assertion that Ms. Hamilton "manufactured the 'final warning' documents as an excuse to terminate his employment" is another speculative theory that is not borne out by the evidence. In support of this statement, Plaintiff cites only to DesRosier's Affidavit, which states that Hamilton "appeared to be looking for an excuse to terminate his employment." It is significant that DesRosiers left Ethan Allen on September 20, 2003, weeks before the date that Plaintiff received two final written warnings and a month before he was terminated. Thus, she clearly has no personal knowledge as to events that occurred in connection with his final warnings or his termination and is speculating as to Hamilton's motives, just as Plaintiff has been throughout this case.

III.    Plaintiff Cannot Avoid Summary Judgment of His Claim for Denial or Interference with His FMLA Rights.

Plaintiff does not dispute (nor can he) that when an employee needs FMLA leave for planned medical treatment, the employee must make a reasonable effort, in consultation with the employer, to schedule the treatment so as not to unduly disrupt the employer's operations. See 29 U.S.C. § 2612(e)(2); 29 C.F.R. § 825.302(e). Plaintiff accuses Ethan Allen of disregarding "the statutory mandate that scheduling must always be subject to the approval of the health care provider," (Opp. at 5), yet he never submitted any medical documentation to Ethan Allen indicating that surgery was required immediately or that his doctors did not approve of his October 23, 2003 surgery date. He has no evidence to support that such surgery was needed "as soon as possible" other than his deposition testimony, and there is no evidence indicating that his doctors had set an earlier surgery date which was ignored or changed at Ethan Allen's insistence. Therefore, even crediting Plaintiff's version of events that Hamilton asked him to schedule his surgery after the opening of the new Natick store, this is precisely the type of situation permitted by the regulations. Plaintiff appropriately discussed the timing of his non-emergency surgery

9

and anticipated leave with Hamilton, and she approved his request for time off for this reason just a few weeks later. Indeed, such conduct has been held to not constitute unlawful interference under the FMLA. See, e.g., Krueger v. Speedway Superamerica, LLC, No. Civ. 03-6568 (DSD/JSM), 2005 WL 1475368 (D.Minn., June 22, 2005) (no unlawful interference under the FMLA where plaintiff delayed her surgery by three months because her manager told her at the time of the initial request that it was a bad time for her to take leave and that the store needed a manager).

In addition, Plaintiff's argument that Ethan Allen manipulated the essential functions of his job when Hamilton allegedly stated that he was "too valuable" to the new Natick store opening to take leave FMLA leave until after it opened is utterly lacking in merit. (Opp. at 5.) Plaintiff readily admitted at his deposition that he could understand Hamilton's alleged position. (Def.'s SUF at ¶ 42.) When asked at his deposition to elaborate why he understood, Plaintiff testified that the Warehouse was then shipping out between $300,000 and $500,000 of products, and "No one knew it better than [him] in the building." (Id.) Furthermore, Plaintiff's regular job description includes responsibilities such as managing the "receiving, storing and loading of furniture and accessories by warehouse workers in accordance with company procedures" and coordinating the "transfer of inventory of supplies to the store," (Id. at Exhibit D), which were involved with the Natick store's opening. His FMLA claim should be dismissed.

IV.   Plaintiff Fails to Adduce Sufficient Evidence to Overcome Dismissal of His Claim for Violation of the Massachusetts Workers' Compensation Act, Mass. Gen. Laws ch. 152, §§ 75A, 75B.

Plaintiff has not produced sufficient evidence to avoid dismissal of his Worker's Compensation Act ("WCA") claim, either. He has no admissible evidence to refute Hamilton's testimony that the termination decision was made before she saw him on October 20, 2003, when he purportedly disclosed that he had hurt his back making a delivery that morning.

10

Consequently, even if such a disclosure were protected activity within the meaning of the WCA, which Ethan Allen denies, there was no causal connection between his disclosure and his termination. Moreover, his current assertion that his November 10, 2003 e-mail to Khusro Elley constituted a re-application for employment pursuant to Mass. Gen. Laws ch. 152, § 75A is absurd. His response to Ethan Allen's interrogatory asking him to identify the persons with whom he had made any formal or informal applications or inquiries for employment does not identify Elley or Ethan Allen, (see Exhibit C at 4), and the e-mail to Elley plainly reflects the ruminations of an angry former employee rather than an application for a particular job. See Exhibit B. In short, his WCA claim merits dismissal.

<h2 style="text-align:center">CONCLUSION</h2>

For these reasons, as well as those set forth in the initial Memorandum of Law in Support of Defendant's Motion for Summary Judgment and other supporting papers, Ethan Allen's Motion for Summary Judgment should be granted in its entirety.

Respectfully submitted,

ETHAN ALLEN INC.

/s/: Heather C. Krauss
Barry A. Guryan, BBO # 214920
bguryan@foley.com
Heather C. Krauss, BBO # 644457
hkrauss@foley.com
FOLEY & LARDNER LLP
111 Huntington Avenue
26th Floor
Boston, MA 02199
Tel: (617) 342-4000

Dated: October 24, 2006          Fax: (617) 342-4001

11

## CERTIFICATE OF SERVICE

I, Heather C. Krauss, hereby certify that on October 24, 2006, a true copy of the foregoing document was served electronically upon counsel for Plaintiff:

Denise A. Chicoine, Esq.
Englander & Chicoine, P.C.
Two Newton Place
Suite 200
Newton, MA  02458-1634

/s/: Heather C. Krauss
Heather C. Krauss

# Exhibit A

1

VOLUME:  I
PAGES:  1 through 213
EXHIBITS:  See Index

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
MICHAEL F. ELDRIDGE,            )
                Plaintiff,      )
                                )  Civil Action
        VS.                     )  No. 04-12506-MEL
                                )
ETHAN ALLEN, INC.,              )
                Defendant.      )
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**DEPOSITION OF DENNA A. HAMILTON,**
a witness called on behalf of the Plaintiff, taken
pursuant to the provisions of the Federal Rules
of Civil Procedure, before Kathleen M. McHugh, a
Registered Professional/Certified Shorthand
Reporter (#120093) and Notary Public in and for
the Commonwealth of Massachusetts, at the offices
of Englander & Chicoine, P.C., Two Newton Place,
Newton, Massachusetts, on Thursday, April 27,
2006, commencing at 10:06 a.m.

COPLEY COURT REPORTING
101 Tremont Street
Boston, Massachusetts 02108
(617) 423-5841

99

1    Starr, Amy Franks, Mike Eldridge, Michael Dupelle,
2    Bill Holmes, Donna Wilson-Curry, Christopher
3    Eramo, Lisa Greenberg, Kathy Smith, Jenny
4    Marshall, Susan Linker, Pat Fecteau, Cheryl Smith
5    and the last person you identified as Costello?
6         A.   Yes.
7         Q.   So that appears to be 13 direct
8    reports.
9              MS. KRAUSS:  Objection.  Did she say
10   Bill Holmes?  Did you say Bill Holmes?
11             THE WITNESS:  No.
12             MS. KRAUSS:  Okay.
13        Q.   So I come up with 13; is that
14   accurate?
15        A.   Direct reports at one time or within
16   the year?
17        Q.   Within this time frame that we're
18   looking at, April, 2003 to October, 2003?
19        A.   That reported in to me?
20        Q.   Yes.
21        A.   Thirteen.
22        Q.   And you checked on the start times of
23   all 13 of your direct reports every day during
24   April to October, 2003?

100

1       A.      Not every day.

2           Q.      How frequently did you verify the start

3   times of all your direct reports in the period

4   April to October, 2003?

5       A.      Verify meaning -- can you explain

6   verifying?

7           Q.      To determine if they were at the

8   location they were supposed to be as their

9   schedule stated?

10      A.      It was random.  I'd call on the

11  weekends.  I would call during the week, and, you

12  know, I'd -- I put out to all my managers, you

13  know, I gave them ten-minute lead time.  If they

14  were going to be later than ten minutes, they just

15  needed to let me know.

16          So I would call randomly to check on

17  it.  I don't know how frequently I would do it.

18  It wouldn't be an everyday practice, but it would

19  be on a consistent basis.

20          Q.      So on a consistent basis for all 13 of

21  your direct reports you would verify that they

22  were starting within ten minutes of when the

23  schedule stated?

24      A.      Yes.  They would sign in, the managers

# Exhibit B



3/27/06
EXHIBIT NO. 30
Margie Simmons

Charlie Farfaglia                    To: Denna Hamilton/Eacorp@Eacorp
11/07/2003 11:13 AM                  cc:
                                     Subject: letter from M Eldridge

Mr. Kathwari,

                 I am writing to you because I have no other direction to turn.
      I was wrongfully terminated from my position of Franklin Warehouse Manager on Oct. 20,2003 by my
District Manager Denna Hamilton. The reasons for termination were tardiness on Oct.4th and Oct.11th, at
the New Natick store location. Denna told me that I was 10 minutes late on Oct. 4th when I arrived at the
Natick store at 8:10 am. I contend that I was not late for work at Ethan Allen because I reported to my
home base, Franklin Distribution at 7am, to meet with my co-worker Danny Forte . I then proceeded to
Natick, In my own vehicle and arrived at 8:10 because I hit unsuspecting traffic on the Mass. Pike from a
accident back up. The following week I was told by Denna Hamilton that I was again late one hour when I
arrived in the New Natick Store at 10am. Once again, I contend that I was not late for I had to arrive at
Franklin Distribution to pick up the company van full of cartons that Denna had requested the day before
after 4pm. I had received a call from Denna  saying that she was looking for and needed a half dozen
samples that had been accidentally sent to Franklin from the New Natick Store days earlier. Denna also
requested a very important carton ( EA kids products) that the New Natick store needed. I, along with
Michael Dupelle (Franklin Customer Service Manager) stayed until 6pm, Friday Oct. 10th, looking for
these products. Michael and I found everything except the EA kids carton. The next morning, fearing the
wrath of Denna for "not knowing my warehouse" I again did a double check looking for the EA kids carton.
The same warehouse weeks earlier, in your visit to Franklin,  Denna had complimented me on having the
place looking good for your visit. When I couldn't find the carton, I was scared of getting chewed out by
Denna and I dreaded the drive to Natick. Another problem I had was the fact that I had my little boy
Marcus Furey Eldridge with me. With Denna's demand that I bring over the 6 cartons on a Saturday
morning, at such a late hour on Friday afternoon, left me with no options for a baby-sitter. One of the traits
that I love about you is the support you have for your workers and their families. I must say that Denna
needs alot of work in that area.....I also called and left a message on Denna's cell phone at 8am when I
realized that I had to feed, dress, and prepare my son for the 85 mile ride (one way)  Denna was making
me perform for these important cartons.
When I arrived in Natick at 10am prompt, I was greeted my Virginia Klingfelter (Natick Softgoods
Specialist) and her deep appreciation that I had driven all the way to Natick from my home, on my regular
day off, to bring her some EXTRA samples she MIGHT of NEEDED. When I told Virginia that I couldn't
locate the EA Kids carton, Virginia told me herself and Denna had found it Friday afternoon, already set
up. I was upset that I had never received a phone call with this information for I had wasted valuable time
looking for the EA Kids carton. I ask you, "What kind of DM would do that to her two managers?" I helped
Virginia unload the cartons and loaded a few things that were being sent back to Franklin. I then went and
found Denna to see if there was anything else she wanted me to do. I was greeted with the evil stare and
with a threatening voice, Denna snapped at me,"YOUR LATE!" I told her I was late  because I had to give
the warehouse another look for the EA Kids carton and she just walked away, degrading me in front of my
little boy. I felt humiliated and embarrassed to tell my son that she was my boss and that everything was
going to be alright.
On Monday morning, I showed up for work and resumed my normal warehouse duties. A few days earlier
I had been asked by Michael Dupelle if I could help solve a problem customer in Medfield,Mass. I asked
Michael what the problem was and he said he had a customer that had three delivery problems in the past
few months and was still waiting for her furniture.. With my knowledge of home delivery service would I be
willing to deliver the piece with a warehouse worker? I have had 20 years experience in the home delivery
business and I said okay, anything to get a EA customer satisfied. I proceeded to Medfield with a
co-worker Danny Forte and proceeded to make the delivery with a very,very angry and suspect customer.
It took me the 10 minutes to calm her down and convince her that we could solve her problem once and
for all. Danny and I proceeded to get the piece up and around the difficult stairway, into her bedroom.
While I was attempting to carry the piece up and around a corner, I hurt my back. I must say my pride and
determination to get the piece in without incident hid my pain. I did not want to get our valued EA customer
any more concern than she already had...I kept the pain to myself. I did switch ends with Danny so the
customer couldn't see me grimacing with pain. I have both the customer and Danny Forte as witnesses to

this action.

When I returned to Franklin, my back was really sore. I was preparing the warehouse for my absence, for I had knee surgery planned for Oct. 23rd . I had injured myself playing basketball in June trying to get back into shape. Denna knew I had two bad knees and that I was going to have surgery to correct the problems. I had visited the medical doctor Franklin's Ethan Allen always uses for our medical needs, Dr. Ravzi. At first Dr. Razvi thought I had strained my knees and he gave me some pain medication and told me to rest. I never missed any work! After awhile, I returned to Dr. Razvi to complain that the pain was the same. Dr. Ravzi then send me to have MRI's performed on each knee. It was thru these MRI's that Dr. Ravzi learned that I had torn the MCL on my left knee and possibly on my right knee. Ethan Allen -Boston was in the mist of relocating the old Natick to the New Natick store. I asked for time off but was told by Denna ," You are too valuable in the transition to take a leave of absence, I was cleaning out the old product for clearance, over $400,000.worth..... and that I could take time off after the store move was complete". In being a dedicated employee, I accepted and continued to work in extreme pain, fighting the pain with prescribed medication from Dr. Ravzi and from my specialist, Dr. Burns. I worked Sunday, Sept. 28th thru Saturday, Oct.4th and Denna Hamilton writes me up for being 10 minutes late?

When Denna finally arrived in Franklin on the afternoon of the 20th. I mentioned to her that I had strained my back making the delivery in the morning. Denna walked right past me, little did I know at the time that she had already made up her mind to terminate me. I thought it odd that she didn't ask how it happened, or even if I was alright. I thought Denna was still mad at me for Saturday's embarrassing scenes, (that she caused). I always informed Denna of any physical problems that I had, as is Ethan Allen policy. As a matter of a fact, a short time earlier I thought I had a possible hernia. I knocked on Denna's door and informed her that I was hurting and would keep an eye on the pain (possible hernia) Denna looked up and starting laughing, saying in a laughing tone that "Everyone is telling me their injuries" I must of given her a puzzled look because she blurted out ," Jackson Rivers has a twisted vein on his penis and has taken some time off" Needless to say I was quite shocked and felt very uncomfortable with that personal information. I often wonder how many other employees know about Jackson Rivers penis problem.. I immediately walked out of her office back to mine....wondering what kind of professional manager would tell a sub-manager something as personal as that..... If you want to check this out, Jackson Rivers was working at the Natick store, not in Franklin where he had started months earlier. I would never of been privy to personal medical information like that. Mr. Kathwari, I sincerely doubt that you would EVER carry yourself as Denna Hamilton freely does. I always thought that private medical information was, .......private. Needless to say, I was called into Denna's office around 3:30pm and Louann Starr was sitting in Denna's office. Denna asked me to take a seat. I was surprised that no other managers were present. I sincerely thought, with the New Natick store soft opening on Oct. 18th that Denna was going to congratulate me for a job well done. Instead Denna brings up the Oct. 4th and 11th time issues. I was shocked and scared, what was happening? Denna started to attack me with accusations about tardiness and I explained that she knew I was on prescribed medication and that I was not up to 101% performance. Denna attacked me about my relationship with Louann and Michael Dupelle, attacked me psychologically, saying that the employee's under my management hated me and complained to her daily. As a matter of fact, I get along very well with the men under my management and I had a open door policy. All of a sudden Denna said "termi......" and I got up, angry and very upset at the events that were happening right in front of my eyes, I walked out of Denna's office and proceeded to slip and hit Michelle's partition as I was walking to my desk. My right knee had given out. Upset and angry that Denna had tried to terminate me 2 days before I was to go out on the FMLA and with my knee sore, I walked back toward Denna's office and told her I had just slipped and banged my knee and turned around and went to clean out my office. Denna comes into my office and tells me,"It's nothing personal" . What kind of manager comes into a terminated individual's office and says something like that? A few minutes later the Franklin Police showed up and ask me for the company keys to the building. I told the officer that they were out in my truck and the officer made me go out and get them immediately. After I handed the keys to the police officer I was told not to go back into the building by Denna and that my personal belongings would be shipped to my home address. I was escorted to my vehicle by the police.

I drove myself to Milford Med Care to get my back check out by Dr. Ravzi. When I arrived in Milford, I told the staff what had happened in Medfield,Mass. that morning and got a note from Dr. Ravzi to take the rest of the week off for rest. I have never been back to Franklin.

How can a manager, never arrested in his life, be treated like a common criminal? I must say I was very ashamed at the behavior of the Ethan Allen representatives representing you that day as managers.

The very next day, I get a call from Travelers and was "interrogated aggressively by a Travelers investigated ( I do believe that the conversation was taped). It was reported by Louann Starr that I was going to file a workers Comp claim on my knee. Who in their right mind would file a workers claim for a knee that they had scheduled in 72 hours for surgery? A surgery that they had been planing for 6-8 weeks? Needless to say, Travelers denied my claim, my actual claim was never sent to Travelers and I gave Travelers the names of the witness to my accident that happened at 10:30 in the MORNING! I must tell you that my two witnesses are very scared for their jobs if they say anything. Most employee's in the Boston District are working in fear, we never had this problem with Lisa Brown.

Mr. Kathwari, I loved working for Ethan Allen from the first day I was officially hired Aug. 5th,1999 to present. I do not like the way my name and reputation have been slandered. I do not like the way my rights were denied by Ethan Allen in regards to FMLA or my rights to a truthful hearing on my injured back via Workers Comp. Myself and my family are in dire straits right now and Ethan Allen's Denna Hamilton and Louann Starr have put me in this position. I had my surgery on my left knee on Oct. 23rd and I can not work. I tried called Khruso and Charlie Farfaglia but neither one of them ever returned my call. The Boston District is ripe for disaster, the gossip queen herself is always opening her mouth, I hear, 3 weeks out of Franklin that Donna Wilson-Curry, along with Cheryl Harvey are on their way out....they are next on Denna's hit list. My position is going to be offered to Brett Condon ( a good man) and Rebecca Deroisers is coming back to Franklin...How do I know all this, from Denna Hamilton's big mouth. I plan on fighting for my rights. How many good people have had their Ethan Allen careers destroyed by Denna Hamilton?

I know I have made some pretty tough comments but I've learned from my mentor Denna Hamilton to take the "emotion" out of managing.



"Mike Eldridge"
&lt;mike12493@myexcel.
com&gt;

To: "Denna Hamilton" &lt;dhamilton@ethanalleninc.com&gt;
cc:
Subject: Fw: Why Mike Eldridge in Franklin?

11/11/2003 10:27 PM
Please respond to "Mike
Eldridge"

EXHIBIT NO. 35
Margie Simmons

----- Original Message -----
From: Mike Eldridge
To: Khruso Elley
Cc: Mike Eldridge
Sent: Monday, November 10, 2003 5:48 PM
Subject: Why Mike Eldridge in Franklin?


Khruso,

I'm writing you today because I always respect you and your position at Ethan Allen. I am very disappointed that you or Charlie never returned any of my phone calls. After 4 years of faithful service to Franklin-Ethan Allen I am abruptly terminated on trumped up charges and I get the cold shoulder from my you? I am amazed that you wouldn't or didn't want to hear my side of the story. We both know that Denna Hamilton is carving the heart out of the Boston District. How many more good people are going to suffer before you step in? Everyone in the Boston District are working in fear and for good reason. If you cross Denna or Louann Starr you are gone. Those two will make your life impossible and subvert any and all efforts to do well .Let me give you some examples...

When I was attempting to keep safety a everyday priority, Louann, with Denna's blessings, would not let me upkeep and repair the Toyota pickers that we spend $23,000 each. The Toyota's need upkeep, wheel's get broken, the computer systems need upkeep and maintenance. On a daily basis, our good men were and are working with equipment that needs maintenance that has not been repaired. Louann Starr sent a letter to Toyota that all transactions must be authorized by her or Denna. Guess how many have been authorized? NONE I did hear that Toyota was called AFTER I was terminated, but only because Denna feared a call from OSHA. I did not fear OSHA, in my opinion the fear of OSHA coming at any moment made me a better safety officer. After all, a OSHA certified warehouse is a safe and clean warehouse.

I asked for and was offered $100.00 from Denna to "repair" the racks.....As I mentioned when you were last out in Franklin, our racks are old and need major repairs. Many frames are bent from pickers hitting them (bad wheels cause the machines to waddle down the aisles) whacking racking arms, I would estimate that we have at least 6 bent arms in Franklin. If an arm is bent and a warehouse worker steps on them, he will fall threw and hurt himself. The electrical batteries, where we charge the pickers at night, are all out of whack, still on the skids when they came to Franklin and are definite a safety issue.

Franklin currently has new employee's driving and using the Toyota pickers, they are not qualified to use them and if they hurt or get hurt using them, a major lawsuit could follow.

When I was clearing out the "old product", shipping them to our Old Natick store for clearance, I estimate there was and still is over $50,000. of Ethan Allen products in Franklin but NOT IN THE SYSTEM. When I started to do some research I was told by Louann to forget about it. What kind of comptroller says that? We ended up sending some of the pieces to Old Natick and sold then as parts, at a tremendous discount.( but they weren't in the books and it looked like a straight profit!!) I did sent over 20 ( 10 tables and 10 sofa's) for parts. The rest are still in Franklin, we were researching them and planning on selling them in a warehouse sale next spring.

As for me getting terminated, Khurso, I loved being a warehouse manager for Ethan Allen. When Dave P. left Franklin, we had NO PROBLEMS, getting the product into or out of Franklin. I never wanted to be anything but a Ethan Allen warehouse manager, I have been "set up" for failure by Denna and Louann. I never caused any problems but solved many. I have contacted the federal labor board and sent Gina a copy of my FMLA medical form (filled out and signed by my doctor) I have every intention of fighting for my job and back pay. My question to you is,".
How many more good people are going to gone by the time I come back?

I loved working for you, you were a great boss.

Respectfully yours,

Mike Eldridge
401-792-8284

EA 00279

**Exhibit C**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

MICHAEL F. ELDRIDGE,           )          Civil Action 04 12506 MEL
                     Plaintiff  )
v.                             )
                               )
ETHAN ALLEN, INC.              )
                     Defendant  )

## PLAINTIFF MICHAEL F. ELDRIDGE'S RESPONSE TO DEFENDANT ETHAN ALLEN'S FIRST SET OF INTERROGATORIES

Interrogatory 1
Identify each person, excluding Plaintiff's attorney(s), with whom Plaintiff has communicated regarding the allegations in his Complaint, including Plaintiff's allegations regarding damages and a description of the substance of each communication.

**Response 1**

**I have discussed all the facts of my case with my wife Carol Eldridge.**

Interrogatory 2
Identify by name and address each person whom Plaintiff expects to call as a fact witness at the trial of this matter, stating with respect to each such person a summary of the facts to which each such person is expected to testify.

**Response 2**
a.      **Denna Hamilton**
        **Ms. Hamilton is expected to testify about my job performance and the reason(s) she terminated me.**

b.      **Rebecca DesRosiers**
        **Ms. DesRosiers is expected to testify about my application for FMLA leave.**

c.      **Erin Richer Lalonde**
        **Ms. Lalonde is expected to testify about my application for FMLA leave.**

d.      **Daniel Forte**
        **Mr. Forte is expected to testify about the events which occurred on October 20, 2003 during a furniture delivery which resulted in an injury to me.**

Page 1 of 5

Plaintiff reserves the right to supplement this list in a timely manner.

Interrogatory 3
Identify by name, address, and field of expertise each person whom Plaintiff expects to call as an expert witness at the trial of this matter, stating with respect to each such person:
a.    the subject matter on which each such expert is expected to testify;
b.    a summary of the facts and/or opinions to which each such expert is expected to testify; and,
c.    a summary of the grounds for each such expert opinion.

Response 3

**Plaintiff has not identified an expert. Plaintiff reserves the right to supplement this response in a timely manner.**

Interrogatory 4
Identify by the corresponding Bates-stamped number on the document, the author of all handwritten documents and handwritten notes on documents produced in response to Defendant's First Set of Requests for Production of Documents to the extent the author of such handwriting is not otherwise identified by name on the face of the document.

Response 4

| Bates No. | Author |
|---|---|
| 01 | **Upon information and belief, Syed Razvi M.D.** |
| 04, 05, 21-24, 60 | **Upon information and belief, David B. Burnes D.O., with the exception of the address and telephone number, which is my handwriting.** |
| 55-57 | **I do not know** |
| 02,03, 26, 27, 37-42, 73,76 80, 81, 85, 86 | **Me** |

Interrogatory 5
Please state whether, from the period of January 1, 2000 to the present, Plaintiff has been treated by any psychologist, psychiatrist, social worker, counselor or any other mental health professional for any condition. If Plaintiffs answer is in the affirmative, please state:
a.    the name and address of each such treating professional;
b.    the reason or purpose for seeking treatment;
c.    the dates of treatment and/or counseling;

d.    any known diagnosis;
e.    any medications that were prescribed and the dates of usage;
f.    Plaintiff's prognosis, if any; and.
g.    any plan for continuing treatment.

## Response 5
**Plaintiff objects to this interrogatory request on the grounds that it is not reasonably calculated to lead to the discovery of admissible evidence as it seeks information which is not relevant to any of the claims or defenses in this matter.**

### Interrogatory 6
To the extent not already provided, identify each person from whom Plaintiff has received any medical, psychiatric or psychological treatment or therapy from January 1, 2000 to the present.

## Response 6
**Plaintiff objects to this interrogatory request on the grounds that it is overly broad and seeks information which is not relevant to any of the claims or defenses in this matter. Without waiving and subject to this objection, plaintiff responds as follows:**

**During 2003 I received medical treatment from:**
**Dr. David B. Burns**
**South County Orthopedics and Physical Therapy, Inc.**
**One High Street, Wakefield, RI 02879**

**Dr. Syed Razvi**
**Milford Med-Care**
**160 South Main Street, Milford, MA 01757**

### Interrogatory 7
State the nature and amount of all monetary damages Plaintiff is seeking to recover in this action, including but not limited to any alleged damages for lost wages, emotional distress, any other compensatory damages, punitive damages and attorneys' fees, including in your answer the basis for each such calculation.

## Response 7
| | |
|---|---|
| Lost wages and benefits 10/21/03 – present | $ 70,000.00 |
| Uninsured medical bills 2003 | $ 19,496.44 |
| Emotional Distress Damages | $ 75,000.00 |
| Liquidated Damages (FMLA violation) and Attorneys Fees (Chapter 151B violation) | $110,000.00 |

Page 3 of 5

Interrogatory 8

Identify each and every person with whom Plaintiff has been employed since October 20, 2003, including self employment, and state the period during which he is or was employed by each such person; the position or positions he held with each such person; whether the position was full-time or part-time; the dates during which he held each such position; and, if applicable, state the date upon which his employment with each such person ended and the reasons for that occurrence.

Response 8

a.    **General Transportation Services**
       **Manager and Trainer**
       **May 2004 to October 2004**
       **laid-off**

b.    **Home Delivery Repairs**
       **April 2005 to July 2005, self-employed**
       **company went out of business**

c.    **Advanced Delivery Services**
       **Regional Manager**
       **July 2005 to December 2005**
       **resigned for better opportunity**

d.    **New England Delivery Service**
       **Vice President**
       **January 2006 through present**

Interrogatory 9

Identify each and every person with whom Plaintiff has made any formal or informal application or inquiry for employment since January 1, 2003, indicating the name of the entity contacted, the position sought, and the date of each application or inquiry.

Response 9

**During 2004 and 2005, I regularly checked local newspapers and websites and made numerous calls for prospective jobs. I received approximately eight interviews for jobs I was not offered or which I declined.**

Interrogatory 10

State Plaintiff's total earnings from any employment or employment-related activity, including self employment, during the period of October 20, 2003 to the present and the source or sources of such earnings. If more than one source, please specify the amount for each source and the dates such income was received.

## Response 10

**In 2004 and 2005, I earned approximately $32,000.00 each year from my employment.**

### Interrogatory 11

Please state Plaintiff's total earnings from any worker's compensation, unemployment, disability, and/or public assistance benefits during the period of October 20, 2003 to the present, and the source or sources of such earnings. If more than one source, please specify the amount for each source and the dates such earnings were received.

### Response 11

**Massachusetts Division of Unemployment Assistance**
**October 21, 2003 to May 2004**
**$11,908.00**

**Rhode Island Unemployment**
**October 2004 to April 2005**
**Approximately $11,000.00**

Signed under the pains and penalties of perjury this     day of February, 2006.

/s/

Michael F. Eldridge

As to all objections

Edward S. Englander (BBO # 154540)
Denise A. Chicoine (BBO # 564152)
ENGLANDER & CHICOINE P.C.
Two Newton Place, Suite 200
Newton, MA 02458-1633
Tel. (617) 964-5400

## Response 10

In 2004 and 2005, I earned approximately $32,000.00 each year from my employment.

## Interrogatory 11

Please state Plaintiff's total earnings from any worker's compensation, unemployment, disability, and/or public assistance benefits during the period of October 20, 2003 to the present, and the source or sources of such earnings. If more than one source, please specify the amount for each source and the dates such earnings were received.

## Response 11

Massachusetts Division of Unemployment Assistance
October 21, 2003 to May 2004
$11,908.00

Rhode Island Unemployment
October 2004 to April 2005
Approximately $11,000.00

Signed under the pains and penalties of perjury this   day of February, 2005.

_____
Michael F. Eldridge

As to all objections

_____
Edward S. Englander (BBO # 154540)
Denise A. Chicoine (BBO # 564152)
ENGLANDER & CHICOINE P.C.
Two Newton Place, Suite 200
Newton, MA 02458-1633
Tel. (617) 964-5400

Page 5 of 5